# EXHIBIT 21

1        IN THE UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF NEW YORK

2

FRANKLIN BUONO,               )

3                         )
     Plaintiff,        )

4                         )
v.                   ) CIVIL ACTION NO.

5                      ) 7:17-CV-05915-PMH-LMS
POSEIDON AIR SYSTEMS, VICTORY )

6 AUTO STORE, INC., VICTORY AUTO )
STORES, INC. d/b/a POSEIDON   )

7 AIR SYSTEMS, WORTHINGTON     )
INDUSTRIES, INC. AND TYCO    )

8 PRODUCTS LP,            )
                       )

9     Defendants.       )

10 _____

11 TYCO FIRE PRODUCTS LP,     )
                       )

12     Third-Party Plaintiff,  )
                       )

13 v.                   )
                       )

14 OPRANDY'S FIRE & SAFETY INC.  )
                       )

15     Third-Party Defendant.  )

16

17       Remote Videoconference Deposition of
           ERIC J. BOELHOUWER, PH.D.

18

             July 21, 2020

19           11:02 a.m.

20     1360 Peachtree Street, NE, Suite 1150
           Atlanta, Georgia

21

      By Marcia Arberman, RPR, CCR B-1059

22

23

24

25

Page 2

1             E X A M I N A T I O N

2                                              Page

3   Examination by Mr. Kirkpatrick              4

4                 E X H I B I T S

5   Exhibit     Description                     Page

6   Exhibit 1   Curriculum vitae and testimony  7
                list

7

    Exhibit 2   Boelhouwer report               24

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1   APPEARANCES OF COUNSEL:
 2        On behalf of the Plaintiff (via
          videoconference):
 3
               KENNETH B. FROMSON, ESQ.
 4             Finkelstein & Partners, LLP
               1279 Route 300
 5             Newburgh, NY  12550
               (845) 562-0203
 6             kfromson@lawampm.com
 7        On behalf of the Defendant/Third Party Plaintiff,
          Tyco Fire Products, LP (via
 8        videoconference):
 9             JAMES KIRKPATRICK, ESQ.
               DANIEL WHITELEY, ESQ.
10             Williams & Connolly, LLP
               725 12th Street, NW
11             Washington, D.C. 20005
               (202) 434-5000
12             jkirkpatrick@wc.com
               dwhiteley@wc.com
13
14        On behalf of the Third-Party Defendant (via
          videoconference):
15
               TARA FAPPIANO, ESQ.
16             Haworth, Barber & Gerstman, LLC
               45 Broadway, Suite 2110
17             New York, NY  10006
               (212) 952-1100
18             tara.fappiano@hbandglaw.com
19
20
21
22
23
24
25
```

Page 4

```
 1              ERIC J. BOELHOUWER, Ph.D.,
 2   having appeared remotely before me, having been first
 3   duly sworn, was deposed and testified as follows:
 4                       EXAMINATION
 5   BY MR. KIRKPATRICK:
 6       Q    Good morning, Dr. Boelhouwer.
 7       A    Good morning.
 8       Q    My name is James Kirkpatrick, and I
 9   represent Tyco Fire Products.  My colleague
10   Daniel Whitely is on as well.
11            Could you just state your full name and
12   address for the record?
13       A    Eric John Boelhouwer, 10 -- what is it?
14   1360 Peachtree Street, Suite 1150, Atlanta, Georgia
15   30307.
16       Q    And, sir, you testified under oath before;
17   right?
18       A    Yes, sir.
19       Q    Okay.  If at any time you don't understand a
20   question that I'm asking, I just ask you to tell me
21   either to clarify it or rephrase.  Otherwise, I'll
22   assume that you understand the question.  Does that
23   sound good?
24       A    Yes, sir.
25       Q    Okay.  Is there any reason that you can't
```

```
                                        Page 5
```

1    testify truthfully today or understand the oath that

2    you're under?

3         A    No, sir.

4         Q    Separate from the process of preparing your

5    report, what did you do to prepare for your testimony

6    today?

7         A    I reviewed the additional depositions that I

8    received -- have been received since the time of my

9    report.  And I reviewed my file and the materials

10   listed in my report.  And I had maybe a couple

11   conversations with Tara Fappiano.

12        Q    I will say something that we found out over

13   these remote depos, is that talking over each other is

14   super-hard on the court reporter.  So I'll try not to

15   talk over you, and I just ask that you also try not to

16   talk over me.

17            So without getting into the details of the

18   conversations with Ms. Fappiano, can you just tell me

19   when those were and how long they lasted?

20        A    We had one last Friday for approximately

21   45 minutes, one this morning for maybe five minutes.

22        Q    Okay.  Was anyone else on the line for those

23   conversations?

24        A    No, sir.

25        Q    Other than Ms. Fappiano, have you discussed

                                                    Page 6

1    this deposition or preparing for this deposition with

2    anyone else?

3         A    No, sir.

4         Q    Okay.  And you mentioned the deposition

5    transcripts and the material listed in your report and

6    your report.  Other than the things that I just said,

7    did you review anything else in preparing for your

8    deposition?

9         A    Just the materials listed for my report and

10   the materials that would have been received for the

11   deposition since the time of my report.  That's all I

12   can recall as I sit here.

13        Q    Okay.  And do you recall which deposition

14   transcripts you reviewed?

15        A    We received Coelho Juliano and two volumes

16   of Taranto.

17        Q    Okay.  Now, Dr.  -- is it Boelhouwer?

18        A    Yes, sir, Boelhouwer.

19        Q    Great.  Now, Dr. Boelhouwer, if you could,

20   do you have Exhibit Share open?

21        A    Yes.

22        Q    Okay.  And if you look in the Marked

23   Exhibits folder, I premarked a couple of exhibits.  Do

24   you see that?

25        A    Yes, sir.

```
                                              Page 7
 1            (Marked for identification, Exhibit 1.)
 2   BY MR. KIRKPATRICK:
 3        Q    Okay.  If you could click on Exhibit 1 for
 4   me.  This is your resume?
 5        A    Yes, sir.  It appears to be a copy of my
 6   current CV and my testimony list.
 7        Q    Okay, great.
 8             And you said this is the most up-to-date
 9   version of this --
10        A    Yes, sir.
11        Q    -- which is updated in March of 2019?
12        A    Yes, sir.
13        Q    Okay.  Would you consider it up-to-date?
14        A    I probably need to add a new entry to it
15   with regard to my volunteer activities, professional
16   activities.  I've just recently been appointed to be
17   the committee chair for the ANSI Z535.7 standard for
18   visual communications, which is under development.  So
19   I do need to make an entry for that.
20        Q    Okay.  Are any of the things that you would
21   need to add to this CV relevant to the opinions that
22   you have provided in your report?
23        A    No, sir.
24        Q    Okay.  Did you add or subtract anything from
25   your CV because you were retained for this case?
```

1      A     No, sir.

2      Q     Okay.  Do you maintain any other versions of

3  your CV, or do you just have the one that you use for

4  everything?

5      A     I mean, I update it periodically, and then I

6  mark the updated version.  There may be some older

7  versions out there prior to March 2019.

8      Q     Okay.  But you just have one current version

9  of your resume?

10      A     Yes, sir.  Just one version of my CV that I

11  use for all matters.

12      Q     Okay, great.

13           I notice that your CV does not contain -- I

14  don't know if I missed it -- your employment history;

15  is that right?

16      A     No.  I don't have an entry for that.

17      Q     Okay.  Is there a reason for that, or just

18  you don't include it?

19      A     I just haven't historically.  I probably

20  should.  I can go through it briefly, if you'd like.

21      Q     Sure.  Let's start after you graduated in

22  1998 from Georgia Institute of Technology.  What job

23  did you have after that?

24      A     Sure.  I went into a professional

25  development program from BASF Corporation.  I

Page 9

1    incorporated three rotational assignments.  One was in

2    corporate engineering in Asheville, North Carolina.

3    One was a product stewardship in New Jersey.  And then

4    I did a training role in a refinery steam cracker that

5    was under production in Port Arthur, Texas.

6              Following those rotational assignments that

7    lasted about 18 months, give or take a little bit, I

8    moved to Baton Rouge, Louisiana, and I was a Process

9    Engineer I for PolyTHF and THF, which is manufacturing

10   chemicals, industrial chemicals.

11             And then from there I -- let's see.  So I

12   transitioned into Year 2, I believe, in that same

13   role.  In Year 3 I think I was in the S-MOIPA plant.

14   And then I was in specialty amines after that.  So it

15   was all very closely geographically -- the plants are

16   adjacent to each other, but it was just different

17   responsibilities for different chemical manufacturing.

18             And then I left the BASF Corporation to go

19   to Auburn to pursue my Ph.D.

20        Q    And what year was that that you left?

21        A    That was the end of 2006.

22        Q    Okay.  So you were there from '98 to '06?

23        A    It would be January of '99 to November of

24   '06.

25        Q    Okay.  Now, in the rotational assignments

Page 10

1   that you described, can you just generally discuss

2   more what those rotations entailed?

3        A    Sure.  My first rotational assignment was in

4   corporate engineering just outside of Asheville,

5   North Carolina.  And I was doing detailed design

6   engineering for a chemical plant that was to be built

7   at the Geismar facility.

8            My next rotational assignment was in product

9   stewardship in New Jersey at the BASF headquarters at

10  the time.  It was in Mount Olive, New Jersey.  And

11  that primarily involved Materials Safety Data Sheets,

12  as they were known at the time; product labeling for

13  all the products for the chemicals division; and then

14  doing training regarding some potential regulatory

15  issues for distributors and other buyers of some

16  certain subchemicals that we were manufacturing at

17  that time.

18           Third is a training assignment related to

19  training operators as it related to a new steam

20  cracker was going to be -- was under construction.  It

21  came on line in Port Arthur, Texas.  So in the period

22  of time during construction before the operators can

23  start running the plant, there is about a year that

24  they are undergoing a period of training to make sure

25  that they are trained to operate the facility.

```
                                             Page 11

 1       Q    And then after that you discussed

 2   Engineering Levels I, II, and III.  So are you a

 3   licensed engineer?

 4       A    I am not a professional engineer.  No, sir.

 5       Q    Okay.  Can you just describe what -- because

 6   I haven't heard of that before, the Engineering I, II,

 7   and III, what the difference between those are.

 8       A    Sure.  So they're generally just roles in

 9   the manufacturing plant with regard to the day-to-day

10   production of chemicals as it relates to, you know,

11   making sure the raw material is there, following up on

12   the management of change, keeping up with production,

13   making sure the shipments are going out.  It's just

14   the day-to-day of running the chemical plant, making

15   sure you're producing the chemicals all set for the

16   customer.

17       Q    Okay.  So you got your MBA while you were

18   working full-time; is that right?

19       A    Yes, sir.

20       Q    Okay.  And then you went to, as you

21   mentioned, Auburn in 2006.  Can you just describe

22   what's involved in obtaining an industrial and systems

23   engineering degree?

24       A    So starting in January of 2007, I started

25   taking classes regarding process safety, occupational
```

Page 12

1    safety, ergonomics.  There's a core set of classes

2    regarding industrial engineering that they wanted us

3    to fulfill so you have a sufficient basis in

4    industrial engineering in addition to what your

5    subspecialty is, mine being human factors, ergonomics,

6    occupational safety.  So there's kind of both of those

7    things going on at the same time.

8              Also, in addition to that, Auburn is part of

9    an education resource center under NIOSH, which funded

10   my doctoral studies.  So my doctoral fellowship is

11   paid for by NIOSH.  But that was a joint program

12   between Auburn and University of Alabama Birmingham

13   where Auburn is responsible for certain aspects of the

14   program and UAB is responsible for other aspects of

15   the program.  And there was also an expectation I

16   would also take classes at UAB as well for

17   epidemiology and a few other topics.

18       Q    Okay.  And were you a full-time student from

19   January of 2007 until you received your Ph.D.?

20       A    Yes, sir, full-time student.  During that

21   time I did have an internship at Dorris and Associates

22   as well.

23       Q    Okay.  And then after you received your

24   Ph.D., where did you work after that?

25       A    I came onboard with Dorris and Associates

Page 13

1    full-time at the same time I finished my doctoral

2    program.

3        Q    Okay.  Have you done litigation consulting

4    since you started at Doris and Associates?

5        A    Primarily assisting with litigation

6    consulting earlier on and then having my own

7    retentions after a couple of years and also doing a

8    fair number of non-litigation projects over the last

9    ten years as well.

10       Q    Okay.  What percentage of your time over the

11   last ten years would you say has been devoted to

12   litigation consulting as opposed to the non-litigation

13   projects you mentioned?

14       A    Approximately 70 percent of my time is

15   litigation related, and 30 percent is non-litigation

16   related.

17       Q    And has that been pretty steady throughout

18   the last ten years?

19       A    I think that's pretty fair.  That's been

20   relatively stable over the last ten years.

21       Q    Okay.  And what type of non-litigation

22   projects do you do?

23       A    Primarily for manufacturers of chemicals or

24   consumer products or, really, any variety of products,

25   whether it's industrial or consumer products,

Page 14

1  generally related to the warnings and instructions and

2  safety communications provided by those manufacturers

3  for their products.

4       It can be Safety Data Sheets.  It can be

5  product labeling, owner's manuals.  In an automotive

6  context, it generally relates to on-product labels or

7  owner's manuals for different manufacturers.

8       Q    And then in terms of the areas where you do

9  litigation consulting, can you describe what types of

10  cases those are?

11      A    Generally, the cases cover occupational

12  safety, human-product interaction, ergonomics.  You

13  know, we generally use the term "human factors" as it

14  relates to the human-product interaction.  So those

15  are generally the areas that I opine about.

16      Q    Do the cases always involve products, as

17  in -- is the question generally, in the cases that you

18  consult on, whether a product had adequate or

19  appropriate labels?

20      A    I would think that's a fair percentage of

21  it.  In an automotive incident, there may be more of a

22  human factors perception-reaction time question or a

23  brake force question.  So there would be some subset

24  of my cases that may not always have a product

25  literature component.  But, generally, it's around the

Page 15

```
 1   warning and instructions related to the product.
 2        Q    Do you have a rough idea of what percentage
 3   of cases involve what you just described, with a
 4   product and some kind of warning issue?
 5        A    I really don't.  I would think it's
 6   certainly more than 50 percent, but I wouldn't know
 7   how to estimate it, how much more over 50 percent.
 8        Q    Okay.  And of the litigation consulting that
 9   you do, what percentage is for the plaintiff as
10   opposed to the defense?
11        A    Approximately 30 percent for plaintiffs and
12   approximately 70 percent for the defense.
13        Q    And has that been consistent throughout the
14   last ten years?
15        A    Probably pretty consistent over the last ten
16   years.
17        Q    Okay.  With respect to this case when were
18   you first retained?
19        A    That's a good question.  Let's see.  We
20   opened the file in December of 2019.  I can't recall
21   my first contact from the law firm.
22        Q    What month did you say?  I'm sorry.
23        A    December is when we opened the file.
24        Q    Okay.  And do you recall who first contacted
25   you?
```

```
                                          Page 16
 1       A     That's a great question.  It was a young
 2   man, a gentleman.  I can't recall his name.
 3       Q     Okay.  Have you ever worked with
 4   Ms. Fappiano's law firm, Haworth, Barber & Gerstman,
 5   before this case?
 6       A     Yes, sir.
 7       Q     How many times?
 8       A     More than two; less than five.
 9       Q     Okay.  Do you recall what those cases were
10   generally about?
11       A     Consumer product-related injuries.
12       Q     And was your role to opine on
13   warnings-related issues?
14       A     On warnings-related issues, yes, sir.
15       Q     And did you offer a written report in all of
16   those cases?
17       A     I don't recall.  I think some of them were
18   in state court.  So I don't recall that we issued
19   written reports in all those matters.
20       Q     Okay.  Do you recall specifically one way or
21   the other, or you're not sure?
22       A     I can't recall as I sit here.  Is it
23   possible I wrote a report for one of those?  Maybe,
24   but I just don't recall.
25       Q     Okay.  Did you provide testimony in all of
```

1    those cases?

2         A    I don't think any of them proceeded to the

3    point of deposition.  I think they settled after

4    disclosures of reports.

5         Q    Okay.  Since being retained for this case,

6    have you been retained by Ms. Fappiano's law firm

7    since?

8         A    I don't believe so, no, sir.

9         Q    Okay.  When you were retained, what was your

10   understanding of your assignment in this case?

11        A    To review materials with regard to potential

12   criticisms with regard to the safety communications as

13   they relate to the subject cylinder.

14        Q    Okay.  Did your understanding of your

15   assignment in this case change at any point?

16        A    I think generally it was around the safety

17   communications for the subject test cylinder.

18        Q    But did your understanding of what your

19   assignment was in this case change from the time you

20   were retained to now?

21        A    I don't recall having a specific

22   conversation about my assignment changing, no, sir.

23        Q    Okay.  And you are being -- or I should say

24   that Dorris and Associates is charging for your time

25   at your hourly rate?

Page 18

1      A     Yes, sir.

2      Q     And what rate is that?

3      A     I believe it's $240 an hour.

4      Q     Okay.  And is that the rate that you use for

5  all consulting?

6      A     Yes, sir.  For all -- file material review,

7  deposition testimony and trial testimony, yes, sir.

8      Q     And is that the rate that you use for all

9  clients regardless of the type of case or the type

10  of -- for a non-litigation type of project?

11      A     Well, non-litigation can be a variety of

12  different ways we structure those contracts.

13  Typically, the clients like to have a fixed number

14  they're working off of.  So we'll just propose a fixed

15  fee for the non-litigation projects.  At times they

16  are hourly, and I do use my same hourly rate.

17          My rate did increase in January of 2020.

18  But since this file was opened in December, we're

19  using my old 2019 rate for this matter.

20      Q     Okay.  And how many hours have you worked on

21  this case so far, roughly?

22      A     I don't really have a good estimate of that.

23  I'd say probably more than 40, but I wouldn't know how

24  many more.

25      Q     Okay.  Do you know -- again estimating --

```
                                              Page 19
```

1  how many hours you've spent preparing your report?

2      A     Approximately, of those 40, I'd say maybe

3  ten of those hours, somewhere in that -- maybe less.

4      Q     Okay.  And how many hours did you spend

5  preparing for this deposition?

6      A     Probably about six hours.

7      Q     And other than preparing your report and

8  preparing for the deposition, what other things have

9  you done to work on this case?

10     A     Reviewing the file materials listed in my

11 report, reading the depositions, reading standards

12 that have been referenced by others, and the standards

13 that I added as well.

14     Q     Okay.  And just so we're clear, those are

15 reviews that were not done in preparation for this

16 deposition?

17     A     I probably went back to some of those

18 standards after reviewing the Juliano and the Coelho

19 reports just to make sure that -- just to refresh

20 myself on the parts of the standards they're

21 referencing and what I'm referencing as well.

22     Q     Okay.  And of the depositions that you

23 mentioned, was that in preparation for the deposition,

24 or was that before?

25     A     I did review the Coelho and the Juliano

Page 20

1    transcripts in the last week.

2         Q    Okay.  But I guess my question is, do you

3    include that in your six hours that you spent

4    preparing for the deposition?

5         A    Probably not, no.  I would say that was

6    separate from those six hours.

7         Q    Okay.  Do you have an ownership interest in

8    Dorris and Associates?

9         A    I do not.

10        Q    Okay.  Looking back at your CV -- and I

11   guess it's really two documents.  So I'm looking at

12   the last page of Exhibit 1.  It is the previous four

13   years of deposition and trial testimony that you have

14   had.  Is this list up-to-date?

15        A    Yes, I believe so.  The last deposition I

16   gave was in March.

17        Q    Okay.  And does this -- and you don't need

18   to review every line, but is this generally, as far as

19   you know, a complete and accurate list of the

20   deposition and trial testimony that you've given over

21   the last four years?

22        A    That's my understanding.  That would be a

23   complete and accurate list based on my recollection as

24   I sit here.

25        Q    Okay.  Over the course of your career, how

```
                                                 Page 21
 1    many times would you estimate that you have given
 2    testimony at trial as an expert?
 3         A    Two times.  They're both listed on the
 4    testimony list.
 5         Q    Okay.  And then what about for deposition
 6    testimony?
 7         A    I haven't added up the ones that are on this
 8    list and probably a handful have rolled off, so I
 9    would estimate between 40 and 50, I believe.
10         Q    Okay.  And how many cases would you estimate
11    that you have submitted a written report but not
12    provided testimony?
13         A    I don't have an estimate for that.  I don't
14    know.
15         Q    More than 50?  Less than 50?  Or you just
16    have no idea?
17         A    Probably more than a hundred.  But that's
18    not -- I can't go back and count that, so I don't know
19    how to estimate that.
20         Q    Sure.  Has a Court ever disqualified you as
21    an expert or excluded your opinions in whole or in
22    part?
23         A    My recollection is twice portions of my
24    opinions have been limited, but my qualifications were
25    not challenged in those matters.
```

```
                                        Page 22
```

1        Q    Okay.  What's the first one where you recall

2    that happening?

3        A    The first one was in federal court in

4    Wisconsin.  It's not on this list because it happened

5    prior to -- it was more than four years ago.  So

6    that's one example.  The other one -- let's see.  The

7    other one is in state court in Arizona.  And it was

8    January of this year.  Part of my opinions were

9    limited.

10       Q    Okay.  And for that federal case in

11   Wisconsin, do you recall the names of the parties?

12       A    It was consolidated at the time, so there

13   was eight different plaintiffs that -- I had written

14   reports on behalf of the eight different plaintiffs,

15   and they were all versus Electrolux.  And it was

16   involving an electric -- electric or gas clothes

17   dryers of different configurations.

18       Q    Okay.  And then same thing for the Arizona

19   case:  Do you recall the names -- oh, it's on here;

20   right?

21       A    Yeah.  I'm trying to find it.  It's kind of

22   small here.  Let's see.  It's halfway down.  Mendoza

23   versus State of Arizona.

24       Q    Okay.

25       A    The deposition was in 2017.

```
                                              Page 23
 1      Q    Okay.  In the cases where you've consulted
 2  other than this one, have any of them involved the
 3  fire protection industry?
 4      A    I had one matter for a fire truck
 5  manufacturer.
 6      Q    Okay.  Are there any other ones?
 7      A    That's all I can recall as I sit here.
 8      Q    Okay.  And do you recall what the issue was
 9  in the fire truck manufacturer case?
10      A    It regarded the human-product interaction of
11  using the levers to control the platform on the
12  ladder.
13      Q    Okay.  Did it involve warnings?
14      A    Yes, sir.  Warnings, instructions, training.
15  Yes, sir.
16      Q    Okay.  And so -- okay.  How about cases
17  involving compressed gas cylinders?
18      A    I had one non-litigation project regarding
19  compressed gas cylinders.  I can't recall any, others
20  litigation-related projects, as I sit here
21  specifically.
22      Q    Okay.  What was that non-litigation project?
23      A    You're probably aware in the last couple
24  years that cryotherapy is a business that is out
25  there.  So one of the cryotherapy manufacturers is
```

```
                                        Page 24
 1   local here in Atlanta, so they asked me to review

 2   their warnings and instructions for their cryotherapy

 3   units for the product they're selling and

 4   distributing.

 5        Q    Okay.  And when did you conduct that review?

 6        A    Probably 2018 into 2019.

 7        Q    Okay.  Do you recall what type of cylinder

 8   that was?

