# EXHIBIT 25

Page 1

```
 1                    Proceedings
 2       UNITED STATES DISTRICT COURT
 3       SOUTHERN DISTRICT OF NEW YORK
 4       ------------------------------------x
 5       FRANKLIN BUONO,
 6                 Plaintiff,
 7                         Civil Action No.
            -against-   7:17-cv-05915-NSR-LMS
 8
         POSEIDON AIR SYSTEMS, VICTORY AUTO
 9       STORE, INC., VICTORY AUTO STORES, INC.
         d/b/a POSEIDON AIR SYSTEMS, WORTHINGTON
10       INDUSTRIES, INC., and TYCO FIRE
         PRODUCTS LP,
11
                    Defendants.
12
         ------------------------------------x
13
         TYCO FIRE PRODUCTS LP,
14
                    Third-Party Plaintiff,
15          -against-
16       OPRANDY'S FIRE & SAFETY INC.,
17                  Third-Party Defendant.
18        ------------------------------------x
19                       September 18, 2019
20                       2:29 p.m.
21               Videotaped 30(b)(6)
         Deposition of OPRANDY'S FIRE & SAFETY
22       INC. by PATRICIA HAWKINS-SCOTT, held at
         the offices of Wilson Elser Moskowitz
23       Edelman and Dicker LLP,1133 Westchester
         Avenue, White Plains, New York,
24       pursuant to Court Order, before Barbara
         Driscoll, a Notary Public of the State
25       of  New York.
```

Page 2

```
 1                    Proceedings
 2        A P P E A R A N C E S:
 3           FINKELSTEIN & PARTNERS
             Attorneys for Plaintiff
 4                529 Broadway
                  Kingston, New York  12401
 5
             BY:   BRIAN ACARD, ESQ.
 6
 7           SHOOK HARDY & BACON
             Attorneys for Defendant and Third-Party
 8           Plaintiff Tyco Fire Products LP
                  2555 Grand Boulevard
 9                Kansas City, Missouri  64108
10           BY:   SARAH E. LYNN BALTZELL, ESQ.
11
             HAWORTH BARBER & GERSTMAN, LLC
12           Attorneys for Third-Party Defendant
             Oprandy's Fire & Safety Inc.
13                45 Broadway, 21st Floor
                  New York, New York  10006
14
             BY:   TARA FAPPIANO, ESQ.
15
16
        Also Present:
17
                  DAVID ROTHSTEIN, Videographer
18
19
20
21
22
23
24
25     Job No. CS3521616
```

Page 3

1                    Proceedings

2                  STIPULATIONS

3              IT IS HEREBY STIPULATED AND

4        AGREED by and among counsel for the

5        respective parties hereto, that the

6        sealing and certification of the

7        within deposition shall be and the

8        same are hereby waived;

9              IT IS FURTHER STIPULATED AND

10       AGREED all objections except as to

11       the form of the question, shall be

12       reserved to the time of the trial;

13             IT IS FURTHER STIPULATED AND

14       AGREED that the within deposition

15       may be signed before any notary

16       public with the same force and

17       effect as if signed and sworn to

18       before the Court.

19

20

21

22

23

24

25

Page 4

1            P. HAWKINS-SCOTT

2            THE VIDEOGRAPHER:  Good

3      afternoon.  We are on the record at

4      2:27 p.m. on September 18, 2019.

5            Please note that the

6      microphones are sensitive and may

7      pick up whispering, private

8      conversations and cellular

9      interference.

10            Please turn off all cell

11      phones or place them away from the

12      microphones as they can interfere

13      with the deposition audio.

14            Audio and video recording

15      will continue to take place unless

16      all parties agree to go off the

17      record.

18            This is media unit number one

19      of the video recorded deposition of

20      Patricia Hawkins-Scott taken by

21      counsel for the defendant in the

22      matter of Franklin Buono versus

23      Poseidon Air Systems, et al., that

24      was filed in the United States

25      District Court for the Southern

Page 5

```
 1              P. HAWKINS-SCOTT
 2        District of New York, Case Number
 3        7:17-CV-05915-NSR-LMS.
 4             This deposition is being held
 5        at Wilson Elser Moskowitz Edelman
 6        and Dicker, LLP, located at 1133
 7        Westchester Avenue, White Plains,
 8        New York.
 9             My name is David Rothstein,
10        from the firm of Veritext Corporate
11        Services, and I am the
12        videographer.  The court reporter
13        is Barbara Driscoll, from the firm
14        of Veritext Coprporate Services.  I
15        am not related to any party in this
16        action, nor am I financially
17        interested in the outcome.
18             Counsel and all present in
19        the room will now state their
20        appearances and affiliations for
21        the record.  If there are any
22        objections to the proceeding,
23        please state them at the time of
24        your appearance, beginning with the
25        noticing attorney.
```

1              P. HAWKINS-SCOTT

2         MS. BALTZELL:  Sarah E. Lynn

3    Baltzell with Shook Hardy & Bacon,

4    counsel for Tyco Fire Products, the

5    defendant and third-party

6    plaintiff.

7         MR. ACARD:  Brian Acard with

8    the firm of Finkelstein & Partners,

9    for plaintiff, Franklin Buono.

10         MS. FAPPIANO:  Tara Fappiano

11    from Haworth Barber & Gerstman, LLC

12    for third-party plaintiff,

13    Oprandy's Fire & Safety Inc.

14         I want to make a statement

15    for the record and to make this

16    clear, we have accommodated

17    counsel's request to split these

18    depositions into two different

19    transcripts and to do them

20    separately.

21         However, I will note that it

22    is now 2:30 in the afternoon and we

23    have been here since 10:00 a.m.

24    with extensive testimony from

25    Ms. Scott already relating to many,

1              P. HAWKINS-SCOTT

2         many documents that have been

3         produced in the context of this

4         litigation.

5              To the extent that counsel

6         intends to ask the same questions

7         or duplicative questions, relating

8         to the same topics, once again,

9         there will be an objection to that,

10        and I will stop this deposition.

11             To the extent that there are

12        items in the 30(b) notice that have

13        not yet been covered, we will

14        certainly cooperate with that

15        questioning and allow those

16        questions to be answered.

17             THE VIDEOGRAPHER:  Will the

18        court reporter please swear in the

19        witness.

20             *      *      *

21     P A T R I C I A   H A W K I N S - S C O T T,

22        having been first duly sworn by

23        the Notary Public, was examined

24        and testified as follows:

25

```
1                P. HAWKINS-SCOTT

2      EXAMINATION

3      BY MS. BALTZELL:

4          Q.    Good afternoon.  It is my

5      understanding that you are here this

6      afternoon in response to a 30(b)6

7      notice for deposition that was served

8      on Oprandy's; is that correct?

9          A.    Yes.

10         Q.    Do you understand that when

11     you give your testimony this afternoon

12     in this deposition that you're

13     testifying not on behalf of you

14     personally, but on behalf of Oprandy's

15     as a company and a party?

16         A.    Yes.

17         Q.    So to the extent that I use

18     the word you, I am really not meaning

19     you as an individual, but more

20     Oprandy's.

21             Does that make sense?

22         A.    Yes.

23         Q.    So any testimony that you

24     provide this afternoon is to be the

25     full basis of knowledge and information
```

```
 1                    P. HAWKINS-SCOTT
 2      that Oprandy's as a company has, not
 3      just you as a person.
 4                    Do you understand that?
 5           A.    Yes.
 6                    MS. BALTZELL:  We will mark
 7           the 30(b) notice as Oprandy's
 8           Exhibit 1.
 9                    (Whereupon, Oprandy's
10           Exhibit 1, 30(b) notice was hereby
11           marked for identification, as of
12           this date.)
13           Q.    Please take a look at the
14      30(b) notice deposition notice,
15      including the topics for discussion
16      today and let me know if you have seen
17      this document.
18           A.    I haven't seen this, but I
19      have discussed this with our attorneys.
20           Q.    I don't need to know about
21      anything that you talked about with
22      your attorney.
23                    There are several topics for
24      deposition listed here on the notice.
25      If I were to walk through and read off
```

```
 1                    P. HAWKINS-SCOTT
 2       each topic and ask you the question,
 3       are you prepared to give testimony on
 4       that topic today on behalf of
 5       Oprandy's, would your answer be yes to
 6       each one?
 7            A.    Yes.
 8            Q.    We can go through each one
 9       individually if you want, but as a
10       whole, would you consider yourself to
11       be the person at Oprandy's most
12       knowledgeable about all of these
13       topics?
14                MS. FAPPIANO:  Note my
15            objection to the form of that.
16                THE WITNESS:  I can answer?
17                MS. FAPPIANO:  Yes.
18            A.    Yes, I would say I would be.
19            Q.    What did you do to prepare
20       for your deposition today to provide
21       testimony on behalf of Oprandy's?
22                MS. FAPPIANO:  Outside of
23            conversations with counsel, of
24            course.
25                MS. BALTZELL:  Correct.
```

```
 1                  P. HAWKINS-SCOTT
 2        A.    Nothing, other than to gather
 3   my notebook and my other -- other
 4   documents to come here today.
 5        Q.    Other than gathering your
 6   notes and the documents that you have
 7   in front of you, am I correct, that you
 8   did absolutely nothing other than that,
 9   to get ready for your deposition today
10   as a corporate representative?
11             MS. FAPPIANO:  Outside of
12        conversations with counsel.
13             THE WITNESS:  Exactly.  I
14        spoke with counsel last week.  I
15        didn't have to prep anything else
16        for today.
17        Q.    So am I correct that you
18   didn't speak with any of the other
19   employees of Oprandy's to get ready for
20   your deposition today as a corporate
21   representative?
22        A.    Absolutely correct, I did
23   not.
24        Q.    Did you review any manuals
25   with respect to either fire suppression
```

Page 12

```
 1                  P. HAWKINS-SCOTT
 2     equipment, the Poseidon compressor, any
 3     manuals at all, to get ready for your
 4     deposition today?
 5          A.    Not at all.
 6               MS. FAPPIANO:  Objection.
 7          That assumes that those exist and
 8          that they are in her possession.
 9          Q.    Does Oprandy's have manuals
10     for some of the products that it has
11     there at the facility?
12               MS. FAPPIANO:  For what
13          products, the products that are
14          part of this action or something
15          else?
16          Q.    What manuals -- let me ask
17     this.  Topic 20, is among other things
18     manuals in Oprandy's possession
19     regarding the Kitchen Knight 1 or 2
20     systems.
21               Do you know if Oprandy's has
22     Kitchen Knight manuals?
23          A.    I honestly would say I don't
24     know.
25          Q.    On topic 20, the topic that
```

```
 1                     P. HAWKINS-SCOTT
 2        you're supposed to testify about, with
 3        respect to topic 20 is the Kitchen
 4        Knight manuals that Oprandy's has in
 5        its possession.
 6                 Is it your testimony today
 7        that you are prepared or are not
 8        prepared to talk about that topic?
 9            A.    No, I am not prepared to talk
10        about that topic.
11            Q.    Then let's go through and see
12        --
13                 MS. FAPPIANO:  Objection to
14            the form of the question.
15            Q.    Let's go through and see
16        which topics you think you're prepared
17        to talk about today.
18                 Topic 1, documents produced
19        by Oprandy's in response to request for
20        production of documents.
21                 So that is documents that
22        Oprandy's has given to all of the
23        parties in the litigation, and they
24        have those little Oprandy's, those kind
25        of Bates number on the bottom
```

Page 14

```
 1                P. HAWKINS-SCOTT

 2      right-hand corner.

 3                  Are you prepared to talk

 4      about the documents produced by

 5      Oprandy's in the litigation today?

 6                  MS. FAPPIANO:  As noted at

 7             the beginning of this deposition

 8             this witness already provided

 9             several hours of testimony on those

10             documents.

11             Q.   Go ahead and answer the

12      question.

13             A.   Well, I did answer all the

14      questions I could about this this

15      morning.  I will answer whatever I can.

16             Q.   Topic 2 is the location,

17      storage and handling of evidence

18      related to the incident at Oprandy's.

19                  Do you see that?

20             A.   Yes.

21             Q.   Are you knowledgeable about

22      the location, storage and handling of

23      those items identified by OSHA that

24      would be kept as evidence with respect

25      to the loss?
```

1          P. HAWKINS-SCOTT

2     A.    You would be talking about

3   the tank?

4     Q.    The tank, and I also believe

5   there are several other items.

6     A.    All of that was -- they

7   subpoenaed all of those items.  OSHA

8   took them.  My husband actually had to

9   hand deliver that to Albany, and then

10  recently, what went to Boston, the

11  gauges and regulators.

12    Q.    After the accident happened,

13  did OSHA come that day to the facility?

14    A.    Absolutely did.

15    Q.    Did OSHA instruct Oprandy's

16  to keep or preserve any items that were

17  at Oprandy's that day?

18    A.    Yes.  They told us to take

19  the tank and bag it and put it in a

20  safe place.

21    Q.    Did Oprandy's do that?

22    A.    We absolutely did.

23    Q.    Other than the tank -- and by

24  tank, am I correct, you mean the --

25    A.    The cylinder.

```
 1              P. HAWKINS-SCOTT
 2        Q.    -- the cylinder that was
 3    being filled, the test tank that was
 4    being filled, on the date of the
 5    accident?
 6        A.    Yes.
 7        Q.    Other than the cylinder
 8    itself, were there any items that OSHA
 9    asked Oprandy's to keep and preserve?
10        A.    No, I don't think there was
11    anything else.
12        Q.    After the incident, what, if
13    anything, did Oprandy's do with the
14    cylinders that were part of the
15    Poseidon cascade system?
16        A.    Everything was kept in its
17    place.
18        Q.    At the time of the incident,
19    where were the cylinders and the
20    Poseidon cascade system?
21        A.    In that room.
22        Q.    Where in the room?
23        A.    If you -- you could come in a
24    door right here or you could come in a
25    door right there, it was set in that
```

Page 17

1                    P. HAWKINS-SCOTT

2        corner.  The cylinders were in the back

3        of it and the machine was in the front

4        of it and it was a wall on this side

5        and that side.

6             Q.    If I were to walk into

7        Oprandy's today, are the cylinders for

8        the cascade system still in that exact

9        location untouched?

10            A.    No, they are not.

11            Q.    Who moved them and when?

12            A.    After the accident that

13       afternoon, the room was completely

14       sealed off by the DKI.  They came and

15       put plastic with a little zipper.  We

16       weren't allowed in that room because it

17       was so contaminated.

18                  During that cleanout, which I

19       am not sure of the period of time, that

20       was removed and cleaned.  Every day

21       they did a little more.  They did take

22       the tanks out and cleaned them, and

23       they put them in our other warehouse,

24       which is like the next room.  That is

25       where they were kept.

```
 1                    P. HAWKINS-SCOTT
 2          Q.    When you say take the tanks
 3     and clean them, are you referring to
 4     the tanks that were on the Poseidon
 5     cascade system?
 6          A.    They were big yellow
 7     cylinders, you saw the pictures.  Yes,
 8     they had to clean all of them.
 9          Q.    If we were to look at the
10     cascade tanks today, do you know if
11     they would still have the same amount
12     of air in them today that they did at
13     the time of the incident?
14          A.    They have never been touched
15     since that day, that accident.
16          Q.    So they weren't emptied and
17     cleaned those tanks?
18          A.    No, they didn't empty
19     anything inside.  They just did all the
20     exterior.
21          Q.    Do you know whether all of
22     the tanks are partially full or whether
23     any of the tanks in the cascade system
24     are currently empty?
25          A.    No, I wouldn't know that.
```

Page 19

```
            P. HAWKINS-SCOTT
 1
 2       Q.    Do you know if anybody at
 3    Oprandy's would have that information?
 4       A.    My husband would know what
 5    was in them, if they are full or empty.
 6    We never used them again.  We never
 7    took any of that and opened them.
 8       Q.    At the time of the accident,
 9    do you know whether one or multiple of
10    the tanks was empty on the day of the
11    accident that were in the cascade
12    system?
13       A.    I wouldn't know that for
14    sure, no.
15       Q.    Do you know if that is
16    something that your husband, Mr. Scott,
17    would know?
18       A.    He might know that.
19       Q.    Did you ask him before coming
20    to your deposition today for any
21    information about the cascade system?
22       A.    No.
23       Q.    I went a little out of order,
24    so we will back up now.
25             Getting ready for your
```

```
 1                    P. HAWKINS-SCOTT
 2      deposition today, did you speak with
 3      your husband about any of the
 4      deposition topics and how to prepare to
 5      give testimony on these topics?
 6           A.    No.  All he says is, his
 7      story has never changed.  We stick by
 8      the same thing that has happened to us
 9      throughout this ordeal.
10           Q.    So other than that, did you
11      have any conversations with your
12      husband about the topics on the
13      deposition notice to get ready to
14      provide testimony as a corporate
15      representative?
16           A.    No, I didn't.  I didn't have
17      every one of these questions in front
18      of me as we were driving here to talk
19      to him about it.  So the answer would
20      be no.
21           Q.    Were you provided a copy of
22      these topics prior to today?
23           A.    No, I didn't have the
24      physical copy in my hand, but I did
25      speak to counsel about the certain
```

Page 21

```
 1                   P. HAWKINS-SCOTT
 2     things that we were looking for.
 3         Q.     Again, I don't get to know
 4     what you guys actually talked about,
 5     but were you aware of the subject
 6     matter of these 30 topics before today
 7     so that you could prepare for your
 8     deposition?
 9              MS. FAPPIANO:  I believe
10         she's answered that at this point.
11         She had said she had a meeting with
12         counsel, and that is privileged.
13              MS. BALTZELL:  Whether or not
14         she was, yes or no, aware of what
15         the topics would be, I don't
16         believe is privileged.
17              MS. FAPPIANO:  She answered
18         it.
19         Q.    Were you aware of what the
20     topics for your deposition would be
21     today?
22         A.    Well, not fully to all this
23     detail but basically, you know, going
24     over my book and all the documentation
25     and the facts that I have, not to
```

```
 1                  P. HAWKINS-SCOTT
 2      exactly all of these details.  We did
 3      -- counsel did tell me some of the
 4      things --
 5                  MS. FAPPIANO:  Strike that
 6          portion from the record when she is
 7          referring to counsel.
 8                  Again, she testified she met
 9          with counsel.  She is prepared to
10          testify.  Can we please move on to
11          the substance of your notice.
12          Q.    Did you speak with any other
13      employees of Oprandy's to prepare for
14      your testimony today?
15                  MS. FAPPIANO:  Asked and
16          answered.
17          Q.    Go ahead.
18          A.    No, I didn't speak to anybody
19      else.
20          Q.    Speaking of Oprandy's as a
21      company, who owns Oprandy's?
22          A.    My husband is the sole owner
23      of Oprandy's.
24          Q.    Who is your husband?
25          A.    Brian E. Scott.
```

1                    P. HAWKINS-SCOTT

2          Q.     Do you have any ownership

3     interest in Oprandy's?

4          A.     I do not.

5          Q.     Are you an employee of

6     Oprandy's?

7          A.     I am.

8          Q.     What is your title?

9          A.     Office manager.

10         Q.     What are your job duties at

11    Oprandy's?

12         A.     I do the payroll, write the

13    paychecks.  I do the billing, oversee

14    the office in general, our inspection

15    sheets, handle all the insurance.  Just

16    the general office duties.

17         Q.     Do you have any duties with

18    respect to filling fire extinguishers

19    or test tanks?

20         A.     Absolutely not, no.

21         Q.     Do you have any personal

22    knowledge about the filling of test

23    tanks for fire extinguishers?

