EXHIBIT "C"

Page 1

1   UNITED STATES DISTRICT COURT
2   SOUTHERN DISTRICT OF NEW YORK
3   Civil Action No. 7:17-cv-05915 NSR/LMS
4   ----------------------------------------x
    FRANKLIN BUONO,
5

                        Plaintiff,
6

            v.
7

    POSEIDON AIR SYSTEMS, VICTORY AUTO
8   STORES,INC., et al.,
9                       Defendants.
10  ----------------------------------------x
                        May 2, 2018
11                      10:02 a.m.
12

            VIDEO-RECORDED DEPOSITION of
13  OPRANDY'S FIRE & SAFETY EQUIPMENT, by
    BRIAN SCOTT, taken by the Parties Present,
14  pursuant to Subpoena, held at the offices
    of Finkelstein & Partners, LLP, 1279 Route
15  300, Newburgh, New York, before Abner D.
    Berzon, a Registered Professional
16  Reporter, Certified Realtime Reporter and
    Notary Public of the State of New York.
17
18
19
20
21
22
23
24
25

Page 2

```
 1   A P P E A R A N C E S :

 2

 3

     FINKELSTEIN & PARTNERS LLP
 4   572 Broadway
     Kingston, New York 12401
 5        Attorneys for Plaintiff
 6   BY: KENNETH B. FROMSON, ESQ.
          kfromson@lawampm.com
 7

 8

     BOWLES & VERNA LLP
 9   2121 N. California Boulevard, Suite 875
     Walnut Creek, New York 94596
10        Attorneys for Defendants
          WORTHINGTON INDUSTRIES
11
     BY: SHELLEY A. MOLINEAUX, ESQ.
12        smolineaux@bowlesverna.com
13

14

     SHOOK HARDY & BACON, LLP
15   2555 Grand Boulevard
     Kansas City, Missouri 64108
16        Attorneys for Defendant
          TYCO FIRE PRODUCTS, sued as
17        ANSUL, INC., and TYCO FIRE
          SUPPRESSION PRODUCTS, TYCO
18        FIRE SUPPRESSION SYSTEMS
19   BY: SANDRA R. STIGALL, ESQ.
          sstigall@shb.com
20

21

22   A L S O   P R E S E N T :

23

        CHRIS HANLON, Videographer
24      PATTY SCOTT

25
```

Page 3

1                S T I P U L A T I O N S

2

3          IT IS HEREBY STIPULATED AND

4    AGREED, by and among counsel for the

5    respective parties hereto, that the

6    filing, sealing and certification of the

7    within deposition shall be and the same

8    are hereby waived;

9           IT IS FURTHER STIPULATED AND

10   AGREED that all objections, except as to

11   form of the question, shall be reserved to

12   the time of the trial;

13          IT IS FURTHER STIPULATED AND

14   AGREED that the within deposition may be

15   signed before any Notary Public with the

16   same force and effect as if signed and

17   sworn to before the Court.

18

19

20                *      *      *

21

22

23

24

25

Page 4

1          THE VIDEOGRAPHER:  Good morning.
2     We are going record at 10:02 on May
3     2nd, 2018.  Please note that the
4     microphones are sensitive and may pick
5     up whispering, private conversations,
6     and cellular interference.
7          Please turn off all cellphones
8     or place them away from the
9     microphones as they can interfere with
10    the deposition audio.
11         Audio and video recording will
12    continue to take place unless all
13    parties agree to go off the record.
14         This is Media Unit No. 1 of the
15    video-recorded deposition of Brian
16    Scott, taken by counsel for defendant,
17    in the matter of Franklin Buono vs.
18    Tyco Fire Products, LP, filed in the
19    U.S. District Court, Southern District
20    of New York, Case No. 7:17-cv-05915.
21         This deposition is being held at
22    Finkelstein & Partners, located at
23    1279 Route 300, Newburgh, New York.
24         My name is Christopher Hanlon.
25    I'm from the firm of Veritext.  I'm

Page 5

1         the videographer today.  Our court
2         reporter is Abner Berzon, also from
3         Veritext.  I'm not related to any
4         party in this action, nor am I
5         financially interested in the outcome.
6              At this time, I would ask
7         counsel to please state your
8         appearances for the record.
9              MR. FROMSON:  For the plaintiff,
10        Franklin Buono.  My name is Kenneth
11        Fromson of the law firm of
12        Finkelstein & Partners.
13             MS. MOLINEAUX:  Shelley
14        Molineaux, on behalf of Worthington.
15             MS. STIGALL:  Sandy Stigall, on
16        behalf of Tyco Fire Products.
17             Thank you.
18             Are you counsel?
19             MS. SCOTT:  No.
20             MS. STIGALL:  We also -- in
21        addition -- well, do we want to go
22        ahead and introduce Patty?
23             MR. FROMSON:  Sure.
24             MS. STIGALL:  Patty Scott is
25        also in attendance here today, in

Page 6

1       addition to the deponent, Brian Scott.

2            THE VIDEOGRAPHER:   Thank you.

3       At this time, our court reporter can

4       swear in our witness and we can

5       proceed.

6

7       B R I A N   S C O T T , having first

8       been duly sworn by Abner D. Berzon, a

9       Notary Public of the State of New

10      York, was examined and testified as

11      follows:

12   EXAMINATION BY MS. STIGALL:

13      Q.    Mr. Scott, could you spell your

14   first, middle, and last name?

15      A.    Brian, B-r-i-a-n, middle initial

16   E, last name Scott, is S-c-o-t-t.

17      Q.    What is your present home

18   address?

19      A.    5 Lake Ridge, two words, Drive,

20   Middletown, New York, 10940.

21      Q.    And are you one of the owners of

22   Oprandy's?

23      A.    I am the sole owner present.

24      Q.    What is the present location of

25   Oprandy's?

Page 7

1       A.      49 Brookline, B-r-o-o-k-l-i-n-e,
2   Avenue, Middletown, New York 10940.
3       Q.      And we're here today concerning
4   an incident that occurred at Oprandy's on
5   February the 12th, 2016.  Did that
6   incident occur at that Brookline address?
7       A.      Yes.
8       Q.      Mr. Scott, do you understand
9   that you're here today pursuant to a
10  subpoena issued to have you testify at a
11  deposition in this civil action?
12      A.      Yes.
13      Q.      And I'm going to show you what
14  we will mark as the next consecutive
15  deposition exhibit here in a minute, and
16  just let me ask you if that's the subpoena
17  that you received that prompted your
18  attendance here today?
19      A.      Yes, it is.
20          MS. STIGALL:  Okay.  If we could
21      go ahead and mark that Defendant's
22      Exhibit 10.  I think we stopped at 9
23      yesterday.  I don't know if we have it
24      in your notes, Shelley, but that's
25      what I have.

Page 8

```
 1            MS. MOLINEAUX:  Yeah, I think
 2      you're right here.
 3            (Defendant's Exhibit 10,
 4      subpoena, marked for identification,
 5      this date.)
 6      Q.    Let me ask you:  Is it your
 7  understanding, or do you understand, that
 8  you would have a right to have legal
 9  counsel for you --
10      A.    Yes.
11      Q.    -- here today?
12            And you've decided not to do
13  that?
14      A.    Correct.
15      Q.    Alright.  What I think I'd like
16  to do first -- well, let's go over some
17  preliminary matters.  Have you ever had
18  your deposition taken before?
19      A.    No.
20      Q.    Do you understand that the court
21  reporter is going to take down what you're
22  saying in written form and the
23  videographer is taking a video of you as
24  you testify?
25      A.    Yes.
```

1     Q.    Do you understand this is much
2  like testifying in court in that you're
3  under penalty of perjury --
4     A.    Yes.
5     Q.    -- like you would be in court --
6     A.    Yes, I understand.
7     Q.    -- and sworn to tell the truth?
8     A.    Yup.
9     Q.    Can I ask you -- sometimes I get
10  a little turned around in may questions --
11  if I ask you a question and you don't
12  understand the answer, would you please
13  tell me and I'll try and rephrase it?
14     A.    Yes.  Okay.
15     Q.    As far as getting a good record
16  here today, one of the things that's
17  important is that I completely finish my
18  sentence before you answer.  And I know,
19  in normal conversation, a lot of times we
20  can anticipate what the question is, and I
21  have a bad habit --
22     A.    I'm good at that myself, yes.
23     Q.    -- I want to jump right in.  And
24  in order that the court reporter can get a
25  good record here today, if we can both try

Page 10

1   our best to let the other person finish

2   speaking before we respond --

3        A.    Okay.

4        Q.    -- or before I ask another

5   question.

6             If at any time during this

7   deposition you feel that you need a

8   break -- for any reason whatsoever --

9   please just tell us and we'd be more than

10  happy to allow you to take a break.

11       A.    Okay.

12       Q.    The only thing -- the only time

13  we really don't want a break is, say, I've

14  asked a question and you haven't answered

15  it yet.  We just need to answer the

16  pending question and then we take the

17  break.

18       A.    Okay.

19       Q.    Are you under any type of

20  medication, drug, alcohol, anything

21  whatsoever today, prescription medication,

22  anything, that would hamper your ability

23  to answer completely and truthfully?

24       A.    No.

25       Q.    I think what I want to do first,

```
                                            Page 11
 1   before we get into the deposition, is to
 2   go over -- and I understand this is an
 3   extensive list of exhibits, of items that
 4   you were asked to produce at the
 5   deposition here today --
 6       A.    Okay.
 7       Q.    -- and so we can talk about--
 8   I'm about read ready to sneeze -- what you
 9   brought and --
10            MS. SCOTT:  Uh-huh.
11       A.    Uh-huh.
12       Q.    -- if there's anything that you
13   maybe have that, for whatever reason, you
14   didn't bring today.
15            So --
16       A.    Yeah, let me have that.  That's
17   the same copy I've --
18       Q.    I was going to say --
19       A.    No, I got mine.
20       Q.    Okay.
21            MR. FROMSON:  Thank you.
22       Q.    Number 1 is all photographs of
23   the scene where Mr. Buono's accident
24   occurred on February 12th, not limited to
25   photos of the area where the accident
```

Page 12

1    occurred, the equipment and the tools.

2              Did you bring any photographs

3    with you here today?

4       A.    No.

5       Q.    Do you have any photographs

6    other than the photographs that were taken

7    by OSHA when they investigated the

8    incident?

9       A.    No, I have no photos.

10      Q.    You didn't take any photos on

11   your phone or --

12      A.    I did, but I don't have them.

13      Q.    Okay.

14      A.    I was -- I was told to basically

15   look at 'em and delete 'em.

16      Q.    When did you delete them?

17      A.    Probably about, pshwew, maybe a

18   month, a month and a half after.

19      Q.    And who told you to delete them?

20      A.    One of my -- one of my vendors

21   who I deal with that in Jersey happened to

22   be a retired police chief out of Jersey

23   and we got talking with this -- you know,

24   it's all in the network, all the guys

25   talk, one of the vendors --

Page 13

1    Q.    I understand.

2    A.    -- who are very supportive, and

3  he says, "If you have any pictures on

4  you," he says, "You better just get rid of

5  them," he says," just delete them," and

6  plus, I don't want to look at them.  It

7  was just a -- two years is enough now.

8  It's just...

9    Q.    So is it your testimony here

10  today that you have no photographs of the

11  scene where the accident occurred or

12  equipment or tools in your possession,

13  electronically or whatever --

14    A.    No.

15    Q.    -- today?

16    A.    No.

17    Q.    The second item is all documents

18  used by Oprandy's to train employees

19  concerning the filling of tanks with

20  compressed air, the filling of tanks with

21  agent or hydrotesting tanks prior to the

22  date of the incident.  I do see a tab

23  thing here that says "Training" on it, but

24  you know what?  Let me do this.  Let me

25  hand you the documents --

Page 14

```
 1        A.    Okay.

 2        Q.    -- that I just received, and if

 3  you could pull out for me what would have

 4  to do with the -- what would be responsive

 5  to that inquiry regarding training

 6  documents.

 7        A.    Well, basically the -- the

 8  training with Chris Foust was basically an

 9  in-house procedure that I trained him.

10  There is really a -- there is a procedure

11  from Poseidon, but I had my own procedure,

12  which I trained him on.  I -- that's the

13  way I was taught and that's the way I just

14  rolled it over to him.  As far as

15  documentation, I had some here.  I don't

16  know if I'll find it.  The employee

17  handbook.  Yeah, I don't have it here.

18  But, anyway...

19             Basically, it was -- it was just

20  air only.  I mean, this -- yeah.

21        Q.    Okay.  But let me -- okay.  Do

22  you have any documents to produce today?

23  Were there any documents that showed

24  training Christopher Foust or -- I'm

25  including in that Mr. Buono -- received
```

Page 15

```
 1    prior to the incident concerning the fire
 2    suppression equipment and -- or --
 3    concerning filling of tanks with
 4    compressed air, tanks with air.  I thought
 5    I saw something earlier.  If you want me
 6    to --
 7         A.    I just --
 8               MS. SCOTT:  It is there.  I gave
 9         it to you.
10         Q.    You want me to go ahead and look
11    through that and see if I see anything
12    that's responsive?
13         A.    Let me see if I can find it.
14    You know where that it is, Patty?
15         Q.    I know there's a lot here.  So,
16    I mean, let me just go through this a bit
17    at a time.  These, I think, where letters.
18    So I don't think it's -- it may be in one
19    of the other files.
20               Can you hand me the other
21    documents and I'll --
22         A.    Okay.
23         Q.    -- look through it quickly and
24    see if I can find it in there.
25               I am seeing three documents so
```

Page 16

1    far -- maybe this would also include -- be

2    included.  There's an employer copy, "Keep

3    file in employee's personnel file."  It's

4    an acknowledgment that Chris received

5    Oprandy's Fire & Safety Employee Handbook.

6         A.    Correct.

7         Q.    And it looks like, from the

8    document he signed, that he received the

9    employee handbook on 8/17/2015 --

10        A.    That's correct.

11        Q.    -- is that correct?

12              I'm going to set that aside --

13        A.    Okay.

14        Q.    -- because we'll maybe just put

15   these together.

16              Then -- where did I just put the

17   other one? -- there is a document, it

18   looks like a letter, it's "Re:  Revised

19   Shop Procedures, to certify that

20   Christopher Foust has been refamiliarized

21   with shop procedures and the layout of the

22   new facility, he's comfortable with the

23   handing of extinguishers."  That looks to

24   be dated on November 10th, 2015.

25        A.    Correct.  That's just when we

1   moved into our -- we bought -- we

2   purchased -- we just moved into Brookline

3   Avenue in August.  We moved in 1st of

4   November and that was a revised copy of

5   new procedures.

6        Q.    And then there's a document

7   dated July 23rd, 2013, Re:  Air Compressor

8   Cascade System Training to certify that,

9   on July 23rd, 2013, Christopher Foust was

10  properly trained on the correct filling

11  procedure for SCBA cylinders?

12       A.    Correct.  That was at my old

13  location in Florida, as you can see by the

14  address.

15       Q.    And then after that, I actually

16  have the Oprandy's Fire & Safety Equipment

17  Hazard & --

18       A.    Handbook --

19       Q.    -- Communications Handbook.

20       A.    -- Hazard Communications,

21  correct.

22       Q.    Does the document that's dated

23  July 23, 2013 and the addendum, I guess,

24  do those relate to training concerning the

25  cascade system?

1      A.    Yes.

2            MS. STIGALL:  What I think I'm

3      going to go ahead and do is put these

4      documents -- that's, one, two -- three

5      separate pages -- and then we add the

6      Oprandy's Fire & Safety Equipment

7      Program -- and we're going to put

8      those together as the next consecutive

9      exhibit, which would be Deposition

10     Exhibit --

11            THE WITNESS:  11.

12            MS. STIGALL: -- 11.

13            Can we possibly get a stapler in

14     here, because once I start putting

15     these together get, I am going to get

16     them messed up, I'm afraid.  We'll go

17     off the record for a minute.

18            THE VIDEOGRAPHER:  Sure.  The

19     time is 10:18 and we're going off the

20     record.

21            (Defendant's Exhibit 11, various

22     documents related to safety

23     procedures, marked for identification,

24     this date.)

25            (Pause.)

Page 19

```
 1            THE VIDEOGRAPHER:  The time is
 2      10:20.  We're back on the record.
 3  BY MS. STIGALL:
 4      Q.    Regarding the items that you
 5  were to bring with you today, training
 6  records, the number 2, documents used to
 7  train Oprandy's, are there any other
 8  documents that would be responsive, other
 9  than these pages that I just marked as
10  Defendant's Exhibit 11?
11      A.    No.
12      Q.    And let me just give you a for
13  example.  And I think you said you trained
14  Chris on the Poseidon system?
15      A.    Correct.
16      Q.    Was -- was there any piece of
17  paper, any document in that training, that
18  he reviewed or that you had him review as
19  a part of his training on the Poseidon
20  SYSTEM?
21      A.    In regards to the operation of
22  it?
23      Q.    Yes.  In regards to the filling
24  of tanks with compressed air, was there
25  any document used or shown to him?
```

Page 20

1       A.      No.   Basically, the
2   documentation was, from what I know of,
3   how to use it.   I just relayed that -- as
4   the trainer, I just relayed that to him.
5       Q.      Did Chris at any time see any
6   owner's guide or product manual or service
7   manual, technical manual, relating to the
8   air filling system?
9       A.      Not that I know of.
10      Q.      You never showed one?
11      A.      I never showed one to him.
12      Q.      So, to your knowledge --
13      A.      To my knowledge, correct.
14      Q.      And we'll go over that training
15  a little bit later.
16      A.      Yeah.
17      Q.      But right now, it's probably
18  better I just go down my list on items and
19  then we'll take it from there.
20              MR. FROMSON:  Can I make a
21          suggestion, just along that line of
22          questioning?  Can you ask him whether
23          he possessed one, understanding that
24          he didn't show him one, not to his
25          knowledge.  I don't know if he had one

1      to show him.
2             MS. STIGALL:  Yeah, I -- can I
3      go into that later?
4             MR. FROMSON:  Absolutely.
5      Q.    Well, do you have any manuals
6      related to the Poseidon system --
7      A.    I have --
8      Q.    -- I'm talking about?
9      A.    I have the book from Poseidon
10     that I think OSHA took at the time of the
11     accident, because I cannot put my fingers
12     on it.  I -- maybe -- umm -- maybe I
13     should say this now, but that compressor
14     was purchased by Poseidon, but built by --
15     I did not purchase it from Poseidon.
16     Q.    Yeah.  And we'll go into --
17     A.    Okay.  We'll go into that later.
18     Q.    -- all that later.
19     A.    I think when this all happened,
20     I have actually a three-ring binder, has
21     manuals, the specs on it, that I think
22     OSHA has it, because we can't find it.
23     Q.    Okay.  And just to clarify, did
24     the binder and the items in it just relate
25     to the compressor, or did they also relate

Page 22

1    to, for example, the cascade system, is

2    which -- you know, is the tanks that are

3    connected to it?

4        A.    Yes.

5        Q.    Was it the whole ball of wax?

6        A.    The whole ball of wax, because

7    it was -- they're both -- it's two

8    separate items, but they both work

9    together.

10       Q.    And we'll go over those later,

11   but is your testimony here today that you

12   currently don't -- you had those items

13   before, you think they maybe went to OSHA,

14   but you no longer have any manuals, specs,

15   documents relating to the workings, the

16   service or what -- anything being the

17   Poseidon system?

18       A.    Correct.  Yes.

19       Q.    Number 3 is documents -- well,

20   number -- number 3 is documents relating

21   to training Christopher Foust or plaintiff

22   prior to the incident on fire suppression

23   equipment.  And that would be including

24   documents used to train them regarding the

25   design, installation, testing, and

Page 23

1    servicing of fire suppression equipment.

2         A.    I wasn't trained.

3         Q.    Well, are you saying plaintiff

4    wasn't trained?

5         A.    Correct.

6         Q.    Okay.  So there would be no

7    documents about Mr. Buono's training,

8    because he wasn't trained on fire

9    suppression --

10        A.    Correct.

11        Q.    -- systems?

12              What about Christopher --

13        A.    Same thing.

14        Q.    -- Foust?

15              He -- he didn't go out into the

16   field and test or service fire

17   suppression --

18        A.    That's correct.

19        Q.    -- equipment?

20        A.    He did not.

21        Q.    Who did that?

22        A.    I did.

23        Q.    Did Christopher Foust ever see,

24   or did you ever show him, a, for

25   example -- did you ever show him a ProTex

Page 24

1    manual relating to the design,

2    installation, testing and servicing of a

3    ProTex system?

4        A.    No.

5        Q.    Do you have those in your

6    possession?

7        A.    I have to keep my manuals,

8    because I'm a ProTex distributor, so I

9    always have the service manuals.

10       Q.    And you have all the up-to-date

11   manuals?

12       A.    Yes, ma'am.

13       Q.    To your knowledge, did

14   Christopher Foust ever see those ProTex

15   manuals?

16       A.    To my knowledge, no.

17       Q.    And when I say "see", I mean

18   actually open 'em up and review them.

19       A.    No.

20       Q.    To your knowledge, did plaintiff

21   ever review those ProTex manuals?

22       A.    No.

23       Q.    Let's switch to Pyro-Chem.  Did

24   Christopher Foust ever see a technical

25   manual regarding the Pyro-Chem Kitchen

Page 25

1   System?

2        A.     No.

3        Q.     Did Mr. Buono?

4        A.     No.

5        Q.     Do you have in your possession

6   manuals for Pyro-Chem Kitchen Fire

7   Suppression --

8        A.     Yes, I do.

9        Q.     -- Systems?

10            What manuals do you have in your

11   possession regarding Pyro-Chem systems?

12        A.     First, I have the service

13   manuals from my training of Pyro-Chem,

14   ProTex, and all the systems that are

15   available to be serviced, and I also have

16   a parts manual for parts, liquid, any

17   components that go the operation of the

18   systems.

19        Q.     And you said from your training

20   on Pyro-Chem.  Where did you get your

21   training on Pyro-Chem?

22        A.     I got a training from an outside

23   agency.  It's a husband and wife.  They

24   train people in my industry around the

25   country.  I am certified every three

Page 26

1    years.  I have been since 1992, just to

2    stay up on the standards and OSHA, or

3    NFPA, and, you know, all the requirements.

4         Q.    Who -- can you tell me who they

5    are?

6         A.    Sure.  It's called FPC, Fire

7    Protection Consultants, out of Baltimore,

8    Maryland.  The gentleman's name is Edward

9    O'Brien.

10        Q.    Are they affiliated or a company

11   that's related to Heiser ProTex?

12        A.    I don't know if they're -- I

13   can't say they're actually affiliated, but

14   they have the knowledge and the

15   qualifications to do outside training

16   based on what the manufacturers tell them,

17   whether it's Ansul, Amerex, Kidde.  But

18   they have the -- they have the material

19   from the manufacturers of -- or the design

20   companies, and they just train outside.

21   They just train on the outside.

22        Q.    Did -- but they're a separate

23   company from Heiser ProTex?

24        A.    Yes.  Yes.

25        Q.    And they're a separate company

Page 27

1    from Ansul or Tyco --

2         A.    Yes.

3         Q.    -- Fire Products?

4               Have you ever gone through

5    Heiser ProTex training?

6         A.    Yes, I have.  I'm a Heiser --

7    Heiser is the -- my distributor, ProTex is

8    the manufacturer of the system and I am

9    the -- I'm a Heiser -- a ProTex

10   distributor since 1995?

11        Q.    That's an authorized

12   distributor --

13        A.    Correct.

14        Q.    -- correct?

15        A.    Correct.

16        Q.    Are you a Pyro-Chem distributor?

17        A.    I'm not a distributor.  I'm a

18   dealer.  There's a difference.

