EXHIBIT "D"

1

2      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
3      ----------------------------------------X
       FRANKLIN BUONO,
4
                                       PLAINTIFF,
5
            Vs.                    CASE NO.
6                                  1:17-cv-05915

7      POSEIDON AIR SYSTEMS, et al.,

8                                      DEFENDANTS.
       ----------------------------------------X
9

10                    DATE:  July 30, 2018

11                    TIME:  10:20 A.M.

12

13          VIDEOTAPED TELECONFERENCED DEPOSITION

14     of the Defendant, WORTHINGTON INDUSTRIES,

15     INC., by a witness, JAMES M. GETTER, taken

16     by the respective parties, pursuant to the

17     Rules of Civil Procedure, held at the

18     offices of Worthington Industries, 200 Old

19     Wilson Bridge Road, Columbus, Ohio 43085,

20     taken before me, Monica K. McBee, a Notary

21     Public in and for the State of Ohio.

22

23

24

25

```
 1

 2    A P P E A R A N C E S:

 3

 4    FINKELSTEIN & PARTNERS, LLP
         Attorneys for the Plaintiff
 5       1279 Route 300
         P.O. Box 1111
 6       Newburgh, New York 12551
         BY:   KENNETH B. FROMSON, ESQ.
 7       (Via teleconference)

 8

 9    BOWLES & VERNA, LLP
         Attorneys for the Defendant
10       WORTHINGTON INDUSTRIES, INC.
         2121 North California Boulevard, Suite 875
11       Walnut Creek, California 94596
         BY:   SHELLEY A. MOLINEAUX, ESQ.
12           (Via teleconference)
                    -and-
13           RICHARD A. ERGO, ESQ.
             (Via teleconference)
14       Raergo@bowlesverna.com
         Smolineaux@bowlesverna.com and
15

16
      WORTHINGTON INDUSTRIES, INC.
17       Attorneys for the Defendant
         WORTHINGTON INDUSTRIES, INC.
18       200 Old Wilson Bridge Road
         Columbus, Ohio 43085
19       BY:   TIMOTHY J. DONEY, ESQ.
         Tjdoney@Worthingtonindustries.com
20

21    (Appearances continued on the following
      page.)
22

23

24

25
```

```
1

2    A P P E A R A N C E S: (Continued)

3

4    SHOOK, HARDY & BACON, LLP
       Attorneys for the Defendant
5    TYCO FIRE PRODUCTS, LP, INCORRECTLY
       SUED AS ANSUL, INCORPORATED AND TYCO
6    FIRE SUPPRESSION PRODUCTS
       2555 Grand Boulevard
7    Kansas City, Missouri 64108
       By:  SANDRA R. STIGALL, ESQ.
8    (Via teleconference)
       Sstigall@shb.com
9

10

11   ALSO PRESENT:

12   Robert L. Miller, Videographer

13

14              *        *        *

15

16

17

18

19

20

21

22

23

24

25
```

1

2      F E D E R A L   S T I P U L A T I O N S

3

4

5      IT IS HEREBY STIPULATED AND AGREED by and

6   between the counsel for the respective

7   parties herein that the sealing, filing and

8   certification of the within deposition be

9   waived; that the original of the deposition

10   may be signed and sworn to by the witness

11   before anyone authorized to administer an

12   oath, with the same effect as if signed

13   before a Judge of the Court; that an

14   unsigned copy of the deposition may be used

15   with the same force and effect as if signed

16   by the witness, 30 days after service of

17   the original & 1 copy of same upon counsel

18   for the witness.

19

20      IT IS FURTHER STIPULATED AND AGREED that

21   all objections except as to form, are

22   reserved to the time of trial.

23

24                *     *     *     *

25

1                      J. GETTER

2                 THE VIDEOGRAPHER:  We are on

3           the record.

4    J A M E S   M.   G E T T E R, of lawful

5    age, Witness herein, having been first duly

6    cautioned and sworn, as hereinafter

7    certified, was examined and said as

8    follows:

9    CROSS-EXAMINATION BY

10   MR. FROMSON:

11        Q.    Good morning, Mr. Getter.  How

12   are you today?

13        A.    Very good.  And yourself?

14        Q.    I am well.  Thank you for the

15   accommodation of appearing by video today.

16   I very much appreciate that, and I don't

17   anticipate that we will be very long on

18   this business day.

19              My full name is Ken Fromson.  I

20   represent the plaintiff in this case,

21   Franklin Buono, related to a lawsuit he has

22   brought stemming from injuries he suffered

23   back on February 12th, 2016.  Can you hear

24   me okay?

25        A.    Yes, I can.

1                    J. GETTER
2          Q.    Fantastic.  I would ask that
3     you let me finish my question in its
4     entirety before you answer the question,
5     such that the court reporter and the
6     videographer have a clear record for us
7     today.  If at any time you don't understand
8     my question, you let me know, and I will be
9     happy to rephrase it.
10               Please keep all your answers
11    verbal, as opposed to a nod of the head or
12    a shrug of the shoulders.  And if you need
13    a break at any time, you let us know, and
14    we will accommodate you.  Is that fair?
15         A.    Yes.
16         Q.    And I will try to keep my voice
17    up, and you please do the same for the
18    benefit of all participants here today,
19    okay?
20         A.    Okay.
21         Q.    Mr. Getter, can you please tell
22    us by whom you are currently employed?
23         A.    Worthington Industries.
24               (Thereupon, Plaintiff's Exhibit
25               No. 1, three-page document titled

```
 1                    J. GETTER
 2          Affidavit of Jim Getter, was marked
 3           for purposes of identification.)
 4          Q.    And at some point earlier than
 5     today, did you provide an affidavit related
 6     to your work and position at Worthington?
 7          A.    Yes.
 8          Q.    And you do have a copy of that
 9     affidavit before you here today?
10          A.    Yes, I do.
11          Q.    That's been marked as Exhibit 1
12     for today's deposition; is that true?
13          A.    Yes.
14          Q.    And is that your full and
15     complete affidavit that you prepared in
16     relation to this case?
17          A.    Yes.
18          Q.    Focusing your attention to the
19     end of the affidavit, do you see a
20     signature line?
21          A.    Yes.
22          Q.    And is that your signature at
23     the end of the affidavit, which is marked
24     as Exhibit 1?
25          A.    Yes, it is.
```

```
 1                        J. GETTER
 2          Q.    And did you -- did you read
 3     that affidavit before you signed it?
 4          A.    Yes, I did.
 5          Q.    And was it fair and accurate to
 6     the best of your knowledge when you signed
 7     it?
 8          A.    Yes.
 9          Q.    And did you, in fact, sign it
10     on May 4th, 2018, before a notary?
11          A.    Not before a notary, but I did
12     sign it, yes.
13          Q.    And in terms of your position
14     at Worthington, for approximately how long
15     have you been employed by Worthington?
16          A.    Been employed by Worthington
17     since 1992, approximately twenty-six years.
18          Q.    What is your date of birth, Mr.
19     Getter?
20          A.    ███████████████ 1957.
21          Q.    That makes you how young today?
22          A.    Sixty years old, sixty years
23     young.
24          Q.    All right, thank you.  And
25     generally speaking, what is your
```

```
 1                    J. GETTER
 2    educational background?
 3         A.    A high school education, many
 4    college degrees, forty -- approximately
 5    forty-two years of experience in designing
 6    pressure vessels similar to this and
 7    others.
 8         Q.    Can you give me a breakdown of
 9    your college degrees?
10         A.    I do not have a college degree.
11    I have many college courses.
12         Q.    Do you hold -- do what --
13    withdrawn, I'm sorry.  What certifications,
14    if any, do you have in your industry in
15    terms of work with industrial products such
16    as these cylinders?
17         A.    There is no certification
18    requirement for DOT type vessels,
19    cylinders.  It's by job experience.
20         Q.    Do you have --
21         A.    I say it's by job experience,
22    and then also Worthington itself certifies
23    me as being capable of doing this work.
24         Q.    So when you reference -- let me
25    withdraw that.  You are a senior product
```

1                    J. GETTER

2    design engineer, correct?

3         A.    Correct.

4         Q.    Outside of your job experience,

5    do you have any formal education in the

6    forum of design engineering?

7         A.    As I said before, I do not have

8    a degree, but I have many classes, college

9    classes in AS -- in engineering.  I have

10   also taken many design -- or many classes

11   in design of ASME or similar type tanks.  I

12   also serve on several committees for

13   writing standards, et cetera.  I also teach

14   the new young engineers DOT, ASME, and

15   similar requirements for regulatory.

16        Q.    When you referenced ASME, in

17   terms of the acronym, could you educate us

18   on what the acronym stands for?

