EXHIBIT "F"

1

2    UNITED STATES DISTRICT COURT SOUTHERN
     DISTRICT OF NEW YORK

3    ----------------------------------------X
     FRANKLIN BUONO,

4
                                    PLAINTIFF,

5
                -against-              Case No.:

6                             1:17-CV-05915-JFK

7    VICTORY AUTO STORE, INC., VICTORY AUTO
     STORES, INC.  D/b/a POSEIDON AIR SYSTEMS,

8    TYCO FIRE PRODUCTS LP, PAMELA L. SIMPERS,
     PAMELA L. SIMPERS d/b/a VICTORY AUTO

9    STORES, BAUER COMP HOLDING GMBH, BAUER
     KOMPRESSOREN GMBH and BAUER COMPRESSORS,

10   INC.,

11                                  DEFENDANTS.
     ----------------------------------------X

12   TYCO FIRE PRODUCTS LP,

13                  THIRD-PARTY PLAINTIFF,

14          -against-

15   O'PRANDY'S FIRE & SAFETY INC.,

16                  THIRD-PARTY DEFENDANT.
     ----------------------------------------X

17

18                  DATE:  September 12, 2019

19                  TIME:  9:47 a.m.

20

21          (DEPOSITION of CURTIS N. HARDING.)

22

23

24

25

```
 1
 2                         DATE:  September 12, 2019
 3                         TIME:  9:47 a.m.
 4
 5
 6                    VIDEOTAPED VIDEOCONFERENCED
 7     DEPOSITION of the Defendant/Third-Party
 8     Plaintiff, TYCO FIRE PRODUCTS LP, by a
 9     witness, CURTIS N. HARDING, taken by the
10     respective parties, held at the offices of
11     Bay Reporting Service, Inc., 414 South
12     Jefferson Street, Green Bay, Wisconsin
13     54301, before Carrie S. Bohrer, RPR, RMR,
14     CRR.
15
16
17
18
19
20
21
22
23
24
25
```

```
 1

 2    A P P E A R A N C E S

 3

 4    FINKELSTEIN & PARTNERS, LLP
        Attorneys for the Plaintiff
 5      1279 Route 300, P.O. Box 1111
        Newburgh, New York  12551
 6      BY:  KENNETH FROMSON, ESQ.
        Kfromson@lawampm.com
 7      (Via videoconference)

 8

 9    SHOOK, HARDY & BACON L.L.P.
        Attorneys for the Defendant/
        Third-Party Plaintiff
10      TYCO FIRE PRODUCTS LP
        2555 Grand Boulevard
11      Kansas City, Missouri  64108
        BY:  SARAH E. LYNN BALTZELL, ESQ.
12

13

14    HAWORTH, BARBER & GERSTMAN, LLC
        Attorneys for the Third-Party Defendant
        OPRANDY'S FIRE & SAFETY INC.
15      45 Broadway, 21st Floor
        New York, New York  10006
16      BY:  TARA FAPPIANO, ESQ.
        Tara.fappiano@hbandglaw.com
17      (Via videoconference)

18

19    ALSO PRESENT:

20    MARK DENESSEN, Videographer

21              *              *              *

22

23

24

25
```

1

2          **221. UNIFORM RULES FOR THE**
            **CONDUCT OF DEPOSITIONS**
3   **221.1 Objections at Depositions**
            **(a) Objections in general.**   No
4   objections shall be made at a deposition
    except those which, pursuant to subdivision
5   (b), (c) or (d) of Rule 3115 of the Civil
    Practice Law and Rules, would be waived if
6   not interposed, and except in compliance
    with subdivision (e) of such rule.   All
7   objections made at a deposition shall be
    noted by the officer before whom the
8   deposition is taken, and the answer shall be
    given and the deposition shall proceed
9   subject to the objections and to the right
    of a person to apply for appropriate relief
10  pursuant to Article 31 of the CPLR.
            **(b) Speaking objections restricted.**
11  Every objection raised during a deposition
    shall be stated succinctly and framed so as
12  not to suggest an answer to the deponent
    and, at the request of the questioning
13  attorney, shall include a clear statement as
    to any defect in form or other basis of
14  error or irregularity.   Except to the
    extent permitted by CPLR Rule 3115 or by
15  this rule, during the course of the
    examination persons in attendance shall not
16  make statements or comments that interfere
    with the questioning.
17  **221.2 Refusal to answer when objection is**
    **made**   A deponent shall answer all questions
18  at a deposition, except (i) to preserve a
    privilege or right of confidentiality, (ii)
19  to enforce a limitation set forth in an
    order of the court, or (iii) when the
20  question is plainly improper and would, if
    answered, cause significant prejudice to any
21  person.   An attorney shall not direct a
    deponent not to answer except as provided in
22  CPLR Rule 3115 or this subdivision.   Any
    refusal to answer or direction not to answer
23  shall be accompanied by a succinct and clear
    statement of the basis therefor.   If the
24  deponent does not answer a question, the
    examining party shall have the right to
25  complete the remainder of the deposition.

1

2              **221. UNIFORM RULES FOR THE
                 CONDUCT OF DEPOSITIONS**

3

    **221.3 Communication with the deponent**
4              An attorney shall not interrupt the
    deposition for the purpose of communicating
5   with the deponent unless all parties consent
    or the communication is made for the purpose
6   of determining whether the question should
    not be answered on the grounds set forth in
7   section 221.2 of these rules and, in such
    event, the reason for the communication
8   shall be stated for the record succinctly
    and clearly.

9

10                     IT IS FURTHER STIPULATED
    AND AGREED that the transcript may be
11  signed before any Notary Public with the
    same force and effect as if signed before a
12  clerk or a Judge of the court.

13

             IT IS FURTHER STIPULATED AND AGREED
14  that the examination before trial may be
    utilized for all purposes as provided by
15  the CPLR.

16

             IT IS FURTHER STIPULATED AND AGREED
17  that all rights provided to all parties by
    the CPLR cannot be deemed waived and the
18  appropriate sections of the CPLR shall be
    controlling with respect hereto.

19

20           IT IS FURTHER STIPULATED AND AGREED
    by and between the attorneys for the
21  respective parties hereto that a copy of
    this examination shall be furnished,
22  without charge, to the attorneys
    representing the witness testifying herein.

