EXHIBIT "G"

1

2    UNITED STATES DISTRICT COURT SOUTHERN
     DISTRICT OF NEW YORK
3    ------------------------------------------X
     FRANKLIN BUONO,
4
                                        PLAINTIFF,
5
                    -against-              Case No.:
6                                        1:17-CV-05915-JFK

7    VICTORY AUTO STORE, INC., VICTORY AUTO
     STORES, INC.  D/b/a POSEIDON AIR SYSTEMS,
8    TYCO FIRE PRODUCTS LP, PAMELA L. SIMPERS,
     PAMELA L. SIMPERS d/b/a VICTORY AUTO
9    STORES, BAUER COMP HOLDING GMBH, BAUER
     KOMPRESSOREN GMBH and BAUER COMPRESSORS,
10   INC.,

11                                     DEFENDANTS.
     ------------------------------------------X
12   TYCO FIRE PRODUCTS LP,

13                    THIRD-PARTY PLAINTIFF,

14             -against-

15   O'PRANDY'S FIRE & SAFETY INC.,

16                    THIRD-PARTY DEFENDANT.
     ------------------------------------------X
17

18                    DATE:  September 12, 2019

19                    TIME:  8:12 a.m.

20

21        (DEPOSITION of ADAM R. MENOR.)

22

23

24

25

1

2                    DATE:  September 12, 2019

3                    TIME:  8:12 a.m.

4

5

6              VIDEOTAPED VIDEOCONFERENCED

7     DEPOSITION of the Defendant/Third-Party

8     Plaintiff, TYCO FIRE PRODUCTS LP, by a

9     witness, ADAM R. MENOR, taken by the

10    respective parties, held at the offices of

11    Bay Reporting Service, Inc., 414 South

12    Jefferson Street, Green Bay, Wisconsin

13    54301, before Carrie S. Bohrer, RPR, RMR,

14    CRR.

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2    A P P E A R A N C E S

 3

 4    FINKELSTEIN & PARTNERS, LLP
        Attorneys for the Plaintiff
 5      1279 Route 300, P.O. Box 1111
        Newburgh, New York  12551
 6      BY:  KENNETH FROMSON, ESQ.
        Kfromson@lawampm.com
 7      (Via videoconference)

 8

 9    SHOOK, HARDY & BACON L.L.P.
        Attorneys for the Defendant/
        Third-Party Plaintiff
10      TYCO FIRE PRODUCTS LP
        2555 Grand Boulevard
11      Kansas City, Missouri  64108
        BY:  SARAH E. LYNN BALTZELL, ESQ.
12

13

14    HAWORTH, BARBER & GERSTMAN, LLC
        Attorneys for the Third-Party Defendant
        OPRANDY'S FIRE & SAFETY INC.
15      45 Broadway, 21st Floor
        New York, New York  10006
16      BY:  TARA FAPPIANO, ESQ.
        Tara.fappiano@hbandglaw.com
17      (Via videoconference)

18

19    ALSO PRESENT:

20    MARK DENESSEN, Videographer

21           *           *           *

22

23

24

25
```

1

2                **221. UNIFORM RULES FOR THE
                  CONDUCT OF DEPOSITIONS**

3     **221.1 Objections at Depositions**
              **(a) Objections in general.**   No

4     objections shall be made at a deposition
      except those which, pursuant to subdivision

5     (b), (c) or (d) of Rule 3115 of the Civil
      Practice Law and Rules, would be waived if

6     not interposed, and except in compliance
      with subdivision (e) of such rule.   All

7     objections made at a deposition shall be
      noted by the officer before whom the

8     deposition is taken, and the answer shall
      be given and the deposition shall proceed

9     subject to the objections and to the right
      of a person to apply for appropriate relief

10    pursuant to Article 31 of the CPLR.
              **(b) Speaking objections restricted.**

11    Every objection raised during a deposition
      shall be stated succinctly and framed so as

12    not to suggest an answer to the deponent
      and, at the request of the questioning

13    attorney, shall include a clear statement
      as to any defect in form or other basis of

14    error or irregularity.   Except to the
      extent permitted by CPLR Rule 3115 or by

15    this rule, during the course of the
      examination persons in attendance shall not

16    make statements or comments that interfere
      with the questioning.

17    **221.2 Refusal to answer when objection is
      made**   A deponent shall answer all questions

18    at a deposition, except (i) to preserve a
      privilege or right of confidentiality, (ii)

19    to enforce a limitation set forth in an
      order of the court, or (iii) when the

20    question is plainly improper and would, if
      answered, cause significant prejudice to

21    any person.   An attorney shall not direct
      a deponent not to answer except as provided

22    in CPLR Rule 3115 or this subdivision.
      Any refusal to answer or direction not to

23    answer shall be accompanied by a succinct
      and clear statement of the basis therefor.

24    If the deponent does not answer a question,
      the examining party shall have the right to

25    complete the remainder of the deposition.

1

2

## 221. UNIFORM RULES FOR THE CONDUCT OF DEPOSITIONS

3

**221.3 Communication with the deponent**

4          An attorney shall not interrupt the
deposition for the purpose of communicating
5  with the deponent unless all parties
consent or the communication is made for
6  the purpose of determining whether the
question should not be answered on the
7  grounds set forth in section 221.2 of these
rules and, in such event, the reason for
8  the communication shall be stated for the
record succinctly and clearly.

9

10          IT IS FURTHER STIPULATED AND AGREED
that the transcript may be signed before
11  any Notary Public with the same force and
effect as if signed before a clerk or a
12  Judge of the court.

13

14          IT IS FURTHER STIPULATED AND AGREED
that the examination before trial may be
utilized for all purposes as provided by
15  the CPLR.

16

17          IT IS FURTHER STIPULATED AND AGREED
that all rights provided to all parties by
the CPLR cannot be deemed waived and the
18  appropriate sections of the CPLR shall be
controlling with respect hereto.

19

20          IT IS FURTHER STIPULATED AND AGREED
by and between the attorneys for the
21  respective parties hereto that a copy of
this examination shall be furnished,
22  without charge, to the attorneys
representing the witness testifying herein.

23

24

25

