EXHIBIT "J"

Page 1

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------
    FRANKLIN BUONO,
3                 Plaintiff,
         vs.              Index Number
4                            7:17-CV-05915-
    POSEIDON AIR SYSTEMS, VICTORY    PMH-LMS
5   AUTO STORE, INC., VICTORY AUTO
    STORES, INC., d/b/a POSEIDON AIR
6   SYSTEMS, WORTHINGTON INDUSTRIES,
    INC. and TYCO FIRE PRODUCTS LP,
7                 Defendants.
    ------------------------------
8   TYCO FIRE PRODUCTS LP,
        Third-Party Plaintiff,
9          vs.
    OPRANDY'S FIRE & SAFETY, INC.,
10      Third-Party Defendant.
    ------------------------------
11
12                    June 25, 2020
                      9:58 a.m.
13
14      Remote video-teleconference deposition of
15  THOMAS TARANTO, taken by Defendant/Third-Party
16  Plaintiff Tyco Fire Products LP, held at Lysander,
17  NY, pursuant to notice, before Elizabeth F. Tobin, a
18  Registered Professional Reporter and Notary Public
19  of the State of New York.
20
21
22
23
24
25

```
 1   A P P E A R A N C E S:
 2
     On behalf of the Plaintiff:
 3        FINKELSTEIN & PARTNERS, LLP
          1279 Route 300, P. O. Box 1111
 4        Newburgh, New York 12551
          845.562.0203
 5        BY:   KENNETH B. FROMSON, ESQ.
                kfromson@lawampm.com
 6              (via video-teleconference)
 7
 8   On behalf of the Defendant/Third-Party Plaintiff
     Tyco Fire Products LP:
 9        WILLIAMS & CONNOLLY, LLP
          725 12th St NW
10        Washington, D.C. 20005
          202.434.5000
11        BY:   DANIEL WHITELEY, ESQ.
                dwhiteley@wc.com
12              JAMES KIRKPATRICK, ESQ.
                jkirkpatrick@wc.com
13              COLETTE CONNOR, ESQ.
                (via video-teleconference)
14
15
     On behalf of the Third-Party Defendant:
16        HAWORTH, BARBER & GERSTMAN, LLC
          45 Broadway, Suite 2110
17        New York, New York 10006
          212.952.1100
18        BY:   TARA FAPPIANO, ESQ.
                tara.fappiano@hbandglaw.com
19              (via video-teleconference)
20
21   ALSO PRESENT:
22              JACK DANON
23
24
25
```

1            STIPULATIONS

2

3        IT IS HEREBY STIPULATED AND AGREED, by and

4    among counsel for the respective parties hereto,

5    that the filing, sealing and certification of the

6    within deposition shall be and the same are hereby

7    waived;

8

9        IT IS FURTHER STIPULATED AND AGREED that all

10   objections, except as to form of the question, shall

11   be reserved to the time of the trial;

12

13       IT IS FURTHER STIPULATED AND AGREED that the

14   within deposition may be signed before any Notary

15   Public with the same force and effect as if signed

16   and sworn to before the Court.

17

18       Federal Rule 30(3) provides:  The parties may

19   stipulate, or the court on motion order, that a

20   deposition may be taken by telephone or other remote

21   means.  For the purpose of this rule and Rules

22   28(a), 37(a)(2) and 37(b)(1), the deposition takes

23   place where the deponent answers the questions.

24                    *     *     *

25

```
 1            COURT REPORTER:  Would you like a copy of
 2       the transcript?
 3            MS. FAPPIANO:  Yes, please.
 4            MR. FROMSON:  Yes, please.
 5            COURT REPORTER:  Good morning.  My name
 6       is Elizabeth Tobin.  I am a New York State
 7       stenographic reporter and a registered
 8       professional reporter.  Today's date is
 9       June 25, 2020 and the time is approximately
10       9:58 a.m.  This is the deposition of Thomas
11       Taranto in the matter of Buono versus Tyco, et
12       al.  This case is venued in the United States
13       District Court for the Southern District of New
14       York.  The case number is
15       7:17-CV-05915-PMH-LMS.
16            At this time I will ask counsel to
17       identify yourself, state whom you represent and
18       agree on the record that there is no objection
19       to this deposition officer administering a
20       binding oath to the witness remotely via
21       video-teleconference.
22            MR. FROMSON:  Good morning.  This is Ken
23       Fromson on behalf of plaintiff and I have no
24       objection to the remote video deposition taking
25       place today.
```

```
                                              Page 5

 1            MR. KIRKPATRICK:  I'm James Kirkpatrick
 2       on behalf of Tyco Fire Products and there's no
 3       objection from us.
 4            MS. FAPPIANO:  This is Tara Fappiano for
 5       third party defendant Oprandy's Fire & Safety.
 6       I have no objections.
 7  T H O M A S   T A R A N T O,
 8  of lawful age, called by the Defendants for
 9  examination pursuant to the Federal Rules of Civil
10  Procedure, stating an address of 3396 Patchett Road,
11  Baldwinsville, New York 13027, having been first
12  duly sworn remotely upon agreement of all counsel,
13  as hereinafter certified, was examined and testified
14  as follows:
15            EXAMINATION OF THOMAS TARANTO
16  BY MR. KIRKPATRICK:
17       Q.   Mr. Taranto.  Could you please state your
18  full name and address for the record?
19       A.   Yeah.  Thomas, middle name is Felix,
20  Taranto.  And 3396 Patchett Road in Baldwinsville,
21  New York and the zip is 13027.
22       Q.   Thank you.  Sir, you've testified under
23  oath before, right?
24       A.   Yes.
25       Q.   If at any time you don't understand my
```

1    question, feel free, please, to ask me to clarify

2    it.  Otherwise I'll assume you understand the

3    question.  Okay?

4         A.    Good.

5         Q.    Is there any reason you can't testify

6    truthfully today or understand the oath that you're

7    under?

8         A.    No reason.

9         Q.    Separate from the process of preparing

10   your report, what did you do to prepare for your

11   testimony today?

12        A.    Reviewed the other expert opinions that

13   we received and read through my report and just

14   reviewed everything.

15        Q.    Which reports from the other experts,

16   which did you review?

17        A.    Did I list their names?  Hold on just a

18   second.  I have to look that up.

19        Q.    Do you recall how many you reviewed?

20        A.    There was four.  I think four or five.

21        Q.    I may be able to shortcut it.  Do you

22   know if you've reviewed all of Tyco's expert

23   reports?

24        A.    I reviewed Juliano, Dr. Coelho --

25             (Court reporter requested clarification.)

```
 1        A.    Kurt Juliano, J-U-I-L-A-N-O [sic].
 2   Christensen, Erik Christensen.  And then there was a
 3   Heejzler, H-E-E-J-Z-L-E-R.  Those are the ones I
 4   looked at.
 5        Q.    Can you say the last one again?
 6        A.    I couldn't say it the first time.  But
 7   I'll try.  It's Heejzler, H-E-E-J-Z-L-E-R.
 8        Q.    Got it.  Got it.  Got it.  How much time
 9   did you spend preparing for this deposition other
10   than drafting your report?
11        A.    Oh, three days.
12        Q.    Full days?
13        A.    Yeah.
14        Q.    Three full days?
15        A.    Yeah.
16        Q.    Did you have any conversations with
17   counsel for plaintiff, Ken Fromson?
18        A.    Yes.
19        Q.    How many conversations did you have with
20   him?
21        A.    I think maybe two.  Maybe a third one on
22   some logistical things.
23        Q.    For the two substantive conversations,
24   how long did they last?
25        A.    Probably around an hour each, maybe a
```

```
                                        Page 8
 1   little less.              T. TARANTO
 2        Q.    Did you speak with anyone else to prepare
 3   for this deposition?
 4        A.    No.
 5        Q.    Other than the expert reports, did you
 6   review any documents?
 7        A.    Well, the ones that are included in my
 8   report.
 9             MR. KIRKPATRICK:  Daniel -- I'm going to
10        have Daniel help me mark exhibits.
11             Daniel, can you mark tab A as Exhibit 1.
12             (Exhibit 1, Thomas Taranto's expert
13        report; 121 pages, marked for identification.)
14             MR. WHITELEY:  Yeah, I'm working on that
15        now.  It's loading in now.
16        Q.    If you refresh, it should now be up,
17   Mr. Taranto.
18        A.    Yep.
19        Q.    Does this look to you like your expert
20   report?
21        A.    Yes.  I don't know if there were things
22   added in the PDF.  There's 121 pages.
23        Q.    This, I believe, includes the appendices.
24        A.    Yeah.
25        Q.    Actually, and on that note, if you could
```

```
                                          Page 9
 1   go to appendix C, it's your CV.
 2         A.     Mm-hmm.
 3         Q.     Is this the most updated version of your
 4   CV?
 5         A.     I'm getting there.
 6                Yes, it is.
 7         Q.     And is it up-to-date?  Would you consider
 8   it up-to-date?
 9         A.     Yeah.
10         Q.     Is there any other experience that you
11   consider relevant to your opinions that's not listed
12   in your CV?
13         A.     No.
14         Q.     Did you add anything to your CV because
15   you were retained for this case?
16         A.     No.
17         Q.     Did you subtract anything?
18         A.     No.
19         Q.     Do you have other versions of your CV
20   that you keep or do you use the same versions for
21   everything?
22         A.     I pretty much use the same version for
23   everything.  I have condensed versions, but...
24         Q.     So this is the most complete version of
25   your CV?
```

```
                                                   Page 10
  1        A.    Yes.      T. TARANTO
  2        Q.    I want to talk about your experience with
  3   compressed gas systems.  This is a very general
  4   question.  What are the type of -- the systems you
  5   generally work with, what are they typically used
  6   for?
  7        A.    Oh, quite a large variety of things.  A
  8   lot of systems are industrial, compressed air.  It's
  9   basically used to power equipment or it's used to
 10   control things or it's used to take part of a
 11   process, usually used for the oxygen content for --
 12   there's an oxidizer and process applications.
 13              Those are the three main uses.  I've also
 14   worked with NASA at Stennis Space Center on missile
 15   grade air system there.  I can't tell you about
 16   that.
 17              And I've worked at Pearl Harbor in the
 18   controlled machine area.  I've worked at the
 19   sub-base and those are all classified things as
 20   well.
 21              But those systems are quite a bit
 22   different typically than the industrial system.
 23        Q.    Sure.  What's the typical range of
 24   pressures involved in those these systems?
 25        A.    Anywhere -- in a typical industrial
```

Page 11

1    system, it might be 100 to 750 psi.  Some of the

2    classified systems are as high as 2,500, 3,000.

3         Q.    What would you consider a high-pressure

4    system?

5         A.    Well, high pressure systems are

6    typically, I think, thought of over 500 psi.  But

7    all -- CGA has their definition of what high

8    pressure is, Compressed Gas Association, National

9    Fire Protection Association.  Everybody has a

10   different level that they then call high pressure.

11   It depends on the --

12        Q.    Which standards would you consider the

13   leading standards in terms of compressed air?

14        A.    It depends on the purpose.  There's

15   Instrument Society of America.  There's Compressed

16   Air & Gas Institute.  There's New Rock which is the

17   European standard company.

18              I mean, it depends on what area of

19   compressed air specialty you're in.

20        Q.    Do you have experience with transfilling?

21        A.    Yes.

22        Q.    What experience is that?

23        A.    Well, I've been a member of the volunteer

24   fire department since 1980 and we have a compressed

25   air system with a cascade and a bank of tanks and

```
                                              Page 12
 1   you transfill the Scott bottles, so I'm quite
 2   familiar with that.
 3              (Court reporter requested clarification.)
 4        A.    They're a self-contained breathing
 5   apparatus bottles.  Scott is a brand name.
 6        Q.    And you physically fill tanks from the
 7   Scott bottles to the breathing apparatus tanks?
 8        A.    From the compressor to the storage tanks
 9   to the Scott bottles, yes.
10        Q.    How --
11        A.    I'm not qualified on the system that we
12   presently have at our firehouse, but I was qualified
13   on the two previous systems for many, many years.
14        Q.    What years were those when you were
15   qualified?
16        A.    From the early 1980s through, I think, we
17   replaced the system in around 2000, 2002.
18        Q.    How often would you use that system?
19        A.    Oh, well, actually one of the systems I
20   drew samples twice a year and sent them to a lab for
21   analysis.  And we also had an online carbon monoxide
22   monitor that I checked periodically every month or
23   two.
24              And then filling bottles, any time we had
25   a major fire incident, maybe four, five times a
```

```
                                                      Page 13
 1   year, I'd use it.  And then after trainings and
 2   stuff, I would use it quite frequency.
 3        Q.    Four to five times plus training.  How
 4   many total do you think that was?
 5        A.    Oh, probably 15 or 20.
 6        Q.    Do you recall the pressures involved in
 7   that system?
 8        A.    Yeah.  Initially our SCBA bottles were
 9   2,200 psi.  And we transitioned to a different air
10   pack.  And the pressure there was 4,500.  And the
11   system that I used throughout most of that time had
12   the ability to accommodate either model.  So you had
13   different controls that you had to set for the 2,200
14   psi bottles versus the 4,500.
15        Q.    Would you ever use either of the systems
16   to fill hand-held fire extinguishers?
17        A.    No.
18        Q.    Would you ever use the systems to fill
19   any low pressure tank?  And low pressure, to use
20   your -- under 500 psi, 500 or below?
21        A.    You could.  We didn't.  We are equipped
22   to use our 4,500 psi, SCBA bottles to power 100 psi
23   air tools for vehicle extrication.  So we have a
24   system on our heavy rescue that allows you to
25   connect up the bottles and reduce the pressure and
```

Page 14

```
 1    operate for, more or less, what's an industrial tool
 2    off the high-pressure bottle.  We do that from time
 3    to time.
 4          Q.    But you didn't fill low pressure tanks?
 5          A.    No.
 6          Q.    Would you say that your experience as a
 7    volunteer firefighter is -- does that form part of
 8    the bases of your opinion in this case?
 9          A.    I think all of your life experience does.
10          Q.    But in particular, do you draw from the
11    experience that you've gained with respect to the
12    specific opinions that you're offering in this case?
13          A.    Well, it's hard to tell where the lines
14    cross between my experience with the high pressure
15    cascade system and my training.
16                In other words, I was sales engineer and
17    Mako Corporation is a company that is in the
18    business, primarily in scuba tanks, underwater
19    tanks.  They also have SCBA equipment.  So I have
20    had to train through my engineering position as a
21    sales engineer for Mako and my experience, I don't
22    know how you draw distinctions.
23          Q.    I guess to put a finer point on it, in
24    terms of -- because obviously this case involves the
25    fire protection industry.
```

1      A.     Yes.      T. TARANTO

2      Q.     Did your experience as a volunteer

3  firefighter inform any of the opinions you have

4  about the fire protection industry?

5      A.     I mean, are you asking that in the

6  context of the restaurant fire protection systems?

7      Q.     Yes.

8      A.     Not really.  I mean, in my position in

9  the fire department, we have a codes enforcement

10 officer in the town and so as far as the authority

11 having jurisdiction and anybody that would go into

12 restaurants or look at systems and so forth and so

13 on, that was never part of my role as volunteer

14 firefighter or anything.  So, you know --

15     Q.     Other than the SCBA tanks and the general

16 attributes of the cascade system, do your

17 experiences as a volunteer firefighter inform your

18 opinions as to how the system at Oprandy's was used?

19     A.     No.  How the system was used is from the

20 record.

21     Q.     In terms of how the system should have

22 been used?

23     A.     Again, there's -- I mean, there's

24 standards.  There's a lot of material on the record

25 about how it should have been used.  I don't know

```
                                        Page 16
 1    how relevant my experience is in relationship to

 2    those facts.

 3         Q.    And I think we have just covered this,

 4    just to make sure it's clear.

 5              Do you consider yourself an expert in the

 6    pre-engineered fire suppression systems, like the

 7    Kitchen Knight system?

 8         A.    No.

 9         Q.    Aside from this case, have you ever

10    encountered a Kitchen Knight system?  When I say

11    Kitchen Knight, just to be clear, I refer to both

12    Kitchen Knight and Kitchen Knight II systems.

13         A.    You're not talking just general

14    pre-engineered restaurant fire suppression systems,

15    you're talking about specific brands?

16         Q.    No, I was.  Now I'm asking about specific

17    brands.

18         A.    No.

19         Q.    Now I'll ask more generally.

20              Have you encountered any other

21    pre-engineered fire suppression system throughout

22    your professional experience?

23         A.    Well, my family was in the restaurant

24    business, so from the time I can remember until I

25    went to college, so, yeah, I had some exposure to
```

1    our fire suppression system that we had.

2         Q.    But were you involved in installing,

3    maintaining or servicing that system?

4         A.    No.

5         Q.    Do you consider yourself an expert in

6    hand-held fire extinguishers?

7         A.    Not really, no.

8         Q.    Do you consider yourself an expert in the

9    fire protection industry in general?  And I'll carve

10   out formal fire fighting.

11        A.    Not including formal fire fighting?

12        Q.    Yeah.  Not including that.

13        A.    I have a fair bit of knowledge in that

14   field, yes.

15        Q.    Did that come from experience other than

16   being a volunteer firefighter?

17        A.    Some degree, yes.  And some degree as

18   being a firefighter.

19        Q.    Other than being a volunteer firefighter,

20   what are those experiences?

21        A.    The -- just the general information I'm

22   aware of and standards and so forth having dealt

23   with them for various purposes over the years.

24        Q.    Are you familiar with the NFPA standards?

25        A.    I'm sorry?

1     Q.    The NFPA standards, is that what you're
2  referring to?
3     A.    Yeah.
4     Q.    In what context other than this case have
5  you come across the NFPA standards?
6     A.    Well, as a -- as an officer in the fire
7  department, in the chiefs' ranks, the fire
8  department, as an executive board member of a fire
9  department.  You know, we had all various things
10  that we have to comply with and review, so forth.
11     Q.    In the course of those experiences that
12  you just described, did you ever have occasion to
13  study or learn NFPA standards 10, 17 or 17A?
14     A.    Not really in the fire department, no.
15     Q.    Do you have any experience writing or
16  designing warning labels in the fire protection
17  industry?
18     A.    Not in the fire protection industry.
19     Q.    Do you have experience writing or
20  designing warning labels in general?
21     A.    Yeah.  My area of expertise throughout my
22  whole career since 1976 has been --
23             (Telephonic interruption.)
24             THE WITNESS:  That will go away.  I
25        apologize.

```
                                          Page 19
 1        A.    I've been in the fluid power industry as
 2   a fluid power engineer.  You design hydraulic and
 3   pneumatic circuits for all manner of and use
 4   applications, anything from a high-speed packaging
 5   machine to a car crusher, you know.
 6              So in association with that, there's
 7   always a component of instructions and labeling and
 8   warnings and so forth that go along with the system.
 9        Q.    And you've been involved in designing
10   those labels?
11        A.    I've been involved in identifying the
12   hazards and typically the ultimate design of the
13   labels would be the client's/engineer's
14   responsibility, but I work quite closely with them
15   in that regard.
16        Q.    So you would say, for example, these are
17   the things that we need to warn people about?
18        A.    Yeah, these are the things that could
19   become -- you know, are hazards and these are the
20   things that we could -- we should cover
21   appropriately.
22        Q.    And then you would -- you would take that
23   to the client's -- I think you said design engineer,
24   and then they would make the label, write the label,
25   design it, et cetera?
```

Page 20

1      A.      Yeah.      T. TARANTO

2      Q.      Do you have any experience writing or

3  designing product -- sorry, product manuals?

4      A.      Yes.   I have a company that manufactures

5  industrial transducers for the measurement of

6  compressed air system performance.   So we have data

7  loggers and then pressure transducers and flow and

8  kW transducers to measure the power to the

9  compressors and so forth.   And I write manuals for

10 those.

11     Q.      And you actually write the entire

12 manuals?

13     A.      Well, usually what I have is our

14 suppliers of components have manuals that they give

15 us authorization to use as source documents and then

16 I use that as a source document and then add the

17 things that are, you know, specific to our

18 application and so forth.

19     Q.      Any other -- other than that, any other

20 experience writing manuals?

21     A.      No.

22     Q.      To jump back, sorry, you said in the

23 fluid power industry.   Can you just describe that

24 very generally?   I don't know what that is.

25     A.      Yes, fluid power industry encompasses

Page 21

1    hydraulics and pneumatics.  Of course, oil is a

2    fluid.  Air is considered a fluid as well.  And so

3    you -- there's -- there's things that you can do

4    with hydraulics because they have a lot more energy

5    available than a pneumatic system does, typically.

6    And then there's a crossover point where you can do

7    different things with either hydraulics or

8    pneumatics.

9            So they're both considered to be fluid

10   powered applications.

11       Q.    I'm sorry.  I'm jumping around a bit.

12            In terms of writing either labels or

13   manuals, have either of these then -- strike that.

14            Are the manuals, to your knowledge, that

15   you've written ever used in the fire protection

16   industry?

17       A.    I don't think we've ever had any of our

18   data acquisition equipment go into the fire

19   protection industry, no. It could.  But I don't know

20   of any.

21       Q.    Have you ever, whether in academia or any

22   other context, studied warning labels?

23       A.    Yeah.  I took a safety engineering class

24   at Clarkson University in 1975 and then throughout

25   my career we have -- I've worked with controls that

Page 22

```
1   can automatically start, stop equipment and so

2   forth.  And so that brings in a new realm of

3   labeling that you have to have, if a machine will

4   start itself automatically.

5           And then working with what they call

6   lockout/tagout instructions, how do you de-energize

7   a piece of equipment.  Because hydraulics is a form

8   of energy.  Pneumatics is a form of energy, just

9   like electricity and so forth.  So, yeah, I've

10  studied various trade information and journals and

11  articles and so forth over the years related to that

12  kind of stuff.

13      Q.    And do those articles, et cetera, do they

14  study the effects that warnings have on human

15  behavior?

16      A.    No.  It's what are the things that you

17  need to be sure to try to accommodate and so forth.

18  But as far as human behavior, no.

19      Q.    This would be an analysis of the

20  regulations of the standards and saying what of

21  those need to be on the warning label?  Do I have

22  that right?

23      A.    Yeah, what are the hazards and what needs

24  to be, you know, dealt with in everything, the

25  instructions, the manuals, the lockout/tagout, the
```

```
                                          Page 23
```

 1    labeling, all those areas. ANTO
 2        Q.    Have any of these involved the fire
 3    protection industry?
 4        A.    Not that I recall.
 5        Q.    Have you ever conducted any research on
 6    how warnings affect people's behavior?
 7        A.    No.
 8        Q.    Have you ever done any consulting on how
 9    warnings affect people's behavior?
10        A.    No.
11        Q.    Do you have any experience testing the
12    efficacy of particular warnings?
13        A.    No.
14        Q.    Before this case, have you ever offered
15    an expert opinion on product warnings, whether in
16    the manual, on the label or anywhere else?
17        A.    In a legal proceeding, no.
18        Q.    Or elsewhere?
19        A.    Well, I mean, I've had input into the
20    lockout/tagout and the labeling and all those things
21    we've been discussing.  I would say that fits your
22    question.
23        Q.    Have you published any articles on the
24    subject of product warnings?
25        A.    Not as the primary subject.  But I've

```
                                              Page 24
```

1  published articles on various applications for fluid

2  power, industrial process systems and so forth and

3  they may have had an element of safety associated

4  with it, but it wasn't the primary thrust of the

5  article.

6      Q.    Do you consider yourself an expert in

7  ergonomics or human factors?

