**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FRANKLIN BUONO,     :
    :
        *Plaintiff,*     :     Civil Action No. 7:17-cv-05915 (PMH)
    :
   v.     :
    :
POSEIDON AIR SYSTEMS, VICTORY AUTO    :
STORE, INC., VICTORY AUTO STORES, INC.  :
d/b/a POSEIDON AIR SYSTEMS,    :
WORTHINGTON INDUSTRIES, INC., AND   :
TYCO FIRE PRODUCTS LP,    :
    :
        *Defendants.*     :
    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

TYCO FIRE PRODUCTS LP,    :
    :
       *Third-Party Plaintiff,*   :
    :
   v.     :
    :
OPRANDY'S FIRE & SAFETY INC.,    :
    :
       *Third-Party Defendant.*   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT**
**TYCO FIRE PRODUCTS LP'S MOTION FOR SUMMARY JUDGMENT**

Submitted by**:**

FINKELSTEIN & PARTNERS
Co-counsel for Plaintiff
1279 Route 300
Newburgh,  NY  12551
Tel: (845) 562-0203
Email: kfromson@lawampm.com

# TABLE OF CONTENTS

*Page No.*

PRELIMINARY STATEMENT………………………………….   1

STATEMENT OF FACTS……………………………………….   2

ARGUMENT……………………………………………………..   8

STANDARD OF REVIEW …………………………………………   8


POINT I

PLAINTIFF'S CLAIMS ARE NOT PREEMPTED………………   9

A.    The test tank as an empty packaging is not
       preempted by the HMTA
……………………………………………………………..   10

B.    HMTA does not apply to the test tank
       provided as a testing tool
……………………………………………………………..   12

C.    The preemption language of the HMTA does
       not apply to labelling relating to the test tank
       itself in contrast to labelling relating to the
       hazardous material being transported
……………………………………………………………..   14

POINT II

DEFENDANT HAD A DUTY TO WARN, INSTRUCT
AND INFORM AS TO THE USE OF THE TEST TANK
……………………………………………………………...   15

A.    The risk of explosion was not open and obvious
        to expected users as a matter of law
.……………………………………………………………...   15


B.    Any duty to warn on the part of Oprandy's does
       not eliminate Defendant's duty
.……………………………………………………………...   19

i

POINT III

THE RECORD SUPPORTS FINDING CAUSATION
………………………………………………………………... 22

POINT IV

DEFENDANT FAILS TO MEET ITS BURDEN AS TO
PLAINTIFF'S  BREACH OF WARRANTY AND
MANUFACTURING DEFECT CLAIMS
………………………………………………………………... 25


CONCLUSION………………………………………………….. 25

# **TABLE OF AUTHORITIES**

Page

## **CASES**

### **Federal Cases**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1609, 26 L. Ed. 2d 142 (1970)……………………………………………………9

*Amica Mut. Ins. Co. v. Electrolux Home Prod. Inc*. 440 FSupp 211 (WDNY 2020)………………………………………………………….. 23-24

*Bonnie & Co. Fashions v. Bankers Tr. Co.*, 945 F. Supp. 693, 709 (S.D.N.Y. 1996). …………………………………………………….. 9

*Bryan!* v. *Maffucci,* 923 F.2d 979, 982 (2d Cir.1991)………………………8

*Burke v Spartanics Ltd.*, 252 F3d 131, 138 (2d Cir 2001)…………………………15, 16

*Elder v. Amtrol Holdings, Inc*., 532 Fed Appx 316 (3rd Cir Del 2013)……………14

*Florida Lime & Avocado Growers, Inc. v. Paul*, 373 US 132 (1963)………………13

*Fox v. Cheminova, Inc.,* 387 F. Supp.2d 160 (EDNY 2005)………………………22

*Hurt v. Coyne Cylinder Co*. 956 F2d 1319 (6th Cir Tenn 1992)……………………13

In re *Amtrol Holdings Inc*., 384 BR 686 (US Bankr Ct Dt Del 4/1/2008)………….14

*In re Publ. Paper Antitrust Litig.*, 690 F3d 51, 66 (2d Cir 2012)……………………22

*In re Roach,* 824 F.2d 1370, 1373-74 (3d Cir. 1987)………………………………10

*Liriano v. Hobart Corp*., 170 F3d 264 (2d Circ 1999)………………………………17,18,22

*Lendino v. Trans Union Credit Info. Co.*, 970 F.2d 1110, 1113 (2d Cir. 1992)……..9

*Lyall v. Leslie's Poolmart*, 984 F. Supp. 587, 597-98 (E.D. Mich. 1997)…………..13

*Matter of Eighth Jud. Dist. Asbestos Litig.*, 33 NY3d 488, 495 (2019)……………15

*MAWA Inc. v. Univar USA, Inc*., 2016 US Dist Lexis 65848 (ED PA May 19, 2016) ……………………………………………………12

*Raney v. Owens-Illinois, Inc.*, 897 F.2d 94, 96 (2d Cir. 1990)…………………………22

*Reed v. Pfizer, Inc.*, 839 FSupp2d 571………………………………………………………23

*Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 9
82-83 (2d Cir.2004)……………………………………………………………………….9

*Tolan v. Cotton*, 572 U.S. 650, 655-57, 134 S. Ct. 1861, 1865-66 (2014)…………9

*Topliff v. Wal-Mart Stores E. LP*, 2007 U.S. Dist. LEXIS 20533
(NDNY Mar. 22, 2007)………………………………………………………………………23

*Whitfield v. Triad Transport, Inc.,* 2008 U.S. Dist. LEXIS 2385, 2008 WL
139082 (E.D.Ark. Jan. 10, 2008)……………………………………………………….13

*Williams v Hill Mfg. Co.*, 489 F Supp 20, 23 [DSC 1980])………………………12,13


## New York State Cases

*Billsborrow v Dow Chemical*, *USA*, 177 AD2d 7 (2d Dep't 1992)……………… 19

*Johnson v Johnson Chem.Co.*, 183 AD2d 64, 71, (2d Dep't 1992)……… ……… 22, 23

*Matter of NYC Asbestos Litig.*, 27 NY3d 765 (2016)……………………………………21

*Orellana v. Boro-Wide Recycling Corp.,* 18 Misc. 3d 1105A*,
2007 NY Misc Lexis 8381*** (Kings Co Sup.Ct. 2007)…………………,10,13, 9,20,22,23, 25

*Rastelli v Goodyear Tire & Rubber Co.*, 79 NY2d 289, 297 [1992])  ……………..15, 20

*Sawyer v A.C. & S., Inc.*, 32 Misc 3d 1237[A], 1237A, 2011 NY Slip
Op 51612[U], *7 (Sup Ct, NY County 2011)………………………………………21


## Other State Cases

*Commonwealth v Berryman,* 437 PA Super 258, 267 (1994)………………………14

*Olson v. Prosoco, Inc.*, 522 NW2d 284 (Iowa 1994)………………………………..13

*Sawash v Suburban Welders Supply Co.*, 407 Mass 311, 317,
(Middlesex 1990)……………………………………………………..……..…12-13