 9        A    I believe those are all carbon dioxide,

10   liquid CO2.

11        Q    Do you recall the pressures involved in

12   those cylinders?

13        A    Not specifically, no.

14        Q    Do you recall the amount of liquid or matter

15   inside of those cylinders?

16        A    They're large.  For dealing with dealers,

17   they're probably at least a hundred gallons; maybe

18   more.

19             (Marked for identification, Exhibit 2.)

20   BY MR. KIRKPATRICK:

21        Q    Okay.  Now, if you can look at Exhibit 2.

22   And when you have it open, if you can just scroll

23   through and confirm that this is the report that you

24   prepared for this case.

25        A    Yes, sir.  It appears to be the report.
```

```
                                          Page 25
1    It's -- my entire report would also encompass my CV
2    and my testimony list, but we already reviewed those
3    as Exhibit 1.  So, yeah, this looks to be a copy of my
4    report up through page 11.
5         Q    Okay.  Did anybody assist you in writing
6    this report?
7         A    No, sir.
8         Q    Okay.  And we mentioned the other experts
9    whose deposition testimony that you've reviewed.  Do
10   you recall reviewing the written report for the other
11   experts in this case?
12        A    The written reports of the experts that I
13   reviewed are listed in my file materials here.
14        Q    Okay.  And as relevant here, I understand
15   that your areas of expertise are warnings -- sorry.
16   Well, I'll finish the question -- are warnings and
17   communications pertaining to warnings and safety
18   communications.  Do I have that right?
19        A    Generally, yes.  Safety communications
20   regarding warning and instructions, yes, sir.
21        Q    Okay.  So what I was going to say is I'll
22   just try to go through your report roughly in order,
23   but just let me know if you're ever not sure where I
24   am because I've been known to jump around a bit.
25        A    Sure.
```

Page 26

1      Q    I'm reading this from page 1:  "Warnings and

2   communications pertaining to warnings and safety

3   communications."  Are those three different things, so

4   warnings, communications pertaining to warnings, and

5   safety communications?

6      A    That sentence probably could have used a

7   little more editing, but yeah.  Yes.  It's really

8   warnings and safety communications regarding product

9   literature, so...

10     Q    Okay.  Can you just describe briefly the

11  difference between those two things, warnings and then

12  the safety communications?

13     A    Sure.  So usually typically for a lot of

14  products, there's going to be a significant amount of

15  product literature, but not all of it is safety

16  related. There may be some instructions to the user

17  with regard to performing certain steps or tasks, but

18  that may not have a safety implication related to

19  their safe interaction and use of the product.

20          So it's just an encompassing of all of the

21  communications that would generally be received by the

22  user from the manufacturer.

23     Q    Okay.  And am I right that you are not

24  offering opinions based on expertise in workplace

25  safety?

Page 27

1      A      Not in this matter, no, sir.

2      Q      Okay.  Or expertise on the fire protection

3  industry specifically?

4      A      I think some of my opinions, to try to

5  address the criticisms of Mr. Juliano or Mr. Coelho,

6  may have reviewed some of those standards, but I don't

7  recall specifically citing any of those in my report.

8      Q      Okay.  So my question more generally is, do

9  you consider yourself an expert in the fire protection

10  industry?

11      A      I certainly have reviewed and used NFPA

12  standards as it relates to other matters.  I just

13  didn't cite any specific NFPA standards in my report

14  for this matter.

15      Q      Okay.  But in terms of the practices and

16  standards that apply to the fire protection industry,

17  do you consider yourself an expert in that

18  specifically?

19      A      I think there's probably a subset of those

20  as it relates to the warnings and safety

21  communications aspect of standards as it relates to

22  fire protection or other NFPA standards generally

23  regarding what safety communications to the end user

24  would be both for litigation and non-litigation

25  circumstances.

Page 28

1    Q    Okay.  On page 2 you note that during your

2   professional work experience, you have led safety

3   reviews for industrial processes.  What are safety

4   reviews for industrial processes?

5    A    Sure.  So when I was working at BASF

6   Corporation, part of the safety reviews for the

7   facilities are -- you perform a process hazard

8   analysis.  And then that process hazard analysis is

9   reviewed periodically, my recollection is every four

10  or five years, approximately, just to make sure

11  whatever modifications you made at the plant during

12  that time are still covered by the process hazard

13  analysis.

14          So you had an opportunity to look at the

15  whole safety system for the facility, from the raw

16  materials to the finished product and all of the

17  potential hazards within the plant.  So it's quite an

18  endeavor to perform that activity as it relates to an

19  industrial chemical manufacturing facility.  It

20  usually took me two months to do those reviews.

21   Q    Okay.  And so is that -- those safety

22  reviews took place over the seven years when you were

23  in manufacturing plants for industrial chemicals?

24   A    Generally, yes, sir, yeah.  So that would be

25  during the time when I was at BASF Corporation for the

1    facilities that I was working in at that time.  If the

2    opportunity came up or it was time on the cycle for

3    their PHA to be reviewed, we'd perform that review.

4         Q    And what years were those?

5         A    I would say that -- I can't pinpoint

6    specific years, but probably at least three full-blown

7    reviews, PHA reviews, in the seven years; possibly

8    more.

9         Q    Okay.  Sorry.  I meant, what were the seven

10   years?

11        A    Sorry.  That was during my period of

12   employment with BASF Corporation, so not necessarily

13   as of January 1999 but probably starting in fall of

14   2000 through the end of 2006.

15        Q    Okay.  How long -- you mentioned three

16   different reviews.  How long does each review take?

17        A    The way that we generally did them is we

18   would try to spend a fixed period of time, maybe a

19   week or two weeks, conducting the bulk of the review

20   and then trying to follow up on that over the next

21   couple of months.  So it could just be a couple of

22   weeks.  Generally, they stretched over months just

23   because it was hard to coordinate everybody's

24   schedules to get everybody back together.

25               And, of course, you didn't have the benefits

Page 30

1  of teleworking like we do here.  So people had to

2  physically come to the site.  There was a period of

3  time they were bringing in people from off site to

4  help facilitate those reviews.  So it was a lot of

5  moving parts.

6       Q    Okay.  And I apologize if you already said

7  this.  What chemicals were involved in these plants?

8       A    So that's quite a list.  So the initial

9  plants that I went into brought in 1,4-Butanediol and

10 then converted that into an arranged structure called

11 tetrahydrofuran.  And then at the same time we would

12 sell tetrahydrofuran commercially and then -- but the

13 bulk of that product went into manufacturing

14 polytetrahydrofuran.

15          So you're polymerizing the tetrahydrofuran

16 molecules to different molecular weights.  And you

17 would know that as a component of spandex.  So the

18 products that you have that have spandex in them

19 contain this polymer.

20      Q    Okay.  I'm sure Marcia really enjoyed that.

21          And so are all of those chemicals for

22 spandex that were at these industrial plants, or

23 that's just one application?

24      A    That was just my first maybe

25 year-and-a-half, two years at the facility.  And then

Page 31

```
 1    I went to work in a plant that primarily did corn
 2    herbicide.  So they were manufacturing a particular
 3    corn herbicide in Beaumont, Texas.  And it was going
 4    to cost $100 million to debottleneck the plant.
 5            So as an alternative, we built a very
 6    special chemical plant in Louisiana, which separated
 7    the optically active from the optically inactive
 8    amines.  So we separated the right enantiomer from the
 9    left enantiomer.  And that allowed us to effectively
10    make twice as much herbicide at the chemical plant
11    because all of the optically active component, the
12    S-MOIPA, is the active ingredient in biological
13    systems reform.
14            So we could effectively make twice as much
15    corn herbicide if we only put through the S-MOIPA as
16    opposed to putting through a blend of the RS-MOIPA.
17            And then I transferred from there over to a
18    multiproduct in the east plant running High-Pressure 1
19    and High-Pressure 2.  So that involved taking in a
20    variety of different raw materials, reacting them with
21    several different catalysts, and then using primarily
22    anhydrous ammonia to make amines.  And that was
23    another business that was involved in the production
24    of those chemicals as well.
25        Q    Much appreciated on that.
```

```
                                                    Page 32
 1              MR. KIRKPATRICK:  Thank you, Marcia.
 2    BY MR. KIRKPATRICK:
 3        Q    This hopefully will be a little bit easier
 4    on Marcia.
 5              You are, I understand, an affiliate
 6    professor at Auburn?
 7        A    I believe so, yeah.  I think that's still
 8    current.  I think that should be winding down here
 9    shortly.
10        Q    And what do you mean by "winding down"?
11        A    I've done that for approximately eight, nine
12    years.  So I think it's time to move on.
13        Q    Sure.
14              Is that essentially an adjunct professor
15    role?
16        A    It's really more of a support role where we
17    discuss our scientific research that we're doing here
18    with the faculty there and the faculty at UAB and try
19    to provide support for each others' research
20    generally.
21        Q    Do you teach any courses -- I should say, as
22    an affiliate professor, do you teach any courses?
23        A    No.  I have not taught any courses as an
24    affiliate professor.
25        Q    Okay.  And you've mentioned before -- and I
```

Page 33

```
 1   see here that you serve on several American National
 2   Standard Institutes Z535 subcommittees.  What are your
 3   responsibilities on those subcommittees?
 4        A    On the .3, .4, .5, .6 subcommittees, I'm
 5   just a committee member.  For the new .7 standard that
 6   will be coming out, I'm the sub-chair for the .7
 7   standard, for digital media.
 8        Q    And as a committee member, essentially what
 9   does that entail, being a committee member?
10        A    There's meetings every couple years.
11   Historically, they've been yearly, but more recently
12   they've been a little more infrequent with regard to
13   reviewing standards, considering change proposals, and
14   keeping the standards up-to-date and kind of reviewing
15   the standards as they relate to the current
16   literature, whatever changes may need to be made as
17   time moves forward.
18        Q    Okay.  So will you actually propose the
19   changes, or you review the proposals and -- both?  Or
20   something else?
21        A    Generally review the proposals and discuss
22   them at committee.  And that could be full committee
23   with all the subcommittee members for all the
24   different standards who have chosen to attend the
25   meeting, or it could be via an email where it could be
```

Page 34

1    a specific change request for us.

2              If there's a global change, usually it's

3    discussed in person at a meeting.  If it's a very

4    finite specific change for a specific standard,

5    generally it's done within the subcommittee.  That can

6    be done via email or teleconference.

7         Q    Okay.  And I understand that these

8    subcommittees promulgate voluntary consensus standards

9    concerning safety information.  Given that these

10   standards are voluntary, what's the practical effect

11   of promulgating these standards?

12        A    To try to provide a uniform visual system

13   for hazard communication in the United States.  So

14   they've been adopted by a variety of different

15   industries over time, whether formally through

16   adoption through a UL standard or some other type of

17   standard or government regulations in some instances.

18              They're commonly referred to in litigation

19   as criticism by the plaintiffs if you don't follow a

20   standard.  So manufacturers generally try to comport

21   with standards as it relates to their products to

22   effectively communicate their hazard communication.

23        Q    Okay.  Aside from this case, in the course

24   of your professional experience, have you ever dealt

25   with pre-engineered fire suppression systems before?

Page 35

1      A    I don't believe so, no, sir.

2      Q    Okay.  And we discussed the case involving

3   cryogenic -- although I don't remember if that was a

4   case or not.  Other than that that we discussed, are

5   there any other experiences that you've had related to

6   compressed gas cylinders?

7      A    Probably some propane cylinders, propane use

8   for consumers, whether it's a smaller cylinder or a

9   propane cylinder at someone's home or, you know, the

10  larger tanks that you may find at someone's home.

11  That's what I can recall sitting here right now.

12     Q    Okay.  But you can recall specifically what

13  those assignments were?

14     A    What those assignments were, sir, as it --

15  well, for the propane it relates to the warnings and

16  safety communications from the manufacturer of the

17  cylinder to the end user.

18     Q    Okay.  And was that a litigation matter?

19     A    Yes, sir.  I've got at least one current

20  litigation matter in that regard, yes, sir.

21     Q    Okay.  And you said you've also had past

22  litigation matters involving propane cylinders?

23     A    I believe so, yes, sir.

24     Q    Okay.  And do you recall, from those cases

25  or from the active case, what types of cylinders those

Page 36

1   are?  And by that I mean, what governed their

2   construction?

3        A    My recollection is that there's ASTM

4   standards regarding the construction, but the physical

5   construction of the cylinders wouldn't be my area of

6   expertise, so...

7        Q    Okay.  Aside from what we've discussed with

8   respect to compressed gas cylinders, do you have any

9   professional experience with compressed gas systems?

10       A    We talked about my non-litigation consulting

11  work for the cryotherapy units.  There's that.  We

12  talked about the propane cylinders litigation.  I

13  can't specifically recall any others.

14       Q    Okay.  And those cases that you just

15  mentioned, those involve just the tanks or the

16  compressed air system as a whole?

17       A    These involve the compressed propane as a

18  component of the tank and the system.

19       Q    But your opinions for consulting work have

20  been related to the compressed gas cylinder or to

21  warnings about the system as a whole?

22       A    I think those are specific to the cylinders

23  and the propane that is filled by the entity that

24  provides the cylinders for consumer purchase.  For --

25  the other one that I can recall is the manufacturer of

                                        Page 37

1    the propane tank, the larger -- I'm going to call it

2    approximately 250-gallon tank that you'd see outside

3    of someone's home.

4         Q     Sure.

5               Okay.  In terms of your experience with NFPA

6    standards, how many cases or consulting arrangements

7    have you had that involve NFPA standards?

8         A     Probably between 10 and 20.

9         Q     Okay.  Do you recall which standards those

10   were in those cases?

11        A     So NFPA 1500 I think is the, what, standard

12   for training as it relates to firefighters.  There's

13   several others that relate to training for

14   firefighters.  There's some that relate to emergency

15   personnel.  As it relates to automotive, applications

16   for electric or hybrid vehicles as it relates to

17   separated power.

18              There's several others that I've used over

19   the years.  I just can't recall the numbers.

20        Q     Sure.

21              Do you recall ever using NFPA 10?

22        A     Not specifically prior to this matter, no,

23   sir.

24        Q     Or 17 or 17A?

25        A     Again, not specifically, not prior to this

```
                                        Page 38
```

1  matter.

2      Q    Okay.  Do you consider yourself an expert in

3  NFPA standards?

4      A    As we discussed earlier, as it relates to

5  the safety communications, warnings and instructions

6  components of those standards, yes, I would consider

7  myself to have expertise as it relates to my

8  subspecialty.  But, generally, outside of warnings and

9  safety instructions, that would not be my area of

10  expertise.

11      Q    Okay.  Have you in the course of your

12  professional experience had occasion to work with any

13  fire codes in any jurisdiction?

14      A    Repeat.

15      Q    The fire codes for any jurisdiction.

16      A    I don't recall having a matter related to

17  fire codes for a particular jurisdiction, no, sir.

18      Q    Okay.  And what about your experience with

19  OSHA standards?

20      A    I have significant experience with OSHA

21  standards as regulations as it relates to a variety of

22  topics, certainly not everything under OSHA.  There's

23  a baking standard; there's a diving standard.  I don't

24  consider myself experts in those regulations, but

25  there's significant portions of OSHA standards that I

Page 39

1    rely upon for my work, yes, sir.

2        Q    Okay.  Can you just list as best you can the

3    areas of the OSHA standards where you consider

4    yourself an expert?

5        A    I don't have a full list of all the OSHA

6    regulations here in front of me, so I wouldn't be able

7    to do that as I sit here.

8        Q    Okay.  Have you ever taught, whether a

9    course or instructions or anything else or training,

10   related to the OSHA standards?

11       A    In part.  I've given a webinar.  And I gave

12   a talk to the State Bar of Georgia regarding chemical

13   hazard communication.  So that would be an area as it

14   relates to OSHA that I have given or taught

15   professional development courses in.

16       Q    Okay.  Any other courses or webinars or

17   trainings?

18       A    Well, my doctoral dissertation is about GHS

19   hazard communication as it relates to OSHA prior to

20   the adoption of the Globally Harmonized System by OSHA

21   in 2012.

22       Q    And then prior to this case -- or I should

23   say, other than this case, do you have professional

24   experience with the Compressed Gas Association

25   standards?

Page 40

1      A     A little here and there, yes, sir.  Yeah, as

2    it relates to the propane matters we discussed

3    previously and the non-litigation work for the

4    cryotherapy.

5      Q     Okay.  Do you recall which standards those

6    would be?

7      A     I think we touched on standards that we were

8    referencing here as it relates to compressed gases as

9    it relates to those materials.

10     Q     Okay.  Those are the ones that you cite in

11   your report?

12     A     Yes, sir.  And I have referenced other

13   Compressed Gas Association standards over time.  I

14   just don't recall the specific numbers.

15     Q     Okay.  On page 2, continuing on to page 4,

16   is your list of materials reviewed.  Are you relying

17   on any material that are not listed here in forming

18   your opinions?  And I will except the references at

19   the end and the other kind of sources that you cite.

20     A     I think that generally would encompass the

21   materials I'm relying upon as it relates to this

22   matter, my study of the human factors and warnings

23   literature and OSHA regulations, NFPA standards,

24   included in all that.  So I think that generally

25   encompasses the materials that I would rely upon as it

Page 41

1   relates to this matter.

2        Q    Okay.  Are there any specific materials that

3   come to mind that are not listed here that you are

4   relying on?

5        A    Not specifically that I can recall, no.

6        Q    Okay.  So other than on page 11 -- is your

7   references -- other than these references and

8   references cited elsewhere in your report, are you

9   relying on any other treatises or academic articles to

10  support your opinions?

11       A    Not specifically.  Just my knowledge of the

12  human factors and safety communications literature in

13  general, in addition to the specific materials I've

14  listed here in the references section of my report.

15       Q    Have you actually reviewed all of the

16  documents and materials listed in your list of

17  materials reviewed?

18       A    For the most part.  I probably didn't read

19  the entirety of every deposition.  Usually we have

20  annotations of the depositions prepared by someone in

21  my office.  So I'll review the annotations of the

22  deposition so I don't have to sit down and read the

23  entirety of the deposition.

24       Q    Okay.  Do you have the annotations of the

25  depositions like on your computer or elsewhere?

```
                                        Page 42
 1        A    Yes, sir.  We have our case summary

 2   analysis, which encompasses the annotations of the

 3   depositions, yes, sir.

 4        Q    Okay.  I would ask that you preserve the

 5   case summary analysis.  We may ask Ms. Fappiano for a

 6   copy of that.  So we'd just ask that you preserve it.

 7        A    Of course.

 8        Q    Okay.  And your expert disclosure, which is

 9   Exhibit 2, this contains every opinion that you plan

10   to offer at trial; right?

11        A    I believe so, yes, sir.

12        Q    Okay.  And the basis -- rather, the bases

13   and the reasons for your opinion as well; right?

14        A    Yes, sir.  And the bases for my opinions are

15   expressed in my report, yes, sir.

16        Q    Okay.  And between your qualifications

17   section and your CV that you provided, those are the

18   qualifications that you rely on in expressing your

19   opinions?

20        A    Yes, sir.

21        Q    Okay.  Have you conducted any other analyses

22   in this case that are not reflected in your report?

23        A    I don't have anything that I've

24   memorialized.  I just have my opinions as they're

25   listed in this report.
```

```
                                              Page 43
 1       Q    Okay.  But in terms of whether memorialized

 2   or not, are there any other specific analyses that

 3   you've undertaken that are relevant to this case that

 4   are not in the report?

 5       A    I don't believe so.  I think we've covered

 6   the materials that I reviewed, and we'll get into the

 7   bases for my individual opinions.

 8       Q    Okay.  Do you have any intention of

 9   conducting any other analyses or reviews before

10   testifying at trial?

11       A    At this time, no, sir.

12       Q    Do you have any plans to amend or supplement

13   your report?

14       A    Not at this time.

15       Q    Okay.  Why don't we take a quick break, five

16   minutes, if that's okay, and come back at 12:10?  Does

17   that sound good?

18       A    Okay.

19            (Whereupon, a recess was taken.)