24         A.     I have seen it done, but I

25    personally wouldn't know how to attempt

```
 1                P. HAWKINS-SCOTT
 2      it.
 3           Q.    If I were to ask you
 4      questions about how to fill an
 5      extinguisher or a test tank, are those
 6      questions that you can answer or are
 7      those things you don't have any
 8      knowledge of?
 9           A.    First of all, they are two
10      different items.  A fire extinguisher
11      is filled with ABC powder, class D, D
12      power, purple K.  They are all
13      different types that they use to fill
14      fire extinguishers.
15                The cylinder is filled with
16      air that is completely two different
17      jobs.
18           Q.    Do you have knowledge on the
19      process for filling a cylinder with
20      compressed air?
21           A.    No.
22           Q.    Do you have -- if I were to
23      ask you questions on what manuals
24      Oprandy's may have had with respect to
25      either the tanks that Oprandy's filled
```

```
 1                   P. HAWKINS-SCOTT
 2        or the air systems that they used to
 3        fill the tanks, do you have any
 4        information as to whether Oprandy's had
 5        manuals for those things?
 6                   MS. FAPPIANO:  Objection to
 7              the form of that.
 8                   You can answer it, if you
 9              understand it.
10        A.    No, I wouldn't know about the
11        different types of manuals that would
12        -- that are there or would be there.
13        Q.    If I were to ask you
14        questions along the lines of did the
15        Poseidon cascade system come with a
16        manual, is that something you would
17        know or not know?
18        A.    I think that this is the
19        mysterious book that they keep talking
20        about that they are looking for.  I
21        think that is a manual on the cascade
22        system which was always kept in this
23        bottom drawer at our office.
24                   The day of the accident that
25        was out and OSHA wanted to look at
```

Page 26

```
 1                    P. HAWKINS-SCOTT
 2      that.  On that day, please remember
 3      there were at least ten different forms
 4      of BCI, OSHA was there, just so many
 5      different companies.
 6                 We believe OSHA took that
 7      manual?
 8           Q.    Do you recall sending OSHA a
 9      copy of the manual?
10           A.    How could we send a copy of
11      it?
12           Q.    So is it Oprandy's testimony
13      that at least at one point in time
14      Oprandy's did have a manual for the
15      Poseidon compressor system?
16           A.    I do believe there was a
17      manual on that.
18           Q.    Was there a manual for the
19      compressor and the cascade system or
20      was it one manual that would go for the
21      compressor and the cascade system?
22           A.    I don't know it.  I never
23      read it.  I have seen -- I knew it was
24      out that day and I know at different
25      times that my husband and Christopher
```

```
 1                    P. HAWKINS-SCOTT
 2      were looking at that manual, especially
 3      when we first moved to that facility,
 4      when we built our new location.
 5           Q.    Does Oprandy's as a company
 6      have an understanding of what was in
 7      that manual, the Poseidon manual?
 8           A.    My husband would know it by
 9      heart, yes.
10           Q.    Do you know it by heart as
11      well?
12           A.    No, I do not.
13           Q.    Are you able to give any
14      testimony about what was in that
15      Poseidon manual?
16           A.    No.
17           Q.    If I wanted to talk to
18      someone about what was in the Poseidon
19      manual, who would I need to speak with
20      to do that?
21           A.    Well, you could ask my
22      husband, but I believe OSHA had, was
23      able to -- they said they were able to
24      obtain a part, but I also believe you
25      can get it online.
```

```
 1                    P. HAWKINS-SCOTT
 2          Q.    So for the deposition topic
 3     having to do with the contents of the
 4     Poseidon manual, did you do anything to
 5     prepare to provide testimony on that
 6     topic today?
 7          A.    No.
 8          Q.    Am I correct that you're not
 9     prepared to give testimony on that
10     topic today, but that someone with
11     Oprandy's could provide that testimony;
12     it is just not you?
13          A.    Well, I believe my husband
14     gave that testimony already, all about
15     that -- the compressor there.
16               MS. BALTZELL:  Read that
17          back.
18               (Record read.)
19          A.    It is not me.  But I believe
20     he gave that already in that deposition
21     up in Newburgh, in his deposition he
22     covered all about that machine.
23          Q.    My question is just simply --
24               MS. FAPPIANO:  It has been
25          answered --
```

```
 1              P. HAWKINS-SCOTT
 2              MS. BALTZELL:  No --
 3              MS. FAPPIANO:  Counsel she
 4         answered it twice.  Can we please
 5         move on.
 6         Q.   One of the topics for
 7    testimony today by a corporate
 8    representative is the content of that
 9    manual.
10              Is that testimony you can
11    provide today on behalf of the company?
12         A.   I don't get the question.
13              THE WITNESS:  Do you want to
14         read it back?
15              MS. BALTZELL:  Sure.  Read it
16         back.
17              (Record read.)
18         A.   I cannot provide testimony on
19    what is in that manual.
20              MS. FAPPIANO:  By counsel,
21         this testimony has already been
22         provided by the sole owner of the
23         company over several hours at a
24         deposition in May of 2018.
25         Q.   One of the topics for today's
```

```
 1                P. HAWKINS-SCOTT
 2      -- one of the topics for today's
 3      deposition to be given by the corporate
 4      representative of Oprandy's is related
 5      to labels on the Poseidon cascade
 6      system and compressor.
 7                Do you have any information
 8      tan knowledge on the labels on the
 9      Poseidon cascade system and compressor?
10          A.   No, I don't but there were
11      pictures taken of it.  All the labels
12      are in the photographs.
13          Q.   But as far as testimony
14      today, can you testify about the labels
15      that are on the Poseidon cascade system
16      and compressor?
17          A.   No, I can't.
18          Q.   Do you think that there is
19      someone at Oprandy's that could provide
20      that testimony?
21          A.   My husband could.
22                MS. FAPPIANO:  Again, by
23          counsel, he already has.
24                MS. BALTZELL:  I will go
25          ahead and mark it now in case we
```

```
 1                  P. HAWKINS-SCOTT
 2        need it.
 3               MS. FAPPIANO:  What do you
 4        need?
 5               MS. BALTZELL:  The court
 6        transcript.
 7               MS. FAPPIANO:  If you have a
 8        problem with it, I suggest that we
 9        deal with in the court on Monday,
10        okay, but this witness is here and
11        she is prepared to testify.
12               Why don't you ask her
13        questions about the things she
14        knows.
15               You know from having read the
16        transcript of Mr. Scott yourself
17        that he is the sole owner of the
18        company.  He testified without
19        counsel over many hours.  And you
20        have, your counsel had the
21        opportunity to ask him every single
22        topic not only in this notice but
23        several hundred others, and you did
24        not.
25               That was the objection to him
```

```
 1                    P. HAWKINS-SCOTT
 2          coming back for another deposition
 3          with which the court agreed.
 4              So ask this witness the
 5          topics that she does have knowledge
 6          about.  Also, stop presuming that
 7          certain things exist, and
 8          intimating that the fact that she
 9          doesn't know them is somehow her
10          fault, when it is, in fact, your
11          questioning that is the problem.
12              MS. BALTZELL:  We will go
13          through the topics and see if you
14          have information on them, all
15          right, and we will find the court's
16          transcript and we will get it on
17          the record but I will let it speak
18          for itself.  I won't presume to
19          paraphrase the court on what the
20          court has ordered.
21     Q.    Topic 28 --
22     A.    Yes.
23     Q.    Topic 28, to paraphrase,
24    really, it is testimony about what came
25    with the Poseidon cascade system and
```

Page 33

```
1                    P. HAWKINS-SCOTT
2        the compressor when it was purchased.
3        What documentation may have come with
4        the cascade system or the compressor.
5                    On behalf of Oprandy's, do
6        you have information on the documents
7        that came with the Poseidon system and
8        compressor when Oprandy's purchased
9        those items?
10           A.    No, I don't have information.
11           Q.    Can you provide testimony on
12       topic 28 today or is that something
13       that you just don't have information
14       on?
15           A.    I don't have information on
16       that.
17           Q.    Is there someone that you
18       think with Oprandy's could provide
19       testimony on topic 28 and does have
20       information?
21           A.    Yes, my husband and he
22       already had given that in his
23       deposition, on May of 2018.
24           Q.    Topic 27 is alterations or
25       changes to the Poseidon cascade system.
```

```
1              P. HAWKINS-SCOTT

2              So questions about whether

3       from the time the system was purchased,

4       I believe it was purchased used from a

5       fire department; does this sound right?

6          A.    That is correct.

7          Q.    So from the time the Poseidon

8       cascade system was purchased from the

9       fire department, through the time of

10      the incident, were there any changes or

11      alterations that would have been made

12      to the cascade system?

13         A.    Not to my knowledge, no.

14         Q.    When you say not to my

15      knowledge, are you saying you know for

16      certain that no changes or alterations

17      were made to the cascade system or that

18      you just don't know whether any were

19      made?

20         A.    I never heard that any

21      alterations were ever made to that

22      system.

23         Q.    So it is Oprandy's testimony

24      that Oprandy's did not make any

25      alterations or changes to the Poseidon
```

1                P. HAWKINS-SCOTT

2       cascade system during that time period?

3            A.    That's right.

4            Q.    Topic 26 is purchasing and

5       servicing, inspection or repair of the

6       Poseidon cascade system and the

7       regulator that was used on the system.

8                 Is that a topic you have

9       information about?

10           A.    I do know my husband did have

11      it serviced at different times.

12           Q.    What did the servicing

13      encompass?

14           A.    I don't know.  I never saw

15      the man do it.

16           Q.    Do you know if your husband

17      would be able to tell us what that

18      servicing encompassed?

19           A.    And he covered that as well

20      in his deposition.  I was present.

21           Q.    The deposition speaks for

22      itself.  I don't know that he did

23      testify --

24                 MS. FAPPIANO:  That is the

25            response to your question.  If you

```
 1                 P. HAWKINS-SCOTT
 2         don't like the answer that is
 3         really not on the witness.  That is
 4         the response to the question.
 5         Q.    Who serviced the Poseidon
 6    cascade system?
 7         A.    I don't know his name.  I
 8    don't know who the company is who does
 9    that.
10         Q.    Would your husband know?
11         A.    He would know.
12         Q.    When was the Poseidon cascade
13    system serviced?
14         A.    I don't know the date.
15         Q.    Do you know if your husband
16    would know?
17         A.    He would know.
18         Q.    Regarding the purchase of the
19    Poseidon cascade system, why did
20    Oprandy's need a cascade system?
21         A.    We fill scuba tanks, you
22    know, with that -- they call it a
23    self-contained breathing apparatus.  We
24    do put it in those little air
25    cylinders, when he does go on to do
```

```
                    P. HAWKINS-SCOTT
 1
 2      what they call a balloon test for a new
 3      fire suppression system.
 4              Other than that, I don't
 5      think it had much other uses really.
 6          Q.   What is the -- if I say fill
 7      capability, does that mean anything to
 8      you?
 9          A.   Well, you would have to put
10      the whole question out there.  I don't
11      know what --
12          Q.   So the cascade system, you
13      have air that will come out of the
14      cascade system and you will use that
15      air to fill another vessel, right?
16          A.   Uh-hum.
17              MS. FAPPIANO:  Are you asking
18          if that is correct?
19          Q.   Is that right?  That is your
20      understanding?
21          A.   Are you familiar with
22      cascading air, what it means?  You have
23      -- it doesn't have anything to do with
24      that whole compressor at all.  You're
25      only drifting air down from a big
```

Page 38

P. HAWKINS-SCOTT

```
 1
 2    cylinder via gravity to a small
 3    cylinder.  So there is no mechanics
 4    involved.  I am aware of that.
 5         Q.    So the tanks that are part of
 6    the cascade system, do you know if they
 7    have a maximum pressure rating, meaning
 8    the amount of pressure that will come
 9    out of them that will go into the tank
10    that's being filled?
11         A.    I wouldn't have that
12    information, no.
13         Q.    Do you know if anybody at
14    Oprandy's would have that information?
15         A.    My husband would, and he also
16    testified all of that to OSHA as well
17    as, I believe, in that deposition.
18         Q.    But that is not something
19    that you can give us testimony on --
20         A.    I don't --
21         Q.    -- on behalf of the company
22    today?
23         A.    I don't have that
24    information.
25         Q.    Do you know whether or not a
```

Page 39

P. HAWKINS-SCOTT

1

2      regulator was being used at the time of

3      the incident?

4          A.    I personally don't know, but

5      through all of the cases and all these

6      depositions, I do know that they were

7      looking for the regulators and that

8      went to Boston as well.  So I know a

9      regulator was involved.

10         Q.    When you say I know a

11     regulator was involved, do you know

12     which regulator was involved or just

13     that a regulator was involved?

14         A.    Well, I wouldn't know.  I

15     mean once that accident happened, we

16     were not -- I wasn't allowed in this

17     room.  I don't know what regulator was

18     used, what you would be talking about,

19     I don't know.

20         Q.    Does Oprandy's provide any

21     training to its employees on use of a

22     regulator when filling the cascade

23     system or when filling a vessel from

24     the cascade system?

25         A.    Yes, there was training for

```
 1              P. HAWKINS-SCOTT
 2      that.
 3          Q.    Tell me about that training;
 4      what is the instruction that is given
 5      with respect to the use of a regulator?
 6          A.    It was only my husband at
 7      first who would be filling those tanks.
 8      When Chris came on board, he was the
 9      one filling those tanks.  He also
10      operates the tow truck.  He is very
11      familiar with filling those cylinders
12      with air to take to a site if he had
13      to.
14              Personally I don't know what
15      the steps would be.  I never really saw
16      it done.  I was not ever present
17      watching what they did.
18          Q.    So if I were to ask you
19      whether or not you're familiar with the
20      steps needed to fill a tank using the
21      cascade system, am I correct that you
22      don't have any information on how that
23      is done?
24          A.    No, I really don't have
25      information on that.
```

Page 41

```
 1                    P. HAWKINS-SCOTT
 2          Q.    What about specificity as to
 3     how -- as to whether or not Oprandy's
 4     trained Mr. Foust on the steps to fill
 5     a tank from the cascade system; do you
 6     know whether or not that is something
 7     that he was specifically provided
 8     training on?
 9          A.    Absolutely he was trained on
10     that.
11          Q.    Tell me what that training
12     entailed.
13          A.    Well, how to fill those
14     tanks.  I mean I don't know what it
15     means.  I never saw it done as I said
16     before, but it would be -- he would
17     train him how to cascade that air, how
18     to -- what to watch for, regulators, et
19     cetera, whatever was needed.
20          Q.    So if one of the --
21          A.    And he had done that many
22     times before.
23          Q.    But specifically as far as
24     what Oprandy's trained him on, the
25     process that Oprandy's imparted to
```

```
 1                    P. HAWKINS-SCOTT
 2      Mr. Foust, do you have any information
 3      on what that specific training was as
 4      far as the process or procedure to fill
 5      a tank?
 6          A.   No, I wouldn't have any exact
 7      information on that.
 8          Q.   Who would have that
 9      information?
10          A.   My husband would.
11          Q.   Topic 25 is the steps used by
12      Oprandy's owners and employees to fill
13      tanks in balloon tests and pressurized
14      air, other than what you just said
15      generally, is that a topic you can
16      provide testimony on?
17          A.   No, but I just told you my
18      husband would have that information and
19      he knows the steps.
20          Q.   As the corporate
21      representative deposed here today to
22      provide testimony on topic 25, is there
23      anything else that you can tell us on
24      behalf of Oprandy's with respect to
25      that topic?
```

```
 1                  P. HAWKINS-SCOTT
 2              MS. FAPPIANO:  Objection.
 3       A.    No, nothing I can add.
 4       Q.    Same question with respect to
 5   recharging agent tanks to be used in
 6   fire suppression systems; is that
 7   something that you're familiar with and
 8   can provide testimony on?
 9       A.    No, I couldn't provide
10   information on that.
11       Q.    Topic 24 is training or
12   warnings given by Oprandy's, and I will
13   paraphrase to employees, specific to
14   whether or not Oprandy's trains or
15   provides information to its employees
16   on dangers associated with filling
17   tanks.
18              Do you have any information
19   on that topic?
20       A.    No.  But my husband trained
21   Christopher.  Frank wasn't trained on
22   putting in any gases or anything like
23   that.  Mr. Foust was trained by my
24   husband.
25       Q.    But as far as the specific
```

Page 44

1                    P. HAWKINS-SCOTT

2       trainings or warnings that Oprandy's

3       may have given to Mr. Foust regarding

4       the dangers associated with filling

5       tanks or extinguishers, do you have any

6       specificities on that information?

7            A.    No, I wouldn't have, no.

8            Q.    Have you ever used the

9       Poseidon system?

10           A.    No, I have not.

11           Q.    Have you ever filled an agent

12      tank?

13           A.    No.

14           Q.    Have you ever filled a test

15      tank?

16           A.    No.

17           Q.    Have you yourself ever looked

18      at a manual for an agent tank?

19           A.    No.

20           Q.    Any agent tank at all?

21           A.    Well, you would have to

22      describe agent.  What are you talking

23      about, agent?  I don't know.

24           Q.    How about a fire

25      extinguisher, have you ever seen a

1                    P. HAWKINS-SCOTT

2       manual for a fire extinguisher?

3                    MS. FAPPIANO:  Objection, as

4            being outside the scope of this

5            litigation.

6                    THE WITNESS:  You want me to

7            answer that?

8            A.    Honestly there is no manual

9       for that.  There are no manuals exactly

10      on how to fill a fire extinguisher that

11      I have seen or know of.

12           Q.    Do you know what a Kitchen

13      Knight system is?

14           A.    My husband does fire

15      suppression systems for restaurants, so

16      I have heard that terminology.  I am

17      aware, I have seen him service the

18      systems.  He builds them.  I am not

19      really that familiar with the exact

20      wording or knowledge about it.

21           Q.    Have you ever seen a balloon

22      test done to a fire suppression system?