19        Q.    What's -- okay.  What is that?

20        A.    The difference is that -- just

21   to maybe familiarize your-- quickly here,

22   a Pyro-Chem and a ProTex system are

23   identical.  It's just that Pyro-Chem

24   designed the system, ProTex is a spinoff

25   of Pyro-Chem, same liquid, same control

Page 28

```
 1   head, same -- just a different labeling,
 2   meets the UL 300 standards for kitchens,
 3   but being that I'm a ProTex distributor, I
 4   can buy different parts from Pyr-- through
 5   Heiser of Pyro-Chem, but I can't buy a
 6   whole use.  I can buy a tank but not a
 7   complete system, but I'm a dealer.  If
 8   they -- they call it a dealership, instead
 9   of a distributor.
10       Q.    So am I correct that you are
11   able to, through channels, obtain parts
12   and work on Pyro-Chem systems, but you're
13   not a Pyro-Chem distributor?
14       A.    Correct.  I'm a dealer.  Yes.
15       Q.    Right.  But you're not an auth--
16       A.    Correct.
17       Q.    -- you don't have a contract
18   where you're --
19       A.    No.
20       Q.    -- an authorized distributor?
21             And you haven't been trained,
22   say, in Marinette or specifically by
23   Pyro-Chem?
24       A.    No, but I've been trained
25   from --
```

Page 29

1       Q.      Yes.

2       A.      -- Ed O'Brien --

3       Q.      Right.

4       A.      -- to --

5       Q.      At --

6       A.      -- service -- it's a service --

7       Q.      -- FPC?

8       A.      Right.

9       Q.      But just -- just so I keep the

10  record straight, you have not been trained

11  by Tyco --

12      A.      Correct.

13      Q.      -- Fire Products regarding

14  Pyro-Chem?

15      A.      Correct.

16      Q.      So you have these manuals

17  relating to -- I'm just trying to

18  summarize.

19      A.      Sure.  Go ahead.

20      Q.      So you have these manuals

21  relating to Pyro-Chem systems and ProTex

22  systems, but those documents were not

23  reviewed by either Christopher Foust or

24  Frank Buono?

25      A.      Correct.  There would be no

Page 30

```
 1   reason.
 2        Q.    And they weren't trained on
 3   those --
 4        A.    Correct.
 5        Q.    -- systems?
 6              So you're not producing anything
 7   as to number 3 --
 8        A.    Correct.
 9        Q.    -- number 4 maybe redundant, to
10   a certain extent, and all documents
11   related to the purchase, servicing,
12   operation or repair of the Poseidon air
13   filling system being used on February
14   12th.  I think we already talked about the
15   binder that you had --
16        A.    Correct.
17        Q.    -- had before?
18        A.    Correct.
19        Q.    Do you have any documents that
20   are related to the purchase of that
21   system?
22        A.    No, I don't.  I -- no, I don't.
23        Q.    Okay.
24        A.    I bought it -- I bought it as a
25   used system.
```

Page 31

1      Q.    And who did you buy it from him?

2      A.    I brought it -- I'm a past fire

3   chief of the -- of a fire department in

4   the same town and they --

5      Q.    Middletown?

6      A.    Or it's in Howells, New York.

7   It's Howells Fire District.  They bought

8   it new from Poseidon in 1989 when I was a

9   member.  We upgraded it, the air system,

10  in 2000, it was available for sale, I

11  bought it from the Howells fire district.

12  When I bought it, I bought the compressor,

13  I bought the four tanks, the regulator,

14  all the main -- and the service manuals.

15  And it was serviced from them and

16  Poseidon, on a regular basis, it has to be

17  serviced and do the air testing, and

18  everything like that, and was done by

19  Poseidon.

20     Q.    When was the last time prior to

21  the February 12th, 2016 incident that that

22  system was serviced?

23     A.    Well, the compressor -- without

24  me looking at it, I want to say 2014

25  maybe.  It has to be serviced once a year,

1  minimum once a year.  I want to say

2  either '14 or '15, before we moved.  That

3  was just on the compressor.  As far as the

4  tanks, there really is no service on

5  those.

6      Q.   And was there ever any service,

7  since you bought it, on the -- I think you

8  said you had the compressor, you had the

9  tanks, and you had the regulator.

10     A.   Correct.

11     Q.   Was there ever any service on

12  the regulator?

13     A.   (Nodding)

14          (Discussion held off the

15     record.)

16     A.   No.

17     Q.   And, you know, I should have

18  said that at the beginning --

19     A.   "Yes" or "no".

20     Q.   -- and I usually always say it,

21  although we have the video that's catching

22  this up and down, and side by side, we

23  need to get the record?

24          MS. STIGALL:  And thank you,

25     court reporter, for the...

Page 33

1        Q.    Do you have in your possession,

2    because that was one of the documents,

3    types of documents asked on number 4,

4    documents in your possession showing the

5    servicing the Poseidon air filling system?

6        A.    No.   I have no records in my

7    possession.

8        Q.    On the day of the incident,

9    was -- when the tank was being filled, was

10   the equipment that was being used that

11   compressor and accompanying tanks and

12   regulator that were purchased from you

13   from the Howells Fire Department?

14       A.    Uh-hum.

15       Q.    Those items always stayed

16   together?

17       A.    Correct.

18       Q.    And, I'm sorry, what year did

19   you say you purchased it?

20       A.    2000.

21       Q.    I had that written down, but I

22   wasn't sure.

23             What was the purpose of

24   purchasing it?  What were you going to use

25   it for?

Page 34

1       A.    Well, A) It's a -- the
2   compressor and the air system is for
3   filling air packs, for SCBAs, the fire
4   department's use, because being in the
5   fire business of the DOT retest facility,
6   and I still can still fill bottles.  I
7   send them out now.  It's that you have to
8   fill bottles.  It's -- it's special
9   breathing air -- special breathing air
10  goes through a filter process and
11  everything else.
12      Q.    So, prior to this incident,
13  other than filling these test cylinders
14  with the Poseidon system, what other uses
15  did you put that system to, where were you
16  filling SCBAs?
17      A.    Up until this, no.
18      Q.    What did you use the Poseidon
19  compressor, bottles, regulator for from
20  the time you purchased it in 2000 to the
21  date of this incident?
22      A.    I -- what I used it for?
23      Q.    Yeah.
24      A.    I used it for filling air
25  pack -- or SCBA bottles.

Page 35

1      Q.     Okay.   That's what -- okay.

2      A.     SCBAs, Self-Contained Breathing

3  Apparatus, air packs, Scott packs.

4      Q.     And you did that for the fire

5  department?

6      A.     Fire departments, industrial

7  accounts, whoever needed it, when -- at

8  any given time.

9      Q.     So am I using the right term to

10  say that you're like an air filling

11  facility or -- what's the correct term?

12      A.     Correct, air filling.

13  (Indicating).   It's part of the industry.

14      Q.     So you were filling SCBA bottles

15  for the fire department?

16      A.     For the fire service or

17  industrial accounts.

18      Q.     How about for dive operations or

19  anything like that?

20      A.     No.   I -- it's the same grade of

21  air, but I didn't have the adaptors.   I

22  don't -- I never filled any S-- for -- for

23  dive, no.

24      Q.     So you were filling SCBA bottles

25  for the fire department and for

1   industrial --

2        A.     Industrial accounts.

3        Q.     And then am I correct that you

4   were also using it to fill cylinders that

5   you would use to go out and test systems?

6        A.     Correct.  Correct.

7        Q.     Was that -- is that it, or is

8   there any anything else you used the

9   system for?

10       A.     No, that's it.

11       Q.     From the time you purchased that

12  system in 2000 to the date of the

13  incident, other than -- did you do the

14  work in filling SCBAs and --

15       A.     Yes.  Yes.

16       Q.     Anybody else?

17       A.     Chris Foust, who I trained.

18       Q.     Anybody else?

19       A.     No.

20       Q.     And I'm kind of diverging from

21  the documents, but some of these things

22  are leading certain ways, so -- I'm going

23  to get back to the documents --

24       A.     Okay.

25       Q.     -- realizing that I may follow

1    up on some of this later.

2        A.    That number 4 actually explains

3    about that air compressor, if you look at

4    that air compressor, and I explained this

5    right to OSHA that morning, that air

6    compressor wasn't even hooked up

7    electrically, but it's an integrated part.

8    You have to have the compressor to fill

9    the air bottles.

10        Q.    The bottles were hooked up?

11        A.    The bottles were hooked up.

12    That was it.  But no electric to it and

13    that's the reason why in the beginning I

14    was a little hesitant on giving OSHA the

15    manual.  I says, there's -- there's

16    nothing -- there's no electric.  Here,

17    follow it.  There's no --

18        Q.    But your -- you -- you seem to

19    remember giving them the manual --

20        A.    Yes.

21        Q.    -- for the Poseidon?

22              But they didn't take the system

23    itself?

24        A.    No.

25        Q.    All documents -- number 5:  All

Page 38

1    documents related to the purchase,

2    servicing, operation, or repair of any

3    regulator used at Oprandy's when filling

4    tanks with compressed air or agent in

5    2016.

6              So I'm -- I think 4 we kind of

7    made it cover the regulator, but let's

8    just say this is specifically as to the

9    regulator.

10        A.    Correct.

11        Q.    I'm assuming, since you don't

12   have any documents that have to do with

13   the purchase of the air filling system and

14   the regulator came with it, you don't have

15   any documents about the --

16        A.    No documentation, no.

17        Q.    -- no documentations of the

18   purchase?

19              Did you at any time -- and I

20   think I asked this before, but let's just

21   make sure.  At any time after you

22   purchased the regulator with the air

23   filling system, did you ever at any time

24   service or calibrate the regulator?

25        A.    No.

Page 39

1      Q.    So you don't have any service
2  records on the regulator?
3      A.    No service records -- no service
4  records on the regulator, correct.
5      Q.    And then I'm just going to close
6  the loop, because it says "repair".  Would
7  it be correct that you never did any sort
8  of repairs on the regulator since you
9  purchased it in 2000?
10     A.    That's correct, no repairs.
11     Q.    So as to number 4 -- number 5,
12  you have no responsive documents?
13     A.    No.  No documents.
14     Q.    Number 6, all documents related
15  to the training Christopher Foust or
16  plaintiff received regarding hydrotesting
17  or filling tanks with compressed air and
18  agent prior to February 12th, 2016.  Other
19  than what we already marked --
20     A.    Uh-hum.
21     Q.    -- as a deposition --
22     A.    Correct.
23     Q.    -- deposition exhibit -- I think
24  it was 9 or 10 -- do you have any other
25  documents regarding training of

Page 40

1   Christopher Foust regarding hydrotesting

2   or filling of tanks with compressed air

3   and agent.

4        A.    No, nothing, except for what I

5   gave you for number 2.

6        Q.    And --

7        A.    As far as the -- the

8   testing -- and it says right in number

9   2 -- that the tank was a DOT tank, made by

10  Worthington, that I am not a DOT retest

11  facility, so he had no training on

12  hydrotesting those cylinders, because I

13  don't have the -- you have to have a

14  license with DOT, and I don't have it, so

15  there would be no training, either way.

16       Q.    Did Christopher Foust do

17  hydrotesting of tanks at your facility?

18       A.    Yes, but they were not tanks.

19  They were fire extinguisher cylinders and

20  at low pressure --

21       Q.    Okay.

22       A.    -- which you don't have to be

23  a -- a non -- a non-DOT tank, you do not

24  have to be licensed and I can do 'em.

25       Q.    Did Christopher Foust hydrotest

Page 41

1   extinguishers at your facilities?

2        A.    Yes.   Low pressure.

3        Q.    Okay.   And what do you mean when

4   you say "low pressure"?

5        A.    Anything less than 999 pounds.

6        Q.    P.s.i.?

7        A.    Service pressure.   Yes.   Fire

8   extinguishers are a 100 p.s.i., maximum

9   195, 240.   Service pressure.

10       Q.    Do you, at your facility,

11  hydrotest kitchen fire expression system

12  agent tanks?

13       A.    No.

14       Q.    Where do you go to have that

15  done?

16       A.    I send them out to a company

17  down in southern Jersey.

18       Q.    Prior to the incident, did you

19  ever at your facility do hydrotesting of

20  Pyro-Chem tanks?

21       A.    No.

22       Q.    Prior to the incident, did you

23  ever do hydrotesting of ProTex agent

24  tanks?

25       A.    No.

Page 42

1       Q.      Didn't test any?

2       A.      Didn't test any of them.

3       Q.      What about filling ProTex tanks,

4    refilling them with agent and air; did you

5    do that at your facility?

6       A.      Yes.

7       Q.      And it's I think what they would

8    call recharging?

9       A.      Recharging, correct.

10   Recharging, refilling, the same thing.

11      Q.      Did Christopher Foust do

12   recharging of ProTex tanks?

13      A.      I want to say I don't recall.  I

14   mean, to be honest with you, we were only

15   there for four months from the time I

16   moved into my building to the time of the

17   accident.  I'm going to probably say no.

18      Q.      But even at the other facility,

19   did he do recharging ever, because didn't

20   he -- hadn't he worked there for several

21   years?

22      A.      Yeah, he worked there for

23   several years.  On occasion, I can't

24   recall how many he did.  If we did, we did

25   it together, but most of the time, I did

Page 43

1   most of the recharging, because, like I
2   said, that's my -- that's my forte.  I got
3   all the -- you know, I know all the ways
4   to do it, the proper way.  But I can't
5   recall.
6        Q.    He might have?
7        A.    He might have, yeah.
8        Q.    You don't know?
9        A.    I -- like I said, I don't
10  recall.
11       Q.    Did Frank Buono ever recharge
12  tanks --
13       A.    No.
14       Q.    -- any kind of tanks?
15       A.    No.
16       Q.    So it would be fair to say -- am
17  I correct -- that you don't have any
18  documents relating to training of either
19  Christopher Foust or plaintiff regarding
20  hydrotesting or recharging tanks, which is
21  refilling tanks with compressed air and
22  agent?
23       A.    Yes, correct.
24       Q.    No documents?
25       A.    No documents.

Page 44

1      Q.    7.   All documents relating to
2    the purchase or acquisition of the tank
3    and valve that were being filled at the
4    time of the incident?
5      A.    No.  Can I -- okay.
6      Q.    So you don't have --
7      A.    No documents.
8      Q.    -- have any document?
9      A.    No.
10     Q.    And can you tell me why it is --
11     A.    Okay.
12     Q.    -- that you don't have any
13   documents?
14     A.    The tank -- the tank that's in
15   question was made by Worthington for
16   Pyro-Chem.  It was made for Pyro-Chem
17   distributors to be an air test tank, no
18   labelling, no markings, no siphon tube in
19   the valve assembly, and the tank was green
20   on the collar and red on the bottom, as
21   the pictures showed of what was left of
22   it.
23         The gentleman -- in 2014, I
24   purchased the business called Catskill
25   Fire Systems from my best friend, Rick.

Page 45

1   He was a Pyro-Chem distributor, he bought

2   the tank from Pyro-Chem for a test tank.

3   It probably 1998 when the tank was made.

4   No markings on it.

5            Anyway, prior to me purchasing

6   this in '14, I used to borrow that tank

7   from Rick; "Hey," Rick I need a tank, I

8   need a test tank.  Can I borrow it?"

9            "Yeah, get it back to me, make

10  you sure you fill it with air."  And

11  that's the only thing that tank ever saw

12  was either -- was air.  That's all it was.

13  There was no -- ever no liquid, no -- it

14  was made and sold by Pyro-Chem as a test

15  tank.

16       Q.    You said it doesn't have a

17  siphon tube.  And that -- that's the tube

18  that goes down in and then --

19       A.    That's pick up --

20       Q.    -- delivers --

21       A.    That'll pick up the liquid.  You

22  don't need one with air.

23       Q.    Did it have a valve on the top

24  of it --

25       A.    Yes.

Page 46

```
 1        Q.     -- when you purchased it?
 2        A.     Yes.
 3        Q.     Okay.  And I -- I'm -- we're
 4    gonna try real hard to not talk over each
 5    other, because -- once I start to get
 6    comfortable, I tend to do it, and I think
 7    we all do that.
 8               What's Rick's last name?
 9        A.     Dillon, D-i-l-l-o-n.
10        Q.     And where was Catskill Fire
11    Systems located?
12        A.     Napanoch, New York.  Ulster
13    county.
14        Q.     When did you purchase the
15    company?
16        A.     August 2014.  And this tank was
17    part of the purchase of the business with
18    his inventory.
19        Q.     If we looked at the tank
20    immediately prior to the incident in
21    February of 2016, was that the same valve
22    and tank that you purchased when you
23    purchased Catskill Fire Systems in August
24    of 2014?
25        A.     Yes.
```

Page 47

1        Q.    And there's a gauge on the tank,
2    a pressure gauge?
3        A.    Yes.
4        Q.    That was on there?
5        A.    Yes.
6        Q.    And up until the time of the
7    incident, was the complete valve assembly
8    on the tank?  And by that, I mean, there's
9    a part that goes on the top that --
10       A.    Schraeder.  It's the connecting
11   valve with a Schraeder valve.
12       Q.    Yes.
13       A.    Yes.
14       Q.    Was that on there prior to
15   filling it on that date --
16       A.    I want --
17       Q.    -- to your knowledge?
18       A.    I want to say yes, to my
19   knowledge.
20       Q.    But wouldn't you need to have
21   that on to be able to fill it?
22       A.    No.  That's why I'm -- that's
23   why -- what it is, it's a -- it's a brass
24   valve that screws into the head and it's
25   got a Schraeder valve.  You don't need it

Page 48

1    to fill the tank, but you need it to do

2    the test on the tank, because the

3    connection -- that will screw on to the

4    control head of the fire suppression

5    system that you're doing the test, or a

6    piece of copper tubing, but you don't need

7    it to fill the tank.

8        Q.    If --

9        A.    You need it to discharge it out,

10   but not to come in.

11       Q.    That piece on top has a little

12   valve on it?

13       A.    Yes.  Probably about as big

14   as -- probably about as big as this

15   (indicating) and it's got threads on the

16   outside, and it's got a Schraeder valve,

17   as if you were filling like a Schraeder

18   valve for a tire, and that would screw on,

19   but you could have that off or loose, but

20   it -- you don't need it, because you're

21   filling the tank from the side.

22       Q.    If when you're filling your --

23   the tank, you're pressing down on a valve

24   to put the agent in, would that be the

25   valve that you --

1        A.     You really don't have to push it
2    down when you're pushing air in, but --
3        Q.     But would that be the only
4    valve --
5        A.     Yes.
6        Q.     -- that would be there to press
7    on, the one that I'm talking about that
8    screws into the top?
9        A.     That's not really a valve.
10    That's just a -- it's just a part of
11    the -- part of the component of the
12    system.  You could -- like I said, you
13    could take that -- there's an actual name
14    for it.  You could actually take that off
15    and you could still fill the tank.
16        Q.     Okay.  So it's your testimony,
17    sitting here today, that you're not -- you
18    don't know, one way or another, whether
19    that portion was on the top of the tank at
20    the time it was being filled in February
21    of 2016?
22        A.     Yes.
23        Q.     So as to number 7, you don't
24    have any documents regarding the purchase
25    or acquisition of the tank and valve?

Page 50

1      A.      That's correct.

2      Q.      Do you know if -- or had that

3  valve ever been rebuilt by your company

4  since it was purchased in August of 2017?

5      A.      Rebuilt?  No.

6      Q.      And had the cylinder ever been

7  hydrotested, to your knowledge?

8      A.      No, it was never hydrotested.

9      Q.      Number 8 was all labels,

10  warnings, manuals or other documents in

11  your possession at the time of the

12  incident regarding the design,

13  installation, servicing, repair, testing,

14  filling or refilling of the tank and valve

15  that was being filled by Mr. Foust on

16  February 12th.

17      A.      I have no documentation on that,

18  on that particular tank.  Like we said

19  before, that was part of the purchase.

20      Q.      Well, am I correct that you do

21  have documents that relate to the

22  Pyro-Chem system?

23      A.      Yes.

24      Q.      You have the Pyro-Chem --

25      A.      Service manuals.

Page 51

```
 1        Q.    -- service manuals, the
 2   technical manuals?
 3        A.    Yes.
 4        Q.    And am I correct that those
 5   technical manuals would contain
 6   information about recharging a tank?
 7        A.    Yes.
 8        Q.    Number 9, all notes or
 9   compilations made by you or any Oprandy's
10   employee regarding the incident that
11   occurred.  I think I saw in here there was
12   a document that I believe was -- it's my
13   understanding -- was produced by OSH-- to
14   OSHA that was an incident report.
15        A.    Is that the one from OSHA?  Is
16   that the OSHA incident report?
17        Q.    Well, this is incident report
18   for February 12th.  It looks like maybe
19   something you all put together for OSHA.
20        A.    Yes.
21        Q.    Would that be like notes, I
22   guess?  That looks like that would be
23   responsive to that category?
24        A.    Correct.
25   Everything -- everything that led up to
```

Page 52

1   that day or what was going on.

2       Q.    Other than this document, do you

3   have any other documents that are notes

4   or -- that contain information that you

5   put together that had to do with what

6   happened that day?

7       A.    There should be some paperwork

8   in there from Workmen's Comp, with the

9   incident numbers.  I don't know if you

10  need that or not.  The only thing I don't

11  have -- like I said in my statement, the

12  only thing I don't have is I don't have

13  the original BCI report from the State or

14  I don't have the fire report from the

15  local fire department.

16      Q.    DCI report?

17      A.    BCI, Bureau of Criminal

18  Investigation.  They took a statement that

19  morning along with --

20      Q.    From you?

21      A.    -- OSHA.

22            From me, along with OSHA.  And

23  then there's also the report from the fire

24  department, the basic field incident

25  report.

Page 53

1      Q.    But you don't have those in your
2   possession?
3      A.    No.  I never got them.
4      Q.    You mentioned something else
5   that you thought was in here and I'm going
6   to look through this real quick, let's see
7   if I can locate it.
8      A.    I know there's Workman Comp case
9   numbers in there and everything.
10      Q.    Is this the one you were talking
11   about?
12      A.    This is the -- no, this is the
13   letter in March from the DOT, Department
14   of Transportation.  They came in because
15   of the DOT regulated tank.  So you might
16   want to use that.
17      Q.    Well, it looks like it was from
18   you --
19      A.    Yes.
20      Q.    -- to the DOT?
21      A.    To the DOT.  That was basically
22   after they came in.  They came in like
23   maybe four days after the accident.  That
24   was just a summary of what they were
25   looking for and everything else.

Page 54

1       Q.    So this is information you
2   provided to the Department of
3   Transportation after the incident?
4       A.    Correct.
5       Q.    Okay.  I think I'll put that
6   with this just because it's authored by --
7       A.    Us.
8       Q.    Yes.  But was there something
9   else that you're looking for --
10      A.    Unless.
11      Q.    -- that had Worker's comp?
12      A.    Workman's Comp?  No.  I mean,
13  there was a Workman's Comp case number --
14  two case numbers, and that should be it.
15      Q.    I don't see anything else, but
16  what I think at this point I'll mark these
17  two documents as Defendant's
18  Exhibits 11 --
19      A.    12.
20      Q.    -- 12, which is the incident
21  report by -- for February 12th, 2016
22  prepared by -- who prepared this?
23      A.    My other half.  We did.
24      Q.    Okay.  And that's Pat?
25      A.    Patty, yes.

Page 55

1      Q.      Patty.

2              And then what about the letter

3   to the U.S. Department of Transportation?

4      A.      Same thing.

5      Q.      Pat prepared that?

6      A.      That was compiled by us

7   together, joint effort.

8      Q.      Okay.  We'll go ahead and mark

9   that?

10     A.      We did it fresh, while -- we did

11  it, by the way, while it was still fresh

12  in our minds.

13     Q.      You've already seen these; is

14  that right?

15     A.      Yes.

16             (Defendant's Exhibit 12,

17  February 12th, 2016 incident report and

18  letter to U.S. DOT, marked for

19  identification, this date.)