19        A.    ASME is not related to this

20   cylinder, but it's others.  ASME is the

21   American Society of Mechanical Engineers.

22   It's typically used for ground storage type

23   tanks.  DOT is for transportable tanks.  In

24   this case, this tank was built to the DOT

25   requirements, which are written by the

```
 1                    J. GETTER
 2    federal government.
 3         Q.     Are you a member of the
 4    American Society of Mechanical Engineers?
 5         A.     Yes, I am.
 6         Q.     And for approximately how long?
 7         A.     Thirty, thirty-five years.
 8         Q.     And when you referenced that
 9    you teach others in relation to standards
10    of ASME, is that within Worthington or is
11    that something outside of Worthington that
12    you participate in that type of teaching --
13         A.     The teaching that --
14         Q.     -- or both?
15         A.     I am sorry.  The teaching that
16    I do is all within Worthington.
17         Q.     Other than ASME, are there
18    other professional associations in the
19    context of engineering to which you belong?
20         A.     Yes, I am a member of a
21    national board, the National Board
22    Inspection Code Committee, writing
23    inspection requirements for tanks.  I am
24    also a member of PVMA, which is a Pressure
25    Vessel Manufacturer's Association.  I am
```

```
 1                    J. GETTER
 2    also a member of CAN, which is a Canadian
 3    standards association for auto gas tanks.
 4         Q.    Any others that you can recall?
 5         A.    Not that I can recall.
 6         Q.    Would you happen to have this
 7    type of information on a resume or CV, such
 8    that if we asked counsel for you to give it
 9    to them, you would be able to provide them
10    with your credentials?
11         A.    I would have to create the
12    resume.  I do not have a current -- I do
13    not have a current resume.
14         Q.    Using February of 2016 as a
15    guide, can you tell us for how long before
16    2016 you were a member of ASME?
17         A.    That would have been, what, two
18    years ago.  So anywhere from twenty-eight
19    to thirty-three years, somewhere in there.
20         Q.    Similarly, for the National
21    Board of Inspections that you referenced,
22    for how long have you been a member?
23         A.    I have been a member there
24    approximately twelve years.
25         Q.    And as to the TVM or was it
```

```
 1                    J. GETTER
 2   TVA?  I forgot, I am sorry.
 3        A.    That's fine.  It's PVMA, which
 4   is Pressure Vessel Manufacturer's
 5   Association.  I have been a member there
 6   for close to twenty-five years.
 7        Q.    And as far as the colleges
 8   where you took courses, is that a long list
 9   or would you be able to summarize the
10   colleges in which you took courses related
11   to, you know, engineering and design?
12        A.    It's been quite a few years
13   ago, but they were courses through Sinclair
14   Community College in the beginning.  I took
15   courses through the Arizona online program.
16   I also took courses at the University of
17   Wisconsin.
18        Q.    Now, let me focus you again to
19   your affidavit.  You have that in front of
20   you, correct?
21        A.    Yes, I do.
22        Q.    Can you summarize for us your
23   responsibilities as a senior product design
24   engineer at Worthington?
25        A.    I am responsible for the design
```

```
 1                    J. GETTER
 2   of our industrial products, which are not
 3   limited to, but they are limited to propane
 4   cylinders, fire suppressant cylinders,
 5   refrigerant cylinders, et cetera, making
 6   sure that they meet the regulatory and
 7   customer specifications.  My duties include
 8   drawings, calculations, regulatory
 9   compliance, and management of the new
10   product side of the manufacturing process.
11        Q.    As far as the manufacturing
12   process and as part of your duties, are you
13   familiar with how Worthington stamps its
14   cylinders and what those stamps mean?
15        A.    Yes, I am.
16        Q.    As it pertains to this
17   particular case and the Worthington
18   cylinder that was involved in the event for
19   which OSHA did an inspection, did you see
20   the subject photos that were taken by OSHA
21   in this case?
22        A.    Yes, I did.
23        Q.    And in reviewing those
24   photographs, did you confirm the markings
25   on the subject cylinder that was involved
```

1                          J. GETTER

2      in this case?

3              A.     Yes, I did.

4              Q.     And what did you confirm those

5      markings to be?

6              A.     There were several markings on

7      the cylinder, one of which is WORTHJ, which

8      is an inspector's symbol for the facility

9      where these tanks -- these cylinders were

10     produced.  The 08, space, 98 is the month

11     and year of production.  So that would have

12     been August of 1998.

13              DOT 4BW is the Department of

14     Transportation standard for these

15     cylinders, which is a three-piece type

16     cylinder that these are made from.  The 225

17     is the marked service pressure for these

18     cylinders.  The M4543 is the registered

19     manufacturer's symbol for the facility

20     where these cylinders were produced.

21              Q.     As it relates to those

22     markings, did they verify for you a certain

23     level of pressure --

24              A.     Yes.

25              Q.     -- for which the cylinder had

```
 1                    J. GETTER
 2    been tested?
 3        A.    Yes, that's the 225 PSI, and
 4    that's the direction from DOT on how to
 5    mark the pressure on the cylinder.
 6        Q.    Now, as it pertained to this
 7    particular cylinder at issue in this case,
 8    did you have an understanding as to who or
 9    what entity had requested the manufacture
10    of this particular cylinder for purchase?
11        A.    Yes, it was --
12              MS. STIGALL:  Objection,
13         foundation.
14        Q.    I'll rephrase the question, all
15    right?  I want to reference your attention
16    to paragraph number five of your affidavit.
17    Do you see it?
18        A.    Yes, I do.
19        Q.    Can you simply read that into
20    the record?
21        A.    Pyro Chem originally --
22              MS. STIGALL:  Objection,
23         foundation.
24        Q.    Go ahead, Mr. Getter, from the
25    beginning.
```

1                       J. GETTER
2        A.    Okay.  Pyro Chem originally
3   requested this cylinder from Worthington as
4   a component of their fire suppressant
5   system.
6        Q.    Mr. Getter, do you have an
7   understanding as to whether an entity had
8   requested this particular Worthington
9   cylinder as a component for a fire
10  suppression system?
11            MS. STIGALL:  Same objection,
12        foundation.
13       Q.    You can answer.
14       A.    I don't understand the first
15  part your question.
16       Q.    Okay.  What I am getting at,
17  and I will try to ask it in a better way,
18  is how you came to learn of the fact that
19  you put in paragraph five, okay?
20       A.    Pyro --
21       Q.    So let me ask it again, you
22  know.  All right.  Do you have an
23  understanding that Pyro Chem -- let me
24  withdraw that.  After I ask a question, you
25  may hear an objection from any of the other

```
1                    J. GETTER
2      attorneys on the line.  So let them put
3      their objection on the record, and then you
4      can answer the question, okay?
5           A.    Okay.
6           Q.    All right.  So do you have an
7      understanding as to who or what entity
8      requested this cylinder from Worthington as
9      a component of a fire suppression system?
10               MS. STIGALL:  Foundation,
11           please.  Thank you.
12               THE WITNESS:  Pyro Chem
13          contacted --
14          Q.    You can --
15          A.    I was going to say Pyro Chem
16     contacted me about these cylinders and the
17     design of them.
18          Q.    All right, let me stop you
19     there.  Did there come a time before 2016
20     that Pyro Chem contacted you about these
21     particular Worthington cylinders that you
22     described earlier?
23          A.    Yes, in 1994.
24          Q.    Can you describe to the best of
25     your recollection what was requested?
```

```
1                     J. GETTER
2           A.    Pyro Chem requested us to
3    design tanks or cylinders for them in
4    accordance with their requirements for fire
5    suppression systems, and there were several
6    models of cylinders that they requested us
7    to -- to create design models for them.
8    They were purchasing these from a different
9    company at that time and were looking for a
10   new source for these cylinders.
11          Q.    Do you on behalf of
12   Worthington, as well as Worthington itself,
13   do you possess any of the written
14   communications, assuming there were any?
15          A.    No, I do not.
16          Q.    Do you have a recollection of
17   what would have been communicated in terms
18   of whether it was on the phone or in
19   writing or some other way?
20          A.    It would have -- they would
21   have -- to the best of my knowledge and
22   memory, again, this was close to
23   twenty-five years ago, they would have sent
24   me drawings from the previous supplier
25   looking for something similar to what they
```

```
 1                   J. GETTER
 2   were supplying in the past or purchasing in
 3   the past.  And we created drawings of what
 4   we could supply, and those were sent to
 5   them for their approval.
 6        Q.   Was there any type of custom or
 7   practice about which you are aware in terms
 8   of what period of time Worthington received
 9   those communications in the usual course of
10   business?
11        A.   Yes, Worthington has a document
12   storage and time period for each type of
13   document, how long we are to keep those in
14   our files.
15        Q.   So that would be -- what was
16   the time period for such a document
17   retention policy?
18        A.   I don't remember what it is for
19   this.  It certainly is much less than where
20   we are today.  Those files were purged
21   many, many years ago.
22        Q.   When you reference the term
23   fire suppression cylinder, can you educate
24   us on what that means?
25        A.   Fire suppressant cylinder or
```