23

24

25

```
 1                    C. HARDING
 2              THE VIDEOGRAPHER:  We're on the
 3         record with the start of Media Unit
 4         Number 1 in the deposition of Curt
 5         Harding for Case Number
 6         1:17-CV-05915-JFK, United States
 7         District Court, Southern District of
 8         New York.  We're at Bay Reporting
 9         Service, Green Bay, Wisconsin.  It's
10         September 12th, 2019.  The time is
11         approximately 9:47 a.m.
12              The court reporter will now
13         swear in the witness and then we'll
14         begin.
15   C U R T I S   N.   H A R D I N G, called as
16   a witness herein, having been first duly
17   sworn/affirmed, was examined and testified
18   as follows:
19   EXAMINATION BY
20   MR. FROMSON:
21        Q.    Good morning, Mr. Harding.  How
22   are you, sir?
23        A.    Good.  Thank you.
24        Q.    My name is Ken Fromson.  I
25   represent Franklin Buono related to an
```

```
 1                    C. HARDING
 2    event that took place back on February 12th
 3    of 2016 and which involved a fire
 4    suppression system tank that exploded.  So
 5    I understand you're here to give some
 6    testimony today of -- about the tank, its
 7    instruction manuals, some general topics.
 8    I would ask that you keep your answers
 9    verbal so that our court reporter can
10    obviously more easily take down what you
11    say as opposed to a shrug of the shoulders
12    or nod of the head.  Let me finish my
13    question before you answer it so that we're
14    not talking over each other.  If you don't
15    understand a question, you just let me
16    know; I will accommodate you and try to
17    rephrase it in a way that we can all
18    understand each other.  Fair enough?
19            A.    Fair enough.
20            Q.    All right.  So for the record,
21    can you state your full name?
22            A.    Curtis Harding.
23            Q.    And what's your residential
24    address?
25            A.    N2387 Rivers Edge Drive,
```

```
 1                    C. HARDING
 2   Marinette, Wisconsin.
 3          Q.    And what is your age?
 4          A.    46.
 5          Q.    And what do you do for a
 6   living?
 7          A.    Technical support.
 8          Q.    And for whom do you work?
 9          A.    Pardon me?
10          Q.    For whom do you work?  Who is
11   your boss?
12          A.    Corey Polzin.
13          Q.    And for what company do you
14   work?
15          A.    Johnson Controls.
16          Q.    What's your general
17   understanding of the relationship between
18   Johnson Controls and Tyco Fire Products,
19   the defendant in the case?
20          A.    Johnson Controls had purchased
21   Tyco.
22          Q.    And what do you do in the
23   context of technical support?
24          A.    I support the pre-engineered
25   products that we manufacture.
```

```
 1                    C. HARDING
 2         Q.    And what kind of products
 3    generally do you manufacture so that you're
 4    providing the support?
 5         A.    Dry chemical products and wet
 6    chemical products.
 7         Q.    Are these generally in the
 8    context of fire suppression systems?
 9         A.    Yes.
10         Q.    What's your general
11    understanding as to why you're here today?
12         A.    I'm here because I was deposed
13    for a case in which somebody was injured.
14         Q.    To prepare for certain subject
15    matter topics related to the fire
16    suppression tank involving Mr. Buono's
17    event, did you take any steps or action to
18    review documents and prepare?
19         A.    Yes, I did.
20         Q.    And generally speaking what did
21    you review?  I'm not asking you for a line
22    listing, but give us a general education as
23    to what you did and what you reviewed.
24         A.    There were drawings, manuals.
25    That's pretty much it.
```

```
 1                    C. HARDING
 2        Q.    And in terms of the drawings
 3   and manuals, do these date back or come
 4   from the Pyro-Chem fire suppression system
 5   and the subject test tank that was involved
 6   in the event in February 2016?
 7        A.    What I saw was part of the fire
 8   suppression system.  I believe there was
 9   some for the test tank as well.
10        Q.    What I want to do, want to make
11   sure we're both talking about the same tank
12   involved in Mr. Buono's event, so I want to
13   learn from you what you believe is the
14   identified product that was involved in his
15   injury.  What's your understanding?
16        A.    Of what tank it was?
17        Q.    Yes, sir.
18        A.    My understanding is it was a
19   PCL-240.
20        Q.    And in terms of the acronym or
21   abbreviation "PCL," just educate us, what
22   does that stand for?
23        A.    I'm not 100 percent, but I
24   believe it stands for Pyro-Chem liquid.
25   2.4 --
```

```
 1                    C. HARDING
 2         Q.    240, what -- what -- I'm so
 3    sorry.  What I should have said before we
 4    started is although we have fantastic
 5    technology here today, we can't speak over
 6    each other, and so I didn't hear the last
 7    part of your answer.  Can you repeat it?
 8         A.    2.4 gallons.
 9         Q.    And when we reference 2.4
10    gallons, what was the intended material or
11    agent to be placed in a test tank such as a
12    PCL 240T?
13         A.    That is the wet chemical agent.
14         Q.    Once again, I'm so sorry.  We
15    could not hear your answer.  Can you repeat
16    it?
17         A.    Wet chemical agent.
18         Q.    So in terms of your
19    understanding, was an intended use of a 240
20    test tank, at least back in 2016, to
21    include charging the tank with a wet
22    chemical agent, in other words putting a
23    wet chemical agent in that tank?
24         A.    No.
25         Q.    So what was the intended use in
```

```
 1                    C. HARDING
 2    terms of what was to go inside a 240 test
 3    tank as of 2016, considering it had a
 4    capacity of 2.4 gallons?
 5         A.    So we are talking 2016.  A test
 6    tank was used to satisfy authority's
 7    requirements.
 8         Q.    Requirements for what?
 9         A.    For testing the system.  The
10    piping integrity.
11         Q.    And so what I'm trying to find
12    out is what was to be inside the 2.4
13    gallons so as to achieve the purpose of
14    testing the integrity of an overall fire
15    suppression system?
16         A.    The authorities could use
17    compressed dry air or nitrogen.
18         Q.    Are you familiar currently with
19    the term or use of the word "balloon
20    testing" in terms of satisfying those
21    requirements to test a suppression system?
22         A.    I am.
23         Q.    And could you just educate us
24    on what your understanding of the term
25    "balloon testing" is in that context?  I
```

```
 1                    C. HARDING
 2   want to make sure we're on the same page
 3   when we use that word or words.
 4        A.    Okay.  Balloon testing is a
 5   term that comes from the authorities having
 6   jurisdiction.  That is their way to test
 7   the piping of a fire suppression system.
 8        Q.    And so from a practical
 9   standpoint, I'm trying to envision how an
10   individual takes a test tank, such as a
11   2.4-gallon test tank, to a restaurant,
12   let's say, and balloon tests that
13   restaurant's Kitchen Knight fire