```
 1                    A. MENOR
 2            THE VIDEOGRAPHER:  We're on the
 3       record with the start of Media Unit
 4       Number 1 in the deposition of Adam
 5       Menor for Case Number
 6       1:17-CV-05915-JFK, United States
 7       District Court, Southern District of
 8       New York.  We're at Bay Reporting
 9       Service, Green Bay, Wisconsin.  It's
10       September 12th, 2019.  The time is
11       approximately 8:12 a.m.
12            The attorneys will now identify
13       themselves and who they represent.
14            MR. FROMSON:  On behalf of the
15       plaintiff, my name is Kenneth Fromson
16       with Finkelstein & Partners.
17            MS. FAPPIANO:  My name is Tara
18       Fappiano.  I'm with Haworth, Barber &
19       Gerstman.  I represent Oprandy's Fire
20       & Safety Equipment.
21            MS. BALTZELL:  Sarah Baltzell,
22       on behalf of Tyco Fire Products, with
23       Shook, Hardy & Bacon.
24            THE VIDEOGRAPHER:  The court
25       reporter will now swear in the
```

```
 1                    A. MENOR
 2         witness and then we'll begin.
 3    A D A M   R.   M E N O R, called as a
 4    witness herein, having been first duly
 5    sworn/affirmed, was examined and testified
 6    as follows:
 7    EXAMINATION BY
 8    MR. FROMSON:
 9         Q.    Good morning, Mr. Menor.  How
10    are you?
11         A.    Good.
12         Q.    Thank you for making yourself
13    available today.  My name is Ken Fromson.
14    I'm going to ask you a number of questions
15    this morning that stem from an incident
16    that happened on February 12th, 2016.  And
17    I would ask you to keep your -- your voice
18    up and speak clearly and slowly if possible
19    for the benefit of the reporter.  You
20    notice that there's a videographer here
21    today as well, such that we're recording
22    this video.  In the event the matter goes
23    to trial, we would make efforts to play the
24    video before a jury.  The answers you give
25    today are under oath as if you were in a
```

```
 1                       A. MENOR
 2     courtroom.  Do you understand that?
 3          A.    I do.
 4          Q.    Could you give us your -- your
 5     name and address --
 6          A.    Adam --
 7          Q.    -- for the record?
 8          A.    -- Robert Menor, 251 Meyer
 9     Avenue, Peshtigo, Wisconsin, 54157.
10          Q.    And what's your age?
11          A.    I am 36 years old.
12          Q.    And what is your occupation by
13     trade?  What do you do for a living?
14          A.    I'm the director of
15     engineering.
16          Q.    And for what company are you
17     the director of engineering?
18          A.    Johnson Controls.
19          Q.    And where is Johnson Control
20     located?
21          A.    My office is in Marinette,
22     Wisconsin.
23          Q.    What's the nature of the
24     business, generally speaking, of Johnson
25     Controls?
```

```
 1                      A. MENOR
 2          A.    So my division of Johnson
 3     Controls is the fire suppression division.
 4     So we're -- we're -- design and develop
 5     fire suppression equipment, fire protection
 6     equipment.
 7          Q.    For how long have you been the
 8     director of engineering at Johnson Control?
 9          A.    I was transitioned to the
10     director in -- it was April, May of 2015.
11          Q.    Generally speaking, what do you
12     do as the director of engineering for
13     Johnson Control?
14          A.    Generally speaking, I'm
15     responsible for the design and development
16     and sustainment of our products, so have a
17     team of managers, engineers, chemists, and
18     technicians that control the design of our
19     products and develop new products.
20          Q.    And before you transitioned
21     into being the director of engineering for
22     Johnson Control, what position did you
23     hold?
24          A.    Prior to being the engineering
25     director, I was the test engineering
```

```
 1                      A. MENOR
 2    manager at Johnson Controls.
 3         Q.     And just give us a brief
 4    description of what that -- that job duty
 5    was -- or what those job duties were.
 6         A.     Yeah, so as the test
 7    engineering manager I was responsible for a
 8    team of technicians that did testing of our
 9    products, and then also the facilities in
10    Marinette, Wisconsin that we use to do the
11    testing of our products.
12         Q.     And when did you become a test
13    engineering manager?
14         A.     In December of 2010.
15         Q.     And did you hold that position
16    consecutively until approximately April or
17    May of 2015 when you became a director?
18         A.     That is correct.
19         Q.     Okay.  And then I presume that
20    was with Johnson Controls, correct?
21         A.     Correct.
22         Q.     And before that what was your
23    position?
24         A.     I was a mechanical engineer
25    with Johnson Controls.
```

```
 1                    A. MENOR
 2      Q.    And again, just generally
 3  speaking, what does it mean to be a
 4  mechanical engineer with Johnson Control?
 5      A.    Yep.  So I was responsible --
 6  in that role, as a mechanical engineer, I
 7  was responsible for the sustainment of our
 8  product lines, specifically some of our
 9  restaurant systems and our engineered
10  systems at that time.
11      Q.    And for approximately how long
12  were you a mechanical engineer for Johnson
13  Controls?
14      A.    From January of 2008 to
15  December 2010 when I was promoted to the
16  test engineering manager.
17      Q.    When did you first become
18  employed by Johnson Control?
19      A.    January 2008.
20      Q.    And before becoming first
21  employed in January of 2008 by Johnson
22  Control, did you have a job?
23      A.    I did.
24      Q.    What were you doing?
25      A.    I was a manufacturing engineer
```