8      A.    No.

9      Q.    Have you ever been an authorized

10 distributor or dealer of a pre-engineered fire

11 suppression system?

12     A.    No.

13     Q.    Have you ever had any training on

14 servicing fire suppression systems?

15     A.    No.

16     Q.    Have you ever had any training on

17 transfilling?

18     A.    Yes.

19     Q.    What is that?  To be clear, what training

20 is that?

21     A.    Operating the cascade system through Mako

22 compressors.  And also our systems at the firehouse

23 when we replaced the system, Bauer was the

24 manufacturer of the system that we installed and

25 their representatives did training that I attended.

```
                                         Page 25
```

1    And then I, in turn, wrote with some of the other

2    members of the fire department, I was in the chiefs'

3    ranks at the time, wrote procedures and such that we

4    use for our filling process and training our people

5    to do it.

6         Q.    So the manufacturers of the source

7    cylinders in these cascade systems provided

8    training.  And you took that training?

9         A.    Yes, they were manufacturers of the

10   system.  You know, there's Taylor-Wharton and

11   there's various companies that make the cylinders.

12   But they're not the people that come in and do the

13   training on running the compressor and filling tanks

14   and everything.

15        Q.    Can you just describe what you mean by

16   the system?  Is that what connects basically the

17   source to the ultimate thing you're either powering

18   or trying to fill?

19        A.    Basically, you start with an air

20   compressor that brings the air up to whatever final

21   discharge pressure the system is designed for.

22   Let's call it 4,000 psi.  And then you have the

23   cascade bottles which store that pressurized air.

24   And then you have whatever manner of connections

25   connect those storage bottles to the filling

Page 26

```
1    station.  And then the filling station has whatever
2    it has for controls and so forth that you then
3    attach the SCBA cylinder to which is ultimately the
4    bottle you're filling.  So you've got all these
5    things connected together and that's what I'm
6    calling the system.
7         Q.    Because you said that it's not the
8    cascade system or the compressor manufacturer that's
9    done the training, at which step of the system,
10   which manufacturer is doing the training?
11        A.    Well, it's typically the -- in the
12   systems that I've been involved with, the
13   manufacturer will -- they may manufacture the
14   compressor or they may not.  They may source the
15   compressor.
16        Q.    I see.  So it comes as one --
17        A.    There's a filter that air has to go
18   through to remove primary carbon monoxide and treat
19   the air so you can breathe it safely.  And then
20   there's the controls and then there's the
21   containment or the whatever you put the tank in that
22   you're filling and then there's the storage bottles.
23             So typically it's the manufacturer, the
24   person that puts all that stuff together and
25   delivers it is the one that does the training on
```

                                                        Page 27

1   their particular system. ARANTO

2        Q.    Have you ever conducted a training

3   specific to the -- have you ever conducted training

4   specific to the fire protection industry?

5        A.    Excluding the fire department as being

6   part of the fire protection industry?

7        Q.    Yeah.  Let's exclude that.  Because I

8   think we covered that.

9        A.    Yeah.  Okay.  No, I haven't.

10        Q.    But you have conducted several trainings

11   throughout your career, I think I remember from your

12   resume?

13        A.    Yeah.

14        Q.    Can you just tell me typically what's

15   involved in training -- in your trainings?  What's

16   your typical approach?

17        A.    I do a pretty wide range of training, but

18   generally the approach is to have training manual

19   documents, procedures, whatever material there might

20   be.  It might be information on the components of

21   the special system or whatever the training topic is

22   and then to have an interactive training where you

23   invite people to ask questions as opposed to just

24   lecturing.

25              Very often in the training material we

Page 28

1   try to do exercises where you say, okay, we just

2   covered this topic.  Now, you know, look at the

3   information and spend some time and map out how you

4   would approach this or what you would do.  And then

5   also in many instances we have a hands-on component

6   where we're actually working with the end material

7   or whatever the topic is.  So, you know, that kind

8   of encompasses all --

9       Q.    When you're training, you're typically

10  training on an entire system as opposed to one

11  particular component of that system, right?

12      A.    It may be component based, but generally

13  most of my work is systems based.

14      Q.    Do you have any experience working as an

15  engineer?

16      A.    Yeah.  In --

17      Q.    Are you a licensed engineer in any

18  jurisdiction?

19      A.    I'm not a licensed engineer, but I'm a

20  graduate mechanical engineer, bachelor of science.

21      Q.    Just for my own knowledge, is there

22  anything that differentiates what someone with your

23  degree does versus a licensed engineer does?

24      A.    Well, I mean, when I -- when I graduated,

25  the licensed engineers generally were civil

Page 29

```
 1   engineers because they had the sign, plans and specs
 2   for water treatment, submersible water systems and
 3   things like that.  So basically the difference is,
 4   if there's something that has to be signed, the
 5   licensed engineer has to sign it.
 6              If I work on a particular project and
 7   there's some piping systems or other things like
 8   that, I'll do conceptual design and then typically
 9   turn it over to an engineering firm who would do the
10   final construction documents and so forth and those
11   are what gets signed by the --
12        Q.    Have you ever been a licensed engineer?
13        A.    No.
14        Q.    Have you ever applied to be a licensed
15   engineer?
16        A.    I took the exam when I graduated and
17   failed it by one point and, again, at that time
18   licensing was mainly civil engineers.  Being a
19   mechanical engineer, I never pursued it further.
20        Q.    Are you familiar with the American
21   Society of Mechanical Engineers Boiler and Pressure
22   Vessel codes?
23        A.    Yes.
24        Q.    Can you just say generally what they are?
25        A.    Oh, they're the guidance for both what
```

 1    they call fired pressure vessels which is like a
 2    steam locomotive engine.  And unfired vessels which
 3    is like an air receiver tank or something that
 4    doesn't have a fire in it.  And then there's a power
 5    piping code for the high pressure piping
 6    construction and so forth.
 7         Q.    Would you say they're a leading industry
 8    standard on the design and construction of pressure
 9    vessels?
10         A.    One of them, yes.
11         Q.    One of the industry standards?
12         A.    Yeah.
13         Q.    Okay.  I think we've already discussed
14    you are familiar with the standards of the
15    Compressed Gas Association?
16         A.    Yes.
17         Q.    Before this case, you were familiar with
18    them?
19         A.    Yes.  Not in great detail but familiar
20    with them, yes.
21         Q.    Is it fair to say that they're the
22    leading standards for the safety of the compressed
23    gases and containers?
24         A.    Yes.  Of course DOT and federal code has
25    ultimate authority there.  But in that area,

```
                                                  Page 31
 1   particularly transport and so forth, CGA is
 2   referenced quite extensively, yes.
 3        Q.    You say you haven't worked much with
 4   them, but do you recall in what context you've
 5   worked with the CGA standards?
 6        A.    Primarily as it revolves around the tanks
 7   at the -- in the fire systems or in the scuba
 8   systems when I was a sales engineer for Mako.
 9   Because there's two variations of tanks that are
10   typically used as storage tanks.  One is DOT
11   cylinders and the other is ASME cylinders.  The ASME
12   cylinders revolve around ASME code.  The DOT
13   cylinders revolve primarily around DOT and CGA
14   requirements.
15        Q.    And when was that?
16        A.    Mako was probably from 1985 till maybe
17   '95 we represented Mako.
18        Q.    Do you recall -- I know this is reaching
19   back -- do you recall which CGA standards you relied
20   on or came across then?
21        A.    No, I can't.  Nothing specific.
22        Q.    I know we discussed the NFPA standards.
23   Do you recall which NFPA standards you've come
24   across in your work, whether as a volunteer
25   firefighter or anything else?
```

                                                    Page 32

1          A.     Yeah.  I don't remember all the numbers.

2     But, you know, mainly the training standards for the

3     various training things.  And then there's standards

4     for fire trucks.  I mean, when you build a fire

5     engine, when you build a ladder truck.  I've been

6     involved in committees doing both of those.

7                You know, there's all kinds of various

8     standards that I've had to become, you know, very

9     familiar with in that work.

10         Q.     In terms of your long career as a

11    volunteer firefighter, how much time have you

12    spent -- I guess we can talk in terms of hours per

13    week.  I'm sure it's changed over time.  But if you

14    can just describe how much time you've spent as a

15    volunteer firefighter.

16         A.     Let me get my wife in here for you.  Way

17    too much.

18         Q.     Yeah.

19         A.     I mean, I was -- in addition to

20    firefighter, I was a medic for 18 years in the fire

21    rescue.  Advanced EMT critical care from 1982 until

22    2000 was the highest level of training in our

23    region.  They didn't have paramedics at that point,

24    so we were called medics.

25                I'm on the executive board,

1    vice-president of one fire department.  I was the

2    line officer and chief in the ranks for 12 years.  I

3    mean, tens of thousands of hours.

4        Q.    In terms of -- let's set the medic, as

5    important as that is, aside.

6              In terms of actual firefighting

7    experience, can you approximate -- obviously you

8    worked full-time at the same time.  Can you

9    approximate how many hours a week generally you

10   would be at the firehouse or working in some other

11   context?

12       A.    It varies because, you know, fire

13   department -- fire department that I belonged to

14   before I moved to where I am now, I personally went

15   on maybe 500 runs a year.  So if the average run is

16   an hour, hour and a half, and you have training one

17   night a week for three hours, then you have

18   committee meetings and such.  I mean, probably 10 or

19   15 hours a week, at least, maybe more.

20       Q.    Do you have -- let's move on generally to

21   how you got involved in this case.  When were you

22   first retained for this case?

23       A.    I believe it was in the early part of

24   2017.

25       Q.    Do you remember who contacted you?

```
                                               Page 34
 1        A.    Yeah.  Andrew Finkelstein.  An assistant
 2   of Andrew's contacted me initially and then I
 3   discussed it with Andrew.
 4        Q.    I don't want to know about conversations
 5   you had with him or anyone else at the Finkelstein
 6   firm.
 7              Have you ever worked with the Finkelstein
 8   firm before?
 9        A.    No.
10        Q.    Do you know how you two got connected?
11        A.    No.
12        Q.    When he contacted you, what was your
13   understanding of your assignment in this case?
14        A.    Was to review, provide opinion on the
15   incident that occurred as far as, you know, the
16   cause and factors that effected it and so forth.
17        Q.    Did your assignment change -- did your
18   understanding of your assignment change at all
19   throughout your retention by the Finkelstein firm?
20        A.    No.
21        Q.    I assume you're being paid for your work
22   in this matter?
23        A.    Yes.
24        Q.    And it's an hourly rate?
25        A.    Yes.
```

Page 35

1       Q.     Is it your usual hourly consulting rate?

2       A.     Yes, it is.

3       Q.     What is that rate?

4       A.     $170 an hour.

5       Q.     How long have you charged that rate?

6       A.     Oh, probably -- probably for ten years.

7       Q.     About how many hours did you spend

8   writing your report?  When I say writing, I mean

9   reviewing, all the work that went into creating your

10  report.

11      A.     A lot.  I would say about 200.

12      Q.     I guess we discussed the number of hours

13  you spent preparing for the deposition is about

14  three full days, correct?

15      A.     Yep.

16      Q.     Other than writing your report and

17  preparing for the deposition, have you had any other

18  significant amount of time that you've spent on this

19  case?

20      A.     Well, we had a meeting in New York to

21  review the parts of the failed cylinder that were

22  returned from OSHA's technical center.  We had a

23  site visit at Oprandy's.  Those are the two related

24  things that probably took the most time.

25      Q.     Sure.  How many times have you been

Page 36

1    retained as an expert in litigation?

2         A.    Well, it would be four total.  But in two

3    of the cases I wasn't actually retained by the legal

4    firm.  I worked with a client as a result of

5    incidents that occurred.  So I was actually paid by

6    the client company.  In two cases I was retained by

7    the legal firm, this and one other.

8         Q.    In terms of those first two cases, you

9    were retained by the client to provide opinions in

10   connection with litigation or for some other

11   purpose?

12        A.    It was before there was any litigation,

13   but litigation followed.  But there were industrial

14   accidents involving hydraulic equipment and the

15   client had me come in to help them with the

16   investigation.

17        Q.    Did you prepare a report in those two

18   cases?

19        A.    In one I did.  In the other case I had a

20   deposition related to the incident.  But in the

21   other case I prepared a report.

22        Q.    So in the two cases where you were

23   retained by the firm -- not by the firm, but by the

24   client -- in one of those cases you submitted an

25   expert report and in the other you sat for a

```
                                    Page 37
 1   deposition?              T. TARANTO
 2        A.     Right.
 3        Q.     But in the case where you sat for a
 4   deposition, you didn't have a report?
 5        A.     Not a real formal report, no.
 6        Q.     Did you have any type of written opinions
 7   that were submitted to the other side --
 8        A.     Yeah.
 9        Q.     -- in the case?  You did?
10               Do you recall the names of those cases?
11        A.     No.
12        Q.     Do you recall what court they were in?
13        A.     No.
14        Q.     Do you recall the location where the
15   incidents occurred?
16        A.     One was in DeWitt, New York.  And the
17   other one might have been in East Syracuse, New York
18   or it might have been in DeWitt.
19        Q.     Do you recall who retained you?
20        A.     Like I say, it was the client company for
21   the incident that occurred.
22        Q.     Do you recall which clients those were?
23        A.     One was Carrier Corporation.  The other
24   was Chrysler Corporation.
25        Q.     Do you recall around what year you were
```

```
                                              Page 38

 1    retained for each of those cases?  No?
 2         A.    It's in the 1980s, both of them.
 3         Q.    Okay.  And then in that -- this case we
 4    don't need to talk about, but obviously we are in
 5    other contexts.
 6              So there's one where you were retained by
 7    the law firm.  Do you recall what court that case
 8    was in?
 9         A.    It was in Texas.  I don't remember the
10    specifics of which court.
11         Q.    Were you retained by the plaintiff or by
12    the defense?
13         A.    I was retained by the defense and
14    actually represented two of the defendants.  I was
15    working with one originally.  The other one decided
16    they wanted me to work with them.  We cleared up any
17    conflict of interest between the two of them.  So I
18    then went ahead.  Ordinarily I would never -- I
19    mean, working for two different defendants, it's --
20         Q.    Sure.
21         A.    But we resolved that to everyone's
22    satisfaction.
23         Q.    The case resolved before trial?
24         A.    Yes.
25         Q.    Did you sit for a deposition in that
```

```
                                              Page 39
1   case?                      T. TARANTO
2        A.     Yes.
3        Q.     Did you testify in court at any point?
4        A.     No.
5        Q.     Generally, let's start with the case
6   we're talking about now.  What were the facts?  Not
7   in detail, but what kind of dispute was it?
8        A.     What are we talking about?
9        Q.     The Texas case.
10       A.     The Texas case?
11       Q.     Yes.
12       A.     It was no personal injury.  It was
13  consequential damages related to the failure of a
14  piece of compressed air equipment.
15       Q.     Have you ever been disqualified as an
16  expert by any court?
17       A.     No.
18       Q.     Have you ever had your opinions excluded,
19  whether in whole or in part by any court?
20       A.     No.
21       Q.     Have you ever been qualified as an expert
22  by a court?
23       A.     I guess I don't know what that entails.
24       Q.     To your knowledge, has a court ever
25  expressly acknowledged you as an expert witness in a
```

```
                                            Page 40
 1   case?                    T. TARANTO
 2        A.    What do you mean by expressly
 3   acknowledged?
 4        Q.    Has acknowledged that you are -- sure.
 5              Has acknowledged that you are qualified
 6   to testify as an expert?
 7        A.    And who would they acknowledge that to?
 8        Q.    The court would acknowledge it to the
 9   parties.
10        A.    Well, I've testified in depositions, so
11   that does constitute an acknowledgement by the
12   court.
13        Q.    I guess -- so you have never testified in
14   court.
15        A.    No.  No.  The cases I've been involved
16   with never went to trial.
17        Q.    Did you write the report that has been
18   marked as Exhibit 1 yourself?
19        A.    Yes.
20        Q.    Did anybody assist you?
21        A.    No.
22        Q.    So now if we look at appendix B of your
23   report --
24        A.    Mm-hmm.
25        Q.    -- it's the list of materials considered.
```

Page 41

1    Are you at your appendix B?   TO

2         A.    Is this going to take long?  Can we take

3    a break now or take a break after this?

4         Q.    It will not take long.  If it takes long,

5    we'll take a break.

6              Are you relying on any materials that are

7    not listed in your list of materials considered in

8    appendix B?

9         A.    No.

10        Q.    Are there any treatises or other articles

11   that you're relying on to form your opinions in this

12   case that are not listed in your report?

13        A.    No.

14        Q.    Did you read all of the materials that

15   are listed in appendix B in your report?

16        A.    I think in my report I said I've reviewed

17   these to one degree or another.  It says, "This

18   appendix is a listing of materials reviewed as of

19   the time the report was completed.  Not all

20   documents are reviewed with equal weight, time and

21   effort.  It is possible that the review of some

22   documents may be limited to the identification and

23   cataloging of the document without any additional

24   detailed review."

25              Do you see that first paragraph?

```
                                           Page 42

 1        Q.     Yes.      T. TARANTO

 2        A.     That's what it is.

 3        Q.     This expert report generally identifies

 4   all of the opinions that you plan to make in this

 5   case, right?

 6        A.     Yes.

 7        Q.     Have you conducted any analyses that are

 8   not contained in this report?

 9        A.     No.

10        Q.     Do you have any intention of conducting

11   any analyses that are not contained in this report?

12        A.     Not at this time.

13        Q.     When you say not at this time, you think

14   that there's a chance that you might conduct an

15   analysis?

16        A.     Well, I mean, there's still -- things are

17   still unfolding to a degree.  So, I mean, new

18   information --

19        Q.     You don't have -- there's no reason to

20   believe you will, you're just saying it could

21   happen?

22        A.     Sure, could.

23               MR. KIRKPATRICK:  Okay.  I think this is

24        a good time for a break.  Is five minutes long

25        enough?
```

1            THE WITNESS:  Five minutes is great.

2            MR. WHITELEY:  Let's come back at 11:06.

3            (A recess was taken from 11:01 a.m. to

4       11:11 a.m.)

5       Q.    Mr. Taranto, at this point we're just

6  going to kind of go through your report roughly in

7  record.  I'll ask questions as we go along.

8       A.    Okay.

9       Q.    I'm starting here at page 10 which is

10  "Construction of the ruptured TFP fire suppression

11  tank."

12       A.    Yes.

13       Q.    So it's your opinion that what ruptured

14  at Oprandy's was a test tank for the Kitchen Knight

15  II system, right?

16       A.    Well, as I discussed in other aspects of

17  the report, it's not a hundred percent clear whether

18  it's for the Kitchen Knight system or the Kitchen

19  Knight II system.

20       Q.    It's your opinion -- it's one of those

21  two things?

22       A.    Yes.

23       Q.    And --

24       A.    And it is a test tank.

25       Q.    It's a test tank as a component part of

Page 44

1    either the Kitchen Knight I or Kitchen Knight II

2    system?

3         A.    Yeah.

4         Q.    And I'll generally refer throughout this

5    deposition as that as the test tank or the subject

6    cylinder as opposed to the source cylinder which

7    would be the cascade system or the agent tank.  So I

8    just want to be clear because I tend to jump around

9    a bit.

10             You're not opining in this case on

11   anything related to the physical design of the

12   subject cylinder, are you?

13        A.    Only to the extent that it's a 4BW 225

14   psi tank and there was design elements in the code

15   of federal regulations that make that up.

16        Q.    But you don't opine that this tank wasn't

17   compliant with those regulations, right?

18        A.    Yes.

19        Q.    And it was designed in accordance with

20   those regulations, that's basically your opinion?

21        A.    Yes.

22        Q.    And you're not offering any opinions that

23   the tank was manufactured with a physical defect?

24        A.    Correct.

25        Q.    And at page 11, I'm still on page 11, you

```
                                              Page 45
1    opine -- rather, it's your understanding that
2    Worthington manufactured this tank and sold it to
3    Tyco, right?
4          A.    That's what the markings indicate.
5          Q.    Do you have any reason to dispute the
6    markings?
7          A.    No.
8          Q.    Now still on page 11, NFPA standards, I
9    think it makes sense here to talk about all the
10   relevant standards that apply to the subject tank at
11   Oprandy's.  You mentioned the DOT rules and
12   regulations apply to the subject tank?
13         A.    Yes.
14         Q.    And that's because, jumping to page 32,
15   unless you don't need to refresh your recollection,
16   because the DOT regulates compressed gas cylinders
17   under the Hazardous Materials Transportation Act?
18         A.    Right.
19         Q.    And because this tank was transported,
20   that's where the jurisdiction comes in?
21         A.    Yes.
22         Q.    And the Department of Transportation's
23   regulations apply to the physical design of the 4BW
24   tanks?
25         A.    Yes.
```

Page 46

```
 1        Q.    And it also sets forth the required
 2   markings for the 4BW tanks, right?
 3        A.    Yes, tank markings on the vessel itself.
 4        Q.    As you note in your report, the subject
 5   tank was also governed by certain standards of the
 6   NFPA?
 7        A.    Yes.
 8        Q.    And you cite several NFPA standards in
 9   your report?
10        A.    Yes.
11        Q.    NFPA 17A applies to pre-engineered wet
12   chemical fire extinguishing systems, right?
13        A.    Correct.
14              MR. KIRKPATRICK:  Daniel, if you could
15        mark tab B as Exhibit 2, that would be great.
16              MR. WHITELEY:  Yes.  Introducing it now.
17              (Exhibit 2, NFPA 17A; 15 pages, marked
18        for identification.)
19        Q.    Can you open for me please, sir,
20   Exhibit 2?  You may need to refresh your browser.
21        A.    Can I have more than one thing opened at
22   a time?
23        Q.    I think it will.
24        A.    I closed the report.
25        Q.    Okay.
```

Page 47

```
 1        A.    I'm looking for the -- waiting for
 2   download.
 3        Q.    If you have a hard copy of your report,
 4   feel free to consult that, too.  It's the same
 5   thing.  I'm working off the hard copy because I'm
 6   not good with technology.
 7              MR. WHITELEY:  NFPA 17A should be in
 8        there now.
 9        A.    Got it.
10        Q.    This is the 2013 edition of the NFPA 17A
11   standard?
12        A.    Yes.
13        Q.    And it's your understanding that this
14   standard applies to the Kitchen Knight system, and
15   that refers to both Kitchen Knight I and II because
16   they are pre-engineered wet chemical fire
17   extinguishing systems?
18        A.    Yes.
19        Q.    In addition to pre-engineered fire
20   suppression systems this standard also applies to
21   the maintenance of those systems; do I have that
22   right?
23        A.    Yes.
24        Q.    Now NFPA 17 -- not 17A, 17 -- applies to
25   dry chemical extinguishing systems, right?
```

```
                                                    Page 48
 1        A.    Yes.      T. TARANTO
 2        Q.    And to jump, sorry, back to 17A, NFPA
 3   17A, in addition to applying to the system as a
 4   whole, it applies to the components of the system,
 5   right?
 6        A.    Correct.
 7        Q.    NFPA -- because NFPA applies to dry
 8   chemical extinguishing systems, do you agree it does
 9   not apply to the Kitchen Knight systems?
10        A.    I believe under chapter 2 of 17A section
11   2.4 references for extracts and mandatory sections
12   it says -- it lists NFPA dry chemicals.  So -- and
13   so in 2.1 it says, "The documents or portions
14   thereof listed in this chapter are referenced within
15   this standard and shall be considered part of the
16   requirements of this document."
17             So since 17 is listed there, that would
18   say that -- NFPA 17 or portions thereof listed in
19   this chapter are referenced within NFPA 17A and
20   shall be considered part of the requirements of NFPA
21   17A.
22        Q.    But that's only with respect to the
23   particular portions of 17A that cite to particular
24   portions in 17A?
25        A.    Not -- not really.  If you look at the --
```

Page 49

1  there's a document which is the methodologies for

2  NFPA standards, the writing guide, if you will.  I

3  believe it says just what it says is -- effectively,

4  if you were to cut and paste 17 into 17A, that's

5  what they mean by that.  17A is a part of 17.