## Federal Register

Amtrol, 77 FR 39567 (July 13, 2012)………………………………………………13       iv

## STATUTES, RULES, AND REGULATIONS

Fed. R. Civ. P 56..........................................................................................................9


**DOT: Hazardous Materials Regulations [HMR]**
49 CFR Parts 171 through 180 ……………………………………………………..10,12

49 C.F.R. § 171.1 …………………………………………………………………...10,11,12,14

49 C.F.R. § 173.29 …………………………………………………………………11,12


**Hazardous Materials Transportation Act [HMTA]**
49 USC  § 5101 et seq. ………………………………………………………………9,10,12,13
49 U.S.C. § 5103..........................................................................................................10,
49 U.S.C. § 5125.........................................................................................................11,14 ,

**Compressed Gas Association [CGA]** ………………………………………… 8,16
CGA P-1 – 2015 ………………………………………………………………… 22
CGA 2. Scope ………………………………………………………………… 22

**National Fire Protection Association [NFPA]**……………………………………4,16
NFPA 10  § 2.1 …………………………………………………………………21
NFPA 10  § 2.4 …………………………………………………………………21
NFPA 17A § 1.7……………………………………………………………………17
NFPA 17A § 3.3.18 …………………………………………………………………..17

## OTHER AUTHORITIES

Restatement (Third) of Torts: Prod. Liab. § 5 (1998).....................................................20

US Department of Energy "Root Cause Analysis Guidance Document"……………..…7,24

## PRELIMINARY STATEMENT

This memorandum of law is submitted on behalf of Plaintiff Franklin Buono ("Plaintiff") and in opposition to the motion of Defendant Tyco Products LLP ("Defendant") for summary judgment dismissing the action on grounds that: (1) Plaintiff's claims against it are preempted by the Hazardous Materials Transportation Act (HMTA), (2) it had no duty to warn Plaintiff, and (3) Plaintiff cannot establish causation. Defendant, however, mischaracterizes the issues and facts, and so fails to establish entitlement to summary judgment as a matter of law.

It is undisputed that: Defendant manufactured and supplied an empty tank with gauge to use as a tool for testing its fire suppression system, (the "test tank"); Defendant provide no information about the test tank in its manuals and no training; the test involved filling the test tank with air, then discharging the air into the system; preparing the tank, Plaintiff and his coworker thought it was not filling because the gauge didn't move; Plaintiff looked for warnings or instructions on the test tank for help, but saw none. In providing no information about the test tank, Defendant breached the manufacturer's duty to inform and warn about dangers from intended or unintended but reasonably foreseeable use of its test tank, and caused Plaintiff injury.

Preemption under the HMTA does not apply here since, *inter alia*, Defendant supplied an empty test tank as a tool to test its fire suppression system product, not as a cylinder to transport hazardous materials in commerce. Additionally, the failure to label the test tank to provide warning about its use is not within the language of the preemption provisions.

The duty to warn and causation are triable issues for the jury. Defendant contends it had no duty because experienced users would know that substantially overfilling a test tank with compressed air creates a risk of explosion. This contention has no bearing to this case as Plaintiff and his coworker, relying on the gauge, did not know the test tank was filling. Under the law

1

and accepted practice of the industry, Defendant had a duty to warn and inform reasonable users, including Plaintiff.  Causation is established by expert opinion and Plaintiff's account that he had looked for information on the tank for help, but seeing none, took no action, remained close to the tank, and subsequently sustained serious injuries when it exploded.

## STATEMENT OF FACTS

On February 12, 2016, Plaintiff had been employed 18 days with Oprandy's, a fire and safety equipment service company, when he was seriously injured in the explosion of the test tank his coworker Chris Foust was attempting to fill with compressed air.  (Exh C[1]: 71/3-7; Exh A)  Plaintiff, 23 years old at the time with a work history limited to jobs such as at a Dunkin Donuts, as an ambulance driver, and as a warehouse employee, had no prior experience in the field.  (Exh B: 44-45, 48/5-12).

As Mr. Foust died before his deposition could be taken, the only competent proof of the incident in the record is Plaintiff's sworn accounts[2].  Plaintiff has explained that after Mr. Foust hooked the test tank up to fill it with air, they both were looking at the gauge on the top of the test tank and it was not filling.  (Exh B: 70/7-12)  Plaintiff was about a foot from the tank, leaning in to look at the gauge.  (Exh B: 73/20-23; 74/16-21; 89/2-11).  Because the gauge was not moving, they thought the test tank was not filling. (Exh A)  Mr. Foust then began "tinkering with it" while Plaintiff looked to the tank for "warnings or instructions, anything," to give some guidance, but saw nothing except a date.  (Exh A; Exh B: 81/7-20)  Plaintiff therefore did not interrupt Mr. Foust, take any action to stop him, or perceive any danger.  (Exh A)   He was

---

[1] References "Exh" are to exhibits submitted with Declaration in Opposition of Kenneth Fromson dated 4/23/2020; references to "Def Exh" are to exhibits submitted with Defendant's motion papers.

[2] For example, Defendant's references to statements purportedly made by Mr. Foust or by Plaintiff contained in the OSHA report are inadmissible hearsay.

unaware that the test tank gauge should not be relied on in filling it and did not consider a risk of an explosion.  (Exh A)  Instead of reacting to a risk of danger, Plaintiff stayed in close proximity to the tank.  (Exh A)   There subsequently was a huge explosion and Plaintiff felt the ground collapse underneath him.  He realized he lost one of his legs, attempted to crawl to the door to call for help, and used his belt to tourniquet his leg.  (Exh B: 83/25-84/10)

Oprandy's is a company that sells, services, tests and repairs fire extinguishers, and services, maintains and tests fire suppression systems at client locations as required by the authority having jurisdiction ("AHJ").  (Exh C: 35-36, 170-71)(Exh K/www.oprandysfire.com). In the short time of his employment there, Plaintiff worked on fire extinguishers and was shown how to fill with agent and compressed gas.  (Exh B: 61)  With fire extinguishers, he had been told not to hold the valve open too long to avoid over-pressurizing, as the chemical would leak out.  (Exh B: 63-66)   The fire extinguisher cylinders had labels providing instructions and notice of hazards.  (Exh A)  While Plaintiff did not recall at the time of his deposition over two years later what the labels said or the extent he had read them, just the fact there were labels and warnings indicated potential dangers and that precautions needed to be followed.  (Exh A)(Exh B: 93/17-25)  As he never witnessed any problem with the fire extinguishers, he hadn't needed to read the written instructions or warnings.  (Exh A; Exh B: 64)  In contrast, the test tank had no warnings or instructions, and, with no labels, did not suggest any danger.  (Exh A)