20   BY MR. KIRKPATRICK:

21       Q    Dr. Boelhouwer, on page 5 you provide a

22   definition of human factors engineering.  And you say

23   that "the academic field of human factors engineering

24   is the scientific discipline concerned" -- and I won't

25   read the whole thing.  Is that definition the commonly
```

1   accepted definition of human factors engineering in

2   the field?

3       A    I think the quote on page 5 from Chapanis

4   would be a fair, commonly accepted definition of human

5   factors, yes, sir.

6       Q    Okay.  And with respect to that definition,

7   it says, "Human factors is a body of information about

8   human abilities," et cetera, et cetera.  What is that

9   body of information that comprises human factors?

10      A    So it's the scientific literature regarding

11  human capabilities and limitations.  So it can be

12  reach arcs.  It could be physical ergonomics.  It

13  could be seated eye height.  So those are physical

14  characteristics of individuals based on a variety of

15  different considerations.  Obviously, there's a

16  distribution.  So those would be one aspect.

17           And then the cognitive side as it relates to

18  warnings and instructions.  So the scientific

19  literature with regard to behavioral responses to

20  warnings is just a subset of the overall human factors

21  literature.

22      Q    Okay.  Does that include information on

23  human psychology?

24      A    Yes, sir.

25      Q    Is it a subset of human psychology, or does

Page 45

1    it encompass the whole field?

2        A    They're going to have some overlap here as

3    it relates to behavior related to human-product

4    interaction and the processing of saving information

5    but certainly not into whole other areas of psychology

6    so that the two fields do touch.  But, you know, it's

7    just -- there's some overlap of that diagram.

8        Q    Okay.  So is the standard for determining

9    whether something is human factors whether the

10   information is specifically about human abilities,

11   human limitations, and other characteristics that are

12   relevant to design?

13       A    Could you repeat that?

14       Q    Sure.  I'll rephrase.

15            So I'm just trying to figure out how you

16   differentiate between academic work that's human

17   factors engineering and outside of human factors

18   engineering.  So is it -- no matter the discipline,

19   it's the information involves human abilities, human

20   limitations, and other characteristics, and those are

21   relevant to design, that that counts as human factors?

22       A    I think that's pretty fair, yes.  So it's

23   really the human-product interaction.  So whatever is

24   involved with the human and the system as however

25   you're going to apply the system and whatever that

```
                                              Page 46
 1    interaction is, that's the study of human factors; so
 2    how the system and -- how the human interacts with the
 3    system.
 4         Q    Okay.  And then a couple paragraphs down,
 5    after the heading Warnings Research, I'm looking at
 6    that first sentence.  It says, "Since the design of
 7    safety communications and the systematic analysis of
 8    responses to those communications is an aspect of
 9    human factors engineering, many of the studies are
10    recorded in the human factors engineering literature."
11             What do you mean by "many of the studies"?
12         A    Well, some studies could -- as you suggested
13    earlier, could be in the psychology literature or
14    maybe you could find some marketing literature.  So it
15    may not be specifically confined just to the human
16    factors publications by the Human Factors and
17    Ergonomics Society.  So it could be broader than that.
18    There may be some in the industrial engineering
19    literature, some in the psychology literature.  So it
20    just depends on the source the authors try to get
21    their work published in.
22         Q    Okay.  And then you cite here to McCarthy,
23    DeJoy, Ayres, and Rogers.  And my question is, are
24    those reviews authoritative in the field of human
25    factors?
```

Page 47

1        A    I would say generally.  You know, I may not

2    agree with every sentence that's in each of those

3    publications.  But, generally, those are reviews of

4    scientific literature, and I think they're

5    representative of the literature as it existed at the

6    time of the review and they're on the whole a fair

7    representation of the literature at the time those

8    reviews were written, yes, sir.

9        Q    Okay.  And then jumping ahead to the list of

10   references that you have at the end, are these

11   references that individuals in the field of human

12   factors frequently rely on in conducting an analysis?

13       A    I would say generally as it relates to human

14   factors and warnings and instructions, this is a

15   representative list of literature.  Obviously, there's

16   thousands of articles, but this is a relatively decent

17   subset, yes, sir.

18       Q    Okay.  Can you just describe generally your

19   methodology in this case?

20       A    Sure.  My methodology is to review the

21   deposition transcripts, the exhibits attached to

22   those, the relevant standards or the standards

23   referenced by others, the reports of the other

24   experts, and then from that come up with my opinions

25   as it relates to the matter and the specific areas I'm

Page 48

1    asked to opine about.

2        Q    Okay.  Of the standards that you referenced,

3    are any of those ambiguous or vague in your opinion as

4    it relates to this case?

5        A    There seems to be a question between some of

6    the other experts as it relates to the applicability

7    of some NFPA standards or portions of NFPA standards.

8    I don't think those really weigh in upon my opinions.

9    They're a disconnect between the other experts.  But

10   it seems that there is some potential issue conflict

11   between the experts as it relates to the materials

12   they believe are applicable to the test tank.

13       Q    Okay.  But as it relates to your opinions,

14   do you believe that any of the standards that you rely

15   on are vague or ambiguous?

16       A    As it relates to the OSHA Hazard

17   Communication Standard and the Compress Gas

18   Association standards, I don't believe that they're

19   ambiguous, no, sir.

20       Q    Okay.  The methodology you described, is

21   that drawn from a standard somewhere, or is there a

22   document that I could go to to find a description of

23   that methodology?

24       A    There is not a specific methodology as it

25   relates to human factors as it relates to the

Page 49

1   development of expert opinions in the field of human

2   factors.   I am aware that other standards bodies have

3   attempted to produce documents like that.   But there's

4   not one that applies specifically to human factors.

5        Q    Okay.   Is there any way to determine whether

6   your opinions are right or not?   Is there any way to

7   test your conclusions?

8             MS. FAPPIANO:   Objection to form.

9        A    I think that the opinions are addressing the

10  criticisms of others and some potential

11  misrepresentation or misunderstanding on their behalf.

12  So I think the opinions provide some clarity to the

13  issues raised by the other experts.

14  BY MR. KIRKPATRICK:

15       Q    But in terms of your methodology, is it

16  testable in any way?

17            MS. FAPPIANO:   Objection to form.

18       A    Could we define a test somehow?   Possibly.

19  But I think, generally, since I'm opining about the

20  standards and the statements in the standards and the

21  their applicability as it relates to Oprandy's fire

22  and safety, I can't think of a specific test that you

23  would apply as it relates to this matter for these

24  opinions.

25  BY MR. KIRKPATRICK:

```
                                              Page 50
```

1       Q    Okay.  I believe you state that your

2   opinions are to a reasonable degree of scientific

3   certainty; is that right?

4       A    In the field of human factors and safety

5   communications, yes, sir.

6       Q    And how would you define that standard?

7       A    More likely than not.

8       Q    Okay.  So I'm on page 6.  But I just want to

9   talk generally about OSHA regulations.  And I know

10  obviously you mentioned there are a lot of them.  But,

11  bird's-eye view, OSHA creates standards and

12  regulations that affect the workplace; right?

13      A    Yes, sir.  It's Occupational Safety and

14  Health Administration, so it's focused on the

15  workplace, yes, sir.

16      Q    And is it fair to say that most employers

17  have to follow OSHA standards?

18           MS. FAPPIANO:  Objection to form.

19      A    I think it's fair to say most private

20  enterprises would fall under -- whether it's a state

21  plan or federal, OSHA, obviously, there's some

22  exceptions, but, generally, yes, OSHA would be

23  applicable to most private businesses.

24  BY MR. KIRKPATRICK:

25      Q    And if an employer fails to follow the OSHA

1    regulations, OSHA can cite them for violations; is

2    that right?

3        A    That is one means by which OSHA has to

4    address potential deficiencies found at an employer

5    work site.

6        Q    And do we agree that Oprandy's is subject to

7    the OSHA standards in its capacity as an employer?

8        A    I think that's fair, that OSHA would be --

9    that Oprandy's would fall under businesses that would

10   be addressed by OSHA, yes, sir.

11       Q    Okay.  And OSHA has regulations governing

12   the handling of hazardous materials; is that right?

13       A    Yes, sir.

14       Q    And within that set of regulations, there

15   are regulations on compressed gases; is that right?

16       A    Yes, sir.  There are some OSHA regulations

17   that relate to compressed gases, yes, sir.

18       Q    And those regulations incorporate by

19   reference CGA pamphlet P-1; is that right?

20       A    I believe that's correct.  But back to

21   the -- I think it's the 1965 version, so not the most

22   current version but the historical version.  I believe

23   that's correct.

24       Q    Okay.  And you're aware, though, that that

25   1965 version -- you may have just said this -- has

                                    Page 52

1    been replaced by a subsequent version?

2         A    But I don't believe the OSHA regulation has

3    been amended to adopt the subsequent revisions.

4         Q    Right.  But I'm asking whether the CGA has

5    replaced the 1965 version of that pamphlet with a

6    subsequent version of that pamphlet.

7         A    That's my understanding, yes, sir.

8         Q    Okay.  And that pamphlet is a standard for

9    safe handling of compressed gases in containers?

10        A    Yes, sir.

11        Q    Okay.  And do you agree that the standards

12   for the safe handling of compressed gases in

13   containers apply to Oprandy's?

14        A    To a certain extent, yes, sir, that they are

15   in the process of transfilling cylinders of compressed

16   gases, so they're -- so some of it is applicable to

17   them, yes, sir.

18        Q    Okay.  And I notice -- I don't know if I saw

19   it right.  Did you just grab something to reference?

20        A    Yeah.  I grabbed the CGA P-1, 2015.

21        Q    Okay.  I just want to be clear what we're

22   referencing.  And I would ask if you reference that

23   for an answer, if you could just clarify that you were

24   reviewing it.  That would be very helpful.

25        A    Sure.

                                              Page 53

1        Q    Okay.  And do you agree that, as defined by

2   the CGA, Oprandy's was the, quote/unquote, "gas

3   supplier" for purposes of the test tank?

4        A    That's really a little bit outside of my

5   area as it relates to the warnings and safety

6   communications on the test tank itself.  But I would

7   say that Oprandy's falls under -- and I'm reviewing

8   the document that we just referenced -- page 8 of

9   Compressed Gas Association CGA P-1, 2015, under

10  Section 5.7 for transfilling.

11            It addresses two circumstances.  One can be

12  the gas supplier or by other personnel who are -- and

13  I'm just going to read from the standards -- quote,

14  "trained in and use equipment designed for this

15  purpose and trained in and follow written operating

16  procedures that include the precautions necessary to

17  avoid the products' hazards and that comply with

18  government standards and regulations."

19       Q    And so my only question is whether -- and I

20  think you answered it -- under this standard whether

21  Oprandy's is a gas supplier with respect to the test

22  tank.  And am I right that you are saying that that is

23  outside of the scope of what you're opining on?

24       A    I think it's outside the area of my opinions

25  that I have addressed in my report and that there's an

Page 54

1   exception under Section 5.7 for transfilling that

2   would address that Oprandy's is not the actual

3   supplier of the gas because they're not the

4   manufacturer but that they have personnel who are

5   intended to meet the sub-bullets of that Section 5.7

6   for transfilling their -- transfilling material from

7   one container to another container.

8        Q    So you're saying that Section 5.7 creates an

9   exception to the definition of gas supplier?

10       A    I'm saying Section 5.7 addresses suppliers

11  and also another category of personnel who can be --

12  so outside of being a supplier that they're personnel

13  who would be involved with the transfilling, or the

14  transfer, of gases from one container to another.

15  That seems to be more applicable to Oprandy's and

16  their personnel as it relates to this matter.

17       Q    But you do not contend that Section 5.7

18  purports to alter the definition of gas supplier?

19       A    It says gas supplier or by personnel who are

20  trained effectively.

21       Q    Yeah.

22       A    So it addresses two circumstances.

23  Oprandy's, not the manufacturer selling compressed

24  gases -- or selling compressed air to end users, that

25  they are effectively the end user of the gas and that

Page 55

1    they are transferring it from one container to another

2    container for their purposes, they don't necessarily

3    seem to fully meet the definition of supplier as it

4    relates to CGA P-1, 2015.

5         Q    And your basis for that opinion is what's

6    set forth here in 5.7?

7         A    And also as the definition of supplier as

8    defined earlier in the standard.

9         Q    And because you believe that the definition

10   of supplier requires that the cylinder be sold to

11   qualify as the gas supplier; is that right?

12        A    Referencing page 4 of the standard, there's

13   a definition for transfilling.  So that's 3.2.30.

14   "Transfer of cryogenic liquid and/or compressed gas

15   from one container to another."  Then we've got

16   3.2.32.  "User.  Individual, group, or business entity

17   that uses the containerized gas in a non-propellable

18   manner."  So that would be applicable to Oprandy's as

19   it relates to the test cylinder.  They would be a

20   user.  They're not able to recover the gas --

21             And then on the previous page, page 3, we

22   have a definition of gas supplier, 3.2.15.  "Gas

23   supplier.  Business that produces, fills, and/or

24   distributes compressed gases."  As it relates to

25   Oprandy's, my understanding is they don't necessarily

1    produce these materials and they're not distributing

2    them by means of selling compressed air to others.

3            So the only portion of gas supplier that

4    would be applicable are these fills, and that really

5    seems to be addressed by transfilling and the

6    exception identified under Section 5.7 for

7    transfilling as it relates to personnel who can be

8    trained who would not qualify as a gas supplier.

9    Q    Okay.  So you believe that the definition of

10   fill as it's defined in the context of the gas

11   supplier definition is limited by this transfilling

12   section?

13   A    I think the gas supplier definition

14   encompasses manufacturing and distribution and

15   filling, so that seems to be much more encompassing of

16   an enterprise than to be applicable to Oprandy's as it

17   relates to this matter.

18           Oprandy's is really transfilling generally

19   from one container to another container for purposes

20   of pressurizing the container with a given gas.  As it

21   relates to this matter, it's compressed air.  So

22   they're transferring from one vessel to another.

23           So transfilling really seems to be a better

24   fit for what their actual activity is and that they

25   are -- under 5.7 it addresses both gas supplier and

                                                    Page 57

1    personnel who are trained to transfer the material

2    from one cylinder to another.  So it seems that

3    transfilling fits Oprandy's business and their

4    activities appropriately.

5         Q    Okay.  Do you agree that transfilling is a

6    type of filling?

7         A    Transfilling certainly is a type of filling,

8    yes, sir, taking material from one vessel and putting

9    it into another vessel, yes, sir.

10        Q    Okay.  Do you contend that any other entity

11   was the, quote/unquote, "gas supplier" with respect to

12   the test tank other than Oprandy's?  And, obviously,

13   I'm not saying that you are saying that they were.

14        A    The only other thing under the transfilling

15   is it addresses the supplier of the transfill

16   equipment, so that would be Poseidon as it relates to

17   this matter.

18        Q    Turning back to your report, I believe I am

19   on --I think I'm still on page 6.  You state that

20   the -- well, you state that the requirements under the

21   OSHA HazCom standard would generally comport with the

22   guidance in the Compressed Gas Association P-1, 2015.

23   My question is what you mean by "generally comport

24   with."

25        A    So OSHA outlines that you have to address

Page 58

1    the hazards of -- the nature of the hazards of the

2    contents of the cylinder.  The Compressed Gas

3    Association has provided -- has adopted the OSHA

4    framework for doing that type of analysis.  And they

5    have provided, using the OSHA terms and the OSHA

6    guidance, the applicable or the relevant statements

7    and collected them, giving it a signal word, and

8    advised that it should use -- 50 gram, needed -- as it

9    relates to compressed air.

10            So OSHA kind of gives us the framework.  The

11   Compressed Gas Association has taken it one step

12   further, compiled all the relevant information as it

13   relates to compressed air and given the statements

14   that should appear on the label for compressed air to

15   the reviewer or reader of the Compressed Gas

16   Association standard.

17       Q    You don't contend that the HazCom standard

18   replaces or otherwise limits the requirements set

19   forth in CGA P-1, 2015, do you?

20       A    I can't think of a specific circumstance

21   that it would.  I mean, obviously, OSHA would be the

22   regulatory authority, so that wouldn't trump the

23   standard, in my mind, if there was some type of

24   conflict between the two.

25            But as it relates to this sub-section as it

Page 59

1  relates to the hazards associated with compressed air,

2  it seems that the CGA is kind of doing the work for

3  the reader by consolidating the appropriate statements

4  and providing them to the reader for their use for

5  cylinders of compressed air.

6      Q    You state that -- well, is it your opinion

7  that Oprandy's had an obligation to label its tanks

8  with respect to potential chemical hazards?

9          MS. FAPPIANO:  Objection to form.

10     A    I think that's fair as it relates to the

11 content of the tank with the intent that, at least in

12 this circumstance, that it was going to be filled by

13 one individual and then get into another individual

14 and then transported to the site where the material

15 would be consumed.

16         So as it relates to contents of the tank

17 itself, it would be reasonable and appropriate for

18 Oprandy's to label the tank as it relates to

19 compressed gas, as identified in CGA P-1, 2015.

20 BY MR. KIRKPATRICK:

21     Q    What is a potential chemical hazard?

22     A    They could be numerous hazards.  They could

23 be either physical or as it relates to flammability.

24 Or there could be a variety of different potential

25 hazards as it relates to short-term exposure,

1   long-term exposure, flammability explosivity.  So

2   there's a wide variety as it relates to chemical

3   products.

4            (Interruption.  Off the record.)

5   BY MR. KIRKPATRICK:

6        Q    I believe I asked what --

7            MR. KIRKPATRICK:  Did you, Marcia, get

8        to the question of what a potential chemical

9        hazard is?

10           THE REPORTER:  Yeah.

11           MR. KIRKPATRICK:  Okay.

12  BY MR. KIRKPATRICK:

13       Q    And so my next question is whether the

14  potential for gas to rapidly expand, does that pose a

15  chemical hazard?

16       A    It depends on the circumstances.  If you

17  have compressed air outside, if you release compressed

18  air into the general environment, there's probably

19  very little concern you would have as it relates to

20  that.  If you're releasing some other type of

21  material, yes, you could be very concerned about the

22  circumstances, so...

23       Q    So in terms of identifying the chemical

24  hazards that you are required to label, how do you

25  make the decision of whether that hazard is

Page 61

1    sufficiently dangerous to warrant a label?

2        A    So that's spelled out in the HazCom standard

3    as it relates to the individual chemicals.  And then

4    the hazard statements and the precautionary statements

5    are all in the HazCom standard based on the

6    characteristics of the material.

7        Q    Okay.  So with respect to the chemical

8    hazard for the rapid expansion of gas, it's

9    context-specific whether a warning is required?

10       A    As it relates to the rapid expansion of a

11   gas, it's going to depend, yes, on the material, on

12   the circumstances, on the actual pressures involved

13   and potentially other characteristics of the material

14   itself.  So if the material is flammable, that's

15   probably a much different consideration than if it's

16   not flammable.

17       Q    Okay.  And when you say that Oprandy's would

18   only be responsible to provide labeling for chemical

19   hazards, are you saying that there are other types of

20   hazards that they are not responsible for labeling?

21       A    As it relates to this matter and the test

22   tank, Oprandy's would effectively need to communicate

23   about the contents of the testing, whether it's

24   compressed air or it's nitrogen and provide those

25   safety communications regarding the potential hazards

                                              Page 62

1    associated with the contents of the container under

2    the guidance given by OSHA and the Compressed Gas

3    Association.

4        Q    And are they required to warn against

5    potential physical hazards of the test tank related to

6    the contents?

7             MS. FAPPIANO:  Objection to form.

8        A    So as I understand your question, if the

9    contents of the tank were released and there's a

10   physical hazard associated with the release of the

11   material?  Is that --

12   BY MR. KIRKPATRICK:

13       Q    Yeah.

14       A    So then as it relates to the -- potentially

15   there's some safety implications depending on the

16   material that may need to be communicated about the

17   material itself, the physical characteristics or the

18   potential hazards associated with the material, yes,

19   sir.

20       Q    Okay.  And this is all spelled out in the

21   HazCom regulations?

22       A    And also in the Compressed Gas Association

23   standard as well, yes, sir.

24       Q    Okay.  So are you familiar with -- and I

25   don't know whether you cite it or not -- CGA Pamphlet

```
                                              Page 63
 1    C-7?  You do cite it.
 2         A     Yes, sir.
 3         Q     Do you agree -- and I guess I'll ask, are
 4    you looking at that standard right now?
 5         A     No.  I didn't pull that out yet, but I can
 6    grab it.
 7         Q     You may not need to, but we'll see.
 8               Again, like the P-1 standard, do you agree
 9    that the C-7 standards apply in conjunction with the
10    OSHA HazCom standards?
11         A     To the extent that the employer is
12    communicating contents of the container, yes, sir.
13         Q     But I guess what I'm asking is, the OSHA
14    standards do not supplant or replace the C-7
15    standards; right?
16         A     No.  The OSHA standard would be over
17    everything.  And then the Compressed Gas Association
18    is providing industry-specific guidance as it relates
19    to labeling for the P-1 standard.  So it's a
20    supplemental resource for users to have information
21    that they need to appropriately label for the contents
22    of the containers that they are filling.
23         Q     Okay.  Do you agree that the C-7 standards
24    were developed in part to give guidance on how to warn
25    of physical and health hazards for compressed gas
```

```
                                        Page 64
```

1   cylinders?

2          A     Hold on.  Let me pull it out.

3          Q     Sure.  Just for the record, are you looking

4   at the 2014 version?

5          A     Yes.  I think -- that's the version I have,

6   2014.

7          Q     Okay, great.

8          A     Okay.  So P-1 is the standard for addressing

9   the safe handling of compressed gases in containers,

10  so that's the handling.  And I apologize.  I may have

11  misstated a previous answer, but C-7 is the guide to

12  classification and labeling of the compressed gases.

13  So that's where you find the specific guidance as it

14  relates to the guidance for the compressed air

15  cylinder.

16              So I reference that at the beginning of my

17  report.  So I may have misspoken earlier.

18         Q     And this standard was developed in part to

19  give guidance on how to warn of physical and health

20  hazards for compressed gas cylinders; is that right?

21         A     Yes, sir.

22         Q     Okay.  And do you agree that the C-7

23  standard places the responsibility to ensure that

24  labels adequately warn of physical hazard on the gas

25  supplier?

Page 65

1      A    As it relates specifically to the contents

2    of the cylinder, the chemical being filled, or the

3    potential hazards associated with the contents of the

4    cylinder, yes, sir.

5      Q    And when you say "the contents of the

6    cylinder," are you drawing a distinction between that

7    and other types of hazards?

8      A    Yes, sir.  As it relates to any type of

9    limitations as it relates to the cylinder itself for

10   the valving or the subcomponents in use to assemble

11   the cylinder, those would not fall under the

12   Compressed Gas Association CGA C-7 as it relates to

13   employers and filling of chemicals.

14     Q    And what is the basis for that limitation?

15     A    I can review the introduction and scope

16   and -- page 1, No. 2.  Scope defines the -- or

17   provides the basis for the -- it's giving general

18   principles for labels and markings and gives

19   recommended minimum requirements for hazardous gases

20   and selected liquids.  And then the next paragraph,

21   the methods of preparing label information established

22   by GHS as required by Title 29 of the U.S. Code of

23   Federal Regulations.

24     Q    You don't need to read the whole thing.  But

25   it's in the scope -- the introduction and the scope

Page 66

1    section?

2         A    Yeah.  That introduction and the scope

3    Section, pages 1 -- yeah, it's page of the CGA-7,

4    2014.

5         Q    Okay.  And are you basing your opinion on

6    anything other than what's on this page essentially?

7         A    Well, the OSHA HazCom standard, which is

8    addressed as part of that page.  So it addresses the

9    hazards associated with the contents of the cylinders

10   or the material being filled into the cylinders.  So

11   that's kind of what's addressed by the standard.

12        Q    Okay.  Do you believe that -- we discussed

13   P-1.  Do you agree that Oprandy's is subject to the

14   requirements of CGA C-7?

15        A    To the extent that the -- as the employer

16   they should be labeling or need to be labeling the

17   cylinders as they're related to the contents and the

18   characteristics and the potential hazards of materials

19   they're filling into the cylinders, yes, sir.

20        Q    Okay.  And turning back to your report,

21   still on page 6, I just want to discuss your

22   understanding of how the test tank was going to be

23   used that day.  Is it your understanding that

24   Mr. Scott asked his employee to fill the tank?  Do I

25   have that right?

Page 67

1        A     That is my understanding, that Mr. Scott

2    requested Mr. Foust to fill the cylinder so he could

3    take it off-premises later that day, yes, sir.

4        Q     Okay.  And do you agree that neither

5    Mr. Buono nor Mr. Foust is going to be involved in the

6    test off-site that day?

7        A     That's my understanding, that only Mr. Scott

8    would be involved in the off-site test that day.

9        Q     Okay.  And do you recall from the OSHA

10   report that the tank was repeatedly filled and

11   refilled at Oprandy's?

12       A     Over what period of time?  Over years and

13   years?

14       Q     Just in general.

15       A     I think that's fair.  It was my

16   understanding Mr. Scott used this tank and other

17   tanks, similar tanks, on multiple occasions to perform

18   these off-site tests.

19       Q     Okay.  And you note here that the subject

20   cylinder was intended to be filled with compressed

21   area and discharged during the same work shift by

22   Oprandy's employees.  My question is, what effect, if

23   any, does this have on Oprandy's obligations to label

24   the cylinder?

25       A     That they're taking the cylinder and filling

Page 68

1    it and transferring it between employees and taking it

2    off-site, transporting it to another location, it

3    certainly seemed that the cylinder would have to be

4    labeled under the OSHA HazCom standard as it relates

5    to the chemical hazards associated with the contents

6    of the cylinder.

7         Q    Okay.  But you're not saying that because it

8    was transferred between employees that that creates

9    some kind of exception to labeling requirements that

10   they otherwise would be subject to?

11        A    No.  The only exception, hypothetically,

12   would be under a circumstance where the individual who

13   fills the vessel and then would use the vessel at the

14   same site within the same work shift, so they're in

15   control of the vessel the entire time.

16             There's an exception under OSHA for if

17   you're the same shift, same person, that if you -- if

18   you're in control of the vessel the entire time, then

19   you wouldn't have to necessarily provide this

20   labeling.  But because there's a transfer, because

21   it's going to be transported off-site, the vessel, as

22   it relates to chemical hazards, would have to be

23   labeled under the OSHA HazCom standard.

24        Q    Okay.  We are now moving on to page 7, I'm

25   happy to say.  You state after the bullet point that