23           A.    I have seen it done on an

24      iPad.  One of the inspectors he does

25      like to take pictures of it and he has

Page 46

```
 1                  P. HAWKINS-SCOTT
 2      sent them to us.
 3           Q.    Do you, as Oprandy's, have an
 4      understanding of when and why a balloon
 5      test would be needed?
 6           A.    Different municipalities have
 7      different rules.  Some want it on a
 8      brand new system.  Some want it on a
 9      system that hasn't been operational for
10      a number of years.  Some could be
11      three, some could be five.  They come
12      and go.
13                 If you change the system out
14      to a new one, sometimes they like to
15      see a balloon test done to that, but we
16      are hearing down the pike but they may
17      do away with that.
18                 MS. FAPPIANO:  Move to strike
19            the portions that is not
20            responsive.
21           Q.    Is it Oprandy's understanding
22      that balloon tests are something that
23      may be required by an authority having
24      jurisdiction, like a fire department?
25                 MS. FAPPIANO:  Note my
```

```
 1              P. HAWKINS-SCOTT
 2        objection.
 3              You can answer.
 4        A.    They are required by
 5    municipalities, not a fire department.
 6    A building inspector.
 7        Q.    Does Oprandy's know whether
 8    or not we will use the Kitchen Knight
 9    system, the manufacturer of the Kitchen
10    Knight system requires a balloon test?
11        A.    I don't have knowledge about
12    that.
13        Q.    Have you ever seen a Kitchen
14    Knight manual?
15        A.    To tell you the truth, the
16    word "Kitchen Knight" is not something
17    we use often.  I don't know anything
18    really anything about a Kitchen Knight.
19        Q.    Would you know whether or not
20    Oprandy's has a Kitchen Knight manual?
21        A.    I don't know.
22              MS. FAPPIANO:  Objection,
23        based upon that last response.
24        Q.    If I wanted to find out if
25    Oprandy's had a Kitchen Knight manual,
```

```
 1                 P. HAWKINS-SCOTT
 2      who would I need to ask to find that
 3      out?
 4           A.    You can ask my husband.
 5                 MS. FAPPIANO:  By counsel,
 6           you already have.
 7           Q.    Do you know what a
 8      hydrostatic test is?
 9           A.    Yes, I know the term.
10           Q.    Do you agree with me that the
11      tank at issue in this accident was a
12      test tank?
13                 Is that your understanding of
14      what the tank was involved in the
15      accident?
16           A.    Describe what you mean by
17      test tank.
18           Q.    What is your understanding of
19      what the tank was that was involved in
20      the accident?  By you I mean Oprandy's.
21           A.    That is a cylinder that is
22      used only to be filled with air, taken
23      to a new restaurant where the new
24      system would be going to be put online.
25      They will put -- force the air through
```

```
 1                P. HAWKINS-SCOTT
 2      the lines and blow up those balloons.
 3      That is my knowledge of those small
 4      tanks or cylinders.
 5           Q.   Does Oprandy's have any
 6      knowledge on how often those kinds of
 7      tanks need to be hydrostatically
 8      tested?
 9           A.   My husband would have that
10      information, I don't.
11           Q.   If I were to ask you, as the
12      representative from Oprandy's, how
13      often or, if ever, the subject tank had
14      been hydrostatically tested, is that
15      something that you can provide
16      testimony on today?
17           A.   No, I wouldn't have that
18      information.
19           Q.   If I ask you the same
20      questions about the valve or the gauge
21      or the regulators, would you have any
22      information on whether or how often
23      those have been serviced?
24           A.   No, I wouldn't --
25                MS. FAPPIANO:  Serviced?
```

```
 1              P. HAWKINS-SCOTT
 2              MS. BALTZELL:  Yes.
 3       A.    No, I wouldn't have that
 4    information.
 5       Q.    Do you think your husband
 6    would have that information?
 7       A.    He might.
 8       Q.    Do you, as Oprandy's, have
 9    any testimony on whether or not there
10    were any markings on the subject tank?
11       A.    Well, to be honest, this is
12    the story that we keep hearing over and
13    over about markings.  I don't know
14    about any markings on that tank.
15       Q.    If you are Oprandy's today,
16    is it your testimony today that
17    Oprandy's isn't aware of whether there
18    were any markings on the tank, or is it
19    just that you personally aren't aware
20    of whether there were any markings on
21    the tank?
22       A.    Me personally.
23       Q.    Is there someone within
24    Oprandy's who would have knowledge of
25    that information?
```

```
 1                 P. HAWKINS-SCOTT
 2      A.    My husband would know.
 3            MS. FAPPIANO:  And he has
 4      testified to it and you have
 5      photographs.
 6      Q.    Topic 21 relates to all of
 7   the materials that were obtained from
 8   Howell's Fire Department.  I will ask
 9   this -- and I will call it a test tank,
10   but it is the tank that is involved in
11   this accident.
12            So if I say test tank, are
13   you tracking me?
14      A.    Yes.
15      Q.    Was the test tank also
16   purchased from Howell's Fire Department
17   when the compressor and Poseidon system
18   was bought?
19      A.    It was not.
20      Q.    When was the test tank
21   purchased?
22      A.    I believe in 20 -- I would
23   say in '14 we acquired another business
24   that was going out of business and we
25   got a lot of his equipment and that
```

Page 52

```
 1                  P. HAWKINS-SCOTT
 2      tank came from him.
 3          Q.    Was the tank new or used when
 4      it came from him?
 5          A.    Used.
 6          Q.    Do you know if when you
 7      purchased the tank, it came with any
 8      records of the history of the tank,
 9      whether there had been alterations to
10      the tank, whether it had been
11      hydrostatic tested.
12              Do you know whether or not
13      records like that came with the tank?
14          A.    No.
15              MS. FAPPIANO:  Note my
16          objection.  You're presuming such
17          things exist, when your own client
18          said they do not.
19              MS. BALTZELL:  Let me clarify
20          because of the objection.
21          Q.    I am referring to, if a test
22      is hydrostatically tested, sometimes
23      the owner will keep a record of that,
24      to show that the test was tested --
25              MS. FAPPIANO:  The tank was
```

```
 1              P. HAWKINS-SCOTT
 2        tested.
 3              MS. BALTZELL:  Uh-hum, the
 4        tank was tested.
 5        Q.    Do you know whether or not
 6    those kinds of records were provided to
 7    you when you purchased the tank?
 8        A.    No, I don't know.  I don't
 9    have that information.
10        Q.    Who would have that
11    information?
12        A.    My husband would have that
13    information.
14        Q.    Topic 18 is the identity of
15    Oprandy's, all Oprandy's owners and
16    employees who used the cascade system.
17              Other than Mr. Foust, do you
18    know of any of the other Oprandy's
19    employees who may have used either the
20    cascade system or the compressor?
21        A.    One would be my husband Brian
22    Scott; one is my son Robert Hawkins.
23    He would have cascaded that air for
24    different reasons.
25        Q.    For what reasons would he
```

```
 1                    P. HAWKINS-SCOTT
 2        have cascaded the air?
 3             A.    Probably to fill a scuba
 4        tank.
 5             Q.    Any other employees who would
 6        have used the cascade system?
 7             A.    No.
 8             Q.    Just the two of them?
 9             A.    Just those two.
10                   MS. FAPPIANO:  She mentioned
11             it included three, including
12             Mr. Foust.
13             Q.    Topic 17 relates to Oprandy's
14        knowledge of and familiarity with
15        safety codes.
16                   Do you have any familiarity
17        with the safety codes that Oprandy's
18        may feel are applicable to them?
19                   MS. FAPPIANO:  Objection to
20             the form.  For what?  That is a
21             very broad question.  In what
22             context?
23             Q.    So sub-A has to do with
24        Oprandy's knowledge with NFPA 10.
25             A.    I don't have knowledge of
```

                    P. HAWKINS-SCOTT

1    NFPA 10.  They are small booklets that

2    are put out there.  10 has to do with

3    portable hand-held fire extinguishers,

4    17A is kitchen systems, and they go on

5    and on.

6            We keep those copies in our

7    shop.  The men also have them in their

8    vans and it quotes different rules

9    about fire extinguishers.  They

10   shouldn't be more than 75 feet apart.

11   You shouldn't have to run across the

12   doorway to grab a fire extinguisher,

13   different sizes and kinds.  That is

14   basically what 10 covers.

15       Q.    Do you provide a copy of NFPA

16   10 to employees such as Christopher

17   Foust?

18       A.    Well, I just said they all

19   have them in their vans and there are

20   copies kept in the office.

21           We do refer back to different

22   ones when people will call and want to

23   know, what would you use on like a

24   battery -- the new electric cars, they

```
 1                  P. HAWKINS-SCOTT
 2      are using that what they call AFFF,
 3      which is a foam.
 4                There are different little
 5      informational things in those books.
 6          Q.   Is it Oprandy's understanding
 7      that Oprandy's should comply with NFPA
 8      10?
 9                MS. FAPPIANO:  Objection.
10          You can't -- don't answer that
11          question.  That is a legal
12          conclusion.
13                MS. BALTZELL:  I will ask it
14          again.
15          Q.   What is Oprandy's
16      understanding or is it Oprandy's
17      understanding that Oprandy's should
18      comply with an NFPA 10?
19          A.   We do.  We do.
20          Q.   So is it your understanding
21      that that is something that you should
22      do or you try --
23          A.   We do do it.
24                MS. FAPPIANO:  Note for the
25          record that NFPA 10 actually refers
```

```
 1              P. HAWKINS-SCOTT
 2       to fire extinguishers which is not
 3       what was involved in this accident.
 4       Q.    Are there any other NFPA
 5    standards?
 6       A.    As I said, there are 17 for
 7    kitchen systems and then there is
 8    another one that I am not that familiar
 9    with.  My husband knows all of them.
10       Q.    I will ask you the same
11    question with respect to NFPA 17.
12              Is it Oprandy's understanding
13    that they should comply with NFPA 17?
14       A.    We do comply with it.
15       Q.    Are you familiar with NFPA
16    17A as well?
17       A.    Yes.  I believe that is what
18    kitchen and ductwork or hood work as
19    well.
20       Q.    Is it your understanding that
21    Oprandy's, that Oprandy's should comply
22    with NFPA 17 and 17A?
23       A.    And we do.
24       Q.    Sub- B is Oprandy's knowledge
25    and familiarity with ASME boiler
```

```
 1                  P. HAWKINS-SCOTT
 2      pressure vessel code.
 3                  Is Oprandy's familiar with
 4      that code?
 5           A.   Personally myself, I don't
 6      know about it.
 7           Q.   Do you know if others in
 8      Oprandy's are familiar with it?
 9           A.   Probably my husband would be.
10           Q.   As far as giving topic --
11      testimony today on the extent of
12      Oprandy's knowledge with respect to
13      that code, is that something that you
14      can do today --
15                  MS. FAPPIANO:  For boilers?
16           Is that what you're asking, for
17           boilers?
18           Q.   -- the code referenced in
19      sub-B?
20           A.   Boiler pressure vessel code.
21                  MS. FAPPIANO:  Do you know
22           what that is?
23                  THE WITNESS:  I don't.  Is it
24           used in our type of -- I personally
25           don't know.
```

1               P. HAWKINS-SCOTT

2          Q.    Do you know if your husband

3     would know?

4          A.    He may know.

5          Q.    As far as just Oprandy's

6     knowledge, generally, it sounds like

7     you don't know sitting here today

8     whether or not that is a code that

9     Oprandy's has knowledge on?

10         A.    Like I said, personally I

11    don't know.

12         Q.    But Oprandy's could; you just

13    don't know?

14         A.    I just don't know.

15         Q.    The same question with

16    subsection C, Oprandy's knowledge and

17    familiarity with the CGA handbooks

18    relating to compressed gases; are you

19    familiar with the CGA handbooks

20    relating to compressed gases?

21         A.    No, I am personally not.

22         Q.    Do you know if your husband

23    or someone else with Oprandy's is

24    familiar with those handbooks?

25         A.    My husband may be.  And I

Page 60

```
                    P. HAWKINS-SCOTT
 1
 2      would like to point out that Oprandy's
 3      is spelled wrong on here many, many
 4      times and it is a legal document.  It
 5      shouldn't be spelled like that.  It
 6      really should be fixed.
 7           Q.   If the question is whether or
 8      not you can provide testimony on behalf
 9      of Oprandy's knowledge with respect to
10      the CGA handbooks on compressed gases,
11      am I correct that Oprandy's may or may
12      not have knowledge on that, but you
13      just don't know one way or another?
14           A.   Personally, I don't.
15           Q.   Same question with respect to
16      17D.  I guess we had parsed it out
17      between agent tanks and compressed gas,
18      but my understanding as I quickly go
19      through this for D and E, your answers
20      would be the same that someone at
21      Oprandy's could have knowledge of those
22      topics, but you just don't know whether
23      or not they do?
24           A.   That is correct.
25                MS. FAPPIANO:  Counsel.  I
```

```
 1                P. HAWKINS-SCOTT
 2         object to the form of the question
 3         and you're testifying for the
 4         witness and you're also presuming
 5         with all of these questions that
 6         any of this applies to what we have
 7         before us.
 8              There is no obligation for us
 9         to producing any sort of witness to
10         speak about topics that are outside
11         the scope of this litigation.
12              MS. BALTZELL:  I am not aware
13         of any objections that were filed
14         prior to today.
15              MS. FAPPIANO:  That is
16         actually incorrect, but that is on
17         you, not on me.
18         Q.    We have talked about your
19    notebook.  Have you read the statements
20    that were provided by Mr. Foust and
21    Mr. Buono that were given to OSHA that
22    have now been typed up?
23         A.    I have never seen them.
24         Q.    Do you know if anybody at
25    Oprandy's has seen them?
```

```
 1                  P. HAWKINS-SCOTT
 2        A.    It would only be my husband
 3   and myself.  We have not seen them.
 4        Q.    Is it your testimony on
 5   behalf of Oprandy's, that nobody at
 6   Oprandy's has seen the statements
 7   provided by Mr. Foust and Mr. Buono to
 8   OSHA?
 9        A.    That is correct.
10             MS. FAPPIANO:  By counsel,
11        OSHA never provided them to
12        Oprandy's?
13             THE WITNESS:  That is
14        correct.
15        Q.    Is it your testimony that no
16   one from Oprandy's has ever seen the
17   typed-up versions of the statements
18   provided by Mr. Foust and Mr. Buono to
19   OSHA?
20        A.    We have never seen it, no.
21        Q.    Topic 14 relates to the
22   employment files.  We already discussed
23   those this morning, so I don't want to
24   discuss them much, other than -- let me
25   see if I can find it.
```

Page 63

```
 1                P. HAWKINS-SCOTT
 2            MS. BALTZELL:  Do you want to
 3       take a break?
 4            MS. FAPPIANO:  No.
 5            MS. BALTZELL:  We're going to
 6       mark this document as Oprandy's
 7       Exhibit 2.
 8            (Whereupon, Oprandy's Exhibit
 9       2, series of documents was hereby
10       marked for identification, as of
11       this date.)
12       Q.   That is a copy of the
13  documents that were provided at
14  Mr. Scott's deposition as being those
15  contained in Mr. Buono's personnel
16  file.
17       A.   Uh-hum.
18       Q.   Did you see in there a copy
19  of the employee handbook?
20       A.   Here.
21       Q.   Yes.
22            The document we just marked
23  as Oprandy's Exhibit 2 is actually
24  documents that were produced by you in
25  this litigation in response to
```

1              P. HAWKINS-SCOTT

2     discovery and the request was for a

3     complete copy of Mr. Buono's personnel

4     file.  That is what we received in

5     response.

6              Does that look to be correct?

7         A.   Yes, it does look to be

8     correct.  The information, the sheet is

9     in there for his emergency numbers.

10    The handbook part is there.  This is

11    more like what should have been in

12    there which, obviously, was at some

13    point.

14        Q.   Do you see the employee

15    handbook in there with the signed page?

16        A.   Yes, right there.

17        Q.   Is there handwriting at the

18    top of that?

19        A.   It has his -- it says F.

20    Buono.

21        Q.   Is that your handwriting?

22        A.   Yes.

23        Q.   Do you know why the version

24    you brought with you today, that we

25    discussed earlier and marked as PS 3,

```
 1                 P. HAWKINS-SCOTT
 2     doesn't have that handwriting at the
 3     top?
 4         A.    This was all given the day at
 5     the Finkelstein's office when took
 6     apart the folders and we marked his
 7     name -- they had all the papers they
 8     were copying, and his name was put on
 9     the top of that.
10                This appears to me to be,
11     what was his folder, given that day we
12     gave her the copies.
13                MS. FAPPIANO:  Can I just
14         clarify that.
15                All those notes that are on
16         there then were written on the
17         copies that were made that day; is
18         that correct?
19                THE WITNESS:  Yes.  She was
20         taking them and making the copies,
21         and then we stapled them all.
22         Q.    If I have the copy from that
23     deposition, do you know whether or not
24     it is going to have that handwriting on
25     the top?
```

1              P. HAWKINS-SCOTT

2        A.    From Brian's deposition that

3    day?

4        Q.    Uh-hum.

5        A.    I would assume it would be.

6    We copied it right there at that

7    office.

8        Q.    Topic 10 relates to the use

9    of a cage or other restraining device

10   at Oprandy's.

11             Do you know what instruction,

12   if any, was provided by Oprandy's to

13   Mr. Foust with respect to use of a cage

14   when filling cylinders?

15       A.    Well, we always describe it

16   as a cage, but it really isn't a cage.

17   It is pretty thick steel.  That's where

18   my husband always said that is where we

19   put the tanks when we fill any of those

20   type of cylinders, including even a

21   scuba tank.

22       Q.    If I say cage, then you have

23   an understanding of what a --

24       A.    Yes, I know.

25       Q.    What is a safety cage then

Page 67

```
 1                    P. HAWKINS-SCOTT
 2      with respect to filling tanks?
 3           A.    It really isn't a cage, but
 4      it is very round -- it would look like
 5      this, an open top, open bot -- they are
 6      really affixed to the front of the
 7      machine.  And they are big, big steel
 8      and you would put an SCBA tank in there
 9      to hold it, so you could fill it with
10      air.  I mean you wouldn't be holding it
11      in your arm and trying to do that.
12                MS. FAPPIANO:  When she was
13           describing that just now, she was
14           referring to a Poland spring water
15           bottle in terms of shape.
16           Q.    You mentioned an SCBA tank,
17      when you were describing a safety cage.
18                Did Oprandy's have available
19      for use a safety cage when employees at
20      Oprandy's were filling an SCBA tank?
21           A.    Yes, it was on that machine.
22           Q.    What is that machine?
23           A.    That compressor.  It is an
24      orange or yellowish type.  You would
25      have seen it in the pictures.
```

Page 68

1                    P. HAWKINS-SCOTT
2          Q.    Is it Oprandy's testimony
3      that at the time of the incident there
4      was a safety cage on the compressor
5      itself that one could put an SCBA tank
6      in, when they were filling the SCBA
7      tank?
8          A.    Yes.
9                MS. FAPPIANO:  Asked and
10          answered.
11         Q.    What about with respect to
12     testing.  Was there a safety cage,
13     which you could put a test tank in,
14     when you were filling a test tank from
15     the cascade system?
16         A.    Yes, it is there.
17         Q.    At the time of the incident,
18     was there a safety cage provided for
19     the test tanks, that could be used when
20     filling the test tank?
21         A.    Well if you look at the
22     pictures from OSHA, there is the
23     machine; there are the cages.  On that
24     given day they were there.
25         Q.    What training, if any, did

```
 1              P. HAWKINS-SCOTT
 2    Oprandy's provide to its employees with
 3    respect to the use of the cage when
 4    filling a test tank?
 5              MS. FAPPIANO:  Asked and
 6         answered.
 7              You can answer it again.
 8         A.    I didn't train them myself
 9    but in hearing my husband talk, that is
10    what the training is, how to put it
11    into the cage, how to fill it, cages
12    regulators, whatever term he uses.  He
13    would best answer that, and I believe
14    he did.
15         Q.    Do you know whether a safety
16    cage was in use at the time of the
17    incident?
18         A.    I would say it appears not
19    from the photographs.
20         Q.     Is there a large difference
21    in size between a test tank and an SCBA
22    tank?
23              MS. FAPPIANO:  Note my
24         objection.
25              You can answer.
```

Page 70

1                    P. HAWKINS-SCOTT

2          A.    I don't -- I would think

3     those breathing apparatus -- well, they

4     could kind of maybe be the same

5     circumference.  They could be about the

6     same.

7          Q.    Is it your understanding that

8     a safety cage that could hold and be

9     effective for an SCBA tank is the same

10    size of cage that could hold and be

11    effective for a test tank?

12         A.    I would say so.

13         Q.    If we have seen testimony in

14    this case that Oprandy's didn't have a

15    safety cage available until after the

16    incident, would you disagree with that

17    testimony?

18         A.    I would totally disagree.  Go

19    to the photographs, please, that OSHA

20    took and BCI took on that day.

21         Q.    I think I asked this, but I

22    don't think you actually answered it.

23              To the extent that safety

24    cages were made available for use when

25    filling a test tank, what was the

```
 1                    P. HAWKINS-SCOTT
 2      specific instruction that Oprandy's
 3      gave its employees with respect to the
 4      safety cages?
 5                    MS. FAPPIANO:  This has been
 6           answered three times now.  I think
 7           we need to move on, please.  She
 8           won't answer it again.
 9                    MS. BALTZELL:  I don't think
10           she has.
11                    MS. FAPPIANO:  She has three
12           times.  Do you want me to go back
13           and have her read it back or can we
14           just move on?
15                    MS. BALTZELL:  Can we humor
16           me --
17                    MS. FAPPIANO:  No, we are not
18           humoring you.
19                    MS. BALTZELL:  I don't think
20           I've had a specific answer.
21                    MS. FAPPIANO:  It has been
22           answered three times.  I have
23           objected to asked and answered
24           twice.  It's been asked, it's been
25           answered, move on.
```

1              P. HAWKINS-SCOTT

2              They had safety cages.  They

3         were instructed to use them.  They

4         were instructed how and they were

5         there and available that day.  All

6         of that I just heard.