20     Q.      You know what?  I think I'm

21  going to go ahead and mark also for

22  Defendant's Exhibit A.  These are

23  basically pretty much what I'm going

24  through, the exhibits, the answers for the

25  Exhibit A.  Can you identify that.  I

Page 56

1    think it's just going through and it's an
2    explanation of what was produced.
3        A.    Correct.  This is the same thing
4    that I have.
5        Q.    Okay.  And did you and Patty
6    prepare that?
7        A.    Yes, we did.
8        Q.    Okay.
9              MS. STIGALL:  So I'm going to go
10       ahead and mark that as Defendant's
11       Exhibit 13.
12             (Defendant's Exhibit 13, Answers
13       to Exhibit A, marked for
14       identification, this date.)
15       Q.    Number 10, it looks like that
16    just relates back to the number 2, which
17    is...
18       A.    Training.
19       Q.    ... training.
20             Did you have anything at
21    Oprandy's that listed the steps for
22    filling tanks with compressed air at the
23    time of this incident?
24       A.    Did I?
25       Q.    Yes.

Page 57

1      A.    No.   Everything was from what I

2   know of.

3      Q.    Okay.

4      A.    I mean, I -- verbally.

5      Q.    On the job?

6      A.    Verbally.

7            MS. STIGALL:  I also -- I think

8      we talked about this employee handbook

9      earlier as one of the items he had

10     reviewed.  I'm going to go ahead and

11     mark that as Defendant's Exhibit 14.

12           (Defendant's Exhibit 14,

13     employee handbook, marked for

14     identification, this date.)

15     Q.    Do you -- it looks like this was

16  an employee handbook that was prepared in

17  1998.

18     A.    Yes.

19     Q.    Is that when your business

20  started?

21     A.    No.  No.  I -- my business

22  was -- I bought the business in 1979.  In

23  1998, my older brother came on board and

24  helped me out and he came from that

25  industrial end, came from the Navy and we

Page 58

1    started a small handbook.  It was just him
2    and I, but, as you grow, you get
3    employees, we just worked down the road,
4    so every so often we would revise it, and
5    then when we moved into our new building
6    in '15, we revised it for the final time,
7    which was in August, or whenever we -- we
8    moved in, you know, late quarter --
9        Q.    August --
10       A.    -- of --
11       Q.    It says --
12       A.    -- '15.
13       Q.    -- August of 2015.
14       A.    '15, right.  That's when we
15   bought the building.  We revised it one
16   more time, because I was -- more
17   employees.
18       Q.    So this handbook was the one
19   that was applicable at the time of the
20   accident?
21       A.    Yes.
22       Q.    Number 11 was Christopher
23   Foust's employment file with Oprandy's.
24   What did you bring today that is
25   Christopher Foust's employee file?

Page 59

```
1       A.    It's enclosed.  We brought his,
2   I want to say, his payroll records.
3       Q.    Okay.  I have --
4       A.    You have that.
5       Q.    We have a (indicating)
6       A.    Correct.  Let me see that.
7             No, this is Frank Buono's.
8       Q.    Oh, sorry.  My mistake.
9       A.    What do you have?
10            MS. SCOTT:  I have it.
11            MS. STIGALL:  Patty, do you have
12      that?
13            MS. SCOTT:  Uh-uh.
14            MS. STIGALL:  I did see one
15      document.
16            MS. SCOTT:  Here's that --
17      here's his employee information and
18      this was the decision from there and
19      just his W-4, which I don't think you
20      want.
21            MS. STIGALL:  Yeah.
22      Q.    We'll go -- let me hand you --
23  well, let's mark it first, Defendant's
24  Exhibit 15.
25            (Defendant's Exhibit 15,
```

Page 60

```
 1        Christopher Foust's employment file,
 2        marked for identification, this date.)
 3        Q.    Can you look at what's been
 4   marked as Defendant's Exhibit 15 and tell
 5   me if those are the documents you are
 6   producing as Christopher Foust's
 7   employment file?
 8        A.    Yes.
 9        Q.    So there's also here a document,
10   it says -- read about why you're looking
11   in the files and there's a letter of
12   reprimand to Christopher Foust, and then
13   it looks like there's a couple of letters.
14   I'll hand these to you.
15             Are these also from Christopher
16   Foust's employment file?
17        A.    Yes.
18        Q.    So those should be part of
19   Defendant's Exhibit 15, in terms of
20   documents that were part of his file?
21        A.    Yes.
22        Q.    Something just came to mind
23   that's a little unrelated, but it was our
24   understanding that Franklin Buono found
25   out about the job opening through his
```

Page 61

1    uncle, whose last name is Faust.

2         A.    But no relation.

3         Q.    Okay.  That's what we wondered,

4    if that's no relation to Christopher

5    Foust.

6         A.    Same -- it's Chris was F-o-u-s-t

7    and his uncle was F-a-u-s-t.

8         Q.    Okay.

9         A.    Same pronunciation; just one

10   letter difference.

11        Q.    Thank you.  Thank you.  That

12   came up the other day and I forgot to ask

13   about it.

14              Is there anything that was in

15   his file that you didn't bring today?  And

16   I know I spoke a bit with Pat about

17   Chris's medical records.  I understand

18   there might be some things that are

19   considered confidential?

20        A.    I think that's everything.

21   That's everything as far as our end, as

22   far as employment.

23        Q.    And then 12 is Mr. Buono's

24   employment file with Oprandy's.

25        A.    That's all I have, ma'am.  He

Page 62

```
 1   was only employed with me for 18 days.
 2       Q.    So I have this employee check
 3   record.  Was there anything else in his
 4   employment file?
 5             THE WITNESS:  Patty, what do
 6       you...
 7       A.    I want to say, whatever you
 8   have, this is it.  Short time.
 9       Q.    I guess the question would be
10   whether you filled out a job application.
11             MS. SCOTT:  Oh, yeah, I have
12       that stuff.  Here's his W-9.  Let me
13       just see what else.  The Finkelstein
14       letter...
15             (Discussion held off the
16       record.)
17             MS. STIGALL:  Let's go ahead and
18       go off the record for just one moment
19       while she gets --
20             MS. SCOTT:  That's his
21       information that we filled out.
22             THE VIDEOGRAPHER:  The time is
23       11:05.  We're going off the record.
24             MS. STIGALL:  Thank you.
25             THE VIDEOGRAPHER:  This will be
```

Page 63

1          the end of Media File No. 1.

2                  (Brief recess.)

3                  THE VIDEOGRAPHER:  We are back

4          on the record.  The time is 11:06.

5          This is the beginning of Media File

6          No. 2.

7                  MS. STIGALL:  So we'll go ahead

8          and mark...

9          Q.     These are the documents that

10    were produced as far as Plaintiff's

11    employment file in response to number 12;

12    is that correct?

13         A.    Yes.

14                 MS. STIGALL:  And that will be

15         the next consecutive exhibit, marking

16         exhibit 16.

17                 (Defendant's Exhibit 16,

18         Plaintiff's employment file, marked

19         for identification, this date.)

20         Q.     Number 13 is a copy of any and

21    all insurance agreements Oprandy's had at

22    the time of the incident that provides

23    Oprandy's or its employees coverage for

24    any liability related to the incident.

25         A.     That would be Workman's

Page 64

1  Compensation, which I have.  Hartford

2  Insurance was the carrier, and the case

3  number was assigned to each person on the

4  day of the accident.

5      Q.    Did you bring that with you here

6  today?

7      A.    I want to say no.

8      Q.    Did you have any other insurance

9  other than Worker's Compensation covering

10  the business for incidents that may occur

11  on the premises or covering Oprandy's for

12  liability separate and apart from Workers'

13  Comp?

14      A.    Yes.  I have building insurance,

15  which I have to have, and I have liability

16  insurance.

17      Q.    And did you bring either of

18  those --

19      A.    No.

20      Q.    -- with you today?

21            Did you have a -- you said your

22  Worker's Compensation was with Hartford --

23      A.    Hartford Insurance.

24      Q.    -- Insurance?

25      A.    Yes.

Page 65

1        Q.      Did it have a policy limit?

2        A.      Pshwew!  Not that I know of.

3        Q.      And then your building

4    insurance, who is that through?

5        A.      Oh, at the time, it was through

6    Mutual -- Mutual -- Mutual Insurance, is

7    that the company?  Yes.

8        Q.      And, at the time, I guess would

9    be building insurance that you may have

10   had relating to something happening at the

11   building --

12       A.      Correct.

13       Q.      -- on February 12th, 2016?

14       A.      Correct.

15       Q.      And it's Mutual Insurance?

16       A.      Liberty Mutual.  That's what it

17   was.  It was Liberty Mutual.  They were

18   the policyholders, which I got when I

19   bought the building.

20       Q.      And do you know anything about

21   what type of coverage that provides?

22       A.      That covered -- I know what it

23   covered.  It covered -- it covered the

24   building, it covered content or -- yeah,

25   basically covered the building, whatever

Page 66

1    the requirement was to have when I got --
2    when I purchased the building.
3         Q.    And you mentioned liability
4    insurance?
5         A.    I have to have liability
6    insurance.
7         Q.    And what --
8         A.    That is --
9         Q.    What do you mean you have to
10   have it?
11        A.    To be in business.  It's -- it's
12   a million dollars, a million dollar
13   coverage, million dollars per aggregate,
14   and my carrier is Hometown Insurance,
15   Bohemia, New York, and the policy is
16   written by a company called
17   McNeil & Company out of Canajoharie, New
18   York.  I can't give you phone numbers or
19   zip codes, but I think I did pretty good.
20        Q.    You did very good.
21              Hometown Insurance, would this
22   be the policy that would have applied at
23   the time of the incident in February 12th,
24   2016?
25        A.    No.

Page 67

1      Q.     Okay.  What would have applied?
2      A.     Workman's Compensation only.
3      Q.     No, but I'm saying, was that
4   policy -- were all these policies in
5   effect on that date?
6      A.     Absolutely, yes.
7      Q.     But you didn't bring the copies
8   today; you don't have the copies --
9      A.     No.  I mean, you can -- I don't
10  have them, no.
11     Q.     14.  Any statement or deposition
12  given by you or any Oprandy's employee
13  regarding the incident.  Who did you give
14  statements to?
15     A.     The morning of the incident, I
16  gave a statement to the New York State
17  Police, BCI division, as far as what
18  happened.  I gave it to 'em, it was
19  a quite lengthy statement, because it had
20  to be redone a couple of times because of
21  the language involved, and then I also,
22  right after that, was the Chris Reed (ph.)
23  from the New York State Department of
24  Labor OSHA from Albany came down, I gave
25  him a statement, and both statements

Page 68

1   coincided with each other.

2        Q.    I'm -- I just have to ask you.

3   You said something it had to be redone

4   because of the language of the statement.

5   I wasn't sure --

6        A.    Well, if you don't know the

7   industry, and you're an outsider, it can

8   be difficult to understand.  If you're not

9   in the fire service and you're Joe Fireman

10  or just a plain -- you're not going to

11  know what a cascade system is.  I had to

12  explain the whole operation of a cascade

13  system and compressor and everything else,

14  and, you know -- so there was the layman's

15  operation, but, to me, is -- it got very

16  intricated sic) where you had to actually

17  explain it and, you know, he read back and

18  looked at it and he said, no, we gotta do

19  this, just to make sure it was right, but

20  that's what took so long for him to do it,

21  and the same with the OSHA guy.  I mean,

22  unless you know the language or the

23  industry, it's all new...

24        Q.    So, to kind of put that in a

25  nutshell, because of the technical

Page 69

```
 1   nature --
 2        A.    Correct.
 3        Q.    -- of the equipment --
 4        A.    Correct.  And plus being I've
 5   been doing it so long.
 6        Q.    I have some other documents
 7   here.  A lot of them are from the
 8   different attorneys involved, requesting
 9   information, requesting the inspection,
10   and then both the subpoenas, and then --
11   I'm not sure what this (indicating) is.
12   Is this just a copy of something?
13        A.    Let's me see that.  It could
14   be a copy of a fax maybe.
15             MS. SCOTT:  It's a fax.
16        Q.    Was it --
17        A.    This was a fax sent on April
18   24th.  I don't even know where it went to.
19             MS. SCOTT:  Disregard it.
20        A.    Yes.
21        Q.    Yeah, I don't have any idea
22   what --
23        A.    There's no number or nothing.
24        Q.    There's no information.  What I
25   think I'll do is, once we take a break,
```

Page 70

```
1    I'm just going to -- well, right now, I'll
2    mark the rest of this that you've produced
3    as the next consecutive exhibit, and, at
4    some point, when we have a break, we'll
5    kind of go through it and decide if we
6    need to ask questions about it.
7               (Defendant's Exhibit 17, an
8         Oprandy's January 24th, 2018 letter to
9         OSHA, and various other letters,
10        marked for identification, this date.)
11       Q.    So this, the next exhibit, is
12   Exhibit 17.  The first page has Oprandy's
13   at the top and it's January 24th, 2018 and
14   it's a letter to OSHA from you about when
15   we were talking about trying to get
16   possession of the cylinder --
17       A.    Yes.
18       Q.    -- and to look at the cylinder.
19            And then there are a number of
20   letters after that, we'll just mark these
21   all as Defendant's Exhibit 17.
22       A.    Okay.
23            MS. STIGALL:  When we reach a
24        break, I'll get something maybe to put
25        on there because we won't able to
```

Page 71

1     staple those together.

2          Shelley just got me one.

3     Q.    How long -- and I know you

4  stated it -- let's just start with this:

5  How long had Franklin Buono worked at

6  Oprandy's prior to this incident?

7     A.    18 days.

8     Q.    And during the 18 days that he

9  worked at Oprandy's, what were his job

10  duties?

11    A.    He was working under Chris,

12  through me also, as a -- to work in the

13  shop, getting to know the familiarization

14  of fire extinguishers, types, sizes,

15  classifications, and the procedures for

16  low-pressure testing and/or recharging.

17    Q.    Did anyone other than Chris

18  train Frank on these procedures?

19    A.    Chris did most of the training,

20  but I was basically -- I was there, you

21  know, on occasion, overseeing, as the

22  owner.

23    Q.    What -- so let's talk about what

24  training you did, or were you just seeing

25  what he was doing, or did -- I just want

Page 72

1   to get a clear record.  Did you ever do
2   training of Frank on the work he was
3   there -- he was doing there at Oprandy's?
4        A.    No.
5        Q.    Chris did that training?
6        A.    Yes.
7        Q.    And what did you see Chris do,
8   in terms of training of Franklin Buono?
9        A.    Well, basically, everything I
10  just said before, as far as, you know, the
11  procedure to -- you know, checking dates,
12  checking pressures, putting -- making sure
13  you put the right chemical in the right
14  cylinder, you know, make sure the fire
15  extinguisher come in and they have to
16  be -- if -- so they could be tested,
17  inspected, and the labeling of 'em, the
18  packaging of 'em, send them out the door.
19  There's a whole -- the whole ball of -- it
20  goes into one big ball of wax, that the
21  last thing you do, you tag it out and it
22  goes out to the customer, and then there's
23  the paperwork process.
24       Q.    Would this be kind of what we
25  think about when we say "on-the-job

Page 73

1  training"?

2       A.    Yes, ma'am.

3       Q.    Somebody who's done the job

4  before is showing the next guy how to do

5  it?

6       A.    Yes.

7       Q.    Do you know, were there any

8  documents -- steps 1, 2, 3, 4, 5, 6, 7 --

9  that Chris used when he was training Frank

10 about what to do?

11      A.    I would say Chris had his -- how

12 do I want to put this?  His technique on

13 how to do it the right way.  I mean...

14      Q.    What -- was there, though, any

15 document that was on the wall or that you

16 can produce here today that said, here's

17 what you do:  1, 2, 3, 4, 5, went through

18 the steps?

19      A.    No.

20      Q.    So the training that Chris gave

21 to Frank was a verbal here's what you do

22 first, here's what you do --

23      A.    Correct.

24      Q.    -- this is what you do, because

25 of that, that type of thing?

Page 74

1      A.     Yes.  Hands-on.

2      Q.     In the time that Frank was at

3   Oprandy's, did he do any hydrotesting of

4   fire extinguishers?

5      A.     No.

6      Q.     Would he inspect fire

7   extinguishers?

8      A.     Yes.

9      Q.     Would he take the fire

10  extinguishers apart and basically rebuild

11  them?

12     A.     Yes.  Rework 'em, recharge 'em,

13  yes.

14     Q.     So, Frank's job, it sounds like,

15  it is solely related to fire

16  extinguishers?

17     A.     Yes.

18     Q.     He gets 'em in, he'll inspect

19  'em; if something needs to be rebuilt, he

20  does that; if it -- if they need new agent

21  in 'em, he'll take out the agent and put

22  in new agent and -- what do you --

23     A.     Recharge.

24     Q.     Recharge.

25            What kind of air do you use on

Page 75

1   the fire extinguishers?

2        A.     Nitrogen.

3        Q.     We had some exhibits we used

4   during the deposition Monday that show

5   photographs of various locations, filling

6   stations, whatever you want to call them,

7   at Oprandy's.  When Frank would recharge

8   fire extinguishers, was there a particular

9   filling station or a particular device

10  he'd use to refill the fire extinguisher

11  with nitrogen?

12       A.     Well, it would be a tank with a

13  regulator, with a hose, with a -- an

14  adaptor that we'd fill into the fire

15  extinguisher and pressurize it.

16       Q.     But what I'm -- I'm handing you

17  what was previously marked Defendant's

18  Exhibit 8, Defendant's Exhibit 9, and

19  Defendant's Exhibit 4.  They're

20  photographs.  Could you look at that,

21  those exhibits, and show me where or what

22  device would be used to refill fire

23  extinguishers with nitrogen?

24       A.     Well, this (indicating) has

25  nothing to do with it, because this is the

Page 76

1    room where the explosion was.

2        Q.    So, when you say "this has

3    nothing to do with it" --

4        A.    That's the whole --

5        Q.    -- you're talking about the

6    photographs in Defendant's Exhibit 4?

7        A.    That's a whole -- that's a whole

8    different room.

9        Q.    Okay.

10       A.    That's not even involved.

11       Q.    Okay.  And I would assume then

12   that you mean that he did not use the

13   Poseidon system to refill fire

14   extinguishers with nitrogen?

15       A.    That's correct.

16       Q.    So let's look at the other two

17   exhibits.

18       A.    Number 8, this is a low-pressure

19   test machine for filling low-pressure

20   extinguishers.  This, and the one happened

21   on the bench, and the two on the floor,

22   happen to be water can extinguishers,

23   which get low-pressure tested to 200

24   pounds.  That's test -- that's a -- that's

25   a low-pressure test machine.

1      Q.    What's done at that location?

2      A.    Testing the -- you're testing,

3  so you're putting -- you're testing the

4  integrity of the shell under pressure with

5  water, hydrotesting.

6      Q.    So it's your testimony, as I

7  understand it, that hydrotesting was done

8  at the station that's shown on Defendant's

9  Exhibit 8?

10     A.    Yes.

11     Q.    Did -- to your knowledge, did

12  Mr. Buono ever fill --

13     A.    No.

14     Q.    -- extinguishers at that

15  location?

16     A.    No.  This is a hydrotest

17  procedure.  That's why.  It's two

18  different -- where I hydrotest and where I

19  fill are two separate parts of the

20  building.

21     Q.    And it's your testimony that he

22  never did hydro --

23     A.    To my --

24     Q.    -- test?

25     A.    -- recall, no.

Page 78

```
 1      Q.    Thank you.
 2            MR. FROMSON:  Just for ease of
 3      reference, do you mind if he shows
 4      that exhibit to the camera for five
 5      seconds, if that?
 6            THE WITNESS:  This is --
 7            MR. FROMSON:  You don't have to
 8      answer any question.  Just hold it
 9      steady for a moment.  And that is
10      Exhibit 8?
11            MS. STIGALL:  Yes.
12            MR. FROMSON:  Great.
13            THE VIDEOGRAPHER:  Got it.
14            MR. FROMSON:  Thank you.  And
15      you're about to show a different one?
16            THE WITNESS:  Correct.
17            MS. STIGALL:  What exhibit is
18      that, sir?
19            THE WITNESS:  This is number 9.
20            MR. FROMSON:  Just hold it
21      steady for at least five seconds.
22            Thank you.
23   By MS. STIGALL:
24      Q.    What goes on at the station
25   that's Exhibit No. 9?
```

1      A.    This is where -- to the -- you

2   can't see it in this picture, but, to the

3   right of that workbench is our -- is what

4   they c-- a hopper system which holds the

5   powder, which it works under air from my

6   shop compressor that you -- works off a

7   vacuum system that you fill the fire

8   extinguishers, and then this bench here

9   (indicating) is the workbench that -- and

10  underneath there are all the drawers with

11  all the parts and valve stems we've got to

12  replace, and this (indicating) is where

13  all the work is done, it's rebuilt, and

14  just to the left of it here (indicating)

15  are my nitrogen tanks, and that's how you

16  recharge it.  And you have to recharge it

17  a particular way, and there's adaptors

18  that go into the valve head to hook your

19  nitrogen to, because every fire

20  extinguisher has a different valve

21  adaptor, has a different hookup adaptor.

22      Q.    So where do you get the nitrogen

23  bottles?

24      A.    I buy -- I have a gas company.

25  They fill 'em.  You can't fill nitrogen.

1   You have to --

2        Q.    Do you -

3        A.    I send them out.

4        Q.    -- know what p.s.i. those

5   bottles are filled to?

6        A.    Uh... dah, dah, dah ... either

7   1800 or 2015 pounds p.s.i. or higher.

8   Yeah, at least 1800, 2000 or higher,

9   2-- p.s.i.

10       Q.    Did Franklin Buono use this

11  station when he was doing work that you

12  described on fire extinguishers?

13       A.    Yes.

14       Q.    Which of these stations were

15  used to recharge agent tanks for fire

16  suppression systems?

17       A.    Probably I would fill it at the

18  first station, Exhibit 8, because that's

19  got a sink, if I ever had to wash the tank

20  down or anything like that, plus I like to

21  keep the wet away from the dry, because

22  it's a wet liquid, and then I would

23  rebuild them on the work bench and

24  pressurize them here (indicating), because

25  that's where all my parts are and my valve

                                        Page 81

1  assemblies and my adaptors for recharging

2  it.

3       Q.    Let's go through the steps and

4  where you would be at the certain times.

5  Tell me the steps you would go through to

6  recharge a Pyro-Chem tank, like which

7  station and what you would do.

8       A.    Well, first -- could I have that

9  one back?

10      Q.    Sure.

11      A.    First of all, if you look, this

12 is a pneumatic belt vice they call it.  In

13 order to take the head off the cylinder

14 you have to put it in took him so long to

15 do it, pneumatic belt vice to hold it,

16 because, otherwise, you won't get the

17 valve head off.  You take the valve head

18 off, you'd either -- you dump out the

19 remaining liquid, put in fresh charge of

20 liquid -- usually I like to do that over

21 the sink, because, like I said, it's a wet

22 agent, okay? --  wash anything out that

23 has to be washed, pour my liquid back in

24 the tank, put it back in the vice, because

25 you have to now put the belt around it to

Page 82

1  tighten it, otherwise the tank would
2  leak -- the valve would leak, and then I'd
3  take it or to the other side.
4           I would rebuild the valve
5  either -- either here or at my work bench,
6  but the last thing before it goes to get
7  pressurized, it would come off the belt
8  vice, go over to the workbench, which is
9  here (indicating), and this is where I
10  would fill it with the nitrogen, at this
11  valve.
12           MR. FROMSON:  As a courtesy, can
13      you hold up the other exhibit.  And
14      what exhibit are you holding up now?
15           THE WITNESS:  This is number --
16      this is Exhibit No. 8.
17           MR. FROMSON:  Can you just hold
18      it steady --
19           THE WITNESS:  Sure.
20           MR. FROMSON:  -- for just a few
21      seconds.
22  By MS. STIGALL:
23      Q.   So that's where you would do a
24  lot of your initial work?
25      A.   That's where you -- you have to

Page 83

1    devalve it, pour liquid, and re-- revalve

2    it after you've rebuilt the head, and then

3    go over to here and --

4              MR. FROMSON:  And that exhibit

5         is what?