1                    J. GETTER
2    application system is different than a fire
3    extinguisher.  A fire extinguisher is what
4    would be mounted on the wall in your office
5    or that you would use in your home.  A fire
6    suppression system would be part of a
7    system that's in a building for putting out
8    a fire, whether it's in a kitchen in a
9    grease hood where you have got nozzles and
10   you have got a cylinder that's someplace
11   else that's piped to those nozzles or in
12   your building where you are sitting, you
13   probably have sprinklers.
14            That's a different type of fire
15   suppression system.  And that would be
16   water, if you will.  So there is many
17   different types of chemicals or products
18   that can be used as a fire suppression
19   medium.  And the system is just a system
20   for dispensing that product.
21        Q.    You reference that Worthington
22   would have provided drawings.  And I would
23   ask you to take a look at Exhibit 2 and
24   Exhibit 3 here this morning and tell us
25   whether these are copies or exemplars of

```
 1                         J. GETTER
 2     those drawings.
 3                    (Thereupon, Plaintiff's Exhibit
 4            No. 2, a Worthington Cylinder
 5            drawing, Bates labeled WORTH00001,
 6            was marked for purposes of
 7            identification.)
 8                    (Thereupon, Plaintiff's Exhibit
 9            No. 3, a Worthington Cylinder
10            drawing, Bates labeled WORTH00002,
11            was marked for purposes of
12            identification.)
13                    THE WITNESS:  Yes, they are.
14            Q.    I would like you to take a look
15     at Exhibit 2, for starters.  And can you
16     take us through the diagram to explain to
17     us what each of the boxes are and what they
18     represent?
19            A.    Certainly.
20                    MR. ERGO:  I am going to
21            object.  It calls for a narrative.
22            Q.    I will ask it more -- I will
23     ask it in a more limited fashion.  What is
24     Exhibit 2?
25            A.    Exhibit 2 is the drawing of the
```

```
 1                    J. GETTER
 2   cylinder itself.
 3        Q.    And is this a document that's
 4   kept by Worthington Cylinder, a subsidiary
 5   of Worthington Industries, Incorporated, as
 6   -- in its usual course of business?
 7        A.    Yes, this is kept in our
 8   archive file.
 9        Q.    And for what purpose was it
10   implemented?  In other words, for what
11   reason was it made?
12        A.    It was made for production so
13   they would know how to make the cylinder
14   that Pyro Chem was requiring -- requesting.
15        Q.    And who was the entity that
16   handled the production?
17        A.    The production was by
18   Worthington Cylinders or Worthington
19   Industries.
20        Q.    What is the box in the top
21   left-hand corner under the acronym REVS?
22   What does that stand for?
23        A.    That stands for revisions.
24   That's the different revisions.  That stop
25   section is revisions that were made to this
```

```
 1                    J. GETTER
 2   drawing or changes to this drawing.
 3        Q.    And so in the chronology of
 4   events to know which drawing we are looking
 5   at, is there a way to determine how many
 6   revisions there were?
 7        A.    Yes.  In the very top row,
 8   there is a letter with a circle around it.
 9   That's the chronological order of the
10   changes that were made to the drawing.  In
11   this case, it started at A and ended at E.
12        Q.    And is there a way to tell from
13   the document what the revisions were?
14        A.    Yes.  We have a short synopsis
15   in the block below the letter, and it's a
16   synopsis of what the change was.
17        Q.    Does it indicate -- do any of
18   these short synopses indicate who was the
19   source of the revision?  In other words,
20   was it a revision that was implemented
21   based upon Worthington versus someone who
22   was requesting the tanks?
23        A.    No.
24        Q.    And so if we look to Box A
25   related to the revision, can you tell us
```

```
 1                    J. GETTER
 2    what was the revision?
 3          A.    That revision was to a change
 4    in the height of the foot ring.  Pyro Chem
 5    would have requested us to make the foot
 6    ring taller to make the cylinder sit taller
 7    for some reason.  So we changed it from a
 8    two-inch tall foot ring to a
 9    two-and-a-half-inch tall foot ring.
10          Q.    What is it about that synopsis
11    that leads you to believe it was a request
12    by Pyro Chem?
13          A.    Because we would have no reason
14    to make that change on our own.  We could
15    have supplied it either with a two inch or
16    two and a half inch, either way.
17          Q.    Can you look at the next
18    revision, which is under the letter B?
19          A.    Yes.  Under here, the working
20    pressure and the specification was 175, and
21    the test pressure was 350.  So there would
22    have been a request from Pyro Chem to
23    change the service pressure on this
24    cylinder from a 175 PSI to a 225 PSI, which
25    also required a test pressure change from
```

```
 1                      J. GETTER
 2    three fifty PSI to 450 PSI.
 3            Q.     And was it your understanding
 4    that such a revision was put into place?
 5            A.     Yes.
 6            Q.     And as to the revision letter
 7    B, can you summarize for us what that was?
 8            A.     B?  I thought I just described
 9    that.
10            Q.     I am sorry, I thought I said C.
11    Look to letter C.
12            A.     C is --
13            Q.     And tell us what was the nature
14    of the revision.
15            A.     I am sorry, yes.  C was adding
16    drawing numbers.  So there would have been
17    a couple drawing numbers that would have
18    been added in the course of creating this
19    design with Pyro Chem's requirements.  So
20    the initial drawings would not have had
21    drawing numbers on them.
22            Q.     And by whose request would that
23    have been done?
24            A.     That would have been our
25    request.
```

```
 1                    J. GETTER
 2         Q.    As to letter D, as in dog, what
 3    was the revision?
 4         A.    Revision D was adding a
 5    geometric tolerance, which is a tolerance
 6    for -- in this case, the tolerance on the
 7    verticality of the cylinder, so how
 8    straight does the cylinder --
 9         Q.    I am sorry.  Did you complete
10    your answer?
11         A.    I said that was the geometric
12    tolerance for how vertical the cylinder --
13    how straight the cylinder stood up.
14         Q.    By whose request was that
15    revision made?
16         A.    That would have been a Pyro
17    Chem request, also.
18         Q.    And then letter E, as in egg,
19    what was the nature of the revision?
20         A.    E was adding the final part
21    numbers and the approval for -- to begin
22    production.
23         Q.    And by whose request was that
24    done?
25         A.    That would have been both Pyro
```

```
 1                    J. GETTER
 2    Chem and us.  Pyro Chem would have been --
 3    they approved this design for production,
 4    and then us would have been adding the
 5    final part numbers or drawing numbers.
 6          Q.    Now, referencing Exhibit 3, you
 7    have that in front of you, correct?
 8          A.    Yes, I do.
 9          Q.    And what is Exhibit 3?
10          A.    Exhibit 3 is a stamping layout.
11          Q.    Is it a stamping layout for the
12    subject cylinder that was involved in this
13    case?
14          A.    Yes, it's for the top head
15    stamping of this cylinder.
16          Q.    To what extent do Exhibit 2 and
17    Exhibit 3 go together?
18          A.    2 is the drawing for our
19    production facility so they know how the
20    cylinder is supposed to be put together.  3
21    is for our facility for the stamping layout
22    so they know how to stamp the top head for
23    the required markings.
24          Q.    And earlier I asked you very
25    procedural questions about whether this was
```

```
 1                     J. GETTER
 2   a business record, so let me ask you the
 3   same for Exhibit 3.  Is Exhibit 3 a
 4   document that's kept in the usual course of
 5   business by your employer, Worthington?
 6        A.    Yes, it is.  It is also kept --
 7        Q.    And is this particular -- go
 8   ahead, I'm sorry.
 9        A.    I would say this is also
10   retained in our archive file.
11        Q.    And this pertains to the actual
12   tank that was involved in the event,
13   correct?
14        A.    Correct.
15        Q.    Now, let's look to the
16   revisions on the top left corner of Exhibit
17   3.  Do you see revision letter A?
18        A.    Yes.
19        Q.    And what was the nature of that
20   revision?
21        A.    We changed the serial number
22   suffix, and then we added a drawing number.
23        Q.    For what reason would that have
24   been done, if you know?
25        A.    It would have been our request.
```

```
 1                    J. GETTER
 2   We use the serial number suffix to
 3   designate the type of cylinder that it is.
 4   In other words, the diameter, the water
 5   capacity pressure, we separate those out
 6   into separate groups.
 7        Q.    And then revision letter B,
 8   what was the nature of revision letter B?
 9        A.    Again, it was a change in
10   serial number suffix, where it was TS,
11   which stood for test sample.  So we would
12   have made --
13        Q.    As far as the -- I am so sorry.
14   Can you repeat that?
15        A.    Yes.  I would say that we
16   produced sample cylinders in the beginning
17   for Pyro Chem to test in their system and
18   also for UL certification.
19        Q.    As far as the initials that are
20   in each of the revision box, do the letters
21   JHN pertain to an individual?
22        A.    Yes, they do.
23        Q.    Who is that?
24        A.    His name was John.  He was one
25   of the people -- one of the guys that
```

1                        J. GETTER
2     worked with me on creating drawings.
3            Q.     His last name is what?
4            A.     I don't remember his last name,
5     I apologize.
6            Q.     Is he still employed by
7     Worthington?
8            A.     No, he is not.
9            Q.     Do you know generally the
10    nature of his leaving Worthington, whether
11    it was by retirement or something else?
12           A.     I believe he went on to another
13    job at a different company.
14           Q.     How about the initials JMG, can
15    you identify that person?
16           A.     That is myself.
17                  (Thereupon, Plaintiff's Exhibit
18           No. 4, a document titled Inspector's
19           Report, was marked for purposes of
20           identification.)
21           Q.     Thank you.  Take a look at
22    Exhibit 4.  Let me know when you have that
23    in front of you.
24           A.     Which one was Exhibit 4, that
25    was the inspector's report?

```
 1                        J. GETTER
 2           Q.    Yes, sir.
 3           A.    I have it, I'm sorry.
 4           Q.    All right.  So in front of you
 5   is Exhibit 4, inspector's report.  Can you
 6   identify -- what is this document?
 7           A.    This is a document that's
 8   required by DOT or the federal government
 9   to describe the cylinders itself and what
10   they were made from, the testing that was
11   completed on them, et cetera.
12           Q.    Who made this report?
13           A.    It would have been generated by
14   our quality control manager at the time.
15           Q.    And who was Melissa
16   Dingus-Luoma?
17           A.    She was a quality manager at
18   that time at the facility.
19           Q.    And does this inspector's
20   report provide us with an inspection
21   related to the particular cylinder in this
22   case?
23           A.    Yes, it does.
24           Q.    How do you know that?
25           A.    By the serial number.  About a
```