14   suppression system.  Using that as a
15   complete hypothetical, can you explain to
16   us what's generally done in terms of the
17   manner in which the test tank is used
18   either with air or nitrogen?
19        A.    Being that's a AHJ requirement,
20   there are many ways that they can do that.
21   But generally speaking, they are using a
22   test tank to push the compressed dry air or
23   nitrogen through the system piping, and
24   then the balloons would be on the end of
25   the nozzles.
```

```
 1                    C. HARDING
 2         Q.    Now, I want to focus your
 3    attention much further back in hindsight,
 4    way earlier than 2016, to your knowledge of
 5    the -- the 240 test tank coming out of its
 6    manufacture and assembly back in 1998.  Are
 7    you with me?
 8         A.    I am.
 9         Q.    As of the time this test tank,
10    the one that was utilized ultimately by Mr.
11    Buono and his co-employee, as of the time
12    this product was manufactured and assembled
13    and left the doors of Pyro-Chem, was one of
14    the intended uses to be balloon tested?
15         A.    I would make the assumption
16    that it was at that time, yes.
17         Q.    So part of my deposition
18    questions down the line are going to be
19    about the -- the way in which Pyro-Chem and
20    Tyco informed individuals on the proper use
21    for that intended use.  Are you with me?
22         A.    I am.
23         Q.    All right.  But first let me
24    get to know you a little bit.  So you told
25    me where you live, you told me your age,
```

```
 1                         C. HARDING
 2    and you told me who you work for, Johnson
 3    Control.  Let me learn a little more.  So
 4    for how long have you been employed in
 5    technical support by Johnson Control?
 6          A.    16 years.
 7          Q.    And what's your educational
 8    background?
 9          A.    Associate degree in fire
10    protection.
11          Q.    And from what school did you
12    get that associate's degree in fire
13    protection?
14          A.    Northeast Wisconsin Technical
15    College.
16          Q.    Do you have any other vocation
17    outside of your position in technical
18    support with Johnson Control?  Any other
19    job?
20          A.    No.
21          Q.    Do you volunteer as a first
22    responder in the context of firefighting?
23          A.    I do not.
24          Q.    Have you ever?
25          A.    No.
```

```
1                        C. HARDING
2          Q.    Have you ever utilized a
3     Pyro-Chem 240 agent tank, ever?
4          A.    Never.
5          Q.    Have you ever utilized a
6     Pyro-Chem 240 test tank, ever?
7          A.    Never.
8          Q.    Same question.  Have you ever
9     utilized a Pyro-Chem 300 tank, ever?
10         A.    I have not.
11         Q.    Have you ever utilized a
12    Pyro-Chem 300 test tank, ever?
13         A.    No.
14         Q.    Have you ever been trained on
15    the use of such tanks?
16         A.    The training I have received is
17    on the fire suppression tank, not a test
18    tank.
19         Q.    When you referenced that the
20    training you have received has been on a
21    fire suppression tank, can you clarify what
22    type of tank you're talking about?
23         A.    Sure.  There are several tanks
24    in a fire suppression system, and they are
25    full of liquid agent that are used for the
```

```
 1                    C. HARDING
 2   purpose of suppressing a fire.  It is a
 3   component of the fire suppression system.
 4        Q.    Some of my questions might
 5   seem, for lack of a better term, common
 6   sense, or some might say stupid.  So I
 7   apologize if they appear that way --
 8        A.    Not at all.
 9        Q.    -- but I need to have a clear
10   record.  So when you use the term
11   "component," what do you mean?
12        A.    What I meant is there are
13   several components of a fire suppression
14   system, with a PCL-240 being one of them.
15        Q.    As part of your review of
16   documents in this case, did you come across
17   and review the Kitchen Knight restaurant
18   fire suppression system technical manuals?
19        A.    Yes.
20        Q.    And did you review the manuals,
21   the technical manuals, for both a PCL-240
22   as well as a PCL-300?
23        A.    Yes.
24        Q.    Are the -- withdrawn.  Are
25   there any distinctions or differences in
```

```
 1                    C. HARDING
 2    the components, design, installation,
 3    maintenance, or recharge, other than the
 4    sizes being different?
 5         A.    Yes.  There are different
 6    nozzles, the valves are different, there's
 7    slight differences in the components.
 8         Q.    Other than those distinctions,
 9    is there any comparison to the way, the
10    method, in which a 240 as opposed to a 300
11    is recharged, or are the safety issues the
12    same?
13         A.    They are recharged.  I would
14    say very similar.  There are some
15    differences but nothing -- nothing major.
16         Q.    Can you reference your
17    attention to a -- to a technical manual
18    that's there at your deposition but for the
19    300 size.
20         A.    Sure.
21         Q.    And when you have it, I'll --
22    I'll ask you some questions about the
23    components.
24         A.    Okay.
25         Q.    Let me pull out my version as
```

```
 1                    C. HARDING
 2    well.  So I -- I appreciate -- give me one
 3    moment.  I have many different copies of
 4    it, so let me find the one -- yeah.  Let's
 5    see.  I'm looking at -- bear with me.  I
 6    appreciate -- hold on a minute.
 7         A.    Okay.
 8              MR. FROMSON:  You're saying 61?
 9         Because I have one on 60.
10              MS. FAPPIANO:  I have it at 61.
11              MR. FROMSON:  Yeah.  Okay.
12         Q.    So I have a technical manual in
13    front of me.  On the bottom right corner,
14    the last numbers are -- begin with 61.
15    What do you have in front of you?
16         A.    The same thing.
17         Q.    So if you could reference your
18    attention -- well, let me ask you this.
19    That particular technical manual, it's
20    dated October 1st, 2001.  Do you know who
21    or what entity produced, in other words
22    wrote, drafted, and put out into the
23    marketplace, this technical manual?
24         A.    In 2001 that would have been
25    Tyco.
```

```
 1                    C. HARDING
 2          Q.    Do you know if there exists a
 3     version back from 1998 that would have went
 4     out the proverbial door with the product as
 5     it was put into the marketplace?
 6          A.    Could you repeat that?
 7          Q.    Sure.  Let me ask it a
 8     different way.  To the best of your
 9     knowledge, is the language in this
10     technical manual the same as the language
11     that would have existed when the product
12     first went into the marketplace back in
13     approximately 1998?
14          A.    That would be a completely
15     different manual.  This is the first
16     version of the Kitchen Knight II manual.
17          Q.    So Bates Number 61 -- or I
18     should say document beginning with Number
19     61 was the first manual for a Pyro-Chem 300
20     fire suppression system?
21          A.    Correct.
22          Q.    Would this have been the manual
23     that was in place as of 2016?
24          A.    I think there were revisions
25     since then to this manual.
```