```
 1                    A. MENOR
 2    at KS Kolbenschmidt, Karl Schmidt Unisia at
 3    the time, KSU, in Marinette, Wisconsin.
 4    How to spell that?
 5                (Laughter.)
 6          Q.    Could you say that slowly for
 7    us one more time --
 8          A.    Yeah.
 9          Q.    -- so we can try and spell it
10    phonetically?
11          A.    Yeah.  So the name of the
12    company is KS Kolbenschmidt.
13          Q.    Where were they located?
14          A.    In Marinette, Wisconsin as
15    well.
16          Q.    And generally speaking what did
17    you do for them?
18          A.    So as a manufacturing engineer
19    I was responsible for the surface treatment
20    department, the engineering activities in
21    the surface treatment department.  So
22    they're a manufacturer of automotive
23    pistons, and they had some surface
24    treatment anodizing and skirt coating for
25    -- anti-friction coating of the skirts of
```

1                      A. MENOR

2      the pistons.  So I was responsible for

3      capital equipment and the operation of that

4      equipment.

5           Q.    For approximately how long were

6      you employed by that company?

7           A.    Approximately two years, I

8      believe.  I started there in December of

9      2005.

10          Q.    What's your educational

11     background?

12          A.    So I have a bachelor's degree

13     in mechanical engineering technology from

14     Northern Michigan University in Marquette,

15     Michigan.  And I have a master's in

16     business administration from the University

17     of Wisconsin-Oshkosh.

18          Q.    And when did you graduate from

19     college to get your bachelor's?

20          A.    I graduated from Northern

21     Michigan University in December of 2005.

22          Q.    In terms of a working

23     relationship, if any, with the defendant in

24     this case, Tyco Fire Protection Products,

25     can you explain the relationship, if any,

```
 1                    A. MENOR
 2    as to why you're here with -- from Johnson
 3    Controls to discuss a product from Tyco?
 4         A.    Yeah, so Johnson Controls is
 5    the parent company of the legal entity for
 6    Marinette, Wisconsin, which is Tyco Fire
 7    Products LP.  And Tyco --
 8         Q.    Do you understand -- sorry.  Go
 9    ahead.  I didn't mean to cut you off.
10         A.    So Tyco -- the parent company,
11    Tyco International, and Johnson Controls
12    merged in 2016.
13         Q.    Do you have a general
14    understanding that this case involves a
15    fire suppression tank incident that
16    happened in February of 2016?
17         A.    Yes.
18         Q.    And generally speaking what did
19    you do to prepare for this deposition
20    today?  Don't tell me what if anything was
21    said between yourself and lawyers, but
22    generally speaking what did you do to
23    prepare for the topics that we will discuss
24    today?
25         A.    I reviewed the OSHA report for
```

```
 1                    A. MENOR
 2    this incident, and I had internal
 3    discussions with some of my colleagues, and
 4    I reviewed some internal documentation, I
 5    reviewed some external standards, and I had
 6    discussions with the attorney for Tyco Fire
 7    Products LP.
 8         Q.    Do you have a -- what is your
 9    understanding as to the type of fire
10    suppression tank that was involved in the
11    event for which I represent Mr. Buono?
12         A.    So from my review of the OSHA
13    report, looking at the pictures and the
14    dimensions of the tank, it's a -- a test
15    tank from the Kitchen Knight system.
16         Q.    And so if I could, I just want
17    you to educate us on what it means to be a
18    test tank.  Can you explain to us what is
19    meant by that term in your industry?
20         A.    A test tank was -- is offered
21    by the company.  So it left the company in
22    an empty state, so an unpressurized state,
23    and it was sold to end users for the use of
24    conducting testing of the fire suppression
25    piping system.  So NFPA 17A requires
```

```
 1                    A. MENOR

 2   obstruction piping integrity testing.  So

 3   the test tank was a -- is a tool used for

 4   that testing.

 5        Q.    And when you reference,

 6   generally speaking, that the tank left the

 7   company in an empty state, would that

 8   include the assembly that's affixed to the

 9   top of the tank as well?

10        A.    It would be the -- the cylinder

11   itself as well as the valve assembly in an

12   assembled state.

13        Q.    And as it pertained to the test

14   tank in this case, as you understand it, do

15   you have a -- an understanding as to what

16   size tank was involved?  And I'll be

17   perfectly clear.  A 2.4 as opposed to a

18   3-gallon, do you have an understanding as

19   to what you believe it was?

20        A.    Yeah, so based off of the --

21   the OSHA report and --

22             THE WITNESS:  Could I have the

23        OSHA report?

24        A.    Based off of the OSHA report,

25   the dimensions specified in the report,
```

```
 1                      A. MENOR
 2    which I don't recall the exact dimensions,
 3    but I believe they're 8 by 22, that aligns
 4    with a 2.4-gallon test tank.
 5          Q.    Do -- given your review of the
 6    OSHA report, did you observe references to
 7    it being a 3-gallon tank?
 8          A.    Yes.  I believe the OSHA report
 9    specifies it as being a Pyro-Chem Kitchen
10    Knight II PCL-300 cylinder assembly.
11          Q.    And to be more clear, was it
12    referenced as a 300T; in other words, a
13    test tank?
14          A.    It was not.  It was referenced
15    as a Pyro-Chem Kitchen Knight II PCL-300
16    cylinder assembly with part number 551194,
17    which I believe is an agent tank.
18          Q.    Is there a distinction between
19    an agent -- just generally speaking, in
20    your industry, using your terms, is there a
21    distinction between an agent tank and a
22    test tank?
23          A.    Yes.  An agent --
24          Q.    Would you educate us on the
25    difference?
```