6         Q.    Okay.  Does it list any content other --

7         A.    It doesn't say this part is or this part

8  isn't.

9         Q.    So if you look at -- first of all, if you

10  look at 2.2 of chapter 2 of 17A --

11         A.    Yes.

12         Q.    -- it lists three standards which are

13  NFPA publications that are referenced and should be

14  considered part of the requirements of this

15  document?

16         A.    Right.

17         Q.    And NFPA 17 is not listed there?

18         A.    No.

19         Q.    It's listed in 2.4 which is references

20  for extracts and mandatory sections?

21         A.    Right.

22         Q.    And then if we look at the third

23  paragraph of the introduction, it says a reference

24  in brackets following a section or paragraph

25  indicates material that has been extracted from

```
                                              Page 50
 1   other NFPA documents? . TARANTO
 2        A.     Right.
 3        Q.     As an aid to the user, the complete title
 4   and edition of the source documents for extracts in
 5   mandatory sections of the document are given in
 6   chapter 2 and for those extracts and informational
 7   sections are in annex C?
 8        A.     Yes.  And that is --
 9        Q.     So --
10        A.     And that's -- that's for the -- it's as
11   an aid to the user.  So that's where they decided.
12   That's where they decided that they would take
13   something from one and actually put it in here.  But
14   it doesn't negate that all of 17 is a part of 17A.
15   It doesn't say that the documents or portion thereof
16   listed in the chapter reference to this standard
17   considered part of the requirements to this
18   document.  It doesn't say limited to those
19   specifically listed as mandatory extracts.  It's --
20        Q.     Why is 17 not listed under 2.2 then, if
21   it's supposed to be incorporated in its entirety?
22        A.     I would imagine that they didn't want to
23   be redundant.  Because it doesn't say -- it doesn't
24   say that it's -- that only 2.2 is part of the
25   requirements to this document.  It says all the
```

1   documents listed in this chapter are part of the

2   requirements.  So --

3        Q.   But it does say --

4        A.   So whether it's listed under 2.2 or 2.4

5   doesn't make any difference.

6        Q.   It says the documents or portions thereof

7   listed in this chapter?

8        A.   Yes.

9        Q.   2.4 says references for extracts and

10  mandatory sections?

11       A.   Right.  That's just the parts -- that's

12  the parts that they decided to copy in their

13  entirety into this document.

14       Q.   You think that's clear from the text of

15  the document?

16       A.   And the writing guide and the fact that

17  if you look at it -- if we find a part that's

18  bracketed with 17.

19       Q.   Okay.  Right.

20       A.   It has a bracketed note by it and it

21  references 17.  And that's just -- that's just the

22  piece that they decided to put in here in its

23  entirety.

24       Q.   Oh, okay.

25       A.   It's an extract.

```
                                        Page 52
```

 1       Q.    We might be saying the same thing.

 2   You're not saying 17 is incorporated in its

 3   entirety, or are you?

 4       A.    It is.  Parts -- there's parts of 17 that

 5   they decided to put in here.

 6       Q.    And be redundant?

 7       A.    And to aid the user, they're culling

 8   those out and they're giving you the source

 9   document.  It's only as an aid to the user.

10             If you look at the introductory paragraph

11   that you just read, it says, "A reference in

12   brackets following a section or paragraph indicates

13   material that has been extracted from another NFPA

14   document.  As an aid to the user, the complete title

15   and edition of the source document for extracts in

16   mandatory sections of the document are given in

17   chapter 2."  But it doesn't say "and you can ignore

18   the rest of the standard."

19             MR. KIRKPATRICK:  Daniel, let's look

20        at -- can we mark tabs C and D as Exhibits 3

21        and 4, please.

22             (Exhibit 3, NFPA 10; 64 pages, marked for

23        identification.)

24             (Exhibit 4, NFPA 17; 29 pages, marked for

25        identification.)

1          MR. WHITELEY:  Entering tab C now as

2     Exhibit 3.  Exhibit 3 has been introduced.  And

3     Exhibit 4 has been introduced.

4     Q.     Exhibit 3, if you look, it's NFPA

5   10-2013, right?  Are you able to pull that up?

6     A.     Yeah.

7     Q.     And if you can look at Exhibit 4.

8   Exhibit 4 is NFPA 17-2013.  If you can just confirm

9   those are the documents you're seeing?

10     A.     Well, I haven't figured out how to open

11   two documents at the same time.

12     Q.     If you right click.  You can download

13   them, too, if you'd like.  If you right click.

14     A.     Did you put 17 up, too?

15     Q.     I believe Exhibit 4 is 17.  You may need

16   to refresh again.

17     A.     How do I get back to the main screen to

18   refresh?  4 is 17.

19     Q.     Aside from the standard, I just want to

20   take a step back.  NFPA standard 17 and 17A apply to

21   permanently installed systems for fire

22   extinguishing, right?

23     A.     Yes.

24     Q.     My next question is, NFPA 10 applies to

25   portable fire extinguishers, right?

```
                                                      Page 54

 1        A.    Yes.       T. TARANTO
 2        Q.    Do you agree that the test tank is not a
 3   portable fire extinguisher?
 4        A.    Yes.
 5        Q.    Do you agree the test tank is not a
 6   portable fire extinguisher?
 7        A.    Yes.
 8        Q.    Do you agree that the NFPA 10 does not
 9   apply to the Kitchen Knight or its component parts?
10        A.    No.
11        Q.    Let's look at NFPA 10.
12              Is the reason that you believe that NFPA
13   10 applies to the Kitchen Knight system because in
14   here again at 2.4 it says references for extracts
15   and mandatory sections and it lists those standards?
16        A.    Yes.
17        Q.    So if we look at --
18        A.    But specifically reference for extracts
19   is there as an aid to the user.
20        Q.    Right.
21        A.    So it's an aid.  It's an aid.  It's like
22   I'm telling you, hey, this is where this came from.
23        Q.    Yes, I agree.  Yes.
24        A.    Okay.  The main point here is --
25        Q.    If I can just ask the questions.  We'll
```

```
                                             Page 55
 1   go through this piece by piece.
 2        A.    Okay.  Okay.
 3        Q.    So if you look at -- we're looking at
 4   NFPA 10, chapter 1, 1-1.  Do you agree that it says,
 5   "The provisions of this standard apply to the
 6   selection, installation, inspection, maintenance,
 7   recharging and testing of portable fire
 8   extinguishers and class D extinguishing agents"?
 9        A.    Yes.
10        Q.    And then 1.1.2, it says, "The
11   requirements shall not apply to permanently
12   installed systems for fire extinguishers even where
13   portions of such systems are portable."
14              Do you see that?
15        A.    Yes.
16        Q.    Do you still believe that NFPA 10 applies
17   to the Kitchen Knight system?
18        A.    Yes.
19        Q.    Because of 2.4?
20        A.    No.
21        Q.    Then why --
22        A.    Because of 2.1.  2.4 is just for aid to
23   the user.  Okay.
24              So for the aid of the user, we're telling
25   you where the mandatory extracts are.  Section 2.1
```

Page 56

1   we could substitute any standard in chapter 2 into

2   that sentence.  So the first standard listed is NFPA

3   1.  Documents or portions thereof listed in this

4   chapter.  So we can say NFPA 1 listed in this

5   chapter are referenced within this standard, within

6   NFPA 10, and should be considered part of the

7   requirements of NFPA 10.

8            So the way it reads is, "NFPA 17A

9   standard for wet chemical extinguishing systems or

10  portions thereof are referenced within NFPA 10 and

11  shall be considered -- shall be considered -- part

12  of the requirements of NFPA 10."

13           So, if we were to cut and paste this

14  together and if we were to look at the scope of 17A,

15  the scope of the 17A says, "the provisions of this

16  standard apply to design" --

17           (Court reporter requested clarification.)

18      A.    "The provisions of this standard apply to

19  the design, installation, operation, testing and

20  maintenance of pre-engineered wet chemical fire

21  extinguishing systems that discharge wet chemical

22  from fixed nozzles and piping by means of an

23  expellent gas."

24      Q.    And if I can just ask a question.

25      A.    "It contains only the essential

```
                                            Page 57
 1    requirements and recommendations needed to make the
 2    standard workable in the hands of those skilled in
 3    the field."
 4         Q.    I have a question.  I'm not sure what
 5    question is pending.  If I could just ask the
 6    question here.
 7              Based on the scope that you just read, do
 8    you agree that that would be contradictory of the
 9    scope listed in NFPA 10 --
10         A.    No.
11         Q.    -- which says that the requirements shall
12    not apply to permanently installed systems?
13         A.    No.
14         Q.    And why are those not contradictory?
15         A.    Because 2.1 tells you that 17A is now
16    part of 10.
17         Q.    Okay.
18         A.    So therefore -- so, therefore, if we were
19    to do a cut and paste, we would have section 1.1,
20    scope applies to portable extinguishers, and then we
21    would add scope from 17A which says the document
22    also applies to wet chemical systems.  Because it
23    tells you that 17A is not stand-alone.  17A is part
24    of 10.  And you don't get to ignore parts of 10.
25         Q.    Even those that are contradictory?
```

```
                                              Page 58
 1        A.    They're not contradictory because it's
 2   all the same document.  In other words, when you --
 3   when you invoke 17A, you're extending the scope
 4   beyond dry fire extinguishers to include wet
 5   systems.
 6        Q.    In terms of NFPA 10 --
 7        A.    We're not talking about NFPA 10 anymore.
 8   We're talking about 10 and 17 as a part of 10.
 9        Q.    NFPA 10, NFPA 17 and NFPA 17A all apply
10   to portable fire extinguishers, wet pre-engineered
11   fire suppression systems and dry pre-engineered fire
12   suppression systems?
13        A.    Only when you're considering 17A.
14        Q.    And why is that?
15        A.    Because if it's not a wet chemical
16   system, then 10 stands alone.  But if it is a wet
17   chemical system, 17A becomes part of 10.  You don't
18   throw 10 out.
19        Q.    You introduced 10 because it's listed in
20   chapter 2?
21        A.    You don't introduce 10.  You bring 17A
22   into 10.  It tells you NFPA 17A "Standard for wet
23   chemical extinguishing systems, all portions
24   thereof, are referenced within NFPA 10 and shall be
25   considered part of the requirements of NFPA 10."
```

```
                                          Page 59

 1        Q.    If NFPA 10 does not apply to permanently

 2   installed systems, then how could anything in NFPA

 3   10 including incorporation by reference apply to

 4   permanently installed systems?

 5        A.    Because you said we're going to adhere to

 6   17A.  If you adhere to 17A, it becomes part of 10.

 7        Q.    If you look at 17A, it does not list NFPA

 8   10?

 9        A.    No, because it doesn't go the other way.

10        Q.    Right.

11        A.    It says that 17A becomes part of NFPA 10.

12        Q.    Okay.

13        A.    It does not say that NFPA 10 becomes part

14   of 17A.  Because if you're only dealing with dry

15   extinguishers, then there's no need for 17A.  But

16   all --

17        Q.    You mean portable fire extinguishers?

18        A.    If you're only dealing with portable fire

19   extinguishers, you don't need 17A.  As soon as you

20   introduce 17A, it becomes part of NFPA 10.

21        Q.    When you say introduce 17A, what do you

22   mean by that?

23        A.    You're dealing with a wet chemical

24   system, so 17A applies.

25        Q.    So 17A applies.
```

Page 60

```
 1        A.    So when 17A applies, you go to 10.  It
 2   says 17A has to be part of 10.
 3        Q.    Can I ask why you would go to 10 if 17A
 4   applies, if 10 is not listed in chapter 2 of 17A?
 5        A.    Because 17A is listed in chapter 2 of 10.
 6        Q.    So it does go both ways?
 7        A.    No.  If you only deal with dry -- if
 8   you're only dealing with portable fire
 9   extinguishers, you have no need to look at 17A.
10        Q.    Then why is it incorporated in 10, but
11   not in 17A?  By the way, I'm not agreeing it's
12   incorporated.  But I'm just saying, if it's
13   incorporated in 10, why is it not incorporated in
14   17A?
15        A.    Because 10 isn't listed in 17A.  And
16   17 -- you're not incorporating 10 into 17A.  You're
17   incorporating 17A into 10.
18        Q.    Okay.  So anything covered by 10 would
19   also be covered by 17A but not everything covered by
20   17A is covered by 10?
21        A.    Right.  A wet chemical system, a wet
22   chemical system only becomes a part of NFPA 10 if
23   you're dealing with a wet chemical system.  If
24   you're dealing with portable extinguishers, 17A is
25   irrelevant.  But as soon as you have a wet chemical
```

Page 61

```
1   system, 17A is considered to be a part of the

2   mandatory requirements of 10.

3        Q.    Do you agree standing alone under --

4   strike that.

5            So it's your contention that NFPA 10,

6   NFPA 17, and NFPA 17A all apply to the Kitchen

7   Knight system?

8        A.    Yes.  Because in chapter 2 --

9        Q.    Yes, I understand your reasoning.  I

10  just --

11           (Court reporter requested clarification.)

12       A.    -- of 17A --

13       Q.    Mr. Taranto, I understand your reasoning.

14  I just want to confirm that that's what you were

15  saying.

16       A.    17 becomes part of 17A.  And in chapter 2

17  of NFPA 10, 17A becomes part of 10.

18           If they wanted to -- and they could

19  charge a lot more money, because what they could do

20  is they could create a single document with all

21  three documents melded together and then they could

22  say, okay, this is what you need.  But then there's

23  a lot of extraneous information in there if you're

24  only dealing with portable fire extinguishers, and

25  it would be a pain in the neck to use.
```

1      Q.    But if you're dealing with a wet chemical

2    suppression system, you're saying it would make

3    sense to add all that, because they all apply?

4      A.    Yes.  Because 17A doesn't stand alone.  I

5    mean, the labeling of a -- of the tanks with the

6    gross weight and the material that goes in it and

7    all those things that are requirements, those are in

8    NFPA 10.  They're not in 17A.

9      Q.    Why are there, for example, NFPA 10, why

10   are there extracts from those standards, NFPA 17 and

11   17A within NFPA 10?  Wouldn't that be completely

12   superfluous?

13     A.    No.  It says in the introduction that you

14   referenced to, it says as an aid to the user, the

15   complete title and edition of source documents for

16   extracts in mandatory sections are given.

17     Q.    Right.

18     A.    But they just do that as an aid to the

19   user.

20     Q.    It doesn't say that the extracts are an

21   aid to the user.  It says that the complete title

22   and edition of the source documents are an aid to

23   the user?

24     A.    Yes.  So you know where the extract came

25   from.

```
                                                    Page 63
```

1        Q.    Right.  Exactly.  TO

2        A.    But still -- in 2.1 it doesn't say the

3   documents or portions listed in chapter 2 are only

4   with respect to extracts' part of the standard.  It

5   says the whole document is part of the standard.

6        Q.    Do we agree that NFPA 17 and NFPA 17A

7   each list each other?  So NFPA 17 lists 17A and vice

8   versa in chapter 2?

9        A.    Yes.

10       Q.    If they're both part of each other, why

11  wouldn't you have one standard, 17, and it applies

12  to wet and dry chemical systems?

13       A.    That's a good thing to ask the

14  committees.  I mean --

15       Q.    Okay.  If we now look at -- I'm going to

16  move on to other standards that apply.

17             Do you agree that the test tank is

18  subject to certain standards of the Compressed Gas

19  Association?

20       A.    Yes.

21       Q.    And that includes CGA P-1-2015 and which

22  is entitled Standard For Safe Handling of Compressed

23  Gases and Containers?

24       A.    Yes.

25             MR. KIRKPATRICK:  Daniel, can you

Page 64

1        introduce tab E as Exhibit 5.

2                ( Exhibit 5, CGA P-1-2015; 29 pages,

3        marked for identification.)

4                MR. WHITELEY:  Introducing it now.  It's

5        loaded in as Exhibit 5.

6        A.    I think I'm figuring out how to do this

7   now.  Look at that.  I got it.

8        Q.    Do you agree that as defined in this

9   standard, Oprandy's Fire Protection was the gas

10  supplier for purposes of the test tank?

11       A.    Well, I'm not --

12       Q.    You can look at --

13       A.    I'm not so sure about that.

14       Q.    I'm looking at 3.2.15 which is the

15  definition of gas supplier.

16       A.    Yes.

17       Q.    Do you agree that Oprandy's was a

18  business that filled compressed gases?

19       A.    Well, they -- I don't know if that's

20  their business.  That's like saying --

21       Q.    They are a business, right?

22       A.    That's like saying if a car dealer puts

23  gasoline in the tank of a car so they could do a

24  test drive, are they now an energy supplier like

25  British Petroleum or ExxonMobil.

Page 65

```
 1        Q.    I think that would depend on the
 2   definition of energy supplier?
 3        A.    Right, so I think it depends on the
 4   definition of the business.  Oprandy's -- Oprandy's
 5   Fire & Safety, they're a fire and safety company.
 6        Q.    Right.
 7        A.    That's the --
 8        Q.    If, for example, Tyco, which ships agent
 9   tanks filled, they're not a gas company.
10        A.    No.  But they put gas in the tanks.
11        Q.    Okay.
12        A.    So the tanks have nitrogen in them.
13        Q.    So --
14        A.    So, you know, I don't know -- I don't
15   know that that is really the business.  It's just
16   like, for Tyco, you know, Praxair or Linde or
17   Air Liquide, they'll ship you a tractor-trailer full
18   of nitrogen.  Gas supply.
19             Tyco because they put a little bit of
20   nitrogen in a tank, does that make them a gas
21   supplier?
22        Q.    If it says here in the definition of gas
23   supplier, it's a business, it doesn't say a gas
24   business, it's a business that produces, fill and/or
25   distributes compressed gases.
```

```
                                    Page 66
 1        A.    It doesn't say a business.  It says
 2   "business that produces, fills and/or distributes
 3   compressed air gases."
 4              And if you went to people familiar with
 5   Oprandy's or if you went to people familiar with
 6   Tyco, and you said what is Tyco's business, you
 7   would say who's going to say gas supplier?
 8        Q.    And that's the standard you would use,
 9   the average person on the street, would they call
10   them a gas supplier?
11        A.    Yeah, would a reasonable person say, oh,
12   yeah, they're a gas supplier.
13        Q.    That's how you contend the CGA is a gas
14   supplier?
15        A.    That's what it says.
16              (Court reporter requested clarification.)
17        A.    Your business is being a gas supplier.
18   And I would add like an Air Liquide or Linde or
19   Praxair.  I mean, there's companies that's what they
20   do.
21        Q.    For purposes of this standard -- rather,
22   for purposes of this testing, there was no gas
23   supplier, in your opinion?
24        A.    It's not their business.  It's not --
25   people --
```

```
                                        Page 67
 1       Q.    My question is just, it's just a yes or
 2    no.  Do you contend that for purposes of the tank
 3    that we're talking about today, there was no gas
 4    supplier?
 5       A.    Yeah, I don't think there was.  Because
 6    the tank was introduced to the market as a fire
 7    protection tank.  And it was used as a fire
 8    protection tank and the business of the company was
 9    the fire protection business.
10       Q.    It's your contention that the CGA
11    standards apply only to, for example, the
12    Air Liquides of the world?
13       A.    Yeah, I -- or it says they're
14    distributors, fills or distributes compressed gases.
15    So I would say that it -- their chain falls under
16    that.
17             Because you pump up the tires of your car
18    with gas, with air, doesn't make an automotive
19    dealership a gas supplier.
20       Q.    So if Halliburton ships massive
21    containers of gas, because they don't specialize in
22    gas, they are not a gas supplier?
23       A.    I don't know.  Do they specialize in gas?
24       Q.    No.  I'm saying because they don't
25    specialize in gas, they would not be a gas supplier?
```

Page 68

```
 1        A.     Do they ship containers of gas?
 2        Q.     I'm using a hypothetical.
 3        A.     That doesn't make any sense.  I mean --
 4        Q.     Why not?
 5        A.     If somebody ships big containers of gas,
 6   I would suppose an element of their business is
 7   being a gas supplier, yeah.
 8        Q.     It's an element of their base?
 9        A.     If you put air in the tires of your car,
10   you're not a gas supplier.  If you put gas in the
11   tank of your car, you're not an energy supplier.
12        Q.     I'm just trying to think of a big company
13   that would sell compressed gas in containers.  But
14   does not specialize --
15        A.     Let's take, for instance, United
16   Technologies.
17        Q.     So United Technologies, I actually don't
18   know what they do.
19        A.     Have you ever heard of Carrier Air
20   Conditioning?
21        Q.     Sure.
22        A.     Okay.  Carrier Air Conditioning is a
23   division of United Technology.  They ship freon in
24   bottles.  So a portion of their business is
25   supplying freon gas in tanks so in that part of
```

Page 69

1    their business, yeah, they would be a gas supplier.

2    You need to fill it up with gas, who do you call.

3    I'm going to call Carrier.

4         Q.    Would it make sense -- obviously I know

5    you didn't write the standards -- would it make

6    sense for the standards to apply only to businesses

7    that specialized in gas supply as opposed to

8    business that fill or produce gases?

9         A.    You know, I'm not making an opinion about

10   that.  I'm just saying it says business that

11   produces, fills and/or distributes compressed gases.

12   That's what it says.

13            Does Oprandy's fit that description?  No.

14   They're a fire protection company.

15        Q.    But they were filling gas on the day that

16   the accident occurred?

17        A.    Yep.  And automotive fills the tank of

18   gas on the car to put it through a test drive.  So

19   if an accident occurred when they did that, does

20   that make them British Petroleum or ExxonMobil?

21            MR. KIRKPATRICK:  Daniel, can you

22        introduce tab F as Exhibit 6.

23            (Exhibit 6, CGA C-7-2014; 166 pages,

24        marked for identification.)

25            MR. WHITELEY:  Introducing now.  It's

```
                                                      Page 70
 1        loading now.    T. TARANTO
 2              (Discussion held off the record.)
 3        Q.    I just want to confirm that CGA C-7-2014
 4   which is the guide to classification and labeling of
 5   compressed gases, that also applies to the subject
 6   tank?
 7        A.    Yes.
 8              MR. KIRKPATRICK:  Daniel, if you could
 9        now do tab 8.
10              MR. WHITELEY:  Introducing it now.
11              (Exhibit 7, extracted portions of 2020
12        NYS Fire Code; 12 pages, marked for
13        identification.)
14              MR. FROMSON:  Exhibit 7.  I probably have
15        about 15 minutes to a stopping point and then
16        maybe we can take a 15, 20-minute lunch break
17        if that works for everybody.  It's now been
18        introduced.
19        Q.    This is, it's not the whole thing,
20   despite how long it took.  This is extracted
21   portions of the 2020 New York State Fire Code.  If
22   you can just confirm the document once you've got it
23   opened?
24        A.    Yeah, I've got it opened.
25        Q.    This is the 2020 fire code?
```

Page 71

```
 1       A.    Yes.      T. TARANTO
 2       Q.    We can agree the fire code also applied
 3   to the subject tank?
 4       A.    It applies to the system.  I don't know
 5   that there would be a specific point in this where
 6   it would apply to the component of the tank.
 7       Q.    Let's turn to --
 8       A.    I mean, I'd have to look at it in some
 9   detail.
10       Q.    Turn to page 391.  I've tried to shortcut
11   it a little bit.  This is chapter 53.  And it's
12   compressed gases.
13       A.    Right.
14       Q.    And it says under "scope" it says,
15   "Storage use and handling of compressed gases and
16   compressed gas containers, cylinders and tanks and
17   systems shall comply with this chapter."
18       A.    But does it say -- well, the test tank
19   has only gas in it.  The agent tanks have other
20   stuff in it.
21       Q.    Right.  So I'm just talking about the
22   test tank.
23       A.    Right.  Right.  Okay.
24       Q.    So you agree that chapter 53 applies to
25   the tank that we're talking about today?
```

```
                                              Page 72
```

1           Could I ask for the record, are you

2    reviewing something else to answer?