Brian Scott, Oprandy's owner and a prior fire department chief, had over 40 years experience.  (Exh C: 117-18)  Chris Foust had worked for him about three years prior to the incident.  (Exh C: 98/16-21)  Mr. Scott had taught him and  told him to look at the rated pressure when filling a fire extinguisher, explaining that the tank can only hold so much pressure.  (C: 97-98/3)  Mr. Scott didn't think he had told him that the tank could explode.  (Exh C:  98/4-6).  As

to the danger of an overpressurized tank, Mr. Scott said: "As a joke, I've always said, if it's over-pressurized, you're just going to get a little more pressure to put out the fire, but, believe it or not, I've got inspectors who are nitpickers and say, "12:00. We're not taking 12:01 or 12:02."  (Exh C: 200/1-12).  He never thought of an explosion happening as it did.  (Exh C: 200/13-21)

Mr. Scott was not a certified distributor of Defendant's Pyro-Chem products, but was an authorized Pyro-Chem dealer, and so able to buy parts from it, such as the test tank, and had the manuals for its Pyro-Chem Kitchen Knight fire suppression system.  (Exh C: 25/5-8, 27-28)  He had purchased the test tank when he purchased the fire systems business from a friend who was a Pyro-Chem distributor.  (Exh C: 44-46).  Mr. Scott was trained and certified in servicing and testing fire suppression systems, including Defendant's, through a third party,  FPC,  that trains and certifies people in the industry around the country.  (Exh C: 25/19-26/9)  FPC, per its website, has seminars on servicing and maintenance of commercial kitchen fire systems which meets the requirements of the NFPA 17, 17A and 96, and IFC.  (Exh H/www.fpcltd.com).  Thus, Mr. Scott was authorized to test fire suppression systems as required by the AHJ and performed tests for clients witnessed by the fire or building inspector, the AHJ. (Exh C: 158-59, 167-68)

Under industry norms, it is general and accepted practice for a manufacturer's system to be serviced by fire protection equipment industry service personnel, regardless of whether or not they hold title as Authorized Dealer or Authorized Distributor or received certification from the manufacturer.  (Exh I: Aff; Rep p 4-17, 53-56, 28)  Requirements for servicing are up to the AHJ.   (Exhi I, Aff at 4)  Moreover, the National Fire Protection Association (NFPA),which governs, does not impose any requirement for certification, but instead refers to "trained persons" on the matter of qualifications.  (Exh J: 135/4-16, 160/2-25)(Exh I; Aff at 16)

4

Oprandy's was not a DOT facility, so it did not hydrotest or train its employees on

hydrotesting DOT cylinders, i.e., test the integrity of the cylinder itself,.  (Exh C: 40/7-15, 201).

Mr. Scott therefore was unaware of the meaning of DOT 4BW 225 on the test tank and could not

explain it to his employees.  (Exh C: 191-193)  Defendant's technical support witness, Curtis

Harding, also admitted to not being completely up to speed on DOT stampings.  (Exh F: 32/6-18)

The DOT markings are DOT 4BW as type of cylinder, 225 as the maximum allowable

working or service pressure, the serial number, manufacturer's symbol, inspector's symbol, and

test date.  (Exh D: 32, 33, 59-60, 83/14-84/2).  The test tank was made and stamped with the

DOT markings by Worthington Industries, a manufacturer and supplier of pressure cylinders, in

accordance with Defendant's requirements for its Pyro-Chem fire suppression systems.

Defendant was to install the valve, put the product in, do the labeling, etc.  (Exh D: 19, 37,

75/20-23)   Other than the DOT markings, Worthington put nothing on the tank as what

warnings or labeling to put on the cylinder "is always up to the manufacturer of the fire

suppression system".   (Exh D: 66/9-17, 83/14-84/2)

Defendant sold the test tank with its Pyro-Chem product "Kitchen Knight" or "Kitchen

Knight II" fire-suppression system, as well as separately, as a test tool required by the AHJ,

which could be "a fire department, an insurance carrier, building inspector, fire inspector -

whoever is an authority in that area." (Exh J: 43:25–44:15; Def Exh 26; Exh G: 15/14-25, 16/3;

Exh F: 52/17-53/2-10).  These systems were developed as wet chemical pre-engineered fire

suppression systems installed in restaurants.  (Def Exh 26).  The system has an agent tank(s) to

release the liquid agent through piping, in addition to a test tank, which is included on a price list

as a component of the system.  (Exh F: 40)  The test tank has "no labelling, no markings, no

siphon tube in the valve assembly, and the tank was green on the collar and red on the bottom."

(Exh C: 44/14-20.)  The test tanks have a gauge that indicates if it is empty or full - the gauge reading would be at 12:00 if full, and below 12:00 if empty.  (Exh C: 164-65)

There is no written information about the test tank in Defendant's manuals or otherwise, yet it is required for system testing, "required per the [AHJ]," to be witnessed by a fire inspector. (Exh F: 24, 38; Exh C: 159/7-25; Exh G: 12, 36:18–37:16).   As Defendant's Mr. Harding testified, "every six months there is maintenance required, and I don't believe it's in the manual as far as integrity testing."  (Exh F: 24/13-16)  In doing the test, Oprandy's removes the liquid agent tank and replaces it with the test tank that had been filled with air, then the air is released into the system's piping in a balloon test.  (Exh C: 158/16-159/16).  For such testing, in Mr. Scott's view: "[a]ir is air;" they could've gone to the gas station to put air in because it is being filled only for an air test.  (Exh C: 204/7-12)  Oprandy's never used the test tank to store compressed air, but kept it empty on the shelf until needed for the next job.  (Exh C: 163)

While Defendant may have provided training of its Kitchen Knight systems to its authorized distributors as it has claimed, it never provided any training regarding the test tank. (Exh F: 27/2-28/7)   In its factory certification training, the only written materials were the manuals - so nothing on the test tank. (Exh F: 26).  The manuals do not state that only authorized distributors are to use the test tank or test the systems as required by the AHJ.  (Def Exh 5) (Def Exh 26)(Exh F: 22/12-17; 32/2-5; 43/6-12)   The manual provides no instructions or description of the test tank's intended use, no warnings about the gauge on the test tank, and no guidance for service technicians, or anyone, as to use or maintenance.   (Exh F: 22,32, 43)   As to how an end user is expected to know how to maintain, use and refill a test tank, Mr. Harding answered nonresponsively that the test tanks were the same as the agent tanks except "shipped empty."