```
                                           Page 69
 1   you disagree with Tyco's experts because there is not
 2   a basis in the applicable OSHA regulations or the
 3   Compressed Gas Association standard that an employer
 4   would have to provide different or additional
 5   warnings.  Different or additional to what?
 6        A    Anything beyond what is defined in the OSHA
 7   HazCom standard as it relates to compressed air and
 8   what was referenced in CGA C-7 as the -- addressing
 9   the contents of the material that's inside the
10   cylinder.
11        Q    Okay.  And so the applicable OSHA
12   regulations that you refer to are the HazCom
13   standards?
14        A    Yes.
15        Q    And the CGA, those are what we just
16   discussed, the P-1 and C-7?
17        A    Yeah.  Primarily C-7 as it relates to OSHA
18   and HazCom.
19        Q    Okay.  And you say that -- well, you mention
20   the expected use of the cylinder as a test tank.  What
21   do you mean by that, the expected use of the cylinder
22   as a test tank?
23        A    That's my understanding of what the intended
24   use of the subject cylinder is, to be used as a test
25   tank for these tests such as Mr. Scott was intending
```

Page 70

1    to perform on the afternoon of the subject incident.

2         Q    Okay.  So you're saying that there was no

3    obligation for Oprandy's to label the tank to describe

4    what the expected use of it would be?

5         A    My opinion is that they would only be

6    responsible for the labeling as it relates to the

7    contents of the tank itself, so the chemicals they

8    chose to fill the tank with.  They're responsible to

9    provide the labeling and the communications as it

10   relates to the contents of the tank itself.  So I hope

11   that addresses your question.

12        Q    I'll try to ask it a different way.  I guess

13   really what I'm asking is what do you mean by -- well,

14   never mind.

15             Is it your opinion here in this paragraph

16   that's after the third bullet point that there was no

17   obligation for Oprandy's to provide warnings regarding

18   the -- basically that the test tank was going to be

19   used as a test tank?

20        A    Yeah.  I think it's really just limited

21   to -- my opinion is limited to they would be

22   responsible to provide warnings and safety

23   communications related to the contents of the

24   cylinder, make sure it's appropriately labeled with

25   the OSHA HazCom standard for that so when it's used

Page 71

```
1    off-site -- transported off-site that cylinder is
2    appropriately labeled under the HazCom standard.
3         Q    So what do you mean by regarding the
4    expected use of the cylinder as a test tank?
5         A    So my understanding of the expected use of
6    the test tank is to be taken off-site, connected to a
7    system, Tyco system that (Zoom glitch) --
8              (Reporter clarification.)
9         A    -- connected to a system off-site to perform
10   the balloon test.  They would discharge the contents
11   of the cylinder as part of this off-site test.
12             So the HazCom standard and the CGA 7
13   standard provide what the employer should label for
14   regarding the contents of the tank.  And that would be
15   the extent of their warnings and safety communications
16   that would be the responsibility of Oprandy's as it
17   relates to this matter.
18   BY MR. KIRKPATRICK:
19        Q    Okay.  And I guess what do you mean by --
20   what would a warning regarding the expected use of the
21   cylinder as a test tank be?
22             MS. FAPPIANO:  Objection to form.
23        A    I think to the extent that Mr. Taranto --
24   Taranto (different pronunciation) -- expresses that
25   there should be some different or additional safety
```

Page 72

1    communications on the tank that that would not be the

2    responsibility of Oprandy's under the applicable

3    regulations and standards as it relates to their

4    employer responsibility.

5              So the employer is responsible for

6    addressing the chemical contents of the tank and the

7    hazards associated with that.  Anything beyond that

8    would not be the responsibility of the employer.

9    BY MR. KIRKPATRICK:

10       Q    Okay.  Do you have an opinion as to whether

11   anyone was required to provide a warning regarding the

12   expected use of the cylinder as a test tank?

13       A    It not -- it's kind of outside the area of

14   my analysis.  I think the -- my opinion really is

15   focused on that Oprandy's had certain responsibilities

16   under the HazCom standard and CGA 7 to provide safety

17   communications regarding the contents of the tank.

18   Any other criticisms as it relates to what should have

19   been on the tank or labeling would not be addressed

20   appropriately by Oprandy's.  That would be

21   appropriately addressed by the manufacturer of the

22   tank assembly, which would not be Oprandy's in this

23   matter.

24       Q    Okay.  Turning to page 8 -- well, actually

25   no.  I think it actually might be on page 7.  My

Page 73

1  question is why an entity selling kitchen fire

2  suppression equipment would be in the best position to

3  evaluate the risks created by the tank.

4      A    Well, they are the manufacturer of the test

5  tank itself.  So they have taken components from a

6  variety of suppliers, and they have created a new

7  product.

8           So as the manufacturer or the assembler of

9  those component parts, they're in the best position --

10  and they're selling this tank as well.  So they're in

11  the best position -- should there be different or

12  additional safety communications that should be

13  provided, that would be the entity that would be best

14  suited to have a consideration of what safety

15  communications may or may not be need to be provided

16  on the tank if necessary.

17          So they chose to identify these test tanks,

18  you know, segregating them from other types of tanks

19  that they manufacture.  They're painting the top-half

20  version.  So there's one way that they're indicating

21  this tank is different than the others.

22          So to the extent that they are making that

23  decision, they are the entity that would be best

24  suited to evaluate should any different or additional

25  safety communications be necessary, and they would be

Page 74

1   the entity that would have to make that determination.

2       Q    And with respect to this accident in

3   particular, is your opinion just that Tyco is in a

4   better position than Oprandy's or a better position

5   than any other manufacturer with respect to safety

6   warnings?

7       A    As we're focusing just on the tank itself,

8   that Tyco as the assembler of the component parts to

9   make the test tank would in the best position to

10  evaluate should any different or additional safety

11  communications need to be provided on the test tank if

12  necessary.

13          So that would -- now, that's separate from

14  the contents of the tank that's being filled by

15  Oprandy's.  That's governed by OSHA adjusted to

16  CGA C-7.  So that would encompass what the scope of

17  Oprandy's responsibilities would be.  Should there be

18  other safety communications provided on the tank

19  itself, that would not be the responsibility of

20  Oprandy's to make that determination.

21      Q    And that's based on the regulation that you

22  just discussed or on their position vis-a-vis being in

23  the best position to provide warnings?

24      A    I think there's certainly guidance from OSHA

25  as it relates to the HazCom standard that Oprandy's is

Page 75

1    the entity that needs to provide the safety

2    communications as it relates to contents of the tank.

3             Should any different or additional warnings

4    need to be provided on the subject cylinder, that

5    would not fall within the purview of Oprandy's but

6    that as the assembler of the components, Tyco is in

7    the best position to evaluate, should any different or

8    additional warnings be needed for the subject

9    cylinder, to make that determination.

10   Q    And you're not opining that it would have

11   been necessary or appropriate for Tyco to have

12   included additional warnings?  You're just saying they

13   would be in a better position if those warnings were

14   required?

15   A    Yes, sir.  Should there be any different or

16   additional safety information that may have been

17   needed to be considered to be provided, Tyco is the

18   entity that would be the ones to evaluate and make

19   that determination.

20            Obviously, they made the determination to

21   paint a portion of the tank green.  So they,

22   obviously, are making some considerations to the

23   intended use of this tank as a test cylinder as

24   opposed to a different type of application.

25   Q    And did the painting of the test tank green

```
                                        Page 76
1    mean anything to you from a warnings perspective, or

2    you're just a saying they treated it as a separate

3    type of tank?

4         A     They're treating it as a separate type of

5    tank.  They chose to put labels on some types of

6    tanks.  And they chose to address this type of tank by

7    painting it green.  So it's just trying to make a

8    differentiation, I think, between the intended uses of

9    the tanks.

10            Does that impart any responsibility upon

11   Tyco to provide any different or additional warning?

12   That's not my -- I'm just saying Oprandy's would not

13   be the entity to make that determination.

14        Q     Okay.  And if the hazards were some kind

15   of -- if a physical health hazard were posed by the

16   Poseidon system as opposed to, you know, the Tyco

17   tank, do you agree that it would be Poseidon that's in

18   the best position to evaluate the risks posed by its

19   product?

20            MS. FAPPIANO:  Objection.

21        A     As it relates to the potential hazards

22   associated with the Poseidon system and potentially

23   transfilling material, yes.  That's under the CGA

24   standard and also addressed by the other experts.  I

25   think that's where we do agree, as I state on page 9,
```

```
                                          Page 77
 1   with Mr. Coelho and Mr. Juliano that Poseidon would be
 2   responsible as it relates to the operating
 3   instructions as the supplier of the transfill
 4   equipment.
 5   BY MR. KIRKPATRICK:
 6       Q    And you agree that Poseidon, in addition to
 7   it being in the standard, they would be in the best
 8   position to evaluate the risks associated with its
 9   product?
10       A    Yes, sir.  Yes, the risks associated with
11   the cascade system and the transfilling of the
12   material from their system, yes, sir.
13       Q    Okay.  On the same page, you state that the
14   product -- sorry.  Actually, I think we just covered
15   that.
16            You state that it is not reasonable to
17   expect an entity that services fire extinguishers to
18   reach a different conclusion with regard to safety
19   communications for the test tank.  What's the basis
20   for that opinion?
21       A    I think that, generally, the expectation is
22   that the manufacturers of products, that they are
23   responsible for performing any analysis as it relates
24   to products they're intending to sell and market, that
25   they are the entity that is best suited to provide the
```

Page 78

1    warnings and safety communications for their product.

2            I think that's generally accepted across

3    many industries, that you wouldn't have an expectation

4    that the consumer or the entity buying your product is

5    going to take that product and then provide -- or

6    perform some different or additional safety analysis

7    as it relates to the characteristics of that product

8    because the consumer or end user or the purchaser of

9    that product is not going to have the benefit of all

10   the knowledge that you did as the assembler of those

11   parts to make the system, to make the test tank.

12           So the entity that should say it's necessary

13   or should any different or additional safety

14   communications be needed, that would fall to the

15   assembler of the test tank.

16      Q    And is that understanding based on something

17   that you've studied or a particular reference, or is

18   that just something that you've observed?

19      A    I think that's expressly in some standards

20   as it relates to -- that are applicable to

21   manufacturers of some products.  Is it in the federal

22   regulations to a certain extent for some products?

23   Yes.  Is it in commonly accepted standards from the

24   UL, ASTM, and others?  Yes.

25           So, generally, I think as the assembler of

1    the component parts to make the system, that entity is

2    responsible for providing the safety communications

3    should any be necessary for that system.  I think

4    that's well-established in the literature and the

5    standards and regulations that are out there for a

6    variety of problems.

7        Q    Okay.  Do you agree that it's important for

8    employers to recognize and guard against workplace

9    hazards?

10       A    Yes, sir.  Yes.  It's certainly -- in

11   general, I would agree that it's important for

12   employers to evaluate potential hazards in the

13   workplace and address them, yes, sir.

14       Q    Okay.  Looking at page 8, there's excerpts

15   that you have from C-7.  It's your opinion that to

16   comply with CGA C-7, Oprandy's would have needed to

17   include a label that includes essentially all the

18   contents listed here?

19       A    So, yeah.  Once the cylinder is filled and

20   is transferred from one individual to the next

21   individual, before it's transferred off-site, it

22   certainly would be -- should have been labeled as

23   compressed air, signal word, and a warning in the

24   statements you see here in the -- out of the middle

25   panel.  And then there's a note as it relates to the

Page 80

1  DOT -- or these are the GHS symbols.  So, yes, that

2  would be the content of the safety information that

3  should have been provided by Oprandy's for the

4  cylinder.

5      Q    Okay.  And it's your opinion that that only

6  would have needed to go on after the tank was filled?

7      A    Prior to the time it's transferred from

8  Mr. Foust to another individual.

9      Q    And is there any requirement that that label

10 be taken off at some point?

11     A    I mean, if the tank is not filled with a

12 given material and it's empty, it probably would be

13 not unreasonable to remove the prior labeling.  I

14 don't know what their process was.  Or if you're

15 intending to fill it with a different material that

16 had on a previous occasion, then it would be

17 appropriate to remove the prior one.

18     Q    Okay.  And this excerpt that you have here,

19 am I right that this is not what the label would need

20 to look like?  It just contains the references that

21 would need to be in the label?  Am I right about that?

22     A    Sure.  So you have to identify the chemical.

23 So here it's compressed air. You have to provide the

24 statements in the middle panel of Figure 1.

25     Q    Oh, okay.  And would it need to look

Page 81

1  identical to the middle panel of this figure?

2       A    There's different ways you can do it.

3  Because it's intended only to be used internally and

4  not being sold, there's not a requirement for a color.

5  So it could just be black and white.

6            So it's really to have the pictogram, the

7  signal word, the identification of the material, and

8  the hazard and precautionary statement.  So that's

9  generally what you're trying to communication because

10 it not being sold to another entity.

11      Q    Okay.  You discussed earlier in your report

12 about how it's important for warnings -- in order for

13 a warning to be effective, the individual who sees the

14 warning has to notice it, agree with it, believe it

15 should be followed, et cetera, et cetera; right?

16      A    Generally, yes, sir.  Yeah, that's fair.

17      Q    Do you have an opinion as to whether a

18 warning on the test tank would have been believed by

19 Mr. Foust?

20           MS. FAPPIANO:  Objection to form.

21      A    You'd have to give me some more information

22 as it relates to that hypothetical.  You know, what is

23 the content?  Was this trying to communicate a hazard?

24 Generally, I think that would fall outside of my

25 opinions as it relates to this matter, which are

```
                                                       Page 82
```

1    really specific just to labeling and as it relates to

2    the cylinder itself.  But that hypothetical, I would

3    need some more information.

4         Q    Okay.  And you did not -- well, strike that.

5              So whether a warning will be followed,

6    believed, the things that you described, it depends on

7    a lot of factors for the warning label; right?

8              MS. FAPPIANO:  Objection to form.

9         A    There's lots of factors that need to be

10   considered:  The characteristics of the intended

11   audience, the safety communication itself, the

12   hazards, prior experience.  There's a variety of

13   factors have to be evaluated.  But, again, that's not

14   the scope of what I'm opining about.

15   BY MR. KIRKPATRICK:

16        Q    Okay.  Now, on page 9 you discuss CGA C-7,

17   Section 5.2.3.  What's the basis for your opinion that

18   this section did not apply to the test tank?

19        A    So this is identifying if you come across a

20   tank that is not appropriately labeled that it should

21   be segregated and returned to the gas supplier or

22   distributor.

23             So if you're hypothetically at a workplace

24   or some location and there's a cylinder that's not

25   appropriately labeled, you shouldn't use that cylinder

Page 83

1    because you're not going to be aware of what the

2    contents of that cylinder is or the general hazards

3    associated with the contents of that cylinder.

4            Given that that would be unknown to you, it

5    would not be appropriate to use that cylinder.  So

6    that cylinder should be segregated and returned to the

7    supplier for them to either dispose of or -- however

8    they're going to address that particular circumstance.

9            So it's really to the end user to not use

10   any cylinder that's not appropriately marked so you

11   wouldn't accidentally discharge a different chemical

12   than you're intending to use in a certain

13   circumstance.

14       Q    And you're saying that this does not apply

15   because the employees at Oprandy's knew the contents

16   of the cylinder?

17       A    Well, it's that the cylinder at the time of

18   the incident is being transfilled with the compressed

19   air.  So the person who's doing the transfilling knows

20   what chemical they're putting into the cylinder.  So

21   once that activity is complete, the contents of the

22   cylinder has to be identified, labeled appropriately,

23   and then it can be transported off-site.

24       Q    You agree that when Mr. Foust -- before he

25   filled the cylinder, when he was handling the

Page 84

```
 1   cylinder, it did not have a label identifying the
 2   contents of the cylinder?
 3       A    I haven't seen any photographs that would
 4   indicate that there would have been a label on there.
 5   And I'm not aware of any evidence that there was a
 6   label on there.
 7            The photographs I've seen, that was at the
 8   time of the accident.  The cylinder is distorted,
 9   ripped apart.  So you can only -- I can't make that
10   determination.  I don't know.
11       Q    Okay.  But if the cylinder did not have a
12   legibly written stamped or stenciled identification on
13   it, then that tank should not have been handled?
14            MS. FAPPIANO:  Objection.
15       A    I think there's different aspects here.  So
16   when we're talking about tank markings, that's
17   separate and apart from the responsibility of
18   Oprandy's but the -- labeling for the contents of the
19   cylinder.  So putting a label on for just the contents
20   of the cylinder would be the responsibility of
21   Oprandy's prior to the time that Mr. Foust -- once he
22   hypothetically finished filling the cylinder and given
23   it to Mr. Scott, the contents of the cylinder should
24   have been appropriately labeled as compressed air in
25   accordance with CGA C-7 and the OSHA HazCom standard.
```

```
                                                    Page 85
```

1   BY MR. KIRKPATRICK:

2       Q    But before Mr. Foust filled the tank, if the

3   container did not have a label on it, then should he

4   have segregated it for a return to the gas supplier or

5   the distributor?

6            MS. FAPPIANO:  Objection to form.

7       A    Based on my understanding as it relates to

8   this circumstance, the subject cylinder was empty.  It

9   had no contents prior to the time it was being filled.

10  So it was not unreasonable for Mr. Foust to attempt to

11  fill the cylinder prior to that time.  And then it's

12  not inappropriate for Mr. Foust not to have applied

13  the label until after the time of filling the cylinder

14  should that have occurred.

15  BY MR. KIRKPATRICK:

16      Q    And what is the basis for your understanding

17  that Mr. Foust knew that the cylinder was empty at the

18  time that he handled it?

19      A    I think that's Mr. Scott's testimony, that

20  he had used the cylinders approximately one week prior

21  to the date of this event to perform a similar

22  exercise and that he was requesting Mr. Foust to fill

23  the cylinders on the day of the subject event to go

24  and do the off-site testing again.

25      Q    So your understanding that Mr. Foust knew

Page 86

1    the tank was empty is based on Mr. Scott's testimony;

2    is that right?

3        A    I think that's fair, yes, sir.  That would

4    be based on Mr. Scott's testimony as it relates to his

5    prior use of the tank and that he had not used it and

6    asked Mr. Foust to fill it on the day of the event,

7    yes, sir.

8        Q    So if Mr. Foust was not sure whether the

9    tank was fully empty, then should he have -- and the

10   tank did not have the contents labeled, then should he

11   have segregated it for return to the gas supplier or

12   distributor?

13            MS. FAPPIANO:  Objection.

14       A    I'm not aware of any basis that Mr. Foust --

15   or any evidence that there's any confusion that the

16   tank was not empty prior to the time of this event.

17   BY MR. KIRKPATRICK:

18       Q    Well, let's just -- even extracting from

19   this case, just as a general matter, under the terms

20   of 5.2.3, if an individual is unsure whether a tank is

21   full or empty, should they segregate it and return it

22   to the gas supplier or distributor?

23            MS. FAPPIANO:  Objection.

24       A    I think -- not knowing the specific business

25   practice of Oprandy's as it relates to how they would

Page 87

```
 1    handle that, I think it certainly is not unreasonable
 2    given that these test tanks are used with either
 3    compressed air or nitrogen that it would be within the
 4    purview of Oprandy's to discharge safely should there
 5    be any residual pressure or material in the tank prior
 6    to the time of filling, so they would -- not knowing
 7    their exact practice, it would not be unreasonable for
 8    them to appropriately handle and prepare the cylinder.
 9             But I don't have any evidence that they did
10    that or they were confused by the contents of the
11    cylinder on the day of this event.
12    BY MR. KIRKPATRICK:
13        Q    So if an individual has reason to believe
14    that they know the contents of the cylinder and that
15    cylinder is not identified, they are still okay to use
16    the cylinder so long as they believe that they know
17    what's in it?
18        A    No, sir.  I think there's -- under this
19    hypothetical, if you don't know what the contents is,
20    could you make a determination of what the contents
21    is?  Yes.  How would you go about doing that?  Well,
22    you would have to maybe test the gas, should there be
23    any.  If the valve is already open and there's not any
24    pressure on the tank, that should confirm the tank is
25    empty.
```

```
                                              Page 88
 1          You're intending to fill it with the same
 2   material it's been filled with previously, air or
 3   nitrogen.  You're not trying to fill it with a
 4   different type of chemical or a different potential
 5   material.  So given that you're intending to use the
 6   tank for its similar purpose, if you can confirm that
 7   it's empty, it would not be inappropriate to fill the
 8   tank.
 9          Should there be any pressure or material in
10   the tank that you're not aware of what the contents
11   is, then you have to take steps to identify the
12   potential contents of the tank prior to using it or to
13   safely discharge the remaining pressure of the
14   material (Zoom glitch).
15          (Reporter clarification.)
16      A    Following a safety procedure to discharge
17   the remaining material so you can ensure the tank is
18   empty prior to the time of filling it.
19   BY MR. KIRKPATRICK:
20      Q    And what's the basis for your opinions
21   related to the appropriateness of the steps for
22   determining whether a tank is empty?
23      A    That would fall on the employer.  That would
24   be their policies and procedures as it relates to
25   handling these tanks that come back.
```

```
                                            Page 89
 1            Obviously, as it relates to the fire

 2   extinguishers, they're bringing these back,

 3   discharging them, reassembling them -- or maintaining

 4   them and refilling them.  So they're in the business

 5   of handling these cylinders or theses types of

 6   cylinders.

 7            So that would be within the purview of the

 8   employer as to the -- what they have determined to be

 9   their policies and procedures as it relates to the

10   handling of the tanks themselves.

11       Q    My question is -- you stated shortly ago

12   that it would not be inappropriate under the

13   circumstances as you understand them for Oprandy's --

14   for Chris Foust to empty the tank or to determine

15   whether the tank is empty.  And I'm wondering on what

16   basis do you believe that such steps would not be

17   inappropriate?

18            MS. FAPPIANO:  Objection.  That

19       misstates his testimony.

20       A    I'm not following your question.

21   BY MR. KIRKPATRICK:

22       Q    You just a short while ago described steps

23   that -- and I believe I'm quoting you right.  You were

24   saying it would not be inappropriate for Chris Foust

25   to determine whether the tank is empty or not.  And my
```

```
                                              Page 90
1    question is, on what basis are you saying that it
2    would not be inappropriate for Chris Foust to do so?
3              MS. FAPPIANO:  I have the same
4         objection.
5         A    As I understand your question, that this is
6    in the purview of what Oprandy's does as it relates to
7    the subject container, that the subject vessel is
8    intended to be filled and discharged, the way it is
9    used, it is my understanding it's fully discharged
10   every time it is used in the balloon test so that the
11   container would always return empty.
12             Should the container not be empty for some
13   reason, there may be indications of pressure or other
14   evidence or communications from Mr. Scott to Mr. Foust
15   as relates to some other possible circumstance.  But
16   the general expectation is the tank would be used, the
17   entire contents would be consumed, and the tank would
18   be empty prior to it returning to Oprandy's, where it
19   is stored until the next time it needs to be filled
20   for the next test.  So that's my understanding of the
21   process.
22             Should there be some other circumstance
23   that -- there may be policies and procedures within
24   Oprandy's to address.  But that would have to be
25   addressed by Oprandy's as it relates to the handling
```

Page 91

1  of a container or a vessel that they don't know the

2  contents of.  But here my understanding is the

3  contents of the vessel is consumed in every test and

4  the containers are returned empty to the facility.

5  BY MR. KIRKPATRICK:

6      Q    Okay.  It is your opinion that employers

7  have the discretion to develop policies and procedures

8  for determining whether a tank is empty or full?

9            MS. FAPPIANO:  Object to the form.

10      A    I think that would be in the purview of

11  Oprandy's business as it relates to the processing and

12  handling of fire extinguishers and the test tanks,

13  that they are the entity that would -- if there's some

14  abnormal circumstance that comes up that they would

15  have to address it as it relates to the -- if there's

16  a tank that they don't know the contents of or

17  whatever circumstance may present itself, they'd make

18  a determination about what to do with that particular

19  tank.

20            If it's a tank that's been received from a

21  supplier, certainly then they would probably go to

22  5.2.3 and say this tank has not been identified

23  appropriately by the supplier, we're sending it back.

24            If it's an internal tank that is similar to

25  the test tank that they know, that they've been in

```
                                              Page 92
 1    control of, that they know what the circumstances of

 2    its use has been and what their intended use is to be,

 3    then they would be the ones to appropriately address

 4    how to handle that circumstance.