7              Counsel, do you agree with

8         me, did you hear all that?

9              MR. ACARD:  I heard it.

10             MS. BALTZELL:  What I don't

11        think I got an answer to was what

12        the specific training looked like

13        that Christopher Foust would have

14        received with respect to the safety

15        cages.

16             MS. FAPPIANO:  Would have

17        received, received?  Was she there

18        when it was being done, or any of

19        that.

20             You haven't set the

21        foundation for that type of a

22        question, and that's a different

23        question.

24             THE WITNESS:  That would be

25        hearsay because I don't know what

```
 1                  P. HAWKINS-SCOTT
 2        my husband said:  Come along here,
 3        pick up a tank, put it in a cage.
 4        Specifically, I can't answer to
 5        what my husband said.  Personally,
 6        I don't know.
 7             MS. BALTZELL:  I will set the
 8        foundation for it.
 9        Q.    Does Oprandy's train its
10    employees on the use of a safety cage?
11             MS. FAPPIANO:  Asked and
12        answered.  Asked three times;
13        answered three times.  Move on.
14        Q.    Go ahead.
15        A.    Please look at the picture.
16    The cage is not removable.  You don't
17    put it away on Tuesday and take it out
18    on Wednesday.  They are soldered or,
19    however, in steel.  It isn't removable.
20             So if you went in the room to
21    fill the tank, you would use the cage.
22    You didn't say, Patty, bring me a cage
23    because it isn't a cage.  It is full of
24    steel.  It is a steel cylinder.  So if
25    he went in to fill the cylinder, you'd
```

Page 74

```
1                    P. HAWKINS-SCOTT
2      use it and put it into the cage.
3                 MS. BALTZELL:  Read back the
4           question.  I am not getting an
5           answer to the question which is why
6           I am having to keep asking it.
7                 MS. FAPPIANO:  It has been
8           answered.  Should we go back and
9           read the last five pages of
10          testimony.  Go for it.  Let's go.
11               Let's hear it all over again,
12          if that is what you want to do,
13          Sarah.
14                MS. BALTZELL:  Read back the
15          question.
16                MS. FAPPIANO:  I won't let
17          her answer it again.  It's been
18          answered.  I don't need to have the
19          court reporter go back and read it,
20          but I am happy to have her do that.
21                MS. BALTZELL:  Please go back
22          to --
23                THE WITNESS:  I hear the
24          question clearly.
25                MS. BALTZELL:  Please go back
```

```
 1                    P. HAWKINS-SCOTT
 2        and read the question.
 3                (Record read.)
 4        A.    I said yes.
 5        Q.    What did that training
 6   involve?
 7        A.    As I put it, I didn't train
 8   Christopher.  I can't speak for my
 9   husband, who trained him.
10        Q.    Did someone at Oprandy's --
11   is it Oprandy's testimony; is it your
12   testimony that someone at Oprandy's did
13   train Mr. Foust on use of a safety
14   cage?
15        A.    My husband, Brian Scott,
16   trained Christopher Foust on the use of
17   the safety cage when filling an air
18   tank.
19                MS. FAPPIANO:  Is that clear
20        now?
21        Q.    So what is Oprandy's
22   knowledge, not just yours, but
23   Oprandy's knowledge as to what exactly
24   that training entailed?
25        A.    Well, it wouldn't be my
```

```
 1              P. HAWKINS-SCOTT
 2      personal knowledge.  I don't know that.
 3      But my husband would know that.
 4              MS. FAPPIANO:  And he has
 5          testified to it.
 6          Q.    So Oprandy's has information
 7      on what that training would have
 8      included, right?
 9              MS. FAPPIANO:  And he has
10          testified to it.
11          A.    Yes.  And my husband -- and
12      he did testify to that.
13          Q.    Do you know whether Mr. Foust
14      was ever provided a copy of the
15      Poseidon documents that Oprandy's did
16      have at one time?
17              MS. FAPPIANO:  Objection.  I
18          don't know that we have established
19          that -- what they had and that it
20          was Poseidon documents.
21          A.    My question back would be why
22      would I?  He had it available at the
23      shop to be used at any time, but why
24      would he have a copy and want to take
25      it home with him?  But he was always
```

1              P. HAWKINS-SCOTT

2      able to get the manual which was kept

3      in the office.

4          Q.    Who drafted the employee

5      handbook at Oprandy's?

6          A.    My husband, and I think

7      perhaps a friend who was also in that

8      business years ago, helped him put all

9      of that together.

10         Q.    Did you have any involvement

11     in the drafting of the handbook?

12         A.    Not a whole lot.  A little

13     bit about, I think, uniforms and stuff

14     like that.

15         Q.    Are you familiar enough with

16     the handbook to provide testimony on it

17     today?

18         A.    I believe I could.

19         Q.    Do you know whether or not

20     the handbook contains any guidance or

21     instruction on filling tanks with

22     compressed air?

23         A.    No, I don't know --

24              MS. FAPPIANO:  Objection.

25         A.    -- off the top of my head.

```
 1                   P. HAWKINS-SCOTT
 2     Dir Q.   Do you know if the handbook
 3     that was in effect at the time of the
 4     incident is still the same handbook
 5     that you have today in use?
 6                   MS. FAPPIANO:  Objection.
 7           She is not going to answer that.
 8           That's a subsequent remedial
 9           measure possibly, and it is outside
10           the questioning.
11                   MS. BALTZELL:  I do believe
12           it is a topic for the deposition.
13                   MS. FAPPIANO:  I have reason
14           to object and instruct her not to
15           answer.
16                   What they have today is not
17           relevant to what happened prior to
18           the date of the accident.
19     Rul Q.   Are you going to follow the
20     advice of your counsel and not answer
21     the question of whether or not
22     Oprandy's --
23                   MS. FAPPIANO:  She is not
24           answering that.
25           Q.     -- has the same employee
```

```
 1                  P. HAWKINS-SCOTT
 2      handbook today that they did at the
 3      time of the accident?
 4                  MS. FAPPIANO:  She is not
 5           answering that question either.
 6           Q.    One of the topics, I believe,
 7      I think really it is to certification
 8      of Oprandy's and its employees, just
 9      the kind of professional and trade
10      certifications.  Is that something you
11      have information on?
12           A.    Yes, I would have some
13      information on it.
14           Q.    Was Christopher Foust ever
15      certified or given certification
16      training on filling fire extinguishers,
17      agent tanks?
18           A.    Yes, he --
19                  MS. FAPPIANO:  Objection.
20           You can answer that.
21           A.    Yes, he was trained by my
22      husband.  There are outside companies
23      that do do this, but they do it
24      intermittently throughout the year and
25      they do fly around the country.
```

Page 80

```
 1                   P. HAWKINS-SCOTT
 2               A couple of times we were
 3      going to set up for him -- he is a
 4      single dad, they weren't quite in his
 5      date on his calendar good, but he was
 6      trained by my husband to fill them.
 7          Q.   I believe your husband went
 8      through training and certification
 9      through FPC.
10          A.   Yes, that is the company,
11      which they fly around the country to
12      different states.  You will see them in
13      Texas, California, and he does that
14      maybe once a year.
15          Q.   Do you know, does Oprandy's
16      know, whether there are any
17      requirements that the individuals who
18      are actually servicing the tanks or
19      extinguishers have their own
20      certifications?
21               MS. FAPPIANO:  Servicing
22          them?
23               MS. BALTZELL:  Uh-hum.
24               MS. FAPPIANO:  I am not sure
25          that we know what that means.
```

```
 1                    P. HAWKINS-SCOTT
 2         A.    Repeat that.
 3         Q.    If I said servicing or work
 4    on, does that make sense to work on a
 5    tank?
 6         A.    Yes.
 7         Q.    Does Oprandy's know whether
 8    there is any requirements that
 9    employees who are actually going to be
10    working on, servicing agent tanks, have
11    their own certification?
12              MS. FAPPIANO:  Objection.
13         You can answer it, if you know.
14         A.    I don't know offhand, but it
15    is something that we do do.
16         Q.    Do you know if anyone within
17    Oprandy's would know the answer to that
18    question, whether or not the
19    individuals who service tanks need
20    certification?
21         A.    Probably my husband would
22    know.
23         Q.    But you don't know one way or
24    another?
25         A.    Yes, I am not sure exactly.
```

```
 1              P. HAWKINS-SCOTT
 2        Q.    The certification that
 3   Mr. Scott had through FPC, do you know
 4   whether that was manufacturer specific
 5   or whether that was general training
 6   that applied to multiple products?
 7        A.    I believe he trained some on
 8   multiple products.  My husband also
 9   gets the kitchen certification from him
10   as well.
11        Q.    Do you know whether or not
12   that training involves training on use
13   of a pressure regulator?
14        A.    I wouldn't know the answer to
15   that.
16        Q.    Who would know?
17        A.    My husband would know.
18        Q.    Do you know whether or not
19   that training that he goes to involves
20   training on filling tanks with
21   compressed air?
22        A.    No, I couldn't be sure if he
23   includes that in that training.
24        Q.    Do you know whether there are
25   any written materials, manuals,
```

```
 1                    P. HAWKINS-SCOTT
 2      instructions, anything at all that is
 3      given out at these training sessions
 4      that he attends at FPC?
 5                MS. FAPPIANO:  Note my
 6           objection to that.  That presumes
 7           they exist.
 8           A.    I haven't seen them; so I
 9      wouldn't say I absolutely know that,
10      no.
11           Q.    Do you know one way or
12      another, whether or not that training
13      includes a discussion of the Pyro-Chem
14      Kitchen Knight manual?
15           A.    Perhaps when he does the
16      system trainings, which is on a
17      different day, he may discuss different
18      systems that are out there, there are
19      several.
20           Q.    Do you know one way or
21      another whether or not that is
22      discussed at that training?
23           A.    No, I have never been
24      present, so I don't really know what is
25      discussed.
```

Page 84

```
 1              P. HAWKINS-SCOTT
 2       Q.    One of the topics on the
 3   corporate reps notice deals with
 4   discussions with OSHA.
 5              Are you familiar with
 6   Oprandy's involvement with OSHA's
 7   involvement with Oprandy's following
 8   the incident following an
 9   investigation?
10       A.    I did accompany my husband to
11   Albany where we met with a woman.  The
12   man who had come to us was not present
13   that day.  They did discuss -- he was
14   explaining more of what the cascading
15   system was to her.  She didn't
16   understand that.  So you know, I had
17   some -- I was present for some of that.
18              MS. BALTZELL:  We are going
19         to mark this document as Oprandy's
20         Exhibit 3.
21              (Whereupon, Oprandy's
22         Exhibit 3, letter from Oprandy's to
23         U.S. Department of Transportation
24         was hereby marked for
25         identification, as of this date.)
```

Page 85

P. HAWKINS-SCOTT

1

2    Q.    This looks to be a letter

3    from Oprandy's to someone at the U.S.

4    Department of Transportation.

5    A.    Okay.

6    Q.    Does this look familiar to

7    you?

8    A.    Yes, I have seen this.

9    Q.    Were you involved at all in

10   writing this letter?

11   A.    Yes, I probably typed it for

12   my husband.

13   Q.    Did you see on the second

14   page where it says, "6SOG for filling

15   air bottles"?

16   A.    Yeah.

17   Q.    It says there, "Enclosed

18   please find the filling procedures for

19   filling air bottles related to the

20   cascade system in Poseidon air

21   compressor, which came directly from

22   the manufacturing company."

23        Do you see that?

24   A.    Yes.

25   Q.    It says, "Enclosed please

Page 86

P. HAWKINS-SCOTT

1
2       find."
3               Do you know if you enclosed a
4       document with this letter?
5           A.    We probably did.
6           Q.    Would it have been a copy or
7       the original?
8           A.    Well, it could have been a
9       copy, yes.
10          Q.    Do you have any recollection
11      of what was copied and attached?
12          A.    No, I don't.
13          Q.    Do you know if you kept a
14      copy of this letter and its attachment
15      in your records at Oprandy's?
16          A.    It is probably in the DOT
17      folder.
18          Q.    Is it your testimony that you
19      likely have a copy of this letter in
20      the DOT folder, and attached to that
21      letter would be the attachment that
22      went with the letter which would be, it
23      looks like, the instructions for the
24      compressor?
25          A.    It may be.

Page 87

```
 1              P. HAWKINS-SCOTT
 2       Q.    I know we have asked for that
 3    in discovery.
 4              MS. FAPPIANO:  Let me ask you
 5          this, Patty, when you say the DOT
 6          folder is that something maintained
 7          by Oprandy's or is that something
 8          that the DOT has?
 9              THE WITNESS:  No.  It is
10          something we kept in the office.
11          When they paid the visit to us that
12          day, they both came with their
13          little cards and they wanted to
14          look at everything.  That is why I
15          made the folder on them.
16              MS. FAPPIANO:  We will go
17          back and look.  We haven't found
18          anything, but we will go back and
19          look.
20       Q.    What is the DOT file you just
21    referenced?
22       A.    Well, it was the day that we
23    found out that we hadn't called in and
24    got a number.  They said we were in
25    violation for not having a number,
```

Page 88

```
 1                    P. HAWKINS-SCOTT
 2      which we didn't know what they were
 3      talking about.  He gave me this number
 4      to call, Patrick Durkin, and it was the
 5      Coast Guard.
 6                    They said, what body of water
 7      did you contaminate?  I said, we
 8      didn't.  What stream?  I said, we
 9      didn't.  What highway?  We didn't.  I
10      don't know why you're calling me.  I
11      said because Patrick Durkin said I need
12      a number, that it's some kind of an
13      incident.
14                    He said, I will give it to
15      you, but I don't know why you're making
16      this phone call.  So we kept a folder
17      with Patrick's card on it and the other
18      gentleman's card and we answered
19      whatever letters they wanted and we
20      just kept that information in a
21      different folder.
22          Q.    Am I correct that it is the
23      incident that is the basis of the
24      lawsuit that prompted that
25      investigation?
```

Page 89

```
 1              P. HAWKINS-SCOTT
 2      A.    Yes.
 3      Q.    Do you have an understanding
 4   of DOT regulations and the fact that
 5   the DOT regulates the transportation of
 6   vessels containing pressed gas?  Is
 7   that something you're familiar with?
 8      A.    Yes, because we supply fire
 9   extinguishers to trucks that all are
10   stopped by DOT officers, and they are
11   given fines because they don't have a
12   fire extinguisher.  So I am familiar
13   what DOT does.
14      Q.    To the best of your
15   knowledge, does DOT kind of regulate
16   your facility or keep an eye on things
17   at the facility, to the extent that
18   you're transporting vessels with
19   compressed gas on it?
20              MS. FAPPIANO:  I will object
21         to the form of that question.
22      A.    We don't have or need DOT
23   numbers.  My husband would know exactly
24   why.  It may have to do with the
25   weight.
```

```
 1                  P. HAWKINS-SCOTT
 2        Q.    Could it relate to the
 3   hydrostatic testing of the vessels,
 4   perhaps?
 5        A.    No, absolutely not.  No.
 6        Q.    Absolutely not or you're not
 7   sure?
 8        A.    I would say no --
 9             MS. FAPPIANO:  Objection.
10   She answered it.
11        Q.    Let's do this.  Look at
12   number 3 on the letter.  I will
13   paraphrase, and you tell me if I am
14   wrong.
15             As I am reading this, your
16   DOT number relates to whether or not
17   you're allowed to hydrostatically test
18   vessels with compressed air that will
19   then be transported, is that right,
20   having read number 3?
21             MS. FAPPIANO:  Note my
22        objection.
23             You can answer, if you can.
24        A.    Well, no, you're on a
25   different road about hydrostatic
```

```
 1                P. HAWKINS-SCOTT
 2    testing of cylinders.  They are not
 3    done because of DOT.  They are done for
 4    cylinder safety.  So we don't -- that
 5    isn't really what DOT is involved
 6    about.
 7         Q.   Does Oprandy's know whether
 8    or not you need a DOT RIN in order to
 9    do hydrostatic testing on vessels?
10         A.   We used to hydrotest in
11    Florida, but we now farm it out to
12    someone else.
13         Q.   The DOT number you were just
14    referring to, is that the DOT number
15    that would allow you to, as far as DOT
16    is concerned, do the hydrostatic
17    testing on the vessel?
18         A.   That is correct.
19         Q.   It sounds like there is a DOT
20    file that this letter, at least you
21    think could be in there, with the
22    attachment that was sent to DOT,
23    correct?
24         A.   Yes, correct.
25         Q.   Do you know where that file
```

```
 1                  P. HAWKINS-SCOTT
 2     is?
 3          A.    It is probably at the office.
 4          Q.    So that is something you can
 5     look for?
 6          A.    Yes, I will.
 7               RQ  MS. BALTZELL:  We will
 8          request that we get a copy of that
 9          file.
10               MS. FAPPIANO:  We looked.  By
11          counsel, we have looked and we have
12          given you everything that we still
13          have.
14               I will endeavor to look again
15          in light of this testimony, but I
16          don't know that there is anything
17          else, also because your client
18          testified that there's nothing
19          else.
20          Q.    Just so I am clear, if I want
21     to go find this DOT file, where do I
22     look?  Where am I going to look for --
23          A.    I am going to look --
24               MS. FAPPIANO:  She answered
25          the question.
```

```
 1              P. HAWKINS-SCOTT
 2       A.    -- in the cabinet, I will.
 3             MS. FAPPIANO:  Move on.
 4             MS. BALTZELL:  I will ask
 5       that a copy be provided.  If we
 6       need testimony on it, we can
 7       revisit that.
 8             MS. FAPPIANO:  I have to stop
 9       at 5 o'clock.
10             THE VIDEOGRAPHER:  The time
11       is 4:05.  We are going off the
12       record.  This is the end of media
13       unit number one.
14             (Recess taken.)
15             THE VIDEOGRAPHER:  The time
16       is 4:17.  We are back on the
17       record.  This is the beginning of
18       media unit number two.
19       Q.    Did you directly interact
20    with anybody from OSHA when they were
21    there at Oprandy's to do their
22    inspection after the accident?
23       A.    On that day, no.
24       Q.    At any time following?
25       A.    No.
```

```
 1                  P. HAWKINS-SCOTT
 2              MS. FAPPIANO:  Other than
 3         what she testified to.
 4         Q.    Was there a primary contact
 5    at Oprandy's for OSHA?
 6         A.    Myself or my husband.
 7         Q.    Have you received a copy of
 8    the evaluation that OSHA did as a
 9    result of their investigation?
10         A.    Yes, we did.
11         Q.    Have you read it?
12         A.    Yes.  My husband knows -- he
13    read more into it than I did.
14         Q.    Do you recall OSHA reaching a
15    conclusion in their evaluation as to
16    what OSHA thinks happened as to why the
17    tank ruptured?
18         A.    Yes, I do.
19         Q.    What do you recall that
20    conclusion to be?
21              MS. FAPPIANO:  Note my
22         objection.
23              MR. ACARD:  Objection.
24         A.    On the back page it says
25    "over pressurization."
```

```
 1              P. HAWKINS-SCOTT
 2      Q.    Do you have any reason to
 3   disagree with that conclusion --
 4              MS. FAPPIANO:  Objection.
 5      Q.    -- given by OSHA?
 6              MS. FAPPIANO:  You can answer
 7   it.
 8      A.    No, I don't object to that
 9   finding.
10      Q.    Do you recall reading
11   anything in the evaluation report that
12   Oprandy's does disagree with?
13              MS. FAPPIANO:  Objection.
14      A.    No.
15      Q.    Was Oprandy's issued any
16   citations or violations by OSHA
17   following the incident?
18              MS. FAPPIANO:  Objection.
19              You can answer it.
20      A.    Yes, I do believe there were
21   some.
22      Q.    In your own words, can you
23   describe what they were?
24      A.    Honestly, I don't know them
25   all.  One that sticks out in my head is
```

1                P. HAWKINS-SCOTT

2       we didn't have an eye wash station,

3       which Christopher was the one who put

4       that up on the wall, so I know that

5       that wasn't true.