6              THE WITNESS:  This is 9.

7              MR. FROMSON:  Thank you.

8         A.    And this will be 9.  This is

9    where you would actually pressurize it,

10   because the nitrogen lines are on this

11   side (indicating) of the wall.

12        Q.    Okay.  And describe to me how

13   you hook it up to pressurize it.

14        A.    On the valve head of all fire

15   suppression systems, just like fire

16   extinguishers, there is a port.  It's

17   usually it's a half-inch port and there's

18   a -- you should come out with a piece of

19   pipe, a paw, a half-inch piece of pipe,

20   like a -- I call it a black nipple -- and

21   you'd hook on a recharge adaptor, and this

22   here -- it doesn't show it here -- on the

23   end of the nitrogen tank, towards the end,

24   is a quick connect that you'd quick

25   connect, and in between the quick connect

Page 84

```
1    and the regulator is a ball valve.

2             So you turn the tank on, set

3    your pressure.  One tank was -- it's a

4    two-stage regulator.  One will tell you

5    pressure going into the tank, one will

6    tell you what your pressure is of the

7    tank.  So, if you -- the -- whether it's

8    1800 or -- whatever your maximum --

9    whatever the pressure is in the tank at

10   the time -- and you would turn the valve

11   on and you'd watch the gauge go up on

12   the -- on the cylinder.  When it --

13       Q.    So --

14       A.    -- hits 12:00, you're done.

15       Q.    So I'm going to hand you what's

16   been marked as Defendant 's Exhibit 6, and

17   I understand this is a test cylinder, but

18   I also understand that the valve is much

19   the same.

20       A.    Yes.

21       Q.    When you say you look at the

22   gauge to see that it's filled up, is it

23   the gauge that's on the agent tank?

24       A.    Yes.

25       Q.    So, looking at Defendant's
```

Page 85

1   Exhibit 6, you can't see that gauge

2   straight on; you're kind of seeing it from

3   the side; right?

4        A.    Correct.

5        Q.    That's the gauge you're talking

6   about that you look at?

7        A.    Yes.

8        Q.    And do you look to see if it

9   goes up to the green?

10        A.    Straight up at 12:00.  That's a

11   full -- that's a full charge.

12        Q.    And you would do that if you

13   were filling a Pyro-Chem tank?

14        A.    Any -- any agent -- anything

15   that has a gauge on it, you have to watch

16   that gauge go up; otherwise, something's

17   wrong.

18        Q.    Okay.  So the equipment that

19   you're using is, you're using the tanks,

20   you're using some connection devices, and

21   above them is going to have a handle on it

22   that you can turn off and on the flow

23   of --

24        A.    Yes.

25        Q.    -- nitrogen?

Page 86

1        A.    Yes.

2        Q.    Is -- I'm handing you what's

3    been marked's Defendant's Exhibit 7 and

4    there's an item called a quarter-turn ball

5    assembly.  If you could look at that, it's

6    the middle or the bottom picture.  Is

7    that -- I'm not -- I don't know if that's

8    the same one?

9        A.    That's the same one.  It's the

10   exact same setup.  This is what was used

11   off the cascade system, which is the same

12   setup that I have on the nitrogen

13   system --

14             MR. FROMSON:  Hold it up.

15       A.    -- because you have to have --

16   you have to have some way of shutting your

17   air off, besides going back to the tank.

18   So it -- an in-line ball valve.  You crack

19   it open for a little air, or you can go

20   all the way, or -- and as you -- as the

21   gauge is -- you reg-- this -- this

22   basically -- basically regulates the

23   amount of flow going into the tank, at

24   your discretion.

25             MR. FROMSON:  What exhibit is

1      that?

2              THE WITNESS:  7.

3              MR. FROMSON:  Thank you.

4      Q.    And the picture that's above

5  that is another fitting.  Which side does

6  it go -- does that go into the tank, or

7  can you tell?

8      A.    Oh, boy.  I got to-- it's been a

9  while.

10     Q.    I guess I should ask first:

11 Would that be a fitting that's also used

12 both when you're filling agent tanks and

13 using the cascade --

14     A.    Yes.

15     Q.    -- system?

16     A.    Yes.  This is -- okay, this

17 (indicating) part here, like I said

18 before, coming out of the tank, is a

19 half-inch port.  This is the half-inch

20 nipple (indicating).  So your flow of air

21 is going this way (indicating), because

22 here's your tank (indicating), here's your

23 valve (indicating), here's your nipple

24 (indicating), here's your adaptor

25 (indicating), and then what we did was

Page 88

```
 1   this (indicating) went into here
 2   (indicating) as an extra adaptor, because
 3   this (indicating) has the ball valve on it
 4   for shutoff.
 5        Q.   Okay.  So they basically -- the
 6   picture that's on the front, that fitting
 7   would go on first and -- and --
 8        A.   And you'd hook into either here
 9   (indicating), or you could hook this
10   (indicating) into here (indicating),
11   because you notice that's the male and
12   that's the female.  So you can quickly --
13   you can actually put an extension on it.
14        Q.   But the larger side of the top
15   fitting would be the one that would screw
16   into the tank?
17        A.   Correct.
18        Q.   And am I correct that the
19   smaller side of the top fitting would
20   quick connect --
21        A.   Onto here (indicating).
22        Q.   -- in -- and hold up -- can you
23   just --
24        A.   Yup.
25        Q.   -- hold that up and point to
```

Page 89

1  where that --
2      A.    This (indicating)-- this would
3  go to the tank, this (indicating) would go
4  into here (indicating), because this
5  (indicating) is the male and that's the
6  female (indicating), and this (indicating)
7  would go hook into the line.
8      Q.    Okay.  So, essentially, you've
9  got your tank with your gauge on it;
10 you've got these two fittings leading to
11 the air hose --
12     A.    (Nodding)
13     Q.    -- and then what's next?
14     A.    Your tank, your connection, your
15 line, and then you have your fill site,
16 which is either going to be nitrogen -- or
17 this happens to be the compressed tanks.
18     Q.    When you were doing filling of
19 the --
20     A.    Fire extinguishers?
21     Q.    Right now we're talking about
22 recharging.
23     A.    Correct.
24     Q.    When you're doing recharging,
25 was there a regulator in there somewhere?

1       A.    Off the tank, two-stage

2    regulator.  If you look at it real -- like

3    real close, if you follow that tank,

4    there's a two-stage regulator on there.

5       Q.    The two-stage regulator, when

6    you say it's off the tank, it's off the

7    nitrogen tank?

8       A.    Correct.

9       Q.    Okay.  And then you would look

10   at the gauge on the agent tank, and when

11   that would get to the green, you'd know to

12   turn the valve --

13      A.    (Indicating)

14      Q.    -- and stop the air?

15      A.    Right.

16      Q.    The regulator that was used to

17   recharge tanks that was with that nitrogen

18   tank, is that is the same type of

19   regulator that's used with the Poseidon

20   system?

21      A.    Yes.  It was a -- it was a

22   two-stage regulator.

23      Q.    But I guess the Poseidon system

24   was purchased with the regulator on it --

25      A.    Correct.

```
 1      Q.    -- is that correct?
 2      A.    Correct.
 3      Q.    Was this a regulator that just
 4  came with the nitrogen tank or --
 5      A.    It's a whole -- no.  It's a --
 6  it's a normal two-stage regulator that you
 7  can use in the industry.
 8      Q.    But it may be a different
 9  manufacturer or something?
10      A.    Exactly.  Exactly.  Yes.
11      Q.    Well, it sounds like it's a
12  similar setup --
13      A.    Same concept.
14      Q.    -- whether -- whether you're
15  doing a compressed air tank or whether
16  you're recharging a cylinder --
17      A.    Correct.  Yes.
18      Q.    -- an agent tank?
19      A.    An agent tank, yes.
20      Q.    Thank you.
21      A.    Okay.
22      Q.    It's -- I understand it's --
23      A.    ... the clarification, yeah,
24  let's you...
25            MS. STIGALL:  You're doing very
```

1     well, but I think I need a break.  So

2     can we take -- would ten minutes be

3     okay?

4              THE WITNESS:  Fine with me.

5              THE VIDEOGRAPHER:  Okay.  We're

6     going off the record.  The time is

7     11:35.

8              (Brief recess.)

9              THE VIDEOGRAPHER:  We are back

10    on the record.  The time is 11:54.

11             MS. STIGALL:  While we were

12    taking a break, Patty Scott provided

13    me with some pages that relate to

14    various contacts that were made after

15    the incident, and I have seven pages

16    that we will mark as Defendant's

17    Exhibit 18.

18             (Defendant's Exhibit 18, seven

19    pages that relate to various contacts

20    and background information made after

21    the incident, marked for

22    identification, this date.)

23  BY MS. STIGALL:

24    Q.    And can you identify those as

25  pages put together relating to contacts

Page 93

1    and background information that was

2    collected after the incident by your wife

3    or you?

4         A.    That's everything, yes.

5         Q.    Thank you.

6               Let's talk a little bit about,

7    again, about filling -- well, we were

8    talking about recharging fire

9    extinguishers.  Now let's switch gears a

10   little bit and just talk about

11   refilling -- I'm sorry, refilling agent

12   tanks is what we talked about before;

13   correct?

14        A.    (Nodding)

15        Q.    Yes?

16        A.    Yes.

17        Q.    I just want to switch gears a

18   little bit and talk about the process of

19   refilling a fire extinguisher with agent,

20   and would that be nitrogen also?

21        A.    Yes.

22        Q.    So it's my understanding, from

23   what we talked about before, that that's

24   what was done at the station, and we held

25   this up for the camera before that's on

Page 94

1    Defendant's Exhibit 9.

2        A.    Yes.

3        Q.    Okay.  And can you, in the same

4    way that when we talked about the

5    recharging of agent tanks, can you tell me

6    what were the connections made along the

7    way from the compressed gas cylinder until

8    we're going into the extinguisher tank.

9        A.    Coming off the tank, you have a

10   two-stage regulator; off the two-stage

11   regulator, you have a line of -- whatever

12   length -- to the work bench; you'd have a

13   ball valve which would be a control valve

14   or ball valve; and after the ball valve

15   would be a -- a quick connect which would

16   be a female connection, which, in turn,

17   would hook into the male connection of

18   the -- that will be threaded in on a male

19   thread of it, which will go into the fire

20   extinguisher valve head -- and there's

21   different connections, because every fire

22   extinguisher has a different valve

23   assembly.  So you can have -- probably

24   have at least seven or eight different

25   connections, because each fire

Page 95

1   extinguisher has their own fitting.
2       Q.     Did you train Christopher Foust
3   on the filling of fire extinguishers?
4       A.     Yes, I did.
5       Q.     And as part of your training
6   with Christopher Foust, did you speak with
7   him about the dangers that are inherent in
8   filling containers with compressed gas?
9       A.     Yes, I did.
10      Q.     What did you tell him?
11      A.     Basically, that it's a -- the
12  fire -- the tank on the wall is a
13  pressurized vessel, high pressure,
14  nitrogen; you have to set your gauge at a
15  certain pressure in order -- if -- if
16  you're pressurizing the fire extinguisher
17  to 195 pounds, you can't try to fill it
18  when you only put 100 pounds in.  You have
19  to have at least 195 pounds or greater.
20  25 pounds -- the standard is, if the 195
21  pounds pressure, which is 99 percent of
22  the fire extinguishers on the dry
23  chemical, once you pressurize it, 25 per--
24  25 p.s.i. greater is the maximum.  So if
25  you have 195 pounds going in to the tank,

1    you need 25 to pounds more, which is 220?

2    That's the maximum.  I explained that to

3    him, it's a pressurized vessel, that

4    there's a procedure -- you have the ball

5    valve, you got the handle, and the whole

6    nine yards.  I explained the whole thing;

7    that if the gauge doesn't go up when you

8    put 200 pounds of nitrogen, stop what

9    you're doing.  It's gonna max out at the

10   maximum anyway, so the chance of anything

11   happening isn't -- is slim to none, but if

12   something -- if the gauge doesn't go up,

13   something's wrong; either you didn't -- it

14   didn't bump, powder's caked, or you got a

15   bad gauge, start all over again.

16       Q.    So you said it's going to stop

17   at the maximum.  Do you mean the maximum

18   that the regulator is set?

19       A.    Maximum set the regulator, yes.

20       Q.    Did you train Christopher Foust

21   on setting the regulator based upon

22   looking at the p.s.i. of the fire

23   extinguisher?

24       A.    Yes.

25       Q.    So would I be correct in knowing

1  in -- in -- would you then say that

2  Christopher Foust knew he needed to look

3  at what pressure the fire extinguisher was

4  rated at?

5       A.    Yes.

6       Q.    And you taught him to do that?

7       A.    Yes, I did.

8       Q.    And did you discuss with

9  Mr. Foust if a cylinder is

10  overpressurized, something -- somebody

11  could be get hurt?

12       A.    Yes.

13       Q.    Tell me what you told him.

14       A.    Basically, if it's

15  overpressurized, there's -- it's a

16  limited -- there's a limitation that if

17  you -- you can point so much air into --

18  you can only put so much air into a

19  cylinder before something's going to

20  happen.  If it goes below -- if you're

21  going over 12:00, over -- over 12:00,

22  which is what the gauge is set at, and

23  nothing's happening, or something

24  shouldn't happen, stop what you're doing.

25       Q.    And did you explain to him why?

1      A.    Oh, yeah.  I explained to him

2  that the tank can only hold so much

3  pressure.

4      Q.    And did you explain to him the

5  tank could explode?

6      A.    Probably not.  But I think he

7  was smart enough to realize that, because

8  just -- he was very crafty and very handy

9  and very mechanically inclined, so -- he

10  worked for a body shop part-time and he

11  knew all about air pressures and tires and

12  everything else.  You know, when you --

13  when something's going to -- if -- you

14  know, everything has its limits and he was

15  very knowledgeable about that.

16      Q.    Do you feel like you know -- you

17  knew Christopher Foust well?

18      A.    After three years, yes.

19      Q.    And based upon your knowledge

20  working around him in a shop for the three

21  years, where there are pressurized tanks,

22  is it your understanding that he was

23  the -- he would know that compressed gases

24  can be dangerous?

25      A.    Yes.  I was comfortable with

1  that.

2      Q.    And he would know that he needs

3  to check what are the pressures on a

4  cylinder that's marked with a pressure?

5      A.    Yes.

6      Q.    And would you expect that he, in

7  training Mr. Buono, that he would relay

8  that information?

9      A.    If at the time to be trained,

10  yes.

11      Q.    So the pressure regulator that

12  was used at the nitrogen tank, that would

13  be adjusted depending upon the pressure in

14  the fire extinguisher --

15      A.    Correct.

16      Q.    -- is that correct?

17      A.    When you had said it -- you had

18  said it in the morning, and

19  unless you're -- you would -- you got 12

20  fire extinguishers, you don't have to set

21  the pressure 12 times.  Once you put one

22  at 195 pounds, you set it for 25 pounds

23  over, you set it and forget it.  At the

24  end of the day, you'd back off your

25  regulator and like you shut -- when you

Page 100

```
 1   shut tank off, you always backed off your
 2   of regulator to zero, because you don't
 3   want pressure on the line.  That was the
 4   procedure also.  But once you set that
 5   regulator, unless you get a different tank
 6   pressure, which wouldn't happen, or, if
 7   you did, you would adjust it accordingly.
 8       Q.   When you say "set the
 9   regulators", it's basically to put it at
10   the --
11       A.   It's a --
12       Q.   -- at the --
13       A.   It was a two-stage regulator, in
14   the center was a -- it's a diaphragm.  And
15   you would counterclockwise to decrease it,
16   counterclockwise (sic) to increase it.
17       Q.   What about the regulator at the
18   Poseidon system?  Was that adjusted?
19       A.   Yes.
20       Q.   How was that adjusted?
21       A.   Again, it's a two-stage
22   regulator, one tank -- one -- one port
23   coming off the last tank, or the cascade
24   system tank, and the other line going to
25   the fill, and it was a -- that was a
```

Page 101

1   different type of a regulator, where it
2   was a dial, so you would -- again,
3   counterclockwise to decrease,
4   counterclockwise -- or clockwise to
5   increase, and you would set it the down to
6   zero and set it as you would go.
7        Q.    Just like with the
8   extinguishers, was it your understanding,
9   based upon your training of Christopher
10  and our working around him for three
11  years, that he was aware of the dangers
12  inherent in handling compressed gas
13  cylinders?
14       A.    Yes.
15       Q.    Including the test cylinder at
16  the issue?
17       A.    Yes.
18       Q.    And it would be your
19  understanding, based upon your training
20  and working with him, that he would have
21  been aware, by looking at that cylinder,
22  what the appropriate fill pressure was?
23       A.    Yes.
24       Q.    Because you taught him to look
25  for that?

Page 102

1      A.    Correct.  Yes, I did.

2      Q.    It's stamped on the tank, isn't

3  it, the 225?

4      A.    No.  The 225 -- uh... that tank

5  was only 175.  It was on the gauge.

6      Q.    So 175 --

7      A.    175 was on --

8      Q.    -- was on the gauge?

9      A.    -- the gauge, yes.  The DOT --

10  the DWDLTBW (ph.)(sic) 225 was the DOT --

11  the DOT number.

12      Q.    Right.

13      A.    Correct.

14      Q.    The little green arrow --

15  area on the tank --

16      A.    12:00.

17      Q.    -- said "Fill to 175"?

18      A.    Correct.

19      Q.    That's where you're supposed to

20  put it?

21      A.    Yes, ma'am.

22      Q.    In the time when Franklin Buono

23  was working at Oprandy's prior to the

24  incident, was he engaged in an argument

25  with Christopher Foust?

1    A.    I don't know.  From what I'm
2  hearing, there was some arguments prior to
3  that morning.  I was not there to witness
4  it, but, from hearsay, yes.
5    Q.    Okay.  And I understand you
6  didn't hear the arguments, but I'd like to
7  know is who heard the arguments and what
8  they heard.
9    A.    I had a young girl who worked
10  for me, told my wife Patty that on
11  occasion she would hear Frank Buono and
12  Chris arguing about something.  I don't
13  know what the particular details were, but
14  I do know that, when Patty would come in
15  at 10:00, there would be no more arguing,
16  so... let's read between the lines or
17  whatever, but I wasn't there to witness
18  anything, but that's what I'm hearing.
19    Q.    Who -- can you give me her name,
20  the young girl?
21    A.    Kimberly Tremberger,
22  T-r-e-m-b-e-r-g-e-r.
23    Q.    Where does she live?
24    A.    Pine Bush, New York.  She come
25  in -- she worked a couple of hours a day.

Page 104

1    She -- she was working a couple of hours a

2    day.  Her brother works -- worked --

3    worked -- works and still does work for

4    me.  Kimberly doesn't -- doesn't work for

5    me anymore.  But she was -- they actually

6    walked in right after -- yeah, they walked

7    in on the accident.  Just -- yeah, I think

8    when they pulled into the parking lot was

9    when all -- everything else happened,

10   so...

11       Q.    I thought you said --

12       A.    But she wasn't -- it was 9:00 in

13   the morning.  They didn't come in until

14   like probably 9:00 -- yeah, 9:00, 9:30

15   that morning, yeah.  She worked part-time.

16   So -- but she walked in on the accident.

17   But, prior to accident, she was there

18   whatever days of the week we had her

19   scheduled for.

20       Q.    So you're saying she wasn't

21   there on the morning of the accident

22   before it happened, but on prior mornings

23   she --

24       A.    She was there.

25       Q.    -- heard this arguing?

1      A.    Yeah, she
2   will -- because -- yeah, like they will
3   start at 8:30.  She would come in like a
4   quarter of nine, ten of, with her brother,
5   and between that 9:00 and 10:00 window,
6   she would hear 'em arguing.
7      Q.    So maybe her brother heard them
8   arguing also?
9      A.    Probably not, because, when he
10  would come in, he would go out with me on
11  the road, so I would say no.
12     Q.    What's his name, just --
13     A.    William.
14     Q.    William Tremberger?
15     A.    Tremberger, yeah.
16     Q.    T-r-e-m-b-e-r-g-e-r?
17     A.    ... g-e-r, yes.
18     Q.    Did you ever hear from any
19  source what they were arguing about?
20     A.    No.
21     Q.    And I'm going to ask you --
22  because I heard this -- did you ever hear
23  that there was any type of argument or
24  disagreement between Frank Buono
25  Christopher Foust concerning drugs?

Page 106

```
 1      A.    I -- I never heard anything
 2 about it.  I don't know what Kimberly had
 3 to say about it.  She can maybe tell you.
 4 I don't know, but I -- I personally never
 5 heard anything about it.
 6      Q.    But you never -- I'm not the
 7 saying you hearing it, but did you hear
 8 from any other source that that was what
 9 the argument was about?
10      A.    I'm going to say yes.
11      Q.    And who did you hear that from?
12      A.    I didn't hear it from employees,
13 but I heard it from outside sources that
14 something was -- something was going on,
15 but, to try to pinpoint it to my place of
16 business, I mean, I couldn't.  But you
17 know what they call rumors?
18      Q.    Well, what were the outside
19 sources?  And I understand --
20      A.    People who knew Chris.
21      Q.    Well --
22      A.    Chris came from a big town, his
23 father was a cop, worked in a body shop.
24 You hear all this after the fact.
25      Q.    What's his father's name?
```

1     A.     Randy.

2     Q.     Foust?

3     A.     Yes.

4     Q.     And he's a --

5     A.     Retired --

6     Q.     -- police --

7     A.     Retired police officer in the

8   Town of Warwick.  You hear all the rumors

9   after the fact, but put one and two

10  together...

11    Q.     Christopher Foust passed away?

12    A.     Correct.

13    Q.     Do you know what he died from?

14    A.     Again, drugs.  That's what the

15  word on the street is, seven month --

16    Q.     Illegal drugs?

17    A.     Excuse me?

18    Q.     Illegal drugs?

19    A.     I'm going to say yes.  Seven

20  months after the accident, September --

21           MS. SCOTT:  20.

22    A.     Right around the 20th.

23    Q.     Of 2016?

24    A.     Correct.

25    Q.     Were you on good terms with

1    Chris after the accident?

2         A.    Absolutely.  Patty and I went

3    down and saw him at the hospital, he took

4    us right on his wheelchair, showed us a --

5    you know, he was in very good spirits, I

6    actually cried on the way out the door,

7    and then we picked up him up probably --

8    that -- when he got released from the

9    hospital -- picked him up, went out to one

10   of my restaurant accounts and took him out

11   to dinner.  Rode right next to me in the

12   front seat.  Oh, yeah.  We had no -- we

13   did -- and -- and -- and he -- first thing

14   he said to -- matter of fact, his father,

15   the night of the accident, called me,

16   after all the dust settled, and actually

17   said to me, he says, "Don't hold yourself

18   responsible for what my son did."  And he

19   said -- and Chris said the same thing.  He

20   says, "It's not your fault."  He says,

21   "I'm -- I'm still your friend."  He loved

22   us -- he loved us both.  We're like a

23   family to him.

24        Q.    Did Chris ever talk to you about

25   what he thought caused the accident?

1      A.    No, but small town, the fire

2    department who handled the call,

3    his -- stone throw from my shop, I'm a

4    past fire chief from the same town, and I

5    was told by one of the fire departments

6    that, when he was conscious through this

7    whole thing, all I heard him say was, "I

8    didn't hear the air flow, so I opened up

9    the valve more," or "...full bore."

10   That's exactly what he told him, and then

11   after that, that's all -- everything else

12   is...

13     Q.    You mean, as he's laying there

14   after he was --

15     A.    Oh, as they were treating him.

16   He was conscious through this whole thing.

17   He said right to 'em, "I didn't open up --

18   I didn't hear..."  it was a cold morning,

19   first of all.  It was the coldest days in

20   February and they filled the tank, had a

21   heater right above 'em, and he actually

22   told him, he says, "I didn't hear -- I

23   didn't hear the air flowing, so I opened

24   up the valve..." either "full bore" or

25   "more," and take it from there.