1                    J. GETTER
2     third of the way down, there is a line that
3     says serial numbers, and this report covers
4     a range of serial numbers for cylinders.
5          Q.     And can you educate us on what
6     you can tell from looking at the serial
7     numbers that allows you to confirm that
8     this inspection pertained to the particular
9     cylinder in this case?
10         A.     In the inspector's report, one
11    of -- yes.  In the inspector's -- or excuse
12    me, in the OSHA report, there is a photo
13    that shows the top head of the cylinder,
14    which shows the marking and the serial
15    number, and it is within this range of
16    numbers.
17         Q.     And other than the serial
18    number, were there other DOT references or
19    manufacturing references that also
20    confirmed it was the same tank?
21         A.     Yes, there is.
22         Q.     Can you summarize those?
23         A.     Yes.  The specification, which
24    is the DOT-4 BW225, which is stamped in the
25    top head of the cylinder.  There is also

```
  1                    J. GETTER
  2    the inspector's mark, WORTHJ.  There is the
  3    identifying symbol, which is our registered
  4    symbol, which is M4543.  There is also the
  5    test date, which was August of 1998.  And
  6    there was no additional markings stamped on
  7    this cylinder.  And we talked about this
  8    earlier, also.
  9                  (Thereupon, Plaintiff's Exhibit
 10            No. 5, a document titled Record of
 11            Chemical Analysis of Material For
 12            Cylinders, was marked for purposes of
 13            identification.)
 14         Q.    Take a look at Exhibit 5.  Let
 15    me know when you have that in front of you.
 16         A.    I have that in front of me.
 17         Q.    And it's identified with a
 18    title, record of chemical analysis of
 19    material for cylinders.  Can you identify
 20    -- what is this document?
 21         A.    Yes, this is the document that
 22    lists the -- lists the heats of material
 23    that were used for the construction of
 24    these cylinders.  It lists the heat number
 25    that was used.  It lists -- the LTV was the
```

```
 1                    J. GETTER
 2    supplier of the material.  It tells you
 3    that there was a check analysis completed
 4    on the material, and then it describes the
 5    chemistry that was discovered in that check
 6    analysis.
 7         Q.    Was this a document that was
 8    prepared by Worthington?
 9         A.    Yes.
10         Q.    And is this a document that is
11    kept in the ordinary course of business by
12    Worthington currently?
13         A.    Yes.
14         Q.    Are you able to confirm whether
15    this record of chemical analysis
16    corresponds to the subject cylinder in this
17    case?
18         A.    Yes, based on the serial
19    numbers.
20         Q.    And you referenced the serial
21    numbers.  Those are listed on the top of
22    the page, correct?
23         A.    Yes, they are.
24         Q.    And they are also listed in the
25    chart.  Do you see that?
```

```
1                        J. GETTER
2          A.    Yes, they are.
3          Q.    Is it your understanding that
4    the serial number for the subject cylinder
5    in this case is encompassed by those ranges
6    of serial numbers?
7          A.    That is correct.
8          Q.    Thank you.  Now I would like to
9    take you back to your affidavit, so let me
10   know when you have that in front of you.
11         A.    I do have it in front of me.
12         Q.    Focus your attention to
13   paragraph nine of your affidavit.  Do you
14   see that?
15         A.    Yes, I do.
16         Q.    All right.  What was your
17   understanding as to what product was to
18   leave Worthington and go to Pyro Chem?
19         A.    It was an empty cylinder per
20   the drawing, which was Exhibit 2.
21         Q.    Did you have an understanding
22   as to whether the empty cylinder was to
23   include any labeling?
24         A.    No, we supplied the cylinder in
25   accordance with Pyro Chem's requirements,
```

```
1                        J. GETTER
2    and they were supposedly going -- they were
3    going to install the valve, put the product
4    in the cylinder, do the labeling, markings,
5    et cetera.  That was part of their
6    responsibility.
7           Q.    Did you provide an empty
8    cylinder without a label?
9           A.    Yes; that's correct.
10          Q.    Did you provide an empty -- did
11   you provide an empty cylinder with an open
12   top that then had a push plug placed in the
13   top?
14          A.    That is correct.
15          Q.    And what was the purpose of the
16   push plug?
17          A.    It's to keep dirt and debris
18   out of the cylinder when it's being shipped
19   from our facility to theirs.
20          Q.    What was your understanding as
21   to what Pyro Chem did with the cylinder
22   upon their receipt?
23          A.    My understanding is this was a
24   component of their fire suppression system
25   and that they would be putting the fire
```

```
 1                    J. GETTER
 2   suppression media in the cylinder,
 3   installing the valve, pressurizing the
 4   cylinder, putting all the labeling on it,
 5   packaging it for shipping, et cetera, to
 6   their customer.
 7        Q.    Other than providing the
 8   cylinder itself what, if any, involvement
 9   did Worthington have with that cylinder in
10   terms of providing it to the -- the
11   purchaser?
12             MR. ERGO:  I am going to
13        object, vague and ambiguous.
14        Q.    Take a look at paragraph
15   twelve.  Do you see paragraph twelve?
16        A.    Yes.
17        Q.    Other than manufacturing the
18   cylinder and providing it to the purchaser
19   what, if any, involvement did Worthington
20   have?
21        A.    None.
22        Q.    Now, as part of Worthington's
23   DOT certification related to these types of
24   cylinders, was there a -- was there a
25   method in place by which Worthington would
```

```
 1                    J. GETTER
 2    test a certain amount of cylinders?
 3         A.    Yes, as part of the DOT
 4    specification.
 5         Q.    What was your understanding as
 6    to what Worthington had done in this
 7    respect?
 8         A.    In this respect, one out of
 9    five hundred cylinders we pressurized to
10    900 PSI, or four times the marked service
11    pressure without rupture.  We also tested
12    one out of two hundred cylinders to test
13    pressure, which is two times the marked
14    service pressure in a jacket or doing a
15    volumetric expansion test which measures
16    the amount of expansion for the cylinder.
17              And then we took the remainder
18    of each of those lots of cylinders, and we
19    tested them to two times the marked service
20    pressure of 450 PSI.  We also took one of
21    two hundred cylinders and did the physical
22    testing, which is the tensile test, et
23    cetera, on the materials.  That's all.
24         Q.    Out of any of those test
25    measures that you just referenced, had any
```

```
 1                    J. GETTER
 2   cylinder ever failed?
 3        A.    No.
 4        Q.    Can you describe for us how the
 5   selection process would be to pick out the
 6   very one cylinder out of every five hundred
 7   cylinders or out of every two hundred
 8   cylinders for those tests?
 9        A.    It's a random pulling of those.
10        Q.    Do you know whether this
11   particular cylinder, the one that was
12   involved in this event in 2016, was ever
13   the randomly chosen cylinder for testing?
14        A.    No, it was not, because random
15   tested cylinders are scrapped during the
16   test process.
17        Q.    As part of -- withdrawn.  Did
18   there come a time that you reviewed the
19   OSHA report regarding its inspection and
20   testing of this subject cylinder?
21        A.    Yes, I did.
22        Q.    I am just going to ask you some
23   questions about that.  Why did you do that?
24        A.    The report was given to me when
25   they were first discussing this cylinder
```

1                        J. GETTER
2    and the accident, so the report was given
3    to me for my review.  I was the one that
4    had knowledge of the design and
5    construction of these cylinders.
6         Q.    As far as the methods employed
7    by OSHA related to its inspection and
8    testing of this subject cylinder, were you
9    familiar in terms of your experience with
10   the method of inspection and testing that
11   was done by OSHA?
12        A.    Yes.
13        Q.    Do you have personal experience
14   in doing those types of inspections and
15   testing that OSHA did in this case?
16        A.    Certainly have been involved
17   with most of the testing that was involved
18   with this cylinder, whether through our own
19   R and D lab or some of the requirements
20   that I have directed.  Certainly, the
21   tensile test, yield strength test of the
22   materials are tests that we do at our own
23   facility.
24        Q.    Did you come to an
25   understanding as to why the cylinder

1                        J. GETTER
2    ruptured in this case based upon your
3    review of the OSHA report?
4              MR. ERGO:  Objection,
5         foundation, calls for expert
6         opinions.
7              MS. STIGALL:  I, likewise,
8         object.
9         Q.    You can answer, Mr. Getter.
10        A.    The cylinder -- my opinion, the
11   cylinder ruptured because it was
12   overpressurized.
13        Q.    Other than the -- other than
14   what you read in the OSHA report, do you
15   have any other basis for that?
16        A.    Yes, based on looking at the
17   pictures of the cylinder after rupture,
18   those are indications that it was an
19   overpressurization failure.
20        Q.    Other than the report and the
21   photos, do you have any other basis for
22   believing it was overpressurization?
23              MS. STIGALL:  I have a
24         continuing objection.
25        Q.    You can answer, Mr. Getter.

1                          J. GETTER

2          A.    I am not certain I understand

3    the question.

4          Q.    You mentioned that you also

5    reviewed the photographs --

6          A.    Correct.

7          Q.    -- and that they corroborated

8    the overpressurization.  Do you recall that

9    answer?

10         A.    Yes.

11         Q.    So you listed the report and

12   the photos.  I am just trying to find out

13   if you looked at anything else.

14         A.    No, I did not see anything

15   else.

16                 (Thereupon, Plaintiff's Exhibit

17          No. 7, a thirteen-page document

18          titled Worthington Industries, Inc.'s

19          Response to Tyco Fire Products LP's

20          Request For Production of Documents,

21          was marked for purposes of

22          identification.)