                              C. HARDING

1
2          Q.    Okay.  Have you seen a more
3    recent technical manual than this one dated
4    October 1st, 2001 as it pertains to a -- a
5    300?
6          A.    Yes.
7                MR. FROMSON:  Let me go off the
8          record for a few minutes.  All right?
9                THE VIDEOGRAPHER:  We're off
10         the record.  The time is 10:06 a.m.
11               (Discussion off the record.)
12               THE VIDEOGRAPHER:  We're back
13         on the record.  The time is 10:12
14         a.m.
15         Q.    Can you put in front of you the
16   technical manual for a Kitchen Knight
17   Restaurant Fire Suppression System that
18   encompasses the 240, and that would be
19   starting with a Document Number 1.  Let me
20   know when you have that in front of you.
21         A.    I have that.
22         Q.    All right.  Now, as part of the
23   overall fire suppression system, is a test
24   tank part of the system or not?
25         A.    It is not.

```
 1                    C. HARDING
 2         Q.    I understand the use -- or the
 3    intended use of the test tank was what you
 4    already explained.  How does someone who
 5    buys a fire suppression system get
 6    information as to the existence of a test
 7    tank to test the fire suppression system?
 8         A.    For a PCL-240, --
 9         Q.    Yes.
10         A.    -- I believe that was on the
11    price list.
12         Q.    Is there anything in the
13    maintenance section of the technical manual
14    that informs a consumer about the use of a
15    test tank to test the integrity of the
16    piping as you described?
17         A.    There is not.
18         Q.    Are you familiar with the
19    training to be done by individuals who are
20    to install the Kitchen Knight fire
21    suppression system?
22         A.    Yes.
23         Q.    And are you familiar with the
24    certification training classes offered?
25         A.    I am.
```

                         C. HARDING

1

2        Q.    Can you -- are you prepared to

3    tell me about the history of those in terms

4    of when the defendant began providing

5    certified training classes?  By example, I

6    don't know if they were giving any since

7    2001 or earlier or later.  Do you know?