```
 1                        A. MENOR
 2          A.    An agent tank has a chemical
 3     agent, a fire suppression agent, that's in
 4     a pressurized condition and shipped as a --
 5     as an assembly.
 6                    MR. FROMSON:  Sure.  Madam
 7            Reporter, can you read back his
 8            answer for the benefit of counsel?
 9                    THE COURT REPORTER:  Sure.
10                    (Requested portion of record
11            read.)
12                    MS. FAPPIANO:  Thank you.
13          Q.    And the capacity -- that test
14     tank is shipped empty, right?
15          A.    That is correct.
16          Q.    Is it your understanding that
17     the OSHA report, if it would have been more
18     accurate, it would have reflected the
19     cylinder as being a PCL-240 as opposed to
20     it indicating it being a 300?
21          A.    It would be a Kitchen Knight
22     PCL-240T.
23          Q.    The T meaning test?
24          A.    That is correct.
25          Q.    And are you familiar with the
```

```
 1                    A. MENOR
 2    Kitchen Knight manuals as it pertains to
 3    instructions for use and maintenance and
 4    recharge, just generally speaking?
 5         A.    I'm aware of the Kitchen Knight
 6    and Kitchen Knight II manuals.
 7         Q.    Okay.  Would there be a
 8    difference in terms of the maintenance and
 9    recharging procedures as in between the
10    240T and a 300T, or are they the same but
11    for the size?
12              MS. BALTZELL:  And let -- let
13         me just for a minute kind of clarify
14         the record.  I know we did this
15         before we got on, but as far as
16         deposition topics go, Mr. Harding is
17         going to be here this afternoon to
18         talk about the manual as one of the
19         topics, and so just for clarification
20         before we continue with the
21         questioning, we have designated Mr.
22         Menor on plaintiff's notice for
23         Topics 1, 3, 5, 7, 8, 10, 11, 12; and
24         then on the topics for Oprandy's
25         notice, for the topics related to the
```

```
 1                    A. MENOR
 2          manual will be designated with Mr.
 3          Harding this afternoon.
 4              MR. FROMSON:   I appreciate
 5          that.   Thank you.
 6          Q.    So then let me reference your
 7   attention to Topic Number 3 on the
 8   deposition notice submitted by Plaintiff,
 9   and I'll read it to you:   Testimony
10   regarding the Defendant's basis for and
11   implementation of language into or
12   exclusion of language from the cylinder's
13   tank labeling, including affixed markings
14   to, or part of, the cylinder tank.
15              So I read that to you just to
16   give you a heads-up.   I'll only ask you
17   questions about markings on the tank.   Fair
18   enough?
19          A.    Understood.
20          Q.    All right.   And that's a topic
21   that you've been designated to discuss
22   today, so let me ask you a great general
23   foundational question.   How did the
24   defendant in this case, to the best of your
25   knowledge, go about determining what
```

```
 1                   A. MENOR
 2    markings to put on the tank that was
 3    involved in the incident back in December
 4    -- February 2016?
 5         A.    So -- so the tank involved in
 6    the incident has a -- a manufacturing date
 7    stamp of August 1998.  So Tyco acquired the
 8    parent company of Pyro-Chem in 1998, and
 9    from my review of the Worthington drawing
10    for this tank, it looks like the design
11    activity occurred prior to 1998.  So I was
12    unable to find design drawings from the
13    Pyro-Chem pre acquisition and/or the
14    engineering change notices prior to
15    acquisition.  So I can't speak exactly to
16    this tank and the design period because it
17    was pre acquisition.
18         Q.    In terms of what you understand
19    to be the markings on this tank that was
20    involved in this incident, those markings
21    are essentially engraved into the green and
22    red tank, correct?
23         A.    Correct.  Yep.  These are the
24    -- the DOT-required markings.
25         Q.    And so my -- my questioning is
```

```
 1                     A. MENOR
 2      along those lines.  How was it determined
 3      what markings would have gone on that tank
 4      when it left the possession of the
 5      manufacturer or distributor which as I
 6      understand it would have been Pyro-Chem
 7      before Tyco acquired it.  Do you
 8      understand?
 9             A.    I do.  Yep.
10             Q.    Can you answer that question?
11             A.    Yep.  So -- so these markings
12      are in compliance with the DOT standard.
13      It would be 49 CFR, for Code of Federal
14      Regulations.  That specifies the marking
15      requirements for this type of cylinder, a
16      4BW specification cylinder.
17             Q.    Do you have any knowledge --
18      although I get it would be hindsight, do
19      you have any knowledge as to whether
20      Pyro-Chem had placed additional markings on
21      their products --
22                   THE COURT REPORTER:  I'm sorry,
23             I need you to repeat the question for
24             me, please.
25                   MR. FROMSON:  Absolutely.  I'll
```

```
1                        A. MENOR
2           start again.
3                   THE COURT REPORTER:  Thank you.
4           Q.    My preface -- my foundation is
5    still about the types of markings that are
6    placed on tanks.  Are you with me?
7           A.    I am.
8           Q.    All right.  And so do you know
9    whether Pyro-Chem, during the calendar year
10   1998 or before, ever had a practice where
11   they would put more information on their
12   tank drawings than was, as you say,
13   required by DOT?
14                   MS. BALTZELL:  Objection.
15           Foundation.
16          A.    I don't know.
17          Q.    You can answer.  All right.
18   Now, during the calendar year of 1998 and
19   before, is it fair to say you were not yet
20   employed in the industry?  Right?
21          A.    That is fair to say, yes.
22          Q.    Referencing the actual markings
23   on the subject tank that was involved in
24   this event, when you use the term DOT, can
25   you educate us on what DOT stands for?
```