3        A.    I'm looking to see if NFPA 55 is a

4    mandatory component of NFPA 10 and it's not.  So I

5    don't know.  I guess I'd have to research it more

6    before I could say yes for sure.  It would stand to

7    reason if NFPA 55 applied it would be referenced in

8    10, in chapter 2.

9        Q.    I'm not talking about NFPA.  I'm just

10   talking about the fire code and whether it applies

11   to the cylinder at issue.  So this says that, "The

12   storage, use and handling of compressed gases in

13   compressed gas cylinders, containers, cylinders

14   tanks and systems, shall comply with this chapter."

15       A.    Okay.  Let's say it does.  I still, you

16   know --

17       Q.    Do you have any reason to think it

18   doesn't apply?

19       A.    Well, it's not listed -- NFPA 55 is not

20   referenced in NFPA 10.

21       Q.    Why would that --

22       A.    I said --

23             (Court reporter requested clarification.)

24       A.    I said I'd like to resolve that.  NFPA 52

25   is and NFPA 59A is.

Page 73

```
 1        Q.    Can you explain why that's relevant to
 2   whether the fire code applies to the tank?
 3        A.    Well, because fire codes a lot of times
 4   apply to the system.
 5        Q.    Yeah.  This says that containers,
 6   cylinders, tanks and systems.
 7        A.    Yeah.  So let's say it does.  Again --
 8        Q.    I want to make sure you agree with me.
 9        A.    Let's say I agree.  I don't know if I --
10   I don't know that I agree a hundred percent.  It
11   certainly appears that way looking at this one
12   paragraph.
13        Q.    And then if you turn to page 100 which is
14   only a couple of pages before.
15        A.    So the numbers are in order, they're just
16   skipping some.
17        Q.    Exactly.  This is chapter 9 entitled
18   "Fire Protection and Life Safety Systems."  Do you
19   agree that this applies to the Kitchen Knight
20   system?
21        A.    Yes.  Wet chemical extinguishing systems
22   17A is listed there.
23        Q.    These standards apply to --
24        A.    The system --
25              (Simultaneous crosstalk.)
```

```
                                              Page 74
```

1          Q.    The New York fire code, do you come

2     across this in your work as a volunteer firefighter

3     or in any other capacity?

4          A.    I've been involved with the New York Fire

5     Code at times.  I've had to reference it, but never

6     on this subject.

7          Q.    Are you aware it adopts the International

8     Fire Code with some amendments?

9          A.    Yeah.

10         Q.    Are you familiar with the International

11    Fire Code?

12         A.    No, I'm not.

13         Q.    Are you aware it's widely adopted by

14    jurisdictions?

15         A.    Yes.

16         Q.    Now, if we could turn back -- sorry, I'm

17    just going back to -- there's some construction

18    going on here -- to what we were looking at before

19    which is chapter 53, 5303.2 says -- assuming -- and

20    I understand you're saying you're not sure.  But

21    based on this document that it applies to the test

22    cylinder.

23              This says, "Compressed gas containers,

24    cylinders and tanks shall be designed, fabricated,

25    tested and marked with the specifications of the

```
                                             Page 75
 1    manufacturer and maintained in accordance with the
 2    regulations of the DOT standards?
 3        A.     Where are you?
 4        Q.     5303.2.
 5        A.     5303.2.  Sorry.  I'm with you.
 6        Q.     Okay.
 7        A.     Yep.
 8        Q.     I just want to -- you agree that the
 9    New York Fire Code says that the compressed gas
10    containers should be designed, et cetera, in
11    accordance with DOT standards?
12        A.     Right.  Or the -- or the ASME.
13        Q.     Yes.  And then if you look at 5303.4.2?
14        A.     Right.
15        Q.     It says that portable containers,
16    cylinders and tanks shall be marked in accordance
17    with CGA C-7?
18        A.     Yes.
19        Q.     And then one more.  It's the very last
20    page of this document.  It's under section 5305
21    which is use and handling of compressed gases.  So
22    this is 5305.7.
23               So I'm just asking, do you agree that the
24    New York Fire Code says that when you are
25    transferring gases between containers you should --
```

```
                                                  Page 76
 1    it shall be performed by qualified personnel using
 2    equipment and operating procedures in accordance
 3    with CGA pdf 1?
 4         A.    Yes.
 5         Q.    We'll put the fire code aside just for
 6    the moment.
 7               Do you also agree that OSHA standards
 8    apply to Oprandy's handling of the tank?
 9         A.    Yes.
10         Q.    And that those standards incorporate by
11    reference the CGA pamphlets that we've been
12    discussing?
13         A.    Yes.
14         Q.    We discussed the DOT, the NFPA, CGA, the
15    fire code and OSHA.  Are there any other sets of
16    regulations or industry standards that your report
17    is based on?
18         A.    No.
19         Q.    Is it fair to say there's a lot of
20    regulations that apply to compressed air cylinders?
21         A.    Oh, yes.
22         Q.    That's because they can be dangerous if
23    they're mishandled?
24         A.    Yeah.
25         Q.    And can rupture if they're overfilled?
```

```
                                                    Page 77
 1        A.    Yes.      T. TARANTO
 2        Q.    And can cause serious injuries?
 3        A.    Yes.
 4              MR. KIRKPATRICK:  I think this is a good
 5        stopping point off the record.  Is 20 minutes
 6        enough for people?
 7              MR. FROMSON:  That's fine.  Thanks.
 8              MR. KIRKPATRICK:  Let's be back at 12:25.
 9              (A recess was taken from 12:05 p.m. to
10        12:29 p.m.)
11   BY MR. KIRKPATRICK:
12        Q.    Mr. Taranto, I just want to jump back to
13   something we talked about earlier.
14              In discussing the incorporation by
15   reference in the various NFPAs, you mentioned a
16   manual of style for interpreting NFPA documents,
17   right?
18        A.    No.
19        Q.    What document did you reference?
20        A.    I'm chairman of one of the ASME
21   committees for compression system efficiency.  For
22   any standards, they publish -- NFPA calls it manual
23   of style for NFPA committee documents.
24        Q.    I may have misspoken.  Can you look at
25   Exhibit 8 which has been marked by our friend
```

```
                                        Page 78
 1   Daniel.                  T. TARANTO
 2              THE WITNESS:  We stopped at 7, right?
 3              MR. KIRKPATRICK:  Yes.  It's marked but
 4         if you refresh it should be there.
 5              (Exhibit 8, Manual of Style for NFPA
 6         Technical Committee Documents; 43 pages, marked
 7         for identification.)
 8         Q.    I just want to confirm that this is the
 9   document that you're talking about for the NFPA?
10         A.    Yeah.  Yeah.  All the standards -- any
11   standards may have specific guidelines that the
12   committees use.  Because all the committees are all
13   different members.  But they want consistency to the
14   standards.  So in this particular document it
15   references that chapter 2 should always be
16   references to mandatory documents.  If there's no
17   mandatory documents, then you don't rename something
18   else chapter 2.  They give you those guidelines.
19         Q.    So this and the text of the NFPA
20   standards themselves are how you interpret those
21   standards?
22         A.    Yeah.  Pretty clearly says that the terms
23   may and may not -- shall not be used.  It says
24   that --
25         Q.    I --
```

```
                                              Page 79
```

1      A.    You should use mandatory terms in chapter

2   2 and so forth.  So you, you know, because if you

3   get sloppy and say may or should or whatever, then

4   should isn't a requirement.  Shall is a requirement.

5   So this is -- chapter 2 is a mandatory section.

6      Q.    I just wanted to make sure this is the

7   document you're referring to.  I don't want to go

8   through it all.

9      A.    Yeah.

10      Q.    Turning back to your report, believe it

11   or not, I think we'll start going quicker.  I hope.

12   We're on page 12.

13      A.    Where did they start, page 11?

14      Q.    Page 10, I think.  I hope at least we'll

15   go faster.

16          So you at one point before discussed the

17   manufacturer's duty to warn.  And you say that Tyco

18   has the responsibility to meet various specific

19   codes and standards associated with the restaurant

20   fire -- kitchen fire suppression system.

21          The specific codes, are those the ones

22   we've been talking about?

23      A.    Yes.

24      Q.    Then you say "In addition, manufacturers

25   have the more general obligation to provide adequate

Page 80

1   warnings for dangers associated with the use of

2   their products"?

3       A.    Yes.

4       Q.    First, to what manufacturers do you

5   refer?  Is that a manufacturer of any product?

6       A.    Manufacturer of hair dryer, coffee pot.

7       Q.    Any product.  And does it extend beyond

8   manufacturers to anyone who sells the product or

9   handles the product?

10      A.    You know, I don't know.  The reference

11  that I used is listed in the back.  It was Thomson

12  Reuters corporate.FindLaw.com.  "Legally Adequate

13  Warning Labels:  A Conundrum For Every

14  Manufacturer."  And there's a web address in the end

15  notes that references where that is.

16      Q.    So you're not opining that manufacturers

17  have the standard?  You're just treating it as an

18  assumption that this is the standard based on that

19  source?

20      A.    Yes.  Based on that source.  And any

21  product you buy, you have warnings, you know, don't

22  use the hair dryer in the bathtub and so forth and

23  so on.  So it's -- I guess, is it general knowledge

24  or -- and specifically that reference.

25      Q.    But this is a -- I guess what I'm getting

```
                                            Page 81
 1   at, this is a legal -- you're talking about a legal
 2   obligation, not something in a standard somewhere?
 3        A.    Yeah.  Yeah.  I'm talking about a legal
 4   obligation which is --
 5        Q.    You're not opining -- you're not opining
 6   on what the law is?
 7        A.    No.  I'm just referencing that and
 8   saying, you know, here's the statement of what
 9   manufacturers are responsible to do according to
10   that reference.
11        Q.    Believe it or not, we're skipping ahead
12   to page 15.
13        A.    All right.  Of course, 13 and 14 are
14   mostly blank.
15        Q.    And I don't have much on this case.  This
16   is the incident and investigation.
17        A.    Right.
18        Q.    And not only here, but you cite
19   throughout your report the OSHA report that was
20   prepared in connection with the incident at
21   Oprandy's?
22        A.    Right.  That was one of the primary
23   documents of the investigation and this is just a
24   chronicle of, you know, how things happened and
25   according to the reports and the record.  Obviously
```

Page 82

```
 1   I wasn't there to witness it, so, these aren't my
 2   observations.
 3        Q.    Sure.  In going through the OSHA report,
 4   was there anything in it that you did not agree
 5   with?
 6        A.    No.  And I think I made a statement to
 7   that effect that the conclusion of the failure being
 8   caused by overpressurization, I didn't observe any
 9   evidence that there was corrosion or any other
10   issues and so forth.  I said I agree with the Salt
11   Lake City technical lab's findings, direct cause is
12   overpressurization.
13        Q.    Are there any other findings, whether
14   they're in this section or not, that you recall
15   reading that you did not agree with in the OSHA
16   report?
17        A.    Not that I recall.
18        Q.    If you look at 1.4.1 which is on the next
19   page --
20        A.    Yep.
21        Q.    -- you say that the Poseidon cascade
22   system includes a multi-stage air-cooled
23   reciprocating air compressor.  And then you
24   say there are also four compressed air cylinders.
25   You say you've used a system like this, right?
```

Page 83

1       A.     Yes.      T. TARANTO

2       Q.     When was this?

3       A.     A lot through the whole 1980s and late

4    1990s.

5       Q.     Is it fair to say that the system that's

6    used at Oprandy's as you described here was a

7    high-pressure system?

8       A.     Yes.

9       Q.     And you agree that it is appropriate for

10   filling high-pressure tanks?

11      A.     Yes.

12      Q.     And the regulator in the system was also

13   a high pressure regulator?

14      A.     It accepts high pressure at the inlet,

15   yes.  Yes.  It regulates to a lower pressure at the

16   outlet.

17      Q.     But in terms of, you know, its ability to

18   finally set the outlet pressure, it's a regulator

19   that's more appropriate for a high-pressure system

20   than a low pressure system?

21      A.     No.  I mean, it could regulate to

22   pressures under 500 psi, which is kind of where we

23   do the cutoff.

24      Q.     Any in the low pressure system, you think

25   that regulator would have been appropriate?

Page 84

1      A.     In other words, you're going to take a
2  6,000 psi regulator and put 500 psi at the inlet?
3      Q.     Right.
4      A.     You would get a regulator that has
5  more -- best practice would be to get a regulator
6  that's going to design for something closer to the
7  inlet pressure you're going to run it.  I suppose
8  there's no reason you couldn't put -- because it
9  would regulate.  But I mean -- it could do it.  But
10  it wouldn't be a best practice to design a system
11  like that.
12      Q.     Do you agree that the higher pressure
13  rating for a regulator, the more difficult it is to
14  get an exact number of outlet pressure in a low
15  pressure environment?
16      A.     Depends on whether it's a single stage or
17  two-stage regulator.
18      Q.     Can you just explain that a little bit?
19      A.     Well, on a single stage regulator, as the
20  pressure is reduced at the inlet, pressure at the
21  outlet tends to creep up some.  And then you've got
22  to readjust.
23             Whereas a two-stage regulator instead of
24  going from inlet to outlet pressure all in one pass,
25  it regulates to a lower pressure at the final

Page 85

1  pressure.  Those are more stable with respect to

2  changing inlet pressure conditions.

3      Q.    Let's turn all the way -- we may jump

4  back, but let's turn all the way to 42.

5           This discusses your root cause analysis.

6  Am I right to say that the methodology for your

7  report is a root cause analysis?

8      A.    Yes.

9      Q.    Can you just describe what that is?

10     A.    Well, paragraph 1, it's a cause-effect

11 evaluation of factors where the result is an

12 occurrence to an undesirable effect.  The dictionary

13 defines cause as something that brings about an

14 effect or result.  Root is something that's an

15 origin.  It discusses the ICA methods.  I think I

16 make reference to the DOE, root cause analysis

17 guidance document, which is an authoritative

18 document which was originally developed for root

19 cause analysis in nuclear power plants.

20          Then I have a reference to books that I

21 have on the subject.

22     Q.    Basically this 5.2 is your description of

23 what your description of root cause analysis is?

24     A.    Yes, and the documents referred to there.

25     Q.    Is the Department of Energy who

Page 86

1   originally developed this methodology?

2        A.    I don't know.  They used a similar

3   methodology in designing systems in a Six Sigma

4   world.  And you do failure FMEA, failure mode effect

5   analysis.

6            When we're designing something, what if

7   this happens, what's the outcome.  What if this

8   happens, what's that outcome.  Six Sigma has a lot

9   of those elements of that kind of analysis.  Whether

10  DOE was first and the nuclear power plant was the

11  impetus for it, I couldn't say for certain.  They

12  were certainly early influences of it, yes.

13       Q.    This Department of Energy document that

14  you rely on that sets forth the methodology, that

15  describes the methodology as you understand it?

16       A.    And as I said in here, there's various

17  RCA methods.  Methods and definitions vary based --

18            (Court reporter requested clarification.)

19       A.    There are various RCA methods.  Methods

20  and definitions vary based on the technology,

21  purpose and organization or guiding body employing

22  the RCA method.

23            These methods recognize that there may be

24  multiple root causes associated with an event.  It's

25  also commonly accepted that as described in the U.S.

Page 87

1    Department of Energy root cause analysis guidance
2    document and there's a DOE identification number.
3    "A chain or cause and effect sequence in which a
4    specific action creates a condition that contributes
5    to the results or an event.  And the chain or
6    sequence of tasks and/or actions and the surrounding
7    conditions leading to an occurrence includes
8    contributing factors that they alone do not directly
9    cause an event but rather contributing factors may
10   increase the probability that an event will occur or
11   increase the severity of that should it occur."
12            So, you know, there's not one thing you
13   can point to is and say this is the RCA method.
14        Q.   Okay.  So it just varies completely
15   depending on context?
16        A.   And the guiding body.  Because there's
17   certain standards and stuff that discuss RCA and
18   they have certain things in mind or if you're --
19        Q.   Are there standards that apply
20   specifically to the context of compressed air
21   systems?
22        A.   Yeah.
23        Q.   And what are those standards in terms of
24   the root cause analysis?
25        A.   Oh, no.

```
                                            Page 88
```

1          Q.    That's why you use the Department of

2     Energy standard?

3          A.    Yes, root cause is a methodology.  And

4     the methodology varies depending upon, you know,

5     what you're trying to accomplish and who you're --

6     who is trying to accomplish it and the goals they

7     set.  The methodologies vary some.  So there's not a

8     single thing that you could say is the gold standard

9     for RCA.

10         Q.    And in what contexts -- have you used the

11    RCA methodology before?

12         A.    Yeah.  Yes.  Excuse me.  Yes.

13         Q.    How many times?

14         A.    Oh, many times.  I don't know.  A dozen.

15         Q.    In what contexts have you used the RCA

16    method?

17         A.    Well, I worked on a Six Sigma project for

18    General Electric where we developed a liquid fuel

19    control unit for delivering fuel to the 8 series

20    turbines.  These are the big jet engines that they

21    use for power plants and they operate on natural gas

22    or they can operate on various liquid fuels like jet

23    fuel or bunker oil or number two.  This particular

24    unit was designed to operate on NAFA.

25               As you go through the design process for

Page 89

1   every critical system or subsystem, you do this

2   failure effect mode analysis meeting where you look

3   at different components of the system, what if this

4   fails, then this happens, that happens.  What's the

5   outcome.  Is it, you know, a bad day at work or did

6   we just destroy the turbine.  Then you score it.

7   Then you have to either go back and redesign so

8   either it's less likely that the event will happen

9   or the outcome is less severe.  You know, it's a

10  whole process.  And it uses RCA methods built into

11  the FMEA.

12       Q.    When you're doing root cause analysis,

13  it's usually forward looking to prevent accidents,

14  do I have that right?

15       A.    No, it's backward looking after something

16  occurs, too.  Like the case in Texas.  You know,

17  there ended up being a fire and a significant amount

18  of damage.  And things that affected that, some of

19  the things preceded the event by several months.

20  And some were decisions that were made.  Some were

21  actions that were taken.  And, you know, it's

22  everything that leads up to it.

23       Q.    But you're typically trying to analyze

24  after an accident or before how to prevent an

25  accident from happening again or something similar,

```
                                         Page 90
```

1   right?                T. TARANTO

2        A.    You're trying to define in a -- FMEA,

3   you're saying how can we prevent the accident or

4   make the results of the accident be less severe.  If

5   you're doing analysis of -- it's like if there's an

6   airplane crash, right, they look at every part of

7   the airplane.  They look at what pilots did, what

8   they said, how the aircraft responded, what the

9   control feedback said, what the black box is telling

10  you.  And they reconstruct what happened.  So that's

11  the type of thing that you're doing.

12       Q.    Other than the Texas litigation, have you

13  done root cause analyses that are backward looking

14  as in after an accident occurred?

15       A.    Well, it doesn't always have to be an

16  accident.  For example, I did a job with Caterpillar

17  in Pontiac, Illinois where they had two automated

18  assembly lines that were automatically powered that

19  assembled fuel injectors.

20            If you can imagine -- do you know what a

21  fuel injector is?  It's a component of a diesel

22  engine that squirts the fuel into each cylinder.

23  They make these things by the millions.  It's a very

24  high production, high-speed thing.  They had two

25  production lines that had pneumatic components as a

Page 91

1   significant part of their mode of operation.  And

2   they couldn't make the rated throughput.

3              So we did root cause analysis.  And at

4   the end of the day we increased the throughput of

5   the assembly lines to 18 percent.  And we cut the

6   energy by compressed air that powered it, by 40

7   percent per fuel injector.  That analysis is used

8   for all kinds of things in engineering.  That's why

9   there's no one way, there's nothing to say this is

10  root cause analysis.

11       Q.    I won't use accident, but a failure, a

12  failure event.  Have you conducted root cause

13  analyses other than the case in Texas where it has

14  been after a failure event?

15       A.    Yeah.  The failure in DeWitt -- I don't

16  know how much -- it was a long time ago and

17  everything.  I don't know how specific I can get

18  about some of these things.  But basically what

19  happened was the machine had a very high-power

20  hydraulic system on it.  And the machine was not

21  functioning as intended.  And an electrical

22  technician started manually engaging different

23  switches in the control system and actually got the

24  machine in a state where two parts of the machine

25  were pushing against each other with hundreds of

```
                                            Page 92
```

1    tons of force.  And it cracked the machine.  And a

2    piece fell from 10 or 12 feet high and hit someone.

3    And this piece weighed probably half a ton.

4         Q.    I know you said it was a while ago, but

5    do you remember what year that was or about what

6    year?

7         A.    It was in the mid 1980s, I would guess, I

8    think is what I said.

9         Q.    Are there any other examples of similar

10   event occurs, a failure event occurs, and then you

11   do a root cause analysis other than the DeWitt one

12   and this case?

13        A.    I mean, I did a job at Frito-Lay in San

14   Antonio.  They had problems making Dorito chips.

15   And it was the way they were blowing the corn.  So

16   if you're going to build a factory to make Dorito

17   chips, you have to start with corn obviously.  You

18   get a big truck of corn and start blowing it into

19   the process.  We use compressed air to blow it in.

20   If you don't do things optimally, process doesn't

21   work good.  Okay.

22             What's the root cause analysis?  In that

23   case the root cause analysis happened to be they

24   didn't maintain balance in the system and the system

25   was not using the air properly and ultimately it got

Page 93

1    to a point where the process didn't work right.

2              So, I can go on and on and on if you want

3    more.

4         Q.    Well, I'm just looking for examples, to

5    the extent there are any, I understand you've done

6    in various context and it always differs.  But where

7    there's been some kind of accident or failure event

8    and what you're trying to do is not fix it going

9    forward, but to analyze what caused that failure.

10        A.    Well, I mean -- I mean, probably the

11   worst thing that can happen in engineering is for

12   you to design a perfectly elegant, well-engineered

13   solution to the wrong problem.

14        Q.    Sure.

15        A.    So -- in any corrective action that

16   you're taking, the first thing is to figure out

17   what's happening.  And so, you know, here's what

18   it's doing.  Gee, we'd like to make it do this

19   instead.  So corrective action is very often a

20   component of the result of the root cause analysis.

21   Just like in the case of FEMA, okay, we've got a

22   very severe outcome with a high likelihood.  How do

23   we change the design to make it less likely or make

24   the outcome less severe or both.  Corrective actions

25   are usually a downstream product of root cause

Page 94

1  analysis.                    T. TARANTO

2       Q.    And are you familiar with the methodology

3  called direct cause analysis?

4       A.    I'm not really familiar with direct cause

5  analysis.  You know, the direct cause in this

6  situation was the overpressurization of the tank.  I

7  mean, that's pretty cut and dry.  And then -- you

8  know, so I'm not familiar with the term of direct

9  cause in the context of a methodology.