(Exh F: 43/19-23)  The two tanks had "the same inherent danger" with over-pressurization, yet end users were informed nothing about the test tanks.  (Exh F:  37/8-13)

As to its agent tanks, Defendant did provide warnings and information in its manuals, in labelling, and training.  (Exh F:  37, 43/19-23)  The manual, for instance, describes the agent tank cylinder sizes, being pre-filled with extinguishing agent and how charged, and represents that it "is manufactured, tested, and marked in accordance with DOT 4B175.".  (Def Exh 26: p. 2-1. )  In the System Maintenance chapter, the manual expressly highlights in a stand-alone box: "**NOTE**  The pressure gauge attached to the extinguishing system should not be used to determine when the charging pressure has been reached. A pressure regulator must be used," in addition to three **CAUTION** text boxes. (Def Exh 26: p 5-1) (Exh I: p. 44)  In addition to DOT markings, the agent tank has a label providing information with bold headings of Maintenance, Recharge, Warning and Caution.  (Exh I:  p 25, p 47 fig 5).  The label communicates specific warnings and cautions about "the anti-recoil plug," "contents under pressure 225 psi … operating pressure," "recharge cylinder," "do not expose to temperature exceeding…," operable range of system," "if cylinder shows some sign of damage …," and directs the user to the manual and NFPA 17A as resources.  (Exh I: p 25, p 47 fig 5).

The record includes Thomas Taranto's expert findings derived from application of a Root Cause analysis in accordance with US Department of Energy "Root Cause Analysis Guidance Document."  He explains that the explosion of the test tank was a result of a direct cause along with one or more root causes and a contributing factor chain.   (Exh I: p 22).  He then sets forth the direct cause, the over-pressurization, the root causes, and the contributing factors at length in his report.  (Exh I: p 42-47).  As pertains to Defendant, contributory factors include its deficient manuals that include no information on the test tank, failure to train, failure to label the test tank

to communicate warnings of danger or instruct on use, creating a complacency as to the test tank from such failures, particularly in contrast to its communications with regard to the agent tank, and breach of the manufacturer's duty to warn of any danger from the intended or unintended but reasonably foreseeable use of the test tank.  (Exh I: p 42-47, 68-69,  p 37 fig 4; p 70 fig 6; Exh J: 118/15-17; 168/8-169/17; 170/19-22; 175-76).  This duty to warn extends to all service technicians, regardless of their authorization status, as it is normal practice in the fire protection equipment industry for service technicians to perform routine maintenance, service and testing on equipment for all manufacturers, independent of status as an authorized distributor.  (Exh I: p 53)  Furthermore, Defendant's manual does not attempt to limit its duty because, whereas it states that "installation and maintenance of the system must conform to the limitations detailed in this manual and be performed by an Authorized Pyro-Chem Kitchen Knight dealer," it details no limitations in the manual about the test tank.  (Exh I: p 53)  Additionally, there are no trained persons as to the test tanks.  (Exh I: 46)

Note, while Defendant incorrectly refers to Oprandy's as a gas supplier under CGA 3.2.15, "business that produces, fills and/or distributes compressed air gases," Mr. Taranto explained that Oprandy's is a "fire and safety company."  (Exh J: 65/4-5, 69/9-14)(Exh L).  The duties here do not relate to the gas supplier – "the tank was introduced to the market as a fire protection tank. And it was used as a fire protection tank and the business of the company was the fire protection business."  (Exh J: 67/1-9)  "Because you pump up the tires of your car with gas, with air, doesn't make an automotive dealership a gas supplier."  (Exh J : 67/17-19).

## ARGUMENT

**STANDARD OF REVIEW:**   Summary judgment is proper only when "reasonable minds could not differ as to the import of evidence." *Bryan!* v. *Maffucci,* 923 F.2d 979, 982 (2d

Cir.1991).  The burden is on the party seeking summary judgment to demonstrate " the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1609, 26 L. Ed. 2d 142 (1970)."  *Bonnie & Co. Fashions v. Bankers Tr. Co.*, 945 F. Supp. 693, 709 (S.D.N.Y. 1996).   "[N]ot only must there be no genuine issue as to the evidentiary facts, but there must also be no controversy regarding the inferences to be drawn from them." *Lendino v. Trans Union Credit Info. Co.*, 970 F.2d 1110, 1113 (2d Cir. 1992), citations omitted. "the inferences to be drawn from the underlying facts contained in [the moving party's] materials must be viewed in the light most favorable to the party opposing the motion . . . ." *Adickes, supra,  Lendino, supra*   I.e., Thus, it is improper "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party.  *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 P.3d 77, 82-83 (2d Cir.2004).   The court may not weigh the evidence by failing "to credit evidence that contradicted" the moving party's factual conclusions.  *Tolan v. Cotton*, 572 U.S. 650, 655-57, 134 S. Ct. 1861, 1865-66 (2014)(citation omitted)

Applying controlling law, Defendant is not entitled to summary judgment as preemption does not apply as a matter of law and triable issues exist as to the duty to warn and causation.

**POINT I:      PLAINTIFF'S CLAIMS ARE NOT PREEMPTED**

None of Plaintiff's state law and common law claims are preempted by the HMTA because: (1) Defendant did not supply the test tank to transport hazardous materials in commerce, but empty to use as a tool required by the AHJ; (2) the issue relates to the use of the test tank and not to transport of materials; and (3) the statutory language on preemption does not include the term "labels" as to the use of cylinders, in contrast to labels for hazardous materials.

"[C]ongressional intent to pre-empt will not be inferred lightly" and the courts should be "reluctant to assume federal preemption." *In re Roach,* 824 F.2d 1370, 1373-74 (3d Cir. 1987). Hazardous Materials Transportation Act ("HMTA"), 49 U.S.C. § 5101 *et seq.,* enacted in 1975, has a preemption clause, but has never been held to completely preempt state common law claims. *Orellana v. Boro-Wide Recycling Corp.,* 18 Misc. 3d 1105A*, 2007 NY Misc Lexis 8381*** (Kings Co Sup.Ct. 2007).   "The HMTA will not preempt a state common-law claim unless "the 'Federal Government has weighed the competing interests . . . [and] reached an unambiguous conclusion about how these competing considerations should be resolved in a particular case. . . and implemented that conclusion via a specific mandate' "  Id. at ***12.

In 49 USC 5103,  the HMTA directs the Secretary of Transportation to "(a) …designate material … as hazardous when the Secretary determines that transporting the material in commerce in a particular amount and form may pose an unreasonable risk to health and safety or property; "  and to  "(b)… prescribe regulations for the safe transportation, including security, of hazardous material in intrastate, interstate, and foreign commerce."   In (b)(A) of this section, it sets forth to whom these regulations apply, and in (b)(B), that it "shall govern safety aspects … of the transportation of hazardous material…"  49 USC 5103.  By this regulatory authority, U.S. Department of Transportation ("DOT") issued as Subchapter C of Title 49 (Transportation) the Hazardous Materials Regulations (HMR; 49 CFR Parts 171 through 180) under a delegation of authority to the Pipeline and Hazardous Materials Safety Administrator "to issue regulations for the safe and secure transportation of hazardous materials in commerce." 49 CFR 171.1

**A.      The test tank as an empty packaging is not preempted by the HMTA**

49 CFR 171.1 preliminarily sets forth that "This section addresses the applicability of the HMR to packagings represented as qualified for use in the transportation of hazardous materials

10

in commerce and to pre-transportation and transportation functions."   In subdivision "(a)

packaging," it states that:

> Requirements in the HMR apply to each person who manufactures, fabricates, marks, maintains, reconditions, repairs, or tests a packaging or a component of a packaging that is represented, marked, certified, or sold as qualified for use in the transportation of a hazardous material in commerce.  49 CFR 171.1(a).