 5    BY MR. KIRKPATRICK:

 6        Q    Is it your understanding under the

 7    regulations -- so not talking about Oprandy's in

 8    particular but under the regulations -- that employers

 9    have the discretion to develop policies and procedures

10    for determining whether a tank that's unidentified is

11    full or empty?

12             MS. FAPPIANO:  Objection to form.

13        A    I think it definitely depends on the

14    employer and their circumstances and what their

15    capabilities are.

16             So if you're an end user and you're taking

17    in a tank from a distributor or somebody you're

18    purchasing material from, that's definitely much

19    different than if you're a more sophisticated entity

20    as it relates to the filling of the tanks and the

21    labeling of the tanks.  And even then, supplier

22    material would be a different category.

23             So I think the answer is, certainly, it

24    depends on whoever the entity is that is receiving the

25    material.
```

Page 93

1      Q    And is that opinion based on particular

2   regulations or industry standards?

3      A    I think it's based in part on the CGA P-1

4   that we're talking about here, where there's a

5   potential for unidentified-contents material, that the

6   end user would return that cylinder to the supplier.

7           But circumstances are going to be different

8   for different entities, depending on their role in the

9   supply chain.

10     Q    And what you're consulting for that opinion

11  is primarily what's in the CGA standards?

12     A    I think that's fair, yeah.  The CGA C-7 does

13  provide some.  P-1 and C-7 provide some guidance as it

14  relates to the cylinders and who's responsible to

15  label the cylinders with regard to the potential

16  hazards and if you come across an unidentified

17  cylinder as a user that you should return it to the

18  supplier, yes sir.

19          MR. KIRKPATRICK:  Okay.  Let's take a

20      break now and come back in five minutes.

21          (Whereupon, a recess was taken.)

22          MR. KIRKPATRICK:  I have no further

23      questions for you, sir.  Thank you for your

24      time.

25          THE WITNESS:  Great.  Thank you.

```
                                            Page 94
 1            MR. FROMSON:  I have no questions.
 2            MS. FAPPIANO:  I have no questions.
 3            THE REPORTER:  Before we go off the
 4       record, is the witness going to read and sign
 5       or waive?
 6            THE WITNESS:  I'll read and sign.
 7            THE REPORTER:  Okay.  And, also, I need
 8       to get the orders.
 9            Ms. Fappiano, did you want a copy?
10            MS. FAPPIANO:  Yes, please.
11            THE REPORTER:  Okay.
12            Mr. Fromson, did you want a copy?
13            MR. FROMSON:  I'll take a copy.  I do
14       not need it expedited.  Just a regular copy.
15            THE REPORTER:  Okay.
16            MS. FAPPIANO:  Yeah, me either.  Regular
17       is fine.
18            THE REPORTER:  Okay.
19            And, Mr. Kirkpatrick, you'll get the
20       original and a copy; right?
21            MR. KIRKPATRICK:  Right.
22            (Deposition concluded at 1:41 p.m.)
23
24
25
```

Page 95

REPORTER DISCLOSURES

The following representations and disclosures are made in compliance with Georgia Law, more specifically:
Article 10(B) of the Rules and Regulations of the Board of Court Reporting (disclosure forms), OCGA 9-11-28(c) (disqualification of reporter for financial interest), OCGA 15-14-37(a) and (b) (prohibitions against contracts except on a case-by-case basis).

- I am a certified reporter in the State of Georgia.
- I am a subcontractor for Veritext.
- I have been assigned to make a complete and accurate record of these proceedings.
- I have no relationship of interest in the matter on which I am about to report which would disqualify me from making a verbatim record or maintaining my obligation of impartiality in compliance with the Code of Professional Ethics.
- I have no direct contract with any party in this action and my compensation is determined solely by the terms of my subcontractor agreement.

FIRM DISCLOSURES

- Veritext was contacted to provide reporting services by the noticing or taking attorney in this matter.
- There is no agreement in place that is prohibited by OCGA 15-14-37(a) and (b).  Any case-specific discounts are automatically applied to all parties, at such time as any party receives a discount.
- Transcripts:  The transcript of this proceeding as produced will be a true, correct, and complete record of the colloquies, questions, and answers as submitted by the certified court reporter.
- Exhibits:  No changes will be made to the exhibits as submitted by the reporter, attorneys, or witnesses.

Page 96

1    - Password-Protected Access:  Transcripts and exhibits
     relating to this proceeding will be uploaded to a
2    password-protected repository, to which all ordering
     parties will have access.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 97

```
 1                  C E R T I F I C A T E
 2
         I hereby certify that the foregoing transcript
 3   was reported, as stated in the caption; that the
     witness was duly sworn and elected to reserve
 4   signature in this matter; that the colloquies,
     questions and answers were reduced to typewriting
 5   under my direction; and that the foregoing pages
     represent a true, correct, and complete record of the
 6   evidence given.
         The above certification is expressly withdrawn
 7   and denied upon the disassembly or photocopying of the
     foregoing transcript, unless said disassembly or
 8   photocopying is done under the auspices of Veritext
     Legal Solutions, and the signature and original seal
 9   is attached thereto.
         Pursuant to Article 10B of the Rules and
10   Regulations of the Board of Court Reporting of the
     Judicial Council of Georgia, I make the following
11   disclosure:  That I am a Georgia Certified Court
     Reporter and Registered Professional Reporter, here as
12   an independent contractor for Veritext Legal
     Solutions; that I was contacted by the offices of
13   Veritext Legal Solutions to provide court reporting
     services for this deposition; that I will not be
14   taking this deposition under any contract prohibited
     by Georgia law; and that I am not disqualified as a
15   reporter for a relationship of interest under the
     provisions of O.C.G.A. 9-11-28(c).
16       This the 3rd day of August, 2020.
17
18
19
20           MARCIA ARBERMAN, CCR-B-1059
21
22
23
24
25
```

Page 98

```
 1    TARA FAPPIANO, ESQ.

 2    tara.fappiano@hbandglaw.com

 3                       August 4th, 2020

 4    RE: Franklin Buono v. Tyco Fire Products LP.

 5         7/21/2020, Eric Boelhouwer (#4139718)

 6         The above-referenced transcript is available for

 7    review.

 8         Within the applicable timeframe, the witness should

 9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12         The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    cs-ny@veritext.com

16

17     Return completed errata within 30 days from

18    receipt of testimony.

19      If the witness fails to do so within the time

20    allotted, the transcript may be used as if signed.