6                No, I don't know.  I didn't

7       really follow up.  My husband dealt

8       more with them.

9            Q.   One of the topics for the

10      deposition was the interactions with

11      OSHA as well as the citations provided

12      by OSHA.

13               As far as who was the person

14      in Oprandy's who was knowledgeable

15      about those topics would that be you or

16      your husband?

17           A.   My husband.

18               MS. BALTZELL:  These are a

19           few pages from the OSHA report that

20           the parties received pursuant to

21           their request from OSHA.

22               We will mark these pages as

23           Oprandy's Exhibit 4.

24                  (Whereupon, Oprandy's

25           Exhibit 4, excerpted pages from

Page 97

```
 1              P. HAWKINS-SCOTT
 2         OSHA report was hereby marked for
 3         identification, as of this date.)
 4              MS. FAPPIANO:  I will make
 5         one overriding objection to all
 6         questions relating to this document
 7         and to the conclusions of OSHA and
 8         any administrative findings by this
 9         agency.
10         Q.    I believe you testified a
11    moment ago that between you and your
12    husband, he would have more information
13    than you would with respect to OSHA's
14    investigation and any citations by
15    OSHA; is that correct?
16         A.    That is correct.
17         Q.    Did you do anything to
18    prepare for your deposition today, to
19    find out what that additional
20    information that he may have that you
21    personally don't to come testify today?
22         A.    No.
23         Q.    This exhibit is a 17-page
24    document.  It says "Citation and
25    notification of penalty."  Then it
```

```
 1                    P. HAWKINS-SCOTT
 2      lists several citations behind it.
 3                    Do you see that?
 4           A.    Yes.
 5           Q.    To save us some time here,
 6      does this document accurately summarize
 7      Oprandy's understanding of the
 8      violations it received from OSHA?
 9                    MS. FAPPIANO:  Note my
10           objection.
11           A.    To the best of my knowledge,
12      I know -- I know there were some.
13           Q.    Does this document appear to
14      contain the violations that Oprandy's
15      received following the accident?
16           A.    Again, I know there were some
17      violations, I guess this may be some of
18      them.
19           Q.    Are you able to speak to the
20      specificities of the violations that
21      were received from OSHA?
22                    MS. FAPPIANO:  Objection.
23           A.    No, I really couldn't give a
24      really accurate account, no.
25           Q.    This may or may not be what
```

```
 1                 P. HAWKINS-SCOTT
 2      you referred to earlier.  But I believe
 3      you mentioned that OSHA may have taken
 4      some pictures of the cascade system?
 5           A.    Yes.
 6           Q.    Do you know where you saw the
 7      pictures, was it in an OSHA report?
 8           A.    I never saw the pictures
 9      because they were beyond what my
10      husband wanted me to see, but there was
11      an investigator who came down after the
12      accident.  He had a really good camera
13      with the big, big lens, so I do know he
14      took pictures of everything.
15           Q.    Did you ever see the end
16      result of those photographs to actually
17      see the photographs that he took when
18      he was there or you were just present
19      when he was just taking the
20      photographs?
21           A.    Well, that morning of the
22      accident, they were all in there taking
23      pictures.  So I do know that.
24           Q.    If I wanted to track down the
25      photographs you were mentioning
```

```
 1              P. HAWKINS-SCOTT
 2    earlier, the photographs that were
 3    taken of the compressor, have you seen
 4    the actual photographs that you're
 5    referring to?  I am trying to figure
 6    out where I would look or if those even
 7    exist.
 8        A.    I never saw OSHA's
 9    photographs.  They never showed us
10    those pictures.
11              THE WITNESS:  Daniel had a
12         few pictures.  I don't know where
13         we got those from.
14              MS. FAPPIANO:  So this
15         happened in the course of
16         attorney-client preparation.
17              So I am going to have to stop
18         the questioning at this juncture
19         with regard to that, based upon a
20         privilege.
21        Q.    I am going to show you this.
22    This is a photograph that I have from
23    OSHA of the Poseidon system.
24              I am just curious if on that
25    photo; one, that is the Poseidon
```

```
1                    P. HAWKINS-SCOTT
2       system, right?
3            A.    Yes.
4            Q.    You referenced there was a
5       safety cage attached to the system.
6            A.    They are right here and this
7       is not a good picture.  Those steel
8       things are right there.  That is not a
9       good photograph.  They put that big
10      black thing in the middle of it.
11           Q.    I am with you, but this is
12      just what we have from OSHA.
13                 MS. BALTZELL:  We will mark
14           this photo as Oprandy's Exhibit 5.
15                 (Whereupon, Oprandy's
16           Exhibit 5, photograph was hereby
17           marked for identification, as of
18           this date.)
19           Q.    I realize the photo is not
20      ideal, but just circle where on the
21      photo, if you can, where the safety
22      cages would have been.
23                 MS. FAPPIANO:  I will allow
24           her to do it, but it is over my
25           objection.  Also, because she never
```

```
 1              P. HAWKINS-SCOTT
 2         saw these photos before.
 3              We don't necessarily know
 4         that these were the ones that OSHA
 5         took, only based upon your
 6         representation that she wasn't
 7         physically in the room after the
 8         accident, so she doesn't have
 9         personal knowledge.
10         Q.   Were you there when they were
11    I taking the photos you saw?  You have
12    personal knowledge of an individual
13    taking the photographs?
14         A.   On that day, they left a
15    state trooper with us.  We weren't
16    allowed in the room once they
17    transported those two boys out.
18              I arrived later, the
19    helicopters were gone.  The trooper
20    didn't allow us anywhere in either of
21    those rooms.  He stayed on the premises
22    at all times.
23         Q.   So OSHA may or may not have
24    taken photos of the cascade system?
25         A.   Maybe they didn't.
```

```
 1                   P. HAWKINS-SCOTT
 2              MS. FAPPIANO:  She doesn't
 3         have that basis of knowledge.
 4              MS. BALTZELL:  No, but that
 5         makes sense.
 6              MS. FAPPIANO:  Nobody really
 7         does except for the ones who took
 8         it because nobody was allowed in
 9         there.
10         Q.    If you know in the photo --
11              MS. FAPPIANO:  Let's go off
12         the record.
13              (Recess taken.)
14              THE VIDEOGRAPHER:  The time
15         is 4:28, and we are going off the
16         record.
17              (Discussion off the record.)
18              THE VIDEOGRAPHER:  The time
19         is 4:31, we are back on the record.
20              MS. BALTZELL:  We marked
21         Oprandy's Exhibit 5.
22                 (Whereupon, Oprandy's
23         Exhibit 5, photograph page taken
24         out of OSHA's report was hereby
25         marked for identification, as of
```

```
 1                    P. HAWKINS-SCOTT
 2          this date.)
 3          Q.    Oprandy's Exhibit 5 is a
 4     photograph page taken out of OSHA's
 5     report that they issued regarding the
 6     incident.
 7                Do you recognize what is
 8     pictured in the photo?
 9          A.    Yes.
10          Q.    What is pictured in the
11     photo.
12          A.    It is the back shop where the
13     accident occurred.  That is the
14     compressor and the fire extinguishers
15     that are fallen around it, and you can
16     see the one safety cage that is on
17     right side closest to the Poseidon
18     name, is evident in this photograph.
19          Q.    Is that picture an accurate
20     photograph of what Oprandy's, that area
21     of Oprandy's looked like on the day of
22     the incident from your recollection?
23          A.    Yes.
24          Q.    Can you just take a pen, and
25     I know the photograph is not perfect,
```

```
 1                    P. HAWKINS-SCOTT
 2      but can you circle where on the
 3      compressor that the safety cage is
 4      located?
 5                    MS. FAPPIANO:  Over my
 6           objection, you can do so.
 7                    Please put an initial and a
 8           date on there.
 9           Q.    Did Oprandy's ever request a
10      copy of OSHA's file from OSHA related
11      to the incident?
12           A.    No, we didn't.
13           Q.    Other than that kind of
14      evaluation report that you I believe
15      said you had read, have you ever seen a
16      rather large stack of papers that is
17      OSHA's complete file with respect to
18      this case?
19           A.    No, we never received that.
20           Q.    In preparing for your
21      deposition today, did you see any
22      deposition transcripts at all that have
23      been taken in this case?
24           A.    No.
25           Q.    Did you look at any documents
```

```
 1                    P. HAWKINS-SCOTT
 2       that may have been produced by other
 3       parties in this case?
 4            A.    No.
 5            Q.    Were you asked to make a
 6       search for additional documents with
 7       respect to your corporate
 8       representative deposition?
 9                 MS. FAPPIANO:  Objection.
10            That is privileged information.
11            Q.    Did you make a search for any
12       documents in advance of your corporate
13       representative deposition?
14            A.    No.
15            Q.    Has there been a final
16       settlement or a resolution with OSHA
17       with respect to the violations that
18       Oprandy's received after the accident?
19                 MS. FAPPIANO:  Objection.
20                 You can answer to the extent
21            it doesn't go into attorney-client
22            privileged information.
23            A.    We pay them quarterly and we
24       are almost done.
25                 MS. BALTZELL:  Does anybody
```

```
 1                    P. HAWKINS-SCOTT
 2          else have questions?
 3                    MR. ACARD:  I have a couple
 4          of quick ones.
 5      EXAMINATION
 6      BY MR. ACARD:
 7          Q.    You mentioned way back that
 8      you had a manual on the premises for
 9      the Poseidon system --
10          A.    Yes.
11          Q.    -- that Christopher could
12      refer to if he wanted to?
13          A.    Yes.
14          Q.    You mentioned that he
15      wouldn't bring it home?
16          A.    Yes.
17          Q.    You are the office manager,
18      correct?
19          A.    Yes.
20          Q.    Does Oprandy's keep other
21      manuals for other tanks and systems on
22      the premises as well?
23          A.    I am not sure, but I know my
24      husband has some books because we have
25      Protex and Ansul systems we put in, and
```

```
 1                P. HAWKINS-SCOTT
 2      I think when we do the updates there
 3      are some reference books they do give
 4      you.
 5           Q.   I guess what I am asking is:
 6      If they come with manuals or reference
 7      books is that something that Oprandy's
 8      would keep on the premises?
 9           A.   Yes.
10           Q.   Is that something that
11      employees could retrieve if they were
12      available, if they wanted to?
13           A.   Absolutely, yes.
14           Q.   Does Oprandy's along the way
15      prevent employees from going to refer
16      to manuals that they actually have?
17           A.   No, we would never.
18           Q.   Have there been occasions
19      that you're aware of where employees
20      would ask to refer to manuals on the
21      premises?
22           A.   Yes.
23                MR. ACARD:  Thank you.  I
24           have no other questions.
25                MS. BALTZELL:  Tara, do you
```

```
 1              P. HAWKINS-SCOTT
 2       have any questions?
 3            MS. FAPPIANO:  I do not.
 4            MS. BALTZELL:  We will mark
 5       as Oprandy's Exhibit 6, the
 6       transcript of the last court
 7       hearing regarding the deposition.
 8            MS. FAPPIANO:  I don't think
 9       it is appropriate for this to be
10       marked as an exhibit as part of a
11       deposition.
12            If you have an issue with
13       this witness and the extensive
14       testimony that she has provided
15       over the course of today, then you
16       should take it up with counsel.
17            The record speaks for itself
18       and we will deal with it between
19       counsel and the court.
20            MS. BALTZELL:  Let's mark it,
21       please.
22            I want to leave the
23       deposition open to the extent that
24       there were topics that we were not
25       able to get testimony on today from
```

Page 110

```
 1              P. HAWKINS-SCOTT
 2       a corporate representative pursuant
 3       to our notice.
 4            (Whereupon, Oprandy's Exhibit
 5       6, transcript of court hearing
 6       regarding the deposition marked for
 7       identification, as of this date.)
 8            MS. FAPPIANO:  I am getting a
 9       copy of that now that you have
10       marked it as an exhibit and you
11       haven't produced it.
12            MS. BALTZELL:  No.  I just
13       got it.
14            I don't have any further
15       questions.
16            MS. FAPPIANO:  We are done.
17       Thank you.
18            (Continued on the following
19       page to accommodate the jurat.)
20
21
22
23
24
25
```

Page 111

```
 1              P. HAWKINS-SCOTT
 2           THE VIDEOGRAPHER:  We are off
 3      the record at 4:39 p.m., and this
 4      concludes the deposition of
 5      Patricia Hawkins-Scott.
 6              The total number of media
 7      units used was two and will be
 8      retained by Veritext Corporate
 9      Services.
10           (Time noted:  4:40 p.m.)
11
12              _____
13           PATRICIA HAWKINS-SCOTT
14
15      Sworn and Subscribed
16      This_____day of _____, 20  .
17
18      _____
           Notary Public
19
20
21
22
23
24
25
```

Page 112

1

2                    C E R T I F I C A T E

3

4      STATE OF NEW YORK      )

5                              : ss.

6      COUNTY OF NEW YORK    )

7

8          I, BARBARA DRISCOLL, a Shorthand

9      Reporter and Notary Public within and

10     for the State of New York, do hereby

11     certify:

12         PATRICIA HAWKINS-SCOTT, the witness

13     whose deposition is hereinbefore set

14     forth, was sworn, such deposition is a

15     true record of testimony given by such

16     witness.

17         I further certify that I am not

18     related to any of the parties to this

19     action by blood or marriage; and that I

20     am in no way interested in the outcome

21     of this matter.

22         IN WITNESS WHEREOF I have set my

23     hand this 21st day of September of

24     2019.

25

Page 113

1

2      ---------------- I N D E X ------------------

3      WITNESS                 EXAMINATION BY     PAGE

4      PATRICIA HAWKINS-SCOTT

5                              Ms. Baltzell      8

6                              Mr. Acard         107

7

8      --------- INFORMATION REQUESTS --------------

9

10     DIRECTIONS:  78, 78

11     RULINGS:  (None)

12     TO BE FURNISHED:  (None)

13     REQUESTS:  92

14

15     ----------------- EXHIBITS --------------------

16     OPRANDY'S                    FOR ID

17     1, 30(b) notice                 9

18     2, series of documents          63

19     3, letter from Oprandy's to U.S.   84

20     Department of Transportation

21     4, excerpted pages of OSHA report   96

22     5, photograph                   101

23     6, transcript of prior court    110

24     hearing regarding the deposition

25

Page 114

1    Tara Fappiano, Esq.

2    tara.fappiano@hbandglaw.com

3                        September 23, 2019

4    RE:    Buono, Franklin v. Tyco Fire Products, Et Al.

5        9/18/2019, Patricia Scott , 30(b)(6) Oprandy's Fire     (#3521616)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    erratas-cs@veritext.com

16

17    Return completed errata within 30 days from

18    receipt of testimony.

19      If the witness fails to do so within the time

20    allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

Page 115

1   Buono, Franklin v. Tyco Fire Products, Et Al.

2   Patricia Scott , 30(b)(6) Oprandy's Fire (#3521616)

3                    E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Patricia Scott , 30(b)(6) Oprandy's Fire

25   Date

Page 116

1    Buono, Franklin v. Tyco Fire Products, Et Al.

2    Patricia Scott , 30(b)(6) Oprandy's Fire (#3521616)

3                    ACKNOWLEDGEMENT OF DEPONENT

4    I, Patricia Scott , Oprandy's Fire, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____   _____

12    Patricia Scott   Date

13    *If notary is required

14                       SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                       _____ DAY OF _____, 20___.

16

17

18                       _____

19                       NOTARY PUBLIC

20

21

22

23

24

25

| & | | |
| --- | --- | --- |

**&**  1:16,21 2:3,7,11
  2:12 6:3,8,11,13

**0**

**05915**  1:7 5:3

**1**

**1**  9:8,10 12:19
  13:18 113:17
**10**  54:24 55:2,3,15
  55:17 56:8,18,25
  66:8
**10006**  2:13
**101**  113:22
**107**  113:6
**10:00**  6:23
**110**  113:23
**1133**  1:23 5:6
**12401**  2:4
**14**  51:23 62:21
**17**  54:13 57:6,11
  57:13,22 97:23
**17a**  55:5 57:16,22
**17d**  60:16
**18**  1:19 4:4 53:14

**2**

**2**  12:19 14:16 63:7
  63:9,23 113:18
**20**  12:17,25 13:3
  51:22 111:16
  116:15
**2018**  29:24 33:23
**2019**  1:19 4:4
  112:24 114:3
**21**  51:6
**21st**  2:13 112:23
**23**  114:3
**24**  43:11
**25**  42:11,22
**2555**  2:8

**26**  35:4
**27**  33:24
**28**  32:21,23 33:12
  33:19
**2:27**  4:4
**2:29**  1:20
**2:30**  6:22

**3**

**3**  64:25 84:20,22
  90:12,20 113:19
**30**  1:21 7:12 8:6
  9:7,10,14 21:6
  113:17 114:5,17
  115:2,24 116:2
**3521616**  114:5
  115:2 116:2

**4**

**4**  96:23,25 113:21
**45**  2:13
**4:05**  93:11
**4:17**  93:16
**4:28**  103:15
**4:31**  103:19
**4:39**  111:3
**4:40**  111:10

**5**

**5**  93:9 101:14,16
  103:21,23 104:3
  113:22
**529**  2:4
**5351**  112:25

**6**

**6**  1:21 8:6 109:5
  110:5 113:23
  114:5 115:2,24
  116:2
**63**  113:18
**64108**  2:9

**6sog**  85:14

**7**

**75**  55:11
**78**  113:10,10
**7:17**  1:7 5:3

**8**

**8**  113:5
**84**  113:19

**9**

**9**  113:17
**9/18/2019**  114:5
**92**  113:13
**96**  113:21

**a**

**a.m.**  6:23
**abc**  24:11
**able**  27:13,23,23
  35:17 77:2 98:19
  109:25
**absolutely**  11:8,22
  15:14,22 23:20
  41:9 83:9 90:5,6
  108:13
**acard**  2:5 6:7,7
  72:9 94:23 107:3
  107:6 108:23
  113:6
**accident**  15:12
  16:5 17:12 18:15
  19:8,11 25:24
  39:15 48:11,15,20
  51:11 57:3 78:18
  79:3 93:22 98:15
  99:12,22 102:8
  104:13 106:18
**accommodate**
  110:19
**accommodated**
  6:16

**accompany**  84:10
**account**  98:24
**accuracy**  114:9
**accurate**  98:24
  104:19
**accurately**  98:6
**acknowledgement**
  116:3
**acknowledgment**
  114:12
**acquired**  51:23
**action**  1:7 5:16
  12:14 112:19
**actual**  100:4
**add**  43:3
**additional**  97:19
  106:6
**additions**  116:6
**administrative**
  97:8
**advance**  106:12
**advice**  78:20
**afff**  56:2
**affiliations**  5:20
**affixed**  67:6
**afternoon**  4:3 6:22
  8:4,6,11,24 17:13
**agency**  97:9
**agent**  43:5 44:11
  44:18,20,22,23
  60:17 79:17 81:10
**ago**  77:8 97:11
**agree**  4:16 48:10
  72:7
**agreed**  3:4,10,14
  32:3
**ahead**  14:11 22:17
  30:25 73:14
**air**  1:8,9 4:23
  18:12 24:16,20
  25:2 36:24 37:13

37:15,22,25 40:12
41:17 42:14 48:22
48:25 53:23 54:2
67:10 75:17 77:22
82:21 85:15,19,20
90:18
**al**   4:23 114:4
115:1 116:1
**albany**   15:9 84:11
**allotted**   114:20
**allow**   7:15 91:15
101:23 102:20
**allowed**   17:16
39:16 90:17
102:16 103:8
**alterations**   33:24
34:11,16,21,25
52:9
**amount**   18:11
38:8
**ansul**   107:25
**answer**   10:5,16
14:11,13,15 20:19
24:6 25:8 36:2
45:7 47:3 56:10
69:7,13,25 71:8,20
72:11 73:4 74:5
74:17 78:7,15,20
79:20 81:13,17
82:14 90:23 95:6
95:19 106:20
**answered**   7:16
21:10,17 22:16
28:25 29:4 68:10
69:6 70:22 71:6
71:22,23,25 73:12
73:13 74:8,18
88:18 90:10 92:24
**answering**   78:24
79:5