Page 110

```
 1       Q.    And as a person that's done that
 2  same filling operation --
 3       A.    Uh-hum.
 4       Q.    -- before and done it many
 5  times --
 6       A.    Absolutely.
 7       Q.    -- and taught him how to do
 8  it --
 9       A.    Correct.
10       Q.    -- what does that mean to you,
11  "opened up the air flow full bore or
12  more"?
13       A.    He was distracted.  Something
14  had to distract him, and it wasn't the
15  heater.
16       Q.    So he is not hearing the air
17  flow and he's just intent on --
18       A.    Right.  Let me explain --
19       Q.    -- blowing that air in there?
20       A.    -- to you.  You gotta remember
21  something.  You had a quick scenario, to
22  bring everybody up to speed here.  You
23  have four large tanks of air.  Okay?  You
24  have a small tank you're going to fill.
25  And the word "cascade" means you're
```

Page 111

1   transferring air from A to B, whether you
2   use one tank, four tanks, two tanks.
3   Okay?  As you hear that air flow...
4           THE WITNESS:  ... and you know
5       this being with Worthington...
6       A.    ... you're filling the small
7   tank, you're going to hear that air flow.
8   That's why it -- that's how they got the
9   word "cascade"; you're cascading air flow
10  from A to B through a series of lines,
11  gauges, and devices.  He didn't hear it,
12  bang!  Hit the valve.  Like that throttle
13  that you -- just pchoo! (ph.) Because
14  otherwise, if you don't have the valve,
15  the only way you can shut that tank off is
16  off the wheel assembly on the valve on the
17  tank itself, which is more -- it's harder
18  to get to.  That's why they put a ball
19  valve on it --
20      Q.    So he --
21      A.    -- for shutoff.
22      Q.    -- he didn't hear the air flow,
23  and so he just starts throttling it even
24  more?
25      A.    Exactly.  Exactly.  He increased

Page 112

1  the flow of the cascaded (sic) of air.

2      Q.    Who heard that?

3      A.    Chris.

4      Q.    I mean --

5      A.    Oh.

6      Q.    He said that there was --

7      A.    He said that to -- to whoever

8  was -- the guys that were treating him on

9  the fire -- from the fire department.

10     Q.    Do you know who?

11     A.    Uh!

12         MS. SCOTT:  I have it written

13     down.  It was Danny --

14     A.    Danny Truex.

15         MS. SCOTT:  -- Truex.

16     A.    Because I know these guys,

17  because he's actually had to be a

18  local -- a local plumber, and they all

19  know me, I've been in this, you know, and

20  he actually said to me, he says, probably,

21  I would say, maybe four months after it

22  happened, "Yeah, we got talk-- we're on

23  the job, we're doing the job together, and

24  he said to me, he said, 'Oh, yeah, by the

25  way,' and he says -- Oh, he told me -- he

Page 113

```
 1   told me -- he says, 'Oh, I didn't hear the
 2   heat -- I didn't hear the heater on, full
 3   bored the valve.'"
 4        Q.    Dan T-r --
 5        A.    Truex, T-r-u-e-x.
 6        Q.    And he's with the --
 7        A.    The fire department.
 8        Q.    There in Middle --
 9        A.    Middletown.
10        Q.    Can you think of any reason --
11   well -- that Dan Truex would have to lie
12   or to make --
13        A.    No.
14        Q.    -- that up?
15        A.    No, he wouldn't, no.
16        Q.    You know him?
17        A.    Oh, I know him.  Yeah, I know
18   him.  He wouldn't have made it up.  No
19   reason to.
20        Q.    And I know all this is difficult
21   to talk about, but what did you hear --
22   you said you heard that Chris died from
23   illegal drugs.  Any details --
24        A.    We --
25        Q.    -- what kind of drugs?
```

1    A.    What do you think it was?

2  Fentanyl.

3    Q.    Okay.  Who else -- okay.  We

4  talked about who worked at your shop.  You

5  worked there that -- for a while Kimberly

6  Tremberger was there, William Tremberger

7  was there, I think maybe your wife works

8  there some, Patty?

9    A.    Uh-hum.

10    Q.    Who else was working?  And maybe

11  not exactly when the accident happened,

12  but who were the employees?

13    A.    I have -- at that time, I

14  have -- well, I have three other

15  employees.

16    Q.    And who were the three others?

17    A.    Kevin Slover, S-l-o-v-e-r.  He's

18  been with me -- he's my number two man;

19  Robby Hawkins, Patty's son --

20    Q.    Robin?

21    A.    Robert.

22    Q.    Robert --

23    A.    Hawkins.

24    Q.    -- Hawkins.

25    A.    -- and Rick Dillon from Catskill

Page 115

1    Fire.  Rick -- Rick worked for me after
2    the purchase.  Is that right?  One, two --
3    I count now, myself, dah, dah, dah, dah.
4         Q.    It seems like there was --
5         A.    That's it.
6         Q.    -- somebody named Arlene that
7    answered the phone.
8         A.    That's as of now.
9         Q.    Okay.  Not back then?
10        A.    No.
11        Q.    Okay.  As far as filling test
12   tanks with air, did anybody do that other
13   than you and Chris?
14        A.    I know Kevin didn't.  I don't
15   recall Robby.  I mean, he -- Robby was in
16   my shop when I was in Florida, then I put
17   him on the road.  So I'm going to say
18   probably not.
19        Q.    And then Rick Dillon?
20        A.    No.
21        Q.    They were more out in the field?
22        A.    Correct.  Correct.
23        Q.    Occasionally I have to kind of
24   stop and go through my notes and see where
25   I am, so just bear with me for a few

Page 116

1   minutes.

2           You know what?  Let -- one thing

3   I haven't done is just gone back a little

4   bit over your background.

5           What's your date of birth?

6       A.    18 days from today, May 20th,

7   1959.

8       Q.    We're really close in time.

9           And where were you born?

10      A.    Middletown.  Lived in Warwick.

11      Q.    As far as your educational

12   history, where did you go to high school?

13      A.    John S. Burke Catholic High

14   School, 1973 to '77.

15      Q.    And did you go to college?

16      A.    Orange County Community College

17   from 1977 to 1980.

18      Q.    And did you get any sort of --

19      A.    Yes.

20      Q.    -- degree?

21      A.    I have a degree in retail

22   business management, associate's degree.

23      Q.    And I don't probably need to go

24   back over every job you've ever had.

25      A.    Didn't have that many.

Page 117

1      Q.    Well, tell me, so what would

2   have been one of your first major types of

3   employment?  I'm talking other than

4   working at a mop and pop restaurant or --

5      A.    1984 to 1987.

6      Q.    And what was that?

7      A.    Georgia Pacific Paper Company.

8      Q.    Is there a plant here?

9      A.    There was.

10     Q.    What did you do there?

11     A.    I was a machine operator.

12           1987 to 1992, worked for

13  Hercules, PFW, as a materials handler.  In

14  the meantime -- in between those jobs,

15  from 1979, I bought the business.  That

16  was my side job.  That was my benefits

17  job.

18     Q.    The business being --

19     A.    I owned it, Oprandy's.  I bought

20  Oprandy's in '79, you know, dabbled with

21  it as a part-time hobby, selling fire

22  equipment and, you know, I got married and

23  then had kids and, you know, move on, move

24  on, and then in 1992 I got laid off from

25  Hercules, I couldn't collect unemployment,

Page 118

1   and so I went full bore with this

2   business, 27 years ago.

3       Q.    And then I think it was in 2000

4   when you bought part of another

5   person's --

6       A.    I bought -- I bought a couple of

7   companies since 19 --

8       Q.    Okay.

9       A.    I bought a couple of companies

10  since -- I bought a couple since 1979.  As

11  a matter of fact, three to be exact.

12      Q.    Would Oprandy's be the only

13  business that you had that -- where you

14  dealt with cylinders that contained

15  compressed gas?

16      A.    Yes.

17      Q.    I thought somewhere you said you

18  were a firefighter?

19      A.    Oh, yeah.  I did 30 years of

20  fire service, as a volunteer.

21      Q.    Where did you say?

22      A.    I started in Warwick, eight

23  years, and ended it 21 years in Howells,

24  and I was chief 2007.  Right up the lines.

25  Done.

Page 119

1      Q.    That was your last year there?

2      A.    2007, yeah.

3      Q.    Okay.  And of course as a

4  firefighter, you're dealing with

5  compressed gases, without a doubt?

6      A.    The compressor in question, I --

7  I was the air guy at the firehouse when

8  they bought it, from 1989 to 2000, so -- I

9  trained the guy -- I -- we trained -- we

10  got trained by Poseidon.  I trained all

11  the guys in my firehouse, when I was a

12  black hat or a white hat, and that's the

13  reason I bought it, because I got a record

14  with it and I just rolled it over to my

15  shop.

16      Q.    Did you ever deal with anybody

17  at Poseidon that you remember, anybody --

18      A.    Dana.  Dana Blakely.  Dana was

19  the person who sold us the compressor in

20  1989.  He was one of the one who used to

21  service it, when I was handling with him,

22  when I was in the fire district, and he

23  was the one who came to Florida, New York

24  when I had it and serviced it.

25      Q.    Do you know if he serviced the

1   system at any time -- let's just say since

2   about 2014, 2015?

3       A.    I don't know when it was

4   serviced last.  I don't know when it was

5   serviced last.  I want to say late '14.

6       Q.    I'll tell you that we did take

7   his deposition in this case.

8       A.    Okay.  So he knew -- he knew who

9   I was.

10      Q.    Have you had any contact with

11  him about either this incident or this

12  lawsuit?

13      A.    No.  No.  I don't even know --

14  is he still with the company?  Like I

15  said, it's been over two years.

16      Q.    Well, there have been some

17  changes.

18      A.    Okay.

19      Q.    It's a little different now,

20  but that's kind of what we got into --

21      A.    Sure.

22      Q.    -- with the deposition, so...

23            Do you belong to a union?

24      A.    No.

25      Q.    And your employees don't --

Page 121

1      A.     No.

2      Q.     -- belong to a union?

3             How did you first come to know

4   Christopher Foust?

5      A.     To be honest with you, I knew

6   his father for years.  At one time, I

7   had my -- my -- the -- on the record, I

8   have a twin brother.

9      Q.     Oh, okay.

10     A.     My twin brother and I had our

11  own lawn mowing business, and Chris's

12  father, Randy, worked for the police

13  department, used to mow lawns with me.  So

14  I've known him for years.  Some place I --

15  I don't remember -- he must have bumped

16  into me and said, "Hey, my son Chris is

17  looking for a job and that's when I was

18  growing, expanding, I put Robby -- took

19  Robby off the road, her son, out of the

20  shop, put him on the road, and that's how

21  it happened.  He came in, I explained

22  everything to him, and we sat -- sat down

23  with him, this is what we do, bing, bing,

24  bing, bing, bing, and he had some

25  exceptions, he had some issues that he had

Page 122

1    to address.  He was a single dad, he had a

2    three year old daughter, he says -- who is

3    going to school in Florida, New York,

4    which is where my old office was, so I

5    made his employment very, very

6    accommodating to him to get my work done.

7    Okay?

8                He said, one morning, "I'm gonna

9    be late.  I'm gonna -- gotta take my

10   daughter," this, this, this.  I worked

11   around his schedule.  He got paid 40

12   hours.  If I needed anything -- I mean, I

13   -- he was -- I was accommodating to him.

14       Q.    Was he good employee?

15       A.    Oh, yes.  Work ethics were very

16   good.  The kid was very, very mechanical

17   inclined, crafty, he had a helicopter's

18   pilot I found out.  Would I want to fly

19   with him?  I don't know.  But he had a

20   helicopter's license.

21               When I moved into my new

22   building, he did all my IT for me.  He

23   says, here's -- here's the list, get me

24   the material, I'll come up one night with

25   my daughter, buy me -- give me coffee,

Page 123

1    throw me a little bit here, I'll wire your

2    whole building.

3              Did the whole computer

4    off -- off hours.  I mean, I had no

5    complaints with the guy.

6              But, bottom line is, and this

7    whole day, got distracted.

8         Q.    Did you come to know Frank Buono

9    the short time he was your employee?

10        A.    No.

11        Q.    Do you have any assessment of

12   his work as an employee in the time he was

13   there?

14        A.    No.  Basically, I hired him, I

15   explained to him, same way I explained

16   everything to Chris, as far as procedures,

17   that you'd be working with Chris, here's

18   our protocol for the day, what time we

19   start, our hours of operation -- you know,

20   like a normal employer would do -- rate of

21   paid, employee handbook received, the W-9

22   for the taxes, when payroll is, be prompt,

23   bing, bing, bing, and, after that, I

24   rolled it -- I -- I introduced him to

25   Chris, you two work together on this.

1         Chris would be the one who would

2    rely (sic) to me -- would come back to me

3    any problems or issues, feedback, or

4    anything else.

5         So, basically I -- I trained

6    Chris, Chris trained him, and that's how

7    it worked.

8       Q.    Have you served in the armed

9    forces?

10      A.    Who, me?

11      Q.    Yes.

12      A.    No.

13      Q.    Did Chris ever talk to you about

14   what happened on the day of the incident?

15      A.    Both times we talked, we were --

16   when we saw him at the hospital, and then

17   we saw him at the dinner, really didn't --

18   really didn't say "I screwed up" or didn't

19   really say any particulars.  His sense of

20   humor was great, his outlook was great.

21   It's like, if he didn't have -- lost his

22   leg, he would -- it just would have been a

23   regular day.  I mean, he -- his sense of

24   humor was very good.  Like I said, his

25   outlook in life was very good.  "Hey, it

Page 125

1  was an accident."  Exact -- he basic-- "It
2  was an accident.  It's not your fault."
3      Q.    Tell me about what you saw on
4  the day of the accident.  Let's just start
5  at the very beginning.
6      A.    I've been waiting for this.
7      Q.    What was the first thing that
8  you remember?  Now I'm not talking about
9  boom, the accident happened.  I'm talking
10  about what's the first thing you remember
11  in terms of any contact you had with
12  either Chris or Frank that morning.
13      A.    I was waiting for you to ask
14  this.  Let's go the chain of events --
15      Q.    Okay.
16      A.    -- from start to finish.  I live
17  ten minutes from my office.  I got to my
18  office that Friday morning probably 8:15,
19  8:20.  It was a gentleman from the gas
20  company, a friend of mine, who was waiting
21  for me to open up.  I had to bring him
22  a -- he needed a regulator -- a regulator
23  for his beer gas, and that was around
24  8:25, 8:30, you know, I unlocked the door.
25              That particular day, both Chris

Page 126

1    and Frank -- Chris had to do something

2    with his daughter in the morning, take her

3    to school.  He says, "I'll be in late,

4    9:00."  Frank says, "I'll come in at

5    9:00," and they punched in about 8:50,

6    8:55.  Okay?  He checked in, set himself

7    up, checked the heat, everything else.

8            About, if not close to 9:00, I

9    know the guy from either the power company

10   or another guy had walked in --

11           MS. SCOTT:  Nels.

12      A.    -- at the same -- Nelson Tree.

13   I had an account with Nelson Tree Service

14   and the gentleman came in with a couple of

15   fire extinguishers.  He says, "I need

16   these retagged, recharged, and I wanna buy

17   three new ones."  He wanted three fire

18   extinguishers inspected, "I want to

19   purchase three more."

20           I said, "Okay.

21           He says, "I'll wait outside in

22   my truck; I got some paperwork to do."

23           I said, "Okay."

24           With that said, I gave Frank his

25   first job.  "Here's three brand new fire

Page 127

1    extinguishers," took them off the shelf,
2    "tag 'em, work on these three."
3                "I will."
4                "The gentleman's waiting for
5    'em."
6                I said to Chris, "Here's the air
7    tank.  I've gotta do a balloon test at
8    11:00 at a deli with the local fire
9    inspector.  I need this tank done."
10               With that said, Chris went to
11   fill the tank, Frank was supposedly doing
12   his job, "I'll be in the office; I gotta
13   make a phone call."
14               Now, the way my office is set
15   up, I have two entry doors, one to the
16   shop, one from the shop to the back room
17   of where this air compressor is -- they
18   were both closed -- heat's on, warm -- it
19   was cold.  I'm on the phone, all of a
20   sudden, I hear, boom!  Like, did you ever
21   hear the furnace malfunction?  That's
22   exactly what it sounded like.
23               I said to the guy, I says, "I'll
24   call you back."  Okay?
25               I go out --

Page 128

```
 1       Q.    Let's stop you right there and
 2   we'll go on with that, the rest.
 3             Ill represent to you that Frank
 4   Buono testified several days ago than you
 5   handed him, or you told him, to fill the
 6   test tank with air.
 7       A.    Absolutely wrong.  He had no
 8   training.  Why would he want to do it?
 9   That's a lie.
10       Q.    Your testimony is that you gave
11   Frank three fire extinguishers to work on
12   and that you told Chris to fill the tank?
13       A.    Yes.
14       Q.    And that you never asked Frank
15   Buono to fill the test tank?
16       A.    That's correct.  Also, that tank
17   that was -- that's in question here, and
18   two other thanks, were filled by Chris
19   exactly one week ago, same procedure, same
20   person.  So why would I have somebody else
21   who knows nothing about it to do it, where
22   something could happen?
23       Q.    Okay.  I just wanted to make --
24       A.    Oh, no.
25       Q.    -- sure we --
```

Page 129

1      A.     Oh, no.

2      Q.     -- we got your testimony?

3      A.     Absolutely.

4      Q.     At any time, while --

5      A.     Hold, hold, hold.  Let me -- let

6  me just stop you for a second.  You're

7  saying that he told you that he --

8      Q.     He told us that -- he testified

9  that you asked -- Chris Buono testified

10  that you asked him to fill the agent tank

11  or the -- the test tank.

12      A.     Okay.  How come in his first

13  deposition that we just showed you this

14  morning, he says that he was filling it

15  and then reversed it and said Chris was

16  filling it?  So who's right and who's

17  wrong now?

18      Q.     I --

19      A.     Thank you.

20      Q.     I -- I'm -- today, what I think

21  is important is that we get your version

22  of what happened.  And the only reason

23  that I'm -- I interject what he said or

24  what anybody else said is that I wanna

25  make sure that what you're saying is your

Page 130

1  testimony and what his is his testimony.
2  So --
3       A.    We'll go one step further.  I'll
4  give you the name of the gentleman from
5  Nelson Tree Service who saw me, told me,
6  witnessed me giving these extinguishers to
7  Frank Buono to take care of.  He's not in
8  there.  I'll give you his name and
9  everything.
10       Q.    Well, it's -- I think it says
11  Henry --
12       A.    Henry --
13       Q.    -- Fairweather.
14       A.    -- Fairweather.
15       Q.    So he would be able to say that
16  you gave the three fire extinguishers to
17  Frank?
18       A.    To take care of.
19       Q.    So, before we go on with the
20  sequence of events, all I'm doing is
21  just --
22       A.    Sure.
23       Q.    -- clarifying, you never were
24  back in the room where the test cylinder
25  was going to be filled that morning

Page 131

1   immediately prior to them filling it --

2       A.      No.

3       Q.      -- in terms of seeing how things

4   are set up or anything?

5       A.      Yeah, I might have -- well,

6   yeah, because I had to go in there and

7   turn the heat on and turn the lights on.

8   That was it.

9       Q.      But in terms of having been in

10  there and seeing how the fill hose was set

11  up, how the connections were set up,

12  anything like that, you wouldn't have seen

13  anything about those specifics until maybe

14  after the accident?

15      A.      Yes.  That's correct.

16      Q.      Okay.  So you're in -- and we

17  can continue.

18      A.      Go ahead.

19      Q.      You're in your office, you hear

20  this loud noise.  What happens next?

21      A.      Well, I walked out to the shop

22  and the pone on the wall, the receiver is

23  hanging off the wall.  I says, something's

24  not right here.  And then I walk into the

25  next room and I can't see anything.  All I

Page 132

1  see is like a dust storm.  All I hear is

2  two guys hollering, "My legs, my legs, my

3  legs."  I thought it was a joke, and I

4  says, "What's going on?"  All I heard

5  Chris say was "The tank exploded."

6          And I couldn't see nothing, so I

7  ran back in.  Meanwhile, I ran back in, I

8  tried to dial 911.  I was just in shock.

9  Henry Fairweather, who is outside in his

10 truck, came in, he tried to control me, I

11 says, "Something happened here.  I don't

12 know."

13         And he -- he -- he says, "You're

14 as white as a ghost."

15         All I know is, after -- like the

16 first thing I did was I opened all the

17 doors, opened all the windows, turned on

18 the exhaust fan, tried to get the air

19 moving, just to see what we can see, and

20 the next thing I know, 911 calls back,

21 fire department shows up, I got a -- I

22 went out to the front of the building, I

23 notified the fire chief, I says, "I had an

24 explosion, no fire.  I think I've got a

25 severe -- a severe leg..."

Page 133

1          All I knew, I couldn't see

2    nothing.  I says, "Put a helicopter on

3    standby.  I'll be in my office."  And I'm

4    just sitting there and Henry was in there

5    trying to console me and that's -- and

6    everything else the fire department took

7    over.  Everything else was taken over by

8    the fire department.

9          I just stayed out of it and then

10   all -- that's -- that's when all hell

11   broke loose.  It was just --

12      Q.    Did you ever, after you had

13   the -- heard the loud noise, did you go

14   into the room where the cylinder was being

15   filled prior to the fire department

16   getting there?

17      A.    Yeah.  I walked in to see what

18   was going on quickly, from what I could

19   see, and I saw that the place -- as the

20   pictures show -- what was there and all

21   Chris said was "The tank exploded."

22   That's all he said to me.

23      Q.    So that's when you went --

24      A.    And they were both conscious and

25   talking to me and I know exactly where

Page 134

1    they were laying down on the floor and
2    everything else alongside of it --
3         Q.    And how big is that room?
4         A.    18 x 16.  I remember when I
5    bought the boards, when I constructed it.
6         Q.    And on that morning, was the
7    Poseidon system generally like in the
8    corner?
9         A.    Yes.
10        Q.    Could you describe for me when
11   you looked into the room -- and I
12   understand there was a lot of white --
13        A.    Uh-hum.
14        Q.    -- smoke or powder?
15        A.    Powder.
16        Q.    -- or whatever, but would you --
17   could you describe where they were in the
18   room.
19        A.    If you'd walk out of the door
20   from the shop, there was a landing,
21   landing was four foot by the length of the
22   building, Frank was on the other side of
23   the landing on the concrete floor, and
24   Chris was maybe eight feet from him, and
25   the compressor was across from him.

1      Q.    I think what I'm going to do,

2   and I understand this is not to scale, if

3   you could like draw a rectangle that shows

4   the room, show where -- put P for where

5   the Poseidon system is, put C for where

6   Chris is, and put --

7      A.    No problem.

8      Q.    -- F for where Frank was, and

9   show the door going in the room.

10      A.    You got a magic marker?  That

11   will work better.

12      Q.    See if that does any better.

13      A.    This is the landing

14   (indicating).  Over here was the -- here

15   was -- the Poseidon air compressor was

16   here (indicating).  Here (indicating) is

17   the landing.  This is the door

18   (indicating), this is the existing shop

19   (indicating), this here is all racks

20   (indicating).  Okay?  This is where Frank

21   ended up (indicating).  And over here --

22   here is the Poseidon (indicating), and

23   Chris was someplace over here

24   (indicating).  Okay.

25            Let me -- this is --

Page 136

1           THE VIDEOGRAPHER:  You want a
2       shot of that?
3           THE WITNESS:  (Displaying photo
4       for videographer).  I never was a good
5       architect.
6       Q.    So point to where the Poseidon
7   system is.
8       A.    Okay.  Here is the room
9   (indicating).  It's 18 x 18, 16 x 16.
10   This is the entrance (indicating) that
11   goes out to the parking lot, which is what
12   the EMS crew used.  There's a landing that
13   goes across and this (indicating) is
14   coming out of a shop.  My office is over
15   here (indicating).  This is grade
16   (indicating).  You would step down six
17   inches to the concrete floor.  This is
18   where Frank was (indicating), these were
19   the racks of all the fire extinguishers
20   (indicating), the back corner was the
21   compressor and the tanks secured to the
22   wall, and Chris was over here
23   (indicating).  He was filling that in
24   front and the force of the explosion
25   pushed him that way (indicating).  And

Page 137

1    this was all open in the middle.