23         Q.    Now, can you take a look at the

24   exhibit that we have marked as Exhibit 7,

25   which was the Worthington response to

```
 1                    J. GETTER
 2    certain document requests.  I understand
 3    that was provided by counsel.  Let me know
 4    when you have that.
 5         A.    I have that.
 6         Q.    I apologize if you have already
 7    answered some of these questions earlier.
 8    I will be brief, I promise.
 9         A.    Okay.
10         Q.    As to request number one at
11    page three, do you see request number one
12    at page three?
13         A.    Yes, I do.
14         Q.    It requests agreements and
15    contracts essentially related to the
16    Worthington cylinder.  I just want to
17    confirm, are you aware of any responsive
18    documents that would be in the possession
19    of Worthington now in 2018 related to the
20    agreements or contracts?
21         A.    No, I am not.
22         Q.    Other than the drawings you
23    provided, the inspection report and the
24    chemical analysis report -- I think I said
25    that correctly, let me double-check.  Let
```

```
 1                        J. GETTER
 2   me withdraw that question.  Take a look at
 3   request number seven.  Let me know when you
 4   see it.
 5        A.    I see it.
 6        Q.    Are you aware of any written
 7   safety warnings or maintenance
 8   recommendations or manuals that would have
 9   gone with the Worthington cylinder?
10        A.    There would not have been.
11        Q.    So in terms of the actual
12   product, I know you have described it as a
13   -- as a cylinder.  Would it go out to the
14   purchaser in a box?
15        A.    It would have been bulk packed
16   on a pallet and stretch wrapped.  So they
17   would have been --
18        Q.    Traditionally --
19        A.    Traditionally, there is --
20        Q.    -- would there have been a --
21        A.    I am sorry.
22        Q.    Hold on, my bad.  I apologize.
23   Did you complete your answer?
24        A.    No, I said they would have been
25   stacked vertically on a wooden pallet and
```

1                      J. GETTER
2     then stretch wrapped.
3          Q.    Would there have been any
4     manual that went with it --
5          A.    No.
6          Q.    -- or with them?
7          A.    No.
8          Q.    And when I reference a manual,
9     I mean an instruction manual.  Would there
10    have been any type of instruction manual to
11    the purchaser?
12         A.    No.
13         Q.    So other than the cylinders
14    themself [sic], is it your understanding
15    that nothing else would have accompanied
16    the subject cylinders?
17         A.    Beyond the packaging materials,
18    no, that would have been all.
19         Q.    Take a look at request number
20    fifteen at page nine.  Let me know when you
21    get there.
22         A.    Request number fifteen on page
23    nine?
24         Q.    Yes, sir.  Yes, sir.
25         A.    Fifteen would have been on page

47

1                    J. GETTER
2    eleven.
3         Q.    I have page nine, request
4    number fifteen related to photographs and
5    moving pictures.  Do you see that?
6         A.    It's on page eleven in what I
7    have.
8         Q.    Fair enough.  We might have
9    different paginations.
10        A.    Yeah.
11        Q.    So do you see request number
12   fifteen related to photographs and moving
13   pictures and videotapes?
14        A.    Correct, I do.
15        Q.    Are you aware of any
16   photographs or videos related to these
17   subject cylinders that date back to the
18   time of the inspections and the revisions
19   and things of that nature?
20        A.    No.
21        Q.    What was your answer?
22        A.    No, there was none taken that I
23   am aware of.
24        Q.    Okay.  And now fast forwarding
25   to approximately April 16th of 2018, I want

```
1                        J. GETTER
2     you to assume that there was an inspection
3     of the remnants of the cylinder in New York
4     City.  Do you -- do you or have you been
5     shown any of the photographs from an
6     inspection of the cylinder?
7          A.    Yes, I have a copy of the OSHA
8     report that shows the photos that were
9     taken at the accident.
10         Q.    Let me rephrase.  As part of
11    the litigation, I would ask you just to
12    assume that the attorneys met in New York
13    City in 2018 with certain representatives
14    to take photographs and video at their
15    choosing of the product or the remnants of
16    the product.  Have you seen any of that?
17         A.    I have seen the pictures of
18    that that were taken at that time.
19         Q.    Have you seen any video,
20    assuming there was video?
21         A.    No, I have not.  I have only
22    seen pictures.
23              (Thereupon, Plaintiff's Exhibit
24         No. 6, a printout, was marked for
25         purposes of identification.)
```

```
 1                    J. GETTER
 2        Q.     Now, take a look at Exhibit 6.
 3   I forgot to ask you about that.  Let me
 4   know when you have it in front of you.
 5        A.     Exhibit 6 was which document?
 6        Q.     It's a -- it's a receipt or a
 7   printout of some kind, and that is a little
 8   bit difficult to read.
 9        A.     Oh, yes.
10             MS. STIGALL:  Yeah.  And for
11           the record, I will just say I really
12           can't read it at all.  I can read the
13           few lines that are at the bottom
14           dark.
15             THE WITNESS:  The -- if you
16           would have printed it on large paper
17           in black and white, it's a little bit
18           more readable.
19        Q.     Understood.
20        A.     I have it in front of me in
21   black.
22        Q.     Let me just ask you -- let me
23   just lay the foundation.  Do you have
24   Exhibit 6 in front of you?
25        A.     Yes, I do.
```

```
 1                      J. GETTER
 2         Q.    Do you have a corresponding
 3    document that you printed on your own for
 4    purposes of the deposition that is a little
 5    bit more legible?
 6         A.    Yes, I do.
 7         Q.    Is it an exemplary copy of
 8    Exhibit 6?
 9         A.    Yes, it was printed from the
10    same e-mail.
11         Q.    Okay.  I would ask that you
12    preserve it.  Don't destroy it.  Give it to
13    counsel, okay?
14         A.    Okay.
15         Q.    All right.  So what is Exhibit
16    6?
17         A.    This is the report of the
18    physical testing that was completed on
19    those lots of cylinders.
20         Q.    Is there a particular place on
21    this report that references the actual
22    subject cylinder involved in this event?
23         A.    Yes.
24         Q.    Can you help us find it?
25         A.    Yes, the serial number range --
```

```
 1                      J. GETTER
 2    it would have been the very top one, the
 3    very first one in the line.
 4            Q.    And how is it that you are able
 5    to identify it, is it by serial number?
 6            A.    By serial number, correct.
 7            Q.    Can you read out the serial
 8    number?
 9            A.    It's difficult for me to read
10    also.  It appears to be 0025801AD through
11    -- and I cannot read the rest of it.  The
12    next line is not readable.  But that would
13    have been that first section for it.
14            Q.    In the absence of having a
15    clearly legible copy, is there any other
16    way to confirm and corroborate that this
17    report related to the testing that would
18    apply to the subject cylinder?
19            A.    No, it's all based on serial
20    number.
21            Q.    And are there certain columns
22    following the serial number that
23    corroborate the testing for the cylinder?
24            A.    Yes.
25            Q.    And are you able to go through
```