8        A.    I do not know.

9        Q.    I'm going to ask you just a --

10   some questions limited to the training

11   classes.  So bear with me for a moment.

12       A.    Okay.

13       Q.    At least that gives you the

14   context.  Do you know why Tyco Fire

15   Products was indicating in the technical

16   manual the necessity to have factory

17   certification training and become

18   certified?

19       A.    Yes.  It's part of being an

20   authorized distributor.  They need to

21   receive training.

22       Q.    And I understand that's part of

23   becoming an authorized distributor.  Why

24   was it important to receive training?

25       A.    I'm sorry, was that a question?

```
 1                    C. HARDING
 2         Q.    Yes.  Can you have the reporter
 3    read it back, please?
 4              (Requested portion of record
 5          read.)
 6         A.    Training's important for the
 7    fire suppression system regarding design,
 8    installation, and maintenance of it.
 9         Q.    When we reference the term
10    "maintenance," what would maintenance
11    include?  Does it include testing the
12    integrity of the piping?
13         A.    Every six months there is
14    maintenance required, and I don't believe
15    it's in the manual as far as integrity
16    testing.
17         Q.    Was integrity testing an
18    important part of maintenance to ensure the
19    integrity of the piping?
20         A.    That is required per the
21    authority.  So I don't think --
22         Q.    When you say "the authority,"
23    do you mean the municipality, like the
24    local fire code, the things of that nature?
25         A.    It's an individual, the
```

```
 1                    C. HARDING
 2    authority having jurisdiction, whoever that
 3    may be.
 4         Q.    All right.  So let me ask you a
 5    general question.  Are there any pre
 6    requirements in order for someone to attend
 7    the training?
 8         A.    They have to be --
 9         Q.    Let me actually -- let me
10    rephrase that.  My questions are before
11    2016.  Okay?  Because my client's incident
12    happened in 2016.  So reference that time
13    frame in your mind, before then.  All
14    right?  What if any requirements were
15    there, what prerequisites were there, for
16    someone to attend the defendant's certified
17    training class?
18         A.    The only prerequisite that I
19    would know is they would have to be an
20    authorized distributor.  So there would be
21    a contractual agreement before training.
22         Q.    What types of training
23    materials or workbooks or presentations
24    were utilized for the training?
25         A.    What they would receive is a --
```

```
 1                    C. HARDING
 2   a manual such as the one that we're looking
 3   at now.  And that's -- that's the
 4   information they receive for training.
 5        Q.    So in other words, the manual
 6   itself would be the totality of the
 7   materials provided for the training?
 8        A.    It would be a large percentage
 9   of it.  There may be some data spec sheets
10   in there or cut sheets on products.  But
11   the majority of the training material is
12   the manual.
13        Q.    As far as the -- the topics or
14   subject matter from within such training,
15   what information related to dangers from
16   unintended uses were provided?
17             MS. BALTZELL:  And let me just
18        object real quickly to make sure
19        we're all on the same page.  What
20        time period are you talking about for
21        training and on what product are you
22        talking about for training of a --
23        training of what?
24             MR. FROMSON:  Well, that's
25        fair.  Let me rephrase.
```

```
 1                    C. HARDING
 2         Q.    As far as the factory
 3    certification training classes were
 4    concerned, did any of those factory
 5    certification training classes encompass
 6    the subject matter of utilizing a test
 7    tank?
 8         A.    No.
 9         Q.    Did the defendant offer any
10    type of other factory certification
11    training classes in the context of test
12    tanks separate and apart from the fire
13    suppression system classes that we're
14    discussing?
15         A.    Did I re -- did I give any
16    additional training?  Is that what you're
17    asking?
18         Q.    Not you, sir.
19         A.    Oh.
20         Q.    But generally the -- were there
21    any such factory certification training
22    classes provided by the defendant, before
23    2016, were they available, but in the
24    context of use of the test tank?
25         A.    I am not aware of any.
```

```
 1                   C. HARDING
 2        Q.    And I appreciate that you might
 3   not be aware of any.  Are you the person
 4   that would know if there had been?  Or is
 5   it someone else's job to know that?
 6        A.    No.  We looked back and there
 7   was never any training on test tanks.
 8        Q.    In your industry, when you
 9   utilize the term recharge of a tank, can
10   you just tell us what that means?
11        A.    Referring to the fire
12   suppression system, recharge of a tank is
13   when you refill it with agent, wet chemical
14   agent, and nitrogen.
15        Q.    Have you ever heard in your
16   industry people discuss recharging of a
17   tank to include recharging it with air,
18   compressed air, or nitrogen?
19        A.    Typically I don't get into
20   those discussions.  I don't hear much about
21   that.  Because it doesn't relate to the
22   fire suppression side of it.
23        Q.    When you say typically that you
24   don't hear about it because it doesn't
25   relate to the fire suppression system side
```

```
 1                     C. HARDING
 2    of it, then in what context do you hear
 3    about it, even though it might be uncommon?
 4         A.    Well, I know it's done.  But
 5    it's not something that I support,
 6    technically support.
 7         Q.    In terms of your understanding
 8    that you know it's done, but don't support,
 9    what is your understanding of the context
10    in which it has been done?  In other words,
11    what has been the intended uses that you
12    knew about but might not have supported?
13         A.    Well, I know it's done because
14    we sell the test tank per a -- an
15    authority's request.  So how they do that
16    is -- is not something that I discuss with
17    them.  That would be on the authority's
18    side.
19         Q.    And as far as the test tanks,
20    such as the test tank that was involved in
21    Mr. Buono's event, that was a test tank
22    that was put out into the market by the
23    defendant; yes?
24         A.    Yes.
25         Q.    And in terms of it being placed
```

```
 1                        C. HARDING
 2      out into the market, the test tank, did it
 3      include any instruction manual when it
 4      essentially left the proverbial door of the
 5      defendant's possession, custody, or
 6      control?
 7             A.    I would have to say no.  That
 8      goes back quite a ways to the late '90s.
 9             Q.    Why do you believe no in part
10      because of the time frame?
11             A.    I say no because it's not
12      something we do today.
13             Q.    For what purpose today is a
14      test tank sold?  In other words, what's the
15      intended use that the test tanks are sold
16      today?
17             A.    I believe the intended purpose
18      of a test tank today is for the puff test
19      which we talked about earlier.
20             Q.    Did you say puff test?
21             A.    Yes.
22             Q.    Synonymous with balloon
23      testing?
24             A.    Yes.
25             Q.    Yes?
```

                        C. HARDING

1                       C. HARDING

2          A.     Yes.

3          Q.     And so before 2016, did the

4     defendant have an understanding as to that

5     being a use of test tanks, in other words

6     puff tests or balloon tests?