```
 1                   A. MENOR
 2        A.    DOT is an acronym for the
 3   Department of Transportation.
 4        Q.    And you also referenced the --
 5   the M4543 number.  Do you recall that?
 6        A.    I did not reference that in my
 7   testimony here, but I do see that number in
 8   the OSHA report.
 9        Q.    Okay.  I apologize for that.
10   Do you have an understanding as to whether
11   the numbers M4543 were also engraved on the
12   subject tank?
13        A.    From my review of the OSHA
14   report, it looks like M4543 was engraved in
15   the tank.
16        Q.    And do you have -- and given
17   your -- your background, your employment,
18   you know, what you do for a living, do you
19   have an understanding as to what those
20   numbers reflect?
21        A.    So I believe those tie back to
22   the manufacturer of the tank, Worthington,
23   and/or the inspector of the tank during
24   production of the tank.
25        Q.    Now, referencing again the
```

```
 1                          A. MENOR
 2      topic heading of what language goes on a
 3      tank as far as labeling, are you familiar
 4      with the term called a "nameplate"?
 5              A.    I am.
 6              Q.    Can you educate us on what is a
 7      nameplate in your industry?
 8              A.    In our industry a nameplate
 9      would go on a -- a finished good assembly
10      that would identify the contents of that,
11      as well as some additional information such
12      as any third-party approvals, like UL,
13      Underwriters Laboratory, that that product
14      has been tested and certified to.
15              Q.    Are you familiar with
16      nameplates that were being utilized on fire
17      suppression tanks back in 1998?
18              A.    From my review of drawings from
19      that time period, yes.
20              Q.    Generally speaking, what was
21      your -- let me ask you this.  Was it your
22      understanding that on a test tank, such as
23      the test tank involved in this case, that
24      nameplates were not put on the tanks?
25              A.    It is my understanding that,
```

```
 1                    A. MENOR
 2   yes, there was no nameplate put on the test
 3   tank.
 4        Q.    And do you have an
 5   understanding as to why?
 6        A.    I do not.
 7        Q.    Do you have an understanding as
 8   to whether nameplates were generally put on
 9   agent tanks as opposed to test tanks?
10        A.    Yes.
11        Q.    And with respect to the
12   nameplate that would have -- withdrawn.
13             Is it fair to say it's your
14   understanding there would have been a
15   nameplate on the corresponding 240 agent
16   tank or a corresponding 300 agent tank --
17        A.    Yes.
18        Q.    -- back in 1998?
19        A.    Yes.
20        Q.    And -- and if you haven't gone
21   back and reviewed those nameplates you let
22   me know, but are you able to tell us what
23   information was on the nameplates of a
24   Pyro-Chem 240 tank back in 1998?
25        A.    I haven't reviewed that
```

```
 1                    A. MENOR
 2    nameplate drawing specifically, so I can't
 3    speak to all of the details that are on
 4    that tank, that nameplate.  But, you know,
 5    like I mentioned earlier, it would be
 6    things like the name of the product, any
 7    certifications that the product -- the
 8    contents of that assembly.
 9          Q.    Would your -- and would your --
10    would your answer be the same for either a
11    300 agent tank or a 240 agent tank, so I
12    don't have to ask the same question twice?
13          A.    That's correct, yeah, the
14    contents of the label -- nameplate would be
15    similar.  The details would vary depending
16    on the size.
17          Q.    As it pertains to this subject
18    test tank that was involved in the
19    explosion, do you know whether there were
20    any documents, manuals, standard operating
21    procedures maintained by Pyro-Chem that
22    would lay out what was to be on a tank's
23    markings, or rather what markings were to
24    be on a tank back then, during that
25    manufacturing phase?
```

```
 1                         A. MENOR
 2          A.     Specific to the test tank?
 3          Q.     Yeah.
 4          A.     No.  I'm not aware of -- of any
 5   documents.
 6          Q.     Are you familiar -- well,
 7   actually, hold on one moment.  I want to
 8   make sure I'm asking you a question that's
 9   within the documents you're designated to
10   discuss.
11                 All right.  Let's look to --
12   let's discuss the standards and regulations
13   in addition to DOT as you understood them.
14   I'm looking at my Topic Number 10, which is
15   basically a way of outlining -- it's going
16   to ask you questions about things like
17   NFPA, CGA, DOT, OSHA, and ASME.  So with
18   that as a background, can you educate us on
19   what is meant by the acronym NFPA?
20          A.     NFPA stands for the National
21   Fire Protection Association.
22          Q.     And do you have an
23   understanding as to whether Pyro-Chem was
24   putting products such as this test tank
25   into the market in a manner that was
```

```
 1                    A. MENOR
 2   governed by NFPA back in 1998?
 3        A.    Could you repeat the question?
 4   I'm --
 5        Q.    Sure.  Let me ask it in a much
 6   shorter way.  Did Pyro-Chem follow NFPA
 7   back in 1998?
 8        A.    So from my review of -- of the
 9   drawings and their approvals, they would
10   have followed NFPA through their UL
11   listing.  So the UL is Underwriters
12   Laboratory.  So products that they certify,
13   using UL, tie to the NFPA standards.
14        Q.    And were you familiar with and
15   are you familiar with NFPA Number 17?
16        A.    I'm aware of NFPA 17.
17        Q.    Without asking you to cite it
18   chapter and verse succinctly, what's your
19   understanding of what 17 covers?
20        A.    So there's 17 and 17A.  And I
21   don't have the title of NFPA 17 in front of
22   me, but I believe that would be for dry
23   chemical extinguishing systems.
24        Q.    And the test tank that's
25   involved in this case, was that considered
```

```
1                        A. MENOR
2     a dry chemical or a wet chemical
3     suppression tank?
4          A.     The test tank that was in this
5     case was a tool for wet chemical systems.
6          Q.     And was wet chemical systems
7     covered by 17A?
8          A.     That is my understanding, yes.
9          Q.     As far as the engineering
10    drawings that pertain to the -- to the tank
11    in this case, you looked at those?
12         A.     I did.
13         Q.     Did you notice one of the
14    drawings pertained to the carton, the box,
15    in which the tank would be shipped?
16         A.     I did.
17         Q.     Do you know who came up with
18    that language on -- on the box?
19         A.     I would have to review that,
20    that drawing.
21         Q.     Do you know whether any
22    drawings exist that demonstrate where the
23    markings on the tank would go?
24         A.     The -- I believe the cylinder
25    -- the drawing for the cylinder itself
```