10      Q.    Where you familiar with the phrase

11  apparent cause analysis?

12      A.    Not as a -- no, not as a methodology.  I

13  mean, there's always a lot of apparent things that

14  you see but very often those are -- symptoms are

15  superficial.  You've got to dig deeper to get to the

16  root cause underneath it.  I don't know if that's

17  what you're referring to.

18      Q.    If we look at page 22, the third

19  paragraph under 3.4?

20      A.    Was that 32?

21      Q.    22.  You say -- it's the third paragraph,

22  3.4 -- "There are many strategies and analytical

23  methods used to investigate situations leading up to

24  undesirable events or outcomes.  The method used

25  here is a form of root cause analysis."

Page 95

1           So I guess what I'm getting at, what are

2    the strategies and analytical methods and why did

3    you choose root cause analysis over those other

4    methods?

5           A.    I think root cause analysis is one of the

6    best organized methods.  A lot of time analysis is

7    done with anecdotal information, not necessarily

8    going deeply into things and evaluating and not

9    making measurements, not getting proper facts and so

10   forth.  And root cause analysis is structured to

11   move beyond the -- you know, the superficial things

12   that you might first see which are very often

13   symptoms, not, you know -- not the underlying

14   problems.

15          So root cause analysis is specifically

16   designed to get to that level.  And if you read the

17   DOE publication, that's part of that discussion.

18          Q.    The big picture, root cause analysis is

19   about identifying all the various causes and

20   contributing factors to the event?

21          A.    Right.

22          Q.    When you say there are many strategies

23   and analytical methods, can you just describe what

24   those are, what you mean by that?

25          A.    What I mean by that is if you work with

Page 96

1  industrial engineers, people have a lot of different

2  ways of approaching a problem.  Some may have

3  particular names or methodologies to them.  Others

4  may not.  There's a lot of different ways to

5  approach it.

6           Root cause analysis is a methodology that

7  I think gives you the best outcome.

8      Q.   The goal of root cause analysis is to

9  prevent recurrence of accident, right?

10     A.   Prevent -- identify the, you know, the

11 factors leading up to the undesirable event and

12 ultimately continuing on.  Very often a component is

13 what do we do to prevent that occurrence or minimize

14 the occurrence in the future.

15          Again, just like with a FEMA analysis,

16 you might be looking to reduce the probability that

17 the occurrence would happen or reduce the severity

18 of the result of it happening or both.

19     Q.   Is it fair to say that root cause

20 analysis is not concerned with what, in fact,

21 actually caused an incident, but to address all

22 potential causes of a future occurrence?

23     A.   No.  It's to analyze all the things that

24 led to the event.  I mean, like in an airplane

25 crash, how much sleep did the pilots get the night

```
                                                    Page 97
 1   before.  Right?  So --  TARANTO
 2        Q.    How do you go about identifying root
 3   causes and contributing factors?
 4        A.    Well --
 5        Q.    I just ask, are you looking at your
 6   report or is it something else?
 7        A.    Yes.  I'm looking at the report for a
 8   reference for it.
 9              MR. KIRKPATRICK:  While you're doing
10        that, Daniel, can you introduce tab M, please,
11        M as in Mary.
12              (Exhibit 9, DOE root cause analysis
13        document; 69 pages, marked for identification.)
14        A.    If you go to page W 100 and it's
15   numerical, it's all numerically sequential.  It just
16   has to be annex W.
17              MR. WHITELEY:  It's introduced now as
18        Exhibit 9.
19        Q.    I'm at 100.
20        A.    Yes, 2.29.  The DOE document says a cause
21   or root cause is a cause that if corrected would
22   prevent occurrence of this and similar occurrences.
23   It does not apply to this occurrence only.  And it's
24   the most fundamental aspect of the cause.
25        Q.    How do you go about selecting the cause I
```

Page 98

1    guess is my question?  What root causes and

2    contributing factors are.  But I want to know how

3    you go about identifying them.

4        A.    You basically look at all of the

5    different elements of the system or the event and

6    then you say, okay, if we -- if this particular

7    thing were to be corrected, would that have

8    prevented this.  If that's true, you have a root

9    cause.  If we did this, then this doesn't happen.

10   We have a root cause.  There can be multiple root

11   causes.  If you say, okay, this affected the outcome

12   but if by itself we corrected this one thing, it

13   wouldn't necessarily have prevented what happened.

14   That's a contributing factor.

15       Q.    Okay.  Okay.  If you look at Exhibit 9, I

16   just want to confirm that this is the DOE document

17   that you are talking about.

18       A.    Right.  Yes.

19       Q.    Did you follow -- so this document sets

20   out five steps of every root cause investigation.

21   Did you follow these five steps?

22       A.    There's -- you know, follow-up isn't

23   really part of the scope for this.  And corrective

24   actions, again, you know, it's not -- I followed

25   this process for the scope of what the task was and,

Page 99

1   as I said before, you know, there's no one thing

2   that you point to and say this is the gold standard

3   for root cause analysis.  But this is a very good

4   description of the methodology and the process.

5        Q.    Did you engage in any independent data

6   collection as opposed to just reading the record or

7   analyzing the exhibits?

8        A.    I mean, I went to the site visit and made

9   observations there and so forth.  And I went to the

10  inspection of the tank pieces in New York and made

11  observations there.  I didn't do any laboratory

12  testing, any metallurgy or anything.  I mean, the

13  direct cause was pretty well-defined.  And the

14  observations of the tank and such pretty clearly

15  showed no contributing factors as might have been

16  related to prior damage of the tank or corrosion or

17  other things which has been substantiated by OSHA

18  and others.  So I didn't do anything like that.

19  But...

20       Q.    So Phase II is most of what you did,

21  assessment?

22       A.    Right.  That was primarily the scope.

23       Q.    Just because they didn't apply here, you

24  didn't do corrective actions and form or follow-up?

25       A.    Yeah.

Page 100

1      Q.    Within assessment, it says that there are

2  several types of root cause analysis and then it

3  lists, I guess, six here, events and causal factor

4  analysis, change analysis, barrier analysis,

5  management oversight and risk-free analysis or MORT

6  analysis, M-O-R-T, human performance evaluation and

7  then Kepner-Tregoe problem-solving decision-making.

8           Would you classify your root cause

9  analysis as any of these or any particular type of

10  root cause analysis?

11      A.    Well, there's components of the events

12  and casual factors.  You know, you look for change

13  but that applies more to situations where you've got

14  a system and, gee, it worked great on Monday and

15  Tuesday, and then it had all kinds of trouble on

16  Wednesday and then by Friday it was magically

17  working again.  So what's different among those

18  days.  So that's really a bit of a different

19  analysis.

20           And barriers, you know, what are barriers

21  to the systemic process, management decisions, you

22  know, human factor performance.  Those are all

23  things that you come into it.  I didn't make a tree,

24  a decision tree drawing.  I rarely engage in that.

25  But, yeah, they're all elements that affect things.

1            I mean, you might have something that was
2    done, a decision that was made months or years prior
3    that contributed to the occurrence.
4        Q.    Would you consider yourself an expert in
5    root cause analysis?
6        A.    I'm experienced in it.  And have applied
7    it in many cases.  Have I written extensively on the
8    topic or anything like that, no.
9        Q.    Have you made any -- sorry.  Go ahead.
10       A.    Go ahead.
11       Q.    I was just going to ask you:  Do you have
12   any writings on it?  I know you said not extensive.
13   But do you have any?
14       A.    Only in the context of how I executed
15   projects.  I did articles on the Caterpillar project
16   and so forth.  Again, it was not really a primer on
17   the root cause analysis, here was the problem, here
18   was the analysis we did and so forth.
19       Q.    Were those articles published anywhere?
20       A.    Yeah.
21       Q.    Where were they published, if you
22   remember?
23       A.    Well, Department of Energy did a
24   technical report on the Caterpillar project.  I've
25   had other articles published in Compressed Air Best

Page 102

1   Practices magazine.  One was the analysis of some

2   operations in a wire drawing plant, you know,

3   various articles.  I've done ACEEE.  I've done some

4   presentations at their annual meetings which are

5   peer-reviewed papers.

6           Q.    But these are not on the root cause

7   analysis specifically?  It's applied to --

8           A.    Application of it, yeah.

9           Q.    Let's look at page 42.  The first root

10  cause that you identify is Oprandy's selection of a

11  high pressure source of compressed air?

12          A.    Yes.

13          Q.    Do you agree that once a pressure rating

14  has been established for a piece of equipment that

15  the user of that equipment has to insure that the

16  actual operating conditions don't exceed that

17  rating?

18          A.    Well, that's not part of identifying a

19  high-pressure system as a root cause.

20          Q.    I'm just asking you --

21          A.    The direct cause was overpressurization.

22          Q.    Right.

23          A.    If the supply system was of a pressure

24  that would not have allowed that to happen, then

25  it's not a root cause.  Right?

Page 103

1        Q.      Sure.  My question --
2        A.      So all this is saying -- all this is
3    saying is if you didn't use a high pressure system,
4    the event wouldn't have happened.
5        Q.      Separate and apart from your analysis, do
6    you agree with the general principle, the way you
7    just said, is true?
8        A.      What did you say?
9        Q.      That once a pressure rating has been
10   established for a piece of equipment in a system,
11   the user of that equipment has to insure that the
12   actual operating conditions don't exceed that
13   pressure rating?
14       A.      Yeah.
15       Q.      Do you agree that the maximum allowable
16   working pressure of any given system is the lowest
17   maximum allowable working pressure of a component of
18   that system?
19       A.      What's your boundary?  What's your system
20   boundary?
21       Q.      Am I wrong that -- so if you have a
22   system and the components have different maximum
23   allowable working pressures, you would say the
24   system's maximum allowable working pressure is the
25   maximum allowable working pressure of the lowest

Page 104

1   pressure component of that system?

2        A.    No, it's like saying the electrical

3   system -- the wires in the street by your house are

4   probably 13,000 volts.  The voltage in your house is

5   220.  If you draw your boundary around the house,

6   then the voltage is 200.  But if you draw it back to

7   the power plant, there's 200,000 volts on main

8   transmission lines.  It depends on what you call the

9   boundary.

10       Q.    Sure.  Okay.

11             Do you agree that given the maximum

12  allowable working pressure of the subject tank that

13  it should not have been incorporated into the system

14  that Oprandy's had set up?

15       A.    No.  You could fill that tank off that

16  system.  It's like you can have 13,800 volts on the

17  lines outside and you have 220 in your house.

18       Q.    So you believe that it was appropriate to

19  use the system that Oprandy's did to fill the

20  subject tank?

21       A.    I didn't say that.

22       Q.    Okay.  I may have missed -- do you

23  agree --

24       A.    Look at the system.  There's a

25  transformer on the pole outside.  That transformer

Page 105

1  steps the voltage down from thirteen-eight to 220.
2  Then there's a line that comes in -- so, you can't
3  just say, is it inappropriate to connect
4  thirteen-eight directly to your house.  Yeah, right.
5  You don't want 13,800 volts coming to your house.
6  Does that mean a part of your system can't be at
7  13,800 volts?
8      Q.   Got you.  Rather than deal in
9  hypotheticals, do you agree that it was
10  inappropriate to use the system that Oprandy's had
11  in the way that it was set up to fill the subject
12  tank?
13     A.   I think if you look at the report under
14  contributing factors, there's elements of the
15  systemic issues that are reported as contributing
16  factors.
17     Q.   So, yes, it's a contributing factor but
18  not necessarily a root cause?
19     A.   Right.  For example, one of the things
20  discussed is safety relief valves.  If you put a
21  safety relief valve in that is set at an appropriate
22  pressure, would that by itself stop the incident
23  from occurring?  No.  It is not -- it's not -- it
24  doesn't address the root cause.  Because the safety
25  valve can fail.

1      Q.    Right.    T. TARANTO

2      A.    So it's a contributing factor is that

3  they didn't have a safety valve in the system.  But

4  it's not a root cause.

5      Q.    Okay.  Okay.  I just want to try to

6  unpack that a little bit.  So when you say that the

7  safety relief device had failed therefore it's not a

8  root cause, does the root cause have to one hundred

9  percent of the time cause an accident for it to be

10 considered a root cause?

11     A.    If you read it, a root cause is if you

12 eliminate this occurrence by itself, doing nothing

13 else, then the event wouldn't have occurred.  So

14 overpressuring the cylinder is a root cause.  If you

15 don't overpressure the cylinder, it doesn't explode.

16 But does a safety valve prevent you from

17 overpressurizing the cylinder, no, not by itself.

18     Q.    Page 43 which I believe is the next page,

19 you discuss the failure to limit the flow of air

20 into the tank.  And I understand that.  Your report,

21 though, talks about how Mr. Foust set the pressure

22 regulator somewhere around 450?

23     A.    Yes.  Not -- my report quotes his

24 statement to OSHA which says that.

25     Q.    Yes.  But, in fact, your report also says

Page 107

1    that the burst pressure was actually around 1100 to
2    1200 psi?
3         A.    That's what the OSHA report establishes,
4    that's what the design parameters establish.  That's
5    what the Worthington experts said.  They test one
6    out of 500 units to 900 psi.  Never had a failure.
7    That's pretty well established in the record.
8         Q.    You don't disagree with any of that?
9         A.    No.
10        Q.    Am I right if Mr. Foust had actually set
11   the pressure at 450 psi there would not have been an
12   explosion?
13        A.    Not really.  I would say if the regulator
14   had limited the pressure to 450 psi there would not
15   have been an explosion.
16        Q.    And that's because at 450 psi because
17   it's below the burst pressure, air could vent from
18   the subject tank and the system, although it would
19   be overpressured, would not explode?
20        A.    Right.
21        Q.    Now I'm on the same page and let me just
22   kind of discuss this.  Is the lack of an
23   overpressure safety device in the compressed air
24   piping --
25        A.    Right.

1        Q.     You do not contend that Tyco had any

2    control over the compressed air piping that

3    connected the Poseidon system to the testing, do

4    you?

5        A.     No.

6        Q.     I want to talk about inappropriately

7    sized safety device.  I know this might be very

8    technical.

9        A.     Might come out what?

10       Q.     The idea of an appropriately sized safety

11   device.  I want to know, how does one determine

12   whether -- sorry.  Go ahead.

13       A.     Where does it say that?

14       Q.     I'm on page 43 and it says -- let me

15   look.  I'm not able it find it.

16              Do you agree that to have a pressure

17   relief device on a system it has to be appropriately

18   sized for it to effectively work?

19       A.     What's your definition of appropriately

20   sized?

21       Q.     You agree that a pressure relief device

22   can be too small for a given system, right?

23       A.     Well, there's two factors.  There's flow

24   rate and there's pressure.  Is too small for what?

25       Q.     To prevent overpressurization.

Page 109

1       A.      Overpressurization is controlled by the

2   pressure setting of where the valve opens.  So now

3   the question becomes, are you saying then the air

4   can flow in more rapidly than the relief can relieve

5   it so the pressure is going to overshoot?

6       Q.      Right.  So if more air is flowing into

7   the tank than air flowing out, it will continue to

8   pressure past whatever the maximum rating is, it

9   would still burst if it weren't big enough, right?

10      A.      Oh, likely not.

11      Q.      And why is that?

12      A.      Well, because if you're filling a bucket

13  with water and I've got a hole drilled in the

14  bucket, you can dump water in so that the level of

15  the bucket rises.  As the level of the bucket rises,

16  the head increases which means the flow going out is

17  faster.  And so then it becomes a balance of how

18  fast can you fill it and can you fill it fast enough

19  to get to the burst pressure.  Even if the relief

20  capacity flow rate of a relief device was undersized

21  to deliver the full flow outlet at the 225 psi

22  limit, there's going to be some potential pressure

23  accumulation.  But for that pressure accumulation to

24  go to 1,000 psi, that 1,000 psi, that relief, even

25  though it's undersized, is going to spill out a lot

```
                                             Page 110
 1    more air, higher rate flow rate.  So, I would say
 2    you have to go some to undersize the relief valve.
 3         Q.    You're aware that there's a formula for
 4    determining the appropriate size of a pressure
 5    safety relief device?
 6         A.    Yes.
 7         Q.    Do you know what that formula is?
 8         A.    I have references to it.  I don't know it
 9    off the top of my head.
10         Q.    We won't spend too much time on this.
11              MR. KIRKPATRICK:  Daniel, can you mark
12         tab G.
13              MR. WHITELEY:  You said G as in Gary?
14              MR. KIRKPATRICK:  G as in Gary.  Yes,
15         thank you.
16              (Exhibit 10, CGA S-1.1; 56 pages, marked
17         for identification.)
18              MR. WHITELEY:  All right.  It should be
19         up now.
20         Q.    If you could refresh your browser.  The
21    latest exhibit, which I believe is 10, is the CGA
22    S-1.1 2005 which is the CGA standards for pressure
23    relief devices.
24              Do you agree that this standard sets
25    forth the requirements for pressure relief devices
```

Page 111

1    for cylinders for compressed gases?

2         A.    Yeah.

3         Q.    So am I right that if you wanted to know

4    how to properly size a pressure relief device, you

5    would look to this standard?

6         A.    Well, I'm not sure about that.  I think

7    if we take a little deeper dive on this, one of the

8    aspects of pressure relief devices in CGA's context

9    is if there's a fire.  Let's suppose you're

10   transporting a gas cylinder, the vehicle catches

11   fire, the fire heats the cylinder.  The heating of

12   the gas in the cylinder causes the pressure to go up

13   and you want to relieve the pressure before the

14   cylinder ruptures.  Of course, the cylinder is going

15   to rupture at a lower pressure because of the

16   impingement of the heat.  So I'm not sure that --

17   I'd have to research this to find out if it's only

18   the overpressurization factor or if it's the fire

19   impingement.  Because I think they talk a lot about

20   fire impingement.

21             On a propane cylinder, if your gas grill

22   catches fire and your propane cylinder goes up and

23   gets overpressurized, then the blow-out plug blows

24   and it goes off like a torch.  And when the fire

25   department comes and your gas grill is on fire,

```
                                            Page 112
```

1    don't expect them to put any water on the fire.  The

2    idea is to let fuel burn out.

3              So I'd have to research that to determine

4    what the actual context of this is for CGA.  ASME

5    has different formulas and most industrial tanks

6    that aren't going over the road, that are

7    stationary, are under the ASME requirements.  And

8    they have formulas for calculating the flow of the

9    relief, allowing a certain amount of pressure rise,

10   pressure accumulation they call it.  So I have to

11   check the context of it.

12        Q.    Regardless whether it's ASME or CGA,

13   there are formulas out there for determining whether

14   the pressure relief device is sufficiently large or

15   allows sufficient amount of flow to prevent a burst

16   event?

17        A.    Sure.

18        Q.    So, while we're on this, I guess, there

19   are at least a dozen different types of pressure

20   relief devices, right?

21        A.    That's being kind.

22        Q.    I just, in this document, there's type

23   CGA 1 through 12.

24        A.    The ultimate pressure relief device is a

25   dead weight device.  So if we put you on top of a

                                              Page 113

1    valve, you're going to seal that valve to a certain

2    pressure based on what you weigh.

3         Q.    Sure.  Which is too much.

4              Given that there's all these different

5    type of pressure relief devices, how do you select

6    the right one for a given system?

7         A.    Look at the codes and standards and what

8    they require.  That's the first thing to do.  And

9    then it's about layers of protection.  The root

10   cause analysis definitely shows you the benefit of

11   layers of protection.

12             So in systems where I have had 13,800

13   volts in the street and I want 220 in the house, in

14   addition to safety valves, very often you put

15   rupture disks which is a piece of metal, maybe four

16   inches in diameter.  If the pressure goes up a

17   certain amount, that just blows away and you open up

18   a four-inch hole.  There's levels of protection,

19   there's different devices.  You have to look at

20   codes and standards.  CGA is worried about fire

21   impingement.  In the unfired ASME code, not the

22   boiler code, not fire pressure vessel code, but in

23   the unfired pressure vessel code, ASME is not

24   concerned about the fire --

25        Q.    And that all depends on the particulars

Page 114

1    of the system?        T. TARANTO

2         A.    It depends on the -- yeah, I mean -- it

3    depends on whether or not NFPA 10 applies, right?

4         Q.    Right.  Depending on which standard

5    applies, it depends on how the system is set up?

6         A.    It gives you design guidance.

7         Q.    Okay.

8         A.    Or design requirements.  Sometimes it's

9    guidance.  Sometimes it's requirements.

10        Q.    And that's the primary place you look is

11   to --

12        A.    The starting point.  It's the starting

13   point.

14        Q.    And so when you're setting up a system of

15   whatever kind, you have to consult whatever

16   guidelines or standards apply to that particular

17   system?  There's not one place you can go to look

18   for it?

19        A.    Right.

20             MR. KIRKPATRICK:  I think this is a good

21        time for a break.  Why don't we go off the

22        record until 1:40?  Does that make sense?

23             THE WITNESS:  That makes sense.  I'm 1:32

24        right now.

25             (A recess was taken from 1:32 p.m. to

Page 115

1      1:40 p.m.)      T. TARANTO

2      Q.    Mr. Taranto, you're aware that the

3  Poseidon system that Oprandy's had came with a

4  concrete safety gauge?

5      A.    I know there's been mention of a safety

6  cage.  I've never seen it or seen any specifications

7  on it.

8      Q.    You don't have any understanding one way

9  or the other as to whether there was a safety gauge?

10     A.    I've seen in the record that there's

11  mention in the record of there having been a safety

12  gauge.  I think it was in the context of they used

13  it at the prior place and they had moved the

14  business to the newer -- to the existing place where

15  the incident occurred.  But again, I don't know any

16  more about it other than that little bit I read in

17  the record.

18     Q.    Did you find -- did you -- strike that.

19          Is it pertinent to your root cause

20  analysis whether there was a safety gauge and, if

21  so, whether it was provided to the employees and

22  whether it was used?

23     A.    It's really not pertinent to the root

24  cause analysis because it wasn't there.  Now, in

25  terms of corrective actions, if we went to the

Page 116

1    corrective action phase, right, we could potentially

2    say that corrective action might be to use a safety

3    gauge.

4         Q.    So the --

5         A.    It wasn't part of the scope and it's only

6    minimally mentioned in the record.

7         Q.    So if a safety gauge were at Oprandy's,

8    that would be relevant to your analysis?

9         A.    Yeah.  If there was a safety gauge there,

10   then the question would be, there would be questions

11   around it, right?

12        Q.    And would you -- can you just kind of

13   describe what those questions would be?

14        A.    Was it used, was it intact, did it

15   contribute to the severity of the accident, did

16   it -- you know, what did it -- how did it respond

17   under the conditions that occurred and so forth.

18        Q.    On page 44 you mention as a contributing

19   factor the regulator's pressure gauge for tank

20   filling does not have a calibration date?

21        A.    Right.

22        Q.    Can you just describe why that is a

23   contributing factor?

24        A.    That's a requirement in NFPA 10 that the

25   gauge be calibrated, I think it's annually.  And a

Page 117

1   gauge that's not calibrated is like a watch without

2   a battery.  It tells time right twice a day.

3        Q.    Do you contend that had the gauge been

4   properly calibrated that there's a decreased chance

5   that this incident would have occurred?

6        A.    Yeah, because you have a gauge that you

7   know was reading correctly.

8        Q.    So you believe then that because it was

9   not properly calibrated that it was not reading

10  correctly?

11       A.    No.  I'm saying because it was not

12  calibrated you don't know if it was reading

13  correctly or not.