In subdivison (c), it states that the "requirements in the HMR apply to transportation of

a hazardous material in commerce", and explains that "[t]ransportation of a hazardous material in

commerce includes: "(1) Movement …,"  "(2) Loading incidental to movement …," "(3)

Unloading incidental to movement …"  and "(4) storage incidental to movement…," which

"(iii)…does not include storage of a hazardous material at its destination."  49 CFR 171.1(c).

Subdivision (f)(1) of 49 CFR 171.1 then sets forth the scope of the HMR's preemption

under 49 USC 5125, stating that it applies, *inter alia*, when the non-Federal requirement is not

substantively the same as the Federal hazardous materials transportation law with respect to

subdivisions "(B)" and "(E)", as Defendant claims applies here:

> (**B**) The packing, repacking, handling, labeling, marking, and placarding of hazardous material;
>
> * * *
>
> (**E**) The design, manufacturing, fabricating, marking, maintenance, reconditioning, repairing, or testing of a package or container represented, marked, certified, or sold as qualified for use in transporting hazardous material.

49 CFR § 173.29 "Empty packagings" sets forth in pertinent part as follows:.

(a) *General.* Except as otherwise provided in this section, an empty packaging containing only the residue of a hazardous material shall be offered for transportation and transported in the same manner as when it previously contained a greater quantity of that hazardous material.

(b) Notwithstanding the requirements of paragraph (a) of this section, an empty packaging is not subject to any other requirements of this subchapter if it conforms to the following provisions:

(1) Any hazardous material shipping name and identification number markings, any hazard warning labels or placards, and any other markings indicating that the material is hazardous (e.g., RQ, INHALATION HAZARD) are removed, obliterated, or securely covered in transportation. This provision does not apply to transportation in a transport vehicle or a freight container if the packaging is not visible in transportation and the packaging is loaded by the shipper and unloaded by the shipper or consignee;

(2) The packaging -
      (i) Is unused;
      * * *;  and,

(3) Any material contained in the packaging does not meet the definitions in § 171.8 of this subchapter for a hazardous substance, a hazardous waste, or a marine pollutant.

(See, e.g.,  *MAWA Inc. v. Univar USA, Inc*., 2016 USDist Lexis 65848 (ED PA May 19, 2016)(Applying 49 CFR. § 173.29(a) to "[c]ontainers that have only a residue of hazardous material").     Here, it is undisputed that the test tank at issue was manufactured, supplied and sold by Defendant in empty and unused form.  Accordingly, by the statutory language, the test tank is an empty packaging under 49 CFR § 173.29 not subject to the requirements of the HMR [49 CFR Parts 171 through 180].  i.e., DOT has not designated an empty container as subject to the regulation under HMTA.   Therefore, claims as to the test tank's labelling are not preempted.

**B.     HMTA does not apply to the test tank provided as a testing tool**

The statutory purpose of the HMTA is made clear by its title and emphasized by Congress in its congressional declaration of policy "to improve the regulatory and enforcement authority of the Secretary of Transportation to protect the Nation adequately against the risks to life and property which are inherent in the transportation of hazardous materials in commerce." *Williams v Hill Mfg. Co.*, 489 F Supp 20, 23 [DSC 1980]).   "[T]he legislative history confirms … that the congressional objective in enacting the HMTA was to promote the safe transportation of hazardous materials and thereby minimize the number and extent of accidents involving

carriers of hazardous materials. H.R.  [**898]  Rep. No. 1083, 93d Cong., 2d Sess. 2156,

reprinted in 1974 U.S. Code Cong. & Admin. News 7669. See *Williams* v. *Hill Mfg. Co.*, 489 F.

Supp. 20, 23 (DSC 1980)." *Sawash v Suburban Welders Supply Co.*, 407 Mass 311, 317, (1990).

"Congressional regulation of one end of the stream of commerce does not, *ipso facto*,

oust all state regulation at the other end," however.  *Florida Lime & Avocado Growers, Inc. v.

Paul*, 373 US 132 (1963).   Accordingly, courts have been disinclined to extend the preemptive

provisions of the HMTA to situations in which the injury occurred during end use and outside

the scope of considerations of transportation.  See, e.g., *Williams*, supra, *Orellana, supra*,

*Whitfield v. Triad Transport, Inc.,* 2008 U.S. Dist. LEXIS 2385, 2008 WL 139082 (E.D.Ark. Jan.

10, 2008); *Lyall v. Leslie's Poolmart*, 984 F. Supp. 587, 597-98 (E.D. Mich. 1997); *Sawash v.

Suburban Welders Supply Co*, 407 Mass 311, (Middlesex 1990); *Olson v. Prosoco, Inc*., 522

NW2d 284 (Iowa 1994); *Hurt v. Coyne Cylinder Co*. 956 F2d 1319 (6th Cir Tenn 1992).

Here, by the description of its own employees, the test tank was supplied by Defendant

empty and to be used and reused by the end user as a tool to test its fire suppression systems as

required by the AHJ.  It was not manufactured to supply and transport hazardous materials to

purchasers, or for purchasers to supply and transport hazardous materials to others.  Thus, the

cases Defendant cite, which involve such facts, are inapplicable.  As the tank's purpose never

was to transport hazardous materials in commerce, its use as a test tool for which it was supplied

is not a matter preempted by the HMTA.

The administrative determination that Defendant cite, 77 FR 39567 (2012), likewise is

unavailing.  There the matter involved a nonrefillable container containing coolant, sold and

purchased for the single use purpose of providing coolant.  It had been supplied to the decedent

technician for that purpose to supply coolant to a client, and he sustained injury in the course of

13

handling it in that form prepatory to its single use of supplying coolant to a client.  Id.; In re

*Amtrol Holdings Inc*., 384 BR 686 (US Bankr Ct Dt Del 4/1/2008), fn 2,  rev'd by, *Elder v.*

*Amtrol Holdings, Inc*., 532 Fed Appx 316 (3rd Cir Del 2013)).  Thus, there the manufacturer

provided hazardous materials transported in commerce in a nonrefillable cylinder and injury

occurred in the course of handling the hazardous materials in the form delivered prior to

supplying same to a client.  In sharp contrast, here Defendant provided an empty refillable tank

as a tool for its systems, and injury occurred when the end user was using the tank as such.