21

22                       Yours,

23                       Veritext Legal Solutions

24

25
```

Page 99

1    Franklin Buono v. Tyco Fire Products LP.

2    Eric Boelhouwer (#4139718)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____     _____

24   Eric Boelhouwer                      Date

25

Page 100

1    Franklin Buono v. Tyco Fire Products LP.

2    Eric Boelhouwer (#4139718)

3                   ACKNOWLEDGEMENT OF DEPONENT

4        I, Eric Boelhouwer, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____  _____

12   Eric Boelhouwer                        Date

13   *If notary is required

14                      SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                      _____ DAY OF _____, 20___.

16

17

18                      _____

19                      NOTARY PUBLIC

20

21

22

23

24

25

[& - add]                                                                Page 1

| & | 1:41  94:22 | 3rd  97:16 | 8 |

### &
**&**  1:14 3:4,10,16
  16:4

### 0
**05915**  1:5
**06**  9:22,24

### 1
**1**  2:6 7:1,3 20:12
  25:3 26:1 31:18
  51:19 52:20 53:9
  55:4 57:22 58:19
  59:19 63:8,19
  64:8 65:16 66:3
  66:13 69:16 80:24
  93:3,13
**1,4**  30:9
**10**  4:13 37:8,21
  95:3
**100**  31:4
**10006**  3:17
**1059**  1:21 97:20
**10b**  97:9
**11**  25:4 41:6
**1150**  1:20 4:14
**11:02**  1:19
**12035**  97:19
**12550**  3:5
**1279**  3:4
**12:10**  43:16
**12th**  3:10
**1360**  1:20 4:14
**15-14-37**  95:5,15
**1500**  37:11
**17**  37:24
**17a**  37:24
**18**  9:7
**1965**  51:21,25 52:5
**1998**  8:22
**1999**  29:13

### 2
**2**  2:7 9:12 24:19
  24:21 28:1 31:19
  40:15 42:9 65:16
**20**  37:8 100:15
**2000**  29:14
**20005**  3:11
**2006**  9:21 11:21
  29:14
**2007**  11:24 12:19
**2012**  39:21
**2014**  64:4,6 66:4
**2015**  52:20 53:9
  55:4 57:22 58:19
  59:19
**2017**  22:25
**2018**  24:6
**2019**  7:11 8:7
  15:20 18:19 24:6
**202**  3:11
**2020**  1:18 18:17
  97:16 98:3
**21**  1:18
**2110**  3:16
**212**  3:17
**24**  2:7
**240**  18:3
**250**  37:2
**29**  65:22

### 3
**3**  9:13 33:4 55:21
**3.2.15.**  55:22
**3.2.30.**  55:13
**3.2.32.**  55:16
**30**  13:15 15:11
  98:17
**300**  3:4
**30307**  4:15

### 4
**4**  2:3 33:4 40:15
  55:12
**40**  18:23 19:2 21:9
**4139718**  98:5 99:2
  100:2
**434-5000**  3:11
**45**  3:16 5:21
**4th**  98:3

### 5
**5**  33:4 43:21 44:3
**5.2.3**  86:20 91:22
**5.2.3.**  82:17
**5.7**  53:10 54:1,5,8
  54:10,17 55:6
  56:6,25
**50**  15:6,7 21:9,15
  21:15 58:8
**562-0203**  3:5

### 6
**6**  33:4 50:8 57:19
  66:21

### 7
**7**  2:6 33:5,6 63:1,9
  63:14,23 64:11,22
  65:12 66:3,14
  68:24 69:8,16,17
  71:12 72:16,25
  74:16 79:15,16
  82:16 84:25 93:12
  93:13
**7/21/2020**  98:5
**70**  13:14 15:12
**725**  3:10
**7:17**  1:5

### 8
**8**  53:8 72:24 79:14
**845**  3:5

### 9
**9**  76:25 82:16
**9-11-28**  95:4 97:15
**952-1100**  3:17
**98**  9:22
**99**  9:23

### a
**a.m.**  1:19
**abilities**  44:8
  45:10,19
**able**  39:6 55:20
**abnormal**  91:14
**academic**  41:9
  43:23 45:16
**accepted**  44:1,4
  78:2,23
**access**  96:1,2
**accident**  74:2 84:8
**accidentally**  83:11
**accuracy**  98:9
**accurate**  20:19,23
  95:7
**acknowledgement**
  100:3
**acknowledgment**
  98:12
**action**  1:4 95:11
**active**  31:7,11,12
  35:25
**activities**  7:15,16
  57:4
**activity**  28:18
  56:24 83:21
**actual**  54:2 56:24
  61:12
**add**  7:14,21,24

**added** 19:13 21:7
**addition** 12:4,8
  41:13 77:6
**additional** 5:7
  69:4,5 71:25
  73:12,24 74:10
  75:3,8,12,16 76:11
  78:6,13
**additions** 100:6
**address** 4:12 27:5
  51:4 54:2 57:25
  76:6 79:13 83:8
  90:24 91:15 92:3
**addressed** 51:10
  53:25 56:5 66:8
  66:11 72:19,21
  76:24 90:25
**addresses** 53:11
  54:10,22 56:25
  57:15 66:8 70:11
**addressing** 49:9
  64:8 69:8 72:6
**adequate** 14:18
**adequately** 64:24
**adjacent** 9:16
**adjunct** 32:14
**adjusted** 74:15
**administration**
  50:14
**adopt** 52:3
**adopted** 34:14
  58:3
**adoption** 34:16
  39:20
**advised** 58:8
**affect** 50:12
**affiliate** 32:5,22,24
**afternoon** 70:1
**ago** 22:5 89:11,22
**agree** 47:2 51:6
  52:11 53:1 57:5

63:3,8,23 64:22
  66:13 67:4 76:17
  76:25 77:6 79:7
  79:11 81:14 83:24
**agreement** 95:11
  95:15
**ahead** 47:9
**air** 1:5,7 36:16
  54:24 56:2,21
  58:9,13,14 59:1,5
  60:17,18 61:24
  64:14 69:7 79:23
  80:23 83:19 84:24
  87:3 88:2
**alabama** 12:12
**allotted** 98:20
**allowed** 31:9
**alter** 54:18
**alternative** 31:5
**ambiguous** 48:3
  48:15,19
**amend** 43:12
**amended** 52:3
**american** 33:1
**amines** 9:14 31:8
  31:22
**ammonia** 31:22
**amount** 24:14
  26:14
**analyses** 42:21
  43:2,9
**analysis** 28:8,8,13
  42:2,5 46:7 47:12
  58:4 72:14 77:23
  78:6
**anhydrous** 31:22
**annotations** 41:20
  41:21,24 42:2
**ansi** 7:17
**answer** 52:23
  64:11 92:23

**answered** 53:20
**answers** 95:18
  97:4
**anybody** 25:5
**apart** 84:9,17
**apologize** 30:6
  64:10
**appear** 58:14
**appearances** 3:1
**appeared** 4:2
**appears** 7:5 24:25
**appended** 100:7
**applicability** 48:6
  49:21
**applicable** 48:12
  50:23 52:16 54:15
  55:18 56:4,16
  58:6 69:2,11 72:2
  78:20 98:8
**application** 30:23
  75:24
**applications** 37:15
**applied** 85:12
  95:16
**applies** 49:4
**apply** 27:16 45:25
  49:23 52:13 63:9
  82:18 83:14
**appointed** 7:16
**appreciated** 31:25
**appropriate** 14:19
  59:3,17 75:11
  80:17 83:5
**appropriately**
  57:4 63:21 70:24
  71:2 72:20,21
  82:20,25 83:10,22
  84:24 87:8 91:23
  92:3
**appropriateness**
  88:21

**approximately**
  5:20 13:14 15:11
  15:12 19:2 28:10
  32:11 37:2 85:20
**arberman** 1:21
  97:20
**arcs** 44:12
**area** 36:5 38:9
  39:13 53:5,24
  67:21 72:13
**areas** 14:8,15
  25:15 39:3 45:5
  47:25
**arizona** 22:7,18,23
**arranged** 30:10
**arrangements**
  37:6
**arthur** 9:5 10:21
**article** 95:3 97:9
**articles** 41:9 47:16
**asheville** 9:2 10:4
**aside** 34:23 36:7
**asked** 24:1 48:1
  60:6 66:24 86:6
**asking** 4:20 52:4
  63:13 70:13
**aspect** 27:21 44:16
  46:8
**aspects** 12:13,14
  84:15
**assemble** 65:10
**assembler** 73:8
  74:8 75:6 78:10
  78:15,25
**assembly** 72:22
**assigned** 95:7
**assignment** 10:3,8
  10:18 17:10,15,19
  17:22
**assignments** 9:1,6
  9:25 35:13,14

**assist** 25:5
**assisting** 13:5
**associated** 59:1
  62:1,10,18 65:3
  66:9 68:5 72:7
  76:22 77:8,10
  83:3
**associates** 12:21
  12:25 13:4 17:24
  20:8
**association** 39:24
  40:13 48:18 53:9
  57:22 58:3,11,16
  62:3,22 63:17
  65:12 69:3
**assume** 4:22
**astm** 36:3 78:24
**atlanta** 1:20 4:14
  24:1
**attached** 47:21
  97:9 98:11
**attempt** 85:10
**attempted** 49:3
**attend** 33:24
**attorney** 95:14
  98:13
**attorneys** 95:19
**auburn** 9:19 11:21
  12:8,12,13 32:6
**audience** 82:11
**august** 97:16 98:3
**auspices** 97:8
**authoritative**
  46:24
**authority** 58:22
**authors** 46:20
**auto** 1:6,6
**automatically**
  95:16
**automotive** 14:5
  14:21 37:15

**available** 98:6
**avoid** 53:17
**aware** 23:23 49:2
  51:24 83:1 84:5
  86:14 88:10
**ayres** 46:23

**b**

**b** 1:6,21 2:4 3:3
  95:3,5,15 97:20
**back** 19:17 20:10
  21:18 29:24 43:16
  51:20 57:18 66:20
  88:25 89:2 91:23
  93:20
**baking** 38:23
**balloon** 71:10
  90:10
**bar** 39:12
**barber** 3:16 16:4
**based** 20:23 26:24
  44:14 61:5 74:21
  78:16 85:7 86:1,4
  93:1,3
**bases** 42:12,14
  43:7
**basf** 8:25 9:18
  10:9 28:5,25
  29:12
**basically** 70:18
**basing** 66:5
**basis** 12:3 42:12
  55:5 65:14,17
  69:2 77:19 82:17
  85:16 86:14 88:20
  89:16 90:1 95:5
**baton** 9:8
**beaumont** 31:3
**beginning** 64:16
**behalf** 3:2,7,14
  22:14 49:11

**behavior** 45:3
**behavioral** 44:19
**believe** 9:12 17:8
  18:3 20:15 21:9
  24:9 32:7 35:1,23
  42:11 43:5 48:12
  48:14,18 50:1
  51:20,22 52:2
  55:9 56:9 57:18
  60:6 66:12 81:14
  87:13,16 89:16,23
**believed** 81:18
  82:6
**benefit** 78:9
**benefits** 29:25
**best** 39:2 73:2,9,11
  73:13,23 74:9,23
  75:7 76:18 77:7
  77:25
**better** 56:23 74:4
  74:4 75:13
**beyond** 69:6 72:7
**biological** 31:12
**bird's** 50:11
**birmingham**
  12:12
**bit** 9:7 25:24 32:3
  53:4
**black** 81:5
**blend** 31:16
**blown** 29:6
**board** 95:4 97:10
**bodies** 49:2
**body** 44:7,9
**boelhouwer** 1:17
  2:7 4:1,6,13 6:17
  6:18,19 43:21
  98:5 99:2,24
  100:2,4,12
**brake** 14:23

**break** 43:15 93:20
**briefly** 8:20 26:10
**bringing** 30:3 89:2
**broader** 46:17
**broadway** 3:16
**brought** 30:9
**built** 10:6 31:5
**bulk** 29:19 30:13
**bullet** 68:25 70:16
**bullets** 54:5
**buono** 1:2 67:5
  98:4 99:1 100:1
**business** 23:24
  31:23 55:16,23
  57:3 86:24 89:4
  91:11
**businesses** 50:23
  51:9
**butanediol** 30:9
**buyers** 10:15
**buying** 78:4

**c**

**c** 63:1,9,14,23
  64:11,22 65:12
  66:14 69:8,16,17
  74:16 79:15,16
  82:16 84:25 93:12
  93:13 95:4 97:1,1
  97:15
**call** 37:1
**called** 30:10
**capabilities** 44:11
  92:15
**capacity** 51:7
**caption** 97:3
**carbon** 24:9
**career** 20:25
**carolina** 9:2 10:5
**cascade** 77:11
**case** 7:25 15:17
  16:5 17:5,10,15,19

18:9,21 19:9
22:10,19 23:9
24:24 25:11 34:23
35:2,4,25 39:22,23
42:1,5,22 43:3
47:19 48:4 86:19
95:5,5,15
**cases** 14:10,11,16
14:17,24 15:3
16:9,16 17:1
21:10 23:1,16
35:24 36:14 37:6
37:10
**catalysts** 31:21
**category** 54:11
92:22
**ccr** 1:21 97:20
**center** 12:9
**certain** 10:16
12:13 26:17 52:14
72:15 78:22 83:12
**certainly** 15:6
27:11 38:22 45:5
57:7 68:3 74:24
79:10,22 87:1
91:21 92:23
**certainty** 50:3
**certification** 97:6
**certified** 95:6,18
97:11
**certify** 97:2
**cetera** 44:8,8
81:15,15
**cga** 51:19 52:4,20
53:2,9 55:4 58:19
59:2,19 62:25
65:12 66:3,14
69:8,15 71:12
72:16 74:16 76:23
79:16 82:16 84:25
93:3,11,12

**chain** 93:9
**chair** 7:17 33:6
**challenged** 21:25
**change** 11:12
17:15,19 33:13
34:1,2,4 99:4,7,10
99:13,16,19
**changes** 33:16,19
95:19 98:10 100:6
**changing** 17:22
**chapanis** 44:3
**characteristics**
44:14 45:11,20
61:6,13 62:17
66:18 78:7 82:10
**charging** 17:24
**chemical** 9:17
10:6 11:14 28:19
31:6,10 39:12
59:8,21 60:2,8,15
60:23 61:7,18
65:2 68:5,22 72:6
80:22 83:11,20
88:4
**chemicals** 9:10,10
10:13 11:10,15
13:23 28:23 30:7
30:21 31:24 61:3
65:13 70:7
**chose** 70:8 73:17
76:5,6
**chosen** 33:24
**chris** 89:14,24
90:2
**circumstance**
58:20 59:12 68:12
83:8,13 85:8
90:15,22 91:14,17
92:4
**circumstances**
27:25 53:11 54:22

60:16,22 61:12
89:13 92:1,14
93:7
**cite** 27:13 40:10,19
46:22 51:1 62:25
63:1
**cited** 41:8
**citing** 27:7
**civil** 1:4
**clarification** 71:8
88:15
**clarify** 4:21 52:23
**clarity** 49:12
**classes** 11:25 12:1
12:16
**classification**
64:12
**clear** 19:14 52:21
**click** 7:3
**clients** 18:9,13
**closely** 9:15
**clothes** 22:16
**co2** 24:10
**code** 65:22 95:9
**codes** 38:13,15,17
**coelho** 6:15 19:18
19:25 27:5 77:1
**cognitive** 44:17
**colleague** 4:9
**collected** 58:7
**colloquies** 95:18
97:4
**color** 81:4
**come** 30:2 41:3
43:16 47:24 82:19
88:25 93:16,20
**comes** 91:14
**coming** 33:6
**commercially**
30:12

**committee** 7:17
33:5,8,9,22,22
**commonly** 34:18
43:25 44:4 78:23
**communicate**
34:22 61:22 81:23
**communicated**
62:16
**communicating**
63:12
**communication**
34:13,22 39:13,19
48:17 81:9 82:11
**communications**
7:18 14:2 17:12
17:17 25:17,18,19
26:2,3,4,5,8,12,21
27:21,23 35:16
38:5 41:12 46:7,8
50:5 53:6 61:25
70:9,23 71:15
72:1,17 73:12,15
73:25 74:11,18
75:2 77:19 78:1
78:14 79:2 90:14
**compensation**
95:11
**compiled** 58:12
**complete** 20:19,23
83:21 95:7,17
97:5 100:8
**completed** 98:17
**compliance** 95:2,9
**comply** 53:17
79:16
**component** 14:25
30:17 31:11 36:18
73:9 74:8 79:1
**components** 38:6
73:5 75:6

comport  34:20
  57:21,23
compress  48:17
compressed  23:17
  23:19 35:6 36:8,9
  36:16,17,20 39:24
  40:8,13 51:15,17
  52:9,12,15 53:9
  54:23,24 55:14,24
  56:2,21 57:22
  58:2,9,11,13,14,15
  59:1,5,19 60:17,17
  61:24 62:2,22
  63:17,25 64:9,12
  64:14,20 65:12
  67:20 69:3,7
  79:23 80:23 83:18
  84:24 87:3
comprises  44:9
computer  41:25
concern  60:19
concerned  43:24
  60:21
concerning  34:9
concluded  94:22
conclusion  77:18
conclusions  49:7
conduct  24:5
conducted  42:21
conducting  29:19
  43:9 47:12
configurations
  22:17
confined  46:15
confirm  24:23
  87:24 88:6
conflict  48:10
  58:24
confused  87:10
confusion  86:15

conjunction  63:9
connected  71:6,9
connolly  3:10
consensus  34:8
consider  7:13 27:9
  27:17 38:2,6,24
  39:3
consideration
  61:15 73:14
considerations
  44:15 75:22
considered  75:17
  82:10
considering  33:13
consistent  15:13
  15:15
consolidated
  22:12
consolidating  59:3
construction
  10:20,22 36:2,4,5
consult  14:18
consulted  23:1
consulting  13:3,6
  13:12 14:9 15:8
  18:5 36:10,19
  37:6 93:10
consumed  59:15
  90:17 91:3
consumer  13:24
  13:25 16:11 36:24
  78:4,8
consumers  35:8
contact  15:21
contacted  15:24
  95:14 97:12
contain  8:13 30:19
container  54:7,7
  54:14 55:1,2,15
  56:19,19,20 62:1
  63:12 85:3 90:7

90:11,12 91:1
containerized
  55:17
containers  52:9,13
  63:22 64:9 91:4
contains  42:9
  80:20
contend  54:17
  57:10 58:17
content  59:11 80:2
  81:23
contents  58:2
  59:16 61:23 62:1
  62:6,9 63:12,21
  65:1,3,5 66:9,17
  68:5 69:9 70:7,10
  70:23 71:10,14
  72:6,17 74:14
  75:2 79:18 83:2,3
  83:15,21 84:2,18
  84:19,23 85:9
  86:10 87:10,14,19
  87:20 88:10,12
  90:17 91:2,3,16
  93:5
context  14:6 56:10
  61:9
continuing  40:15
contract  95:10
  97:14
contractor  97:12
contracts  18:12
  95:5
control  23:11
  68:15,18 92:1
conversation
  17:22
conversations
  5:11,18,23
converted  30:10

coordinate  29:23
copies  98:14
copy  7:5 25:3 42:6
  94:9,12,13,14,20
core  12:1
corn  31:1,3,15
corporate  9:2 10:4
corporation  8:25
  9:18 28:6,25
  29:12
correct  51:20,23
  95:17 97:5 100:8
corrections  100:6
cost  31:4
council  97:10
counsel  3:1 98:14
count  21:18
counts  45:21
couple  5:10 6:23
  13:7 23:23 29:21
  29:21 33:10 46:4
course  20:25
  29:25 34:23 38:11
  39:9 42:7
courses  32:21,22
  32:23 39:15,16
court  1:1 5:14
  16:18 21:20 22:3
  22:7 95:4,18
  97:10,11,13
cover  14:11
covered  28:12
  43:5 77:14
cracker  9:4 10:20
created  73:3,6
creates  50:11 54:8
  68:8
criticism  34:19
criticisms  17:12
  27:5 49:10 72:18

**cryogenic** 35:3 55:14
**cryotherapy** 23:24 23:25 24:2 36:11 40:4
**cs** 98:15
**current** 7:6 8:8 32:8 33:15 35:19 51:22
**curriculum** 2:6
**customer** 11:16
**cv** 1:5 7:6,21,25 8:3,10,13 20:10 25:1 42:17
**cycle** 29:2
**cylinder** 17:13,17 24:7 35:8,9,17 36:20 55:10,19 57:2 58:2 64:15 65:2,4,6,9,11 67:2 67:20,24,25 68:3,6 69:10,20,21,24 70:24 71:1,4,11,21 72:12 75:4,9,23 79:19 80:4 82:2 82:24,25 83:2,3,5 83:6,10,16,17,20 83:22,25 84:1,2,8 84:11,19,20,22,23 85:8,11,13,17 87:8 87:11,14,15,16 93:6,17
**cylinders** 23:17,19 24:12,15 35:6,7,22 35:25 36:5,8,12,22 36:24 52:15 59:5 64:1,20 66:9,10,17 66:19 85:20,23 89:5,6 93:14,15

**d**

**d** 1:6
**d.c.** 3:11
**dangerous** 61:1
**daniel** 3:9 4:10
**data** 10:11 14:4
**date** 7:8,13 20:14 33:14 85:21 99:24 100:12
**day** 11:9,9,14,14 66:23 67:3,6,8 85:23 86:6 87:11 97:16 100:15
**days** 98:17
**dealers** 24:16
**dealing** 24:16
**dealt** 34:24
**debottleneck** 31:4
**december** 15:20 15:23 18:18
**decent** 47:16
**decision** 60:25 73:23
**declare** 100:4
**deemed** 100:6
**defendant** 1:15 3:7,14
**defendants** 1:9
**defense** 15:10,12
**deficiencies** 51:4
**define** 49:18 50:6
**defined** 53:1 55:8 56:10 69:6
**defines** 65:16
**definitely** 92:13,18
**definition** 43:22 43:25 44:1,4,6 54:9,18 55:3,7,9 55:13,22 56:9,11 56:13

**degree** 11:23 50:2
**dejoy** 46:23
**denied** 97:7
**depend** 61:11
**depending** 62:15 93:8
**depends** 46:20 60:16 82:6 92:13 92:24
**deponent** 98:13 100:3
**depos** 5:13
**deposed** 4:3
**deposing** 98:13
**deposition** 1:17 6:1,1,4,8,11,13 17:3 18:7 19:5,8 19:16,23 20:4,13 20:15,20 21:5 22:25 25:9 41:19 41:22,23 47:21 94:22 97:13,14
**depositions** 5:7 19:11,22 41:20,25 42:3
**describe** 11:5,21 14:9 26:10 47:18 70:3
**described** 10:1 15:3 48:20 82:6 89:22
**description** 2:5 48:22
**design** 10:5 45:12 45:21 46:6
**designed** 53:14
**detailed** 10:5
**details** 5:17
**determination** 74:1,20 75:9,19,20 76:13 84:10 87:20

91:18
**determine** 49:5 89:14,25
**determined** 89:8 95:11
**determining** 45:8 88:22 91:8 92:10
**develop** 91:7 92:9
**developed** 63:24 64:18
**development** 7:18 8:25 39:15 49:1
**devoted** 13:11
**diagram** 45:7
**difference** 11:7 26:11
**different** 9:16,17 14:7 18:12 22:13 22:14,17 26:3 29:16 30:16 31:20 31:21 33:24 34:14 44:15 59:24 61:15 69:4,5 70:12 71:24,25 73:11,21 73:24 74:10 75:3 75:7,15,24 76:11 77:18 78:6,13 80:15 81:2 83:11 84:15 88:4,4 92:19,22 93:7,8
**differentiate** 45:16
**differentiation** 76:8
**digital** 33:7
**dioxide** 24:9
**direct** 95:10
**direction** 97:5
**disagree** 69:1
**disassembly** 97:7 97:7

discharge   71:10
83:11 87:4 88:13
88:16
discharged   67:21
90:8,9
discharging   89:3
discipline   43:24
45:18
disclosure   42:8
95:4 97:11
disclosures   17:4
95:1,2,13
disconnect   48:9
discount   95:16
discounts   95:15
discretion   91:7
92:9
discuss   10:1 32:17
33:21 66:21 82:16
discussed   5:25
11:1 34:3 35:2,4
36:7 38:4 40:2
66:12 69:16 74:22
81:11
dispose   83:7
disqualification
95:4
disqualified   21:20
97:14
disqualify   95:8
dissertation   39:18
distinction   65:6
distorted   84:8
distributes   55:24
distributing   24:4
56:1
distribution   44:16
56:14
distributor   82:22
85:5 86:12,22
92:17

distributors   10:15
district   1:1,1
diving   38:23
division   10:13
doctoral   12:10,10
13:1 39:18
document   48:22
53:8
documents   20:11
41:16 49:3
doing   10:5,14 13:7
32:17 58:4 59:2
83:19 87:21
doris   13:4
dorris   12:21,25
17:24 20:8
dot   80:1
dr   4:6 6:17,19
43:21
drawing   65:6
drawn   48:21
dryers   22:17
duly   4:3 97:3
dwhiteley   3:12

**e**

e   2:1,4 97:1,1 99:3
99:3,3
earlier   13:6 38:4
46:13 55:8 64:17
81:11
easier   32:3
east   31:18
editing   26:7
education   12:9
effect   34:10 67:22
effective   81:13
effectively   31:9,14
34:22 54:20,25
61:22
eight   22:13,14
32:11

either   4:21 59:23
83:7 87:2 94:16
elected   97:3
electric   22:16,16
37:16
electrolux   22:15
email   33:25 34:6
emergency   37:14
employee   66:24
employees   67:22
68:1,8 83:15
employer   50:25
51:4,7 63:11
66:15 69:3 71:13
72:4,5,8 88:23
89:8 92:14
employers   50:16
65:13 79:8,12
91:6 92:8
employment   8:14
29:12
empty   80:12 85:8
85:17 86:1,9,16,21
87:25 88:7,18,22
89:14,15,25 90:11
90:12,18 91:4,8
92:11
enantiomer   31:8,9
encompass   25:1
40:20 45:1 74:16
encompasses
40:25 42:2 56:14
encompassing
26:20 56:15
endeavor   28:18
engineer   9:9 11:3
11:4
engineered   34:25
engineering   9:2
10:4,6 11:2,6,23
12:2,4 43:22,23

44:1 45:17,18
46:9,10,18
enjoyed   30:20
ensure   64:23
88:17
entail   33:9
entailed   10:2
enterprise   56:16
enterprises   50:20
entire   25:1 68:15
68:18 90:17
entirety   41:19,23
entities   93:8
entity   36:23 55:16
57:10 73:1,13,23
74:1 75:1,18
76:13 77:17,25
78:4,12 79:1
81:10 91:13 92:19
92:24
entry   7:14,19 8:16
environment
60:18
epidemiology
12:17
equipment   53:14
57:16 73:2 77:4
ergonomics   12:1,5
14:12 44:12 46:17
eric   1:17 4:1,13
98:5 99:2,24
100:2,4,12
errata   98:11,13,17
esq   3:3,9,9,15 98:1
essentially   32:14
33:8 66:6 79:17
established   65:21
79:4
estimate   15:7
18:22 21:1,9,10,13
21:19

estimating 18:25
et 44:8,8 81:15,15
ethics 95:10
evaluate 73:3,24
  74:10 75:7,18
  76:18 77:8 79:12
evaluated 82:13
event 85:21,23
  86:6,16 87:11
everybody 29:24
everybody's 29:23
evidence 84:5
  86:15 87:9 90:14
  97:6
exact 87:7
examination 2:3
  4:4
example 22:6