**answers**   60:19
**anybody**   19:2
22:18 38:13 61:24
93:20 106:25
**apart**   55:11 65:6
**apparatus**   36:23
70:3
**appear**   98:13
**appearance**   5:24
**appearances**   5:20
**appears**   65:10
69:18
**appended**   116:7
**applicable**   54:18
114:8
**applied**   82:6
**applies**   61:6
**appropriate**   109:9
**area**   104:20
**arm**   67:11
**arrived**   102:18
**asked**   16:9 22:15
68:9 69:5 70:21
71:23,24 73:11,12
87:2 106:5
**asking**   37:17
58:16 74:6 108:5
**asme**   57:25
**associated**   43:16
44:4
**assume**   66:5
**assumes**   12:7
**attached**   86:11,20
101:5 114:11
**attachment**   86:14
86:21 91:22
**attempt**   23:25
**attends**   83:4
**attorney**   5:25 9:22
100:16 106:21
114:13

**attorneys**   2:3,7,12
9:19
**audio**   4:13,14
**authority**   46:23
**auto**   1:8,9
**available**   67:18
70:15,24 72:5
76:22 108:12
114:6
**avenue**   1:23 5:7
**aware**   21:5,14,19
38:4 45:17 50:17
50:19 61:12
108:19

**b**

**b**   1:9,21 7:12 8:6
9:7,10,14 57:24
58:19 113:17
114:5 115:2,24
116:2
**back**   17:2 19:24
28:17 29:14,16
32:2 55:22 71:12
71:13 74:3,8,14,19
74:21,25 76:21
87:17,18 93:16
94:24 103:19
104:12 107:7
**bacon**   2:7 6:3
**bag**   15:19
**balloon**   37:2 42:13
45:21 46:4,15,22
47:10
**balloons**   49:2
**baltzell**   2:10 6:2,3
8:3 9:6 10:25
21:13 28:16 29:2
29:15 30:24 31:5
32:12 50:2 52:19
53:3 56:13 61:12
63:2,5 71:9,15,19

72:10 73:7 74:3
74:14,21,25 78:11
80:23 84:18 92:7
93:4 96:18 101:13
103:4,20 106:25
108:25 109:4,20
110:12 113:5
**barbara**   1:24 5:13
112:8
**barber**   2:11 6:11
**based**   47:23
100:19 102:5
**basically**   21:23
55:15
**basis**   8:25 88:23
103:3
**bates**   13:25
**battery**   55:25
**bci**   26:4 70:20
**beginning**   5:24
14:7 93:17
**behalf**   8:13,14
10:4,21 29:11
33:5 38:21 42:24
60:8 62:5
**believe**   15:4 21:9
21:16 26:6,16
27:22,24 28:13,19
34:4 38:17 51:22
57:17 69:13 77:18
78:11 79:6 80:7
82:7 95:20 97:10
99:2 105:14
**best**   69:13 89:14
98:11
**beyond**   99:9
**big**   18:6 37:25
67:7,7 99:13,13
101:9
**billing**   23:13

**bit** 77:13
**black** 101:10
**blood** 112:19
**blow** 49:2
**board** 40:8
**body** 88:6
**boiler** 57:25 58:20
**boilers** 58:15,17
**book** 21:24 25:19
**booklets** 55:2
**books** 56:5 107:24
  108:3,7
**boston** 15:10 39:8
**bot** 67:5
**bottle** 67:15
**bottles** 85:15,19
**bottom** 13:25
  25:23
**bought** 51:18
**boulevard** 2:8
**boys** 102:17
**brand** 46:8
**break** 63:3
**breathing** 36:23
  70:3
**brian** 2:5 6:7
  22:25 53:21 75:15
**brian's** 66:2
**bring** 73:22
  107:15
**broad** 54:21
**broadway** 2:4,13
**brought** 64:24
**building** 47:6
**builds** 45:18
**built** 27:4
**buono** 1:5 4:22 6:9
  61:21 62:7,18
  64:20 114:4 115:1
  116:1

**buono's** 63:15
  64:3
**business** 51:23,24
  77:8

**c**

**c** 2:2 7:21,21 59:16
  112:2,2
**cabinet** 93:2
**cage** 66:9,13,16,16
  66:22,25 67:3,17
  67:19 68:4,12,18
  69:3,11,16 70:8,10
  70:15 73:3,10,16
  73:21,22,23 74:2
  75:14,17 101:5
  104:16 105:3
**cages** 68:23 69:11
  70:24 71:4 72:2
  72:15 101:22
**calendar** 80:5
**california** 80:13
**call** 36:22 37:2
  51:9 55:23 56:2
  88:4,16
**called** 87:23
**calling** 88:10
**camera** 99:12
**capability** 37:7
**card** 88:17,18
**cards** 87:13
**cars** 55:25
**cascade** 16:15,20
  17:8 18:5,10,23
  19:11,21 25:15,21
  26:19,21 30:5,9,15
  32:25 33:4,25
  34:8,12,17 35:2,6
  36:6,12,19,20
  37:12,14 38:6
  39:22,24 40:21
  41:5,17 53:16,20

54:6 68:15 85:20
  99:4 102:24
**cascaded** 53:23
  54:2
**cascading** 37:22
  84:14
**case** 5:2 30:25
  70:14 105:18,23
  106:3
**cases** 39:5
**cell** 4:10
**cellular** 4:8
**certain** 20:25 32:7
  34:16
**certainly** 7:14
**certification** 3:6
  79:7,15 80:8
  81:11,20 82:2,9
**certifications**
  79:10 80:20
**certified** 79:15
**certify** 112:11,17
**cetera** 41:19
**cga** 59:17,19 60:10
**change** 46:13
  115:4,7,10,13,16
  115:19
**changed** 20:7
**changes** 33:25
  34:10,16,25
  114:10 116:6
**chem** 83:13
**chris** 40:8
**christopher** 26:25
  43:21 55:17 72:13
  75:8,16 79:14
  96:3 107:11
**circle** 101:20
  105:2
**circumference**
  70:5

**citation** 97:24
**citations** 95:16
  96:11 97:14 98:2
**city** 2:9
**civil** 1:7
**clarify** 52:19
  65:14
**class** 24:11
**clean** 18:3,8
**cleaned** 17:20,22
  18:17
**cleanout** 17:18
**clear** 6:16 75:19
  92:20
**clearly** 74:24
**client** 52:17 92:17
  100:16 106:21
**closest** 104:17
**coast** 88:5
**code** 58:2,4,13,18
  58:20 59:8
**codes** 54:15,17
**come** 11:4 15:13
  16:23,24 25:15
  33:3 37:13 38:8
  46:11 73:2 84:12
  97:21 108:6
**coming** 19:19 32:2
**companies** 26:5
  79:22
**company** 8:15 9:2
  22:21 27:5 29:11
  29:23 31:18 36:8
  38:21 80:10 85:22
**complete** 64:3
  105:17 116:8
**completed** 114:17
**completely** 17:13
  24:16
**comply** 56:7,18
  57:13,14,21

**compressed** 24:20
59:18,20 60:10,17
77:22 82:21 89:19
90:18
**compressor** 12:2
26:15,19,21 28:15
30:6,9,16 33:2,4,8
37:24 51:17 53:20
67:23 68:4 85:21
86:24 100:3
104:14 105:3
**concerned** 91:16
**concludes** 111:4
**conclusion** 56:12
94:15,20 95:3
**conclusions** 97:7
**consider** 10:10
**contact** 94:4
**contain** 98:14
**contained** 36:23
63:15
**containing** 89:6
**contains** 77:20
**contaminate** 88:7
**contaminated**
17:17
**content** 29:8
**contents** 28:3
**context** 7:3 54:22
**continue** 4:15
**continued** 110:18
**conversations** 4:8
10:23 11:12 20:11
**cooperate** 7:14
**copied** 66:6 86:11
**copies** 55:7,21
65:12,17,20
114:14
**coprporate** 5:14
**copy** 20:21,24
26:9,10 55:16

63:12,18 64:3
65:22 76:14,24
86:6,9,14,19 92:8
93:5 94:7 105:10
110:9
**copying** 65:8
**corner** 14:2 17:2
**corporate** 5:10
11:10,20 20:14
29:7 30:3 42:20
84:3 106:7,12
110:2 111:8
**correct** 8:8 10:25
11:7,17,22 15:24
28:8 34:6 37:18
40:21 60:11,24
62:9,14 64:6,8
65:18 88:22 91:18
91:23,24 97:15,16
107:18 116:8
**corrections** 116:6
**counsel** 3:4 4:21
5:18 6:4 7:5 10:23
11:12,14 20:25
21:12 22:3,7,9
29:3,20 30:23
31:19,20 48:5
60:25 62:10 72:7
78:20 92:11
109:16,19 114:14
**counsel's** 6:17
**country** 79:25
80:11
**county** 112:6
**couple** 80:2 107:3
**course** 10:24
100:15 109:15
**court** 1:2,24 3:18
4:25 5:12 7:18
31:5,9 32:3,19,20
74:19 109:6,19

110:5 113:23
**court's** 32:15
**covered** 7:13
28:22 35:19
**covers** 55:15
**cs** 114:15
**cs3521616** 2:25
**curious** 100:24
**currently** 18:24
**cv** 1:7 5:3
**cylinder** 15:25
16:2,7 24:15,19
38:2,3 48:21
73:24,25 91:4
**cylinders** 16:14,19
17:2,7 18:7 36:25
40:11 49:4 66:14
66:20 91:2

**d**

**d** 1:9 24:11,11
60:19 113:2
**d0t** 87:5
**dad** 80:4
**dangers** 43:16
44:4
**daniel** 100:11
**date** 9:12 16:4
36:14 63:11 78:18
80:5 84:25 97:3
101:18 104:2
105:8 110:7
115:25 116:12
**david** 2:17 5:9
**day** 15:13,17
17:20 18:15 19:10
25:24 26:2,24
65:4,11,17 66:3
68:24 70:20 72:5
83:17 84:13 87:12
87:22 93:23
102:14 104:21

111:16 112:23
116:15
**days** 114:17
**deal** 31:9 109:18
**deals** 84:3
**dealt** 96:7
**declare** 116:4
**deemed** 116:6
**defendant** 1:17
2:7,12 4:21 6:5
**defendants** 1:11
**deliver** 15:9
**department** 34:5,9
46:24 47:5 51:8
51:16 84:23 85:4
113:20
**deponent** 114:13
116:3
**deposed** 42:21
**deposing** 114:13
**deposition** 1:21
3:7,14 4:13,19 5:4
7:10 8:7,12 9:14
9:24 10:20 11:9
11:20 12:4 14:7
19:20 20:2,4,13
21:8,20 28:2,20,21
29:24 30:3 32:2
33:23 35:20,21
38:17 63:14 65:23
66:2 78:12 96:10
97:18 105:21,22
106:8,13 109:7,11
109:23 110:6
111:4 112:13,14
113:24
**depositions** 6:18
39:6
**describe** 44:22
48:16 66:15 95:23

**describing** 67:13 67:17
**detail** 21:23
**details** 22:2
**device** 66:9
**dicker** 1:23 5:6
**difference** 69:20
**different** 6:18 24:10,13,16 25:11 26:3,5,24 35:11 46:6,7 53:24 55:9 55:14,22 56:4 72:22 80:12 83:17 83:17 88:21 90:25
**dir** 78:2
**directions** 113:10
**directly** 85:21 93:19
**disagree** 70:16,18 95:3,12
**discovery** 64:2 87:3
**discuss** 62:24 83:17 84:13
**discussed** 9:19 62:22 64:25 83:22 83:25
**discussion** 9:15 83:13 103:17
**discussions** 84:4
**district** 1:2,3 4:25 5:2
**dki** 17:14
**document** 9:17 60:4 63:6,22 84:19 86:4 97:6 97:24 98:6,13
**documentation** 21:24 33:3
**documents** 7:2 11:4,6 13:18,20,21

14:4,10 33:6 63:9 63:13,24 76:15,20 105:25 106:6,12 113:18
**door** 16:24,25
**doorway** 55:13
**dot** 86:16,20 87:8 87:20 89:4,5,10,13 89:15,22 90:16 91:3,5,8,13,14,15 91:19,22 92:21
**drafted** 77:4
**drafting** 77:11
**drawer** 25:23
**drifting** 37:25
**driscoll** 1:24 5:13 112:8
**driving** 20:18
**ductwork** 57:18
**duly** 7:22
**duplicative** 7:7
**durkin** 88:4,11
**duties** 23:10,16,17

**e**

**e** 2:2,2,10 6:2 22:25 60:19 112:2 112:2 113:2 115:3 115:3,3
**earlier** 64:25 99:2 100:2
**edelman** 1:23 5:5
**effect** 3:17 78:3
**effective** 70:9,11
**either** 11:25 24:25 53:19 79:5 102:20
**electric** 55:25
**elser** 1:22 5:5
**emergency** 64:9
**employee** 23:5 63:19 64:14 77:4 78:25

**employees** 11:19 22:13 39:21 42:12 43:13,15 53:16,19 54:5 55:17 67:19 69:2 71:3 73:10 79:8 81:9 108:11 108:15,19
**employment** 62:22
**emptied** 18:16
**empty** 18:18,24 19:5,10
**enclosed** 85:17,25 86:3
**encompass** 35:13
**encompassed** 35:18
**endeavor** 92:14
**entailed** 41:12 75:24
**equipment** 12:2 51:25
**errata** 114:11,13 114:17
**erratas** 114:15
**especially** 27:2
**esq** 2:5,10,14 114:1
**established** 76:18
**et** 4:23 41:18 114:4 115:1 116:1
**evaluation** 94:8,15 95:11 105:14
**evidence** 14:17,24
**evident** 104:18
**exact** 17:8 42:6 45:19
**exactly** 11:13 22:2 45:9 75:23 81:25 89:23
**examination** 8:2 107:5 113:3

**examined** 7:23
**excerpted** 96:25 113:21
**exhibit** 9:8,10 63:7 63:8,23 84:20,22 96:23,25 97:23 101:14,16 103:21 103:23 104:3 109:5,10 110:4,10
**exhibits** 113:15
**exist** 12:7 32:7 52:17 83:7 100:7
**explaining** 84:14
**extensive** 6:24 109:13
**extent** 7:5,11 8:17 58:11 70:23 89:17 106:20 109:23
**exterior** 18:20
**extinguisher** 24:5 24:10 44:25 45:2 45:10 55:13 89:12
**extinguishers** 23:18,23 24:14 44:5 55:4,10 57:2 79:16 80:19 89:9 104:14
**eye** 89:16 96:2

**f**

**f** 64:19 112:2
**facility** 12:11 15:13 27:3 89:16 89:17
**fact** 32:8,10 89:4
**facts** 21:25
**fails** 114:19
**fallen** 104:15
**familiar** 37:21 40:11,19 43:7 45:19 57:8,15 58:3,8 59:19,24

77:15 84:5 85:6
89:7,12
**familiarity** 54:14
54:16 57:25 59:17
**fappiano** 2:14
6:10,10 10:14,17
10:22 11:11 12:6
12:12 13:13 14:6
21:9,17 22:5,15
25:6 28:24 29:3
29:20 30:22 31:3
31:7 35:24 37:17
43:2 45:3 46:18
46:25 47:22 48:5
49:25 51:3 52:15
52:25 54:10,19
56:9,24 58:15,21
60:25 61:15 62:10
63:4 65:13 67:12
68:9 69:5,23 71:5
71:11,17,21 72:16
73:11 74:7,16
75:19 76:4,9,17
77:24 78:6,13,23
79:4,19 80:21,24
81:12 83:5 87:4
87:16 89:20 90:9
90:21 92:10,24
93:3,8 94:2,21
95:4,6,13,18 97:4
98:9,22 100:14
101:23 103:2,6,11
105:5 106:9,19
109:3,8 110:8,16
114:1
**far** 30:13 41:23
42:4 43:25 58:10
59:5 91:15 96:13
**farm** 91:11
**fault** 32:10

**feel** 54:18
**feet** 55:11
**figure** 100:5
**file** 63:16 64:4
87:20 91:20,25
92:9,21 105:10,17
**filed** 4:24 61:13
**files** 62:22
**fill** 24:4,13 25:3
36:21 37:6,15
40:20 41:4,13
42:4,12 45:10
54:3 66:19 67:9
69:11 73:21,25
80:6
**filled** 16:3,4 24:11
24:15,25 38:10
44:11,14 48:22
**filling** 23:18,22
24:19 39:22,23
40:7,9,11 43:16
44:4 66:14 67:2
67:20 68:6,14,20
69:4 70:25 75:17
77:21 79:16 82:20
85:14,18,19
**final** 106:15
**financially** 5:16
**find** 32:15 47:24
48:2 62:25 85:18
86:2 92:21 97:19
**finding** 95:9
**findings** 97:8
**fines** 89:11
**finkelstein** 2:3 6:8
**finkelstein's** 65:5
**fire** 1:10,13,16,21
2:8,12 6:4,13
11:25 23:18,23
24:10,14 34:5,9
37:3 43:6 44:24

45:2,10,14,22
46:24 47:5 51:8
51:16 55:4,10,13
57:2 79:16 89:8
89:12 104:14
114:4,5 115:1,2,24
116:1,2,4
**firm** 5:10,13 6:8
**first** 7:22 24:9
27:3 40:7
**five** 46:11 74:9
**fixed** 60:6
**floor** 2:13
**florida** 91:11
**fly** 79:25 80:11
**foam** 56:3
**folder** 65:11 86:17
86:20 87:6,15
88:16,21
**folders** 65:6
**follow** 78:19 96:7
**following** 84:7,8
93:24 95:17 98:15
110:18
**follows** 7:24
**force** 3:16 48:25
**foregoing** 116:5
**form** 3:11 10:15
13:14 25:7 54:20
61:2 89:21
**forms** 26:3
**forth** 112:14
**found** 87:17,23
**foundation** 72:21
73:8
**foust** 41:4 42:2
43:23 44:3 53:17
54:12 55:18 61:20
62:7,18 66:13
72:13 75:13,16
76:13 79:14

**fpc** 80:9 82:3 83:4
**frank** 43:21
**franklin** 1:5 4:22
6:9 114:4 115:1
116:1
**friend** 77:7
**front** 11:7 17:3
20:17 67:6
**full** 8:25 18:22
19:5 73:23
**fully** 21:22
**furnished** 113:12
**further** 3:9,13
110:14 112:17

**g**

**gas** 60:17 89:6,19
**gases** 43:22 59:18
59:20 60:10
**gather** 11:2
**gathering** 11:5
**gauge** 49:20
**gauges** 15:11
**general** 23:14,16
82:5
**generally** 42:15
59:6
**gentleman's** 88:18
**gerstman** 2:11
6:11
**getting** 19:25 74:4
110:8
**give** 8:11 10:3 20:5
27:13 28:9 38:19
88:14 98:23 108:3
**given** 13:22 30:3
33:22 40:4 43:12
44:3 61:21 65:4
65:11 68:24 79:15
83:3 89:11 92:12
95:5 112:15 116:9

**giving** 58:10
**go** 4:16 10:8 13:11
13:15 14:11 22:17
26:20 30:24 32:12
36:25 38:9 46:12
55:5 60:18 70:18
71:12 73:14 74:8
74:10,10,19,21,25
87:16,18 92:21
103:11 106:21
**goes** 82:19
**going** 21:23 48:24
51:24 63:5 65:24
78:7,19 80:3 81:9
84:18 92:22,23
93:11 100:17,21
103:15 108:15
**good** 4:2 8:4 80:5
99:12 101:7,9
**grab** 55:13
**grand** 2:8
**gravity** 38:2
**guard** 88:5
**guess** 60:16 98:17
108:5
**guidance** 77:20
**guys** 21:4