2        Q.    So if, in your experience, when

3    you were filling tanks with air from the

4    Poseidon system, how far from the Poseidon

5    system would you be?

6        A.    Well, in front of that Poseidon

7    compressor are two chambers that you're

8    supposed to put the tank in.  So you would

9    fill it right in front of it because all

10   your gauges and stuff are on the

11   compressor.

12           So, why he didn't use to those

13   gauges is beyond me.  He filled it on the

14   ground.  That's why everything was below.

15           If you look at the severity,

16   everything went across there from the

17   knees down.  If it was higher up, it would

18   have been a higher projection.  The tank

19   was on the ground being filled, so when it

20   exploded, it went like this (indicating).

21   And he happened to be in the line of fire,

22   and so did Frank.

23       Q.    So how is it different if they

24   used the compressor to fill it and they're

25   using the gauges?  What are the -- the

Page 138

1  gages --

2      A.    They're different.

3  The -- the -- and -- and I'm saying this

4  from Day 1:  Let's throw the compressor

5  out of the whole concept.  The compressor

6  was never hooked up, never used.  When I

7  left Florida, New York, knowing I was

8  moving to a new building, I filled all

9  four of those tanks with 4500 pounds of

10  air, because I can use the air compre-- I

11  can use the cascade system at any time

12  without the compressor until I need air.

13  All the compressor does is it compresses

14  air and fills the tanks.  I can -- I could

15  have filled 20 of those tanks,

16  whatever you  -- you would never, ever,

17  ever using the compressor, and that's when

18  I explained to OSHA, "Don't even bring

19  Poseidon into this picture, because the

20  compressor never ran."  The compressor the

21  last time ran was July of '15 at my old

22  location when I topped off all four of

23  those tanks to relocate.

24      Q.    Did you -- when you purchased

25  the compressor from Poseidon, did you also

1  purchase the tanks and the regulator?

2      A.    Came as package deal.  And I've

3  been saying that from Day 1 and I said

4  right to the OSHA guy.  I said, "Come

5  here; let me show you.  Here's the

6  compressor.  Do you see a wire going from

7  the five horsepower motor to an on/off

8  switch on the floor like you're supposed

9  to have, back to my panel?"  He says,

10  "No."  I said, "Poseidon is not even

11  involved in this, because it was never

12  used."

13      Q.    When you walked into the room

14  after the incident, was the compressor

15  running?

16      A.    No re-- again --

17      Q.    That's -- I'm just clarifying --

18      A.    No.

19      Q.    -- that for the record.

20      A.    Never, ever, electrically hooked

21  up.

22      Q.    That --

23      A.    Still to this day, not hooked

24  up.

25      Q.    That's -- that's what I'm

1  clarifying for the record.

2       A.     Never hooked up.  Like I said, I

3  could have filled 20 of those 175 pound

4  tanks until they ran out of air and then

5  I'd either have to go someplace else and

6  get air or fire up -- or -- or wire the

7  compressor.

8       Q.     As far as using the tanks in the

9  cascade system, am I correct that you can

10 hook up to any one of four tanks to fill a

11 cylinder?

12      A.     Yes.  Again, it works off the

13 word "cascade":  One, two, three, four.

14 It's called a bank of tanks.  You can put

15 two tanks, four tanks.  I've seen five,

16 six, seven, eight, nine, ten.  You start

17 with your first tank, fill it up, you open

18 up the valve.  Okay?  As that tank lowers

19 down, where if you get down to 100 pounds

20 and you have to cascade to 200 pounds,

21 what's going to happen?  It's not going to

22 get any air flow.  So tank -- go to your

23 next tank, run out of air, you go to your

24 third tank, and then go to your fourth

25 tank.  Just keep on going.  That's how the

Page 141

1    word "cascade" comes in.

2         Q.    So each -- that's how you keep

3    the cascade --

4         A.    Correct.

5         Q.    -- going?

6               So each time you go to a new

7    tank, are you rehooking up the connection?

8    Is that how it works?

9         A.    No.  The connection that you're

10   filling to always stays the same.  You're

11   only just changing your lines as you

12   progress down the --

13        Q.    So the regulator never moves if

14   you --

15        A.    Absolutely --

16        Q.    -- if you're using a regulator?

17        A.    Regulator is set once, it stays.

18              THE VIDEOGRAPHER:  We have ten

19        minutes.

20        Q.    Since you didn't go into --

21   since you didn't see the cascade system in

22   any detail that morning as they were

23   setting it up to fill the tank, I take it

24   that you don't know how the regulator was

25   set at the time of the accident; is

Page 142

```
 1   that --
 2        A.    No --
 3        Q.    -- correct?
 4        A.    -- that's correct.
 5        Q.    Can't say one way or another?
 6        A.    Can't say.
 7              I will say that -- I said this
 8   before -- that Chris, one week ago, filled
 9   three tanks the same procedure, same way,
10   so I'm going to presume that those gauges
11   were set at the last position, which was
12   175.  You wouldn't have to -- nothing else
13   was filled between one Friday to next
14   Friday.  We never used -- never used --
15   had to use the cascade system.
16        Q.    When you trained Chris on
17   filling cylinders, what did you train him
18   to do as far as the regulator from the
19   cascade system?
20        A.    Always make sure that your
21   regulator is set to the proper
22   procedure -- to the proper fill pressure
23   of the tank you're filling, because you
24   could fill a tank at 175, you can fill it
25   a SC-- a self-contained -- a breathing air
```

Page 143

1   pack to 2000 pounds, 4500 pounds, you have

2   to set the regulator based on the tank

3   that you're filling.

4       Q.    And did you give him any

5   direction as far as where to look on a

6   test tank to know what pressure you are

7   filling to?

8       A.    Yes, because, like I said, he

9   was very knowledgeable, and I said, if

10  filling this tank of air is this -- is

11  this is -- is -- is the same as if you're

12  filling a tank for a fire -- a fire

13  extinguisher; you've got a gauge on it.

14  In order to fill anything, whether it's a

15  compressed air cylinder or fire-- they

16  have to have gauge in it, always check

17  your gauge.

18      Q.    The gauge is going to show you

19  the number?

20      A.    That's you're working pressure,

21  yes.

22      Q.    And if, for example, on this

23  tank, the gauge in the green area says

24  175, what was your training to Chris

25  concerning where to set that part of the

Page 144

1   regulator, the part going into the tank?

2   What --

3        A.    No more than 25 pounds greater

4   than your test -- your service pressure,

5   which would be no greater than the working

6   pressure, which would be 175 and 25 is

7   220.  Oh, no, 205.  What's 1 -- 1 -- 200.

8   200 pounds.

9             THE VIDEOGRAPHER:  Running out

10       of time.  About four minutes left.

11       Q.    Is it your testimony, sitting

12   here today that what -- let me ask you:

13   Was Chris supposed to be in that room that

14   morning?

15       A.    Yes.  Only Chris.

16       Q.    Was Frank supposed to be in that

17   room that morning?

18       A.    No.

19       Q.    Whatever happened to the

20   extinguishers that you testified to that

21   you gave Frank to work on?

22       A.    What happened to them?

23       Q.    Yeah.

24       A.    Oh, God.  With my rec-- as far

25   as my recollection, I think either I did

Page 145

1    it or William, who came in -- somebody --
2    you know, everything -- that day -- they
3    could have been done that day or they
4    might have done that following Monday,
5    once everything settled, but they did go
6    back out to the customer.
7             MS. STIGALL:  One more question
8        and then we're going to try and get
9        this stopped.
10            (Referring to drilling and
11       hammering on roof.)
12       Q.    I guess my question was, that
13   morning, you assigned Frank Buono to do
14   these fire extinguishers?
15       A.    Uh-hum.
16       Q.    Did he go back and do that?
17       A.    No, because he -- I don't -- he
18   never did 'em in the first place, because
19   they were still, after the accident, all
20   this was going on, the three brand new
21   fire extinguishers were still sitting on
22   the work bench where I left them for him
23   to do and the three from Nelson Tree were
24   still sitting next to him.  So he never
25   did them.

1          MS. STIGALL:  Let's go head

2      and...

3          THE VIDEOGRAPHER:  The time is

4      12:51.  We're going off the record.

5      This is the end of Media File No. 1.

6          (Recess.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1         A F T E R N O O N   S E S S I O N
2                    1:49 p.m.
3
4            THE VIDEOGRAPHER:  Good
5       afternoon.  We're back on the record.
6       The time is 1:49.  This is the
7       beginning of Media File No. 3.
8
9  B R I A N    S C O T T ,
10 having been previously duly sworn,
11 testified further as follows:
12 CONTINUED EXAMINATION
13 BY MS. STIGALL:
14     Q.    Mr. Scott, we've moved, we're
15 now away from the pounding that was on the
16 roof?
17            THE VIDEOGRAPHER:  Can you put
18       your mike on?
19     Q.    We're now away from the pounding
20 that was on the roof and now I have my
21 mike on, so we'll go ahead and proceed.
22            I'm going to hand you a few
23 documents that we marked as additional
24 exhibits during the break, and just for
25 identification, so we get those in the
```

1  record --

2       A.     Okay.

3       Q.     -- the first document I have is

4  listed as Defendant's Exhibit 19 and I

5  understand those to be kind of time cards

6  for Chris Foust and Frank Buono for

7  February.

8            (Defendant's Exhibit 19, time

9       cards for Chris Foust and Frank Buono

10      for February 2016, marked for

11      identification, this date.)

12      Q.     Can you identify them as that?

13      A.     Yes.  First one is for Chris

14  Foust for February of '16 and the second

15  one is for Frank Buono for the same month

16  of '16.

17      Q.     Thank you.

18           (Defendant's Exhibit 20,

19      Worker's Compensation claim notes for

20      Chris Foust and Frank Buono, marked

21      for identification, this date.)

22      Q.     Next, as Defendant's Exhibit 20,

23  I have some notes taken regarding, I think

24  it's the Worker's Compensation claim.

25  Could you identify to me Defendant's

1   Exhibit 20, whose handwriting those notes

2   are in, if you know?

3        A.    It's not mine.   I don't know

4   whose handwriting it is, but it has the

5   claim number Chris Foust with his address,

6   and also has a claim number for Frank

7   Buono, with -- I assume these last numbers

8   are -- the numbers are the Social Security

9   numbers.

10        Q.    And I'll just represent to you

11   that was a document I received from your

12   wife, Patty.  Does it look to you to be

13   something that maybe would have been in

14   your file?

15        A.    Yes.

16        Q.    Your business records?

17        A.    Absolutely.

18            (Defendant's Exhibit 21, copy of

19        a spiral notebook containing notes

20        kept by Patty Scott relating to

21        contact with parties involved with the

22        accident, marked for identification,

23        this date.)

24        Q.    Now, as to Defendant's

25   Exhibit 21, can you tell me what that is.

Page 150

1     A.    This is a spiral notebook -- a

2  copy of a spiral notebook -- of notes that

3  my wife Patty started the day of the

4  accident with everybody who -- all parties

5  that were involved, including Hartford,

6  Department of Labor, DKY, who were the

7  cleanup company, the insurance company,

8  lawyers.  This is all -- everything --

9  this is a regular -- a ledger book that we

10  kept from the date of the accident in

11  contact with any parties involved

12  regarding the incident.

13     Q.    And that is Defendant's

14  Exhibit 21?

15     A.    Yes.

16          (Defendant's Exhibit 22,

17      prescription for Fentanyl Transdermal

18      System, marked for identification,

19      this date.)

20     Q.    And finally, I've got

21  Defendant's Exhibit 22, which is an

22  exhibit I received from your wife, as I

23  understand.  As I understand, it was

24  something that she found when she was

25  looking for keys to move a car after the

Page 151

1   accident?

2       A.    Correct.   I can re-- in the shop

3   of the building, not -- excluding from the

4   room of where the accident happened, Chris

5   had his desk and that's where he used to

6   keep his stuff, and, after the accident,

7   we had to move his car and, in turn, we

8   found these prescriptions of fentanyl,

9   and, yes, that belonged to Chris.

10      Q.    So that we're clear, Defendant's

11  Exhibit 22, was that found on the day of

12  the accident?

13      A.    If not the day of the accident,

14  within 24 hours of the accident, yes.

15      Q.    When you were going to move the

16  car?

17      A.    Correct.

18      Q.    And I see that this is a

19  prescription for Fentanyl Transdermal

20  System, 100 milligrams an hour, expiration

21  date August 2017.

22            Is that what you understand

23  it --

24      A.    Yes --

25      Q.    -- to be?

Page 152

```
 1        A.     -- it is.  Yes.
 2               (Defendant's Exhibit 23, diagram
 3        drawn by witness at today's deposition
 4        showing layout of room where incident
 5        occurred, marked for identification,
 6        this date.)
 7        Q.     And finally, we have Defendant's
 8   Exhibit 23, that was utilized by you
 9   earlier in this deposition.  If you can
10   just describe, generally, what you were
11   doing when you drew that.
12        A.     Basically, I showed the parties
13   here of a layout of the room of where the
14   incident happened on that date in
15   February, showing the position of the
16   equipment, the doorways, and exactly when
17   I entered the room after the incident
18   happened of where both Mr. Foust and
19   Mr. Buono were on the ground.
20        Q.     Thank you.
21               MS. STIGALL:  I'm going to go
22        pass you as a witness at this time and
23        allow -- I think plaintiff's attorney
24        is going to ask you, Mr. Fromson is
25        going to ask you, some questions.
```

1          THE VIDEOGRAPHER:  Can you clip

2     on?

3          MR. FROMSON:  Absolutely.

4  EXAMINATION BY MR. FROMSON:

5     Q.    Good afternoon, Mr. Scott.

6     A.    Okay.

7     Q.    My name is Ken Fromson.  Excuse

8  my hoarse voice.  I will be brief this

9  afternoon.  I have a couple of follow-up

10  questions.  I'll try not to be

11  duplicative.  Okay?

12     A.    Okay.

13     Q.    Just keep all your answers

14  verbal as opposed to providing a shrug of

15  the shoulders or a nod of the head.

16     A.    Okay.

17     Q.    If there's a question you don't

18  understand, let me know; I'll rephrase it

19  for you.  Fair enough?

20     A.    Fair enough.

21     Q.    Okay.  Earlier in your

22  testimony, you had described that the air

23  compressor was literally not hooked up to

24  an electrical outlet.  Do you recall

25  generally --

Page 154

1      A.    Yes.

2      Q.    -- explaining that?

3            You had indicated -- and I'm

4   paraphrasing you -- that the cascade

5   system bottles of air may have been

6   electrified?

7      A.    No.

8      Q.    So is it fair to say that

9   neither the compressor or the cascade

10  system was plugged in to anything?

11     A.    Correct.

12     Q.    No electricity whatsoever to

13  either of those devices; correct?

14     A.    Absolutely, yes.

15     Q.    Thank you.

16           Earlier in your testimony, when

17  you were describing the facts, the events

18  that you experienced on that day, at some

19  point you indicated that you went into

20  your office and that then all hell broke

21  loose.  Do you recall generally making

22  that statement?

23     A.    Yes.

24     Q.    What do you mean when you

25  reference "all hell broke loose" after you

Page 155

1    went into your office and the event had

2    already happened?

3         A.    Like I said, I was on the phone,

4    I was on the phone with a vendor, a

5    supplier, and I heard -- heard an

6    explosion, I hung up the phone and I went

7    out into the shop and saw nobody in the

8    main shop, and I went in through the next

9    door and all I saw was powder and that's

10   when I heard all the screaming and the

11   hollering of "Hey, explosion, I lost my

12   leg, my leg, my legs," and that's when

13   everything started.

14        Q.    And so I may have misunderstood

15   your answer earlier in the day.  I took

16   your answer to mean you had called, that

17   there was a call to 911, that you left the

18   treatment to be done by EMS and fire

19   department, and that you then went into

20   your office and then all hell broke loose.

21        A.    No.

22        Q.    So it's --

23        A.    No.

24        Q.    When you referenced that hell

25   had broken loose, did --

Page 156

1       A.      Hell had broke loose --

2       Q.      -- the events?

3       A.      From the time I heard that

4    explosion till I walked out, saw the

5    phone, the phone was off the hook in the

6    shop, nobody in the shop, then I looked

7    into the other room, all I saw was powder

8    and dust, and that's where everybody was,

9    that's when everything -- thing -- that's

10   when everybody hell broke -- I was not the

11   first one to call 911, by the way.

12       Q.      And thank you for the

13   clarification.

14       A.      Okay.

15       Q.      Have you seen the OSHA report

16   related to the government's investigation

17   of what transpired?

18       A.      The official, well, I don't

19   recall seeing it.  We did get it.  Did we

20   get it?

21       Q.      Have you --

22       A.      Yes.

23       Q.      Have you seen the -- the

24   citations and notifications --

25       A.      Yes.

1      Q.    -- and --

2      A.    Yes.

3      Q.    -- penalties --

4      A.    Yes.

5      Q.    Hold on a second.  Just let me

6   finish before you answer, for the benefit

7   of the court reporter.  You're

8   anticipating my questions, and I

9   appreciate that.  Consider it to be more

10  of a question-and-answer session --

11     A.    Okay.

12     Q.    -- again, for his benefit,

13  because he can't type us both down at the

14  same time.  Are you with me?  Yes?

15     A.    Yes.

16     Q.    Fantastic.

17           So did you receive the citation

18  and notifications of penalties summarizing

19  the issues in the investigation result?

20     A.    Yes, I did.

21     Q.    Was it your understanding that

22  on the day of the event Chris Foust was

23  attempting to fill this subject tank with

24  compressed air?

25     A.    Yes.

Page 158

1      Q.     And was it your understanding

2   that there was an air line, or a hose,

3   that was connected to the Poseidon cascade

4   system that then led to the subject tank

5   and valve assembly?

6      A.     Yes.

7      Q.     And was it your understanding

8   that Oprandy's Fire used the cylinder and

9   valve assembly product as a portable

10  compressed air source for testing fire

11  suppression systems at field sites?

12     A.     Yes.

13     Q.     In your industry, what does it

14  mean when you use the term "to test fire

15  suppression systems"?

16     A.     So, juris-- under the standards,

17  authorities have a -- jurisdictions, or

18  fire inspectors or building inspectors,

19  require that when a commercial restaurant

20  system is installed, you have to perform

21  what they call a balloon test, and the

22  balloon test works as the following:  The

23  whole entire fire suppression system is

24  installed.  You have to remove the tank of

25  liquid agent, which is the final component

1   of the test, remove that cylinder, and you

2   are to replace that tank with a tank of

3   air.  Okay?

4            You set whole system up, you

5   take the nozzles off the -- the nozzle

6   come off the drops, you put balloons on

7   them.  It has to be witnessed by a fire

8   inspector, and you do what they call a

9   balloon test.  The tank that you fill with

10  air -- you go through the whole cycle.

11  You pull the pull stations, shuts off the

12  gas valves, trips any fire alarms, fills

13  the balloons with air, fire inspector

14  witnesses it you take pictures, you sign

15  off, you're done.  Now you know that the

16  system will work.

17           What you do is, you're doing an

18  air test to make sure it works instead of

19  the real test of liquid, which can be

20  expensive and very costly, or, excuse me,

21  messy.  So it's a balloon test and it's in

22  the -- and it's in the(indicating)

23  "standards" of that we go by to perform a

24  balloon test at the discretion of the

25  authority having jurisdiction.

Page 160

1      Q.    You had described earlier in

2   your testimony that Chris Foust,

3   approximately a week earlier, had filled

4   other tanks in the same general way that

5   he was performing his work on this day of

6   the event.  Do you recall generally --

7      A.    Yes.

8      Q.    -- testifying to that?

9            Those other tanks from

10  approximately a week earlier, were those

11  also Worthington tanks with the similar

12  fire -- or Kitchen Knight valve assembly?

13     A.    Exactly the same.  The system

14  happened to be at a restaurant and the

15  reason there were three, because there was

16  a renovation on a restaurant, one system

17  had two tanks, one system had one tank.

18  So, instead of running back and forth to

19  fill tanks, I had three tanks.  You had to

20  put two tanks on one test, one tank on the

21  other, two tests.  Exact same cylinder,

22  same size, same -- same everything.  Same.

23     Q.    As you sit here today, do you

24  have an independent recollection of

25  assigning Chris Foust that job

Page 161

1  approximately a week earlier related to

2  the other tanks?

3      A.    I do have a recollection of it.

4  I -- that was a Friday morning, and I

5  specifically said to Chris, I says, "I

6  have a -- I have a test in the morning, I

7  need three tanks filled, I have to be

8  at..." such and such a job down the

9  street, in whatever time we figured, "...

10  to do a balloon test," and he said -- I

11  said, "Can you fill the tanks?"  And he

12  said, "Yes."

13      Q.    In terms of the protocol,

14  standard operating procedure back then

15  related to these other tanks,

16  approximately a week earlier --

17      A.    Uh-hum.

18      Q.    -- from where would these tanks

19  be retrieved within Oprandy's Fire?

20      A.    When you say "retrieved" --

21      Q.    Where do you get them from?

22      A.    Well, the tank that was involved

23  in the incident --

24      Q.    I'm not asking you about that

25  yet.  The tanks that are used a week

Page 162

1   earlier.

2        A.    They were old, they were -- they

3   were Pyro-Chem tanks that were no longer

4   eligible to be used for final end product

5   because of the fact of the tank was either

6   too small, it was undersized, the

7   labelling was off of it, but it could

8   still be used as an air tank for testing,

9   because of the situation where you can get

10  multiple tanks when you need two tanks at

11  the same time.

12       Q.    Were these tanks -- and I may

13  have asked you earlier, so I need some

14  clarification.  These tanks that were used

15  for that restaurant approximately a week

16  earlier, were they the same cylinder size,

17  p.s.i. and valve assembly on those that

18  was being used on the day of our event in

19  February of 2016?

20       A.    Same pressure, same

21  manufacturer, same style.  As far as the

22  size, it could have been up or down a

23  size, but, when it comes to air, air is

24  air and tank is tank, but they were

25  identical carbon copies.

Page 163