1                       J. GETTER
2    the columns with us and identify what type
3    of testing was done?
4           A.    Yes.
5           Q.    So, for example, whether it's a
6    tensile test or a burst test, those are
7    referenced in the columns?
8           A.    Yes, they are.
9           Q.    All right.  Take us through the
10   -- because of the difficulty in reading it,
11   I need you to educate us on the columns
12   across the page, what -- what tests are
13   included.  So what is the first test?
14          A.    The first test is a tensile
15   test.
16          Q.    And you are spelling that
17   T-E-N-S-I-L-E, correct?
18          A.    That is correct.
19          Q.    And what is it about the
20   tensile test in this case in terms of the
21   results that are reflected?
22          A.    In this case, the -- we pull a
23   tensile test of the top head, the bottom
24   head, the side wall of the cylinder, and
25   also through the longitudinal weld of the

```
 1                    J. GETTER
 2    cylinder.  In the case of this cylinder, in
 3    accordance with DOT requirements, that
 4    minimum number is seventy thousand.  In
 5    this report, the lowest number is
 6    seventy-nine thousand four hundred.  So the
 7    actual tensile test exceeded the DOT
 8    minimum requirements.
 9                    The next column is the yield
10    strength of the material, and that would
11    have been on the top head, the bottom head,
12    and the sidewall.  And DOT only requires
13    that you record this number, it does not
14    provide a minimum.  The next column is the
15    elongation for the material.  And I cannot
16    read the numbers of what's on my report.
17                    The next column, when you do a
18    tensile test, you have a reduced area that
19    you measure, and that's what that number
20    represents is the area of the reduction
21    from the tensile testing.  The next column
22    is a weld or bend test on the material.
23    You do a bend test to prove that the
24    material was laudable.  In the case of
25    this, it said pass.
```

```
 1                    J. GETTER
 2              The next column where we put a
 3    value in for these cylinders is a burst
 4    test pressure.  And it shows we took these
 5    -- this cylinder up to 900 PSI without
 6    failure.  The next column is the volumetric
 7    expansion test I described, which we took
 8    those up to 400 PSI.
 9              And the next columns talk about
10    the amount of expansion that the cylinders
11    saw, so it was 8 CC total expansion.  There
12    was two CC of permanent expansion.  And we
13    are allowed 91 CC of permanent expansion,
14    so it met its requirements.  The next
15    column, I -- the rest of the columns, I
16    cannot read what they are saying.
17         Q.    And was that the final column?
18         A.    Yes.
19              MR. FROMSON:  All right.  Thank
20         you, Mr. Getter.  I don't have any
21         other questions at this time.  Other
22         people on the phone may very well.
23         Thank you.
24              MR. ERGO:  Okay, this is Rich
25         Ergo.  I have to take a break because
```

```
 1                    J. GETTER
 2          I have to drive someone somewhere,
 3          but I am going to get right back.
 4          You know, give me -- if we can take,
 5          like, ten minutes and resume?
 6               MS. STIGALL:  Why don't we go
 7          ahead and take fifteen, and then we
 8          will have plenty of time because I
 9          know you probably want to print out
10          what I sent also.
11               MR. DONEY:  Yes.
12               THE VIDEOGRAPHER:  We are off
13          the record.
14               (Recess taken.)
15               THE VIDEOGRAPHER:  We are on
16          the record.
17   CROSS-EXAMINATION BY
18   MS. STIGALL:
19          Q.    Mr. Getter, my name is Sandy
20   Stigall.  I represent Tyco Fire Products,
21   LP, who is a defendant in the present
22   action.  I wanted to start off by
23   clarifying, the defendant in the present
24   action is Worthington Industries.  Are you
25   an employee of Worthington Industries or
```

```
 1                      J. GETTER
 2    are you an employer -- employee of
 3    Worthington Cylinders Corp.?
 4         A.    An employee of Worthington
 5    Industries.  Worthington Cylinders is a
 6    part of Worthington Industries.
 7         Q.    Okay.  Would you agree with me
 8    that Worthington Industries is one of the
 9    largest steel processors in the United
10    States?
11         A.    I believe that's true.
12              MR. ERGO:  Foundation.
13         Q.    Okay.  And that -- am I correct
14    that Worthington Cylinders is one of the
15    segments of Worthington Industries?
16              MR. ERGO:  Objection, vague,
17          ambiguous, foundation, calls for a
18          legal conclusion.
19         Q.    Well, is Worthington Cylinders
20    under the umbrella without getting into the
21    legalities of it of Worthington Industries?
22              MR. ERGO:  The same objection,
23          but you can answer.
24              MR. DONEY:  You can go ahead
25          and answer.
```

```
 1                    J. GETTER
 2              THE WITNESS:  I'm sorry, yes.
 3              (Thereupon, Defendants' Exhibit
 4         No. 8, an eight-page document titled
 5         Manufacturing Today, was marked for
 6         purposes of identification.)
 7         Q.    And I had pulled some things
 8    from the Internet.  One of the things I
 9    pulled was this article.  This is from
10    Manufacturing Today that is Defendants'
11    Exhibit 8?
12         A.    Yes.
13         Q.    And in the article, it notes
14    that Worthington Cylinders is the world's
15    leading manufacturer of -- and supplier --
16    of pressure cylinders with around twenty
17    percent of the total global market.  Does
18    that sound like a good estimate to you in
19    terms of your knowledge of the company that
20    you work for?
21              MR. ERGO:  Foundation, calls
22         for speculation.
23              THE WITNESS:  I don't know the
24         size of our company and what
25         percentage we distribute.
```

```
1                        J. GETTER
2           Q.     So sitting here today, you
3    don't have any idea of an estimate of the
4    percentage of the world market that your
5    employer has in the area of the cylinders;
6    is that correct?
7           A.     That is correct.
8           Q.     Do you know how many plants
9    Worthington Cylinders has that manufacture
10   pressure cylinders?
11          A.     Worthington Cylinders has --
12   the pressure cylinder group has I believe
13   twenty-six facilities.  I am not certain
14   how many are making other than pressure --
15   I am guessing it's somewhere around
16   twenty-two to twenty-three, twenty-two or
17   twenty-three facilities make pressure
18   cylinders.
19          Q.     Okay.  And some of those are in
20   the United States, and some are in foreign
21   countries, including Austria, US, Canada,
22   Portugal, and the Czech Republic; is that
23   correct?
24          A.     We do not have a facility in
25   Canada.
```

```
 1                      J. GETTER
 2          Q.    Oh, okay.
 3          A.    We do not have a facility in
 4   Czech Republic.  The only international
 5   facilities that we have are in Austria,
 6   Poland, and Turkey.
 7          Q.    Not Portugal?
 8          A.    Excuse me, Portugal also, I am
 9   sorry.
10          Q.    Okay.  The bottom line is this
11   is a big outfit, correct?
12          A.    Pardon?
13                MR. ERGO:  Vague, ambiguous.
14          Q.    You may answer.
15          A.    I missed the question, if you
16   can --
17          Q.    Would you agree with me that it
18   is a big company that you work for?
19                MR. ERGO:  The same objection.
20                THE WITNESS:  I mean, big is a
21          --
22          Q.    And would you agree that
23   Worthington Cylinders, that their specialty
24   is manufacturing and supplying pressure
25   cylinders?
```

```
 1                      J. GETTER
 2          A.     Pressure cylinders, yes.
 3          Q.     And was a pressure cylinder
 4   what you were testifying about supplying to
 5   Pyro Chem as related to this case?
 6          A.     Yes, a pressure cylinder only.
 7          Q.     Do you -- do you manufacture
 8   pressure cylinders for a number of
 9   different clients?
10          A.     Can you be specific on what you
11   mean by clients?  Are you --
12          Q.     Well, tell me the types of
13   pressure cylinders that your company
14   produces for buyers or clients.
15          A.      It's a large number of products
16   we make.  We make propane cylinders.  We
17   make refrigerant cylinders, fire
18   suppressant cylinders, acetylene cylinders,
19   high pressure gas cylinders, cryogenic type
20   cylinders and tanks, a lot of different
21   specialty gas cylinders and tanks.
22          Q.     Say over the past fifteen
23   years, what companies has Worthington
24   manufactured and sold fire suppressant
25   cylinders for?
```

```
 1                    J. GETTER
 2              MR. ERGO:  I'll pose an
 3         objection, but only to the extent
 4         that Worthington considers those
 5         customers -- the names and identities
 6         proprietary.  If they don't, then I
 7         will allow the witness to answer.  If
 8         they do, then I will instruct him not
 9         to answer.
10              MR. DONEY:  We do consider
11         those proprietary.  She is asking for
12         our customers.
13              THE WITNESS:  Yes.
14              MS. STIGALL:  So you are
15         instructing him not to answer?
16              MR. DONEY:  I think so, unless
17         you want to narrow it down more to
18         where Jim is comfortable that it's
19         well-known that we supply them.  But
20         if it's not well-known to the world
21         that we supply them, then that's
22         proprietary information.
23              THE WITNESS:  Because in most
24         cases, fire suppressant customers are
25         proprietary.  Designs are
```

```
 1                    J. GETTER
 2         proprietary, et cetera.
 3         Q.    And I understand that the
 4    design would be proprietary.  I guess I am
 5    asking you when you design fire suppression
 6    cylinders for companies, do you consider
 7    the identity of those companies proprietary
 8    or confidential?
 9         A.    I have always treated it that
10    way, yes.
11              MS. STIGALL:  What we will do
12         is just go ahead and mark this for
13         now, and we can decide if I want to
14         pursue it further in the future,
15         given that there is the objection.
16         Q.    In your business of
17    manufacturing pressurized cylinders for
18    various industrial users, do you sometimes
19    provide labels with the tanks you sell?
20         A.    We do on cylinders that are
21    finished products ready to fill.  In this
22    case, this was a cylinder that was not
23    ready to fill.  It was a part of -- it was
24    going to be a part of a system in that it
25    was Pyro Chem's responsibility to complete
```

```
 1                    J. GETTER
 2   the system.
 3           Q.     And in your role concerning
 4   that process, when you are dealing with a
 5   cylinder that Worthington is not providing
 6   the label, does Worthington as a normal
 7   practice inquire about the contents of the
 8   label that will be affixed on the cylinder?
 9           A.     No.
10                  MR. ERGO:   I am going to object
11            to the extent that calls for
12            speculation, lacks foundation.
13           Q.     Okay.  Mr. Getter, you
14   testified earlier about a certain agreement
15   between your employer and Pyro Chem
16   concerning the label on the cylinder at
17   issue, correct?
18           A.     Yes.
19           Q.     Have you worked with other
20   manufacturers when labels are not to be
21   included as a part of the end product of
22   the pressurized cylinder?
23           A.     Could you rephrase the
24   question?  I am not certain I understand
25   your question.
```

```
 1                    J. GETTER
 2        Q.    Okay.  Other than the instance
 3   in this case where you have testified that
 4   you were working with Pyro Chem concerning
 5   the cylinder and your testimony concerning
 6   whether or not a label was supposed to be
 7   included, have you over your tenure at
 8   Worthington Cylinders worked with other
 9   clients in designing, manufacturing,
10   selling them cylinders where labels are not
11   affixed?
12        A.    Yes.
13        Q.    By Worthington?
14        A.    Yes.
15        Q.    When that has happened, in your
16   experience, do you inquire about what's
17   going to be put on the label in the end?
18        A.    No.
19        Q.    Do you make any recommendations
20   based upon your experience working at
21   Worthington Cylinders concerning what
22   should be affixed on the label by your
23   client after it leaves your plant?
24        A.    No, because --
25              MR. ERGO:  I am going to
```

```
 1                     J. GETTER
 2          object, an incomplete hypothetical.
 3                MR. DONEY:  Go ahead.
 4          Q.    I didn't hear his answer.  I am
 5     sorry if he answered.
 6          A.    I am always unsure when I am
 7     supposed to answer or not.  The -- on all
 8     of the cylinders like this that we are not
 9     supplying or doing anything with a label,
10     it is cylinders that are part of a system
11     similar to this for fire suppression.  In
12     all of these cases, the fire suppression
13     system manufacturer is far more experienced
14     than us in what is required for warnings,
15     instructions of the system, et cetera.
16                MS. STIGALL:  Okay.  And I -- I
17           think I would strike that answer as
18           nonresponsive.
19          Q.    Let me ask my question again.
20          A.    Okay.
21          Q.    In your experience, when you
22     are working with a client in providing a
23     pressurized cylinder where Worthington is
24     not providing the label, and you said you
25     have done that, do you inquire about what
```

```
 1                    J. GETTER
 2    will be placed on the label after the
 3    cylinder leaves Worthington?
 4              MR. DONEY:  Asked and answered.
 5              MR. ERGO:  I am going to
 6         object, asked and answered, but you
 7         can answer again.  But the objection
 8         stands.
 9              THE WITNESS:  Okay.  Well, you
10         know, I answered no originally, and
11         then I qualified the answer, and the
12         answer being on fire suppression
13         systems or cylinders, we are not the
14         expert on what warnings or labeling
15         should be on the cylinder.  That is
16         always up to the manufacturer of the
17         fire suppression system.
18         Q.   So I understand you are
19    qualifying, but do you inquire about what
20    that label is going to be?
21         A.   No.
22              MR. ERGO:  Asked and answered.
23         Q.   Okay.  Do you know what a label
24    on a Kitchen Knight 2 system tank contains?
25    Do you know what's on that label --
```

```
 1                        J. GETTER
 2          A.     No, I --
 3          Q.     -- as far as the time frame
 4    when this tank was manufactured?
 5          A.     No, I have not seen the label.
 6          Q.     In looking at the exhibits that
 7    were -- well, let me ask you a question.
 8    What is -- one second.  I am looking
 9    through my notes.  What is CGA, space,
10    CG-7?
11          A.     CGA is the Compressed Gas
12    Association, and CG-7 is a relief device, a
13    spring loaded relief device.
14          Q.     CG-7?
15          A.     CG-7 is a type of pressure
16    relief device.  It's a spring loaded relief
17    device.
18          Q.     Does Worthington manufacture
19    cylinders used in cascade systems?
20          A.     Not that I am aware of.
21                 MR. ERGO:  Objection,
22           foundation.
23                 (Thereupon, Defendants' Exhibit
24           No. 11, a document titled Mobile SCBA
25           Refill/Cascade Cylinders, was marked
```

```
 1                    J. GETTER
 2        for purposes of identification.)
 3        Q.    Well, if you will look at what
 4   was marked Defendants' Exhibit 11, it says
 5   mobile SCBA refill, slash, cascade
 6   cylinders.  And this is off the Worthington
 7   website.  Do you do any work concerning
 8   cascade cylinders?
 9        A.    No, I do not.
10        Q.    Would you know whether the
11   cascade cylinder used on -- or do you know
12   whether the cascade cylinder that was used
13   on the Poseidon system to fill the cylinder
14   at issue in this case is a Worthington
15   product?
16        A.    I do not know that.  I have not
17   seen pictures of those cylinders.
18        Q.    Could I direct your attention
19   to the last exhibit?
20             (Thereupon, Defendants' Exhibit
21              No. 12, a color copy of a photograph,
22              was marked for purposes of
23              identification.)
24        Q.    I think it's --
25        A.    Yes.
```