7          A.     Yes.

8          Q.     And did the defendant have an

9     understanding before 2016 that the use of a

10    test tank such as the one Mr. Buono was

11    involved with for purposes of balloon

12    testing or puff testing was being done by

13    test tanks placed into the market by

14    Defendant?

15         A.     Yes.

16         Q.     And before 2016 but after 1998,

17    did Defendant ever send out a manual to

18    accompany the test tanks as they were sold

19    into the marketplace?  I understand it

20    might not -- I'm not -- let me withdraw

21    that completely.

22               Putting aside the test tank in

23    this case that went out the door in 1998,

24    did there ever come a time that manuals

25    accompanied the test tanks but before 2016?

```
 1                     C. HARDING
 2          A.    I don't believe so.  I have
 3    never seen a manual on a test tank, and we
 4    went back and looked and never saw any
 5    information on manuals for test tanks.
 6          Q.    The test tank in this case, in
 7    which Mr. Buono was involved with, is it
 8    your understanding that it had a PSA marked
 9    -- psi marking of 225?
10          A.    I believe there was a DOT stamp
11    on it of 225.
12          Q.    And in terms of your
13    understanding, what does that 225 psi mean
14    to a consumer?
15          A.    It's a DOT stamping, and I'm
16    not completely up to speed on DOT
17    stampings, but the 225 does signify the
18    pressure.
19          Q.    Did the Defendant -- and when I
20    say "the Defendant," I understand you're
21    here on behalf of the Defendant.
22                Did the Defendant have an
23    understanding as to the inherent dangers of
24    putting compressed air into a test tank?
25                MS. BALTZELL:  Object to form
```

```
 1                    C. HARDING
 2         and foundation.  Go ahead.
 3         Q.    I'll ask it in a different way
 4   because there's an objection as to form.
 5              Are you aware of the -- of the
 6   inherent danger of refilling a tank such as
 7   a 2.4-gallon tank with compressed air?
 8              MS. BALTZELL:  Objection.  Form
 9          and foundation.
10         A.    Yes.
11         Q.    Let me move the volume for a
12   second.  Would you repeat your answer for
13   us?  Because we didn't hear you.
14         A.    I said yes.
15         Q.    Thank you.  And generally
16   speaking, what is your understanding of the
17   inherent dangers of refilling a tank with
18   compressed air?
19         A.    Well, it's just compressed air,
20   so if you -- if there's too much pressure,
21   that would be the danger in itself.
22         Q.    And so are the dangers of
23   compressed air -- and particular -- such as
24   overpressurization, are those dangers any
25   different today than they were in 2016 --
```

```
 1                    C. HARDING
 2    than they were in 1998, or is it
 3    essentially conceptually the same inherent
 4    danger?
 5              MS. BALTZELL:  Object to the
 6          form and also object as we're off
 7          topic.  I don't think inherent
 8          dangers of a test tank is one of the
 9          topics.
10              MS. FAPPIANO:  Can you --
11              MR. FROMSON:  Yeah, we're
12          having volume issues here.  Give us a
13          minute to see if we can fix it.
14          Okay?  And we'll go off the record.
15              THE VIDEOGRAPHER:  We're off
16          the record.  The time is 10:29 a.m.
17              (Discussion off the record.)
18              (Requested portion of record
19          read.)
20              THE VIDEOGRAPHER:  We are back
21          on the record.  The time is 10:31
22          a.m.
23              MR. FROMSON:  All right.  So
24          I'll withdraw the last question.
25          Q.    Overpressurization can lead to
```

```
 1                     C. HARDING
 2      the tank exploding.  Yes?
 3               MS. BALTZELL:  Object as
 4           outside the scope of the deposition
 5           topics.  And its foundation.
 6               MR. FROMSON:  Well, I'm not --
 7               MS. BALTZELL:  What topic are
 8           you on?
 9               MR. FROMSON:  Well, I'll tell
10           you, I'll pull -- I'm sure it's
11           within the technical manual not to
12           overpressurize a tank.  I didn't
13           think I was asking something so off
14           base.  However, give me a moment and
15           I'll find the topic that pertains to
16           it.
17               So he's here to talk about the
18           technical manual, right, which
19           includes design, installation,
20           maintenance, and use, is he not?
21               MS. BALTZELL:  He is, but I do
22           believe he's testified that there is
23           not a technical manual that's
24           applicable to our product, our test
25           tank.
```

```
 1                    C. HARDING
 2              MR. FROMSON:  Right, and I'm
 3         not asking about a test tank.  My
 4         question didn't say test tank.  It
 5         was really just is there an inherent
 6         danger with overpressurizing a tank,
 7         and that just -- I think that's
 8         common sense.  I don't think I'm
 9         going far afield.
10              MS. BALTZELL:  And I'll --
11         yeah, I'll --
12              MR. FROMSON:  I'll ask the
13         question again and you can have your
14         objection as to form.
15              MS. BALTZELL:  Yeah, that
16         works.
17              MR. FROMSON:  Okay?
18              MS. BALTZELL:  That works.
19              MR. FROMSON:  All right.
20         Q.   So do you have an understanding
21    that overpressurization of a tank, such as
22    a tank utilized in a fire suppression
23    system, can lead to the tank exploding?
24              MS. BALTZELL:  And object to
25         the form of the question as well as
```

```
 1                    C. HARDING
 2            outside the scope of the topics for
 3             this deponent for this deposition.
 4       Q.      You can answer.
 5       A.      Okay.  I would have to assume
 6   that it would be dangerous if you
 7   overpressurize a tank, yes.
 8       Q.      Does overpressurization include
 9   or exclude a test tank versus an agent
10   tank, or is it still the same inherent
11   danger if you overpressurize tanks?
12       A.      I would say it's the same
13   inherent danger.
14       Q.      Do you have an understanding as
15   to why there's been and was no manual that
16   accompanied test tanks --
17       A.      I do not.
18       Q.      -- such as the test tank --
19   sorry -- such as the test tank involving
20   Mr. Buono?
21       A.      I do not.
22       Q.      Do you have any -- do you have
23   an understanding as to whether that subject
24   matter has ever been discussed by the
25   defendant in terms of the decision-making
```

```
 1                    C. HARDING
 2    process of whether to have a manual for a
 3    test tank?
 4         A.    I do not.
 5         Q.    Have you made any search for
 6    any such records related to whether there
 7    are manuals for the test tank?
 8         A.    Yes.
 9         Q.    And did your search come up
10    with nothing?
11         A.    That is correct.  Nothing.
12         Q.    And just to -- and just to make
13    sure I understand the diligence that you
14    utilized, what did you do?
15         A.    We reached out internally to
16    groups within the company.
17         Q.    In terms of the technical
18    manual for a fire suppression system that
19    would include a 300, do you have an
20    understanding that test tanks are listed as
21    the components within that technical
22    manual?
23         A.    Yes.
24         Q.    Do you have an understanding as
25    to why they're included as components in
```

```
1                      C. HARDING
2    that technical manual?
3         A.    I do not.
4         Q.    Was that a subject matter that
5    you inquired about to prepare for this
6    deposition?
7         A.    I did not inquire regarding why
8    the 300 is in that technical manual.
9         Q.    In any event, as part of your
10   preparation for this deposition, did you
11   come across any information or documents
12   that would explain why it's included in the
13   manual for the 300 size?
14        A.    I did not.
15        Q.    And now, you're aware also that
16   the manual for the 240 is in a different --
17   is a different manual altogether, correct?
18        A.    That is correct.
19        Q.    And you -- do you have an
20   understanding that the component list
21   within the technical manual for the 240, it
22   does not include a reference to the test
23   tank, correct?
24        A.    That is correct.
25        Q.    Do you know why?
```

```
 1                    C. HARDING
 2          A.    I do not.
 3          Q.    Did you make any inquiry as to
 4    find out why?
 5          A.    I did discuss internally, and I
 6    did not receive any response as to why
 7    that's in there.
 8          Q.    Did you come across any
 9    documents that provided an answer to the
10    question?
11          A.    I did not.
12          Q.    Are you aware that the test
13    tank does appear on a sales list that's
14    been provided in the case?
15          A.    Yes, I am.
16          Q.    Or I should say a price list.
17    Have you seen the price list that includes
18    the test tank?
19          A.    Yes.
20          Q.    It references the test tank as
21    a component of the Kitchen Knight
22    suppression system, correct?
23          A.    Correct.
24          Q.    Do you have an understanding as
25    to whether the defendant put forward any
```

```
 1                    C. HARDING
 2   documentation, and when I say documentation
 3   I mean instructions or warnings or
 4   information or pamphlets, to consumers of
 5   test tanks before 2016 that indicated what
 6   the defendant believed the intended uses
 7   were for such test tanks?  And when I say
 8   test tanks, I'm talking about the type of
 9   test tank utilized by Mr. Buono.
10        A.    So you're asking why there was
11   not information put out for that test tank?
12   Is that correct?
13        Q.    That's a separate question, but
14   you can answer that --
15        A.    Okay.
16        Q.    -- as well if you want.
17        A.    Yeah, I don't know why
18   information was not put out regarding the
19   test tank.
20        Q.    And just in terms of clarity,
21   because your question -- your answer was
22   that you don't know why information was not
23   provided about the test tank, do you know
24   why Defendant didn't provide documentation
25   that referenced what the intended use was
```