```
 1                    A. MENOR
 2    would identify the markings that are
 3    required or reference the standard that
 4    defines what markings are required and the
 5    location of said markings.
 6         Q.    And were those drawings done --
 7    as it pertains to this tank, the 240 tank
 8    that you believe was involved in the event,
 9    were those drawings done by Worthington,
10    the manufacturer of the subject tank
11    itself?
12         A.    So from my review and my
13    understanding of the situation, Worthington
14    would have collaborated with Pyro-Chem at
15    the time to design that 240 tank.
16         Q.    If I were to ask you any
17    questions related to the language in the
18    man -- in the technical manuals, how that
19    language was there, who decided to put it
20    there, is that something that you're not
21    prepared to testify about today but,
22    rather, that's something for the other
23    gentleman today whose name is Curt Harding?
24         A.    That is correct, yes.  It's --
25    yeah, Curt is prepared to discuss that.
```

```
 1                    A. MENOR
 2        Q.    That might make my deposition
 3   of you quite short.  So give me one moment.
 4   All right?
 5        A.    Absolutely.
 6              MR. FROMSON:  You know what,
 7         let's take a five-minute break.  All
 8         right?
 9              THE VIDEOGRAPHER:  We're off
10         the record.  The time is 8:44 a.m.
11             (Recess held.)
12              THE VIDEOGRAPHER:  We're back
13          on the record.  The time is 8:53 a.m.
14        Q.   (By Mr. Fromson:)  Mr. Menor,
15   thanks for taking the break.  Appreciate
16   it.
17              Do you have an understanding as
18   to what if any other language to be marked
19   on the subject test tank in this case was
20   considered back during the 1998 time frame?
21        A.   I do not.  I did a review with
22   my colleagues who were employed by Tyco at
23   that time to see if they have any access to
24   old drawings or change notices or design
25   diaries from Pyro-Chem, and we were not
```

```
 1                         A. MENOR
 2      able to uncover any, discover any.
 3              Q.    And as it pertains to the
 4      technical manuals, the instruction
 5      booklets, for the -- the test tank or the
 6      agent tanks, what have you, is that a topic
 7      that's left for Curt to discuss, in other
 8      words what language went into those manuals
 9      and why?
10              A.    It is for Curt to discuss.
11              Q.    Do you know the location of
12      where the product was manufactured and
13      assembled before it went out of the
14      possession, custody, and control of
15      Pyro-Chem back in 1998?
16              A.    I've got -- so the
17      manufacturing location of Pyro-Chem is in
18      Boonton, New Jersey, and I believe the
19      address is on the design drawings from that
20      time.
21              Q.    So generally speaking, it's
22      your understanding, on behalf of Tyco, --
23              A.    Um-hmm.
24              Q.    -- that the product was
25      assembled -- in other words the tank and
```

```
 1                         A. MENOR
 2      the assembly and the valve assembly was
 3      assembled in Boonton, New Jersey and then
 4      essentially was shipped out the proverbial
 5      door into the marketplace from Boonton, New
 6      Jersey; is that fair?
 7              A.      That is my understanding, yes.
 8              Q.      And in terms of the time frame
 9      post manufacture and assembly back in '98,
10      are you able to tell us when it went out
11      that proverbial door into the marketplace?
12      By that I mean just because it was
13      manufactured in 1998 doesn't necessarily
14      mean it left Pyro-Chem's possession,
15      custody, and control in '98.  Do you know
16      when it left the door?
17              A.      I do not.
18              Q.      Have you observed -- have you
19      seen any records that reflect when it went
20      into the marketplace but you just don't
21      recall?
22              A.      I have not seen any records
23      that would have shown when that particular
24      test tank was placed on the market.
25                      MR. FROMSON:  I told you I'd be
```

```
 1                    A. MENOR
 2          short, and I don't have any questions
 3          at this time.  Thanks so much.
 4               THE WITNESS:  Thank you.
 5               MR. FROMSON:  I'll pass the
 6          witness.
 7    EXAMINATION BY
 8    MS. FAPPIANO:
 9          Q.    Good morning.
10          A.    Good morning.
11          Q.    As I mentioned earlier, I
12    represent Oprandy's Fire & Equipment in
13    this action.  I just have a few follow-up
14    questions on a couple items that were in my
15    notice that I'm going to ask you.
16               My -- so getting back onto that
17    topic that we were just talking about, what
18    happened to the product once it was
19    manufactured, have you done a search for
20    documents to determine to whom it was
21    originally sold?
22          A.    I personally have not done that
23    search, no.
24          Q.    Okay.  Have you seen any
25    documents that indicate to whom it was
```

1                          A. MENOR
2      originally sold?
3            A.    No, I have not.
4            Q.    Are you familiar with Oprandy's
5      Fire & Equipment other than this
6      litigation?
7            A.    I am not.
8            Q.    Okay.  We talked about the
9      difference between a test tank and an agent
10     tank.  Based upon your experience and the
11     documents that you have reviewed, would a
12     test tank be sold to a different type of
13     customer than an agent tank?
14           A.    No.
15           Q.    They have two different
16     purposes, though; is that correct?
17           A.    That is correct, yep.
18           Q.    And can you describe for me the
19     distinction between their two purposes?
20           A.    So an agent tank is part of a
21     fire suppression system, to protect a
22     restaurant, in this particular case.  A
23     test tank is to be used in the testing of
24     that system, specifically the piping of
25     that system, to ensure the integrity of