14       Q.    So I guess I'm just trying to -- you

15  agree that the -- can you just explain how if the

16  regulator -- strike that.

17            Do you agree that the regulator was set

18  to the fully open position --

19       A.    No.

20       Q.    -- when this incident occurred?

21       A.    No.

22       Q.    Do you believe that the regulator was set

23  to 450 psi as Mr. Foust indicated?

24       A.    I don't know.

25       Q.    Then I'm having trouble figuring out why

Page 118

1    the calibration of the gauge could have contributed
2    to this event or how do you know that it could have
3    contributed to this event?
4           A.    Because a gauge should be calibrated so
5    you know it's reading correctly.  Again, it's a
6    contributing factor.  It's not a root cause.  I'm
7    not saying a properly calibrated gauge would have
8    prevented this accident.  But an improperly
9    calibrated gauge is certainly a contributing factor.
10          Q.    It could have, but you're not opining as
11   to whether it actually did contribute to the
12   accident?
13          A.    Right.
14          Q.    The next is, same page.
15          A.    It contributed to the accident.  I mean,
16   every contributing factor contributes to the
17   accident.  What degree, you know, you can't say.
18          Q.    So if the gauge were functioning
19   correctly, the fact that it had not been calibrated
20   would be irrelevant, right?
21          A.    If the gauge was not in need of
22   calibration and it was reading correctly, then the
23   fact that it didn't have a calibration sticker on it
24   would still be a contributing factor under the
25   guidelines of the standard.  But it would be less

Page 119

1    likely that it was a contribution to the end event.

2        Q.    And you don't have an opinion as to

3    whether it was reading correctly?

4        A.    No.

5        Q.    So just -- I'm sorry if this is rehashing

6    what you just said.  But the -- if it were reading

7    correctly, it would still -- the lack of calibration

8    would still be a contributing factor because the

9    NFPA standards require it?

10       A.    Right.  And how would you know if it was

11   reading correctly?

12       Q.    I'm just saying, assuming that it were,

13   it would still be a contributing factor?

14       A.    Yes.

15       Q.    The next is on page 44 and it is using

16   the cylinder gauge to check the pressure.  So you

17   believe that it was improper for Mr. Foust to use

18   the cylinder's gauge to check the pressure?

19       A.    The standards say you shouldn't do that.

20       Q.    Are you contending that the cylinder

21   gauge was inaccurate?

22       A.    Unknown.

23       Q.    So you don't have an opinion one way or

24   another?

25       A.    No.

1      Q.    Sort of like the last one, it's still a

2   contributing factor because the standards require

3   not using the cylinder gauge to check pressure?

4      A.    Right.

5      Q.    You mention in this section that

6   Mr. Foust pressed down on the valve three times.

7   What's your understanding of the valve that he was

8   pressing down on?

9      A.    The valve that allows the air or agent in

10  the case of an agent tank to be discharged from the

11  tank when the system activates.

12     Q.    So in pressing down on the valve, he

13  opened the tank and essentially allowed air to flow

14  in?

15     A.    I'm not sure what consequence pressing

16  down on the valve actually was.  Because the

17  pressure allows the free flow of air in.  It only

18  restricts the flow coming out.  It doesn't let the

19  air come out until it actuates.  I'm not sure what

20  is relevant about him having pushed on the valve

21  other than the fact that everybody seems to -- the

22  testimony documents that that's a correlation in

23  their eyes.  Whether or not it's a -- whether or not

24  it's an observation or a contributing factor, it

25  might just be anecdotal.

Page 121

1      Q.    You don't have an opinion one way or the

2   other as to whether pressing of the valve

3   contributed at all to the event?

4      A.    Yeah.  There's nothing in the record and

5   there's nothing that substantiates that.

6      Q.    And then in this second section you say

7   that the Kitchen Knight manual is silent with

8   respect to recharging instructions with respect to

9   test tanks?

10     A.    Right.

11          MR. KIRKPATRICK:  Daniel, can you mark N

12      as in Nancy.

13          (Exhibit 11, Kitchen Knight II technical

14      manual; 53 pages, marked for identification.)

15          MR. WHITELEY:  It's loading in now as

16      Exhibit 11.  It's in now as Exhibit 11.

17          MR. KIRKPATRICK:  Great.

18     Q.    Mr. Taranto, is this the Kitchen Knight

19   II product manual that you referred to?

20     A.    We're onto 11?

21     Q.    Yes.  We're onto 11.

22     A.    I'm not yet.  I don't know why some

23   programmer couldn't have written this thing to

24   refresh when something new comes in.

25          Yes.  Kitchen Knight II.

Page 122

1        Q.    You agree that failing to follow the
2     manual is a contributing factor of this accident,
3     right?
4        A.    Not really.  I mean, I don't have that as
5     a contributing factor because the manual doesn't
6     have anything in it.  So failing to follow nothing
7     is not, you know --
8        Q.    I'm getting tired.
9              You agree it's important for servicers,
10    maintainers of Kitchen Knight systems to follow this
11    manual generally?
12       A.    I think the standards required that they
13    be trained on the system and trained to the manual
14    and that they follow it.  Again, it's not
15    necessarily just my opinion.
16       Q.    You agree with that, it's important to --
17       A.    Yes, that's what it says you're supposed
18    to do.
19       Q.    I believe you acknowledge this in your
20    report.  If you look at the introduction so this is
21    the page ending in 00063, you agree that the manual
22    instructs that the system must conform to the
23    limitations detailed in this manual and be performed
24    by an authorized Pyro-Chem Kitchen Knight II dealer.
25              Do you agree that neither Chris Foust nor

Page 123

1    Franklin Buono nor Brian Scott or anyone else at

2    Oprandy's was an authorized Pyro-Chem Kitchen Knight

3    II dealer?

4         A.    I believe that Brian Scott testified that

5    he was an authorized dealer, but not an authorized

6    distributor.

7         Q.    But your understanding, he was an

8    authorized Pyro-Chem Kitchen Knight II dealer?

9         A.    That's what I -- I'd have to go back and

10   check the deposition.  I believe at one point in his

11   deposition that's what he indicated.  He was a

12   dealer, not a distributor.  There was a distinction.

13   It was really unclear kind of what the distinction

14   was.

15        Q.    You don't have any reason to believe that

16   Chris Foust was an authorized Pyro-Chem Kitchen

17   Knight II dealer, do you?

18        A.    Well, an employee would not be.  The

19   company is the authorized dealer.

20        Q.    It's your understanding that the

21   company --

22        A.    Pardon me.

23        Q.    It's your understanding that a company is

24   an authorized dealer as opposed to an individual?

25        A.    Yeah.  I mean, a company is an authorized

Page 124

1  distributor, an authorized dealer for a product
2  line.
3       Q.    Do you have a basis for that
4  understanding?
5       A.    Well, the contract for distributorship or
6  dealership is between the two companies.
7       Q.    With respect to -- are you just speaking
8  in respect to industry practice in general or with
9  respect to the Kitchen Knight system in particular?
10      A.    I mean, I worked for a fluid power
11  distributor for 1976 to 2000.  And the contracts
12  never said Tom Taranto is an authorized distributor.
13  It said the company is an authorized distributor and
14  Tom Taranto is an employee of the company.
15      Q.    Do you agree that it is important to
16  follow this instruction, that installation and
17  maintenance shall conform to limitations and be
18  performed by an authorized Pyro-Chem Kitchen Knight
19  II dealer?
20      A.    Yes, I agree that that's important.
21      Q.    If we now look at -- I guess I'll ask
22  more generally.  Are you aware whether in the fire
23  protection industry this is a standard requirement
24  for servicers of pre-engineered fire suppression
25  systems?

```
                                           Page 125
 1        A.    A standard requirement or a standard
 2   practice?
 3        Q.    Standard requirement.
 4        A.    It is a standard requirement.
 5        Q.    Have you consulted other pre-engineered
 6   fire suppression systems?
 7        A.    Yes.
 8        Q.    What manuals are those?
 9        A.    Amerex manual I took a brief look at.
10        Q.    Amerex?
11        A.    Yeah.
12        Q.    Any others?
13        A.    No.
14        Q.    If you turn to chapter 6 to the page
15   ending 112, this is system recharge.  Here in the
16   general section it says at the end, "Because it is
17   difficult to completely understand every aspect of
18   an intricate pre-engineered system simply by reading
19   the technical manual, Pyro-Chem Kitchen Knight II
20   will not be responsible for system recharge
21   performed by any noncertified persons"?
22        A.    Yes.
23        Q.    Do you agree that's important to follow
24   as well?
25        A.    Yes.
```

                                                    Page 126

 1        Q.    And then at point C, 5-C in the second
 2   column, it says that it's talking about after a
 3   system recharge, it says, "Reinstall valve and
 4   pickup tube and pressurize tank at 225 psi," right?
 5        A.    What tank are we talking about?
 6        Q.    This says after a system discharge.  It
 7   says reinstall valve and pickup tube and pressurize
 8   tank at 225 psi?
 9        A.    Are we talking about an agent tank or a
10   test tank?
11        Q.    I'm just asking you if that's what it
12   says, that "After a system discharge you should
13   reinstall valve and pickup tube and pressurize tank
14   to 225 psi and reinstall piping network"?
15        A.    That's what it says.
16        Q.    Do you agree this manual doesn't contain
17   step-by-step instructions on how to refill --
18   whether an agent or testing, doesn't contain
19   step-by-step instructions on how to do that?
20        A.    It does not.
21        Q.    And that's true with respect to whatever
22   type of tank, agent or test?
23        A.    No.  This is -- this is an agent tank.
24   Because it says, Flushing solution part number
25   yada-yada-da must be used when flushing the system.

1    And the test tank doesn't have a pickup tube in it.

2         Q.    My question is -- Mr. Taranto, it's been

3    a long day.  I'm not going back to this.

4              I just want -- I'll try to ask yes or no

5    questions.  If you have an explanation, definitely

6    feel free to make them.  I'm just asking, this

7    manual and this chapter does not contain

8    step-by-step instructions on how to refill any kind

9    of tank?

10        A.    B says fill the tank half full with

11   water, agitate the tank.  It says, use flushing

12   solution part number 79656.  So what are those if

13   they're not the steps of flushing the system?

14        Q.    It does not contain step-by-step

15   instructions on how to pressurize the tank?

16        A.    No, it just says pressurize to 225 psi.

17        Q.    It's not just that the manual doesn't

18   contain step-by-step instructions on the test tank

19   but with respect to any test tank?

20        A.    That's a step-by-step instruction for

21   using an agent tank to flush.

22        Q.    In terms of pressurizing the tank.  I'm

23   sorry if I misspoke.

24        A.    In terms of pressurizing the tank, no.

25        Q.    So looking at the next page, there's a

Page 128

1    note here that says the pressure gauge attached to

2    the tank valve should not be used to determine when

3    the charging pressure has been reached, pressure

4    regulator must be used?

5         A.    Where is that?

6         Q.    Pardon?

7         A.    What paragraph are you on?

8         Q.    On the next page, 11, the note in the

9    bottom?

10        A.    There it is.  Yeah.

11        Q.    And that is -- you mention that in your

12   report as part of why it was a contributing factor

13   to --

14        A.    Yeah.

15        Q.    Okay.  We've discussed -- there are many

16   different ways to recharge a tank, right, to

17   pressurize a tank?

18        A.    What do you mean by different ways?

19        Q.    You can transfill, you can use a

20   compressor, et cetera, et cetera?

21        A.    Right.

22        Q.    Is there any way to count the number of

23   ways or just countless number of ways?

24        A.    Well, I'm sure there's a limited number

25   of ways.  But, you know, ultimately you've got to

Page 129

1    introduce a pressurized gas into the tank.

2         Q.    And there are different kinds of

3    regulators as well as we've discussed?

4         A.    Right.

5         Q.    One stage, two stage?

6         A.    Right, different pressure.

7         Q.    Back pressure, vacuum pressure,

8    differential pressure?

9         A.    Right.

10        Q.    Different pressure relief devices, right?

11        A.    Yes.

12        Q.    And different ways to connect the piping

13   from the source to the subject tank?

14        A.    Yes.

15        Q.    Depending on all of those different

16   factors, the steps that you would go through to fill

17   a tank would be different?

18        A.    Yes.  Well, yes.  To pressurize the tank.

19        Q.    Is that why the Compressed Gas

20   Association places the duty to provide step-by-step

21   instructions on the supplier of the transfill

22   equipment?

23        A.    I guess I don't know the reasoning behind

24   it.

25        Q.    But the Compressed Gas Association does

```
                                          Page 130
 1   place the duty to provide step-by-step instructions
 2   on the supplier of the transfill equipment, right?
 3        A.    Yes, I believe that's true.
 4        Q.    Did you consider whether the supplier of
 5   the transfill equipment -- who would be the supplier
 6   of the transfill equipment here?
 7        A.    I don't know.
 8        Q.    Would it be Poseidon?
 9        A.    I don't know what -- I don't know where
10   all those different parts came from.
11        Q.    Did you consider whether the failure of
12   the -- strike that.
13             Are you aware that Brian Scott at
14   Oprandy's had a list, a step-by-step list, of
15   instructions from Poseidon about how to use their
16   system?
17        A.    I believe I saw that in his deposition
18   although I don't know that there was anything ever
19   entered into the record to show what that was.
20        Q.    Assuming that he did indeed have those
21   step-by-step instructions, would it be a
22   contributing factor to this incident that he did not
23   provide those instructions to his employees?
24        A.    Yeah.  Yeah.  They should have the
25   instructions.
```

```
                                          Page 131
 1        Q.    Is there any reason that that wasn't
 2   included in your report?
 3        A.    I never saw the instructions.  The
 4   instructions aren't part of the record.
 5        Q.    So you --
 6        A.    There was only talk about the
 7   instructions.  There's no document that said here's
 8   the instructions.  I haven't seen it, have you?
 9        Q.    So if you saw those instructions, that
10   might be a contributing factor?
11        A.    Right.
12        Q.    But because you've only seen it in the
13   form of testimony, without the document, he said
14   that they exist, you can't say for certain that it's
15   a contributing factor?
16        A.    It's kind of like following the manual on
17   something that's not in there.
18        Q.    But --
19        A.    There's nothing to follow.  Right?
20   There's --
21        Q.    Do you have any reason to doubt that
22   those instructions were accurate?
23        A.    Yeah.  I haven't seen them.
24        Q.    Did you ever seek them out or look for
25   them?
```

```
                                          Page 132
 1        A.    I think in the record there's discussion
 2   about the fact that he thought maybe OSHA had all
 3   the documentation or something.  They --
 4        Q.    You didn't go out and look for Poseidon's
 5   standards step-by-step instructions --
 6        A.    Only the ones that would matter are the
 7   ones that they had.
 8        Q.    Wouldn't it matter if Poseidon didn't
 9   give the correct instructions to Oprandy's?
10        A.    Right.  But going out and finding what
11   instructions are there.  I mean, the instructions we
12   have here are entered into the record as being the
13   instructions.  If I just go out on the web and find
14   Kitchen Knight instructions, this is the record.
15        Q.    Your understanding is because it was what
16   was provided to you by counsel?
17        A.    Right.  It's got the Bates number on it.
18        Q.    Unless it's in the record, you can't
19   consider it?  Unless it's a physical document in the
20   record, you can't consider it for your report?
21        A.    Yeah, I wouldn't.
22        Q.    Next, if you go to page 28 and that's
23   3.6.7 in your report, you identify as a -- I'm
24   looking at the wrong thing.  Sorry.  3.6.5 and no
25   access to manual and servicing procedure
```

Page 133

1  instructions.            T. TARANTO

2            Is that a root cause or is that a

3  contributing factor?

4       A.    It would be a contributing factor.

5       Q.    So the fact that neither Chris Foust nor

6  Franklin Buono were given access to the Kitchen

7  Knight II manual is a contributing factor in this

8  event?

9       A.    Yes.

10       Q.    And if you had the Poseidon manual, that

11  might also be a contributing factor, depending on

12  what the manual said?

13       A.    Sure.

14       Q.    Now, I understand from a root cause

15  analysis perspective that what's in the manual is

16  important to preventing future accidents.  But given

17  that the manual was never given to the employees,

18  whether something was in the manual or not wouldn't

19  have prevented the accident in this case, right?

20       A.    Again, that's why they're contributing

21  factors, because -- it's not one thing, if this

22  happened, then the incident wouldn't have occurred.

23  So it doesn't change -- it doesn't change the aspect

24  of the manual being silent on using a test tank.  It

25  doesn't change anything.

1      Q.    You're not implying that whether it was

2    in the manual or wasn't in the manual actually, in

3    fact, contributed to the accident because the manual

4    was never given to the employees?

5      A.    No, I'm saying that what is or isn't in

6    the manual is still relevant as a contributing

7    factor because it's -- the contributing factor is a

8    chain of things.

9      Q.    Right.

10     A.    And so it's -- it's in the chain.

11     Q.    Right.  And so is not giving that manual

12   to employees?

13     A.    Yes.

14     Q.    That's also in the chain.  I'm looking at

15   page 51.  Sorry to jump back.

16           You opine as a contributing factor that

17   the manual does not comply with NFPA 17A?

18     A.    Yes.

19     Q.    The reason is because the manual must

20   contain instructions necessary to safely design,

21   install and reliably perform the maintenance and

22   recharge service in accordance with the manual,

23   right?

24     A.    Right.

25     Q.    And that the NFPA 17A requires the manual

Page 135

```
 1   to train a person to safely design, install and
 2   perform maintenance in accord with the manual?  I'm
 3   looking at 6.1.1, the second sentence.
 4        A.    17A, it says the manual is essential in
 5   the definition of a trained person.  17A, 3.3.18.
 6        Q.    While you're looking, I guess the
 7   ultimate question is --
 8        A.    It defines trained as "A person who has
 9   undergone the instructions necessary to safely
10   design and install and reliably perform the
11   maintenance and recharge service in accordance with
12   the manufacturer's design, installation and
13   maintenance manual."
14              So if the instructions to perform that
15   work don't exist in the manual, then it's -- the
16   manual is required to do the training.
17        Q.    And your understanding --
18        A.    In the definition.
19        Q.    In your understanding that is based on
20   the text of the regulation NFPA 17A and in that
21   interpreted document as well?
22        A.    I just read the text from 17A.
23        Q.    That's what you're basing your opinion
24   on?
25        A.    It says they have to be trained to the
```

```
 1   manual.                    T. TARANTO
 2        Q.    Where does it say that?
 3        A.    If the manual is silent on some aspect of
 4   performing the maintenance and other functions shown
 5   here, if the manual is silent on that and the manual
 6   is necessary to be trained, then how can you be
 7   trained in that aspect of the work if the manual is
 8   silent with respect to it?
 9        Q.    So, just for example, if the manual says,
10   perform a piping integrity test or the balloon test,
11   something like that, the manual should also set out
12   step by step how you do that?
13        A.    Yeah.  Isn't that what it says?  It says
14   that it has to -- well, it might be a better
15   definition of manual is -- reference for design,
16   installation and maintenance of the lists of
17   chemical system and equipment.
18        Q.    Right, that's the definition of manual.
19        A.    And the balloon test is part of the
20   maintenance of the system.  I believe it has to be
21   done twice a year.
22        Q.    Doesn't it just say the document
23   referenced for design?  It doesn't say that it has
24   to have every -- it says reference for design,
25   servicing and inspection, not that it contains every
```

Page 137

1    piece of information that would be necessary for the
2    design, installation and performance.
3        A.    I don't understand how you're reading
4    document referenced.  I mean --
5        Q.    The document --
6        A.    I would read that as the document
7    reference is the bible for designing, installing and
8    maintenance of the system is the manual.
9        Q.    Sure.  And to use the bible analogy, I
10   mean the bible doesn't tell you everything about how
11   it is in life, but it contains the core things.
12            Do you agree there's information outside
13   of the four corners of the manual that can be
14   relevant for servicing the system?
15       A.    That's like we talked about very early
16   on.  You have the documentation component.  Then you
17   have the hands-on component.  Yeah, you need to have
18   both components of training.  You can't write
19   everything down necessarily that you do in a
20   hands-on training.  But the manual -- the manual is
21   the reference for that information.
22       Q.    Sure.  And so where is it -- what's the
23   basis for your opinion that the information you say
24   should have been included is required to be included
25   under those regulations?

1    A.    Because -- because the reference, the

2  authoritative reference for doing these various

3  functions is the manual.  And a trained person is

4  trained to do what's in the manual.  So if it's not

5  in the manual, how can you be trained to do it.

6    Q.    So I guess, again, to go back to the --

7  so let's look at the definition of trained.  It's

8  3.3.18.  It's your -- you say that this requires a

9  person to be able to effectively service the system

10  based on what's in the manual, right?

11    A.    Yes.  Isn't that what it says?  In

12  accordance with the manual.  The manufacturer --

13    Q.    Do you agree that trained is defining a

14  person?

15    A.    Yes.

16    Q.    A person who has undergone instructions

17  necessary to safely service the system in accordance

18  with the manual?

19    A.    Yes.

20    Q.    And so, for example, if the manual said

21  perform the balloon test, the trained person is

22  someone who received training on how to do that?

23    A.    Yes.  And they received it based on the

24  instructions in the manual.

25    Q.    So if the instructions aren't in the

                                        Page 139

1   manual, it would be impossible to train someone on

2   that?

3         A.    Correct.

4         Q.    I guess you said you reviewed one other

5   manual for a pre-engineered fire suppression system.

6   Did that comply with Rule 17A?

7         A.    I took a brief look at it.  I didn't

8   review it in detail which is why it's not on the

9   document list.

10        Q.    So you have not ever seen a manual that

11  you say complies with Rule 17A?

12        A.    I have not.  I have not researched that.

13        Q.    If a manual were to say conduct a

14  hydrostatic test of the cylinder, do you think that

15  the manual would need to contain step-by-step

16  instructions on how to do that?

17        A.    Yeah.  If you go to -- I mean, if you go

18  to the documents that govern doing hydrostatic

19  tests, they had details how you go about doing it.

20        Q.    You're saying that also needs to be in

21  the manual?

22        A.    Or say hydrostatically test in accordance

23  with the referenced document.

24        Q.    It wouldn't be enough if someone has been

25  trained on how to hydrostatically test in some other

```
                                           Page 140
 1   context?                   T. TARANTO
 2       A.    Why are we talking about hydrostatically
 3   testing?  I mean, the service techs -- it's not part
 4   of the maintenance of the system.  The tanks need to
 5   be hydrostatically tested and they're sent to
 6   someone who does that as a business.
 7       Q.    Exactly.  So that person is trained in
 8   how to hydrostatically test, right?
 9       A.    Yes.
10       Q.    And so if someone, for example, were to
11   be trained on how to fill and use a test tank, there
12   wouldn't need to be step-by-step instructions for
13   them to comply with the product manual?
14       A.    But the manual is the authoritative
15   reference of doing those things safely.
16       Q.    So your answer is no to that?
17       A.    No.  Right.
18       Q.    Okay.  So am I right that your opinion is
19   that a layperson should be able to pick up the
20   manual and have it tell them how to maintain,
21   install, service the system?
22       A.    That would be -- yeah.
23       Q.    I think we already covered this, the
24   source for that is, you believe, the text of 17A?
25       A.    Yes.
```

1      Q.    If we now go to page 53, you say that TFP

2  has a general obligation to provide warning or

3  danger that may arise with the use of the product.

4  I just want to clarify again, that's your

5  understanding of the law, not your opinion?

6      A.    Yes.

7      Q.    You state that it is common for service

8  providers to provide maintenance on fire protection

9  equipment without being authorized servicers, right?