**C.     The preemption language of the HMTA does not apply to labelling relating to the test tank itself in contrast to labelling relating to the hazardous material being transported**

As set forth in Point IA, supra, HMTA's preemption provision, 49 USC 5125(b), and 49

CFR 171.1, present the subject areas within its preemptive scope, which include "(B) the

labeling, marking … of hazardous material," and "(E) the … marking … a package, container

…, that is represented, marked, certified, or sold as qualified for use in transporting hazardous

material in commerce."   While Defendant contends that Plaintiff's claims as to the failure to

properly label to provide warning with regard to the use of the refillable cylinder is preempted

under (E)'s reference to marking the cylinder, under the rules of statutory interpretation, the term

"marking" in (E) cannot be read to include "labeling," given that the language in subdivision (B)

sets forth both "labeling" and "marking" as distinct terms.   "Where a section of a statute

contains a given word, the omission of such word from a similar section of the statute shows a

different legislative intent."  *Commonwealth v Berryman*, 437 PA Super 258, 267 (1994).

Accordingly, the preemptive scope of subdivision (E) does not include labeling relating

to the container's use, and so also does not apply to preempt Plaintiff's claims.

**POINT II       DEFENDANT HAD A DUTY TO WARN, INSTRUCT AND INFORM AS TO THE USE OF THE TEST TANK**

14

As addressed at length by Plaintiff's expert, Defendant under accepted industry standards had a duty to reasonably foreseeable users to warn and inform as to the test tank, including to provide the same warnings as provided for the agent tank such as instruction to not rely on the pressure gauge on the tank and warn of pressurized contents.  Now on its motion, Defendant ignores its failures and misstates Plaintiff's claims as alleging "a failure to warn of the risk of explosion with putting 1200 psi of air into a tank rated for 225," to which it conclusorily disputes any duty.  As this mischaracterizes Plaintiff's claims, Defendant fails to meet its burden of establishing the absence of any duty to warn or instruct as a matter of law.

**A.  The risk of explosion was not open and obvious to expected users as a matter of law.**

"[A] plaintiff may recover in strict products liability or negligence when a manufacturer fails to provide adequate warnings regarding the use of its product." *Rastelli v Goodyear Tire & Rubber Co.*, 79 NY2d 289, 297 [1992])   "A manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known." *Burke v Spartanics Ltd.*, 252 F3d 131, 138 (2d Cir 2001)(citation omitted).  This duty includes dangers from unintended uses that are reasonably foreseeable.  Id.  It "extends to the original or ultimate purchasers of the product, to employees of those purchasers, and to third persons exposed to a foreseeable and unreasonable risk of harm by the failure to warn." *Matter of Eighth Jud. Dist. Asbestos Litig.*, 33 NY3d 488, 495 (2019).  As the *Burke* Court explained:

> The class of reasonably foreseeable users [to whom the duty is owed] will, of course, encompass a spectrum of persons with widely varying abilities and experience bearing on their perception of the hazards at hand. Some may be practiced and skilled operators, while others may be novices, or may use the machine in adverse conditions that, though atypical, are still foreseeable.
> Id. at 138.

"So long as the relevant risks are not obvious to *some* members of the class of foreseeable users, a reasonable manufacturer might well be expected to warn. And, as a result, a duty to warn

will generally be said to exist." Id. at 138. Here, Mr. Scott with over 40 years experience, Mr. Foust with three years, and Plaintiff with 18 days all fall within the spectrum of foreseeable users. Furthermore, the use of the test tank at the time, although irregular, was reasonably foreseeable, or at the very least, presents a triable issue of fact as to foreseeability. As Defendant provided no warning or instruction, it plainly failed to provide adequate warnings as was its duty.

Defendant attempts to shield itself from liability by contriving to define the risk as open and obvious by mischaracterizing it as the risk with putting 1200 psi of air into a 225 rated tank. Plaintiff and Mr. Foust, however, indisputably did not know that this was occurring, but thought no air was going in because they were relying on the gauge on the tank, which did not move. Thus, as they did not "see" air going in, the risk of an explosion flatly was not open and obvious.

Defendant then offers the conclusory, circular and immaterial argument that it is entitled to expect all users of the test tank to know that putting 1200 psi of air into a 225 rated tank would cause an explosion because all users should be trained or experienced to know this. As this defective argument does not apply to the circumstances here, it can be rejected summarily.

Furthermore, Defendant's attempts to use the NFPA and CGA to bolster its use of conclusory and circular logic is unavailing. Defendant claims its position is supported by the NFPA's requirement that only trained persons are to handle the test tank, but disregards that it failed to provide training as to the test tank. With no training and no information in the manual on the test tank, Defendant established that no person could be trained with respect to the test tank in accordance with NFPA (National Fire Protection Association 2013) requirements, namely, "a person who has undergone the instructions necessary to safely design, install and reliably perform the maintenance and recharge service in accordance with the manufacturer's design, installation manual." NFPA 17A § 3.3.18. (Exh I p 28/3.6.7; Exh J: 135/4-16, 138/1-5,

151/16-20.)  NFPA 17A § 1.7, states that "[o]nly trained persons shall be considered competent

to design or lay out, install, and service wet chemical systems."  As no one could be trained,

Defendant established there was no one considered competent under NFPA 17A § 1.7 to use the

test tank to service its systems.  As to the CGA and its assertions that users of compressed gas

should be familiar with the properties and inherent hazards and trained in the safe handling,

given the broad spectrum of persons with widely varying abilities and experience that case law

recognizes as foreseeable users, the CGA fails to present Defendant with valid grounds for

presuming only seasoned professionals will use its test tank.  Such an argument is contrary to the

law and is disputed by general industry practices as attested to by Plaintiff's expert.

     Additionally, it cannot be conclusorily said that all seasoned professionals would realize

that overfilling would result in explosion.  Mr. Scott  did not appear at his deposition to

genuinely recognize this risk.  Plaintiff's expert points out that persons in this business will have

a range of experience and knowledge, and that it is reasonably foreseeable that anticipated users

of the test tank would not recognize the potential hazards and risks of injury.  Moreover,

Defendant's reliance on CGA is misplaced, as it was not a lack of familiarity about compressed

gas that was the problem here, but a lack of knowledge and information about the test tank.

     Moreover, while the risk indisputably was not open and obvious to Plaintiff, even if the

situation were otherwise the circumstances would not warrant a finding that a duty to warn claim

fails as a matter of law.  In *Liriano v. Hobart Corp*., 170 F3d 264 (2d Circ 1999), for example,

the Second Circuit addressed the open and obvious doctrine in a case in which the plaintiff, on

the job a week, was injured at work when his hand was caught in the meat grinder manufactured

by the defendant and sold to the plaintiff's employer with a safety guard on, but removed prior to

17

the incident.  The action included a claim against the manufacturer for failing to have a warning

on the machine that it should only be operated with a safety guard.  Id. at 266.