exception 54:1,9
  56:6 68:9,11,16
exceptions 50:22
excerpt 80:18
excerpts 79:14
excluded 21:21
exercise 85:22
exhibit 2:5,6,7
  6:20 7:1,3 20:12
  24:19,21 25:3
  42:9
exhibits 6:23,23
  47:21 95:19,19
  96:1
existed 47:5
expand 60:14
expansion 61:8,10
expect 77:17
expectation 12:15
  77:21 78:3 90:16
expected 69:20,21
  70:4 71:4,5,20
  72:12

expedited 94:14
experience 28:2
  34:24 36:9 37:5
  38:12,18,20 39:24
  82:12
experiences 35:5
expert 21:2,21
  27:9,17 38:2 39:4
  42:8 49:1
expertise 25:15
  26:24 27:2 36:6
  38:7,10
experts 25:8,11,12
  38:24 47:24 48:6
  48:9,11 49:13
  69:1 76:24
explosivity 60:1
exposure 59:25
  60:1
expressed 42:15
expresses 71:24
expressing 42:18
expressly 78:19
  97:6
extent 52:14 63:11
  66:15 71:15,23
  73:22 78:22
extinguishers
  77:17 89:2 91:12
extracting 86:18
eye 44:13 50:11

**f**

f 97:1
facilitate 30:4
facilities 28:7 29:1
facility 10:7,25
  28:15,19 30:25
  91:2
factors 12:5 14:13
  14:22 40:22 41:12
  43:22,23 44:1,5,7

44:9,20 45:9,17,17
  45:21 46:1,9,10,16
  46:16,25 47:12,14
  48:25 49:2,4 50:4
  82:7,9,13
faculty 32:18,18
fails 50:25 98:19
fair 13:8,19 14:20
  44:4 45:22 47:6
  50:16,19 51:8
  59:10 67:15 81:16
  86:3 93:12
fall 29:13 50:20
  51:9 65:11 75:5
  78:14 81:24 88:23
falls 53:7
familiar 62:24
fappiano 3:15
  5:11,18,25 42:5
  49:8,17 50:18
  59:9 62:7 71:22
  76:20 81:20 82:8
  84:14 85:6 86:13
  86:23 89:18 90:3
  91:9 92:12 94:2,9
  94:10,16 98:1
fappiano's 16:4
  17:6
far 18:21 20:18
federal 22:3,10
  50:21 65:23 78:21
fee 18:15
fellowship 12:10
field 43:23 44:2
  45:1 46:24 47:11
  49:1 50:4
fields 45:6
figure 45:15 80:24
  81:1
file 5:9 15:20,23
  18:6,18 19:10

25:13
fill 56:10 66:24
  67:2 70:8 80:15
  85:11,22 86:6
  88:1,3,7
filled 36:23 59:12
  65:2 66:10 67:10
  67:20 74:14 79:19
  80:6,11 83:25
  85:2,9 88:2 90:8
  90:19
filling 56:15 57:6,7
  63:22 65:13 66:19
  67:25 84:22 85:13
  87:6 88:18 92:20
fills 55:23 56:4
  68:13
financial 95:4
find 22:21 35:10
  46:14 48:22 64:13
fine 94:17
finish 25:16
finished 13:1
  28:16 84:22
finite 34:4
finkelstein 3:4
fire 1:11,14 3:7
  4:9 23:3,4,9 27:2
  27:9,16,22 34:25
  38:13,15,17 49:21
  73:1 77:17 89:1
  91:12 98:4 99:1
  100:1
firefighters 37:12
  37:14
firm 15:21 16:4
  17:6 95:13
first 4:2 10:3
  15:18,21,24 22:1,3
  30:24 46:6

**fit** 56:24
**fits** 57:3
**five** 5:21 16:8
  28:10 43:15 93:20
**fixed** 18:13,14
  29:18
**flammability**
  59:23 60:1
**flammable** 61:14
  61:16
**focused** 50:14
  72:15
**focusing** 74:7
**folder** 6:23
**follow** 29:20 34:19
  50:17,25 53:15
**followed** 81:15
  82:5
**following** 9:6
  11:11 88:16 89:20
  95:2 97:10
**follows** 4:3
**force** 14:23
**foregoing** 97:2,5,7
  100:5
**form** 49:8,17
  50:18 59:9 62:7
  71:22 81:20 82:8
  85:6 91:9 92:12
**formally** 34:15
**forming** 40:17
**forms** 95:4
**forth** 55:6 58:19
**forward** 33:17
**found** 5:12 51:4
**four** 20:12,21 22:5
  28:9
**foust** 67:2,5 80:8
  81:19 83:24 84:21
  85:2,10,12,17,22
  85:25 86:6,8,14

89:14,24 90:2,14
**framework** 58:4
  58:10
**franklin** 1:2 98:4
  99:1 100:1
**frequently** 47:12
**friday** 5:20
**fromson** 3:3 94:1
  94:12,13
**front** 39:6
**fulfill** 12:3
**full** 4:11 11:18
  12:18,20 13:1
  29:6 33:22 39:5
  86:21 91:8 92:11
**fully** 55:3 86:9
  90:9
**funded** 12:9
**further** 58:12
  93:22

**g**

**gallon** 37:2
**gallons** 24:17
**gas** 22:16 23:17,19
  35:6 36:8,9,20
  39:24 40:13 48:17
  53:2,9,12,21 54:3
  54:9,18,19,25
  55:11,14,17,20,22
  55:22 56:3,8,10,13
  56:20,25 57:11,22
  58:2,11,15 59:19
  60:14 61:8,11
  62:2,22 63:17,25
  64:20,24 65:12
  69:3 82:21 85:4
  86:11,22 87:22
**gases** 40:8 51:15
  51:17 52:9,12,16
  54:14,24 55:24
  64:9,12 65:19

**geismar** 10:7
**general** 41:13
  60:18 65:17 67:14
  79:11 83:2 86:19
  90:16
**generally** 10:1
  11:8 14:1,6,11,13
  14:15,17,25 16:10
  17:16 20:18 25:19
  26:21 27:8,22
  28:24 29:17,22
  32:20 33:21 34:5
  34:20 38:8 40:20
  40:24 47:1,3,13,18
  49:19 50:9,22
  56:18 57:21,23
  77:21 78:2,25
  81:9,16,24
**gentleman** 16:2
**geographically**
  9:15
**georgia** 1:20 4:14
  8:22 39:12 95:2,6
  97:10,11,14
**gerstman** 3:16
  16:4
**getting** 5:17
**ghs** 39:18 65:22
  80:1
**give** 9:7 63:24
  64:19 81:21
**given** 20:20 21:1
  34:9 39:11,14
  56:20 58:13 62:2
  80:12 83:4 84:22
  87:2 88:5 97:6
  100:9
**gives** 58:10 65:18
**giving** 58:7 65:17
**glitch** 71:7 88:14

**global** 34:2
**globally** 39:20
**go** 8:20 9:18 21:18
  25:22 48:22 80:6
  85:23 87:21 91:21
  94:3
**going** 10:20 11:13
  12:7 25:21 26:14
  31:3 37:1 45:2,25
  53:13 59:12 61:11
  66:22 67:5 68:21
  70:18 78:5,9 83:1
  83:8 93:7 94:4
**good** 4:6,7,23
  15:19 18:22 43:17
**governed** 36:1
  74:15
**governing** 51:11
**government** 34:17
  53:18
**grab** 52:19 63:6
**grabbed** 52:20
**graduated** 8:21
**gram** 58:8
**great** 6:19 7:7 8:12
  16:1 64:7 93:25
**green** 75:21,25
  76:7
**group** 55:16
**guard** 79:8
**guess** 20:2,11 63:3
  63:13 70:12 71:19
**guidance** 57:22
  58:6 62:2 63:18
  63:24 64:13,14,19
  74:24 93:13
**guide** 64:11

**h**

**h** 2:4 99:3
**half** 30:25 73:19

**halfway** 22:22
**handful** 21:8
**handle** 87:1,8 92:4
**handled** 84:13
85:18
**handling** 51:12
52:9,12 64:9,10
83:25 88:25 89:5
89:10 90:25 91:12
**happened** 22:4
**happening** 22:2
**happy** 68:25
**hard** 5:14 29:23
**harmonized** 39:20
**haworth** 3:16 16:4
**hazard** 28:7,8,12
34:13,22 39:13,19
48:16 59:21 60:9
60:15,25 61:4,8
62:10 64:24 76:15
81:8,23
**hazardous** 51:12
65:19
**hazards** 28:17
53:17 58:1,1 59:1
59:8,22,25 60:24
61:19,20,25 62:5
62:18 63:25 64:20
65:3,7 66:9,18
68:5,22 72:7
76:14,21 79:9,12
82:12 83:2 93:16
**hazcom** 57:21
58:17 61:2,5
62:21 63:10 66:7
68:4,23 69:7,12,18
70:25 71:2,12
72:16 74:25 84:25
**hbandglaw.com**
3:18 98:2

**heading** 46:5
**headquarters** 10:9
**health** 50:14 63:25
64:19 76:15
**heard** 11:6
**height** 44:13
**help** 30:4
**helpful** 52:24
**herbicide** 31:2,3
31:10,15
**hereto** 100:7
**high** 31:18,19
**historical** 51:22
**historically** 8:19
33:11
**history** 8:14
**hold** 64:2
**home** 35:9,10 37:3
**hope** 70:10
**hopefully** 32:3
**hour** 18:3
**hourly** 17:25
18:16,16
**hours** 18:20 19:1,3
19:4,6 20:3,6
**human** 12:5 14:12
14:13,14,22 23:10
40:22 41:12 43:22
43:23 44:1,4,7,8,9
44:11,20,23,25
45:3,9,10,11,16,17
45:19,19,21,23,24
46:1,2,9,10,15,16
46:24 47:11,13
48:25 49:1,4 50:4
**hundred** 21:17
24:17
**hybrid** 37:16
**hypothetical**
81:22 82:2 87:19

**hypothetically**
68:11 82:23 84:22

**i**

**idea** 15:2 21:16
**identical** 81:1
**identification** 7:1
24:19 81:7 84:12
**identified** 56:6
59:19 83:22 87:15
91:22
**identify** 73:17
80:22 88:11
**identifying** 60:23
82:19 84:1
**ii** 11:2,6
**iii** 11:2,7
**impart** 76:10
**impartiality** 95:9
**implication** 26:18
**implications** 62:15
**important** 79:7,11
81:12
**inactive** 31:7
**inappropriate**
85:12 88:7 89:12
89:17,24 90:2
**incident** 14:21
70:1 83:18
**include** 8:18 20:3
44:22 53:16 79:17
**included** 40:24
75:12
**includes** 79:17
**incorporate** 51:18
**incorporated** 9:1
**increase** 18:17
**independent** 97:12
**indicate** 84:4
**indicating** 73:20
**indications** 90:13

**individual** 43:7
55:16 59:13,13
61:3 68:12 79:20
79:21 80:8 81:13
86:20 87:13
**individuals** 44:14
47:11
**industrial** 9:10
11:22 12:2,4
13:25 28:3,4,19,23
30:22 46:18
**industries** 1:7
34:15 78:3
**industry** 23:3 27:3
27:10,16 63:18
93:2
**information** 34:9
44:7,9,22 45:4,10
45:19 58:12 63:20
65:21 75:16 80:2
81:21 82:3
**infrequent** 33:12
**ingredient** 31:12
**initial** 30:8
**injuries** 16:11
**inside** 24:15 69:9
**instances** 34:17
**institute** 8:22
**institutes** 33:2
**instructions** 14:1
15:1 23:14 24:2
25:20 26:16 38:5
38:9 39:9 44:18
47:14 77:3
**intended** 54:5
67:20 69:23 75:23
76:8 81:3 82:10
90:8 92:2
**intending** 69:25
77:24 80:15 83:12
88:1,5

**intent** 59:11
**intention** 43:8
**interaction** 14:12
14:14 23:10 26:19
45:4,23 46:1
**interacts** 46:2
**interest** 20:7 95:5
95:8 97:15
**internal** 91:24
**internally** 81:3
**internship** 12:21
**interruption** 60:4
**introduction**
65:15,25 66:2
**involve** 14:16 15:3
23:13 36:15,17
37:7
**involved** 10:11
11:22 23:2 24:11
30:7 31:19,23
45:24 54:13 61:12
67:5,8
**involves** 45:19
**involving** 22:16
23:17 35:2,22
**issue** 15:4 23:8
48:10
**issued** 16:18
**issues** 10:15 16:13
16:14 49:13

**j**

**j** 1:17 4:1
**james** 3:9 4:8
**january** 9:23
11:24 12:19 18:17
22:8 29:13
**jersey** 9:3 10:9,10
**jkirkpatrick** 3:12
**job** 8:22
**john** 4:13

**joint** 12:11
**judicial** 97:10
**juliano** 6:15 19:18
19:25 27:5 77:1
**july** 1:18
**jump** 25:24
**jumping** 47:9
**jurisdiction** 38:13
38:15,17

**k**

**keeping** 11:12
33:14
**kenneth** 3:3
**kfromson** 3:6
**kind** 12:6 15:4
22:21 33:14 40:19
58:10 59:2 66:11
68:9 72:13 76:14
**kirkpatrick** 2:3
3:9 4:5,8 7:2
24:20 32:1,2
43:20 49:14,25
50:24 59:20 60:5
60:7,11,12 62:12
71:18 72:9 77:5
82:15 85:1,15
86:17 87:12 88:19
89:21 91:5 92:5
93:19,22 94:19,21
**kitchen** 73:1
**knew** 83:15 85:17
85:25
**know** 8:14 11:10
14:13 15:6 18:23
18:25 20:19 21:14
21:18 25:23 30:17
35:9 45:6 47:1
50:9 52:18 62:25
73:18 76:16 80:14
81:22 84:10 87:14
87:16,19 91:1,16

91:25 92:1
**knowing** 86:24
87:6
**knowledge** 41:11
78:10
**known** 10:12
25:24
**knows** 83:19

**l**

**label** 58:14 59:7
59:18 60:24 61:1
63:21 65:21 67:23
70:3 71:13 79:17
80:9,19,21 82:7
84:1,4,6,19 85:3
85:13 93:15
**labeled** 68:4,23
70:24 71:2 79:22
82:20,25 83:22
84:24 86:10
**labeling** 10:12
14:5 61:18,20
63:19 64:12 66:16
66:16 68:9,20
70:6,9 72:19
80:13 82:1 84:18
92:21
**labels** 14:6,19
64:24 65:18 76:5
**ladder** 23:12
**large** 24:16
**larger** 35:10 37:1
**lasted** 5:19 9:7
**law** 15:21 16:4
17:6 95:2 97:14
**lawampm.com** 3:6
**led** 28:2
**left** 9:18,20 31:9
**legal** 97:8,12,13
98:23

**legibly** 84:12
**levels** 11:2
**levers** 23:11
**licensed** 11:3
**limitation** 65:14
**limitations** 44:11
45:11,20 65:9
**limited** 21:24 22:9
56:11 70:20,21
**limits** 58:18
**line** 5:22 10:21
20:18 99:4,7,10,13
99:16,19
**liquid** 24:10,14
55:14
**liquids** 65:20
**list** 2:6 7:6 20:14
20:19,23 21:4,8
22:4 25:2 30:8
39:2,5 40:16
41:16 47:9,15
**listed** 5:10 6:5,9
19:10 21:3 25:13
40:17 41:3,14,16
42:25 79:18
**literature** 14:25
26:9,15 33:16
40:23 41:12 44:10
44:19,21 46:10,13
46:14,19,19 47:4,5
47:7,15 79:4
**litigation** 13:3,5,8
13:12,12,15,15,21
14:9 15:8 18:10
18:11,15 23:18,20
23:22 27:24,24
34:18 35:18,20,22
36:10,12 40:3
**little** 9:7 26:7 32:3
33:12 40:1 53:4
60:19

llc   3:16
llp   3:4,10
lms   1:5
local   24:1
location   68:2
 82:24
long   5:19 29:15,16
 60:1 87:16
look   6:22 24:21
 28:14 80:20,25
looking   20:10,11
 46:5 63:4 64:3
 79:14
looks   25:3
lot   26:13 30:4
 50:10 82:7
lots   82:9
louisiana   9:8 31:6
lp   1:8,11 3:7 98:4
 99:1 100:1

**m**

m   2:1
maintain   8:2
maintaining   89:3
 95:9
making   11:11,13
 11:14 73:22 75:22
 95:9
man   16:2
management
 11:12
manner   55:18
manuals   14:5,7
manufacture
 73:19
manufacturer
 23:5,9 26:22
 35:16 36:25 54:4
 54:23 72:21 73:4
 73:8 74:5

manufacturers
 13:23 14:2,7
 23:25 34:20 77:22
 78:21
manufacturing
 9:9,17 10:16 11:9
 28:19,23 30:13
 31:2 56:14
march   7:11 8:7
 20:16
marcia   1:21 30:20
 32:1,4 60:7 97:20
mark   8:6
marked   6:22 7:1
 24:19 83:10
market   77:24
marketing   46:14
markings   65:18
 84:16
material   6:5 11:11
 18:6 40:17 54:6
 57:1,8 59:14
 60:21 61:6,11,13
 61:14 62:11,16,17
 62:18 66:10 69:9
 76:23 77:12 80:12
 80:15 81:7 87:5
 88:2,5,9,14,17
 92:18,22,25 93:5
materials   5:9 6:9
 6:10 10:11 17:11
 19:10 25:13 28:16
 31:20 40:9,16,21
 40:25 41:2,13,16
 41:17 43:6 48:11
 51:12 56:1 66:18
matter   18:19 23:4
 24:14 27:1,14
 35:18,20 37:22
 38:1,16 40:22
 41:1 45:18 47:25

49:23 54:16 56:17
 56:21 57:17 61:21
 71:17 72:23 81:25
 86:19 95:8,14
 97:4
matters   8:11
 16:19 21:25 27:12
 35:22 40:2
mba   11:17
mccarthy   46:22
mean   8:5 32:10
 36:1 46:11 57:23
 58:21 69:21 70:13
 71:3,19 76:1
 80:11
means   51:3 56:2
meant   29:9
media   33:7
meet   54:5 55:3
meeting   33:25
 34:3
meetings   33:10
member   33:5,8,9
members   33:23
memorialized
 42:24 43:1
mendoza   22:22
mention   69:19
mentioned   6:4
 11:21 13:13 19:23
 25:8 29:15 32:25
 36:15 50:10
methodology
 47:19,20 48:20,23
 48:24 49:15
methods   65:21
middle   79:24
 80:24 81:1
million   31:4
mind   41:3 58:23
 70:14

mine   12:5
minimum   65:19
minutes   5:21,21
 43:16 93:20
misrepresentation
 49:11
missed   8:14
misspoken   64:17
misstated   64:11
misstates   89:19
misunderstanding
 49:11
modifications
 28:11
moipa   9:13 31:12
 31:15,16
molecular   30:16
molecules   30:16
month   15:22
months   9:7 28:20
 29:21,22
morning   4:6,7
 5:21
mount   10:10
move   32:12
moved   9:8
moves   33:17
moving   30:5 68:24
multiple   67:17
multiproduct
 31:18

**n**

n   2:1,1
name   4:8,11 16:2
names   22:11,19
national   33:1
nature   58:1
ne   1:20
necessarily   29:12
 55:2,25 68:19

**necessary** 53:16
73:16,25 74:12
75:11 78:12 79:3
100:6
**need** 7:14,19,21
20:17 33:16 61:22
62:16 63:7,21
65:24 66:16 73:15
74:11 75:4 80:19
80:21,25 82:3,9
94:7,14
**needed** 58:8 75:8
75:17 78:14 79:16
80:6
**needs** 75:1 90:19
**neither** 67:4
**never** 70:14
**new** 1:1 3:17 7:14
9:3 10:9,10,19
33:5 73:6
**newburgh** 3:5
**nfpa** 27:11,13,22
37:5,7,11,21 38:3
40:23 48:7,7
**nine** 32:11
**niosh** 12:9,11
**nitrogen** 61:24
87:3 88:3
**non** 13:8,12,15,21
18:10,11,15 23:18
23:22 27:24 36:10
40:3 55:17
**north** 9:2 10:5
**notary** 100:13,19
**note** 28:1 67:19
79:25 98:10
**noted** 100:7
**notice** 8:13 52:18
81:14
**noticing** 95:14

**november** 9:23
**number** 13:8
18:13
**numbers** 37:19
40:14
**numerous** 59:22
**nw** 3:10
**ny** 3:5,17 98:15

**o**

**o** 2:1
**o.c.g.a.** 97:15
**oath** 4:16 5:1
**object** 91:9
**objection** 49:8,17
50:18 59:9 62:7
71:22 76:20 81:20
82:8 84:14 85:6
86:13,23 89:18
90:4 92:12
**obligation** 59:7
70:3,17 95:9
**obligations** 67:23
**observed** 78:18
**obtaining** 11:22
**obviously** 44:15
47:15 50:10,21
57:12 58:21 75:20
75:22 89:1
**occasion** 38:12
80:16
**occasions** 67:17
**occupational**
11:25 12:6 14:11
50:13
**occurred** 85:14
**ocga** 95:4,5,15
**offer** 16:15 42:10
**offering** 26:24
**office** 41:21
**offices** 97:12

**oh** 22:19 80:25
**okay** 4:19,25 5:22
6:4,13,17,22 7:3,7
7:13,20,24 8:2,8
8:12,17 9:22,25
11:5,17,20 12:18
12:23 13:3,10,21
15:8,17,24 16:3,9
16:20,25 17:5,9,14
17:23 18:4,20,25
19:4,14,22 20:2,7
20:10,17,25 21:5
21:10 22:1,10,18
22:24 23:1,6,8,13
23:16,16,22 24:5,7
24:21 25:5,8,14,21
26:10,23 27:2,8,15
28:1,21 29:9,15
30:6,20 32:25
33:18 34:7,23
35:2,12,18,21,24
36:7,14 37:5,9
38:2,11,18 39:2,8
39:16 40:5,10,15
41:2,6,24 42:4,8
42:12,16,21 43:1,8
43:15,16,18 44:6
44:22 45:8 46:4
46:22 47:9,18
48:2,13,20 49:5
50:1,8 51:11,24
52:8,11,18,21 53:1
56:9 57:5,10
60:11 61:7,17
62:20,24 63:23
64:7,8,22 66:5,12
66:20 67:4,9,19
68:7,24 69:11,19
70:2 71:19 72:10
72:24 76:14 77:13
79:7,14 80:5,18,25

81:11 82:4,16
84:11 87:15 91:6
93:19 94:7,11,15
94:18
**old** 18:19
**older** 8:6
**olive** 10:10
**onboard** 12:25
**once** 79:19 83:21
84:21
**ones** 21:7 23:6
40:10 75:18 92:3
**open** 6:20 24:22
87:23
**opened** 15:20,23
18:18
**operate** 10:25
**operating** 53:15
77:2
**operators** 10:19
10:22
**opine** 14:15 16:12
48:1
**opining** 49:19
53:23 75:10 82:14
**opinion** 42:9,13
48:3 55:5 59:6
66:5 70:5,15,21
72:10,14 74:3
77:20 79:15 80:5
81:17 82:17 91:6
93:1,10
**opinions** 7:21
21:21,24 22:8
26:24 27:4 36:19
40:18 41:10 42:14
42:19,24 43:7
47:24 48:8,13
49:1,6,9,12,24
50:2 53:24 81:25
88:20

**opportunity**  28:14 29:2

**opposed**  13:12 15:10 31:16 75:24 76:16

**oprandy's**  1:14 49:21 51:6,9 52:13 53:2,7,21 54:2,15,23 55:18 55:25 56:16,18 57:3,12 59:7,18 61:17,22 66:13 67:11,22,23 70:3 70:17 71:16 72:2 72:15,20,22 74:4 74:15,17,20,25 75:5 76:12 79:16 80:3 83:15 84:18 84:21 86:25 87:4 89:13 90:6,18,24 90:25 91:11 92:7

**optically**  31:7,7,11

**order**  25:22 81:12

**ordering**  96:2

**orders**  94:8

**original**  94:20 97:8

**osha**  38:19,20,22 38:25 39:3,5,10,14 39:19,20 40:23 48:16 50:9,11,17 50:21,22,25 51:1,3 51:7,8,10,11,16 52:2 57:21,25 58:3,5,5,10,21 62:2 63:10,13,16 66:7 67:9 68:4,16 68:23 69:2,6,11,17 70:25 74:15,24 84:25

**outlines**  57:25

**outside**  10:4 37:2 38:8 45:17 53:4 53:23,24 54:12 60:17 72:13 81:24

**overall**  44:20

**overlap**  45:2,7

**owner's**  14:5,7

**ownership**  20:7

## p

**p**  51:19 52:20 53:9 55:4 57:22 58:19 59:19 63:8,19 64:8 66:13 69:16 93:3,13

**p.m.**  94:22

**page**  2:2,5 20:12 25:4 26:1 28:1 40:15,15 41:6 43:21 44:3 50:8 53:8 55:12,21,21 57:19 65:16 66:3 66:6,8,21 68:24 72:24,25 76:25 77:13 79:14 82:16 99:4,7,10,13,16,19

**pages**  66:3 97:5

**paid**  12:11

**paint**  75:21

**painting**  73:19 75:25 76:7

**pamphlet**  51:19 52:5,6,8 62:25

**panel**  79:25 80:24 81:1

**paragraph**  65:20 70:15

**paragraphs**  46:4

**part**  12:8 21:22 22:8 28:6 39:11 41:18 63:24 64:18

**66:8 71:11 93:3**

**particular**  31:2 38:17 74:3 78:17 83:8 91:18 92:8 93:1

**parties**  22:11 95:16 96:2

**partners**  3:4

**parts**  19:20 30:5 73:9 74:8 78:11 79:1

**party**  1:12,15 3:7 3:14 95:10,16

**password**  96:1,2

**peachtree**  1:20 4:14

**people**  30:1,3

**percent**  13:14,15 15:6,7,11,12

**percentage**  13:10 14:20 15:2,9

**perception**  14:22

**perform**  28:7,18 29:3 67:17 70:1 71:9 78:6 85:21

**performing**  26:17 77:23

**period**  10:21,24 29:11,18 30:2 67:12

**periodically**  8:5 28:9

**person**  34:3 68:17 83:19

**personnel**  37:15 53:12 54:4,11,12 54:16,19 56:7 57:1

**perspective**  76:1

**pertaining**  25:17 26:2,4

**ph.d.**  1:17 4:1 9:19 12:19,24

**pha**  29:3,7

**photocopying**  97:7,8

**photographs**  84:3 84:7

**physical**  36:4 44:12,13 59:23 62:5,10,17 63:25 64:19,24 76:15

**physically**  30:2

**pictogram**  81:6

**pinpoint**  29:5

**place**  28:22 95:15

**places**  64:23

**plaintiff**  1:3,12 3:2 3:7 15:9

**plaintiffs**  15:11 22:13,14 34:19

**plan**  42:9 50:21

**plans**  43:12

**plant**  9:13 10:6,23 11:9,14 28:11,17 31:1,4,6,10,18

**plants**  9:15 28:23 30:7,9,22

**platform**  23:11

**please**  94:10

**pmh**  1:5

**point**  17:3,15 68:25 70:16 80:10

**policies**  88:24 89:9 90:23 91:7 92:9

**polymer**  30:19

**polymerizing**  30:15

**polytetrahydrofu...**  30:14

**polythf**  9:9

port  9:5 10:21
portion  56:3 75:21
portions  21:23
  38:25 48:7
pose  60:14
posed  76:15,18
poseidon  1:5,6
  57:16 76:16,17,22
  77:1,6
position  73:2,9,11
  74:4,4,9,22,23
  75:7,13 76:18
  77:8
possible  16:23
  90:15
possibly  29:7
  49:18
potential  10:14
  17:11 28:17 48:10
  49:10 51:4 59:8
  59:21,24 60:8,14
  61:25 62:5,18
  65:3 66:18 76:21
  79:12 88:4,12
  93:5,15
potentially  61:13
  62:14 76:22
power  37:17
practical  34:10
practice  86:25
  87:7
practices  27:15
pre  34:25
precautionary
  61:4 81:8
precautions  53:16
premarked  6:23
premises  67:3
preparation  19:15
  19:23

prepare  5:5 87:8
prepared  24:24
  41:20
preparing  5:4 6:1
  6:7 19:1,5,7,8
  20:4 65:21
present  91:17
preserve  42:4,6
pressure  31:18,19
  87:5,24 88:9,13
  90:13
pressures  24:11
  61:12
pressurizing  56:20
pretty  13:17,19
  15:15 45:22
previous  20:12
  55:21 64:11 80:16
previously  40:3
  88:2
primarily  10:11
  13:5,23 31:1,21
  69:17 93:11
principles  65:18
prior  8:7 22:5
  37:22,25 39:19,22
  80:7,13,17 82:12
  84:21 85:9,11,20
  86:5,16 87:5
  88:12,18 90:18
private  50:19,23
probably  7:14
  8:19 15:15 18:23
  19:6,17 20:5 21:8
  21:17 23:23 24:6
  24:17 26:6 27:19
  29:6,13 35:7 37:8
  41:18 60:18 61:15
  80:12 91:21