**h**

**h** 7:21 115:3
**hand** 14:2 15:9
20:24 55:4 112:23
**handbook** 63:19
64:10,15 77:5,11
77:16,20 78:2,4
79:2
**handbooks** 59:17
59:19,24 60:10
**handle** 23:15
**handling** 14:17,22
**handwriting**
64:17,21 65:2,24

**happened** 15:12
20:8 39:15 78:17
94:16 100:15
**happy** 74:20
**hardy** 2:7 6:3
**hawkins** 1:22 4:1
4:20 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1,22
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1

111:1,5,13 112:12
113:4
**haworth** 2:11 6:11
**hbandglaw.com**
114:2
**head** 77:25 95:25
**hear** 72:8 74:11,23
**heard** 34:20 45:16
72:6,9
**hearing** 46:16
50:12 69:9 109:7
110:5 113:24
**hearsay** 72:25
**heart** 27:9,10
**held** 1:22 5:4 55:4
**helicopters** 102:19
**helped** 77:8
**hereinbefore**
112:13
**hereto** 3:5 116:7
**highway** 88:9
**history** 52:8
**hold** 67:9 70:8,10
**holding** 67:10
**home** 76:25
107:15
**honest** 50:11
**honestly** 12:23
45:8 95:24
**hood** 57:18
**hours** 14:9 29:23
31:19
**howell's** 51:8,16
**hum** 37:16 53:3
63:17 66:4 80:23
**humor** 71:15
**humoring** 71:18
**hundred** 31:23
**husband** 15:8 19:4
19:16 20:3,12
22:22,24 26:25

27:8,22 28:13
30:21 33:21 35:10
35:16 36:10,15
38:15 40:6 42:10
42:18 43:20,24
45:14 48:4 49:9
50:5 51:2 53:12
53:21 57:9 58:9
59:2,22,25 62:2
66:18 69:9 73:2,5
75:9,15 76:3,11
77:6 79:22 80:6,7
81:21 82:8,17
84:10 85:12 89:23
94:6,12 96:7,16,17
97:12 99:10
107:24
**hydrostatic** 48:8
52:11 90:3,25
91:9,16
**hydrostatically**
49:7,14 52:22
90:17
**hydrotest** 91:10

**i**

**ideal** 101:20
**identification** 9:11
63:10 84:25 97:3
101:17 103:25
110:7
**identified** 14:23
**identity** 53:14
**imparted** 41:25
**incident** 14:18
16:12,18 18:13
34:10 39:3 68:3
68:17 69:17 70:16
78:4 84:8 88:13
88:23 95:17 104:6
104:22 105:11

**included** 54:11
76:8
**includes** 82:23
83:13
**including** 9:15
54:11 66:20
**incorrect** 61:16
**individual** 8:19
102:12
**individually** 10:9
**individuals** 80:17
81:19
**industries** 1:10
**information** 8:25
19:3,21 25:4 30:7
32:14 33:6,10,13
33:15,20 35:9
38:12,14,24 40:22
40:25 42:2,7,9,18
43:10,15,18 44:6
49:10,18,22 50:4,6
50:25 53:9,11,13
64:8 76:6 79:11
79:13 88:20 97:12
97:20 106:10,22
113:8
**informational**
56:5
**initial** 105:7
**inside** 18:19
**inspection** 23:14
35:5 93:22
**inspector** 47:6
**inspectors** 45:24
**instruct** 15:15
78:14
**instructed** 72:3,4
**instruction** 40:4
66:11 71:2 77:21
**instructions** 83:2
86:23

**insurance** 23:15
**intends** 7:6
**interact** 93:19
**interactions** 96:10
**interest** 23:3
**interested** 5:17
112:20
**interfere** 4:12
**interference** 4:9
**intermittently**
79:24
**intimating** 32:8
**investigation** 84:9
88:25 94:9 97:14
**investigator** 99:11
**involve** 75:6
**involved** 38:4 39:9
39:11,12,13 48:14
48:19 51:10 57:3
85:9 91:5
**involvement** 77:10
84:6,7
**involves** 82:12,19
**ipad** 45:24
**issue** 48:11 109:12
**issued** 95:15 104:5
**items** 7:12 14:23
15:5,7,16 16:8
24:10 33:9

**j**

**job** 2:25 23:10
**jobs** 24:17
**juncture** 100:18
**jurat** 110:19
**jurisdiction** 46:24

**k**

**k** 7:21 24:12
**kansas** 2:9
**keep** 15:16 16:9
25:19 50:12 52:23

55:7 74:6 89:16
107:20 108:8
**kept** 14:24 16:16
17:25 25:22 55:21
77:2 86:13 87:10
88:16,20
**kind** 13:24 70:4
79:9 88:12 89:15
105:13
**kinds** 49:6 53:6
55:14
**kingston** 2:4
**kitchen** 12:19,22
13:3 45:12 47:8,9
47:13,16,18,20,25
55:5 57:7,18 82:9
83:14
**knew** 26:23
**knight** 12:19,22
13:4 45:13 47:8
47:10,14,16,18,20
47:25 83:14
**know** 9:16,20
12:21,24 18:10,21
18:25 19:2,4,9,13
19:15,17,18 21:3
21:23 23:25 25:10
25:17,17 26:22,24
27:8,10 31:15
32:9 34:15,18
35:10,14,16,22
36:7,8,10,11,14,15
36:16,17,22 37:11
38:6,13,25 39:4,6
39:8,10,11,14,17
39:19 40:14 41:6
41:14 44:23 45:11
45:12 47:7,17,19
47:21 48:7,9
50:13 51:2 52:6
52:12 53:5,8,18

55:24 58:6,7,21,25
59:2,3,4,7,11,13
59:14,22 60:13,22
61:24 64:23 65:23
66:11,24 69:15
72:25 73:6 76:2,3
76:13,18 77:19,23
78:2 80:15,16,25
81:7,13,14,16,17
81:22,23 82:3,11
82:14,16,17,18,24
83:9,11,20,24
84:16 86:3,13
87:2 88:2,10,15
89:23 91:7,25
92:16 95:24 96:4
96:6 98:12,12,16
99:6,13,23 100:12
102:3 103:10
104:25 107:23
**knowledge** 8:25
23:22 24:8,18
30:8 32:5 34:13
34:15 45:20 47:11
49:3,6 50:24
54:14,24,25 57:24
58:12 59:6,9,16
60:9,12,21 75:22
75:23 76:2 89:15
98:11 102:9,12
103:3
**knowledgeable**
10:12 14:21 96:14
**knows** 31:14 42:19
57:9 94:12

**l**

**labels** 30:5,8,11,14
**large** 69:20 105:16
**lawsuit** 88:24
**leave** 109:22

**left**  102:14
**legal**  56:11 60:4
  114:23
**lens**  99:13
**letter**  84:22 85:2
  85:10 86:4,14,19
  86:21,22 90:12
  91:20 113:19
**letters**  88:19
**light**  92:15
**line**  115:4,7,10,13
  115:16,19
**lines**  25:14 49:2
**listed**  9:24
**lists**  98:2
**litigation**  7:4
  13:23 14:5 45:5
  61:11 63:25
**little**  13:24 17:15
  17:21 19:23 36:24
  56:4 77:12 87:13
**llc**  2:11 6:11
**llp**  1:23 5:6
**lms**  1:7 5:3
**located**  5:6 105:4
**location**  14:16,22
  17:9 27:4
**look**  9:13 18:9
  25:25 64:6,7 67:4
  68:21 73:15 85:6
  87:14,17,19 90:11
  92:5,14,22,22,23
  100:6 105:25
**looked**  44:17
  72:12 92:10,11
  104:21
**looking**  21:2 25:20
  27:2 39:7
**looks**  85:2 86:23
**loss**  14:25

**lot**  51:25 77:12
**lp**  1:10,13 2:8
**lynn**  2:10 6:2

## m

**machine**  17:3
  28:22 67:7,21,22
  68:23
**maintained**  87:6
**making**  65:20
  88:15
**man**  35:15 84:12
**manager**  23:9
  107:17
**manual**  25:16,21
  26:7,9,14,17,18,20
  27:2,7,7,15,19
  28:4 29:9,19
  44:18 45:2,8
  47:14,20,25 77:2
  83:14 107:8
**manuals**  11:24
  12:3,9,16,18,22
  13:4 24:23 25:5
  25:11 45:9 82:25
  107:21 108:6,16
  108:20
**manufacturer**
  47:9 82:4
**manufacturing**
  85:22
**mark**  9:6 30:25
  63:6 84:19 96:22
  101:13 109:4,20
**marked**  9:11
  63:10,22 64:25
  65:6 84:24 97:2
  101:17 103:20,25
  109:10 110:6,10
**markings**  50:10
  50:13,14,18,20

**marriage**  112:19
**materials**  51:7
  82:25
**matter**  4:22 21:6
  112:21
**maximum**  38:7
**mean**  15:24 37:7
  39:15 41:14 48:16
  48:20 67:10
**meaning**  8:18 38:7
**means**  37:22 41:15
  80:25
**measure**  78:9
**mechanics**  38:3
**media**  4:18 93:12
  93:18 111:6
**meeting**  21:11
**men**  55:8
**mentioned**  54:10
  67:16 99:3 107:7
  107:14
**mentioning**  99:25
**met**  22:8 84:11
**microphones**  4:6
  4:12
**middle**  101:10
**missouri**  2:9
**moment**  97:11
**monday**  31:9
**morning**  14:15
  62:23 99:21
**moskowitz**  1:22
  5:5
**move**  22:10 29:5
  46:18 71:7,14,25
  73:13 93:3
**moved**  17:11 27:3
**multiple**  19:9 82:6
  82:8
**municipalities**
  46:6 47:5

**mysterious**  25:19

## n

**n**  2:2 7:21 113:2
**name**  5:9 36:7
  65:7,8 104:18
**necessarily**  102:3
**necessary**  116:6
**need**  9:20 27:19
  31:2,4 36:20 48:2
  49:7 71:7 74:18
  81:19 88:11 89:22
  91:8 93:6
**needed**  40:20
  41:19 46:5
**never**  18:14 19:6,6
  20:7 26:22 34:20
  35:14 40:15 41:15
  61:23 62:11,20
  83:23 99:8 100:8
  100:9 101:25
  105:19 108:17
**new**  1:3,23,25 2:4
  2:13,13 5:2,8 27:4
  37:2 46:8,14
  48:23,23 52:3
  55:25 112:4,6,10
**newburgh**  28:21
**nfpa**  54:24 55:2,16
  56:7,18,25 57:4,11
  57:13,15,22
**notary**  1:24 3:15
  7:23 111:18 112:9
  116:13,19
**note**  4:5 6:21
  10:14 46:25 52:15
  56:24 69:23 83:5
  90:21 94:21 98:9
  114:10
**notebook**  11:3
  61:19

**noted** 14:6 111:10
  116:7
**notes** 11:6 65:15
**notice** 7:12 8:7 9:7
  9:10,14,14,24
  20:13 22:11 31:22
  84:3 110:3 113:17
**noticing** 5:25
**notification** 97:25
**nsr** 1:7 5:3
**number** 4:18 5:2
  13:25 46:10 87:24
  87:25 88:3,12
  90:12,16,20 91:13
  91:14 93:13,18
  111:6
**numbers** 64:9
  89:23

**o**

**o** 7:21
**o'clock** 93:9
**object** 61:2 78:14
  89:20 95:8
**objected** 71:23
**objection** 7:9
  10:15 12:6 13:13
  25:6 31:25 43:2
  45:3 47:2,22
  52:16,20 54:19
  56:9 69:24 76:17
  77:24 78:6 79:19
  81:12 83:6 90:9
  90:22 94:22,23
  95:4,13,18 97:5
  98:10,22 101:25
  105:6 106:9,19
**objections** 3:10
  5:22 61:13
**obligation** 61:8
**obtain** 27:24

**obtained** 51:7
**obviously** 64:12
**occasions** 108:18
**occurred** 104:13
**offhand** 81:14
**office** 23:9,14,16
  25:23 55:21 65:5
  66:7 77:3 87:10
  92:3 107:17
**officers** 89:10
**offices** 1:22
**okay** 31:10 85:5
**once** 7:8 39:15
  80:14 102:16
**ones** 55:23 102:4
  103:7 107:4
**online** 27:25 48:24
**open** 67:5,5
  109:23
**opened** 19:7
**operates** 40:10
**operational** 46:9
**opportunity** 31:21
**oprandy's** 1:16,21
  2:12 6:13 8:8,14
  8:20 9:2,7,9 10:5
  10:11,21 11:19
  12:9,18,21 13:4,19
  13:22,24 14:5,18
  15:15,17,21 16:9
  16:13 17:7 19:3
  22:13,20,21,23
  23:3,6,11 24:24,25
  25:4 26:12,14
  27:5 28:11 30:4
  30:19 33:5,8,18
  34:23,24 36:20
  38:14 39:20 41:3
  41:24,25 42:12,24
  43:12,14 44:2
  46:3,21 47:7,20,25

48:20 49:5,12
  50:8,15,17,24
  53:15,15,18 54:13
  54:17,24 56:6,7,15
  56:16,17 57:12,21
  57:21,24 58:3,8,12
  59:5,9,12,16,23
  60:2,9,11,21 61:25
  62:5,6,12,16 63:6
  63:8,23 66:10,12
  67:18,20 68:2
  69:2 70:14 71:2
  73:9 75:10,11,12
  75:21,23 76:6,15
  77:5 78:22 79:8
  80:15 81:7,17
  84:6,7,19,21,22
  85:3 86:15 87:7
  91:7 93:21 94:5
  95:12,15 96:14,23
  96:24 98:7,14
  101:14,15 103:21
  103:22 104:3,20
  104:21 105:9
  106:18 107:20
  108:7,14 109:5
  110:4 113:16,19
  114:5 115:2,24
  116:2,4
**orange** 67:24
**ordeal** 20:9
**order** 1:24 19:23
  91:8
**ordered** 32:20
**original** 86:7
**osha** 14:23 15:7,13
  15:15 16:8 25:25
  26:4,6,8 27:22
  38:16 61:21 62:8
  62:11,19 68:22
  70:19 84:4 93:20

94:5,8,14,16 95:5
  95:16 96:11,12,19
  96:21 97:2,7,15
  98:8,21 99:3,7
  100:23 101:12
  102:4,23 105:10
  106:16 113:21
**osha's** 84:6 97:13
  100:8 103:24
  104:4 105:10,17
**outcome** 5:17
  112:20
**outside** 10:22
  11:11 45:4 61:10
  78:9 79:22
**overriding** 97:5
**oversee** 23:13
**owner** 22:22 29:22
  31:17 52:23
**owners** 42:12
  53:15
**ownership** 23:2
**owns** 22:21

**p**

**p** 2:2,2 4:1 5:1 6:1
  7:1,21 8:1 9:1
  10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1
  31:1 32:1 33:1
  34:1 35:1 36:1
  37:1 38:1 39:1
  40:1 41:1 42:1
  43:1 44:1 45:1
  46:1 47:1 48:1
  49:1 50:1 51:1
  52:1 53:1 54:1

55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
**p.m.**  1:20 4:4
  111:3,10
**page**  64:15 85:14
  94:24 97:23
  103:23 104:4
  110:19 113:3
  115:4,7,10,13,16
  115:19
**pages**  74:9 96:19
  96:22,25 113:21
**paid**  87:11
**papers**  65:7
  105:16
**paraphrase**  32:19
  32:23 43:13 90:13
**parsed**  60:16
**part**  12:14 16:14
  27:24 38:5 64:10
  109:10
**partially**  18:22
**parties**  3:5 4:16
  13:23 96:20 106:3

112:18
**partners**  2:3 6:8
**party**  1:14,17 2:7
  2:12 5:15 6:5,12
  8:15
**patricia**  1:22 4:20
  111:5,13 112:12
  113:4 114:5 115:2
  115:24 116:2,4,12
**patrick**  88:4,11
**patrick's**  88:17
**patty**  73:22 87:5
**pay**  106:23
**paychecks**  23:13
**payroll**  23:12
**pen**  104:24
**penalty**  97:25
**people**  55:23
**perfect**  104:25
**period**  17:19 35:2
**person**  9:3 10:11
  96:13
**personal**  23:21
  76:2 102:9,12
**personally**  8:14
  23:25 39:4 40:14
  50:19,22 58:5,24
  59:10,21 60:14
  73:5 97:21
**personnel**  63:15
  64:3
**phone**  88:16
**phones**  4:11
**photo**  100:25
  101:14,19,21
  103:10 104:8,11
**photograph**
  100:22 101:9,16
  103:23 104:4,18
  104:20,25 113:22

**photographs**
  30:12 51:5 69:19
  70:19 99:16,17,20
  99:25 100:2,4,9
  102:13
**photos**  102:2,11
  102:24
**physical**  20:24
**physically**  102:7
**pick**  4:7 73:3
**picture**  73:15
  101:7 104:19
**pictured**  104:8,10
**pictures**  18:7
  30:11 45:25 67:25
  68:22 99:4,7,8,14
  99:23 100:10,12
**pike**  46:16
**place**  4:11,15
  15:20 16:17
**plains**  1:23 5:7
**plaintiff**  1:6,14 2:3
  2:8 6:6,9,12
**plastic**  17:15
**please**  4:5,10 5:23
  7:18 9:13 22:10
  26:2 29:4 70:19
  71:7 73:15 74:21
  74:25 85:18,25
  105:7 109:21
**point**  21:10 26:13
  60:2 64:13
**poland**  67:14
**portable**  55:4
**portion**  22:6
**portions**  46:19
**poseidon**  1:8,9
  4:23 12:2 16:15
  16:20 18:4 25:15
  26:15 27:7,15,18
  28:4 30:5,9,15

32:25 33:7,25
  34:7,25 35:6 36:5
  36:12,19 44:9
  51:17 76:15,20
  85:20 100:23,25
  104:17 107:9
**possession**  12:8,18
  13:5
**possibly**  78:9
**powder**  24:11
**power**  24:12
**premises**  102:21
  107:8,22 108:8,21
**prep**  11:15
**preparation**
  100:16
**prepare**  10:19
  20:4 21:7 22:13
  28:5 97:18
**prepared**  10:3
  13:7,8,9,16 14:3
  22:9 28:9 31:11
**preparing**  105:20
**present**  2:16 5:18
  35:20 40:16 83:24
  84:12,17 99:18
**preserve**  15:16
  16:9
**pressed**  89:6
**pressure**  38:7,8
  58:2,20 82:13
**pressurization**
  94:25
**pressurized**  42:13
**presume**  32:18
**presumes**  83:6
**presuming**  32:6
  52:16 61:4
**pretty**  66:17
**prevent**  108:15

**primary** 94:4
**prior** 20:22 61:14
  78:17 113:23
**private** 4:7
**privilege** 100:20
**privileged** 21:12
  21:16 106:10,22
**probably** 54:3
  58:9 81:21 85:11
  86:5,16 92:3
**problem** 31:8
  32:11
**procedure** 42:4
**procedures** 85:18
**proceeding** 5:22
**proceedings** 1:1
  2:1 3:1
**process** 24:19
  41:25 42:4
**produced** 7:3
  13:18 14:4 63:24
  106:2 110:11
**producing** 61:9
**production** 13:20
**products** 1:10,13
  2:8 6:4 12:10,13
  12:13 82:6,8
  114:4 115:1 116:1
**professional** 79:9
**prompted** 88:24
**protex** 107:25
**provide** 8:24
  10:20 20:14 28:5
  28:11 29:11,18
  30:19 33:11,18
  39:20 42:16,22
  43:8,9 49:15
  55:16 60:8 69:2
  77:16
**provided** 14:8
  20:21 29:22 41:7