```
 1        Q.    And how would it be that
 2   Oprandy's Fire would store those tanks
 3   before assigning them to Chris?  Would
 4   they be situated somewhere that they were
 5   full, or would they be situated somewhere
 6   where they were empty or half full or half
 7   empty, such that Chris would then take
 8   them and fill them?
 9        A.    Usually, if -- at the morning of
10   the incident, that tank was empty.
11        Q.    I'm asking about the one a week
12   earlier or the several a week earlier.
13        A.    They're empty until I need them.
14        Q.    So that's -- thank you for that
15   clarification.
16             When you say they're empty until
17   you need them, how was it, in your usual
18   course of business, that Oprandy's Fire
19   would know they were empty?
20        A.    I would be the only one doing
21   the testing, and it would be discharged on
22   the job for the test, I'd come back and
23   I'll put them on the shelf and leave them
24   until I need them for the next time, which
25   could be whenever.
```

1      Q.    So, presumably, the tanks that
2  he had used for the restaurant
3  approximately a week earlier came from
4  some area of Oprandy's Fire and presumably
5  they were empty because they had been used
6  at some point even earlier until they were
7  emptied.  Is that fair?
8      A.    Yes.
9      Q.    And it would be your
10 understanding that each of those tanks
11 would have had a gauge, a pressure gauge
12 on, or attached to the valve assembly, on
13 those respective tanks; right?
14     A.    Yes.
15     Q.    And it would be your
16 understanding that those would be reading
17 as empty?
18     A.    Yes.
19     Q.    Now, those -- you're very
20 familiar with those pressure gauges;
21 right?
22     A.    Yes.
23     Q.    Is it fair to say those pressure
24 gauges, back then, they didn't have an
25 "Empty" word?  The word "empty", I'm using

Page 165

1   that word, but the gauges didn't say
2   "Empty"; correct?
3       A.    Correct.
4       Q.    How would they have indicated to
5   a user, or someone like yourself, that
6   they were not full?
7       A.    If it was full, it would be at
8   12:00; if it was empty, it will be below
9   12:00, whether it could be at 9:00, 8:00,
10  7:00, but someplace, if it was below
11  12:00, you know right away it had no
12  pressure in it and I would know because of
13  the fact because I'm the one who
14  discharged it.
15      Q.    Now, let me ask you about the
16  tank in question, the product in question,
17  that was the subject of this event where
18  these individuals were hurt.  Okay?
19      A.    Okay.
20      Q.    How did you know, or what basis
21  do you have to tell us, that that subject
22  tank was empty at the time that Chris
23  Foust attempted to fill it?
24      A.    Because exactly one week ago
25  that tank, along with the two other tanks,

Page 166

1   were used, total of three tanks, were used

2   in a balloon test, and they were empty,

3   and I left them on the shelf, and I didn't

4   know about this -- that February 12th,

5   that test, I didn't know that that test

6   was going to happen until the day before.

7   So I would leave the tank empty and then

8   do what I need for Friday morning at

9   11:00, fill it.

10       Q.    Do you have any documentation,

11  anything whatsoever, that would

12  corroborate what you're telling us, that

13  these tanks -- in particular, this subject

14  tank -- was utilized and was in fact

15  empty?

16       A.    The only thing I would have

17  would be the day I did the --

18       Q.    The balloon test?

19       A.    -- the day I did the balloon

20  test.

21       Q.    Okay.  So if you needed to, if

22  you wanted to prove that you had actually

23  done a balloon test at a restaurant, you

24  could potentially look back to your

25  records?

1    A.    I know exactly what the name of

2  the account was, the day I did, and who

3  the inspector was.

4    Q.    Do you recall now?

5    A.    I exactly know.

6    Q.    Tell us who.

7    A.    It was the Town of Walkill,

8  Middletown, New York.  It was at Cosmo's

9  Pizzeria, Route 211 East, and the

10 inspector was a gentleman by the name of

11 Nick Elia.  He was my witness to the air

12 test.  We have did a double -- double

13 system.  It was a renovation.  It was a

14 restaurant under renovation and due to

15 final CO, that morning we had to do a

16 balloon test.

17         (Discussion held off the

18      record.)

19         THE WITNESS:  E-l-i-a.  Dominick

20      Elia.

21         MS. STIGALL:  Did you say a

22      final C...

23         THE WITNESS:  CO, certificate of

24      occupancy.

25    Q.    What was Dominick Elia's

Page 168

1    relationship to the situation?

2         A.    He was the Town of Walkill

3    building inspector/code enforcement

4    officer, mostly building inspector.

5         Q.    Now, let me change -- change

6    subjects --

7         A.    Go ahead.

8         Q.    -- for a moment.

9              The maximum pressure available

10   from the Poseidon cascade system, was that

11   approximately 4,000 p.s.i.?

12        A.    4500.  That's the most the tanks

13   can -- that's the most the tanks can take,

14   because when you them off the compressor,

15   the compressor automatically shuts off at

16   4500.  So you can't max out.

17        Q.    And you are referencing the

18   Poseidon cascade system that was at

19   Oprandy's fire on the day of the event?

20   Yes?

21        A.    Yes.

22        Q.    Yes?

23        A.    Yes.

24        Q.    I want to make sure.

25        A.    Yes, yes, yes, yes.

Page 169

1    Q.   In terms of the actions that
2  were taken by Messrs. Foust and Buono, was
3  it your understanding that they were --
4  they would listen for the sound of air
5  flowing into the cylinder and watch the
6  pressure gauge on the valve assembly on
7  the top of the cylinder until it indicated
8  the cylinder was full?
9    A.   No.
10   Q.   Is it true that Chris Foust was
11  not certified to service fire
12  extinguishers?
13   A.   Now, reiterate that, as far as
14  "service".
15   Q.   Let me see --
16   A.   There's a -- there's a -- some
17  clarification.
18   Q.   I would represent to you that
19  the OSHA report in this case indicated
20  certain facts based upon what the OSHA
21  individuals had investigated; in part,
22  that employees Foust and Buono performed
23  hydrostatic testing of low-pressure DOT
24  cylinders and fire extinguishers.  Is
25  that -- do you agree with that?

1      A.      No.

2      Q.      Do you know how an individual

3  from OSHA would have received that

4  information?

5      A.      It didn't come from me, because

6  I am not -- I -- I can hydrotest

7  low-pressure cylinders, not DOT cylinders,

8  and OSHA knew that.

9      Q.      I would want you to assume the

10  OSHA report states that neither Mr. Foust

11  or Mr. Buono were certified to service

12  fire extinguishers, perform hydrostatic

13  tests, in the context of the way the OSHA

14  report used the term "certify".  Do you

15  have an understanding, given your industry

16  knowledge, as to what they're talking

17  about?

18      A.      Correct, but the word "service"

19  is very vague.  "Service", I have four

20  technicians, including myself.  We service

21  on the road.  When they come in the shop,

22  they don't service 'em.  They do

23  maintenance on 'em or recharging or

24  low-pressure testing.  So the word

25  "service", it has some clarification on

Page 171

1    it.

2         Q.     So in the industry, the term

3    "service" is the --

4         A.     We service.

5         Q.     In the industry, the term

6    "service" is distinctly different than

7    "recharging"; correct?

8         A.     Absolutely, yes.

9         Q.     Thank you for the clarification.

10   Now, I'd ask you to consider the cascade

11   system with the compressor, as you

12   understood it was configured back on the

13   day of the event.  Can you picture it in

14   your mind?

15        A.     Absolutely.

16        Q.     And have you seen the

17   photographs from the OSHA report that

18   depict the red cascade -- the red

19   compressor with the cascade system behind

20   it?

21        A.     Yes.

22        Q.     And are those fair and accurate

23   as to that being the compressor and the

24   cascade system that Oprandy's had acquired

25   from the fire district many years ago?

Page 172

1        A.     Yes.

2        Q.     So now, just focus on the

3    compressor and the cascade system for me.

4             Was there any language on that,

5    whether it be a fixed by a label or a

6    sticker or a card or a tag, that

7    instructed users as to the pressurization

8    of cylinders that would be getting filled

9    with air?

10       A.     No.

11       Q.     Same question.  I'm going to go

12   down a list of a bunch of item.  Alright?

13       A.     Okay.

14       Q.     Same question:  Any such

15   language as to overpressurization?

16       A.     No.

17       Q.     Was there any such language to

18   review the manufacturing service manuals?

19       A.     No.

20       Q.     Was there any such language to

21   use certain tools?

22       A.     No.

23       Q.     Was there any such language to

24   use certain recharge materials?

25       A.     No.

Page 173

1      Q.    Was there any such language to
2   use certain lubricants?
3      A.    No.
4      Q.    Was there any such language to
5   charge only to a certain pressure?
6      A.    Language as far as what?
7      Q.    Such as a warning or instruction
8   not to overpressurize, but only to go to a
9   certain p.s.i.?
10     A.    No.
11     Q.    Was there any language to
12  utilize or use a pressure relief device?
13     A.    No.
14     Q.    Was there any language to
15  confirm that the agent --
16     A.    Back to --
17     Q.    Yes.
18     A.    On that pressure relief valve,
19  resay that again.
20     Q.    Absolutely.  And we're only
21  talking about the cascades system and the
22  compressor.  Was there any such language
23  to utilize a pressure relief device while
24  filling an agent tank?
25     A.    There -- yes, there -- the --

1   verbally, on all high-pressure cylinders,

2   there's a relief valve built right into

3   the cylinder.  A self-contained breathing

4   apparatus is high pressure.  By the

5   manufacturer, and by everything else, you

6   have to have a blowoff disc, so that

7   you're only supposed to put in 500 pounds,

8   you put in 700 pounds, everybody has that

9   fallacy that the tank will devalve.  No.

10  It actually blows a safety.  That's --

11  that's common sense.

12      Q.    You referenced "verbally", so I

13  want to make sure my question is clear.

14  Was there any language on the compressor

15  or the cascade system -- whether affixed

16  by label, sticker, card, or tag -- that

17  instructed users to utilize a pressure

18  relief device while filling an agent tank?

19      A.    No.

20      Q.    Any such language to confirm the

21  agent tank's own pressure gauge on the

22  valve assembly was functional?

23      A.    No.

24      Q.    Now I'm going to ask you the

25  very same questions, but solely as it

Page 175

1    pertains to the tank and valve assembly.

2        A.    Alright.

3        Q.    So, as a foundation, can you

4    picture in your mind the actual tank and

5    valve assembly in this case?

6        A.    Yes.

7        Q.    Was there any language on either

8    the cylinder or the valve assembly, or

9    affixed to it by label, sticker, card or

10   tag, that instructed users as to the

11   pressurization of the cylinder?

12       A.    No.

13       Q.    Language not to overpressurize

14   the cylinder?

15       A.    No.

16       Q.    Was there language to review the

17   manufacturer's servicing manuals?

18       A.    No.

19       Q.    Was there any language to use

20   certain tools?

21       A.    No.

22       Q.    Was there any language to use

23   certain recharge materials?

24       A.    No.

25       Q.    Was there language to use

1  certain lubricants?

2      A.    No.

3      Q.    Was there language to only

4  charge to a certain pressure?

5      A.    No.

6      Q.    Was there any language to use a

7  certain pressurizing adaptor?

8      A.    Language written?  No.

9      Q.    Was there any language to use a

10  pressure relief device?

11     A.    No.

12     Q.    Now, you had talked earlier

13  about how to know when a tank is full and

14  you used the expression "at 12:00, you're

15  full."  Do you remember generally --

16     A.    Sure.

17     Q.    -- explaining that to us?

18     A.    Yes.

19     Q.    So, do you have an understanding

20  as to what can render a tank's pressure

21  gauge to not function properly?

22     A.    No.

23     Q.    Have you ever experienced in

24  your line of work a pressure gauge on a

25  fire suppression system -- such as a tank

1  with a valve assembly we're discussing

2  here -- where you observed the pressure

3  gauge to not function properly?

4      A.    Yes.

5      Q.    Can you give us an example.

6      A.    I just recently did some the

7  other day.  I sent them out for hydro,

8  came back and filled 'em, go through all

9  the procedure, like I've always done, put

10 pressure to it of 200 pounds, 225, and

11 tank -- nitrogen going in and no gauge

12 reading, no gauge reading, devalve --

13 depressurize it in replace the valve.

14     Q.    And do you have experience,

15 given your working knowledge of this

16 industry, as to the various reasons why a

17 pressure gauge would not function

18 properly?

19     A.    Multitude of things.  It could

20 have been -- well, first of all, you

21 always check the gauge itself to make sure

22 that it's intact, you know, the gauge --

23 the -- all that gauge is is a needle, and

24 if the needle is broken, bent, the glass

25 is blown, that's your first sign that the

1  gauge is no good.  The other part is that

2  all it is is a small little orifice that

3  is probably big as a paper clip.  That air

4  has to go through it and could be an

5  obstruction, and so you basically start

6  all over again.

7       Q.    Now, when you reference an

8  obstruction, what type of obstruction are

9  you talking about?

10      A.    It could be an obstruction of...

11  anything.  Chances -- not dirt, but just

12  an obstruction of when it was originally

13  made or when it was -- it could have been

14  something maybe in the liquid.  I --

15  that's it.  But to the -- the chances of a

16  gauge going bad, on my experience --

17      Q.    Low?

18      A.    -- 1 out of 500.  So...

19      Q.    So isn't it -- how would it be

20  that, in your experience, that tank would

21  with a valve assembly such as this one,

22  which only had air, it didn't have

23  chemical --

24      A.    Right.

25      Q.    -- why would there be an

Page 179

1   obstruction in the gauge?

2       A.    There wasn't.  Who said there

3   was an obst...(sic)?

4       Q.    I'm not saying there was.

5       A.    There was no obstruction in the

6   gauge.

7       Q.    I'm not saying there was.  I'm

8   asking is it possible for a tank such as

9   this one that's only filled with air to

10  get an obstruction?

11      A.    Probably not.

12      Q.    And why do you say that?

13      A.    What else would be in it but

14  air?  It had never saw liquid, never saw

15  powder, never saw anything but air only,

16  so there would be no obstruction.

17      Q.    Now, as it pertains to those

18  tanks, the ones that were used for the

19  restaurant, and the one that was used for

20  this, the one that was used in this event,

21  do you know when was the last time those

22  gauges were inspected?

23      A.    The last time they were filled.

24      Q.    And how would it have been

25  inspected?

Page 180

1        A.    When you go to fill it.  There
2    is no way to inspect the gauge.  If the
3    gauge -- if it's -- if it's flat line here
4    and it goes to 12:00, the gauge is
5    working.  How -- there is no other way to
6    check a gauge.
7        Q.    Have you ever heard the
8    expression "calibration of a gauge" as
9    part of maintenance or inspection?
10        A.    Not required.
11        Q.    I didn't -- I didn't ask you if
12    it was required --
13        A.    It's not.
14        Q.    -- sir?  My question was have
15    you ever --
16        A.    Yes, I have heard of it.  Yes.
17        Q.    Let me ask  -- so you've heard
18    the expression, "to calibrate", as part of
19    maintenance or inspection?  Yes?
20        A.    Yes.
21        Q.    Was there anything, any language
22    on the tank or valve assembly in this case
23    that would instruct users to maintain or
24    inspect the pressure gauge?
25        A.    No.

```
                                    Page 181

 1       Q.    Are you familiar with the firm
 2  in the industry related to fire
 3  suppression systems and extinguishers, the
 4  acronym SDS, for -- is it a safety data
 5  set or --
 6       A.    Yes.
 7       Q.    What does it mean?
 8       A.    Safety data sheets.
 9       Q.    Now, did you have an
10  understanding that extinguishers,
11  including those from Pyro-Chem, provide
12  SDS, safety data sheets, for compliance
13  with OSHA?
14       A.    Yes.
15       Q.    In this case, as it pertained to
16  this particular tank and valve assembly,
17  was there an SDS that was within Oprandy's
18  possession back in February of 2016?
19       A.    For what?
20       Q.    For the tanked valve assembly in
21  this case, the one that was either -- the
22  Pyro-Chem.
23       A.    Yes, but why would you need -- a
24  safety data sheet is only on the chemical
25  that's involved.
```

```
 1      Q.    I understand.
 2      A.    Why do you need a safety data
 3  sheet on air?
 4      Q.    I'm not -- I don't have the
 5  answer.
 6      A.    I don't have it either.
 7      Q.    I only have questions.
 8      A.    I have safety data sheets for
 9  every single chemical that is in my
10  possession at 49 Brookline Avenue.
11      Q.    Understood.  And back in
12  February, you did --
13      A.    I had it then.  I've had it for
14  probably ten years since it's been
15  required.
16      Q.    Thank you.
17            Did you have an understanding as
18  to whether Mr. Foust had a Pyro-Chem
19  certificate?
20      A.    Continue.
21      Q.    I'm sorry?
22      A.    Oh.  Ask again.
23      Q.    Sure.
24            Did you have an understanding as
25  to whether Mr. Foust had a Pyro-Chem
```

Page 183

1   certificate?

2       A.    Not required.  No.

3       Q.    And did you have an

4   understanding as to whether Mr. Buono had

5   a Pyro-Chem certificate?

6       A.    No.  Not required.

7       Q.    So the answer is neither one of

8   them --

9       A.    No.

10      Q.    Hold on.  You just got to let me

11  finish.  It's for the benefit of the

12  reporter.  So it was your understanding

13  that neither Mr. Foust or Mr. Buono had

14  Pyro-Chem certificates?

15      A.    True.

16      Q.    Thanks.

17      A.    Could I ask you a question on

18  that?

19      Q.    Yeah.  I might not have the

20  answer, but if you want.

21      A.    What does this -- what does this

22  Pyro-Chem have anything to do with --

23  we're going off the subject.  You are.

24      Q.    Okay.

25      A.    You're going way off the

Page 184

1  subject.  You go way off, you're going out

2  of the scope, and you're not focusing on

3  what we're here for.

4       Q.    Alright.  I appreciate your

5  candor.

6       A.    Well, I've been in this 40 years

7  and I'm being asked questions that have

8  nothing to do with pertaining to filling a

9  simple tank of breathing air, bottom line.

10      Q.    What was your understanding as

11 to the pressure gauge being on the gauge

12 175?

13      A.    What was my --

14      Q.    What was your understanding,

15 what was your basis for believing the

16 pressure gauge at full would indicate 175

17 p.s.i.?

18      A.    Because that's the way it came

19 from the factory of Pyro-Chem.

20      Q.    Had you ever -- okay.

21           MR. FROMSON:  And so can I mark

22      this.

23           (Plaintiff's Exhibit 1,

24      photograph, marked for identification,

25      this date.)

Page 185

1      Q.     So do you have it in front of
2   you, the exhibit?
3      A.     Correct.
4      Q.     I'd ask you to presume that that
5   is a picture of the pressure gauge from
6   the valve assembly on the day of the
7   event.  Will you do that for me, sir?
8      A.     Negative.  It's not.
9      Q.     What makes you believe it's not?
10     A.     Because this is a 225-pound
11  gauge and the tank on question was 175.
12  So this has -- this has nothing to do with
13  the accident.
14     Q.     And so if that reflects the
15  pressure gauge that was provided to all
16  the parties here from OSHA at their
17  inspection site from Salt Lake City,
18  shipped in a box to New York, you would --
19     A.     That's wrong.
20     Q.     -- your indication is they've
21  got the wrong gauge?
22     A.     They've got the wrong gauge, and
23  I can explain why.
24     Q.     Go ahead.
25     A.     Pyro-Chem designed their kitchen

Page 186

1    suppression systems back in 2001, 2002.
2    They increased their tank sizes, increased
3    their liquid sizes to compensate for those
4    tanks, and they also -- they also
5    increased their tank pressures from 175 to
6    225.  You cannot buy from Pyro-Chem today
7    a 175 pound p.s.i. tank of any liquid
8    agent.  Not available.  Are they still out
9    there?  Yes.  There are fire suppression
10   systems still today that I still service
11   and I still fill at 175 because they're
12   still (indicating) "legal" in the
13   industry.
14            That tank was a tank, they took
15   a sample of what I had in my inventory,
16   showing 225 pounds.  That's not the --
17   that's not the cylinder.  If you find --
18   if you can find a tank with the green
19   collar on it from Pyro-Chem, that's a
20   175-pound gauge on it.  Because that came
21   off of a cylinder that was a 2.4 gallon
22   liquid, that could only take 175 pounds
23   pressure.
24        Q.    The other tanks that you had
25   utilized at the restaurant, at Cosmo's,

Page 187

1   approximately earlier, do you still have

2   those in your possession?

3        A.    Yes, I do.

4        Q.    And I apologize if you told me,

5   those were of the same p.s.i.?

6        A.    175.

7        Q.    I would simply ask you not to

8   throw them out; preserve them, please.

9        A.    I still use them.

10       Q.    Fantastic.

11       A.    Thank you.

12            MR. FROMSON:  Can we go off the

13       record for a moment.

14            THE VIDEOGRAPHER:  Sure.  The

15       time is 2:26.  We're going off the

16       record.

17            (Brief recess.)

18            THE VIDEOGRAPHER:  The time is

19       2:42.  We're back on the record.

20            MR. FROMSON:  I have no further

21       questions at this time.  Thank you

22       very much for your candor today.

23            THE WITNESS:  Thank you.

24   EXAMINATION BY MS. MOLINEAUX:

25       Q.    Alright.  Good afternoon.  I'm

1   just going to jump in, probably jump

2   around more than they have, because I'm

3   trying to fill in some holes and -- I want

4   to ask you:  If Chris said in his

5   statement that he was pushing down the

6   valve on the cylinder, do you have an

7   understanding of what he would be pushing

8   on?

9        A.   Yes.  If you took this -- let me

10  bring this up.  If you took this main

11  valve off, this part here, off --

12       Q.   First, I just want to represent

13  for the video that this is a tank that you

14  had in your car and you brought in, it was

15  one of the tanks that was filled the week

16  before our incident.  So it's not an exact

17  match of the tank that we had in this

18  incident?

19       A.   Very close.

20       Q.   But it's close?

21       A.   Close.

22       Q.   Okay.

23       A.   Okay.

24       Q.   Okay.  So with that

25  understanding...

Page 189

1      A.    This male connection threads
2  into the top of the valve.  Okay?  The
3  reason it's on here is because, mainly so
4  I don't lose it.  If you took this off,
5  you could push down on the disc which
6  would open up the valve assembly, which
7  will allow air in it.  You can push down
8  on it.  You don't have to push down on it
9  when you're filling it with air, because
10  the air will flow either -- either way
11  you'll get air into that cylinder.
12      Q.    Had you taught Chris to push
13  down on that valve?
14      A.    I basically told him here's
15  how -- here's how I do it, here's how you
16  can do it.  So basically, it was up to him
17  how he filled it.  Either way -- either
18  way you task, you did this, you will get
19  air into that cylinder.
20      Q.    Is it's appropriate to push down
21  on that to get air in the cylinder?
22      A.    Yes.
23      Q.    Does it help air go into the
24  cylinder faster?
25      A.    Proba-- I'm going to say yes.

Page 190

1       Q.    Okay.  And you said that the
2   valve in our -- on our subject cylinder
3   had never been rebuilt; is that accurate?
4       A.    That's accurate.
5       Q.    Had it ever been taken apart, in
6   any capacity, as far as you know?
7       A.    No.
8       Q.    And to the best of your
9   knowledge, is the valve that was on there
10  at the time this subject cylinder was
11  being filled the same valve that
12  originally came with the cylinder?
13      A.    At my purchase, yes.  That was
14  on that valve when I acquired it through
15  the purchase of Catskill Fire in 2014.
16      Q.    Okay.  I'm going to show you
17  what we've previously marked as
18  Defendant's Exhibit 6.  What I'm
19  particularly interested in you looking at
20  are the numbers up here in the left corner
21  of that OSHA -- oh, you're right, sorry --
22  that OSHA read off the stampings of the
23  cylinder.  Do you have an understanding
24  what those numbers represent?
25      A.    Yes.

1    Q.    Okay.  Could you tell what they

2  are.

3    A.    DOT, Department of

4  Transportation, 4 bravo whiskey 225.

5    Q.    And what does 4 bravo whiskey

6  225 mean to you?

7    A.    That is from -- I'm not a DOT

8  facility, but I'm going to say that is a

9  lot number that Worthington manufactured

10  and assigned to the Department of

11  Transportation for this particular size

12  and type of cylinder.

13    Q.    Okay.

14    A.    And the 225, I'm going to

15  presume is --

16    Q.    Well, I don't want -- I

17  want -- I want what your understanding at

18  the time would have been.

19    A.    DO -- DOT 4BW is 225, those were

20  the markings that were assigned by the

21  manufacturer or by -- I think they would

22  be assigned by DOT to the manufacturer to

23  make this tank.

24    Q.    Okay.  Are there any other

25  stampings on there?

1      A.     There is a number below it, it

2  says Worth, which is Worthington, which is

3  the manufacturer of the cylinder, 0898,

4  which is the month and year of the

5  manufacturing of that cylinder.

6      Q.     And I see there's one more set

7  of numbers below the DOT4BW225?

8      A.     M4543.  Like I said, I -- I'm

9  not familiar with it, but I'm going to

10  presume that could be a lot number from

11  the manufacturer.

12      Q.     Okay.  So would it surprise you

13  to learn that the 225 is the listed

14  service pressure of the tank?

15      A.     Don't know.

16      Q.     Does that surprise you?

17      A.     Probably not.

18      Q.     Okay.  So, knowing the

19  manufacturer's stampings list the service

20  pressure at 225, what would you understand

21  the cylinder could be filled to?

22      A.     225.

23      Q.     And, with that understanding,

24  what would you expect the gauge on the

25  cylinder to say?

1      A.    225.

2      Q.    And if on the day of the

3  incident -- well, I'm assuming that, since

4  you didn't recognize the 225 as being the

5  fill pressure, you probably never had any

6  conversations with Chris regarding the

7  fill pressure being stamped on the

8  cylinder?

9      A.    Correct.

10          MS. STIGALL:  Objection to form.

11     Q.    At the time of the incident,

12  going back to that day --

13     A.    Uh-hum.

14     Q.    -- did you ever an understanding

15  what the 225 stamped on the cylinder

16  meant?

17     A.    No.  I always went by pressure

18  on the gauge.

19     Q.    So when you were filling a

20  cylinder, you would look at the gauge to

21  determine the fill pressure; is that

22  correct?

23     A.    Correct.

24     Q.    And because you didn't have an

25  understanding of what the 225 stamping on

1   the cylinder meant, you never had any

2   conversations with Chris telling him that

3   the service pressure may be stamped -- was

4   stamped on the cylinder?

5        A.    That's correct.

6        Q.    Now, I want to ask you a little

7   bit about setting the regulator when

8   you're going to fill a cylinder.

9            You testified -- and correct me

10  if I'm wrong, because it's kind of a

11  paraphrase -- you testified that, when you

12  go to fill a cylinder, you set the

13  regulator, whether you're filling it with

14  air or from the nitrogen tanks, to 25

15  p.s.i. above its service pressure.

16       A.    Correct.

17       Q.    Correct.  So, if you were

18  filling a 175 p.s.i., you would set the

19  regulator to 200?

20       A.    Correct.

21       Q.    And does that mean that the

22  regulator only let's out 200 p.s.i. at a

23  time?  In other words, once 225 p.s.i. has

24  moved through the regulator, does it shut

25  off automatically?

1      A.    You can't get anymore air out

2   because your regulator is stuck

3   at two-twe-- you're set at 225.  If you go

4   to fill up -- it's as if you're filling a

5   tire.  You put 45 pounds in, once you hit

6   45 pounds, it shuts off.  This doesn't

7   shut off.  It just won't give you anymore

8   pressure.

9      Q.    So no more pressure would come

10  out the regulator?

11     A.    Correct, because it's set at

12  225.  It's a set regulator.

13     Q.    But is it a steady flow that

14  keeps coming?

15     A.    Oh, yes --

16     Q.    Okay.

17     A.    -- until it --

18     Q.    Until you --

19     A.    -- hits --

20     Q.    -- go and turn --

21     A.    -- that --

22     Q.    -- it off?

23     A.    Until it hits that -- if you --

24  if you run a flow of air and you're set at

25  225, once it hits 225, you're gonna have

Page 196

1    still air in that line, but you're not

2    gonna move anymore than 225, because

3    that's what the regulator is set at.

4         Q.    Okay.   I just wanted to clarify

5    that.   Okay.

6              And you had made a comment that

7    the test tanks that were given to test the

8    kitchen -- or the fire suppression

9    systems -- were red and green; is that

10   correct?

11        A.    The tank in question, yes.

12        Q.    What was your understanding of

13   why it was red in green?

14        A.    That's the way it was purchased

15   when Catskill Fire bought it from

16   Pyro-Chem as a test tank only.

17        Q.    So, with your knowledge in the

18   industry, it's your understanding that a

19   kitchen fire suppression system that is

20   painted red and green is to be used as a

21   test tank only?

22        A.    No.

23        Q.    No?

24        A.    Pyro-Chem tank only.   I test

25   other systems besides Pyro-Chem and

1   Pyro-Chem is the only one that has a green

2   label on it, that particular tank.

3   Everything else is whatever is out there.

4        Q.    Have you ever seen another

5   Pyro-Chem test tank that was red and

6   green?

7        A.    No.

8        Q.    You didn't paint the tank, did

9   you?

10       A.    No, I did not.

11       Q.    Do you know if -- I think you

12   said you bought it from Rick.  Do you know

13   if he painted the tank green?

14       A.    No.  It came from -- according

15   to my recollection --

16       Q.    From Rick?

17       A.    -- from what he told --

18   Rick -- from what he told me, he bought

19   that tank as a Pyro-Chem distributor from

20   Pyro-Chem that color, the way it was.

21       Q.    Okay.

22            MR. FROMSON:  Are you going to

23       ask him if he has any others exactly

24       like this one?

25            MS. MOLINEAUX:  You can ask him.

Page 198

1          MR. FROMSON:  Do you currently

2      suppose any exemplary tanks just like

3      the one that was in this event?

4          THE WITNESS:  No.  I got those

5      instead (indicating).

6  BY MS. MOLINEAUX:

7      Q.    And you had said that you were

8  told by one of the firemen that -- who

9  handled the call heard Chris say, "I

10  didn't hear the air flow, so I opened the

11  valve."  Do you remember that?

12      A.    Yes.

13      Q.    And what valve do you understand

14  that to be that he opened?

15      A.    Between the two-stage regulator

16  and probably six, seven, eight foot of air

17  hose to the tank he was filling, through

18  all the connections, there's a quarter --

19  there's a ball valve, which is an on/off

20  valve, and that's what he was using, you

21  crack the valve, and that's when he said

22  he didn't hear it, and pshwoot! full bore

23  opened it.

24      Q.    And that would be the

25  quarter-turn ball valve that's in

Page 199

1   Defendant's Exhibit 7 on the bottom?

2        A.    Yes.  You're correct.

3        Q.    Thank you.

4              And may have said this, but I

5   just want to clarify.  You said that you

6   had discussions with Chris that, if a

7   cylinder is overpressurized, something

8   will happen; is that correct?

9        A.    Yes.

10       Q.    And what is that something?

11       A.    Well, A) if it's

12  overpressurized, whether it's an air

13  cylinder or a fire extinguisher,

14  overpressurize it, you can't go out the

15  door, because now it's overcharged, which,

16  technically, everything is supposed to be

17  in the straight up 12:00 position.  If

18  it's overpressurized, it's easy to put too

19  much air in it or you weren't paying

20  attention, which means you have to start

21  the process over again and that that gauge

22  has to be at the 12:00.

23       Q.    Or what would be the danger of

24  letting an overpressurized tank go out of

25  the building?

1    A.    As a joke, I've always said, if

2    it's overpressurized, you're just going to

3    get a little more pressure to put out the

4    fire, but, believe it or not, I've got

5    inspectors who are nitpickers and say,

6    "12:00.  We're not taking 12:01 or 12:02.

7    12:00."  I've actually had 'em come from

8    the factory, brand new, at 12:02, and I

9    got -- right out of the box.  So, it can

10   happen.  I've also had 'em come out of the

11   box with no pressure on 'em.  So it's a --

12   it's a...

13       Q.    Did you have an understanding at

14   the time of this incident that a tank that

15   was overpressurized exploded?

16       A.    Yes.  But I never, ever thought

17   of it going -- happening, to this extent.

18       Q.    And why is that?

19       A.    Based experience and training, I

20   just never forecasted anything ever to

21   happen.  You never -- you never expect the

22   worst.

23       Q.    So you made comments that you

24   are able to hydrotest low-pressure

25   cylinders, but not DOT cylinders, because

Page 201