1                    J. GETTER

2         Q.    -- Exhibit 12.  And I will

3    grant you, it is not a very good picture of

4    the Poseidon cascade system.  But you can

5    see in that photograph the Poseidon

6    compressor.  And then on the back, you can

7    barely see there are some yellow tanks

8    affixed to that compressor.  Sitting here

9    today, do you know whether those tanks are

10   Worthington tanks?

11        A.    I have -- I would have --

12             MR. ERGO:  I am going to

13        object, foundation, it calls for

14        speculation.

15             THE WITNESS:  I would have no

16        idea what the tank is without seeing

17        the markings on it.

18             MS. STIGALL:  Okay, that's

19        fair.  Yeah, and I understand the

20        objection because we have not been

21        able to get in and see those yet, and

22        we won't be able to -- we aren't

23        getting in there until later on next

24        month, but I still wanted to check on

25        that after seeing that you all

```
 1                        J. GETTER
 2          manufactured some of those.
 3          Q.    Have you ever had your
 4    deposition taken before?
 5          A.    No, this is my first.
 6          Q.    And you said you are not a
 7    professional engineer?
 8          A.    No, I am not.
 9                MR. ERGO:  Objection,
10          mischaracterizes testimony.
11          Q.    Are you a person with the
12    degree of a professional engineer, PE?
13                MR. ERGO:  Objection, vague and
14          ambiguous.
15                THE WITNESS:  No, I am not.
16          Q.    Do you have a degree that
17    qualifies you as a licensed mechanical
18    engineer?
19          A.    No, I do not.
20                MR. ERGO:  The same objection.
21                THE WITNESS:  And no, I do not.
22          Q.    I am just looking over my notes
23    here.  In your affidavit, you mentioned
24    that Pyro Chem contacted you concerning the
25    type of cylinder at issue.  Is it your
```

```
 1                    J. GETTER
 2    testimony that they contacted you
 3    personally?
 4         A.    Yes, they did.
 5         Q.    Who did you speak with from
 6    Pyro Chem?
 7         A.    I don't remember his name.  He
 8    was the engineer responsible for the
 9    systems, fire suppression systems.
10         Q.    Was he out of Boonton, New
11    Jersey, at that time?
12         A.    Yes.
13         Q.    Did you ever have contact with
14    anyone out of the Marinette, Wisconsin,
15    location concerning these types of
16    cylinders?
17         A.    I visited a Marinette facility
18    after Marinette started producing these
19    tanks themselves.  I met several of the
20    Marinette people at the Jefferson facility
21    prior to them starting to make their own
22    tanks.
23         Q.    So you -- you have been both to
24    the Boonton location and the Marinette
25    location?
```

```
1                      J. GETTER
2           A.    I was at the Boonton facility
3      before I worked for Worthington.  I was at
4      the Marinette facility after the Marinette
5      facility started producing their own --
6      producing these themselves.
7           Q.    Who did you work for when you
8      went to the Boonton facility?
9           A.    Press Steel Tank in Milwaukee,
10     Wisconsin.
11          Q.    Had they previously made tanks
12     for Pyro Chem?
13          A.    Yes.  They made tanks for Pyro
14     Chem before I started working for them.
15          Q.    Okay.  And then at some point,
16     that business went over to Worthington?
17          A.    That is correct.
18          Q.    Did it go over because you
19     moved to Worthington?
20               MR. ERGO:  Objection.
21          Q.    Did it follow you?
22               MR. ERGO:  Calls for
23          speculation.
24          Q.    If you know.
25          A.    No, they -- they were having
```

```
1                    J. GETTER
2    supply issues out of Pressed Steel Tank,
3    and they contacted me to see if where I
4    moved to could make tanks for them or
5    cylinders for them.
6         Q.    And for clarity, was that
7    Pressed Steel Tank?
8         A.    Correct.  P-R-E-S-S-E-D, space,
9    Steel, S-T-E-E-L, space, Tank, T-A-N-K.
10        Q.    Can you remember the name of
11   anyone at Pyro Chem either in Boonton or in
12   Marinette with whom you worked concerning
13   these particular types of tanks?
14        A.    No, I do not remember.  That's
15   been too many years ago.
16        Q.    Was there anyone else at
17   Worthington whose name you remember who
18   worked at Worthington concerning these
19   particular tanks?
20        A.    There is no one that's still
21   here at Worthington that I worked with in
22   the design of these.
23        Q.    Number nine of your affidavit,
24   you say per the agreement between TFP and
25   Pyro Chem -- or with TFP and Pyro Chem, I
```

```
 1                    J. GETTER
 2    am sorry.  Do you have any copy of any
 3    agreement between TFP or Pyro Chem and
 4    Worthington?  Have you located any
 5    concerning --
 6          A.    Not.
 7          Q.    -- this cylinder, type of
 8    cylinder?
 9          A.    No, I have not.
10          Q.    Do you remember ever seeing any
11    written agreements between the two
12    outlining what their various
13    responsibilities were concerning labeling?
14          A.    Written, I do not.  It was all
15    verbal discussion.
16          Q.    And you were part of that
17    verbal discussion?
18          A.    Yes, I was.
19          Q.    Is that right?
20          A.    Yes, I was.
21          Q.    And then the discussion that
22    you had, was it with someone at Boonton or
23    someone at Marinette?
24          A.    Boonton, Boonton or however you
25    pronounce it.
```

1                        J. GETTER

2          Q.    Yeah, I am never too sure

3    myself, I understand.  Am I correct then

4    that you did not draw the design for these

5    tanks, but you approved it?

6          A.    I directed the drawing of them.

7    I did not make the drawing itself.  And

8    then, yes, I did approve them.

9          Q.    Did you ever make any

10   recommendations to Pyro Chem concerning

11   labeling of the tanks?

12         A.    No.

13         Q.    Without telling me the names of

14   other fire suppression companies that your

15   company makes pressurized cylinders for,

16   would it be correct that typically when you

17   manufacture and sell them those cylinders,

18   those other companies, that the cylinders

19   do not have a label on them?

20         A.    None of those cylinders have a

21   label when they leave our facility.  In all

22   cases, the customer has told me that they

23   will be supplying and installing the label.

24              (Thereupon, Defendants' Exhibit

25         No. 9, a three-page document titled

```
 1                        J. GETTER
 2              Fire Suppression, was marked for
 3              purposes of identification.)
 4         Q.    Okay.  And so looking at
 5    Defendants' Exhibit 9, I see a number of
 6    different sizes of red fire suppression
 7    tanks.
 8         A.    Yes.
 9         Q.    Would the only -- is that what
10    they look like when they go to other
11    customers?
12              MR. ERGO:  Objection,
13              foundation.
14              THE WITNESS:  If you are
15              referring to the seamless fire
16              extinguisher brochure, those are
17              cylinders that are made out of our
18              Austrian facility, not --
19         Q.    I am sorry, I was talking about
20    Exhibit 9, the one that says fire
21    suppression.
22         A.    Okay, I am sorry.  That's
23    typically what they look like, yes.
24         Q.    And is it your testimony here
25    today that as the world's leading
```