1                    C. HARDING

2    of the test tank?

3          A.    I do not.

4                MR. FROMSON:  Curtis, I want to

5          thank you -- let me take another few

6          minutes.  I might be done.  I just

7          want to look over my list.  Okay?

8                THE WITNESS:  Sounds good.

9                MR. FROMSON:  Before I pass the

10         witness, let me just take five

11         minutes.  All right, Sarah?

12               MS. BALTZELL:  Sure, that

13         sounds good.

14               THE VIDEOGRAPHER:  We're off

15         the record.  The time is 10:40 a.m.

16               (Recess held.)

17               THE VIDEOGRAPHER:  We're back

18         on the record.  The time is 10:43

19         a.m.

20         Q.    So, Mr. Harding, I want to make

21    sure I'm -- I understand something

22    conceptually here.  I have, as provided to

23    us in this case, the technical manuals for

24    the Pyro-Chem restaurant kitchen fire

25    suppression systems, including those that

1                     C. HARDING
2    encompass the 240 size and the 300 size,
3    and you as well have seen those documents
4    in preparation for the deposition, correct?
5         A.    Correct.
6         Q.    And it's your understanding
7    that those technical manuals do not
8    encompass use or maintenance or
9    instructions pertaining to test tanks such
10   as a 240 test tank or a 300 test tank,
11   correct?
12        A.    That is correct.
13        Q.    And so how does the defendant
14   expect a consumer, before 2016, to know how
15   to maintain, use, and refill a test tank
16   such as the one that was used by Mr. Buono?
17             MS. BALTZELL:  Object to the
18        foundation.
19        A.    The test tanks are similar to
20   the fire suppression tank; it's just that
21   they are shipped empty.  There's no liquid
22   agent inside it.  So the concept would be
23   the same.
24        Q.    To the best of your knowledge,
25   did the defendant ever attempt, before

```
 1                    C. HARDING
 2    2016, in the context of instruction manuals
 3    or any type of documentation, inform
 4    consumers of test tanks of what you just
 5    told us?
 6         A.    No.
 7              MR. FROMSON:  Okay.  I'm going
 8         to pass the witness.  Thank you for
 9         your time, Mr. Harding.
10              THE WITNESS:  Thank you.
11    EXAMINATION BY
12    MS. FAPPIANO:
13         Q.    Picking up on that very
14    quickly, and for the sake of completeness,
15    in our document production from the
16    defendants throughout this case, you've
17    actually received three separate manuals --
18              MS. FAPPIANO:  And I'll give
19         you the Bates numbers if you need
20         them, Sarah.
21         Q.    -- which pertain to the PCL-240
22    system.  Have you seen that there's three
23    different versions of them in your
24    preparation for this deposition?
25              MS. BALTZELL:  What are your
```

```
 1                    C. HARDING
 2      Bates numbers so we can get them out?
 3           MS. FAPPIANO:  Sure.  I'm happy
 4      to do that.  So -- and they're very
 5      small, so bear with me.  1448, --
 6           MS. BALTZELL:  Okay.  Hang on.
 7           MS. FAPPIANO:  -- and that is
 8      technical manual for Kitchen Knight
 9      Restaurant Fire Suppression System
10      PCL-240, and it's got a date on the
11      second page --
12           MS. BALTZELL:  Are you talking
13      --
14           MS. FAPPIANO:  -- of December
15      15, 1999.
16           MS. BALTZELL:  Are you talking
17      about the ones that are encompassed
18      in the UL listing?
19           MS. FAPPIANO:  I don't know.
20      I'm asking -- there's three different
21      versions here that have been
22      produced, and I'm going to be asking
23      the witness why and if there's a
24      distinction.  So --
25           MS. BALTZELL:  And I can speak
```

```
1                      C. HARDING
2           to the why they were produced.  I
3           don't -- the -- why they were
4           produced is because we provided you
5           the UL listings, and so the UL
6           listing starts on Page -- let me get
7           this right.  And you'll see it has
8           ULEX on the bottom of most of the
9           numbers.  Let me find it.  It starts
10          at Page 1445.  Everything from there
11          to the end is the UL listing.  So as
12          to the why, if there are manuals that
13          happen to be in the UL listing, you
14          received them by virtue of them just
15          being in the UL listing, not because
16          it was a responsive manual to a
17          particular request.  Does that help?
18               MS. FAPPIANO:  Okay.
19          Q.    So my -- my question is -- and
20     this is all I want to know.  This
21     particular manual, however it was produced,
22     or for whatever reason it was maintained,
23     was this a manual that was put into
24     marketplace?
25          A.    Yes.
```

```
 1                    C. HARDING
 2        Q.    Okay.  And this manual does not
 3   contain any information about the use or
 4   the maintenance of the test tank that we've
 5   been talking about; am I correct?
 6              MS. BALTZELL:  If you want to
 7         look at it.
 8        Q.    This version?
 9        A.    You are correct.
10        Q.    Okay.  Thank you.  There's a
11   second version, which I have here.
12              I'm doing this chronologically.
13   Maybe not, actually.  It's at Bates 1557 of
14   -- which appears to have some differences
15   from the one that we just referenced.  My
16   -- it's the same question I have.  Was this
17   a manual that was put into the marketplace
18   that starts at Page 1557?
19        A.    We're looking for that one
20   right now.
21              THE WITNESS:  This is the one
22         here?
23              MS. BALTZELL:  (Nods head up
24         and down.)
25        A.    And your question was if it was
```

```
 1                    C. HARDING
 2   put into the marketplace?
 3         Q.     That was my question, yes.
 4         A.     Yes.
 5         Q.     Okay.  And am I correct that
 6   this version of the manual also does not
 7   contain any information about the use or
 8   maintenance of the test tank that we've
 9   been talking about?
10         A.     That is correct.
11         Q.     Thank you.  Okay.  And the
12   third version was the one that you were
13   questioned about by plaintiff's counsel,
14   which is the one that starts at 0001.  And
15   is there any other distinct -- are there
16   any distinctions between these three
17   manuals that speak to the use of the test
18   tank in any way, shape, or form?
19         A.     There is not.
20         Q.     Okay.  Thank you.  In these --
21   the training classes that we talked about
22   earlier, those are provided to
23   distributors, correct?
24         A.     Correct.
25         Q.     And they were not provided to
```

```
 1                    C. HARDING
 2   consumers or end users of your product; is
 3   that correct?
 4        A.    That is correct.
 5        Q.    Besides -- were the
 6   distributors given any type of materials to
 7   distribute to the consumers to whom they
 8   were selling that pertained to the test
 9   tanks that we've been talking about?
10        A.    No.
11        Q.    Do you know for this particular
12   tank -- and I'm not sure if this is within
13   your area of expertise, so tell me if it is
14   not.  Do you know to which distributor this
15   particular tank was sold?
16        A.    I do not.
17        Q.    Do you know into which
18   jurisdiction it was sold?  We've been
19   talking about the jurisdiction of
20   authorities.  Do you know where it went?
21        A.    I do not.
22        Q.    You spoke earlier about the
23   fact that -- and I believe you used the
24   language "do not support balloon testing."
25   I just want to clarify what you mean by "do
```

1                     C. HARDING

2    not support."

3              Is it correct that that's not

4    really a reference to you morally or

5    ethically supporting something; that's just

6    technical support is not provided for

7    balloon testing; is that correct?

8         A.    I was referring to technical

9    support, that is correct.

10        Q.    Okay.  And therefore, once a

11   test tank goes out the door, so to speak,

12   into the marketplace, is it accurate to

13   state that there is no technical support

14   provided for it by the company?

15        A.    That is correct.

16        Q.    Do you in your role have any

17   interaction with consumers or end users of

18   the product?

19        A.    I do receive phone calls from

20   end users about our products.  Occasionally

21   I do, yes.

22        Q.    Okay.  Are you familiar at all

23   with Oprandy's Fire & Equipment?

24        A.    Only referring to this case.

25        Q.    Give me one moment.

```
 1                   C. HARDING
 2              MR. FROMSON:  Do you want five
 3         minutes?  We're going to get done
 4         with this deposition quite early
 5         today.
 6              MS. FAPPIANO:  It's going to go
 7         quickly; I just want to make sure
 8         that I've covered what I need to.
 9         Give me one second.  I'm just going
10         to switch to a different document.
11         That's all.
12         Q.    Okay.  We talked about earlier
13    that there is on the price list, and I just
14    want to get onto the record that that's the
15    -- it starts at Bates Number 1371, a
16    listing for the tank -- the test tank as a
17    component part.  Is that correct?
18         A.    That is correct.
19         Q.    Okay.  And the date on this
20    price list is July 24th, 2000.  Is that
21    correct?
22         A.    That is correct.
23         Q.    Are there any price lists for
24    prior to 2000 that you're aware of that
25    you've been able to find?
```

1                        C. HARDING

2          A.     I wasn't able to find any prior

3     to 2000.

4          Q.     Do you know if this is -- do

5     you know if -- if this is the first price

6     list that was published, for lack of a

7     better word, for the Kitchen Knight

8     suppression system?

9          A.     It may be.  I'm -- I'm not 100

10    percent.

11         Q.     Okay.  What would be the

12    purpose of including the test tank as a

13    component on this price list?

14         A.     The price lists are offered to

15    our distributors to purchase all of the

16    components that we offer.

17         Q.     And why would a distributor

18    need to purchase a test tank such that it

19    would be listed on this sheet?

20         A.     Because the authority having

21    jurisdiction is requesting it.

22         Q.     And when you refer to the

23    authority having jurisdiction, that can be

24    things like fire departments; is that -- is

25    that accurate?

```
 1                    C. HARDING
 2         A.    Yes, could be a fire
 3    department, could be an insurance carrier.
 4         Q.    Excuse me.  I cut you off.  I
 5    apologize.  I'll let you finish that
 6    answer.
 7         A.    I said could be fire
 8    department, it could be an insurance
 9    carrier, whoever is in authority in that
10    area.
11         Q.    Okay.  Might that include
12    building inspectors?
13         A.    I would think so.
14         Q.    And fire inspectors?
15         A.    Yes.
16         Q.    Okay.  And so it's -- was the
17    defendant, prior to 2016, aware that
18    distributors were selling the component
19    test tank to these authorities that you
20    just described?
21              MS. BALTZELL:  Objection.
22         Foundation.
23         A.    What I would believe is the
24    distributors would purchase the test tanks
25    and then they would own them, and they
```

```
 1                     C. HARDING
 2   would not be resold to anybody else.
 3        Q.    Why would the distributors need
 4   to own the test tank then?  For what
 5   purpose?
 6        A.    They are used as a tool.  It's
 7   something that they could reuse.
 8        Q.    For what reason?
 9        A.    For the --
10        Q.    You would --
11        A.    For the puff test or balloon
12   test that we had discussed earlier.
13        Q.    Okay.
14             MR. FROMSON:  That was known in
15         2016?
16        Q.    And that was known in 2016
17   before this accident occurred; is that
18   correct?
19        A.    Yes.
20        Q.    Okay.  You testified earlier,
21   and forgive me for paraphrasing, that you
22   did not know why Tyco, the defendant, did
23   not put out information pertaining to the
24   test tank; is that correct?
25        A.    Correct.
```

                        C. HARDING

1

2        Q.    Should they have put out

3    information pertaining to the test tank?