```
 1                    A. MENOR
 2    that piping, that there's no obstructions
 3    in the piping, so that when the agent tank
 4    would need to be discharged, that the
 5    system would have the ability to flow
 6    through the piping and suppress the fire.
 7         Q.    Okay.  And the testing that you
 8    just described, is that testing that is
 9    intended to happen at the point of
10    installation or periodically or something
11    else?
12         A.    My understanding, that would be
13    at the time of installation and
14    commissioning of the system if the local
15    AHJ, the authority having jurisdiction,
16    would require such a test.
17         Q.    Okay.  And you don't know into
18    which jurisdiction this particular tank was
19    originally sold; is that correct?
20         A.    That is correct.
21         Q.    And I suspect I know the answer
22    to some of these questions, but I'm going
23    to do this on the record anyway.  Do you
24    have any knowledge, besides your review of
25    the documents, as to what design decisions
```

```
 1                    A. MENOR
 2   were made with regard to this particular
 3   tank?
 4          A.    I do not.
 5          Q.    Okay.  Do you know if any
 6   alternative designs were considered?
 7          A.    I do not.
 8          Q.    Do you know if there were, in
 9   the testing phase of this particular test
10   tank, any issues with its performance
11   before it was put into the marketplace?
12          A.    I'm not aware.
13          Q.    Are you aware of there having
14   been any other similar accidents or
15   failures due to overpressurization of a
16   similar type of test tank?
17          A.    In my review and discussion
18   with our risk management team, they have a
19   record retention of ten years, and they did
20   a review and were not able to find any
21   other incidents.
22          Q.    Okay.  Of any kind?  Or with
23   regard to overpressurization?
24          A.    With regard to this test tank
25   and overpressurization.
```

```
 1                    A. MENOR
 2          Q.    Okay.  And you did review the
 3     OSHA report, so you understand that they
 4     made a conclusion that overpressurization
 5     was the reason that this tank failed; is
 6     that correct?
 7          A.    I understand that that was the
 8     conclusion, yes.
 9          Q.    Okay.  Besides the tank and
10     valve assembly to which you referred
11     earlier, to your knowledge were there any
12     other component parts that were provided
13     with the test tank to be used by the end
14     user?
15          A.    So that would be based on my
16     review of the finished good assembly
17     drawing, and there's some items more
18     related to shipping, bubble wrap and
19     carton, than the actual components of the
20     test tank.  So -- so my --
21          Q.    Okay.
22          A.    You know, I would like to pull
23     up the drawing just to confirm that, but
24     from my review of the test tank finished
25     good assembly drawing, those would be the
```

```
 1                    A. MENOR
 2    -- the two primary components, the cylinder
 3    and the valve assembly.
 4         Q.    Okay.  You understand what a
 5    pressure regulator is?
 6         A.    I'm aware of what pressure
 7    regulators are and what they do, yes.
 8         Q.    Okay.  Was there a pressure
 9    regulator that was to be sold with this
10    test tank as a matter of design?
11         A.    With the Kitchen Knight test
12    tank, no, there wasn't a pressure regulator
13    sold with it.
14         Q.    And it's -- and we've heard
15    this a couple times from you.  You're not
16    familiar with what the manual information
17    is for this test tank; am I correct?
18         A.    That's correct.
19         Q.    Are you familiar with the term
20    "pressure relief valve" or the component, a
21    pressure relief valve?
22         A.    I'm familiar with that term,
23    yeah, a pressure relief valve.
24         Q.    Can you just tell me from your
25    understanding what that is?
```

```
 1                    A. MENOR
 2        A.    So a pressure relief valve
 3   relieves pressure of cylinders.  Depending
 4   on a number of instances, there could be
 5   different styles, like a fusible one that's
 6   more dependent on temperature, and then
 7   there's ones that are dependent on pressure
 8   to operate.
 9        Q.    And based upon your review of
10   the documents, do you know if any decisions
11   were made about whether to include a
12   pressure relief valve with this particular
13   type of test tank?
14        A.    Based off of my review, I
15   didn't -- I wasn't able to get the -- any
16   of the Pyro-Chem drawings or related
17   specifications to that, but from my review
18   of 49 CFR, the DOT regulation, they don't
19   require pressure relief valves at this
20   certain pressure and size of the cylinder.
21        Q.    Okay.  Do you have any
22   knowledge or information about the type of
23   training that would be required for a user
24   or a -- a consumer for this particular type
25   of test tank?
```

```
 1                      A. MENOR
 2          A.    I'm not aware, no.
 3          Q.    Okay.  Give me one moment
 4   because I'm just kind of scrolling through
 5   what your particular knowledge is so I'm
 6   asking the appropriate questions of you.
 7          A.    Yes, no problem.
 8          Q.    Can you tell us whether, when a
 9   product is put into the marketplace,
10   whether there's any sort of database or
11   registration of this particular type of
12   test tank that occurs, some central
13   location that would indicate where -- where
14   it's -- it -- by whom it's purchased, where
15   it goes from there?
16          A.    I'm not aware of any such
17   database for once the tank is placed on the
18   market.
19          Q.    Okay.  Thank you.  Have you had
20   any conversations or dealings with
21   Oprandy's in connection with this
22   litigation?
23          A.    I have not.
24          Q.    Okay.  Did you have -- besides
25   reviewing the OSHA report, did you have any
```

```
 1                    A. MENOR
 2    involvement with the investigation itself
 3    following the accident?
 4          A.    I did not.
 5          Q.    Do you know whether there is
 6    any practice by Tyco to track, internally,
 7    where a product is sold to and where it
 8    goes from there?
 9          A.    I'm not aware of that.  We do
10    have a list of authorized distributors that
11    we use to control who the product is sold
12    to, but then past that we don't have
13    systems or controls who those distributors
14    -- what they decide to do with the product.
15          Q.    Okay.  Give me one second.
16          MR. FROMSON:  Can I ask a
17           general question?
18          MS. FAPPIANO:  Go for it.
19    EXAMINATION BY
20    MR. FROMSON:
21          Q.    I'm just going to ask you a
22    general history legacy question.  Do you
23    know what Pyro-Chem's business was back in
24    the mid '90s to 1998?
25          A.    From my review of the
```