10     A.    Yes.

11     Q.    And the basis for your opinion are these

12 examples that you cite in your report?

13     A.    Yes.  I went to two different websites

14 and they typically will show distributors to be that

15 they're a distributor for certain products but they

16 service all products and all systems.

17           (Court reporter requested clarification.)

18     Q.    So do you have any indication that these

19 companies have actually performed service on fire

20 protection systems?

21     A.    No.  I just accessed their website and I

22 documented that in the appendix.

23     Q.    If we look at 7.1, you say that the

24 manufacturer has a duty to make sure that the

25 warning is available to all users of the product?

```
 1        A.    Yes.       T. TARANTO

 2        Q.    That would be in this case anyone who

 3   handles the test tank after it leaves Tyco?

 4        A.    According to the website -- according to

 5   that website that's in the end notes, the quote is

 6   "This duty extends to those using or purchasing the

 7   product as well as to those who could reasonably be

 8   expected to be harmed by its use."

 9        Q.    And that's the understanding of the law,

10   again, you're not opining that's the case?

11        A.    That's the reference that I cite in back.

12        Q.    If, for example, Tyco's test tank were to

13   be sold to, you know, given to an authorized

14   distributor and sold, for example, to Oprandy's,

15   Tyco has a duty to make sure everyone has the

16   manual; is that your understanding?

17        A.    They have the duty to warn of the

18   hazards.  Anyone that could reasonably be expected

19   to be harmed by its use.

20        Q.    Is that a yes, they would be responsible

21   for making sure that Oprandy's has the manual?

22        A.    That's not what I read on the website

23   is -- they don't have to necessarily teach them how

24   to do a balloon test properly.  They just have to

25   give them the information to do it safely.  They
```

Page 143

```
1    have a duty to warn them of the harm that could come
2    to them, you know, and as far as doing the job
3    properly, the way I view this can be reserved for
4    their authorized distributors.  But they have to
5    warn anyone who could reasonably be expected to be
6    harmed by the use what the harm is and how to avoid
7    being harmed.
8         Q.    And that's your understanding of the law
9    based on that reference that you cited?
10        A.    Yes.
11        Q.    This is something that's not related to
12   anything we're talking about right now, but do you
13   attempt -- I guess I should say, am I right that you
14   do not attempt in your report to rank the
15   contributing factors in terms of which is more
16   important, which is less important?
17        A.    You can't do that.  I mean, the way you
18   would do that from an engineering sense is you
19   determine all the factors that affect the
20   performance of a machine.  And then you run tests.
21   And you change this factor.  Then you change that
22   factor.  Then you change these two.  Then you change
23   those three.  And they run the test over and over
24   again.  Then you have some definition of how much
25   each factor contributes.  I'm not sure we want to
```

Page 144

1    blow this tank up a hundred times to find out the

2    significance.

3           Q.    At page 54 onto 55 you say, "While the

4    direct cause of the incident was overpressurization,

5    Tyco's failure and their duty to warn of a danger

6    associated with overpressurization of the Tyco fire

7    products test tank that ruptured is a contributing

8    factor"?

9           A.    Where exactly are you reading that?

10          Q.    Bottom -- the last two lines of 54 and

11   then the top of 55.

12          A.    Right.

13          Q.    So is it your contention that Tyco had an

14   obligation to warn that overpressurization can lead

15   to explosion?

16          A.    Yes.

17          Q.    Is that based on the assumption that it

18   was not known to the individuals at Oprandy's that

19   overpressurization could lead to explosion?

20          A.    I don't know that that's relevant.  It's

21   a requirement of NFPA 10 and that notice is on the

22   agent tank.

23          Q.    So your contention is based on the

24   requirement of NFPA 10?

25          A.    Yeah.  The tank was produced by a fire

1    protection company.  Tyco, TFP, right.  It was sold

2    into the fire protection market.  It was being

3    handled by a fire protection distributor.  And NFPA

4    10 says that tanks have to have certain labeling on

5    them.  And that's part of the -- the pressure.

6         Q.    All I'm asking is the reason that you're

7    saying that a duty existed or whether Tyco should

8    have done this is because it's in the regulations?

9         A.    No.  I think that's to both points.  It's

10   in the regulations and it's something that you need

11   to know to safely -- to be warned that you might be

12   harmed by overpressurization.  I think that speaks

13   to both points, right.

14        Q.    Sure.  So because the law requires it and

15   because NFPA 10 requires it?

16        A.    Yeah.

17        Q.    Is it your understanding that any tank

18   whether it's governed by an NFPA 10 or not is

19   required to include the warning that

20   overpressurization could lead to explosion?

21        A.    I think that -- you know, I don't know.

22   I think that under the law overpressurization is a

23   hazard that could cause you harm.  So it would stand

24   to reason that you should be -- there is a duty to

25   warn.

```
                                    Page 146
```

1     Q.    For all manufacturers?

2     A.    As for a tank that is not a fire

3 protection tank, I don't know that NFPA 10 would

4 apply.  Whether it's a CGA spec -- there would be

5 other specs that apply if it wasn't an NFPA --

6     Q.    In terms of the law, all tanks are

7 required, whether by NFPA 10 or not, to include a

8 warning that overpressurization could lead to

9 explosion?

10     A.    Yeah.  I mean, I have a tank that I got

11 from the farm supply store.  And it's got a safety

12 relief valve on it.  It's got an instruction manual.

13 It has all kinds of warnings on it like don't tamper

14 with the relief.  Yada-da-da-da.

15     Q.    Any tank that does not warn about a risk

16 of overpressurization leading to explosion is, you

17 would say, defective in that it does not warn

18 properly?

19     A.    Yeah.  It doesn't warn of a hazard that

20 can be pretty severe.

21     Q.    And it doesn't matter -- it's not

22 relevant to your opinion whether that risk of

23 explosion is already well-known among users of that

24 product?

25     A.    I didn't see anything in the reference

Page 147

1   about the law to say if it's something even -- that
2   everybody knows that you still don't have a duty to
3   warn of it.  The law doesn't distinguish and say,
4   well, everybody knows this, so you don't have to
5   worry about it.  Don't use a hair dryer when you're
6   standing in the bathtub.
7        Q.    Okay.
8        A.    They actually say that in the manual.
9   Look at the hair dryer manual sometime.  They talk
10  about using it in the water and stuff.  There's
11  warnings there.
12       Q.    Luckily -- unfortunately, I should say, I
13  don't use hair dryers very much.  I'll take your
14  word for it.
15            Have you studied any other tanks in the
16  fire protection industry to determine that those
17  warnings are included?
18       A.    They're included on the exemplary tanks
19  for the agent tank that Tyco produces.
20       Q.    Any other tanks?
21       A.    Yes.  I have -- I have Amerex tank.  I
22  have -- bought some fire extinguishers.  I just
23  looked at the labels on the fire extinguishers we
24  have, we have on fire trucks at the firehouse.  I
25  just looked at a smattering of things.  And there's

Page 148

1   information in there.  Warnings on the label, the

2   agent tank that Tyco makes has warnings.  The Amerex

3   tank has warnings.  So --

4        Q.    And the warnings specifically say that

5   overpressurization can lead to explosion?

6        A.    I don't know that they say that in so

7   many words, but they give you a max pressure.  They

8   warn of the hazard and so forth.  Whether

9   overpressurization explosion is specifically on

10  there, I don't know.  But it's effectively telling

11  you don't overpressurize it.

12       Q.    Next, on page 45 is a lack of description

13  of test tank intended use.  Is your opinion based on

14  the assumption that a description of the intended

15  use of the product would have changed the way that

16  the tank was handled in this case?

17       A.    I believe if you look at NFPA 10, it says

18  that you shall not use a fire protection tank for

19  anything other than intended use.  And since the

20  intended use isn't defined, you really can't use

21  that test tank for anything.

22       Q.    Even if it's well-known in the industry

23  that test tanks are used for testing piping

24  integrity?

25       A.    NFPA 10 doesn't say that.  NFPA 10 says

1    fire protection tank should only be used for their

2    intended use.  And if there's no statement of the

3    intended use, it's another one of those nothing

4    things.

5         Q.    And your opinion on this is based on NFPA

6    10?

7         A.    I believe it's in 10.  I don't believe

8    it's in 11.  I believe that's in 10.

9         Q.    If we look at 65, and we'll -- I'll be at

10   a good point for a break here very soon.  But if we

11   can just finish out these questions.

12             65, you list several other deficiencies

13   that you see in the manual.  We've done intended

14   use.  That's NFPA 10 that requires that.

15        A.    What page are you on?  I'm sorry.

16        Q.    I'm on page 65.  Because my question was

17   going to be you say NFPA requires description of

18   use, and I gather that's in NFPA 10?

19        A.    Is that the reference that I cull out --

20   on page 65.

21        Q.    I don't think you were specific, so I was

22   going to ask you that.

23        A.    I just did a search on NFPA 10.  C.1.3

24   says marking clearly the intended use.  It's in 10.

25   It's in 10 in different places, I think.

```
                                          Page 150
1        Q.    The next is the manual does not provide
2    for -- necessary to perform required service at six
3    month intervals.
4              Is the basis for that opinion -- strike
5    that.
6              Is the reason that you believe that the
7    manual is defective because in NFPA 17A they
8    reference the balloon test so in the manual you have
9    to have a step-by-step on how to perform that?
10       A.    I think in the Kitchen Knight manual they
11   also mention the piping integrity test being
12   performed twice a year.  Then they don't give you
13   anything about how to do it.
14       Q.    Because it's culled out in the manual, it
15   also needed a step-by-step?
16       A.    The manual is the authoritative source.
17   Just like under chapter 5 recharge we were looking
18   at before.  System recharge.  It says, step one,
19   after discharge, inspect the entire system for
20   damage.  Yada-da-da-da.  Number two, disconnect the
21   quarter-inch actuation tubing.  And then there's
22   more.  Number three --
23              (Court reporter requested clarification.)
24       A.    Number three is relieve the pressure from
25   the top chamber of the tank valve by depressing the
```

Page 151

1    core of the valve.  And then there's something to

2    follow.  And there's 10 steps in the manual.

3         Q.   I understand.  I don't need you to read

4    the manual to me.  I'm trying to get through this as

5    quickly as possible to let you go on with your day.

6    I'm just asking, is your opinion based on the fact

7    there's not a step-by-step instruction on how to

8    perform the piping integrity test?

9         A.   It's silent.

10        Q.   Is that why you believe the manual is

11   deficient in that respect?

12        A.   Yes.

13        Q.   Would it affect your opinion if it's

14   common knowledge in the fire protection industry how

15   to perform the piping integrity balloon test?

16        A.   No.  Because the 17A and 10 both say that

17   the authoritative reference is the manual and it

18   needs to have the instructions to safely perform

19   those functions and a trained person has to be

20   trained to the manual.

21        Q.   Your report says that with greater

22   attention given to the age agent tanks as compared

23   to the test tanks?

24        A.   What --

25        Q.   I don't have it in front of me.  I'll

Page 152

1    just ask you in general.  Your overall opinion is
2    because the manual and other aspects of warnings
3    give more attention to agent tanks as opposed to
4    test tanks that it could be interpreted that agent
5    tanks are more dangerous than test tanks?
6         A.    Yeah.  I think that leads to complacency
7    which is a contributing factor.  And I believe I
8    cited some information from the depositions.
9         Q.    I'm just asking if that's what your
10   opinion is.
11        A.    Yeah, yeah.
12        Q.    My question is:  What is the basis for
13   your opinion that the differential treatment of
14   those two tanks leads to complacency?  I just want
15   to make sure, are you looking through your report or
16   is there anything else you're looking at?
17        A.    Yeah, I'm looking through the report.
18        Q.    If it helps, I believe it's at page 25.
19        A.    26.  Mr. Foust testifies, "What I was
20   doing the day of the accident doesn't actually apply
21   anything to do with fire extinguishers.  I was just
22   filling the cylinder with air."  And Mr. Harding,
23   who is the Johnson Controls technical support fellow
24   does the training, says have you ever been used --
25   have you ever trained in the use of such tanks,

Page 153

1    meaning the test tanks.  And the training I have

2    received is on a fire suppression tank not a test

3    tank.

4              And he goes on to -- the question is,

5    when you reference that the training you have

6    received has not been -- has been on a fire

7    suppression tank, can you clarify what type of tank

8    you're talking about.  Sure, there are several tanks

9    in the fire suppression system.  They're full of

10   liquid agent that are used for purposes of

11   suppressing the fire.  It's a component of the fire

12   suppression system.

13             Then the question is, now, as part of the

14   fire suppression system, is the test tank a part of

15   the system or not.  And he says it's not.  It's

16   clearly listed in the manual as a component of the

17   system.  But as per factory certification training

18   classes are concerned, did any of those factory

19   certification training classes encompass the subject

20   matter in using the test tank.  No.  Then there's a

21   similar exchange with the director of engineering.

22        Q.    Mr. Taranto, I just -- I don't need you

23   to read from the report.  If I need you to, I'll let

24   you know.  I'm trying to get us out of here as

25   quickly as possible.

1      A.    I want to be clear here.  You said it's

2   my opinion.  It's not just my opinion.  These people

3   testified.  And if you read their testimony, it's

4   showing they don't have the same respect for an air

5   tank that they have for an agent tank.

6      Q.    So you are observing that complacency as

7   a contributing factor, it's not your opinion that

8   you're making in this case?

9      A.    Right.  It's both.  It's an opinion, an

10  observation.

11     Q.    Is there anything that -- is there

12  anything your expertise or background allows you to

13  conclude that complacency is a contributing factor

14  as opposed to just what these people are saying?

15     A.    Complacency is a contributing factor

16  defined in various references for the root cause

17  analysis.  And it's true of everything.  I mean, I

18  was training a guy to run a fire pump one day on an

19  engine.  And he went and shut the pump down and he

20  reached up with his foot and he kicked the valve

21  closed and the fire hydrant came three feet out of

22  the ground.  And it was because he was complacent.

23     Q.    Just to be clear, you're not opining as

24  an expert in human psychology, right?

25     A.    No.  I have some knowledge of it.  It's a

Page 155

1   component of the root cause analysis that I made

2   these observations and it certainly seems to be a

3   contributing factor in this instance.

4        Q.    So you read these depositions and

5   concluded complacency is a contributing factor?

6        A.    Which is something if you review the

7   literature on root cause analysis is something that

8   you should look for.

9        Q.    When you refer to the literature, is that

10  the DOE standard Department of Energy standard?

11       A.    And there's also another book I have on

12  the subject.  I've got a couple of books on it.  I

13  don't know how many I put in the reference, but

14  they're in the reference in the end, the end notes.

15       Q.    Do you have off the top of your head the

16  names of those books?

17       A.    It's right in the end notes in the back.

18       Q.    So there's nothing outside of the end

19  notes that would contain -- that you were relying

20  on?

21       A.    It's actually -- it's not in the end

22  notes.  It's in appendix X.  And it's Latino, Latino

23  and Latino, "Root Cause Analysis Improving

24  Performance for Bottom Line Results."  CRC Press,

25  Taylor & Francis.

```
                                            Page 156
 1            MR. KIRKPATRICK:  Why don't we, if you're
 2       done with that answer, why don't we go off the
 3       record for five minutes?  Come back shortly
 4       after 2:50.  Sound good?
 5            THE WITNESS:  Sounds great.
 6            (A recess was taken from 2:46 p.m. to
 7       2:52 p.m.)
 8       Q.    We are ready to turn to page 46 which is
 9  contributing factor training.  Actually, it's a
10  different part of your report, but I don't think we
11  need to look at it.  You agree that so-called buddy
12  training is inappropriate, right?
13       A.    Yeah.  I mean, buddy training can be
14  good, can be bad.  And you have no way of knowing
15  which is which.
16       Q.    So that's why it's not best practice?
17       A.    Not best practice.
18       Q.    So at page 46 you contend that Tyco Fire
19  Products' failure to train on test tanks is a
20  contributing factor to this event?
21       A.    Yes.
22       Q.    Just as an initial question, you're aware
23  that neither Mr. Scott nor Mr. Foust nor Mr. Buono
24  received training from Tyco Fire Products?
25       A.    Yes.
```

Page 157

1      Q.    But it's still a contributing factor
2    because it's in the chain?
3      A.    Yes.
4      Q.    As in it was a contributing factor that
5    they weren't trained and also a contributing factor
6    that if they were trained, it wouldn't have included
7    the right stuff?
8      A.    Yes.
9      Q.    What is the basis for your opinion that
10   Tyco had an obligation to provide training on the
11   test tank?
12     A.    Because the test tank is listed as part
13   of a system and it's involved in the maintenance of
14   the system and the NFPA 17A and 10 both require that
15   the manual include all those things that are
16   necessary to maintain and service the system.  And
17   according to the deposition of Mr. Harding, the
18   technical support rep in charge of training, he
19   says, our primary resource for the training is the
20   manual.  And he said, we looked back and there was
21   never any training on test tanks.
22     Q.    So your understanding for why it was up
23   to Tyco -- I guess, what's your understanding for
24   why it was Tyco's responsibility to provide training
25   as opposed to someone else?

1    A.    Because the tank was produced by a fire

2    protection company, sold into the fire protection

3    market, used in a fire protection system being

4    serviced by an unauthorized fire protection company

5    and the NFPA 17A and 10 both clearly say that the

6    manual is the reference for the maintenance and

7    other functions of the system and that a trained

8    person has to be trained to the manual and none of

9    that happens in relationship to the intended use of

10   the test tank.  I mean somebody could say I'm going

11   to use the test tank to flush the system.  Well,

12   that won't work because the test tank doesn't have a

13   syphon tube in it anywhere.  That whole space is

14   just a void.

15       Q.    Am I right that the basis for your

16   opinion that Tyco's training is deficient is because

17   Tyco's manual is deficient?

18       A.    Well, not solely.  The manual is

19   deficient.  Mr. Harding says we looked back and

20   we've never done any training on the tanks so there

21   was nothing additional on that subject in the

22   training.  At one point he said he's never been

23   trained on a test tank.

24       Q.    In terms of NFPA 17A or NFPA 10 where

25   does it say that Tyco is responsible for training on

Page 159

1    all things in the manual?  Or rather, I should

2    say -- so you're saying because it's not in the

3    manual, you couldn't have trained on it?

4        A.    It's another one of those nothing things,

5    yes.  It says under definition, the manual is the

6    document referred for design, installation,

7    maintenance of the listed chemical agent equipment.

8    And a trained person is trained to the manual and

9    the manual is produced by the manufacturer.

10       Q.    So it's the same reasons that the manual

11   is deficient and because Mr. Harding in his

12   deposition said that they don't train on the

13   manual -- rather, on the test tanks?

14       A.    It would be different if he said, I know

15   the manual doesn't say anything about the test tank,

16   but here's our PowerPoint presentation, and here's

17   what we teach them about the test tank in the

18   training.  That would be different, right?  It's

19   absent in both places.

20       Q.    If it were in either place -- let's say,

21   for example, it were in the training, would the

22   manual then be acceptable?

23       A.    I think the manual would still be

24   deficient.  But at least people would be trained on

25   how to do the proper maintenance when it comes to

```
                                          Page 160
 1    the use of the test tank. RANTO
 2         Q.    You mentioned, I believe, earlier that
 3    NFPA 17A requires service technicians to have
 4    training that's acceptable to the jurisdiction
 5    having authority?
 6         A.    Yes.
 7         Q.    Right?  And does that training typically
 8    include how to properly conduct routine maintenance
 9    on the system?
10         A.    I really didn't look into that training.
11    I know that Mr. Scott in his deposition said that he
12    was trained once every three years at a company from
13    the Baltimore area who I presume is recognized by
14    the authorities having jurisdiction and that -- and
15    what that training includes, I don't know.
16         Q.    Why do you presume that it is recognized
17    by the authority having jurisdiction if you haven't
18    seen a document to that effect?
19         A.    Well, I don't know how the company could
20    have been in business for -- they've been in
21    business a long time and that's what they do is
22    training.  I don't see how they could be in business
23    doing training unless the authorities having
24    jurisdiction said you were trained by FPC or
25    whatever that company was, hey, that's good.  So I
```

Page 161

1    didn't look at that. T. TARANTO

2         Q.    Okay.

3         A.    Because we're really not talking about

4    third-party training here.  But the NFPA standards

5    don't say you have to be trained by the

6    manufacturer.  You have to be trained by someone and

7    in a process that is acceptable to the authority

8    having jurisdiction and there are third-party

9    training companies out there.

10        Q.    And if the third-party training companies

11   out there trained on how to use a test tank, would

12   you still believe that Tyco's training is deficient?

13        A.    Yes.

14        Q.    Because it should be both --

15        A.    Because maybe I elect to go to Tyco

16   training and I don't get trained by the third party.

17        Q.    But if, for example, Mr. Scott were to

18   have been trained by the third party, trained in how

19   to use the test tank, would it still be a

20   contributing factor to this case that Tyco's

21   training didn't have a description of how to use the

22   test tank?

23        A.    Yeah, I think it would.

24        Q.    And that's because --

25        A.    The standards required the manual to be

Page 162

1    the reference.  It's the authoritative reference.

2    And required them to train -- required Tyco to train

3    people to maintain recharge and do the various

4    functions of the system.

5         Q.    Do you agree that the CGA standards

6    require that anyone involved in transfilling should

7    be properly trained in how to do so?

8         A.    They do.  But then again, you get into

9    that business question.  Is their a business gas

10   supply or they're a business supplier --

11        Q.    And --

12              (Simultaneous crosstalk.)

13        A.    It's required in both places.  It's

14   required by NFPA.  It's also required by CGA.

15        Q.    And the fire code, right?

16        A.    And the fire code and in 17A and 10.

17   They have to be trained in --

18        Q.    So if we could look at Exhibit 5.

19        A.    Okay.

20        Q.    If you look at -- it's page 8 at the top

21   left and it's 5.7.

22        A.    5.7.

23        Q.    And this is transfilling.  The transfer

24   of gases from one container to the other shall be

25   performed only by the gas supplier or by personnel

```
                                          Page 163
 1    who shall be trained in the use of the equipment?
 2         A.    Yes.
 3         Q.    Do you agree this is not confined just to
 4    the use of the gas supplier?
 5         A.    No.  It applies to anyone who is doing
 6    transfilling.
 7         Q.    Have you ever designed a curriculum --
 8    rather, have you ever been involved in a training
 9    that you would say is compliant with NFPA 17A?
10         A.    No.
11         Q.    Have you ever designed or been involved
12    with any training that is specific to a particular
13    NFPA standard?
14         A.    Yeah.  I can't cite the standards by
15    number but I was -- I was involved -- I was in the
16    chiefs' ranks, the fire department, for 12 years,
17    two years as chief and I was involved in the
18    training on a wide range of topics at the firehouse,
19    all of -- many of which have some element of NFPA
20    requirements pump out of emission and such.
21         Q.    It's not a training specific to a NFPA
22    standard?  They have elements of the NFPA standards
23    embedded in them?
24         A.    There's specific requirements for certain
25    trainings.
```

                                                    Page 164

1        Q.    And you've been involved in designing
2   those trainings?
3        A.    I've been involved in designing and
4   offering those trainings, yeah.  To the men of the
5   fire department.
6        Q.    Other than the NFPA standards, is there
7   any other -- strike that.
8             Other than looking at the regulations
9   themselves, is there anywhere else that you would
10  look to see what should be included in a
11  manufacturer's training?
12       A.    Manufacturer's training for --
13       Q.    A manufacturer training like the one
14  we're talking about in the report?
15       A.    For what, system maintenance?
16       Q.    Yeah.
17       A.    I guess if I was going to -- if I was
18  going to address a training like that, a starting
19  point would be obviously the NFPA 10 and 17A, 17.
20  And then from there the New York State Fire Office
21  has tons of resources that you can call and you can
22  contact somebody there and say what have you got on
23  restaurant systems trainings and so on and so forth.
24  There's other avenues that you can get resources to
25  do that type of thing with.