The *Liriano* Court held that it is not just the plaintiff's knowledge of the hazard that is

considered on the question of whether a danger is so open and obvious as to eliminate a duty to

warn because: "a warning can do more than exhort its audience to be careful. It can also affect

what activities the people warned choose to engage in."  Id. at 270, citations omitted.  "[T]he

value of the warning can lie as much in making known the existence of alternatives as in

communicating the fact that a particular choice is dangerous. It follows that the duty to warn is

not necessarily obviated merely because a danger is clear." Id..  A warning can convey at least

two messages – "one states that a particular place, object or activity is dangerous;" another

explains that the risk of danger need not be taken to achieve an outcome, but recommends a

safety measure, such as, instead of a road sign saying "Danger – Steep Grade," the sign says

"Steep Grade Ahead – Follow Suggested Detour to Avoid Dangerous Areas."  Id.  The *Liriano*

Court then explained that the duty to warn with a sign of the second type "may persist even when

the danger of the road is obvious and a sign of the first type would not be warranted."  Id.

Thus, the *Liriano* Court held that they were not required "to decide the difficult question

of whether New York would consider the risk posed by meat grinders to be obvious as a matter

of law" because:

> …Even if most ordinary users may - as a matter of law - know of the risk of using a
> guardless meat grinder, it does not follow that a sufficient number of them will - as a
> matter of law - also know that protective guards are available, that using them is a
> realistic possibility, and that they may ask that such guards be used. It is precisely these
> last pieces of information that a reasonable manufacturer may have a duty to convey even
> if the danger of using a grinder were itself deemed obvious.
> Id. at 271.

Here, even if a more experienced person would have known of the risk of using a high pressure system to fill a low pressure cylinder or of relying on the gauge on the tank to determine if it was filling, which Plaintiff did not know, Defendant's duty to warn is not obviated given that it could have - as it did with its agent tank - provide warnings that recommend safety measures.

The case law Defendant cites is flatly inapplicable as the cases address an experienced plaintiff and a danger obvious to even an inexperienced layperson.  Rather than reciting a rule as to an absence of duty to warn those in the profession about the dangers generally known to that profession, Defendant's cases illustrate that the existence of a duty is dependent on the facts and circumstances.  Defendant's argument furthermore is belied by the fact that, in contrast to its silence with its test tanks, it did provide warnings and instructions to those in the profession on its agent tanks in its Kitchen Knight systems, both in labelling on the tank and in its manuals, when the two tanks posed the same risks.  The manual, for example, expressly warns as to the agent tank that its gauge should not be relied upon in filling it.

**B.  Any duty to warn on the part of Oprandy's does not eliminate Defendant's duty**

As manufacturer of the test tank with the gauge assembly, Defendant had a duty to warn and instruct on its use notwithstanding any duty any other entity may have had.

On a claim against a manufacturer for a failure to warn regarding the use of its product that had been provided to an employer and used by its employee, it is a question for the jury whether an employer's negligence in failing to warn an employee of the dangers in working with the product constitutes a superseding or intervening cause that relieves the manufacturer or distributor of liability.  *Billsborrow v Dow Chemical*, *USA*, 177 AD2d 7 (2d Dep't 1992).  That a claim might lie against another entity on other grounds does not shield the manufacturer from liability.  In *Orellana*, *supra*, for example, the action against the manufacturer of aerosol cans

19

with nail enamel dryer product (NED) for failing to provide adequate warnings on the explosion hazard with disposal arose after the NED cans were dumped at the waste transfer station and exploded. 18 Misc3d 1105A.  The NED cans had been discarded by the carrier CTI after being shipped to its terminal for local delivery, but the purchaser could not be located.  Id.  The NED cans had warnings "flammable" and "do not use near fire or flame or while smoking," but, as attested to by the plaintiff's expert, these warnings did not adequately address the explosion hazard with disposal.  Id.  *Inter alia*, the manufacturer claimed it could not be liable for a failure to warn and label because disposal of hazardous wastes is regulated under the EPA and did not apply to it, and that CTI, not it, was the Generator of the hazardous waste.  Id.  The court rejected this argument, in addition to arguments as to preemption and causation, given that the "lawsuit does not allege a claim based upon  liability as a generator of hazardous waste under the EPA, but State law tort claims based upon inadequate warnings by a manufacturer of a product.   Id.

Based on the law, Defendant's argument that Oprandy's had a duty to warn fails to refute Defendant's duty.  Defendant's argument, for one, attempts to erroneously constrict the duty to warn claim to warning of the risk of using a high pressure system to fill the test tank, and to disregard the other contributing factors stemming from Defendant's complete lack of warnings, information, and training about the test tank.  The case law Defendant cites is also inapposite.  In *Rastelli, supra,* the court expressly explained that the case there was not one "where the combination of one sound product with another sound product creates a dangerous condition about which the manufacturer of each product has a duty to warn."  79 NY2d at 298.  The case there involved the defendant's sound product being combined with a defective product.

Defendant's citations to "components part doctrine" cases also is misplaced.  That doctrine is not at issue here as the test tank was not integrated as a component into a high-

pressure system or vice versa; rather the high-pressure system was being used as a device to put air in the test tank.  Neither the test tank or the high pressure system is a component as understood by that doctrine.  *Sawyer v A.C. & S., Inc.*, 32 Misc 3d 1237[A], 1237A, 2011 NY Slip Op 51612[U], *7 (Sup Ct, NY County 2011), explains:

> In general, under the component-part supplier doctrine, component part manufacturers are exempt from liability because they manufacture products that are designed to be incorporated into a larger mechanical system. The component is then substantially altered by the customer or integrated into a larger, more complex product over whose design the manufacturer of the component has no control." *See* Restatement, § 5, cmt. a.

Even if the component part principles were not out of context here such that the "duty to warn of combined use of its product with another product depends in part on whether the manufacturer's product can function without the other product" (*Matter of NYC Asbestos Litig*., 27 NY3d 765 (2016)), it would not apply to shield Defendant from liability because the test tank to function required being filled with air by another product.  Under those circumstances, Defendant had a duty to instruct and/or warn about the air source, but was silent.  By this failure of duty, Defendant was not, as Defendant claims, "a mere bystander to" the choice made.

As to Defendant's contention that the NFPA and the CGA establish that they had no duty, these provisions take no such stance.  As to the NFPA, Plaintiff's expert explains in his expert report that the test tank is subject to the standards set out in NFPA 10 as well as NFPA 17A.  (Exh I: p  68).  NFPA 17A is not read on its own, but within the standards in NFPA 10. NFPA 10 Chapter 2 states in § 2.1 "General":  "The documents or portions thereof listed in this chapter are referenced within this standard and shall be considered part of the requirements of this document." NFPA 17A is listed in NFPA 10 Chapter 2 § 2.4; therefore, NFPA 17A is part of NFPA 10.  (Exh J: 48/10-21, 49/1-5, 50/3-19, 51/14-23, 54/8 – 63/14, 174/17-21).  Thus, the label requirements of NFPA 10 apply to this system.  (Exh I: p 59-60)

As to the CGA, it expressly states in its introduction to CGA P-1 – 2015  that "it should not be assumed that every acceptable commodity grade, test or safety procedure or method, precaution, equipment or device is contained within, or that abnormal or unusual circumstances may not warrant or suggest further requirements or additional procedure."  (Def Exh 20, p ii). Similarly in its "2. Scope," it sets forth "This standard is primarily for the users of compressed gases in containers … [and] also contains precautions that are applicable to gas suppliers and distributors. It should not be assumed that all applicable safety and security precautions or regulations are contained here."  Accordingly, whereas the CGA may set forth duties on the part of users and others, it does not, nor is it intended to, determine the scope of duties on the part of manufacturers nor does it allocate responsibility for occurrences caused by multiple wrongdoers.