problems  79:6

procedure  88:16
procedures  53:16
  88:24 89:9 90:23
  91:7 92:9
proceeded  17:2
proceeding  95:17
  96:1
proceedings  95:7
process  5:4 9:8
  11:25 28:7,8,12
  52:15 80:14 90:21
processes  28:3,4
processing  45:4
  91:11
produce  49:3 56:1
produced  95:17
produces  55:23
producing  11:15
product  9:3 10:8
  10:12 14:5,6,12,14
  14:18,24 15:1,4
  16:11 23:10 24:3
  26:8,15,19 28:16
  30:13 45:3,23
  73:7 76:19 77:9
  77:14 78:1,4,5,7,9
production  9:5
  11:10,12 31:23
products  1:8,11
  3:7 4:9 10:13
  13:24,24,25 14:3
  14:16 26:14 30:18
  34:21 53:17 60:3
  77:22,24 78:21,22
  98:4 99:1 100:1
professional  7:15
  8:24 11:4 28:2
  34:24 36:9 38:12
  39:15,23 95:10
  97:11

professor  32:6,14
  32:22,24
program  8:25
  12:11,14,15 13:2
prohibited  95:15
  97:14
prohibitions  95:5
project  18:10
  23:18,22
projects  13:8,13
  13:22 18:15 23:20
promulgate  34:8
promulgating
  34:11
pronunciation
  71:24
propane  35:7,7,9
  35:15,22 36:12,17
  36:23 37:1 40:2
propellable  55:17
proposals  33:13
  33:19,21
propose  18:14
  33:18
protected  96:1,2
protection  23:3
  27:2,9,16,22
provide  16:25
  32:19 34:12 43:21
  49:12 61:18,24
  68:19 69:4 70:9
  70:17,22 71:13
  72:11,16 74:23
  75:1 76:11 77:25
  78:5 80:23 93:13
  93:13 95:14 97:13
provided  7:22
  14:2 21:12 42:17
  58:3,5 73:13,15
  74:11,18 75:4,17
  80:3

**provides** 36:24
  65:17
**providing** 59:4
  63:18 79:2
**provisions** 97:15
**psychology** 44:23
  44:25 45:5 46:13
  46:19
**public** 100:19
**publications** 46:16
  47:3
**published** 46:21
**pull** 63:5 64:2
**purchase** 36:24
**purchaser** 78:8
**purchasing** 92:18
**purports** 54:18
**purpose** 53:15
  88:6
**purposes** 53:3
  55:2 56:19
**pursuant** 97:9
**pursue** 9:19
**purview** 75:5 87:4
  89:7 90:6 91:10
**put** 31:15 76:5
**putting** 31:16 57:8
  83:20 84:19

**q**

**qualifications**
  21:24 42:16,18
**qualify** 55:11 56:8
**question** 4:20,22
  14:17,22,23 15:19
  16:1 20:2 25:16
  27:8 46:23 48:5
  53:19 57:23 60:8
  60:13 62:8 67:22
  70:11 73:1 89:11
  89:20 90:1,5

**questions** 93:23
  94:1,2 95:18 97:4
**quick** 43:15
**quite** 28:17 30:8
**quote** 44:3 53:2,13
  57:11
**quoting** 89:23

**r**

**r** 97:1 99:3,3
**raised** 49:13
**rapid** 61:8,10
**rapidly** 60:14
**rate** 17:25 18:2,4,8
  18:16,17,19
**raw** 11:11 28:15
  31:20
**reach** 44:12 77:18
**reacting** 31:20
**reaction** 14:22
**read** 41:18,22
  43:25 53:13 65:24
  94:4,6 98:9 100:5
**reader** 58:15 59:3
  59:4
**reading** 19:11,11
  26:1
**really** 13:24 15:5
  18:22 20:11 26:7
  30:20 32:16 45:23
  48:8 53:4 56:4,18
  56:23 70:13,20
  72:14 81:6 82:1
  83:9
**reason** 4:25 8:17
  87:13 90:13 98:11
  99:6,9,12,15,18,21
**reasonable** 50:2
  59:17 77:16
**reasons** 42:13
**reassembling** 89:3

**recall** 6:12,13
  15:20,24 16:2,9,17
  16:18,20,22,24
  17:21 22:1,11,19
  23:7,8,19 24:7,11
  24:14 25:10 27:7
  35:11,12,24 36:13
  36:25 37:9,19,21
  38:16 40:5,14
  41:5 67:9
**receipt** 98:18
**received** 5:8,8
  6:10,15 12:19,23
  26:21 91:20
**receives** 95:16
**receiving** 92:24
**recess** 43:19 93:21
**recognize** 79:8
**recollection** 20:23
  21:23 28:9 36:3
**recommended**
  65:19
**record** 4:12 60:4
  64:3 94:4 95:7,9
  95:17 97:5
**recorded** 46:10
**recover** 55:20
**reduced** 97:4
**refer** 69:12
**reference** 51:19
  52:19,22 64:16
  78:17
**referenced** 19:12
  40:12 47:23 48:2
  53:8 69:8 98:6
**references** 40:18
  41:7,7,8,14 47:10
  47:11 80:20
**referencing** 19:21
  19:21 40:8 52:22
  55:12

**referred** 34:18
**refilled** 67:11
**refilling** 89:4
**refinery** 9:4
**reflected** 42:22
**reform** 31:13
**refresh** 19:19
**regard** 7:15 11:9
  17:11,12 26:17
  33:12 35:20 44:19
  77:18 93:15
**regarded** 23:10
**regarding** 10:14
  11:25 12:2 23:18
  25:20 26:8 27:23
  36:4 39:12 44:10
  61:25 70:17 71:3
  71:14,20 72:11,17
**regardless** 18:9
**registered** 97:11
**regular** 94:14,16
**regulation** 52:2
  74:21
**regulations** 34:17
  38:21,24 39:6
  40:23 50:9,12
  51:1,11,14,15,16
  51:18 53:18 62:21
  65:23 69:2,12
  72:3 78:22 79:5
  92:7,8 93:2 95:3
  97:10
**regulatory** 10:14
  58:22
**relate** 17:13 33:15
  37:13,14 51:17
**related** 10:18,19
  13:15,16 14:1
  15:1 16:11,13,14
  23:20 26:16,18
  35:5 36:20 38:16

39:10 45:3 62:5
66:17 70:23 88:21
**relates**   11:10 14:6
14:14 27:12,20,21
28:18 34:21 35:15
37:12,15,16 38:4,7
38:21 39:14,19
40:2,8,9,21 41:1
44:17 45:3 47:13
47:25 48:4,6,11,13
48:16,25,25 49:21
49:23 53:5 54:16
55:4,19,24 56:7,17
56:21 57:16 58:9
58:13,25 59:1,10
59:16,18,23,25
60:2,19 61:3,10,21
62:14 63:18 64:14
65:1,8,9,12 68:4
68:22 69:7,17
70:6,10 71:17
72:3,18 74:25
75:2 76:21 77:2
77:23 78:7,20
79:25 81:22,25
82:1 85:7 86:4,25
88:24 89:1,9 90:6
90:15,25 91:11,15
92:20 93:14
**relating**   96:1
**relationship**   95:8
97:15
**relatively**   13:20
47:16
**release**   60:17
62:10
**released**   62:9
**releasing**   60:20
**relevant**   7:21
25:14 43:3 45:12
45:21 47:22 58:6

58:12
**rely**   39:1 40:25
42:18 47:12 48:14
**relying**   40:16,21
41:4,9
**remaining**   88:13
88:17
**remember**   35:3
**remote**   1:17 5:13
**remotely**   4:2
**remove**   80:13,17
**repeat**   38:14 45:13
**repeatedly**   67:10
**rephrase**   4:21
45:14
**replace**   63:14
**replaced**   52:1,5
**replaces**   58:18
**report**   2:7 5:5,9,10
6:5,6,9,11 7:22
16:15,23 19:1,7,11
21:11 24:23,25
25:1,4,6,10,22
27:7,13 40:11
41:8,14 42:15,22
42:25 43:4,13
53:25 57:18 64:17
66:20 67:10 81:11
95:8
**reported**   97:3
**reporter**   5:14
60:10 71:8 88:15
94:3,7,11,15,18
95:1,4,6,18,19
97:11,11,15
**reporting**   95:4,14
97:10,13
**reports**   16:19 17:4
19:19 22:14 25:12
47:23

**repository**   96:2
**represent**   4:9 97:5
**representation**
47:7
**representations**
95:2
**representative**
47:5,15
**request**   34:1
**requested**   67:2
**requesting**   85:22
**required**   60:24
61:9 62:4 65:22
72:11 75:14
100:13
**requirement**   80:9
81:4
**requirements**
57:20 58:18 65:19
66:14 68:9
**requires**   55:10
**research**   32:17,19
46:5
**reserve**   97:3
**residual**   87:5
**resource**   12:9
63:20
**respect**   15:17 36:8
44:6 53:21 57:11
59:8 61:7 74:2,5
**responses**   44:19
46:8
**responsibilities**
9:17 33:3 72:15
74:17
**responsibility**
64:23 71:16 72:2
72:4,8 74:19
76:10 84:17,20
**responsible**   12:13
12:14 61:18,20

70:6,8,22 72:5
77:2,23 79:2
93:14
**resume**   7:4 8:9
**retained**   7:25
15:18 17:5,6,9,20
**retentions**   13:7
**return**   85:4 86:11
86:21 90:11 93:6
93:17 98:13,17
**returned**   82:21
83:6 91:4
**returning**   90:18
**review**   6:7 17:11
18:6 19:25 20:18
24:1,5 29:3,16,19
33:19,21 41:21
47:6,20 65:15
98:7
**reviewed**   5:7,9
6:14 25:2,9,13
27:6,11 28:9 29:3
40:16 41:15,17
43:6
**reviewer**   58:15
**reviewing**   19:10
19:18 25:10 33:13
33:14 52:24 53:7
**reviews**   19:15 28:3
28:4,6,20,22 29:7
29:7,16 30:4 43:9
46:24 47:3,8
**revisions**   52:3
**right**   4:17 8:15
11:18 22:20 25:18
26:23 31:8 35:11
42:10,13 49:6
50:3,12 51:2,12,15
51:19 52:4,19
53:22 55:11 63:4
63:15 64:20 66:25

80:19,21 81:15
82:7 86:2 89:23
94:20,21
**ripped** 84:9
**risks** 73:3 76:18
77:8,10
**rogers** 46:23
**role** 9:4,13 16:12
32:15,16 93:8
**roles** 11:8
**rolled** 21:8
**rotational** 9:1,6,25
10:3,8
**rotations** 10:2
**rouge** 9:8
**rough** 15:2
**roughly** 18:21
25:22
**route** 3:4
**rpr** 1:21
**rs** 31:16
**rules** 95:3 97:9
**running** 10:23
11:14 31:18

**s**

**s** 2:4 9:13 31:12,15
99:3
**safe** 26:19 52:9,12
64:9
**safely** 87:4 88:13
**safety** 1:14 10:11
11:25 12:1,6 14:2
14:4,12 17:12,16
25:17,19 26:2,5,8
26:12,15,18,25
27:20,23 28:2,3,6
28:15,21 34:9
35:16 38:5,9
41:12 46:7 49:22
50:4,13 53:5
61:25 62:15 70:22

71:15,25 72:16
73:12,14,25 74:5
74:10,18 75:1,16
77:18 78:1,6,13
79:2 80:2 82:11
88:16
**saving** 45:4
**saw** 52:18
**saying** 53:22 54:8
54:10 57:13,13
61:19 68:7 70:2
75:12 76:2,12
83:14 89:24 90:1
**says** 44:7 46:6
54:19
**schedules** 29:24
**scientific** 32:17
43:24 44:10,18
47:4 50:2
**scope** 53:23 65:15
65:16,25,25 66:2
74:16 82:14
**scott** 66:24 67:1,7
67:16 69:25 84:23
90:14
**scott's** 85:19 86:1
86:4
**scroll** 24:22
**seal** 97:8
**seated** 44:13
**section** 41:14
42:17 53:10 54:1
54:5,8,10,17 56:6
56:12 58:25 66:1
66:3 82:17,18
**see** 6:24 9:11
15:19 22:6,22
33:1 37:2 63:7
79:24
**seen** 84:3,7

**sees** 81:13
**segregate** 86:21
**segregated** 82:21
83:6 85:4 86:11
**segregating** 73:18
**selected** 65:20
**sell** 30:12 77:24
**selling** 24:3 54:23
54:24 56:2 73:1
73:10
**sending** 91:23
**sent** 98:14
**sentence** 26:6 46:6
47:2
**separate** 5:4 20:6
74:13 76:2,4
84:17
**separated** 31:6,8
37:17
**serve** 33:1
**services** 77:17
95:14 97:13
**set** 11:15 12:1
51:14 55:6 58:18
**settled** 17:3
**seven** 28:22 29:7,9
**share** 6:20
**sheet** 98:11
**sheets** 10:11 14:4
**shift** 67:21 68:14
68:17
**shipments** 11:13
**short** 59:25 89:22
**shortly** 32:9 89:11
**side** 44:17
**sign** 94:4,6 98:12
**signal** 58:7 79:23
81:7
**signature** 97:4,8
97:19

**signed** 98:20
**significant** 26:14
38:20,25
**similar** 67:17
85:21 88:6 91:24
**sir** 4:16,18,24 5:3
5:24 6:3,18,25 7:5
7:10,12,23 8:1,10
11:4,19 12:20
16:6,14 17:8,22
18:1,6,7 23:14,15
24:25 25:7,20
27:1 28:24 35:1
35:14,19,20,23
37:23 38:17 39:1
40:1,12 42:1,3,11
42:14,15,20 43:11
44:5,24 47:8,17
48:19 50:5,13,15
51:10,13,16,17
52:7,10,14,17 57:8
57:9 62:19,23
63:2,12 64:21
65:4,8 66:19 67:3
75:15 77:10,12
79:10,13 81:16
86:3,7 87:18
93:18,23
**sit** 6:12 16:22
20:24 23:7,20
39:7 41:22
**site** 30:2,3 51:5
59:14 67:6,8,18
68:2,14,21 71:1,1
71:6,9,11 79:21
83:23 85:24
**sitting** 35:11
**six** 19:6 20:3,6
**small** 22:22
**smaller** 35:8

society  46:17
sold  55:10 81:4,10
solely  95:11
solutions  97:8,12
  97:13 98:23
somebody  92:17
someone's  35:9,10
  37:3
sophisticated
  92:19
sorry  15:22 25:15
  29:9,11 77:14
sound  4:23 43:17
source  46:20
sources  40:19
southern  1:1
spandex  30:17,18
  30:22
special  31:6
specialty  9:14
specific  17:21
  27:13 29:6 34:1,4
  34:4 36:22 40:14
  41:2,13 43:2
  47:25 48:24 49:22
  58:20 61:9 63:18
  64:13 82:1 86:24
  95:15
specifically  16:20
  23:21 24:13 27:3
  27:7,18 35:12
  36:13 37:22,25
  41:5,11 45:10
  46:15 49:4 65:1
  95:3
spelled  61:2 62:20
spend  19:4 29:18
spent  19:1 20:3
stable  13:20
stamped  84:12

standard  7:17
  33:2,5,7 34:4,16
  34:17,20 37:11
  38:23,23 45:8
  48:17,21 50:6
  52:8 53:20 55:8
  55:12 57:21 58:16
  58:17,23 61:2,5
  62:23 63:4,8,16,19
  64:8,18,23 66:7,11
  68:4,23 69:3,7
  70:25 71:2,12,13
  72:16 74:25 76:24
  77:7 84:25
standards  19:11
  19:12,18,20 27:6
  27:12,13,16,21,22
  33:13,14,15,24
  34:8,10,11,21 36:4
  37:6,7,9 38:3,6,19
  38:21,25 39:3,10
  39:25 40:5,7,13,23
  47:22,22 48:2,7,7
  48:14,18 49:2,20
  49:20 50:11,17
  51:7 52:11 53:13
  53:18 63:9,10,14
  63:15,23 69:13
  72:3 78:19,23
  79:5 93:2,11
start  8:21 10:23
started  11:24 13:4
starting  11:24
  29:13
state  4:11 16:18
  22:7,23 39:12
  50:1,20 57:19,20
  59:6 68:25 76:25
  77:13,16 95:6
stated  89:11 97:3

statement  81:8
statements  49:20
  58:6,13 59:3 61:4
  61:4 79:24 80:24
states  1:1 34:13
steady  13:17
steam  9:4 10:19
stenciled  84:12
step  58:11
steps  26:17 88:11
  88:21 89:16,22
stewardship  9:3
  10:9
store  1:6
stored  90:19
stores  1:6
street  1:20 3:10
  4:14
stretched  29:22
strike  82:4
structure  18:12
  30:10
student  12:18,20
studied  78:17
studies  12:10 46:9
  46:11,12
study  40:22 46:1
sub  33:6 54:5
  58:25
subchemicals
  10:16
subcommittee
  33:23 34:5
subcommittees
  33:2,3,4 34:8
subcomponents
  65:10
subcontractor
  95:6,11
subject  17:13,17
  51:6 66:13 67:19

68:10 69:24 70:1
  75:4,8 85:8,23
  90:7,7
submitted  21:11
  95:18,19
subscribed  100:14
subsequent  52:1,3
  52:6
subset  14:23 27:19
  44:20,25 47:17
subspecialty  12:5
  38:8
subtract  7:24
sufficient  12:3
sufficiently  61:1
suggested  46:12
suite  1:20 3:16
  4:14
suited  73:14,24
  77:25
summary  42:1,5
super  5:14
supplant  63:14
supplement  43:12
supplemental
  63:20
supplier  53:3,12
  53:21 54:3,9,12,18
  54:19 55:3,7,10,11
  55:22,23 56:3,8,11
  56:13,25 57:11,15
  64:25 77:3 82:21
  83:7 85:4 86:11
  86:22 91:21,23
  92:21 93:6,18
suppliers  54:10
  73:6
supply  93:9
support  32:16,19
  41:10

**suppression** 34:25
73:2
**sure** 8:21,24 10:3
10:24 11:8,11,13
11:15 16:21 19:19
21:20 25:23,25
26:13 28:5,10
30:20 32:13 37:4
37:20 45:14 47:20
52:25 64:3 70:24
80:22 86:8
**sworn** 4:3 97:3
100:14
**symbols** 80:1
**system** 28:15
34:12 36:16,18,21
39:20 45:24,25
46:2,3 71:7,7,9
76:16,22 77:11,12
78:11 79:1,3
**systematic** 46:7
**systems** 1:5,7
11:22 31:13 34:25
36:9

**t**

**t** 2:1,4 97:1,1 99:3
99:3
**take** 9:7 12:16
29:16 43:15 67:3
78:5 88:11 93:19
94:13
**taken** 43:19 58:11
71:6 73:5 80:10
93:21
**talk** 5:15,16 39:12
50:9
**talked** 36:10,12
**talking** 5:13 84:16
92:7 93:4
**tank** 36:18 37:1,2
48:12 53:3,6,22

57:12 59:11,16,18
61:22 62:5,9
66:22,24 67:10,16
69:20,22,25 70:3,7
70:8,10,18,19 71:4
71:6,14,21 72:1,6
72:12,17,19,22
73:3,5,10,16,21
74:7,9,11,14,18
75:2,21,23,25 76:3
76:5,6,17 77:19
78:11,15 80:6,11
81:18 82:18,20
84:13,16 85:2
86:1,5,9,10,16,20
87:5,24,24 88:6,8
88:10,12,17,22
89:14,15,25 90:16
90:17 91:8,16,19
91:20,22,24,25
92:10,17
**tanks** 35:10 36:15
59:7 67:17,17
73:17,18 76:6,9
87:2 88:25 89:10
91:12 92:20,21
**tara** 3:15 5:11
98:1
**tara.fappiano**
3:18 98:2
**taranto** 6:16 71:23
71:24
**tasks** 26:17
**taught** 32:23 39:8
39:14
**teach** 32:21,22
**technology** 8:22
**teleconference**
34:6
**teleworking** 30:1

**tell** 4:20 5:18
**ten** 13:9,11,18,20
15:14,15 19:3
**term** 14:13 59:25
60:1
**terms** 14:8 27:15
37:5 43:1 49:15
58:5 60:23 86:19
95:11
**test** 17:17 48:12
49:7,18,22 53:3,6
53:21 55:19 57:12
61:21 62:5 66:22
67:6,8 69:20,22,24
70:18,19 71:4,6,10
71:11,21 72:12
73:4,17 74:9,11
75:23,25 77:19
78:11,15 81:18
82:18 87:2,22
90:10,20 91:3,12
91:25
**testable** 49:16
**testified** 4:3,16
**testify** 5:1
**testifying** 43:10
**testimony** 2:6 5:5
7:6 16:25 18:7,7
20:13,20 21:2,4,6
21:12 25:2,9
85:19 86:1,4
89:19 98:9,18
100:8
**testing** 61:23
85:24
**tests** 67:18 69:25
**tetrahydrofuran**
30:11,12,15
**texas** 9:5 10:21
31:3

**thank** 32:1 93:23
93:25
**thereto** 97:9
**theses** 89:5
**thf** 9:9
**thing** 22:18 43:25
57:14 65:24
**things** 6:6 7:20
12:7 19:8 26:3,11
82:6
**think** 9:13 13:19
14:20 15:5 16:17
17:2,3,16 27:4,19
32:7,8,12 36:22
37:11 40:7,20,24
43:5 44:3 45:22
47:4 48:8 49:9,12
49:19,22 50:19
51:8,21 53:20,24
56:13 57:19 58:20
59:10 64:5 67:15
70:20 71:23 72:14
72:25 74:24 76:8
76:25 77:14,21
78:2,19,25 79:3
81:24 84:15 85:19
86:3,24 87:1,18
91:10 92:13,23
93:3,12
**third** 1:12,15 3:7
3:14 10:18 70:16
**thousands** 47:16
**three** 9:1 26:3 29:6
29:15
**time** 4:19 5:8 6:11
10:10,12,17,22
11:18 12:7,18,20
12:21 13:1,1,10,14
14:22 17:19,24
22:12 28:12,25
29:1,2,18 30:3,11

32:12 33:17 34:15
40:13 43:11,14
47:6,7 67:12
68:15,18 80:7
83:17 84:8,21
85:9,11,13,18
86:16 87:6 88:18
90:10,19 93:24
95:16 98:19
**timeframe** 98:8
**times** 16:7 18:15
21:1,3
**title** 65:22
**today** 5:1,6
**top** 73:19
**topics** 12:17 38:22
**touch** 45:6
**touched** 40:7
**trained** 10:25
53:14,15 54:20
56:8 57:1
**training** 9:4 10:14
10:18,19,24 23:14
37:12,13 39:9
**trainings** 39:17
**transcript** 95:17
97:2,7 98:6,20
100:5,8
**transcripts** 6:5,14
20:1 47:21 95:17
96:1
**transfer** 54:14
55:14 57:1 68:20
**transferred** 31:17
68:8 79:20,21
80:7
**transferring** 55:1
56:22 68:1
**transfill** 57:15
77:3

**transfilled** 83:18
**transfilling** 52:15
53:10 54:1,6,6,13
55:13 56:5,7,11,18
56:23 57:3,5,7,14
76:23 77:11 83:19
**transitioned** 9:12
**transported** 59:14
68:21 71:1 83:23
**transporting** 68:2
**treated** 76:2
**treating** 76:4
**treatises** 41:9
**trial** 18:7 20:13,20
21:2 42:10 43:10
**truck** 23:4,9
**true** 95:17 97:5
100:8
**trump** 58:22
**truthfully** 5:1
**try** 5:14,15 25:22
27:4 29:18 32:18
34:12,20 46:20
70:12
**trying** 22:21 29:20
45:15 76:7 81:9
81:23 88:3
**turning** 57:18
66:20 72:24
**twice** 21:23 31:10
31:14
**two** 6:15 16:8
20:11 21:3 26:11
28:20 29:19 30:25
45:6 53:11 54:22
58:24
**tyco** 1:7,11 3:7 4:9
71:7 74:3,8 75:6
75:11,17 76:11,16
98:4 99:1 100:1

**tyco's** 69:1
**type** 13:21 18:9,9
18:10 24:7 34:16
57:6,7 58:4,23
60:20 65:8 75:24
76:3,4,6 88:4
**types** 14:9 35:25
61:19 65:7 73:18
76:5 89:5
**typewriting** 97:4
**typically** 18:13
26:13

**u**

**u.s.** 65:22
**uab** 12:14,16
32:18
**ul** 34:16 78:24
**undergoing** 10:24
**understand** 4:19
4:22 5:1 25:14
32:5 34:7 62:8
89:13 90:5
**understanding**
17:10,14,18 20:22
52:7 55:25 66:22
66:23 67:1,7,16
69:23 71:5 78:16
85:7,16,25 90:9,20
91:2 92:6
**undertaken** 43:3
**unidentified** 92:10
93:5,16
**uniform** 34:12
**united** 1:1 34:13
**units** 24:3 36:11
**university** 12:12
**unknown** 83:4
**unquote** 53:2
57:11
**unreasonable**
80:13 85:10 87:1

87:7
**unsure** 86:20
**update** 8:5
**updated** 7:11 8:6
**uploaded** 96:1
**use** 8:3,11 14:13
18:4,8,16 26:19
35:7 53:14 58:8
59:4 65:10 68:13
69:20,21,24 70:4
71:4,5,20 72:12
75:23 82:25 83:5
83:9,12 86:5
87:15 88:5 92:2,2
**user** 26:16,22
27:23 35:17 54:25
55:16,20 78:8
83:9 92:16 93:6
93:17
**users** 54:24 63:20
**uses** 55:17 76:8
**usually** 26:13
28:20 34:2 41:19

**v**

**v** 1:4,13 98:4 99:1
100:1
**vague** 48:3,15
**valve** 87:23
**valving** 65:10
**variety** 13:24
18:11 31:20 34:14
38:21 44:14 59:24
60:2 73:6 79:6
82:12
**vehicles** 37:16
**verbatim** 95:9
**verify** 98:9
**veritext** 95:6,14
97:8,12,13 98:14
98:23

veritext.com
   98:15
version   7:9 8:6,8
   8:10 51:21,22,22
   51:25 52:1,5,6
   64:4,5 73:20
versions   8:2,7
versus   22:15,23
vessel   56:22 57:8,9
   68:13,13,15,18,21
   90:7 91:1,3
victory   1:5,6
videoconference
   1:17 3:2,8,14
view   50:11
violations   51:1
vis   74:22,22
visual   7:18 34:12
vitae   2:6
volumes   6:15
voluntary   34:8,10
volunteer   7:15

| w |
| --- |

waive   94:5
want   50:8 52:21
   66:21 94:9,12
wanted   12:2
warn   62:4 63:24
   64:19,24
warning   15:1,4
   25:20 61:9 71:20
   72:11 76:11 79:23
   81:13,14,18 82:5,7
warnings   14:1
   16:13,14 23:13,14
   24:2 25:15,16,17
   26:1,2,4,4,8,11
   27:20 35:15 36:21
   38:5,8 40:22
   44:18,20 46:5
   47:14 53:5 69:5

70:17,22 71:15
   74:6,23 75:3,8,12
   75:13 76:1 78:1
   81:12
warrant   61:1
washington   3:11
way   16:20 29:17
   49:5,6,16 70:12
   73:20 90:8
ways   18:12 81:2
wc.com   3:12,12
we've   36:7 43:5
   55:15
webinar   39:11
webinars   39:16
week   20:1 29:19
   85:20
weeks   29:19,22
weigh   48:8
weights   30:16
went   8:24 11:20
   19:17 30:9,13
   31:1
white   81:5
whiteley   3:9
whitely   4:10
wide   60:2
williams   3:10
winding   32:8,10
wisconsin   22:4,11
withdrawn   97:6
witness   93:25 94:4
   94:6 97:3 98:8,10
   98:12,19
witnesses   95:19
wondering   89:15
word   58:7 79:23
   81:7
work   12:24 19:9
   28:2 31:1 36:11
   36:19 38:12 39:1

40:3 45:16 46:21
   51:5 59:2 67:21
   68:14
worked   16:3 18:20
working   11:18
   18:14 28:5 29:1
workplace   26:24
   50:12,15 79:8,13
   82:23
worthington   1:7
writing   25:5
written   16:15,19
   21:11 22:13 25:10
   25:12 47:8 53:15
   84:12
wrote   16:23

| x |
| --- |

x   2:1,4

| y |
| --- |

yeah   22:21 25:3
   26:7 28:24 32:7
   40:1 52:20 54:21
   60:10 62:13 66:2
   66:3 69:17 70:20
   79:19 81:16 93:12
   94:16
year   9:12,13,20
   10:23 22:8 30:25
yearly   33:11
years   13:7,9,11,18
   13:20 15:14,16
   20:13,21 22:5
   23:24 28:10,22
   29:4,6,7,10 30:25
   32:12 33:10 37:19
   67:12,13
york   1:1 3:17
young   16:1

| z |
| --- |

z535   33:2
z535.7   7:17
zoom   71:7 88:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.