53:6 61:20 62:7
  62:11,18 63:13
  66:12 68:18 76:14
  93:5 96:11 109:14
**provides** 43:15
**ps** 64:25
**public** 1:24 3:16
  7:23 111:18 112:9
  116:19
**purchase** 36:18
**purchased** 33:2,8
  34:3,4,8 51:16,21
  52:7 53:7
**purchasing** 35:4
**purple** 24:12
**pursuant** 1:24
  96:20 110:2
**put** 15:19 17:15,23
  36:24 37:9 48:24
  48:25 55:3 65:8
  66:19 67:8 68:5
  68:13 69:10 73:3
  73:17 74:2 75:7
  77:8 96:3 101:9
  105:7 107:25
**putting** 43:22
**pyro** 83:13

## q

**quarterly** 106:23
**question** 3:11 10:2
  13:14 14:12 28:23
  29:12 35:25 36:4
  37:10 43:4 54:21
  56:11 57:11 59:15
  60:7,15 61:2
  72:22,23 74:4,5,15
  74:24 75:2 76:21
  78:21 79:5 81:18
  89:21 92:25
**questioning** 7:15
  32:11 78:10

100:18
**questions** 7:6,7,16
  14:14 20:17 24:4
  24:6,23 25:14
  31:13 34:2 49:20
  61:5 97:6 107:2
  108:24 109:2
  110:15
**quick** 107:4
**quickly** 60:18
**quite** 80:4
**quotes** 55:9

## r

**r** 2:2 7:21 112:2
  115:3,3
**rating** 38:7
**reaching** 94:14
**read** 9:25 26:23
  28:16,18 29:14,15
  29:17 31:15 61:19
  71:13 74:3,9,14,19
  75:2,3 90:20
  94:11,13 105:15
  114:9 116:5
**reading** 90:15
  95:10
**ready** 11:9,19 12:3
  19:25 20:13
**realize** 101:19
**really** 8:18 32:24
  36:3 37:5 40:15
  40:24 45:19 47:18
  60:6 66:16 67:3,6
  79:7 83:24 91:5
  96:7 98:23,24
  99:12 103:6
**reason** 78:13 95:2
  114:11 115:6,9,12
  115:15,18,21
**reasons** 53:24,25

**recall** 26:8 94:14
  94:19 95:10
**receipt** 114:18
**received** 64:4
  72:14,17,17 94:7
  96:20 98:8,15,21
  105:19 106:18
**recess** 93:14
  103:13
**recharging** 43:5
**recognize** 104:7
**recollection** 86:10
  104:22
**record** 4:3,17 5:21
  6:15 22:6 28:18
  29:17 32:17 52:23
  56:25 75:3 93:12
  93:17 103:12,16
  103:17,19 109:17
  111:3 112:15
**recorded** 4:19
**recording** 4:14
**records** 52:8,13
  53:6 86:15
**refer** 55:22 107:12
  108:15,20
**reference** 108:3,6
**referenced** 58:18
  87:21 101:4 114:6
**referred** 99:2
**referring** 18:3
  22:7 52:21 67:14
  91:14 100:5
**refers** 56:25
**regard** 100:19
**regarding** 12:19
  36:18 44:3 104:5
  109:7 110:6
  113:24
**regulate** 89:15

regulates 89:5
regulations 89:4
regulator 35:7
39:2,9,11,12,13,17
39:22 40:5 82:13
regulators 15:11
39:7 41:18 49:21
69:12
relate 90:2
related 5:15 14:18
30:4 85:19 105:10
112:18
relates 51:6 54:13
62:21 66:8 90:16
relating 6:25 7:7
59:18,20 97:6
relevant 78:17
remedial 78:8
remember 26:2
removable 73:16
73:19
removed 17:20
repair 35:5
repeat 81:2
report 95:11 96:19
97:2 99:7 103:24
104:5 105:14
113:21
reporter 5:12 7:18
74:19 112:9
representation
102:6
representative
11:10,21 20:15
29:8 30:4 42:21
49:12 106:8,13
110:2
reps 84:3
request 6:17 13:19
64:2 92:8 96:21
105:9

requests 113:8,13
required 46:23
47:4 116:13
requirements
80:17 81:8
requires 47:10
reserved 3:12
resolution 106:16
respect 11:25 13:3
14:24 23:18 24:24
40:5 42:24 43:4
57:11 58:12 60:9
60:15 66:13 67:2
68:11 69:3 71:3
72:14 97:13
105:17 106:7,17
respective 3:5
response 8:6 13:19
35:25 36:4 47:23
63:25 64:5
responsive 46:20
restaurant 48:23
restaurants 45:15
restraining 66:9
result 94:9 99:16
retained 111:8
retrieve 108:11
return 114:13,17
review 11:24
114:7
revisit 93:7
right 14:2 16:24
16:25 32:15 34:5
35:3 37:15,19
64:16 66:6 76:8
90:19 101:2,6,8
104:17
rin 91:8
road 90:25
robert 53:22

room 5:19 16:21
16:22 17:13,16,24
39:17 73:20 102:7
102:16
rooms 102:21
rothstein 2:17 5:9
round 67:4
rq 92:7
rul 78:19
rules 46:7 55:9
rulings 113:11
run 55:12
ruptured 94:17

**s**

s 2:2 7:21,21 115:3
safe 15:20
safety 1:16,21
2:12 6:13 54:15
54:17 66:25 67:17
67:19 68:4,12,18
69:15 70:8,15,23
71:4 72:2,14
73:10 75:13,17
91:4 101:5,21
104:16 105:3
sarah 2:10 6:2
74:13
save 98:5
saw 18:7 35:14
40:15 41:15 99:6
99:8 100:8 102:2
102:11
saying 34:15
says 20:6 64:19
85:14,17,25 94:24
97:24
scba 67:8,16,20
68:5,6 69:21 70:9
scope 45:4 61:11
scott 1:22 4:1,20
5:1 6:1,25 7:1 8:1

9:1 10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1,16 20:1 21:1
22:1,25 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1,16 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1,22 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1,15
76:1 77:1 78:1
79:1 80:1 81:1
82:1,3 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
111:5,13 112:12
113:4 114:5 115:2
115:24 116:2,4,12
scott's 63:14
scuba 36:21 54:3
66:21

**sealed**  17:14
**sealing**  3:6
**search**  106:6,11
**second**  85:13
**see**  13:11,15 14:19
  32:13 46:15 62:25
  63:18 64:14 80:12
  85:13,23 98:3
  99:10,15,17
  104:16 105:21
**seen**  9:16,18 23:24
  26:23 44:25 45:11
  45:17,21,23 47:13
  61:23,25 62:3,6,16
  62:20 67:25 70:13
  83:8 85:8 100:3
  105:15
**self**  36:23
**send**  26:10
**sending**  26:8
**sense**  8:21 81:4
  103:5
**sensitive**  4:6
**sent**  46:2 91:22
  114:14
**separately**  6:20
**september**  1:19
  4:4 112:23 114:3
**series**  63:9 113:18
**served**  8:7
**service**  45:17
  81:19
**serviced**  35:11
  36:5,13 49:23,25
**services**  5:11,14
  111:9
**servicing**  35:5,12
  35:18 80:18,21
  81:3,10
**sessions**  83:3

**set**  16:25 72:20
  73:7 80:3 112:13
  112:22
**settlement**  106:16
**shape**  67:15
**sheet**  64:8 114:11
**sheets**  23:15
**shook**  2:7 6:3
**shop**  55:8 76:23
  104:12
**shorthand**  112:8
**show**  52:24 100:21
**showed**  100:9
**side**  17:4,5 104:17
**sign**  114:12
**signature**  112:25
**signed**  3:15,17
  64:15 114:20
**simply**  28:23
**single**  31:21 80:4
**site**  40:12
**sitting**  59:7
**size**  69:21 70:10
**sizes**  55:14
**small**  38:2 49:3
  55:2
**soldered**  73:18
**sole**  22:22 29:22
  31:17
**solutions**  114:23
**son**  53:22
**sort**  61:9
**sound**  34:5
**sounds**  59:6 91:19
**southern**  1:3 4:25
**speak**  11:18 20:2
  20:25 22:12,18
  27:19 32:17 61:10
  75:8 98:19
**speaking**  22:20

**speaks**  35:21
  109:17
**specific**  42:3 43:13
  43:25 71:2,20
  72:12 82:4
**specifically**  41:7
  41:23 73:4
**specificities**  44:6
  98:20
**specificity**  41:2
**spelled**  60:3,5
**split**  6:17
**spoke**  11:14
**spring**  67:14
**ss**  112:5
**stack**  105:16
**standards**  57:5
**stapled**  65:21
**state**  1:24 5:19,23
  102:15 112:4,10
**statement**  6:14
**statements**  61:19
  62:6,17
**states**  1:2 4:24
  80:12
**station**  96:2
**stayed**  102:21
**steel**  66:17 67:7
  73:19,24,24 101:7
**steps**  40:15,20
  41:4 42:11,19
**stick**  20:7
**sticks**  95:25
**stipulated**  3:3,9,13
**stipulations**  3:2
**stop**  7:10 32:6
  93:8 100:17
**stopped**  89:10
**storage**  14:17,22
**store**  1:9

**stores**  1:9
**story**  20:7 50:12
**stream**  88:8
**strike**  22:5 46:18
**stuff**  77:13
**sub**  54:23 57:24
  58:19
**subject**  21:5 49:13
  50:10
**subpoenaed**  15:7
**subscribed**  111:15
  116:14
**subsection**  59:16
**subsequent**  78:8
**substance**  22:11
**suggest**  31:8
**summarize**  98:6
**supply**  89:8
**supposed**  13:2
**suppression**  11:25
  37:3 43:6 45:15
  45:22
**sure**  17:19 19:14
  29:15 80:24 81:25
  82:22 90:7 107:23
**swear**  7:18
**sworn**  3:17 7:22
  111:15 112:14
  116:14
**system**  16:15,20
  17:8 18:5,23
  19:12,21 25:15,22
  26:15,19,21 30:6,9
  30:15 32:25 33:4
  33:7,25 34:3,8,12
  34:17,22 35:2,6,7
  36:6,13,19,20 37:3
  37:12,14 38:6
  39:23,24 40:21
  41:5 44:9 45:13
  45:22 46:8,9,13

47:9,10 48:24
51:17 53:16,20
54:6 68:15 83:16
84:15 85:20 99:4
100:23 101:2,5
102:24 107:9
**systems**   1:8,9 4:23
12:20 25:2 43:6
45:15,18 55:5
57:7 83:18 107:21
107:25

**t**

**t**   7:21,21,21 112:2
112:2 115:3,3
**take**   4:15 9:13
15:18 17:21 18:2
40:12 45:25 63:3
73:17 76:24
104:24 109:16
**taken**   4:20 30:11
48:22 93:14 99:3
100:3 102:24
103:13,23 104:4
105:23
**talk**   13:8,9,17 14:3
20:18 27:17 69:9
**talked**   9:21 21:4
61:18
**talking**   15:2 25:19
39:18 44:22 88:3
**tan**   30:8
**tank**   15:3,4,19,23
15:24 16:3 24:5
38:9 40:20 41:5
42:5 44:12,15,18
44:20 48:11,12,14
48:17,19 49:13
50:10,14,18,21
51:9,10,12,15,20
52:2,3,7,8,10,13
52:25 53:4,7 54:4

66:21 67:8,16,20
68:5,7,13,14,20
69:4,21,22 70:9,11
70:25 73:3,21
75:18 81:5 94:17
**tanks**   17:22 18:2,4
18:10,17,22,23
19:10 23:19,23
24:25 25:3 36:21
38:5 40:7,9 41:14
42:13 43:5,17
44:5 49:4,7 60:17
66:19 67:2 68:19
77:21 79:17 80:18
81:10,19 82:20
107:21
**tara**   2:14 6:10
108:25 114:1
**tara.fappiano**
114:2
**tell**   22:3 35:17
40:3 41:11 42:23
47:15 90:13
**ten**   26:3
**term**   48:9 69:12
**terminology**   45:16
**terms**   67:15
**test**   16:3 23:19,22
24:5 37:2 44:14
45:22 46:5,15
47:10 48:8,12,17
51:9,12,15,20
52:21,24 68:13,14
68:19,20 69:4,21
70:11,25 90:17
**tested**   49:8,14
52:11,22,24 53:2,4
**testified**   7:24 22:8
31:18 38:16 51:4
76:5,10 92:18
94:3 97:10

**testify**   13:2 22:10
30:14 31:11 35:23
76:12 97:21
**testifying**   8:13
61:3
**testimony**   6:24
8:11,23 10:3,21
13:6 14:9 20:5,14
22:14 26:12 27:14
28:5,9,11,14 29:7
29:10,18,21 30:13
30:20 32:24 33:11
33:19 34:23 38:19
42:16,22 43:8
49:16 50:9,16
58:11 60:8 62:4
62:15 68:2 70:13
70:17 74:10 75:11
75:12 77:16 86:18
92:15 93:6 109:14
109:25 112:15
114:9,18 116:8
**testing**   68:12 90:3
91:2,9,17
**tests**   42:13 46:22
**texas**   80:13
**thank**   108:23
110:17
**thick**   66:17
**thing**   20:8 101:10
**things**   12:17 21:2
22:4 24:7 25:5
31:13 32:7 52:17
56:5 89:16 101:8
**think**   13:16 16:10
25:18,21 30:18
33:18 37:5 50:5
70:2,21,22 71:6,9
71:19 72:11 77:6
77:13 79:7 91:21
108:2 109:8

**thinks**   94:16
**third**   1:14,17 2:7
2:12 6:5,12
**three**   46:11 54:11
71:6,11,22 73:12
73:13
**time**   3:12 5:23
16:18 17:19 18:13
19:8 26:13 34:3,7
34:9 35:2 39:2
68:3,17 69:16
76:16,23 78:3
79:3 93:10,15,24
98:5 103:14,18
111:10 114:19
**timeframe**   114:8
**times**   26:25 35:11
41:22 60:4 71:6
71:12,22 73:12,13
80:2 102:22
**title**   23:8
**today**   9:16 10:4,20
11:4,9,16,20 12:4
13:6,17 14:5 17:7
18:10,12 19:20
20:2,22 21:6,21
22:14 28:6,10
29:7,11 30:14
33:12 38:22 42:21
49:16 50:15,16
58:11,14 59:7
61:14 64:24 77:17
78:5,16 79:2
97:18,21 105:21
109:15,25
**today's**   29:25 30:2
**told**   15:18 42:17
**top**   64:18 65:3,9
65:25 67:5 77:25
**topic**   10:2,4 12:17
12:25,25 13:3,8,10

13:18 14:16 28:2
28:6,10 31:22
32:21,23 33:12,19
33:24 35:4,8
42:11,15,22,25
43:11,19 51:6
53:14 54:13 58:10
62:21 66:8 78:12
**topics** 7:8 9:15,23
10:13 13:16 20:4
20:5,12,22 21:6,15
21:20 29:6,25
30:2 32:5,13
60:22 61:10 79:6
84:2 96:9,15
109:24
**total** 111:6
**totally** 70:18
**touched** 18:14
**tow** 40:10
**track** 99:24
**tracking** 51:13
**trade** 79:9
**train** 41:17 69:8
73:9 75:7,13
**trained** 41:4,9,24
43:20,21,23 75:9
75:16 79:21 80:6
82:7
**training** 39:21,25
40:3 41:8,11 42:3
43:11 68:25 69:10
72:12 75:5,24
76:7 79:16 80:8
82:5,12,12,19,20
82:23 83:3,12,22
**trainings** 44:2
83:16
**trains** 43:14
**transcript** 31:6,16
32:16 109:6 110:5

113:23 114:6,20
116:5,8
**transcripts** 6:19
105:22
**transportation**
84:23 85:4 89:5
113:20
**transported** 90:19
102:17
**transporting**
89:18
**trial** 3:12
**trooper** 102:15,19
**truck** 40:10
**trucks** 89:9
**true** 96:5 112:15
116:8
**truth** 47:15
**try** 56:22
**trying** 67:11 100:5
**tuesday** 73:17
**turn** 4:10
**twice** 29:4 71:24
**two** 6:18 24:9,16
54:8,9 93:18
102:17 111:7
**tyco** 1:10,13 2:8
6:4 114:4 115:1
116:1
**type** 58:24 66:20
67:24 72:21
**typed** 61:22 62:17
85:11
**types** 24:13 25:11

**u**

**u.s.** 84:23 85:3
113:19
**uh** 37:16 53:3
63:17 66:4 80:23
**understand** 8:10
9:4 25:9 84:16

**understanding** 8:5
27:6 37:20 46:4
46:21 48:13,18
56:6,16,17,20
57:12,20 60:18
66:23 70:7 89:3
98:7
**uniforms** 77:13
**unit** 4:18 93:13,18
**united** 1:2 4:24
**units** 111:7
**untouched** 17:9
**updates** 108:2
**use** 8:17 24:13
37:14 39:21 40:5
47:8,17 55:24
66:8,13 67:19
69:3,16 70:24
72:3 73:10,21
74:2 75:13,16
78:5 82:12
**uses** 37:5 69:12

**v**

**v** 114:4 115:1
116:1
**valve** 49:20
**vans** 55:9,20
**verify** 114:9
**veritext** 5:10,14
111:8 114:14,23
**veritext.com**
114:15
**version** 64:23
**versions** 62:17
**versus** 4:22
**vessel** 37:15 39:23
58:2,20 91:17
**vessels** 89:6,18
90:3,18 91:9
**victory** 1:8,9

**video** 4:14,19
**videographer** 2:17
4:2 5:12 7:17
93:10,15 103:14
103:18 111:2
**videotaped** 1:21
**violation** 87:25
**violations** 95:16
98:8,14,17,20
106:17
**visit** 87:11

**w**

**w** 7:21
**waived** 3:8
**walk** 9:25 17:6
**wall** 17:4 96:4
**want** 6:14 10:9
29:13 45:6 46:7,8
55:23 62:23 63:2
71:12 74:12 76:24
92:20 109:22
**wanted** 25:25
27:17 47:24 87:13
88:19 99:10,24
107:12 108:12
**warehouse** 17:23
**warnings** 43:12
44:2
**wash** 96:2
**watch** 41:18
**watching** 40:17
**water** 67:14 88:6
**way** 60:13 81:23
83:11,20 107:7
108:14 112:20
**wednesday** 73:18
**week** 11:14
**weight** 89:25
**went** 15:10 19:23
39:8 73:20,25
80:7 86:22

| | z |
|---|---|
| **westchester**  1:23 5:7 | |
| **whereof**  112:22 | **zipper**  17:15 |
| **whispering**  4:7 | |
| **white**  1:23 5:7 | |
| **wilson**  1:22 5:5 | |
| **witness**  7:19 10:16 11:13 14:8 29:13 31:10 32:4 36:3 45:6 58:23 61:4,9 62:13 65:19 72:24 74:23 87:9 100:11 109:13 112:12,16 112:22 113:3 114:8,10,12,19 | |
| **woman**  84:11 | |
| **word**  8:18 47:16 | |
| **wording**  45:20 | |
| **words**  95:22 | |
| **work**  57:18 81:3,4 | |
| **working**  81:10 | |
| **worthington**  1:9 | |
| **write**  23:12 | |
| **writing**  85:10 | |
| **written**  65:16 82:25 | |
| **wrong**  60:3 90:14 | |

| x |
|---|
| **x**   1:4,12,18 113:2 |

| y |
|---|
| **yeah**  85:16 |
| **year**  79:24 80:14 |
| **years**  46:10 77:8 |
| **yellow**  18:6 |
| **yellowish**  67:24 |
| **york**  1:3,23,25 2:4 2:13,13 5:2,8 112:4,6,10 |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.