```
 1  you're not DOT certified --
 2      A.    Yes.
 3      Q.    -- I think is what you said?
 4      A.    You have to have a retest
 5  facility --
 6      Q.    Okay.
 7      A.    -- a retest to license, which I
 8  don't have.
 9      Q.    Is it your position that the
10  cylinder in this case was not a
11  low-pressure cylinder?
12      A.    Yes.  It was a low-pressure
13  cylinder, but it was a DOT low-pressure
14  cylinder --
15      Q.    Okay.
16      A.    -- which, to be honest with you,
17  all your kitchen system cylinders today,
18  even the newer ones, are DOT cylinders,
19  low-pressure.
20      Q.    What type of low-pressure
21  cylinders would not be DOT?
22      A.    A company called Amerex Fire
23  Extinguisher Company at one time made DOT
24  low-pressure cylinders, portables, but I'm
25  pretty sure -- they're still out there,
```

Page 202

1  but I'm pretty sure that they don't make

2  those cylinders anymore, but they're still

3  out in the field.  And is the only

4  exemption to the rule.  "Exception", I

5  should say.

6      Q.    What's the only exception?

7      A.    Is the only exception, is

8  Amerex.  Everything is all non- -- all

9  your fire extinguishers today and all

10  your -- all your fire extinguishers,

11  portables, now are non DOT low-pressure,

12  except for this Amerex -- it must have

13  been a badge in a year in the mid to late

14  90's, but your kitchen suppression systems

15  today, that you buy, are low-pressure, but

16  they're DOT reg-- DOT cylinders.  I send

17  out 25, 30 a month, I rotate them out,

18  send them out to a DO-- to retest 'em,

19  which is a company that did this one

20  (indicating).

21      Q.    Okay.  Now, I think you

22  testified that the high-pressure cascade

23  system that was used on that day was

24  filtered, clean, breathable air.  Would

25  that be correct?

Page 203

1        A.    Yes.

2        Q.    Why would you use filtered,

3   breathable clean air to fill up a cylinder

4   to do a balloon test that nobody was going

5   to be breathing?

6        A.    That has nothing to do with it.

7   That has -- that's not -- that's not why

8   it was done.  I could use anything.  I

9   could have used shop air, which -- I could

10  use -- I could have used shop air, but I

11  couldn't, because my shop air compressor

12  only goes to 150.  I needed 175.  Yes, you

13  could have used nitrogen, but I think, at

14  the time, Chris specified to me that "I'm

15  low on nitrogen, waiting for a delivery of

16  tanks to come in, can I use air off the

17  compressor?"  I says, "Fine."  Air is air.

18  Air is air.  Let's be real.  And I said,

19  "You know how to do it?"  He says, "Yes;

20  we've done it before."  He says, "I know

21  the procedure.  I'll fill it."  So...

22       Q.    Are you saying that conversation

23  happened the day of the incident?

24       A.    It happened prior -- before this

25  incident and the week before and weeks and

Page 204

1    weeks before, when I was -- those tanks
2    were probably always filled by those --
3    that cascade system.  You got to remember
4    something, nitrogen is expensive,
5    required -- required to be put in portable
6    fire extinguishers, and there's a reason
7    why.  Breathing air -- for a test for an
8    air tank, I could have gone to the gas
9    station and put in 50 cents in the machine
10   and gotten 175 air out of it.  Air is air.
11   It's only for breathing, it's only for an
12   air test.  That particular morning, A),
13   like said before, my shop air compressor
14   only goes to 150, I was low on nitrogen,
15   he had stuff to do to fill, which would --
16   prior to this test was a priority to fill
17   fire extinguishers, so I says -- he said,
18   "I want to fill it off the shop compressor
19   or the cascade system."  I says, "Fine."
20   Same procedure.  Just the air is air.
21       Q.    So if your nitrogen had not been
22   low, would you have used the nitrogen
23   tanks?
24       A.    That would have been his call,
25   but, again, I had four tanks of multiple,

Page 205

1    multiple quantities of air.  Why would I

2    not use a cascade system if the gauges and

3    the procedures are right?  Would I?  It

4    would have been his call.

5            MS. MOLINEAUX:  I'm just looking

6        through my notes.

7            THE WITNESS:  Sure.  Go ahead.

8        Q.    Do you drug test your

9    applicants?

10       A.    No.

11       Q.    As someone who has been working

12   in this industry almost 30 years, why do

13   you think this happened?

14       A.    Huh!  I think -- and my honest

15   opinion -- that, based on what you -- I've

16   told you before, with the arguing back and

17   forth between Chris and Frank, I think

18   there was a drug deal going down.  I think

19   something happened prior to that morning.

20   Where on my -- where?  It could have

21   happened out of my office -- I don't

22   know -- and I think that something went

23   down, something was going to go down, I

24   think there was a transaction of drugs or

25   money, and Frank Buono can say what he

Page 206

1    wants, but I think he went into that room,
2    confronted Chris, Chris was distracted,
3    and if you look at the OSHA findings, the
4    bottom line was overpressurization of a
5    cylinder due to carelessness.
6            It seems awful funny that I got
7    a 36-year old man, who's very suave as far
8    as mechanics and everything else, can fill
9    the exact same tanks, same procedure, same
10   this, this, this, one week ago, if not two
11   years ago, and that morning something
12   happens.  He's filled 'em with other
13   people in the room before, I've been in
14   there watching him fell 'em, he's sitting
15   with Robby, everybody.  Distraction was on
16   something else and it wasn't business
17   related, and I think it was drug-related.
18   That's my honest opinion as the employer.
19           Look, it's too -- it's too
20   coincidental -- I could see if he just
21   walked in the shop 30 days ago and I put
22   him on something.  But if you look at the
23   big picture, the man was well rounded,
24   he's done this before.  It's not like I --
25   you know, it's not like he didn't know

1    what he was doing.  Something -- something

2    caused it.  Whether it was the heater,

3    maybe, but if the heater was on, he still

4    would have known to shut that gauge off,

5    that machine off at 12:00, but to have

6    somebody else talking to him or arguing

7    about something else, yes, and I'm going

8    to stick to that.

9        Q.    In Chris's statement to OSHA, he

10   mentioned online training and courses.  Do

11   you know what training he would be talking

12   about, specifically?

13       A.    Probably the in-house training

14   that I would do.  And let me explain how

15   that works.  I, as the owner of a company,

16   through the association I belong to and

17   all my training, I, as the employer,

18   absorb all the training.  I do 24, 30

19   hours a year worth of training off

20   premises to keep my certifications, and I

21   would come back with the information and

22   all the booklets and I would train my

23   people.  Okay.

24            Just for instance, on this

25   compressor, I learned, in the fire

1  service, I trained my guys as fire chief

2  or as lieu-- captain and, in turn, when I

3  bought the system, I trained whoever was

4  involved.

5          I might have shown Robby -- her

6  son worked for me.  Robby might have seen

7  me do it.  Did he actually physically do

8  it?  Probably not.  Chris, being that he

9  was my shop guy, whether it was in my old

10 building or new building, I would train

11 him.  And this is how it's done.  You

12 know, there's ways to do it.

13         But that -- I did all the

14 training.

15     Q.    So is it your position that

16 Chris didn't engage in online training or

17 courses?

18     A.    No.

19     Q.    Okay.

20     A.    At the present time -- at that

21 time, no.

22     Q.    Okay.  So, if he mentioned in

23 his statement that you provided him a list

24 of courses, you wouldn't know what courses

25 he was talking about?

Page 209

1    A.    I don't know what courses he was
2  talking about, and, to schedule the
3  courses, and, like I also said this
4  before, being a single dad and when he was
5  with his daughter, if I was going to
6  schedule, I would have had to-- it would
7  have been very difficult, due to the fact
8  being a single dad and working with his
9  daughter's schedule, single dad, that
10  would have been a conflict, but there were
11  courses.  Would I have sent him on
12  courses?  I probably would have, down the
13  road.  But, like I said before, a lot of
14  training he did in the shop was based on
15  what I learned through my experience and I
16  would just train everybody.
17    Q.    But I guess what I'm trying to
18  understand, is there a list of courses
19  that you keep that you hand out to
20  employees?
21    A.    There is a course, I have sent
22  my other guys out for classes, yes, and
23  Chris just wasn't out there to go for any
24  courses.  There are courses available.
25    Q.    But I'm trying to -- I'm just

Page 210

1   trying to gather, if Chris said in his

2   statement, "Brian provided me with a list

3   of courses," would you know what list he

4   was speaking of?

5        A.    No.

6        Q.    Okay.

7              MS. MOLINEAUX:  I think that's

8        all I have for now.

9              MS. STIGALL:  I don't have very

10       many, so...

11             THE WITNESS:  More?

12             MS. STIGALL:  Yes.  Sorry.

13   REEXAMINATION BY MS. STIGALL:

14       Q.    You purchased the tank when you

15   purchased -- the cylinder at issue in this

16   case, when you purchased --

17             THE VIDEOGRAPHER:  Is your mike

18       on?  I didn't mean to interrupt, but

19       you might want to start that over.

20             MS. STIGALL:  Thank you.

21       Q.    I believe, if I remember

22   correctly, you said you purchased the tank

23   when you purchased the business in, what

24   year was that?

25       A.    August of 2014, from Catskill

Page 211

1   Fire.

2        Q.    So, other than occasionally

3   using the tank prior to that time, I take

4   it that you would not be able to say

5   whether a valve that's on a tank from 1998

6   had ever been rebuilt prior to the time

7   that you purchased it in 2014?

8        A.    Yes, that's correct.

9        Q.    So you really can't -- it could

10  have been rebuilt in that time; you

11  couldn't say one way or another?

12       A.    Correct.

13       Q.    Additionally, we were talking a

14  little bit about the gauge in the case.

15  Prior to you gaining possession in -- of

16  the tank, could it be possible that, at

17  some point, the gauge was switched out

18  with another tank?

19            MR. FROMSON:  Just objection as

20       to form.

21       A.    Could it have been?  It wasn't

22  done by me.

23       Q.    I'm saying that you didn't take

24  possession of the tank till 2014.

25       A.    Correct.

Page 212

1      Q.    So all I'm saying is, you can't

2    rule out that, at some point, say a gauge

3    got smashed, or damaged, or whatever, and

4    the gauge was switched out on that tank --

5      A.    I can't say.

6      Q.    -- prior to your possession?

7      A.    I'm gonna say I can't say.  I

8    don't know.

9      Q.    Right.  Are you aware that OSHA

10   tested the gauge and found it to be

11   working properly at the pressure it was

12   supposed to be working at?

13     A.    Yes.

14     Q.    And that doesn't surprise you,

15   does it?

16     A.    It doesn't.

17     Q.    Because you normally don't see

18   gauges go bad --

19     A.    Exactly.

20     Q.    -- I think you said?

21           It's my understanding from your

22   testimony earlier that you trained Chris

23   to look at the gauge, to be aware of what

24   the fill pressure was for the cylinder.

25     A.    Correct.

1        Q.    And that was a part of the

2  procedure or the steps that you taught him

3  in filling a cylinder at the Poseidon

4  system --

5        A.    Yes.

6        Q.    -- correct?

7              So, according to the proper

8  procedure that you taught him and what you

9  saw him do over the years, would you have

10 expected that on the morning of this

11 incident he would have looked at that

12 gauge as a part of his standard procedure

13 and determined what the proper fill

14 pressure was?

15       A.    Yes.

16       Q.    And he would have known he

17 shouldn't fill it over that pressure

18 that's shown on the gauge in the green?

19       A.    Yes.

20       Q.    I barely touched on Defendant's

21 Exhibit 22, which is, basically, it look

22 like an outside -- I don't know if this is

23 a prescription or if it's something that a

24 Fentanyl patch goes into.  It's my

25 understanding that that was -- and I'm

Page 214

1    just trying to make sure I have this

2    right.  Is it correct that your wife, when

3    she was looking for the keys to move

4    Mr. Foust's car, either the day of the

5    incident or the next day, found this in

6    his things?

7         A.    Yes.

8         Q.    And was there at some point also

9    a Fentanyl patch found?

10        A.    That I can't say.  I -- I can't

11   say.

12        Q.    Okay.  Well, I saw something in

13   notes that was in that spiral notebook --

14        A.    Okay.

15        Q.    -- that was put together, and

16   maybe I'll just ask you whose handwriting

17   it is.  If you can just look at where it

18   says "Note", there's a star, and can you

19   tell me whose handwriting that is.

20        A.    "Note:  Fentanyl patch 100

21   milligrams was found here at our office,

22   including one used one in Chris's coat

23   pocket."  This was witnessed by several

24   people:  Bruce Pennings, Rick -- these are

25   employers -- Rick Dillon, Robert Hawkins,

1   myself, and Patty.  That's Patty's

2   penmanship.  That's her writing.

3           We were looking for the keys to

4   his car that day, so the first thing you

5   do is, you start with his coat.

6       Q.    And according to this, in the

7   coat pocket, shortly after the incident,

8   you found a Fentanyl patch 100 milligrams,

9   and including a used one in Chris's coat

10  pocket.

11      A.    Yes.

12      Q.    Did Chris ever mention to you

13  being on Fentanyl?

14      A.    Not to my knowledge.

15      Q.    And then we talked a little bit

16  before about the arguing that was going

17  on, or that you heard was going on prior

18  to this incident.

19          Can you read this.  It says

20  "Thursday..."  -- start -- just read

21  slowly for the court reporter, starting at

22  "Thursday, February 18th..."

23          First, whose handwriting is

24  that?

25      A.    First of all, that's Patty --

Page 216

1      Q.     Your wife.

2      A.     -- Scott, my wife.

3             "Thursday, February 18th.

4  Employee, Kimberly Tremberger.  Kimberly

5  arrives at the office every morning at

6  9:15, 9:30.  She states that Chris and

7  Frank were verbally fighting every morning

8  that week of the accident.  When I, Patty,

9  arrived at the office at 10:00 a.m., they

10  did not raise their voices at all."

11            Again, what's this -- what's the

12  fighting about?  It wouldn't be about fire

13  extinguishers.

14     Q.     Are you aware that, when OSHA

15  tested the cylinder, they didn't find any

16  type of defect in terms of the cylinder

17  itself?

18     A.     Yes.  I'm aware of that.

19     Q.     And are you aware that they

20  found that it was simply overpressurized

21  to the extent that it eventually ruptured?

22     A.     Yes.

23            MS. STIGALL:  I think that's all

24     I have.  Thank you.

25            THE VIDEOGRAPHER:  Okay.  Please

Page 217

1          stand by.  The time is 3:13.  We're

2          going off the record.  This is the end

3          of Media File No. 4 and that concludes

4          this deposition.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 218

1               C E R T I F I C A T I O N

2

3

4

5          I, ABNER D. BERZON, a Registered

6     Professional Reporter, Certified

7     Realtime Reporter and Notary Public,

8     do hereby certify that the foregoing

9     witness, BRIAN SCOTT, was duly sworn

10    on the date indicated, and that the

11    foregoing is a true and accurate

12    transcription of my stenographic

13    notes.

14          I further certify that I am not

15    employed by nor related to any party

16    to this action.

17

18

19

20       ABNER D. BERZON, RPR, CRR

21

      Notary Public, State of New York
22    No. 01BE6303311
      Qualified in New York County
23    Commission Expires 5/12/18

24

25

Page 219

1              E X H I B I T S

2

3   Defendant's

4   NO.       DESCRIPTION                PAGE

5   10 subpoena                            8

6   11 various documents related to     18

7      safety procedures

8   12 February 12th, 2016 incident     55

9      report and letter to U.S. DOT

10  13 Answers to Exhibit A             56

11  14 employee handbook                57

12  15 Christopher Foust's employment   59

13     file

14  16 Plaintiff's employment file      63

15  17 an Oprandy's January 24th, 2018  70

16     letter to OSHA and various

17     other letters

18  18 seven pages that relate to       92

19     various contacts and background

20     information made after the

21     incident

22  19 time cards for Chris Foust and   148

23     Frank Buono for February 2016

24

25  (Exhibits Continued on following page.)

1           E X H I B I T S (Continued)

2

3   Defendant's

4   NO.          DESCRIPTION              PAGE

5   20 Worker's Compensation claim       148

6      notes for Chris Foust and

7      Frank Buono

8   21 copy of a spiral notebook         149

9      containing notes kept by Patty

10     Scott relating to contact with

11     parties involved with the

12     accident

13  22 prescription for Fentanyl         150

14     Transdermal System

15  23 diagram drawn by witness at       152

16     today's deposition showing

17     layout of room where incident

18     occurred

19

20  Plaintiff's

21  NO.       DESCRIPTION                 PAGE

22  1         photograph                  184

23

24        (Exhibits retained by counsel.)

25

1                    EXAMINATION INDEX

2

3

4

5    WITNESS:

6

7    BRIAN SCOTT

8

9    BY                        PAGE(S)

10   MS. STIGALL:           6, 210

11   MR. FROMSON:           153

12   MS. MOLINEAUX:         187

13

14

15

16

17

18

19

20

21

22

23

24

25