1                    J. GETTER
2      manufacturer and supplier of pressure
3      cylinders that you do not make any
4      recommendations to your customers
5      concerning how those pressurized cylinders
6      should be filled?
7                    MR. ERGO:  I am going to
8             object.  It's asked and answered.
9             It's argumentative, and it assumes
10            facts not in evidence.
11                   MS. STIGALL:  This was a more
12            specific question.
13            Q.    As an employee of one of the
14     world's leading manufacturers and suppliers
15     of pressure cylinders, when you manufacture
16     and supply fire suppression cylinders to
17     companies, for companies, do you make any
18     recommendations concerning how those
19     cylinders should be filled?
20                   MR. ERGO:  The same objections,
21            with an emphasis on the asked and
22            answered.
23                   THE WITNESS:  So am I supposed
24            to answer?
25                   MR. DONEY:  Yeah.

```
 1                    J. GETTER
 2              THE WITNESS:  Okay.
 3              MR. ERGO:  No, you answer
 4         again.
 5              THE WITNESS:  Okay.  We -- we
 6         do not do any of the labeling on any
 7         of the fire suppression cylinders.
 8         The fire suppression cylinder company
 9         is a far better expert than us at the
10         system.  We are considered an expert
11         on the cylinder itself, not fire
12         suppression systems.
13         Q.   I understand.  As an expert,
14    your company -- on pressurized cylinders,
15    when you sell these cylinders, do you make
16    any recommendations to your customers
17    concerning how the cylinders should be
18    filled?
19              MR. ERGO:  Objection, asked and
20         answered.
21              MS. STIGALL:  He hasn't
22         answered it.
23              MR. ERGO:  I will allow him to
24         answer it for I believe the fourth or
25         fifth time.  After that, I am going
```

```
 1                    J. GETTER
 2          to consider seeking a protective
 3          order.
 4               MS. STIGALL:  Okay.
 5               THE WITNESS:  No.
 6          Q.    And so the question is do you
 7    make any recommendations to these users
 8    about how the tanks should be filled?
 9          A.    No.  I don't know how they are
10    filled.
11          Q.    Are you aware of any other
12    incidents of burst tanks as related to the
13    product at issue, which is these tanks that
14    Worthington manufactures for Pyro Chem?
15          A.    I am not aware of any burst
16    failures, if that's the question.
17          Q.    Yes, yes, that's what my
18    question is, concerning these tanks.
19          A.    I am not aware of any burst
20    failures.
21               (Thereupon, Defendants' Exhibit
22          No. 10, a Worthington Industries
23          document, was marked for purposes of
24          identification.)
25          Q.    Okay.  And I am a little
```

1                         J. GETTER
2    confused because Exhibit 10, you started to
3    look at that.  What are -- are these fire
4    extinguisher cylinders that I see a
5    photograph on Exhibit 10 or is that
6    something else?
7          A.    Those are cylinders -- this is
8    the first time I have seen this document or
9    this picture.  But these appear to be
10   pictures out of our Austrian facility.
11   They are a seamless cylinder.  And they
12   would be for a high pressure system, as you
13   can see by the table, the pressures.  You
14   know, 200 and 300 bar is a very high
15   pressure.  So it would be certainly for a
16   different application.  I am not certain
17   what those are.
18         Q.    So it's a much higher pressure
19   than the tank we are talking about here or
20   the cylinder we are talking about here,
21   correct?
22         A.    Significantly higher pressure.
23         Q.    Thank you.
24               MS. STIGALL:  I am going to
25          look over my notes.  I am probably

```
 1                    J. GETTER
 2          finished, if you can just bear with
 3          me for a second.  Or if someone else
 4          has questions, that's fine.  I don't
 5          have any more questions.
 6                    MR. ERGO:  Ken, do you have
 7          more questions?
 8                    MR. FROMSON:  No, I don't have
 9          any questions, thanks.
10   DIRECT EXAMINATION BY
11   MR. ERGO:
12          Q.    All right, I just have one
13   question.  The inspection report, which
14   exhibit is it?  Exhibit 4, could you turn
15   to that, Mr. Getter?
16          A.    Yes.
17          Q.    There is a reference down
18   towards the bottom to CGA -- CG-7?
19          A.    Correct.
20          Q.    Is that a mistake?
21          A.    Yes, that is a mistake on this
22   report.
23          Q.    Could you explain that?
24          A.    Typically, every -- typically
25   finished cylinders we produce have a relief
```

```
 1                    J. GETTER
 2   device.  And in this case, it's a typo
 3   error, basically a copy and paste error for
 4   this report.
 5        Q.    Did you supply this cylinder
 6   with a relief valve?
 7        A.    No, we do not.
 8        Q.    Were you asked to?
 9        A.    No, we were not.
10             MR. ERGO:  All right, thank
11        you.  No further questions.
12             MR. DONEY:  Yeah, I do want --
13             MR. FROMSON:  This is Ken
14        Fromson.  I have a question.
15             MR. DONEY:  Go ahead.
16   RECROSS-EXAMINATION BY
17   MR. FROMSON:
18        Q.    In the event that the
19   typographical error that you described, if
20   it was not to be CG-7, was there some other
21   acronym or abbreviation that was supposed
22   to be there?
23        A.    No, there was not.  It should
24   have -- the answer would have been none for
25   this application.
```

```
 1                    J. GETTER
 2            MR. FROMSON:  Thank you.
 3            MR. DONEY:  This is Tim Doney.
 4        I guess I do have one question, just
 5            for clarification of the question
 6            Sandy was asking.
 7    DIRECT EXAMINATION BY
 8    MR. DONEY:
 9        Q.    When you indicated that you
10    don't communicate with the customers about
11    how they should fill it or the other stuff,
12    but what -- what is stamped on these tanks
13    when they go to the customer?
14        A.    What is stamped on the tank is
15    the DOT required markings.  And the
16    markings, like we have talked about, have
17    the DOT 4BW 225, 225 being -- well, let me
18    back up.  The DOT 4BW being the type of
19    cylinder, the 225 being the maximum
20    allowable working pressure or service
21    pressure for the application.  The serial
22    number is on there so that you know -- so
23    you can tie it back to its inspector's
24    report.  The manufacturer's symbol, the
25    inspector's symbol, et cetera are on there,
```

```
 1                    J. GETTER
 2    along with the test date.
 3         Q.    Okay.  So Tyco and -- Tyco
 4    understands what all those numbers mean,
 5    especially the pressure limitations?
 6         A.    They most certainly, since they
 7    are all --
 8              MS. STIGALL:  Objection, form
 9         and foundation.
10         Q.    Okay.  Let me -- how do I say
11    that in a way I won't get objected to?
12    Does Tyco understand what those numbers
13    mean?
14         A.    Tyco certainly should, as they
15    are a manufacturer of these same cylinders.
16         Q.    Okay.  So they know -- does
17    Tyco know what the pressure rating is on
18    the cylinders we provide them?
19         A.    Yes.
20              MS. STIGALL:  Objection, form
21         and foundation, same objection.
22              MR. DONEY:  Okay.  That's all I
23         have.
24              MR. FROMSON:  This is Ken
25         Fromson.  I don't have any further
```

```
 1                    J. GETTER
 2          questions.
 3               MS. STIGALL:  No more here.
 4               THE VIDEOGRAPHER:  We are off
 5          the record.
 6               MR. FROMSON:  Ken Fromson for
 7          Plaintiff.  I will take an
 8          E-transcript and, obviously, a final
 9          certified copy with a signature on
10          it, and that's all I need.  I do not
11          need to order the video at this time,
12          unless we go to trial, at which time
13          I will order it prior to trial.
14               MS. STIGALL:  E-transcript for
15          Sandy Stigall, please.
16               MR. ERGO:  Yeah, for
17          Worthington, we will take an
18          E-transcript and a hard copy.  I
19          would like the exhibits.
20               MS. STIGALL:  Same here.  This
21          is Sandy Stigall.
22               MR. FROMSON:  Please provide a
23          copy of the exhibits.
24               *          *          *
25
```

```
 1                         J. GETTER
 2              (Whereupon, at 12:26 P.M., the
 3         Examination of this witness was
 4         concluded.)
 5
 6                 o          o          o          o
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                      J. GETTER

2              D E C L A R A T I O N

3

4        I hereby certify that having been

5   first duly sworn to testify to the truth, I

6   gave the above testimony.

7

8        I FURTHER CERTIFY that the foregoing

9   transcript is a true and correct transcript

10   of the testimony given by me at the time

11   and place specified hereinbefore.

12

13

14

15              _____

                           JAMES M. GETTER

16

17

18   Subscribed and sworn to before me

19   this _____ day of _____ 20____.

20

21

22   _____
         NOTARY PUBLIC

23

24

25

1                        J. GETTER

2                    E X H I B I T S

3

4    PLAINTIFF'S EXHIBITS

5

6    EXHIBIT    EXHIBIT                      PAGE

7    NUMBER     DESCRIPTION

8      1        Affidavit of Jim Getter   6

9    2 and 3    Worthington Cylinder
                drawings, Bates labeled
10              WORTH00001 and
                WORTH00002                 22
11
       4        Inspector's Report        31
12
       5        Record of Chemical
13              Analysis of Material
                For Cylinders             34
14
       7        Worthington Industries,
15              Inc.'s Response to Tyco
                Fire Products LP's Request
16              For Production of
                Documents                 43
17
       6        A printout                49
18

19   (Continued on the following page.)

20

21

22

23

24

25

1                        J. GETTER

2
    DEFENDANTS' EXHIBITS
3
    EXHIBIT      EXHIBIT                        PAGE
4   NUMBER       DESCRIPTION

5      8          Manufacturing Today          57

6      11         Mobile SCBA Refill/Cascade
                  Cylinders                     67
7
       12         Color copy of a
8                 photograph                    68

9      9          Fire Suppression             76

10     10         Worthington Industries
                  document                      80
11
        (Exhibits retained by Court Reporter.)
12
                        I N D E X
13

14  EXAMINATION BY                             PAGE

15  MR. FROMSON                                5, 83

16  MS. STIGALL                                55

17  MR. ERGO                                   81

18  MR. DONEY                                  83

19

20

21    INFORMATION AND/OR DOCUMENTS REQUESTED

22  INFORMATION AND/OR DOCUMENTS          PAGE

23  (None)

24

25

```
 1                    J. GETTER

 2            C E R T I F I C A T E

 3

 4   STATE OF OHIO           )
                             :  SS.:
 5   COUNTY OF MONTGOMERY    )

 6

 7       I, MONICA K. MCBEE, a Notary Public

 8   for and within the State of Ohio, do hereby

 9   certify:

10       That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14       I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19       IN WITNESS WHEREOF, I have hereunto

20   set my hand this 8th day of August 2018.

21

22

23   _____

24            MONICA K. MCBEE

25
```