4              MS. BALTZELL:   Objection to the

5         form.

6        A.    That wouldn't be for me to

7    decide.   That would be upper management's

8    decision.

9        Q.    That would be a decision that

10   would be made by the defendant; is that

11   correct?

12       A.    Correct.

13             MS. BALTZELL:   I have nothing

14        further.

15             MR. FROMSON:   I have just a

16        short line of questioning.

17   EXAMINATION BY

18   MR. FROMSON:

19       Q.    I'd ask you to take a look at

20   the technical manual for the 240, which I

21   believe started at 1557, but I'm going to

22   reference your specific attention to Pages

23   1603 and 1604, which are part of the

24   Chapter V for System Maintenance.  So let

25   me know when you get there.

```
 1                   C. HARDING
 2        A.    What page was that?
 3        Q.    It's Bate -- I apologize if I
 4   got the number wrong.  The bottom right
 5   corner in small print, it says 1603.
 6        A.    I don't think I have the right
 7   one, do I?
 8        Q.    And it's the November 1st, 1994
 9   version.
10             MS. BALTZELL:  We've got a few
11          copies of manuals running around, so
12          let me try to --
13             MR. FROMSON:  I'll tell you
14          what.
15             MS. BALTZELL:  Because his is
16          -- his is different.
17        Q.    If you can -- if -- I've given
18   you an example now.  If you can find
19   Chapter V, System Maintenance, of a 240
20   manual, let me know, you tell me the Bates
21   number that you have, and we'll go from
22   there.
23             MS. BALTZELL:  There you go.
24          Do that.
25        A.    Okay.  I have System
```

1                        C. HARDING

2    Maintenance, Page 59 and Page 60 on the

3    bottom right corner.

4         Q.    So do you see -- is there a

5    section -- a subsection for piping and

6    nozzles?

7         A.    Yes.

8         Q.    And within that subsection of

9    piping and nozzles, does it essentially

10   state in sum and substance that as part of

11   the maintenance process, piping should be

12   flushed with warm water and blown out with

13   air or nitrogen?

14        A.    Yes.

15        Q.    And so before 2016, was that at

16   least part of the maintenance instructions

17   provided by Defendant as it pertained to

18   the Kitchen Knight fire suppression system?

19        A.    Yes.

20        Q.    With what component, if any, of

21   the fire suppression system, back in 2016,

22   was an individual to flush the piping with

23   warm water and then blow it out with air or

24   nitrogen, if any?

25        A.    That would be followed by

```
 1                    C. HARDING
 2   maintenance after a system discharge.
 3        Q.    I understand the context --
 4        A.    Okay.
 5        Q.    -- in terms of when it would be
 6   done.  My question is with what component,
 7   if any, of a fire suppression system
 8   offered by Kitchen Knight would an
 9   individual flush the piping with either or
10   both warm water and then blow it out with
11   air or nitrogen?
12        A.    That I don't know.
13        Q.    Would it -- would it be a test
14   tank that would be utilized in terms of
15   doing a balloon test or a puff test to blow
16   out air from the test tank through the
17   piping?
18        A.    It is possible, yes.
19        Q.    Was this something that was
20   possible or known to -- to Defendant before
21   2016, that individuals were taking part in
22   the maintenance of the suppression system
23   such as blowing out the piping with air or
24   nitrogen in the context of the piping and
25   nozzles within the technical manual that
```

```
 1                    C. HARDING
 2   we're discussing?
 3          A.    It may have been known, yes.
 4               MR. FROMSON:  That was my line
 5          of questioning.  Thank you so much.
 6               THE WITNESS:  Thank you.
 7               MR. FROMSON:  Anything else?
 8               MS. FAPPIANO:  I don't have
 9          anything else.
10               MR. FROMSON:  We are done.
11          Thank you so much for your time, sir.
12               THE WITNESS:  Thank you.
13               THE VIDEOGRAPHER:  This is the
14          end of the deposition of Curt Harding
15          on September 12th, 2019.  We're off
16          the record at 11:04 a.m.
17               MR. FROMSON:  So I'll take an
18          E-Tran again and I'll get back to you
19          on ordering the video.  Okay?
20               THE COURT REPORTER:  Okay.
21          Thank you.  Tara, you're ordering as
22          well, the second one?
23               MS. FAPPIANO:  Yes.  Thank you.
24               MS. BALTZELL:  Same.  And we'll
25          read and sign.
```

```
 1                        C. HARDING
 2                 (Whereupon, at 11:04 A.M., the
 3            Examination of this witness was
 4            concluded.)
 5
 6                ○           ○           ○           ○
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    C. HARDING

 2              D E C L A R A T I O N

 3

 4        I hereby certify that having been

 5   first duly sworn to testify to the truth, I

 6   gave the above testimony.

 7

 8        I FURTHER CERTIFY that the foregoing

 9   transcript is a true and correct transcript

10   of the testimony given by me at the time

11   and place specified hereinbefore.

12

13

14

15                 _____
                          CURTIS N. HARDING

16

17

18   Subscribed and sworn to before me

19   this _____ day of _____ 20___.

20

21

22   _____
         NOTARY PUBLIC

23

24

25
```

```
1                        C. HARDING
2                  E X H I B I T S
3
4    EXHIBIT    EXHIBIT                  PAGE
5    NUMBER     DESCRIPTION
6    (None)
7
8                    I N D E X
9
10   EXAMINATION BY                      PAGE
11   MR. FROMSON                         6, 55
12   MS. FAPPIANO                        44
13
14
15     INFORMATION AND/OR DOCUMENTS REQUESTED
16   INFORMATION AND/OR DOCUMENTS        PAGE
17   (None)
18
19
20        QUESTIONS MARKED FOR RULINGS
21   PAGE LINE QUESTION
22   (None)
23
24
25
```

```
1                    C. HARDING

2            C E R T I F I C A T E

3

4    STATE OF WISCONSIN      )
                             :  SS.:
5    COUNTY OF BROWN         )

6

7          I, CARRIE S. BOHRER, a Notary Public

8    for and within the State of Wisconsin, do

9    hereby certify:

10         That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14         I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19         IN WITNESS WHEREOF, I have hereunto

20   set my hand this 18th day of September

21   2019.

22

23

24   _____

                CARRIE S. BOHRER

25
```