```
 1                    A. MENOR
 2    documents, they were a fire suppression
 3    manufacturer.
 4         Q.    And do you know the size of the
 5    company in terms of how many employees were
 6    in Boonton, New Jersey at the time this was
 7    assembled?
 8         A.    I do not, no.
 9         Q.    Do you know how many engineers
10    they had?
11         A.    I do not.
12         Q.    And do you know the chronology
13    in terms of when Tyco Fire Products LP
14    merged or somehow took over assets of
15    Pyro-Chem?
16         A.    I know that -- the general
17    timing being in 1998.  The exact details of
18    -- of the merger and the transition, I am
19    not aware of the specifics of that.
20         Q.    Let me ask it a different way.
21    Do you know when Tyco took on the
22    responsibility for the product that
23    Pyro-Chem had manufactured, this subject
24    test tank?
25         A.    Yeah, so from my review of the
```

```
 1                    A. MENOR
 2    -- the drawings, so we were able to find
 3    the Tyco drawings, so that would indicate
 4    to me that that -- at that time Tyco
 5    created drawings for this product that was
 6    priorly Pyro-Chem's product.  And so that
 7    activity is in the engineering change
 8    notices and on the drawings, and that's in
 9    the 1998 time frame.
10    EXAMINATION BY
11    MS. FAPPIANO:
12         Q.    I think my last question is you
13    mentioned you do have some colleagues who
14    are working there now who were back there
15    in 1998.  Were -- did any of them have any
16    involvement with the manufacture of this
17    test tank?
18         A.    No.
19              MS. FAPPIANO:  Okay.
20    EXAMINATION BY
21    MR. FROMSON:
22         Q.    On -- with respect to her line
23    of questioning, did any of those
24    individuals have participation in the
25    implementation of the markings, the
```

```
 1                    A. MENOR
 2   language on the test tank?
 3        A.    No.
 4             MS. FAPPIANO:  I think that's
 5        all we have for you, Mr. Menor.
 6        Thank you very much.
 7             MR. FROMSON:  Thank you for
 8        your time.
 9             THE WITNESS:  Thank you both.
10        Have a good rest of your day.
11             THE VIDEOGRAPHER:  This is the
12        end of the deposition of Adam Menor
13        on September 12th, 2019.  We're off
14        the record at 9:09 a.m.
15             THE COURT REPORTER:  Can I just
16        have you state on the record, on the
17        written record, you transcript orders
18        for me, please?
19             MR. FROMSON:  Sure on behalf of
20        plaintiff, I'll take an E-Transcript
21        and I -- and I assume Sarah will get
22        a copy and have her witness sign it
23        at some point?
24             MS. BALTZELL:  Correct.
25             MS. FAPPIANO:  Same here.
```

```
1                    A. MENOR
2              MR. FROMSON:  Thank you.
3              THE COURT REPORTER:  So, Tara,
4         an E-Tran as well, did you say?
5              MS. FAPPIANO:  Yes.  Thank you.
6              THE COURT REPORTER:  Thank you.
7              MS. BALTZELL:  I'll do an
8         E-Tran as well.
9              THE VIDEOGRAPHER:  Are there
10        any video orders?
11             MR. FROMSON:  I don't need to
12        make an order right now.  My order
13        will probably come as we get closer
14        to trial.  Okay?
15             THE VIDEOGRAPHER:  Okay.
16             MS. FAPPIANO:  Yeah, I'll do
17        the same thing.  That's fine.
18             (Whereupon, at 9:09 A.M., the
19        Examination of this witness was
20        concluded.)
21
22             o         o         o         o
23
24
25
```

```
 1                    A. MENOR
 2              D E C L A R A T I O N
 3
 4        I hereby certify that having been
 5   first duly sworn to testify to the truth, I
 6   gave the above testimony.
 7
 8        I FURTHER CERTIFY that the foregoing
 9   transcript is a true and correct transcript
10   of the testimony given by me at the time
11   and place specified hereinbefore.
12
13
14
15            _____
                      ADAM R. MENOR
16
17
18   Subscribed and sworn to before me
19   this _____ day of _____ 20____.
20
21
22   _____
          NOTARY PUBLIC
23
24
25
```

```
 1                    A. MENOR
 2               E X H I B I T S
 3
 4    EXHIBIT    EXHIBIT                   PAGE
 5    NUMBER     DESCRIPTION
 6    (None)
 7
 8                  I N D E X
 9
10    EXAMINATION BY                  PAGE
11    MR. FROMSON                 7, 43, 45
12    MS. FAPPIANO                 35, 45
13
14
15      INFORMATION AND/OR DOCUMENTS REQUESTED
16    INFORMATION AND/OR DOCUMENTS       PAGE
17    (None)
18
19
20        QUESTIONS MARKED FOR RULINGS
21    PAGE LINE QUESTION
22    (None)
23
24
25
```

1                      A. MENOR

2              C E R T I F I C A T E

3

4    STATE OF WISCONSIN       )
                              :  SS.:
5    COUNTY OF BROWN          )

6

7         I, CARRIE S. BOHRER, a Notary Public

8    for and within the State of Wisconsin, do

9    hereby certify:

10         That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14         I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19         IN WITNESS WHEREOF, I have hereunto

20   set my hand this 18th day of September

21   2019.

22

23                      _Carrie S. Bohrer_

24         _____

25                    CARRIE S. BOHRER