1       Q.     You have not -- I may have already asked
2    this, I apologize if I have.   You haven't been
3    involved in training specific for pre-engineered
4    chemical suppression -- fire suppression systems?
5       A.     No.
6       Q.     In terms of on page 66 which is 8.3.1.1,
7    you state that the omission of required procedures
8    was a contributing factor to this event, right,
9    because Tyco did not provide step-by-step
10   instructions on how to fill the tank?
11      A.     That ten steps on how to do the recharge,
12   they don't have any steps on the balloon testing or
13   handling the tank and refilling it or anything.
14      Q.     What is the basis for your opinion that
15   it was Tyco that was supposed to provide the
16   instructions on how to fill the test tank?
17      A.     If you look at NFPA 17, it's the
18   manufacturer's responsibility to have a manual that
19   has all that stuff in it.   It's the reference.
20      Q.     So the key sources for these obligations
21   are the definition of the manual and the definition
22   of trained?
23      A.     Right.   The testimony of what Tyco does
24   in their training and doesn't do.
25      Q.     You're not opining that Poseidon was not

Page 166

1    obligated to provide step-by-step instructions on

2    how to refill using their system?

3        A.    It's actually transfill from their

4    system.  Not refill.

5        Q.    Right.  Transfill.  You're not saying

6    that they weren't required to do that?

7        A.    No.

8        Q.    If you had their step-by-step, you could

9    opine on whether that was a contributing factor?

10       A.    Right.

11       Q.    So we've talked about how there are many

12   ways to fill a tank depending on the type of

13   equipment you have?

14       A.    Right.

15       Q.    Is it your contention a description of

16   all of those should be in the manual?

17       A.    No.  I think that filling from

18   compressors would be one area.  And I think

19   transfilling should be in the manual as well because

20   if you look at the -- both the NFPA standards and

21   some of the texts in the manual, it says for the

22   agent tanks, they have to be charged with nitrogen.

23   And the description of doing the piping integrity

24   check in 17A, it says that you should use dry air or

25   nitrogen.  So if you use nitrogen to fill an agent

Page 167

1   tank or if you use nitrogen to fill an air tank,

2   nitrogen is a transfilling operation and the

3   nitrogen tanks that you typically buy are 2,000 psi

4   and higher full of nitrogen.

5            So filling the agent tank off of a 2,000

6   psi nitrogen system should be included and filling a

7   test tank off a 2,000 psi nitrogen system or higher

8   should also be included in my opinion.  Because

9   that's a very foreseeable thing because you have to

10  fill the agent tank with nitrogen.

11       Q.   So any foreseeable way that you could

12  fill the tank you think should be included?

13       A.   Something that would be foreseeable to

14  the manufacturer and certainly transfilling from a

15  nitrogen bottle cascade system is very foreseeable

16  to the manufacturer because they have to do it in

17  the agent tank and it's allowed in the test tank.

18       Q.   And it's your contention that it's not

19  just Tyco who have this obligation but any

20  manufacturer?

21       A.   Right.

22       Q.   Have you ever seen a product manual for a

23  pre-engineered fire suppression system that you

24  believe meets the requirements of the NFPA including

25  instructions for filling?

Page 168

1        A.     I haven't researched that.

2        Q.     We can look now at page 47.  I think I

3   already got your answer on this.  I want to circle

4   back.  Sorry.  You're saying both Poseidon and Tyco

5   had an obligation to provide step-by-step

6   instructions?

7        A.     Yeah.

8        Q.     Now page 47, this is a contributing

9   factor is a lack of product labeling.

10       A.     Right.

11       Q.     So you rely on the regulations that we've

12   discussed, the industry standards we've discussed in

13   forming your opinions as to what should have been

14   included on a label; is that right?

15       A.     Yes.

16       Q.     And primarily in NFPA 10?

17       A.     And 17A.

18       Q.     Where do you rely on 17A?

19       A.     Actually, it's actually in 10 because if

20   you do a search on 17A under nameplate, nameplate

21   doesn't exist in 17A.  The only place a nameplate

22   exists is in NFPA 10.  So the requirements to have

23   the gross weight after the tank is filled and the

24   charge pressure and the maximum pressure and all the

25   different things that are on this label here for the

Page 169

1    agent tank, that's not there out of the goodness of

2    Tyco's heart.  That's there because it's required in

3    NFPA 10.  And NFPA 17A is part of NFPA 10.

4              And similarly, a similar label with this

5    tank should only have dry air or nitrogen in it.

6    And it should only be pressurized to this level.

7    And they should only be used for testing and so

8    forth.  Very simple label like that similar to this

9    one but with the specifics for the test tank is

10   certainly a reasonable thing to have and I believe

11   because the test tank is also part of the fire

12   suppression system, my opinion is it's required by

13   NFPA 10 because 17A and 17 are part of NFPA 10.

14        Q.    So your understanding of what Tyco was

15   required to do and your opinions as to what should

16   have been on the tank itself come from NFPA 10 and

17   17 by virtue of it being incorporated?

18        A.    Yes.

19        Q.    When you said Tyco didn't include this

20   out of the goodness of their heart, do you mean

21   generally manufacturers only label things as

22   required by the regulations?

23        A.    Right.  And I believe one of the expert

24   reports that I read -- I don't know if it was

25   Mr. Christensen or Dr. Christensen or who -- said,

1  oh, yeah, he's got this label in his report, but

2  Tyco is not required to put that label on that tank.

3  So he was opining that Tyco could produce an

4  unlabeled agent tank.  And that's clearly not the

5  case.

6       Q.    Well, but what I'm asking is when you

7  said, you know, they're not doing it out of the

8  goodness of their heart, you're saying manufacturers

9  put labels on things because the regulations require

10 them to do so?

11      A.    Because the regulations require them.

12 Because they have a duty to warn.  You ever seen the

13 labels on a step ladder?

14      Q.    Not off the top of my head.

15      A.    Look at your step ladder when you get

16 home.  Look at all the warning labels on it.  Don't

17 put it on tilting ground and all kind of labels on

18 it.

19      Q.    So your opinions on what should have been

20 included in the label is basically whatever NFPA 10

21 says should have been on the label?

22      A.    Right.

23      Q.    Did you look anywhere else to determine

24 whether -- what should be included on the label?

25      A.    Again, it's made by a fire protection

```
                                        Page 171
```

1   company.  It's sold in the fire protection industry.

2   It's used in a fire protection system.  If it looks

3   like a duck, walks like a duck, it's a duck.

4        Q.    The answer to that is no, just to be

5   clear?

6        A.    Yes.

7        Q.    In terms of warnings generally, do you

8   agree that the effectiveness of a warning can be

9   affected by things like the language that's used on

10  the warning label?

11       A.    Oh, yes.

12       Q.    And the syntax and the emphasis?

13       A.    Yes.

14       Q.    The way that the user perceives the

15  complexity or cost with complying with the label?

16       A.    Yes.

17       Q.    And all sorts of other things affect how

18  effective a label is.  You did not analyze those

19  types of factors in terms of determining whether

20  this label would have actually been followed?

21       A.    No.  I mean -- I don't know that there's

22  relevance.  If there was a label there and the label

23  was poorly done, then some opining on the label and

24  the fonts used and the pictures and yada-da-da-da

25  might be appropriate.  But the fact that there is no

Page 172

1   label was pretty fundamental.

2       Q.    Am I right that as with the manual and

3   the training, it doesn't matter whether this label

4   would have been followed for it to be a contributing

5   factor, right?

6       A.    Right.

7       Q.    And again, on page 68 you discuss the

8   manufacturer's general duty to warn.  Again, that's

9   your understanding of the law, right?

10      A.    Yes.

11      Q.    And is there -- and outside of the

12  context of the fire protection industry,

13  manufacturers -- how do they know when they have a

14  duty to warn?

15      A.    You should read that article that I

16  referenced.  The second part of that was the

17  conundrum of labeling for manufacturers.  And the

18  thing is that it's not a -- it's not a clear-cut

19  thing.  I read the article and certainly, you know,

20  I'm -- I did a little bit of research in that arena,

21  but I'm not an expert in that.  But, you know

22  it's -- yeah.  It's question mark.

23      Q.    Your understanding is that Worthington

24  actually made this tank, sold it to Tyco and then

25  Tyco sold it?

Page 173

1        A.    No.         T. TARANTO

2        Q.    No, that's not your understanding?

3        A.    Worthington mailed the cylinder.

4        Q.    Right.  Right.

5        A.    The cylinder went out of Worthington

6    without a valve on it.  It became a tank when Tyco

7    put a valve on it and designed it for the use in the

8    fire protection system.  That's when it became a

9    fire protection tank.  From Worthington it was a

10   cylinder, a 4BW 225 cylinder made to that end number

11   and that's what it was when it left Worthington.

12       Q.    Did Worthington know that it would be by

13   Tyco in its pre-engineered fire suppression system?

14       A.    I think that tank was made.  I think

15   there's testimony that that tank was made only for

16   Tyco.  So -- and they presumably would know and have

17   an application for it.

18       Q.    Do you think that Worthington had a duty

19   to warn under the NFPA standards and that they

20   should have put in a label?

21       A.    No.  Because they're not a fire

22   protection company.  That particular division makes

23   DOT cylinders and they fulfill all the DOT

24   requirements having the 4BW testing one out of every

25   500 tanks to 900 psi or 1,000, whatever it was.  And

Page 174

1  all the requirements of making the cylinder Tyco

2  met.

3      Q.    And NFPA 10 doesn't apply to Worthington?

4      A.    Right.  Right.  Worthington -- the

5  requirements of the cylinder.  It doesn't become a

6  fire protection tank until Tyco applies it and

7  introduces it into that market.

8      Q.    Because your opinions are specific to

9  what the NFPA requires, Worthington is not subject

10  to the NFPA, ergo, they didn't need to include a

11  nameplate?

12      A.    Right.  The requirements that they -- the

13  requirements that the Code of Federal Regulations

14  for the markings on that DOT cylinder were done by

15  Worthington.  It's stamped into the valve end of the

16  head.

17      Q.    I believe we've covered this, but when

18  you say in your report that the NFPA standards

19  require name plates, you're referring to NFPA 10?

20      A.    Yes, the word nameplate doesn't appear in

21  17A.

22      Q.    And we just discussed earlier today the

23  gas supplier's duty to warn?

24      A.    Right.

25      Q.    If we assume that Oprandy's or we can

Page 175

1    abstract if we assume that a company is a gas

2    supplier, you would agree that they would have the

3    duty to warn of foreseeable issues with the product?

4         A.    Right.  And under CGA I think that they

5    have to put the diamond with the cylinder picture on

6    it and the pressure hazard or whatever.  I mean, the

7    CGA has specific requirements that are necessary for

8    them.

9         Q.    Essentially the gas supplier has to

10   follow those CGA standards?

11        A.    Right.

12        Q.    And you do not have -- other than, you

13   don't attempt to design a label, right?  You're just

14   saying the label that was on -- the nameplate that

15   was on the agent tank should have been on the test

16   tank?

17        A.    Or something similar to it.  Something

18   that applied to -- I mean, I'm saying that the NFPA

19   10 calls for a nameplate on a fire suppression tank.

20   The test tank is listed in the manual as a component

21   of the fire suppression system.  It should have a

22   label on it.  The content of the label should be

23   consistent with the requirements of NFPA 10 and

24   that, you know would be the gross weight and so

25   forth and things, and it would be a label similar to

Page 176

1    the one they put on the agent tank.

2         Q.    Are these labels similar to the labels

3    that are on hand-held fire extinguishers?

4         A.    Yes, they are.  I can show you one if you

5    want.  It's right around the corner.

6         Q.    Is there anything in particular on the

7    warning label that you -- that in particular you

8    believe would have prevented the accident or are you

9    just saying that by not having this it was a

10   contributing factor?

11        A.    Right.  It's not a root cause.  If

12   it's -- it by itself is going to prevent the

13   accident, then it's a root cause.  It's a

14   contributing factor.

15        Q.    So there's no particular -- if we look at

16   the NFPA -- rather, the label that was on the agent

17   tank, there's nothing you would point to and say

18   this specific thing should have been included on the

19   test tank?

20        A.    NFPA points out what should have been --

21        Q.    I'm sorry.  I misspoke.  Not should have

22   been on the test tank but what would have prevented

23   the accident from occurring.

24        A.    Now I'm confused, I guess.

25        Q.    I'll start over.  In the context of --

1   because this is a contributing factor and not a root

2   cause, there's not anything on this label that you

3   can point to and say, this would have prevented the

4   accident if it were on the test tank?

5          A.    Right.

6          Q.    So you're not contending that any of the

7   things on the agent tank label, had they be on the

8   test tank label, would have, in fact, changed the

9   way that Chris Foust filled the system, for example?

10         A.    Right.  Right.  I'm not contending that.

11  If that were the case, then it would be a root

12  cause.

13         Q.    Your report doesn't cite to any CGA

14  standards, does it?

15         A.    No.  Because the experts introduce the

16  CGA standards and, yes, they do apply, but is the

17  business a gas supplier, you know, I suppose that's

18  something that could be debated.  But it is clearly

19  a fire protection tank.

20              MR. KIRKPATRICK:  Let's take ten minutes

21         and I should hopefully be very close to

22         wrapping up.  Why don't we come back at 3:35?

23              THE WITNESS:  That sounds great.

24              (A recess was taken from 3:26 p.m. to

25         3:37 p.m.)

```
                                        Page 178
```

1          MR. KIRKPATRICK:  I have hopefully just a

2      few more questions.

3      Q.    I want to go back to your CV which is

4   appendix C.  So from 1976 to 2000 you worked for

5   Tri-Line Corporation?

6      A.    Yes.

7      Q.    I know this is very broad, it's a long

8   time you worked for Tri-Line Corporation.  What were

9   your general job responsibilities there?

10     A.    I was a sales engineer for hydraulic and

11  pneumatic equipment and we applied hydraulic

12  systems, pneumatic systems, air compressors for,

13  like I said, a wide range of applications.  Anything

14  from a packaging machine to a pharmaceutical

15  application where we used the air to grow penicillin

16  bugs to car crushers.  We had a request one time,

17  they built a hotel in Niagara Falls with a

18  restaurant that revolved on top.  They wanted to

19  turn the whole hotel.

20     Q.    And you told them no?

21     A.    Every room is a Falls view room then if

22  the whole hotel is turning.  It turned out that's

23  not hard to do.  The difficult thing is to stop it

24  once it is turning.  We designed systems for just,

25  you name it, some of the craziest stuff.

```
                                              Page 179
 1        Q.    So generally designing hydraulic and --
 2   what was the other word you said?
 3        A.    Pneumatic systems.  Compressed air
 4   systems.  Again, everything from the missile grade
 5   air system to Stennis Space Center to running
 6   packaging machines in a potato chip plant.
 7        Q.    Did you in the course of that, do any
 8   work in the fire protection industry?
 9        A.    Yes, mainly dry sprinkler systems because
10   they use compressed air to keep the water out of the
11   pipes until there's a fire.  They do that in
12   warehouses and unheated buildings that will freeze
13   up otherwise.  It's the primary application.
14        Q.    Was that a large percentage of your work
15   at Tri-Line?
16        A.    No.
17        Q.    And then in 2000 you went to
18   Pneumatech --
19        A.    Right.
20        Q.    -- in Wisconsin?
21        A.    Yes.  I actually continued to live here
22   in Syracuse.
23        Q.    Okay.  Was there a reason that you went
24   from Tri-Line to Pneumatech?
25        A.    Tri-Line was a distributor for a product
```

Page 180

```
 1    that Pneumatech manufactured related to optimizing
 2    compressed air system performance.  And Pneumatech
 3    had actually contracted with Tri-Line for me to work
 4    on some of their projects.  They made me an offer to
 5    become a partner in the company.  So professionally
 6    it was a good move.  And I left Tri-Line very
 7    amicably.  I mentioned the Six Sigma project on the
 8    big jet engines that drive the turbine power plants.
 9    After I left Tri-Line, Tri-Line contracted with
10    Pneumatech for me to continue working on that Six
11    Sigma project with GE.  So it was all very amicable.
12         Q.    And in your work there, did you do any
13    work in the fire protection industry?
14         A.    Again, just related to where compressors
15    or compressed air is applied to fire protection
16    systems.  Again, not a big piece of it.
17         Q.    Do you have an estimate for how many of
18    those types of projects you worked on?
19         A.    Oh, usually it was in the context of
20    doing the entire plant compressed air system.  Many
21    of them, I'd say many -- maybe 50 or 75 had
22    components where they use air over here for fire
23    protection as well.  But it was dealing mainly with
24    the main plant air system.
25         Q.    And then at Data Power Services, that's
```

                                                      Page 181

1    your own -- that's your own business, company?

2         A.    Yes.

3         Q.    In terms of the -- I'm sorry.  In terms

4    of the sprinkler systems you were talking about, it

5    would be a part of your compressed air system, you

6    didn't actually design the sprinkler system?

7         A.    No.

8         Q.    Back to Data Power Services, that's your

9    own company?

10        A.    Yes.

11        Q.    Do you have any employees?

12        A.    No.

13        Q.    Can you just kind of generally describe

14   what you do at Data Power Services?

15        A.     There's really a few elements.  I do

16   training for compressed air system designed

17   primarily for improving efficiency, but also

18   improving performance and reliability.  I'm a

19   trainer for the Department of Energy.  I'm a trainer

20   for a group called Compressed Air Challenge.  I'm a

21   trainer for the United Nations industrial

22   organization and I train globally for, again,

23   compressed air system performance and efficiency

24   improvements.  And so the training is one component.

25              And then I also do compressed air system

Page 182

1    assessments where I will work with clients to do a

2    lot of root cause analysis to achieve whatever their

3    goal is, make their production lines run better,

4    make the system more reliable, whatever it is.  And

5    those are, you know, those are really the two

6    primary areas of the business.

7            I also mentioned I have a company that

8    makes portable data loggers and packages transducers

9    because in the process of doing root cause analysis

10   on compressed air systems, I developed instruments

11   to make measurements and gather the data.  And after

12   many years of beating off customers that wanted to

13   buy the stuff, I said maybe we'll start making it

14   and selling it.  So that's another relatively small

15   component of what I do.  It's all word of mouth.

16   It's built to order.  And so we will help customers

17   with data acquisition systems.

18           Actually have one client right now where

19   they make polyester thread and we're working on a

20   computer system to monitor the polyester area and

21   provide real time advisories to the operators about

22   the operating conditions and so forth.  So actually

23   there will be an embedded computer installed and so

24   forth.  Those are really the three areas that I deal

25   in.

```
                                        Page 183
 1        Q.    Again, in any work while you've been at
 2   Data Power Services specific to the fire suppression
 3   industry?
 4        A.    Again, just as an adjunct usually to
 5   industrial system.
 6        Q.    When it's an adjunct to an industrial
 7   system, you're not involved in actually designing or
 8   servicing or building the fire suppression aspect of
 9   it, right?
10        A.    Right.
11        Q.    And then in terms of your professional
12   experience -- and you have several things listed
13   here, it's on C 94.  We don't need to go through all
14   of them.
15             But do any of these listed here involve
16   the fire protection industry or have you in the
17   course of your professional experience consulted,
18   worked on, anything like that for the fire
19   protection industry?
20        A.    No, not really.  I mean, my area of
21   expertise is fluid power.  So I've worked on -- my
22   work is involved on the hydraulic or the compressed
23   air side of things.  As I mentioned, I've worked
24   with compressed air systems, everything from systems
25   on board submarines to systems that, like I
```

Page 184

1  mentioned, the missile grade air system at Stennis

2  Space Center.  You know, Stennis has 12 miles of

3  pipe operating at 2,500 psi.  It's a major, major

4  league system both in terms of size, pressure and

5  power.

6          When the fellow asked me about that to

7  see if I would work with him, he told me what he had

8  and I said where did you get my name.  He says, I

9  was talking with an engineer at Oak Ridge National

10  Labs and he said there were only two people in the

11  country he knew of that could deal with our system.

12  And he hadn't called the other guy yet.

13      Q.    Then in terms of your experience as an

14  instructor, those things listed here, not your

15  volunteer firefighter experience, are any of these

16  specific or have they been specific to the fire

17  protection industry?

18      A.    No.  Only in the context of maybe how the

19  compressed air system interfaces with a dry

20  standpipe system.  Again, the focus is the fluid

21  power side of things.

22          MR. KIRKPATRICK:  I am done.  So I'm

23      ready to pass you and I thank you for your

24      time.  I appreciate it.

25          THE WITNESS:  Yes, thank you.

```
                                              Page 185

1              MS. FAPPIANO:  Can we go off the record

2        for just one sec?

3              (Discussion held off the record.)

4              (A brief recess was taken at this time.)

5              MR. FROMSON:  We are agreeing to

6        reconvene tomorrow at 9:00 a.m.

7              (Whereupon, the proceedings were

8        adjourned at 4:00 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 186

1                        **J U R A T**

2

3

4              I do hereby certify that I have read

5        the foregoing transcript of my deposition.

6

7        _____

8                      THOMAS TARANTO

9

10

11   Sworn and subscribed

12   before me

13   this _____ day of

14   _____, 2020.

15   A Notary Public

16   of the State of _____

17

18

19

20

21

22

23

24

25

Page 187

1

2                        I N D E X

3

4    WITNESS                  EXAMINATION BY        PAGE

5    THOMAS TARANTO        MR. KIRKPATRICK            5

6

7                      E X H I B I T S

8    EXHIBIT        DESCRIPTION              PAGE

9    Exhibit 1     Thomas Taranto's expert      8

10                 report; 121 pages

11   Exhibit 2     NFPA 17A; 15 pages          46

12   Exhibit 3     NFPA 10; 64 pages           52

13   Exhibit 4     NFPA 17; 29 pages           52

14   Exhibit 5     CGA P-1-2015; 29 pages      64

15   Exhibit 6     CGA C-7-2014; 166 pages     69

16   Exhibit 7     extracted portions of 2020  70

17                 NYS Fire Code; 12 pages

18   Exhibit 8     Manual of Style for NFPA     78

19                 Technical Committee

20                 Documents; 43 pages

21   Exhibit 9     DOE root cause analysis      97

22                 document; 69 pages

23   Exhibit 10    CGA S-1.1; 56 pages         110

24   Exhibit 11    Kitchen Knight II technical 121

25                 manual; 53 pages

Page 188

1

2                    CERTIFICATE

3

4    STATE OF NEW YORK )

5                        ) ss.

6    COUNTY OF SUFFOLK)

7

8            I, Elizabeth F. Tobin, a Registered

9    Professional Reporter and Notary Public within and

10   for the State of New York, do hereby certify:

11           That Thomas Taranto, the witness whose

12   deposition is hereinbefore set forth, was duly sworn

13   by me remotely and that such deposition is a true

14   record of the testimony given by such witness.

15           I further certify that I am not related

16   to any of the parties to this action by blood or

17   marriage and that I am in no way interested in the

18   outcome of this matter.

19

20

21

22           ELIZABETH F. TOBIN, RPR

23

24

25

Page 189

1

2    June 25, 2020

3

4                        ERRATA

5

6    PAGE/LINE   CHANGE/REASON

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.