**POINT III.    THE RECORD SUPPORTS FINDING CAUSATION**

"[I]f an act is deemed wrongful because it is believed significantly to increase the risk of a particular injury, we are entitled—in the tort context at least—to presume that such an injury, if it occurred, was caused by the act. *In re Publ. Paper Antitrust Litig.*, 690 F3d 51, 66 (2d Cir 2012),   On a failure to warn claim specifically, in *Liriano*, supra, the Second Circuit explained:

> When a defendant's negligent act is deemed wrongful precisely because it has a strong propensity to cause the type of injury that ensued, that very causal tendency is evidence enough to establish a *prima facie* case of cause-in-fact. The burden then shifts to the *defendant* to come forward with evidence that its negligence was *not* such a but-for cause.
> 170 F3d at 271.

Furthermore, even if the plaintiff failed to read the warning that was on the product, a manufacturer's failure to provide proper warning can be determined to be causally connected to the injury.  See, e.g., *Johnson v Johnson Chem.Co.*, 183 AD2d 64, 71, (2d Dep't 1992).   "A manufacturer who provides insufficient warnings cannot avoid liability solely because the warnings which were provided were not read." *Orellana*, supra, 18 Misc 3d 1105[A], at ***22,

citations omitted.   On causation, the "intensity of the language used in the text of the warning" and "the prominence with which such language is displayed" are factors which must be considered since a person who "tends to ignore one sort of label, might pay heed to a different, more prominent or more dramatic label." *Johnson*, 183 AD2d at 70; (citation omitted) .

Additionally, a failure to follow workplace instruction with regard to a potentially hazardous product does not establish as a matter of law that different warnings would not have affected the worker's behavior either. *Orellana*, supra, at ***24.  It cannot be concluded as a matter of law that the individual would not have heeded the instruction if the gravity of danger had been brought to the individual's attention by an adequate warning.   *Orellana*, supra, at ***24.  Thus, in *Orellana*, even though CTI did not read the warning on the NED aerosol cans and the employee did not heed the employer's instruction not to put aerosol products in the garbage truck, triable issues of fact existed as to whether, if more conspicuous and prominent warnings were provided on the boxes and cans, CTI would not have disposed of them by throwing into the dumpster and the garbage collector would not have picked them up in their truck.  Id. at ***26.

Applying the law to the facts, a prima facie cause-in-fact exists by reason of Defendant's undisputed failure to warn and instruct.  Defendant does not meet its burden to come forward with evidence to refute, but presents argument that disregards its failures.  Defendant cites to *Reed v. Pfizer, Inc*., 839 FSupp2d 571 for the assertion that the plaintiff must show how "provided warnings were inadequate."  This does not support Defendant's argument because here, there were no provided warnings and the record establishes that any warning would have assisted Plaintiff.  Defendant also cites to *Amica Mut. Ins. Co. v. Electrolux Home Prod. Inc*. 440 FSupp 211 (WDNY 2020), yet the court there states: "The adequacy of a manufacturer's

23

instructions and warnings "is generally a question of fact to be determined at trial and is not ordinarily susceptible to the drastic remedy of summary judgment." The court then presents two exceptions that do not exist here– "where the hazard is open and obvious, or where there is no evidence that additional warnings would have added to the consumer's appreciation of the risk." Plaintiff here looked for warnings, and had there been warnings, he would have reacted in some manner to interrupt Mr. Foust and/or protect himself. Any labelling at all would have at the very least alerted him to the fact of a potential danger. Thus, the lack of warnings is causally connected to Plaintiff's injuries.

The record here also includes Plaintiff's expert's root cause analysis that sets forth at length multiple contributing factors that led to this incident. (Exh I) As Plaintiff's expert testified, the test tank, at the very least, should have been labelled the same as the agent tank. He explained that the failure to label was one of the contributing factors under a root cause analysis, but as it was not the root cause, it cannot be said that rectifying "it by itself is going to prevent the accident." (Exh J: 175/17-176/14). Moreover, Plaintiff's expert explains that as Plaintiff looked for "warnings,… instructions, anything" on the test tank when he saw that there was a problem filling it, the lack of warning labels deprived Plaintiff of information which would have been his final opportunity to avoid serious injury. (Exh I: p 29; Exh A)

Furthermore, as to Defendant's failure to provide information in the manual or training, the fact that Plaintiff and Mr. Foust had not read the manuals or received training does not refute causation as a matter of law, particularly as Defendant's failures created a complacency with the test tank, as Plaintiff's expert explains at length. (Exh I) Defendant falsely claims that no one at Oprandy's read Defendant's manuals, when Mr. Scott in fact testified only that neither Plaintiff nor Mr. Foust read the manuals as "there would be no reason." (Exh C: 29/20 -30/1). As the

manuals contained no information about the test tanks, which is the only thing Mr. Foust handled

with respect to Defendant's system, the manual's deficiency establishes why it was not read.

Had there been information about the test tank, there would have been a reason for Mr. Foust to

read it.  Additionally, whether warnings would have been heeded if provided in the manual, such

that the gravity of dangers would have been brought to their attention, is a triable issue of fact.

(See, *Orellana*, supra). Likewise, had there been information about the test tank in the manuals,

there could have been training about its use and the gravity of dangers, which presents a triable

issue of fact.

## IV   DEFENDANT FAILS TO MEET ITS BURDEN AS TO PLAINTIFF'S  BREACH OF WARRANTY AND MANUFACTURING DEFECT CLAIMS

In its Points IV and V, Defendant argues for dismissal of Plaintiff's breach of warranty

and manufacturing defect claims but fails to meet its burden on summary judgment as it fails to

present proof of its claims.  Furthermore, as to Plaintiff's manufacturing defect claim, while

Defendant claims that it is undisputed that there is no manufacturing defect and cites to its 56.1

Statement, Plaintiff's response is that it is disputed as Plaintiff has testified that the gauge on the

test tank did not move at the time at issue.  Thus, there is evidence in the record of a defect.

## CONCLUSION

Based on the above, it is respectfully requested that the Court deny Defendant's motion

for summary judgment in its entirety and grant Plaintiff such other relief as to this Court is just.

Dated; April 23, 2021                                  Respectfully submitted
      Newburgh, NY                                  FINKELSTEIN & PARTNERS:


By _____*ken Fromson*_____
     Kenneth Fromson